## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| **Zachair, Ltd.,** | ) | **Case No.:  20-10691-TJC** |
| | ) | |
| Debtor. | ) | **Chapter 11** |
| | ) | |

**DEBTOR'S MOTION PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364; 507 AND FED. R. BANKR. P. 2002, 4001 AND 9014; AND LOCAL BANKRUPTCY RULES 4001-4 AND 4001-5; (I) AUTHORIZING THE DEBTOR TO OBTAIN POSTPETITION FINANCING, (II) GRANTING LIENS AND SUPER-PRIORITY CLAIMS, (III) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED LENDER, (IV) MODIFYING THE AUTOMATIC STAY, AND (V) GRANTING RELATED RELIEF**

Zachair, Ltd. (the "Debtor"), the debtor and debtor in possession in the above captioned case, pursuant to sections 105, 361, 362, 363, 364, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 4001-5 of the Local Bankruptcy Rules of the United States Bankruptcy Court for the District of Maryland (the "Local Rules"), files this motion (the "Motion") requesting the entry of an order substantially in the form attached hereto as Exhibit A (the "Proposed Order") authorizing the Debtor, among other things, to obtain senior secured post-petition financing (the "DIP Facility") pursuant to the terms and conditions of that certain *Debtor-In-Possession Term Loan Credit Agreement* by and between the Debtor, as borrower, and Legalist DIP SPV II, LP (the "DIP Lender"), as lender, substantially in the form attached hereto as Exhibit B (the "DIP Agreement").  In support thereof, the Debtor states as follows.

## __Introduction__[1]

1.      As noted in nearly every pleading filed in this Court since the Petition Date, the success of this chapter 11 case depends on the sale of the Debtor's 423-acre Property.  The Debtor's appraiser has valued the Property between $19.3 million and $22.1 million.  But, in order to achieve this highest and best sale price, the Property must be properly marketed.  The Debtor accordingly retained the experienced property broker Fraser Forbes to lead the marketing and sale efforts, which quickly developed and began implementing a thorough marketing process for the Property.

2.      It is the considered view of Fraser Forbes (and the Debtor) that effective marketing of the Property requires the Debtor to immediately engage consultants to prepare reports to assist the Debtor in dealing with prospective purchasers.  Such reports include environmental and geotechnical reports, engineering analyses, environmental studies, preliminary design work, and preliminary zoning and entitlement analyses.  The Debtor lacks the cash to fund these necessary expenses.  The Debtor also has certain other critical expenses related to the Property and the bankruptcy case, including real property taxes, bond premiums, permitting fees, adequate protection payments to its senior lender, other extraordinary expenses, and professional fees and costs.  Although the Debtor's airport operations have been cash flow positive during this case, the airport operations do not generate sufficient cash flow to fund the foregoing expenses. The proposed DIP Facility is critical to preserving and maximizing the value of the Debtor's real estate assets, and to position the Debtor to file a plan that provides payment in full to creditors and a return to equity.

---

[1] All capitalized terms not defined in the Introduction shall have the meanings ascribed to them later in this Motion.  All capitalized terms not defined in this Motion shall have the meanings ascribed to the in the DIP Agreement.

3.      The proposed DIP Facility will enable the Debtor to pay all costs required for a successful marketing process and the Debtor's necessary operating expenses, will enable the Debtor to defray a portion of its professional fees, and will ensure that the Debtor has sufficient funds to pay any extraordinary post-petition expenses.  The DIP Facility represents the result of a thorough search process conducted by the Debtor, in consultation with its professionals, involving numerous potential lenders.  Upon completion of this process, the Debtor selected Legalist SPV II, LP ("DIP Lender"), an affiliate of Legalist, Inc. ("Legalist"), as its debtor-in-possession lender.  Legalist is well known as a litigation funder.  Legalist also has developed a niche market in providing DIP lending for smaller mid-market debtors.  The DIP lending market for loans of this size is relatively small.  Legalist has distinguished itself in its flexibility and responsiveness.  Importantly, Legalist is a true lender.  It is not in the business of "loan to own," and does not have any pre-petition relationship to the Debtor, the property, or the Debtor's creditors.  The Debtor believes that the terms of the DIP Facility represent the best terms reasonably available to the Debtor.  The DIP Facility also will not prejudice any existing secured creditors, as such lenders' interests are protected by an equity cushion of approximately <u>more than 360%</u> of the total amount of asserted secured claims (including the DIP Facility).

**<u>Summary of Material Terms and Disclosures Pursuant to<br>Bankruptcy Rule 4001(C)(1)(b) and Local Rule 4001-5</u>**

4.      In accordance with Bankruptcy Rule 4001(C)(1)(b) and Local Rule 4001-5, below is a summary of the terms of the Loan Agreement and Proposed Order.  All disclosures required by Local Rule 4001-5 are set forth in this summary.

| Item | Material Terms |
|---|---|
| **Borrower**<br>DIP Agreement at p. 1<br>Proposed Order at ¶ a | Zachair, Ltd. |

| | |
|---|---|
| **Lender**<br>DIP Agreement at p. 1<br>Proposed Order at ¶ a | Legalist DIP SPV II, LP ("DIP Lender") |
| **DIP Facility (LBR 4001-5(a)(3))**<br>DIP Agreement at p. 1<br>Proposed Order at ¶ a | Up to $1,500,000 ("DIP Commitment").  The DIP Motion does not seek authority for interim borrowing. |
| **Interest Rate (LBR 4001-5(a)(3))**<br>DIP Agreement at § 2.04(a), (c) | 12% per annum of the outstanding principal balance. |
| **Default Interest Rate (LBR 4001-5(a)(3))**<br>DIP Agreement at § 2.04(b) | 4.75% per annum (in addition to base interest) |
| **DIP Fees**<br>DIP Agreement at § 2.04(a)<br>DIP Agreement at § 2.05<br>DIP Agreement at § 2.07<br>Proposed Order at ¶ 4 | <ul><li>Undrawn portion of the DIP Commitment shall accrue an "Undrawn Line Fee" of 3.75% per year;</li><li>Commitment Fee of 2.75% of DIP Commitment payable without interest on Maturity Date;</li><li>Underwriting Fee of 1.75% of DIP Commitment payable without interest upon the Maturity Date;</li><li>Monitoring Fee of $2,187.50 per month until termination of the DIP Commitment; and</li><li>Makewhole Fee, if loan is prepaid prior to 180 days from entry of DIP Order, equal to difference between (a) 4.75% of the aggregate amount of principal borrowed by Debtor less (b) aggregate amount of prior payments of interest and Undrawn Line Fees.</li></ul> |
| **Maturity Date (LBR 4001-5(a)(3))**<br>DIP Agreement at § 1.01<br>Proposed Order at ¶ 8 | The earlier to occur of (x) the second anniversary of the date on which the DIP Order is entered and (y) the acceleration of the DIP Loans following an Event of Default. |
| **Use of Proceeds (LBR 4001-5(a)(3))**<br>DIP Agreement at § 2.02<br>Proposed Order at ¶ 6 | The proceeds of the DIP Loans shall be used by the Debtor solely to pay<ul><li>DIP Lender Expenses</li><li>all other DIP Obligations</li><li>amounts permitted under the DIP Budget</li><li>amounts that are subject to the Carveout</li><li>other amounts approved in advance in writing by the DIP Lender.</li></ul> |

