IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
**Greenbelt Division**

| | |
|---|---|
| In Re: | : |
| | : |
| ZACHAIR, LTD., | : Case No. 20-10691-TJC |
| | : Chapter 11 |
| Debtor(s) | : |
| | : |

**MOTION FOR JUDICIAL VIEW**

COMES NOW, Sandy Spring Bank ("SSB"), by counsel, hereby moves the Court for an order authorizing a judicial view, stating as follows.

I. **GENERAL BACKGROUND**

1. The debtor Zachair, Ltd. ("Debtor" or "Zachair") is before this Court pursuant to a voluntary petition filed under Chapter 11 of the Bankruptcy Code on January 19, 2020 (the "Petition Date"). Zachair has continued in possession of its property and affairs since the Petition Date and is conducting its business as a Debtor in Possession.

2. The Debtor's principal asset is certain real property consisting of approximately 423.45 acres situated in Prince Georges County, Maryland (the "Property") as the same is identified or referenced at Schedule A/B 55.1 of the bankruptcy schedules filed by Zachair in this case.

3. SSB is a secured creditor herein, holding a claim in the approximate amount of $2.4 million secured by a first priority deed of trust recorded against the Property.

4. On September 8, 2020, the Debtor filed a motion seeking post-petition secured financing under section 364 of the Bankruptcy Code, seeking a priming lien in favor of the proposed DIP lender ("the DIP Motion ").

1

5. The DIP Motion seeks to prime SSB's first priority deed of trust with what is essentially a "hard money" loan providing for $1.5 million in funding, bearing true interest costs of between fifteen and twenty percent (15-20%) *per annum*, and providing for a repayment period of *up to two full years*. Essentially, the Debtor is seeking funding to carry out the proposed development, marketing and *possible* sale of the Property over a period of up to two years -- all without having filed a Plan or a Disclosure Statement.

6. The DIP Motion's proposal to obtain approval of the request to prime SSB's lien relies, in principal part, upon an Appraisal obtained by the Debtor which provides a purported valuation of the Property at over twenty million dollars ($20,000.000.00) (the "Appraisal"). However, the Appraisal relies upon a number of assumptions, many of which were labeled "extraordinary assumptions." Under the Uniform Standards of Appraisal Practice ("USPAP"), an extraordinary assumption is one directly related to a specific assignment, as of the effective date of the Appraisal results, which, if found to be false, could alter the appraiser's opinions or conclusions. In other words, it allows the appraiser to assume that certain *unknown* information is fact, and rely upon it to prepare the Appraisal report.

7. Germane to the instant motion are the following. The Appraisal makes the "extraordinary assumption" that there are no existing geo-technical or soils related problems that would affect the value or development potential of the Property. This is of material significance because the majority of the Property was subject to surface mining for many years, and over the past several years the Debtor has been conducting surcharge fill operations ("Surcharge Operations") under which fill from third party sites has been received and dumped onto the mined portions of the Property. To be clear, the Property has been used as a *landfill* for many years, not as commonly thought accepting municipal solid waste, but rather accepting under its

2

permits clean compactible fill, and not construction rubble or municipal solid waste. As was discussed in detail in the SSB opposition to the DIP Motion (the "SSB Opposition"), the Property has been subjected to substantial overfill relating to the dumping and Surcharge Operations, which have resulted in a veritable "mountain range" of dirt and debris on the Property, and is alarmingly out of compliance with requirements of its governmental mining and surcharge permits, all of which materially and directly affect the risks and costs of potential development of the Property. Additionally, the Appraisal also makes the assumption that there are no environmental issues affecting the Property. Yet, the last Phase I and Phase II reports available from the Debtor appear to be from 2006 to 2008, long before the full impact of the surface mining and subsequent Surcharge Operations. So the environmental status of the Property after the many years of dumping is simply unknown. SSB will not set out the general facts surrounding the Surcharge Operations information contained in the Opposition here, rather they are incorporated by reference. But, in short, the Appraisal's treatment of the substantial overfill from the Surcharge Operations, and its treatment of the environmental conditions renders it wholly unreliable. But to be clear, and to be fair to the appraiser, this is not the fault of the appraiser. He had to make the assumptions he made *because the facts were unknown*. Without these assumptions he could not have completed his report.

8. This matter is coming on for hearing on an expedited schedule, with expedited discovery. Having done document discovery as substantial as the limited time and resources have permitted, and having taken now five depositions, it is clear that the Property is an unusually complex asset given the tortured history of the mining and Surcharge Operations, and the Debtor's breathtakingly continuous abject failure to abide its mining permits in terms of the

allowed amounts of fill under the Surcharge Operations, the type of material allowed and sedimentation control, and a total failure to monitor and report compaction,

9. The instant motion is principally aimed at illuminating the Court as to the *quantum* of the excess fill material from the Surcharge Operations operation. In short, the Debtor has accumulated a veritable mountain range of excess and possibly impermissible fill (consisting of who knows what) – which exists on property intended for *residential* development – that can only be truly comprehended when viewed in person. It is essential to a fair trial of this matter that the Court go to the Property and see this very perplexing situation in order to fully understand SSB's case, the testimony of its entitlement expert, Eliot Powell, and certain engineering drawings that will be tendered into evidence.