| | |
|---|---|
| | In no event shall any portion of the DIP Loans (including without limitation the Carveout) be used for payment of fees, costs, or expenses incurred by any party in (x) investigating or pursuing any claim or cause of action against the DIP Lender, any Affiliate thereof, or any other Indemnified Person or (y) questioning or challenging, or taking any other action that could reasonably be expected otherwise to impair, any DIP Lien or DIP Claim (or the priority, validity, or enforceability thereof), any DIP Obligation, any DIP Loan Document, or any right or remedy of the DIP Lender. |
| **Budget (LBR 4001-5(a)(3))** <br> DIP Agreement at § 6.01(b) <br> Proposed Order at ¶ 7(i) | The initial DIP Budget is attached hereto as Exhibit C. Except for payments that are subject to the Carveout, in no event shall actual cash disbursements vary upward from the DIP Budget (on a category, monthly, or cumulative basis) by more than 10%; provided that the Debtor may carry forward any unused budgeted amount to subsequent periods; and further provided that the Debtor is permitted to use cash on hand as of the entry of the DIP Order, and proceeds of airport operations received after the entry of the DIP Order, for airport and general administrative expenses, without restriction under the DIP Agreement. |
| **Events of Default (LBR 4001-5(a)(3))** <br> DIP Agreement at § 9.01 <br> Proposed Order at ¶ 9 | Events of Default under the DIP Agreement include customary defaults as set forth in Section 9.01 of the DIP Agreement, including without limitation entry of an order, without the prior written consent of the DIP Lender: <br><br> a. Granting adequate protection to any party, except as set forth in the DIP Budget or the DIP Agreement; <br> b. Granting relief from the automatic stay to any party, other than the DIP Lender, with respect to any DIP Collateral; <br> c. Surcharging any DIP Collateral, or subjecting the DIP Lender or DIP Collateral to marshaling; <br> d. Approving credit or debt (other than the DIP Loans) secured by a Lien on any DIP Collateral (unless the proceeds are to be used to pay all DIP Obligations); <br> e. Approving any administrative-expense claim, expense, or cost against the Debtor (other than the DIP |

| | |
|---|---|
| | Claims and the Carveout) with priority of payment senior or equal to the DIP Claims; <br> f. Modifying, staying, vacating, or rescinding any part of any DIP Order; <br> g. Holding, adjudicating, or declaring any DIP Lien or DIP Claim (or the priority, validity, or enforceability thereof), any DIP Obligation, any DIP Loan Document, or any right or remedy of the DIP Lender to be invalid, unenforceable, or otherwise subject to question, challenge, or impairment; <br> h. Enjoining, restraining, or in any other way preventing a Debtor from conducting any material part its business; <br> i. Appointing an examiner or trustee in the Debtor's Case; <br> j. Confirming any chapter 11 plan that does not provide for repayment in full in cash on the effective date of such plan of all outstanding DIP Obligations; <br> k. Converting the Debtor's Case to chapter 7; or <br> l. Dismissing the Debtor's Case. <br> The DIP Agreement further provides that the filing of a motion by the Debtor, or the Debtor's failure to oppose a motion filed by another party, that seeks the relief described above shall be a default. |
| **DIP Liens (Rule 4001(c)(1)(B)(i); LBR 4001-5(a)(2)(G))** <br> DIP Agreement at § 10.03 <br> Proposed Order at ¶ e <br> Proposed Order at ¶ 6 | The DIP Lender shall receive: (i) under section 364(c)(2), automatically perfected, senior DIP Liens on all DIP Collateral not subject to Existing Liens; (ii) under section 364(c)(3), automatically perfected, junior DIP Liens on all DIP Collateral subject to Existing Liens; (iii) under section 364(d)(1), automatically perfected, equal DIP Liens on all DIP Collateral subject to Existing Liens, other than Permitted Senior Liens; and (iv) **under section 364(d)(1), automatically perfected, senior priming DIP Liens on all DIP Collateral subject to Existing Liens, other than Permitted Senior Liens**. |
| **Carveout (LBR 4001-5(a)(2)(F))** <br> DIP Agreement at § 1.01 <br> DIP Agreement at § 10.05 <br> Proposed Order at ¶ 13 | The DIP Claims and the DIP Liens, and any administrative or super-priority claim against the Debtor, shall be subject and subordinate to the Carveout. "Carveout" means the aggregate amount of (x) all accrued and unpaid post-petition professional fees of the Debtor's bankruptcy |

| | |
|---|---|
| | counsel, financial advisor, and appraiser; (y) United States Trustee fees; and (z) other administrative expenses, to the extent such administrative expenses have been incurred, but not paid, and are permitted in the DIP Budget; provided, however, that upon delivery of a Carveout Trigger Notice, the Carveout for expenses incurred thereafter shall be limited solely to the Triggered Carveout Cap of $50,000.00. The delivery of a Carveout Trigger Notice shall not limit or cap the amounts that have accrued prior to the delivery of the Carveout Trigger Notice.  The DIP Agreement does not provide for payment of professionals engaged by a creditors' committee because no creditors committee has been appointed, and to the best of Debtor's knowledge, no such appointment is contemplated. |
| **Perfection of Liens (Rule 4001(c)(1)(B)(vii))** DIP Agreement at § 10.02 Proposed Order at ¶ 6 | The DIP Liens granted to the DIP Lender in all DIP Collateral shall be automatically perfected without reference to any notice or recordation requirements of non-bankruptcy law. |
| **Adequate Protection (Rule 4001(c)(1)(B)(ii))** Motion at Exhibit C Proposed Order at ¶ 16 | Sandy Spring shall receive as adequate protection monthly payments of $11,935.33.  The Debtor's prepetition secured creditors further shall be adequately protected by the substantial equity cushion in the Property, which is approximately 360% % of the aggregate asserted secured claims (including of the DIP Commitment); ongoing payment of real estate taxes; insurance on property; continued lien on Property, junior only to lien of DIP Lender and property taxes |
| **Waiver of Automatic Stay (Rule 4001(c)(1)(B)(iv); LBR 4001-5(a)(2)(H))** DIP Agreement at § 9.02(a), (b) Proposed Order at ¶ f Proposed Order at ¶ 15 | Notwithstanding Bankruptcy Code section 362, while any Event of Default has occurred and is continuing, the DIP Lender may immediately, without further order of, or application to, the Bankruptcy Court: (i) Declare the DIP Commitment terminated; and (ii) Declare all DIP Obligations immediately due and payable, without the requirement of presentment, demand, protest, or any other notice, all of which are waived by the Debtor.  The DIP Lender must apply to the Bankruptcy Court for entry of an order terminating the automatic stay with respect to any DIP Collateral.  Debtor bears burden of establishing cause to deny lifting stay upon occurrence of Event of Default. |