10. The excess fill issue is absolutely pivotal to this contested matter. It is important for the Court to know an alarming fact learned in the appraiser's deposition on Friday, October 24. It was learned that the Debtor's engineers provided only one of several different aerial surveys prepared by the engineers where aerial topographical data is overlayed on the Property to determine whether there is excess fill, and, showing whether such excess fill can be spread to other areas of the Property rather than "exported" offsite. The single aerial survey provided to the Debtor's appraiser created the appearance that the fill would roughly "balance", i.e. that it could be spread elsewhere on the Property, which is much less expensive than loading it onto trucks and exporting it elsewhere. So, the appraiser had only this *one* aerial survey to rely upon in making his "extraordinary assumption" that the fill would balance. However, this was but one of several such surveys. The various surveys had different assumptions. But the appraiser testified that the engineers refused to provide him any other drawings and "shut down" on him. This of course required the "extraordinary assumption" that the fill would balance on the Property, since

the single drawing was the only factual information provided to the appraiser, and he had to assume it was true to complete his report.  The assumptions underlying the one drawing provided to the appraiser are simply not correct, and in fact it is SSB's belief that he was in effect deceived by the engineers' refusal to provide all the relevant surveys and information. The engineering firm has represented the Debtor as well as creditor and long-time contract purchaser PD Hyde Field over the past years. It appeared from his testimony that the appraiser's impression was that the engineering firm felt it had a conflict that prohibited it from providing information that would be damaging to the Debtor.

11.     Undersigned counsel, despite decades at the bar, cannot recall filing a motion for view in a bankruptcy case, and recognizes that such motions are more commonly used in criminal cases, or, in the civil context, in eminent domain cases.  However, counsel believes such an extraordinary measure is warranted here. Testimony and photographic evidence are simply inadequate to demonstrate the very large scope of the problems that exist on the Property. As one Court noted, "If a picture is worth a thousand words, then the real thing is worth a thousand pictures". *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1266 (9th Circuit 2001) (approving view in trade dress case, but disapproving independent view by trial court without notice to parties).   It is also relevant to note that the Property is only about a half hour's drive from the courthouse, so can quickly and easily be conducted.

12.     In the course of doing research for this motion, counsel found an excellent student law review note, the title of which hits the nail in this case directly on the head. Keele, Layne S. (2005) *When Mohammed Goes to the Mountain: The Evidentiary Value of a View*, Indiana Law Journal, Vol. 80: Iss. 4, Article 4 (available at

https://www.repository.law.indiana.edu/cgi/viewcontent.cgi?article=1614&context=ilj )

("Mountain Note"). The Mountain Note begins: "If the hill will not come to Mahomet, Mahomet will go to the hill". Mountain Note p. 1091 (quoting Francis Bacon, *Essays, Civil and Moral*, in 3 Harvard Classics pt. 1 (Charles W. Elliott ed. 1910). Here, there are literally hills on the Property – towering hills -- that will not come to the Court; thus, the Court should go to the hills.

13. As detailed in the Mountain Note, there appears to be no issue and it appears uniform and undisputed that "the ability of the court to conduct a view is virtually universally acknowledged". Mountain Note at 1094 (footnote omitted). Rather, the principal legal issue surrounding views is what evidentiary status they should be given. Should a view be considered full evidentiary evidence, or should it be considered no evidence at all, but rather a benefit to provide the Court with context in which to understand the evidence that is, or will be introduced at trial? SSB believes that here the view will likely fall into the latter category, as there will be engineering documents, other exhibits, and expert testimony that will provide ample evidence of the over fill from the Surcharge Operations. SSB believes it is essential that the Court conduct a view so it can take such evidence in context of the sheer physical magnitude of the "mountain range" and that such view would be most helpfully conducted prior to the evidentiary portion of the trial. The Court can address and regulate the procedural matters in its sound discretion, such as who may attend, or speak, or whether documentary evidence or testimony should or should not be presented during the view. In light of the relief requested, and the unknown particularities of the procedural safeguards that may be required by the Court, no proposed order is being submitted herewith.

WHEREFORE, SSB prays that the Court enter an order scheduling a view by the Court, and setting forth the procedures and parameters for the conduct of the same, and that SSB have such other and further relief as this Court may deem just.

                            **SANDY SPRING BANK**
                                    **By Counsel**

/s/ Bruce W. Henry
Bruce W. Henry, #05873
Kevin M. O'Donnell
HENRY & O'DONNELL, P.C.
300 N. Washington Street
Suite 204
Alexandria, VA  22314
(703) 548-2100
(703) 548-2105 (fax)
bwh@henrylaw.com
Counsel to Sandy Spring Bank

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 26, 2020, I served a true and correct copy of the foregoing Motion by ECF notification to:

    Bradford F. Englander (benglander@wtplaw.com; rodom@wtplaw.com)
    Michael J. Lichtenstein (mjl@shulmanrogers.com)
    tlockwood@shulmanrogers.com)
    M. Evan Meyers (bdept@mrrlaw.net)
    L. Jeanette Rice (Jeanette.Rice@usdoj.gov,
    USTPRegion04.GB.ECF@USDOJ.GOV)
    Jeffrey L. Tarkenton (Jeffrey.tarkenton@wbd-us.com,
    karla.radtke@wbdus.com,pascal.naples@wbd-us.com,morgan.patterson@wbdus.com,matthew.ward@wbd-us.com)
    US Trustee - Greenbelt (USTPRegion04.GB.ECF@USDOJ.GOV)

                                      /s/ *Bruce W. Henry*
                                      Bruce W. Henry