| | |
|---|---|
| **Lender Consent to Plan and Requests to Obtain Credit (Rule 4001(c)(1)(B)(v))**<br>DIP Agreement at § 6.11<br>Proposed Order at ¶ 7(x) | All other submissions to the Bankruptcy Court relating to the DIP Loans, DIP Claims, DIP Liens, and DIP Collateral shall be in form and substance acceptable to, and must receive the prior consent of, the DIP Lender.  Except as set forth above, the Final DIP Order does not affect any person's rights with respect to filing of a plan. |
| **Case Milestones (Rule 4001(c)(1)(B)(vi))**<br>DIP Agreement at Schedule 1 | The DIP Agreement contains the following case milestones:<br>• Execution of definitive real estate purchase and sale agreement: October 29, 2021<br>• File plan and disclosure statement: November 30, 2021<br>• Entry of confirmation order: April 30, 2022<br>• Effective date of plan: Second anniversary of the DIP Order<br>Except as set forth above, the Final DIP Order does not affect the deadlines for filing a plan or disclosure statement, or obtaining approval or confirmation thereof |
| **Releases and Indemnification (Rule 4001(c)(1)(B)(viii), (ix))**<br>DIP Agreement at § 8.01 | The Debtor shall indemnify the DIP Lender and its Affiliates (expressly including Legalist, Inc.) and related parties from, all liabilities, obligations, losses, damages, penalties, claims, actions, causes of action, judgments, suits, costs, expenses, fees, and disbursements, of any kind or nature whatsoever, whether direct, indirect, special, exemplary, or consequential and whether based on federal, state, foreign, or international laws, statutes, rules, or regulations, that may be imposed on, incurred by, or asserted against such Indemnified Person, in any way arising from, in connection with, or relating to any DIP Loan Document, the transactions contemplated thereby, or any action taken or not taken in connection therewith; provided that such indemnity shall not be available to an Indemnified Person to the extent that any Indemnified Liability was a direct result, as determined by a court of competent jurisdiction, in a final and non-appealable order, of the gross negligence or willful misconduct of such Indemnified Person.  Except as provided above, there is no release or indemnification in the DIP Loan Documents. |
| **Determinations Regarding Prepetition Liens (Rule 4001(c)(1)(B)(iii))**<br>Proposed Order at ¶ B | The proposed order carries forward findings made in previously entered cash collateral orders. |
| **Cross-Collateralization (LBR 4001-5(a)(2)(A))** | The DIP Agreement does not grant cross-collateralization to prepetition secured creditors. |

| | |
|---|---|
| **Findings of Fact Regarding Prepetition Liens (LBR 4001-5(a)(2)(B))** | The DIP Agreement does not seek to bind the estate or parties in interest with respect to prepetition liens or waivers of claims. |
| **506(c) and Marshaling Waivers (Rule 4001(c)(1)(B)(x); LBR 4001-5(a)(2)(C))**<br>DIP Agreement at § 6.04<br>DIP Agreement at § 9.01(iii)(C)<br>Proposed Order at ¶ 14 | The DIP Lender shall not be surcharged with respect to the maintenance of the DIP Collateral, and rights of surcharge and marshaling are effectively waived by provisions of the DIP Agreement making such an order granting such relief an event of default. Waiver of surcharge and marshaling rights are justified by the fact that the DIP Loan is strictly post-petition, and by virtue of the broad Carveout provisions. |
| **Liens on Avoidance Actions (Rule 4001(c)(1)(B)(xi); LBR 4001-5(a)(2)(D))**<br>DIP Agreement at Schedule 4 | The DIP Lender <u>does not</u> have a lien on Avoidance Actions or the proceeds thereof. The DIP Agreement expressly excludes Avoidance Actions from the DIP Collateral. |
| **Roll Up of Prepetition Debt (LBR 4001-5(a)(2)(E))** | The DIP Lender is not a pre-petition creditors, and the DIP Agreement thus does not roll up any prepetition secured debt. |
| **Treatment of Committee Professionals (LBR 4001-5(a)(2)(F))** | No Official Committee of Unsecured Creditors has been appointed in the Debtor's case. Consequently, the DIP Agreement and Final DIP Order do not provide treatment for committee professionals. |
| **Insider Relationship (LBR 4001-5(a)(1)(A))** | There is no insider relationship between the Debtor and the DIP Lender. |
| **Nature or Source of Cash Collateral (LBR 4001-5(a)(1)(B))** | All funds collateralizing the DIP Loan are (a) borrowings from the DIP Lender; (b) cash on hand; and (c) Debtor's operating revenues. |
| **Cash flow projection (LBR 4001-5(a)(1)(C))** | Attached hereto as Exhibit C (subject to revision as may be approved by DIP Lender). |
| **Estimated amount owed to creditors claiming interest in cash collateral (LBR 4001-5(a)(1)(D)** | Sandy Spring Bank: $2,392,410.30 (as of January 1, 2020)<br>The following creditors assert liens in the Property:<br>Real property taxes: $27,884.74 (as of July 1, 2020) (*see* claims register, claim nos. 8, 9, 10, and 11)<br>PD Hyde Field LLC (disputed): $1,200,000 as of Petition Date (*see* proof of claim no. 18) |
| **Description of collateral (LBR 4001-5(a)(1)(E)**<br>DIP Agreement at § 1.01<br>Proposed Order at fn. 6 | All assets of the Debtor, other than Excluded Assets |

**Jurisdiction**

5.    This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue lies properly in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding pursuant to 28 U.S.C. § 157.

6.    The statutory and legal predicates for the relief requested herein are sections 105, 361, 362, 363, 364, and 507 of the Bankruptcy Code, Rules 2002, 4001, and 9014 of the Bankruptcy Rules, and Rules 4001-4 and 4001-5 of the Local Rules.

**Background**

**A.  The Debtor and the Chapter 11 Case**

7.    On January 17, 2020 (the "Petition Date"), the Debtor filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtor is continuing in possession of its property and the management of its business as a debtor-in-possession, pursuant to sections 1107 and 1108 of the Bankruptcy Code.

8.    The Debtor is a Maryland corporation which owns an assemblage of real property totaling 423.45 acres located in Prince George's County, Maryland (the "Property").  The Property historically has been operated as an airfield known as Hyde Field (the "Airfield").  The Airfield generates revenue for the Debtor through the rental of hangar and parking spaces for aircraft.

9.    In addition to the Airfield, portions of the Property not used in Airfield operations previously were mined for sand and gravel.  The cavities created by the sand and gravel mining were used for surcharge fill operations, whereby the Debtor contracted for the acceptance of clean fill dirt removed from other third-party sites in exchange for a fee (the "Surcharge Fill Operation").  Such fees generated the vast majority of the Debtor's operating revenues.  The

Debtor was advised by the Maryland Department of the Environment in early March 2020 that the Surcharge Fill Operation must cease. The Debtor stopped accepting additional surcharge fill material, and worked with its professionals and its contractor (Metro Earthworks) to ensure compliance with MDE's directives and to stabilize the final surcharge grade in the area of fill operations.

10.    While the Airfield operations are cash flow positive, the amounts generated from the Airfield are not alone sufficient to pay all costs of maintaining the Property, including real estate taxes.

**B. The Debtor's Secured Indebtedness**

11.    On the Petition Date, the Debtor's secured debt obligations primarily consisted of $2,392,410.30 owed to Sandy Spring Bank ("Sandy Spring") pursuant to a certain *Deed of Trust Note* dated December 11, 2015 in the original principal amount of $2,300,000.00, as modified by certain *Modification and Extension Agreements* dated November 2, 2018, and April 3, 2019 (together, the "2015 Note"). *See* Claim No. 21. The 2015 Note is secured by the Property and various other property of the Debtor pursuant to a *Deed of Trust and Security Agreement* dated December 11, 2015. Also, Prince George's County, Maryland filed proofs of claim asserting claims for real property taxes totaling $27,884.74, which it states are secured by the Property. *See* Claim Nos. 8, 9, 10, and 11. Last, PD Hyde Field LLC ("PD Hyde") filed a proof of claim asserting a claim in the amount of $5,617,818.00, of which it asserts that $1,200,000.00 is secured by the Property. *See* Claim No. 18.[2] The Debtor disputes PD Hyde's claim, including any

---

[2] PD Hyde Field asserts in its proof of claim that the claim is secured to the extent of $1,200,000 pursuant to Section 365(j) of the Bankruptcy Code. Section 365(j) does not apply in this case. Section 365(j) applies when a debtor rejects an executory agreement for the sale of real property. The contract between the parties was not executory as of the Petition Date. It had been terminated because PD Hyde Field failed to close by the deadline under the purchase agreement. Thus, in addition to disputing that PD Hyde Field has any claim at all, the Debtor disputes that any portion of its claim is a secured claim.

secured claim.  The Debtor further is indebted to TD Auto Finance LLC in the amount of
$103,108.77 and Mercedes-Benz Financial Services USA LLC in the amount of $35,303.30,
which obligations each are secured by automobiles owned by the Debtor.[3]  *See* Claim Nos. 5 and
6.  The total secured claims filed in the Debtor's case total $3,758,707.11.

12.    In addition to the secured claims, the Debtor's scheduled and filed unsecured claims
total $4,933,295.64, for a total alleged prepetition debt of $ 8,692,002.75.

**C.  Use of Cash Collateral**

13.    On February 7, 2020, the Debtor filed its *Consent Motion for Interim Order*
*Authorizing the Debtor's Use of Cash Collateral* (the "Cash Collateral Motion") seeking authority
to use the cash collateral of Sandy Spring on a consensual basis.  *See* Docket No. 17.  As adequate
protection for the use of Sandy Spring's cash collateral, the Cash Collateral Motion sought
authority to pay to Sandy Spring monthly payments of $11,935.33 (the "Adequate Protection
Payments") and to provide Sandy Spring with a replacement lien in post-petition cash collateral to
the extent of any diminution in Sandy Spring's prepetition cash collateral.  On February 12, 2020,
the Court entered an order granting the Cash Collateral Motion on an interim basis.  *See* Docket
No. 24.

14.    The Debtor has continued to use cash collateral with the consent of Sandy Spring.
Sandy Spring consented to two subsequent orders extending the Debtor's authority to use cash
collateral on an interim basis, which were entered by the Court on May 19, 2020, and August 21,
2020, respectively.  *See* Docket Nos. 66 and 101.  The Debtor's current authority to use cash
collateral expires on October 16, 2020, unless further extended.

---

[3] TD Auto Finance LLC and Mercedes-Benz Financial Services USA LLC shall be referred to herein as the "Auto
Lenders".  Under the DIP Agreement, the collateral of the Auto Lenders is "Excluded Collateral."  Thus, this motion
does not affect the security interests of the Auto Lenders.

15.     Following the cessation of the Surcharge Fill Operation, the Debtor lacked sufficient cash flow to continue to make the Adequate Protection Payments to Sandy Spring.  The second and third interim cash collateral orders approved by Sandy Spring suspend the Debtor's obligation to make Adequate Protection Payments during the term of the orders.

**D.  The Sale Process for the Property and Need for DIP Financing**

16.     The Debtor's primary goal through this bankruptcy case is to sell the Property for its highest and best value in order to generate sufficient funds to satisfy the Debtor's obligations to its creditors, and to provide a return to equity.  The Debtor has made significant progress towards this goal.

17.     The Debtor engaged an appraiser, William C. Harvey ("Mr. Harvey") of William C. Harvey and Associates, to complete an appraisal of the Property to assist in the Debtor's sale efforts as well as for use in the bankruptcy case.  Mr. Harvey's appraisal states that the Property has a value between $19.3 million and $22.1 million.  The appraisal confirms that, based upon the claims filed and scheduled in the case, if marketed properly the Property will generate sufficient proceeds to pay all creditors in full, pay all taxes resulting from the sale, and provide for a substantial distribution to the Debtor's equity owners.

18.     The Debtor also held a highly competitive selection process to retain a broker for the Property.  It ultimately retained Fraser Forbes, which promptly initiated a carefully planned and thorough marketing process.  Fraser Forbes has sent initial marketing materials to thousands of potential parties in its marketing database in order to increase the exposure of the Property and to identify potentially interested purchasers.  Fraser Forbes also created a data room containing documents pertaining to the Property, and has been in regular contact with parties interested in accessing the data room in order to do initial diligence with respect to the Property.  The initial

response to the marketing process has been positive, as the Debtor has received indications of interest from many major developers in the Washington, D.C.-area.

19.     To realize the highest and best value for the Property requires the assistance of consultants to provide advice and information regarding zoning, entitlement, geotechnical and environmental and development issues.  The DIP Budget (defined below) reflects projections of the consultant expenses.  Based on discussions with Fraser Forbes, the Debtor believes that the amount budgeted for consultants is greater than the actual expenses to be incurred.  The Debtor certainly will endeavor to keep the consulting costs well within the DIP Budget.  However, the Debtor considers it import to have sufficient funds available for consultants to ensure the Debtor's ability to market the Property effectively.

20.     In addition to providing for the payment of consultants, the Debtor must pay expenses associated with owning and maintaining the Property.  Such expenses include real estate taxes, costs of maintaining sediment control and similar systems, payment of insurance premiums, payment of license and permitting fees, costs as may arise in connection with extraordinary repairs to the Airport facilities, or other similar expenses that may arise.  Although the Airport operates on positive cash flow basis, the Debtor's current and projected operating revenues are insufficient to fund all such expenses.

21.     The Debtor has operated in chapter 11 since January 17, 2020.  During such time, no payments have been made to the Debtor's bankruptcy counsel or financial advisor.  The DIP Facility also is available to fund partial payment of interim professional fees and costs as may be allowed.

22.     The Debtor accordingly requires additional funds in order to successfully complete the sale process for the Property and maximize the value for the benefit of creditors.  With the

assistance of its financial advisor, the Debtor has prepared a budget (the "DIP Budget") attached hereto as Exhibit C outlining its post-petition cash needs over the remainder of this bankruptcy case. The Debtor believes that its budget and projections are an accurate reflection of its funding requirements and will allow it to pay its necessary expenses, including resuming Adequate Protection Payments to Sandy Spring, and to hire the experts and consultants which are critical to the sale process.

**E.  Alternate Sources of Financing Are Not Readily Available**

22.    The Debtor undertook an extensive and competitive search to identify potential sources of DIP financing. The Debtor first solicited Sandy Spring, which stated that it was not interested in providing additional funding to the Debtor. It also contacted one other conventional bank as well as five lenders specializing in debtor-in-possession financing to gauge such parties' interest in providing the required funding as well to determine the loan terms the parties were willing to provide.

23.    At the conclusion of its search, the Debtor identified the DIP Lender as the lender willing to provide the necessary financing on terms which, as a whole, represent the best deal for the Debtor. Following additional, arm's-length negotiations with the DIP Lender regarding the terms of the DIP Agreement, the Debtor believes that the DIP Facility will provide financing necessary for the Debtor to pay its essential operating expenses during this case and fund the required costs of the sale process for the Property on terms which are fair, reasonable, and in the best interests of the Debtor and its creditors.

24.    The Debtor further believes that the terms of the DIP Facility are equal to or better than those general obtained by similar debtors. The Debtor has reviewed the terms of similar financing provided to other debtors, including by the DIP Lender. The terms of the DIP Facility

compare favorably, and in some respects are more favorable, than available comparisons reviewed by the Debtor. *See, e.g.,* Motion for Entry of an Order Authorizing the Debtor to Obtain Post-Petition Financing, *Klausner Lumber Two LLC*, Case No. 20-11518 (KBO) (Bankr. D. Del.), Docket No. 130 (motion filed August 13, 2020).

**Relief Requested**

25.     By this Motion, the Debtor seeks entry of an order authorizing it to obtain debtor-in-possession financing in the maximum amount of $1,500,000.00 on the terms set forth in the DIP Agreement.  For the reasons set forth below, the Debtor's request to obtain such financing satisfies all applicable provisions of the Bankruptcy Code, is necessary and appropriate, and is a sound exercise of the Debtor's business judgment.

## I.   The Debtor Is Authorized to Obtain Additional Post-petition Credit Under Sections 364(c) and 364(d)(1) of the Bankruptcy Code.

### a.   The Debtor May Obtain Secured and Superpriority Financing Under Section 364(c).

25.     Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances. Specifically, section 364(c) of the Bankruptcy Code provides that:

> If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt:
>
> > (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
> >
> > (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or
> >
> > (3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

26.    To satisfy the requirements of section 364(c) of the Bankruptcy Code, a debtor

need only demonstrate "by a good faith effort that credit was not available" to the debtor on an

unsecured or administrative expense basis.  *Bray v. Shenandoah Fed. Savs. & Loan Ass'n (In re*

*Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986).  "The statute imposes no duty to seek credit

from every possible lender before concluding that such credit is unavailable."  *Id.*; *see also Pearl-*

*Phil GMT (Far East) Ltd. v. Caldor Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001) (superpriority

administrative expenses authorized where debtor could not obtain credit as an administrative

expense).  When few lenders are likely to be able and willing to extend the necessary credit to a

debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an

exhaustive search for financing."  *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga.

1988), *aff'd sub nom.*, *Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n. 4 (N.D. Ga.

1989); *see also In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (approving

financing facility and holding that the debtor made reasonable efforts to satisfy the standards of

section 364(c) where it approached four lending institutions, was rejected by two, and selected the

most favorable of the two offers it received).

27.    The Debtor's competitive financing process involving several potential lending

sources did not identify any lender willing to provide financing on an unsecured basis.  After

reviewing all of its options, the Debtor believes that the DIP Facility is the best available

financing option and provides the most advantageous terms possible under the circumstances.

The Debtor has satisfied the "good faith" standard required to obtain financing under section

364(c).  *See In re Snowshoe Co.*, 789 F.2d at 1088.  This Court should, therefore, authorize the

Debtor to provide to the DIP Lender (i) a superpriority administrative expense claim for any

obligations arising under the DIP Facility as provided in section 364(c)(1) of the Bankruptcy

Code, (ii) a senior lien pursuant to section 364(c)(2) on all assets of the Debtor not otherwise subject to Existing Liens (as defined in the DIP Agreement), and (iii) a junior lien pursuant to section 364(c)(3) on assets subject to Existing Liens.

      **b.  The Debtor May Obtain Financing Secured by Senior Liens on the Existing Collateral Under Section 364(d)(1).**

28.     In addition to authorizing financing under section 364(c) of the Bankruptcy Code, courts also may authorize a debtor to obtain post-petition credit secured by a lien that is senior or equal in priority to existing liens on the encumbered property without the consent of the existing lien under section 364(d)(1).  Specifically, section 364(d)(1) of the Bankruptcy Code provides:

> The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if:
>
> > (A) the trustee is unable to obtain such credit otherwise; and
> >
> > (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(1).  Thus, in order to obtain debtor-in-possession financing with priming liens, a debtor-in-possession must show two elements: (1) that the debtor is unable to obtain such credit otherwise; and (2) that the secured creditor that is being primed is receiving adequate protection. *See id.*; *In re Health Diagnostic Lab., Inc.*, 2015 Bankr. LEXIS 4471, at *23 (Bankr. E.D. Va. Aug. 17, 2015).

29.     Courts advocate using a "holistic approach" to evaluate post-petition financing agreements that focuses on the transaction as a whole, not just on the priming of liens.  As one court noted:

> [o]btaining credit should be permitted not only because it is not available elsewhere, which could suggest the unsoundness of the basis for use of the funds generated by credit, but also because the credit acquired is of significant benefit to the debtor's

18

estate and that the terms of the proposed loan are within the bounds of reason, irrespective of the inability of the debtor to obtain comparable credit elsewhere.

*In re Aqua Assocs.*, 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991).

30.    Courts consider a number of factors when considering requests to obtain credit under section 364(d), including, without limitation:

- Whether the party subject to a priming lien has consented to such treatment;

- Whether alternative financing is available on any other basis (i.e., whether any better offers, bids or timely proposals are before the court);

- Whether the proposed financing is necessary to preserve estate assets and is necessary, essential, and appropriate for continued operation of the debtor's business;

- Whether the terms of the proposed financing are reasonable and adequate given the circumstances of both the debtor's and proposed lender(s); and

- Whether the proposed financing agreement was negotiated in good faith and at arms' length and entry therein is an exercise of sound and reasonable business judgment and in the best interest of the debtor's estate and its creditors.

*See, e.g., Ames Dep't Stores*, 115 B.R. at 37–39; *Bland v. Farmworker Creditors*, 308 B.R. 109, 113-14 (S.D. Ga. 2003); *In re Farmland Indus., Inc., 294 B.R. 855 (Bankr. W.D. Mo. 2003)*, *In re Lyondell Chem. Co.*, Case No. 09-10023 (Bankr. S.D.N.Y. March 5, 2009); *In re Barbara K. Enters., Inc.*, 2008 WL 2439649, at *10 (Bankr. S.D.N.Y. June 16, 2008).  The DIP Facility, which will be secured by liens senior in priority to the Existing Liens, satisfies each of these factors.

31.    First, although neither Sandy Spring nor the other allegedly secured creditors have consented to the granting of senior liens with respect to their respective collateral, as described in Section II of this Motion the interests of these parties are adequately protected by, among other things, the substantial equity in the Property.[4]  After adding the DIP Facility to the Debtor's total

---

[4] Further, the Debtor disputes the claim of PD Hyde, including the secured portion asserted in PD Hyde's proof of claim.

secured debt, the equity cushion protecting the secured creditors' asserted interests is approximately 360% of the secured debt being primed. Additionally, the automobiles securing the Debtor's obligations to the Auto Lenders are Excluded Collateral under the DIP Agreement. The DIP Facility thus does not prime the liens of the Auto Lenders.

32.     Second, as described in Section I.a of this Motion, the Debtor and its advisors pursued numerous possible financing sources, and ultimately determined that the DIP Facility represented the best option for obtaining the postpetition financing required by the Debtor. No lender was willing to loan funds to the Debtor on an unsecured or junior lien basis. The DIP Agreement reflects the most favorable terms on which the DIP Lender is willing to offer DIP financing following lengthy, arm's length negotiations. No party, including the DIP Lender, is willing to lend the required financing without obtaining first-priority liens in the Debtor's assets.

33.     Third, the Debtor requires the proceeds of the DIP Facility to fund its essential expenses during this bankruptcy case and to fund the cost of the experts and consultants critical to the success of the sale process for the Debtor's Property. Without access to the DIP Facility, the Debtor will not be able to provide the reports, studies, and other information required by prospective buyers in order to maximize the value of the Property. The failure to provide this necessary information as part of the sale process would increase the risk to prospective purchasers, thus chilling bidding and possibly impeding the Debtor's efforts to obtain the highest possible sale price. Providing the Debtor with the liquidity necessary to preserve the Property and run an effective, value-maximizing sale process is in the best interest of all stakeholders.

34.     Fourth, the DIP Facility will provide access to $1.5 million in financing on terms which are reasonable under the circumstances of this case, which will allow the Debtor to pay its critical operating and administrative expenses and fund a thorough sale process. The Debtor's

competitive process which resulted in the selection of the DIP Lender ensured that the terms of the DIP Facility are market-rate and reasonable. The Debtor does not believe it can reasonably obtain better terms than those offered by the DIP Lender.

35.     Fifth, the Debtor selected the DIP Lender following a competitive selection process involving no less than seven potential lenders. The Debtor and the DIP Lender negotiated the DIP Agreement in good faith and at arms' length. The Debtor has no prior connection to the DIP Lender. None of the other potential lenders contacted by the Debtor were willing to make a loan on terms more favorable (and some were unwilling to make any loan, regardless of the terms). As the DIP Facility is necessary to maximize the value of the Property for the benefit of creditors and represents the best lending terms reasonably available to the Debtor, the entry into the DIP Agreement is a proper exercise of the Debtor's sound business judgment and is in the best interest of all parties-in-interest in this case.

## II.    Existing Secured Creditors Are Adequately Protected.

36.     Holders of Existing Liens are adequately protected and will not be impaired by the proposed DIP Facility. Adequate protection serves to protect a secured creditor's "interests against the diminution in value of [its] security during a bankruptcy proceeding." *In re Health Diagnostic Lab., Inc.*, 2015 Bankr. LEXIS 4471, at *25 (Bankr. E.D. Va. Aug. 17, 2015) (quoting *Contrarian Funds LLC v. Aretex LLC (In re WestPoint Stevens, Inc.)*, 600 F.3d 231, 257 (2d Cir. 2010)). *See also In re 495 Central Park Ave. Corp.*, 136 B.R. at 631 ("The goal of adequate protection is to safeguard the secured creditor from diminution in the value of its interest during the Chapter 11 reorganization."); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986); *In re Hubbard Power & Light*, 202 B.R. 680, 685 (Bankr. E.D.N.Y. 1996).

37.     "The Code states in section 361(3) that adequate protection may be provided by assuring a creditor of the 'indubitable equivalent' of its interest in the estate." *Bray v. Shenandoah Fed. Savings & Loan Ass'n (In re Snowshoe Co., Inc.)*, 789 F.2d 1085, 1088 (4th Cir. 1986).  Adequate protection may be provided in various forms, including payment of adequate protection fees, payment of interest, or granting of replacement liens or administrative claims.  A sufficient equity cushion also may provide adequate protection of a secured lender's interest.  *In re James River Assoc.*, 148 B.R. 790, 796 (E.D. Va. 1992); *see also In re Snowshoe Co., Inc.*, 789 F.2d at 1088 (allowed priming, superpriority claim where trustee had provided evidence of a 38 percent equity cushion and financial projections supporting ability to repay).

38.     Under the "equity cushion" theory, the creditor is adequately protected if a debtor has equity in a property sufficient to protect the creditor against the declining value of the collateral or an increase in the claim from accrual of interest or expenses.  *In re Health Diagnostic Lab., Inc.*, 2015 Bankr. LEXIS at *25; *In re James River Associates*, 148 B.R. at 796.  "The existence of an equity cushion standing alone can provide adequate protection." *Loudoun County v. Jones (In re Jones)*, 2013 Bankr. LEXIS 178, at *2 (Bankr. D. Md. Jan. 16, 2013) (Mannes, J.).

39.     The amount of equity cushion sufficient to adequately protect the creditor is determined on a case-by-case basis.  *Id.; In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("[t]he determination of adequate protection is a fact specific inquiry . . . left to the vagaries of each case"); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (the application of adequate protection is case specific, but "its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process" (citation omitted)).  But, case law has almost uniformly held that an equity cushion of 20% or more

22

constitutes adequate protection. *In re Health Diagnostic Lab., Inc.*, 2015 Bankr. LEXIS 2731, at *8-9 (Bankr. E.D. Va. Aug. 17, 2015) (citing *In re Franklin Equip. Co.*, 416 B.R. 483, 528 (Bankr. E.D. Va. 2009)). *See also In re Jones*, 2013 Bankr. LEXIS 178, at *2 (Bankr. D. Md. Jan. 16, 2013) (Mannes, J.) (noting that most courts hold that a 20% equity cushion suffices); *In re Rogers Development Corp.*, 2 B.R. 679 (Bankr. E.D. Va. 1980) (holding that an equity cushion of 15% to 20% constituted adequate protection for a creditor).

40.     Here, the Debtor's enormous equity in the Property provides all required adequate protection to holders of Existing Liens being primed by the DIP Facility.  The appraisal prepared by Mr. Harvey valued the Property at between $19.3 million and $22.1 million.  The scheduled and filed prepetition secured claims (including claims of Sandy Spring Bank, real estate taxes, and the disputed secured claim of PD Hyde Field) are less than $3,800,000.  Even after giving effect to the $1.5 million DIP Facility, and relying on the low end of Mr. Harvey's appraisal, the equity cushion is $14,000,000.  This amounts to approximately 360% of the aggregate amount of the Existing Liens.[5]  By any measure, the holders of the Existing Liens will enjoy adequate protection and are protected by an equity cushion of approximately 360%.  No further adequate protection is required under these circumstances. *Loudoun County v. Jones (In re Jones)*, 2013 Bankr. LEXIS at *2 (stating that "an equity cushion standing alone can provide adequate protection").

41.     Notwithstanding the fact that the 360% equity cushion provides all adequate protection to the secured creditors, the Debtor proposes to grant additional protection.  The DIP Budget proposes to pay $11,935.33 per month to Sandy Spring as Adequate Protection Payments.  Additionally, the DIP Budget provides for the payment of real estate taxes, which will satisfy the

_____

[5] The equity cushion for Sandy Spring Bank is much greater than 360%.  PD Hyde Field's claim is behind the Bank. Thus, the equity cushion for Sandy Spring is $15,200,000, approximately 6.3 times the amount of Sandy Spring's secured claim, that is, 630%.

existing post-petition claims of the State of Maryland and Prince George's County, and will

further protect Sandy Spring Bank, as well as satisfy the real property tax liens.  The majority of

the funds are to be used to pay for activities that facilitate the sale of the Property.  This too

ultimately inures to the benefit of the secured creditors by providing a source of payment of their

allowed claims.

42.    The total adequate protection package proposed by the Debtor appropriately

protects holders of secured claims against the diminution in the value of their interests, and, as

such, is fair and reasonable and satisfies the requirements of section 364 of the Bankruptcy Code.

### III. The Debtor Should Be Authorized to Use Prepetition Cash Collateral

43.    Section 363(c) of the Bankruptcy Code governs a debtor's use of a secured creditor's

cash collateral.  Specifically, section 363(c) provides, in pertinent part:

> The trustee may not use, sell, or lease cash collateral . . . unless—
>     (A) each entity that has an interest in such cash collateral consents; or
>     (B) the court, after notice and a hearing, authorizes such use, sale, or lease
>         in accordance with the provisions of this section.

11 U.S.C. § 363(c)(2).

44.    Therefore, the Debtor may not use the cash collateral of its prepetition secured

creditors ("Cash Collateral"), to the extent any such creditor has an interest in cash collateral,

without either their consent or authorization of this Court.  Section 363(e) further provides that on

request of an entity that has an interest in property to be used by a debtor, the Court "shall prohibit

or condition such use, sale, or lease as is necessary to provide adequate protection of such

interest."  11 U.S.C. § 363(e).

45.    Here, the Debtor requires use of Cash Collateral to pay the experts and consultants

which are critical to the sale process for the Property and to pay the Debtor's essential operating

expenses during the lengthy sale process, as well as the other uses identified in the DIP Budget.

24

As described in Section II of this Motion, the adequate protection to be provided to the Debtor's prepetition secured creditors is more than sufficient to approve the use of the Cash Collateral under section 363 of the Bankruptcy Code.  The equity cushion for all such creditors is approximately 360% of the total amount of asserted secured claims (including the DIP Facility). This equity cushion vastly exceeds the 20% equity cushion considered by most courts to provide sufficient adequate protection.  *See In re Health Diagnostic Lab., Inc.*, 2015 Bankr. LEXIS 2731, at *8-9 (Bankr. E.D. Va. Aug. 17, 2015).  The Debtor also proposes to resume Adequate Protection Payments of $11,935.33 to Sandy Spring.  The Debtor's prepetition secured creditors will receive all necessary and appropriate adequate protection under the DIP Facility and Proposed Order.

46.     Accordingly, the Debtor requests that the Court authorize the Debtor to use Cash Collateral in accordance with the terms set forth in the Proposed Order.

**IV.   The Senior DIP Lenders and the Senior DIP Agent Are Entitled to the Protections of Section 364(e) of the Bankruptcy Code.**

47.     Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.  Section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

48.     As described throughout this Motion, the DIP Facility is the result of the Debtor's reasonable and informed determination that the DIP Lender offers the most favorable terms on which to obtain needed post-petition financing, and is the product of extensive, arms' length, and good faith negotiations between the Debtor and the DIP Lenders.  The terms and conditions of the DIP Agreement are fair and reasonable, and the proceeds of the DIP Facility will only be used for purposes that are permissible under the Bankruptcy Code.  Further, the Debtor and DIP Lender have no prior connections or relationship, and no consideration is being provided to any party to the DIP Agreement other than as described herein or in the Agreement.  Accordingly, the Court should find that the DIP Lenders are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code, and are entitled to all of the protections afforded by that section.

**V.     Modification of the Automatic Stay is Warranted**

43.     The relief requested herein contemplates a modification of the automatic stay (to the extent applicable) to permit the Debtor to: (i) grant the security interests, liens, and superpriority claims described above with respect to the DIP Lender and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens; (ii) permit the DIP Lender to exercise, upon the occurrence and during the continuance of an Event of Default (as defined in the DIP Agreement) after the expiration of any applicable grace period, or the occurrence of Maturity Date, as applicable, (a) certain immediate remedies, as further detailed in the Proposed Order, with respect to the loans issued under the DIP Facility, and (b) certain other remedies under the DIP Agreement and/or the Proposed Order; and (iii) implement the terms of the Proposed Order.

44.     Stay modifications of this kind are ordinary and standard features of postpetition financing facilities and, in the Debtor's business judgment, are appropriate under the present

26

circumstances.  *See, e.g., In re The Great Atlantic & Pacific Tea Company, Inc.*, Case No. 15-23007 (RDD) (Bankr. S.D.N.Y. July 21, 2015) [Docket No. 88]; *In re Chassix Holdings, Inc.*, Case No. 15-10578 (MW) (Bankr. S.D.N.Y. Mar. 13, 2015) [Docket No. 67]; *In re The Great Atlantic & Pacific Tea Company, Inc.*, Case No. 10-24549 (RDD) (Bankr. S.D.N.Y. Jan. 13, 2010) [Docket No. 43].  The requested modification of the automatic stay should be approved.

### VI.  Waiver of Stay Under Bankruptcy Rules 4001(a)(3) and 6004(h)

45.    The Debtor also requests that the Court waive the stay imposed by Bankruptcy Rule 4001(a)(3) and, to the extent it applies, Bankruptcy Rule 6004(h).  *See* Fed. R. Bankr. P. 4001(a)(3), 6004(h).  As described above, the relief that the Debtor seeks in the Motion is necessary for the Debtor to pay its essential obligations during this chapter 11 case and to fund necessary costs of the sale process in order to maximize the value of the Property for benefit of all parties-in-interest.  Accordingly, the Debtor respectfully requests that the Court waive the 14-day stays imposed by Bankruptcy Rule 4001(a)(3) and 6004(h), as the nature of the relief sought herein justifies immediate relief.

### Reservation of Rights

46.    Nothing in this Motion should be construed as (a) an admission as to the validity, priority, or character of any claim or other asserted right or obligation, or a waiver or other limitation on the Debtor's ability to contest the same on any ground permitted by bankruptcy or applicable non-bankruptcy law; (b) a promise to pay any claim; or (c) granting third-party-beneficiary status or bestowing any additional rights on any third party.

### Notice

47.    Notice of this Motion has been given to the following parties or their counsel: (i) the Office of the United States Trustee; (ii) all creditors; (iii) all parties specifically requesting

notice in this case; and (iv) the DIP Lender.  The Debtor submits that, in light of the nature of the relief requested, no other or further notice need be given.

WHEREFORE, the Debtor respectfully requests that the Court enter a final order substantially in the form of the Proposed Order attached hereto: (i) granting the Motion, (ii) authorizing the Debtor to enter into the proposed DIP Agreement, and (iii) granting such other and further relief as the Court deems just and proper.

Dated: September 8, 2020                    WHITEFORD TAYLOR & PRESTON, LLP

                                           */s/  Bradford F. Englander*
                                           Bradford F. Englander, Esq., Bar No. 11951
                                           David W. Gaffey (admitted pro hac vice)
                                           3190 Fairview Park Drive, Suite 800
                                           Falls Church, Virginia 22042
                                           Telephone: (703) 280-9081
                                           Facsimile: (703) 280-3370
                                           Email:  benglander@wtplaw.com

                                           *Counsel for the Debtor*

## **CERTIFICATE OF SERVICE**

I hereby certify that on September 8, 2020, I reviewed the Court's CM/ECF system and it reports that an electronic copy of the foregoing Motion will be served electronically by the Court's CM/ECF system on the following parties:

- Bradford F. Englander    benglander@wtplaw.com, rodom@wtplaw.com
- Nancy D. Greene    ndg@ndglaw.com
- Bruce W. Henry    bwh@henrylaw.com, kmo@henrylaw.com;jtm@henrylaw.com;mbp@henrylaw.com
- Patrick J. Kearney    pkearney@sgrwlaw.com, jnam@sgrwlaw.com
- Nicole C. Kenworthy    bdept@mrrlaw.net
- Michael J. Klima    bankruptcy@peroutkalaw.com
- Michael J. Lichtenstein    mjl@shulmanrogers.com, tlockwood@shulmanrogers.com
- Jeffery Thomas Martin    jtm@henrylaw.com, mbp@henrylaw.com
- M. Evan Meyers    bdept@mrrlaw.net
- L. Jeanette Rice    Jeanette.Rice@usdoj.gov, USTPRegion04.GB.ECF@USDOJ.GOV
- Jeffrey L. Tarkenton    Jeffrey.tarkenton@wbd-us.com, karla.radtke@wbd-us.com,pascal.naples@wbd-us.com,morgan.patterson@wbd-us.com,matthew.ward@wbd-us.com
- US Trustee - Greenbelt    USTPRegion04.GB.ECF@USDOJ.GOV
- Jacob Christian Zweig    jzweig@evanspetree.com, crecord@evanspetree.com

I hereby further certify that on September 8, 2020, a copy of the foregoing *Motion* was also served on the parties listed on the attached service list in the manner indicated.

*/s/ Bradford F. Englander*
Counsel

29