IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
**Greenbelt Division**

| | | |
|---|---|---|
| In Re: | : | |
| | : | |
| ZACHAIR, LTD., | : | Case No.  20-10691-TJC |
| | : | Chapter   11 |
| Debtor(s) | : | |
| | : | |

**OPPOSITION OF SANDY SPRING BANK TO DEBTOR'S MOTION
AUTHORIZING POST-PETITION FINANCING WITH PRIMING
LIENS AND SUPER-PRIORITY CLAIMS AND FOR OTHER RELIEF**

COMES NOW, Sandy Spring Bank ("SSB"), by counsel, and files this opposition to the Debtor's motion filed herein seeking i) authorization for post-petition financing, ii) approval to provide senior secured liens and super-priority claims, iii) modifying the automatic stay, and iv) for other relief (the "DIP Motion") as was filed at Docket #170 in the records of the Court in this proceeding.

SSB objects to the DIP Motion for numerous reasons, including, but not limited to the following: i) SSB avers and represents that the Debtor has not adequately and properly solicited alternative financing options that do not involve the granting of a priming loan senior to SSB's first priority deed of trust, ii) SSB avers and represents that the Debtor 364 Motion and proposed priming lien fail to provide adequate protection to SSB of its senior secured lien in and against the Debtor's real property, iii)  the DIP Motion improperly seeks to achieve under the guise of a motion for DIP financing under 11 U.S.C. 364, the improper payment of professional fees and other administrative expenses from proceeds of secured property upon which SSB holds a pre-petition, senior secured lien, iv)  the DIP Motion additionally seeks to achieve through a projected two year loan, the development, marketing and proposed sale of the Debtor's principal asset in a manner that effects an improper and impermissible confirmation of a *sub-rosa* plan of

1

reorganization, v) the DIP Motion seeks to improperly, and in bad faith, shift the economic risks of a speculative real estate development project in Prince George's County, Maryland from the interests of the equity owners of the Debtor, onto the back of SSB. The Debtor is without funds due to the systematic withdrawal of all the mining and surcharge income from the Debtor by its shareholders, Dr. and Mrs. Asterbadi (the Shareholders) in the millions of dollars over many years. The Statement of Financial Affairs discloses that the Shareholders withdrew about $1.5 million out of the Debtor in the two years before the petition, leaving it essentially bereft of funds.  Further, as noted in more detail below, the property in questions was subjected to mining and surface fill operations ("Surcharge") that were conducted upon the property for over twenty-five (25) years, and upon which Surcharge overfill in the millions of cubic yards of fill material, environmental concerns and other development concerns and risks are readily apparent.

## I.  GENERAL BACKGROUND

1. The debtor Zachair, Ltd. ("Debtor" or "Zachair") is before this Court pursuant to a voluntary petition filed under Chapter 11 of the Bankruptcy Code on January 19, 2020 (the "Petition Date"). Zachair has continued in possession of its property and affairs since the Petition Date and is conducting its business as a Debtor in Possession.

2. The Debtor's principal asset is certain real property consisting of approximately 423.45 acres situated in Prince Georges County, Maryland (the "Property") as the same is identified or referenced at Schedule A/B 55.1 of the bankruptcy schedules filed by Zachair in this case. The Debtor has two Shareholders, Dr. and Mrs. Asterbadi, as tenants by the entireties. The Debtor has owned the Property since March, 1995, over 25 years.

3. SSB is a secured creditor herein, holding a claim in the approximate amount of $2.4 million secured by a first priority deed of trust recorded against the Property.

4. On September 8, 2020, the Debtor filed the DIP Motion with this Court seeking approval of certain proposed DIP financing under which the Debtor seeks, *inter alia*, to prime the first priority lien of SSB as to the Property. The DIP Motion alleges that the Debtor requires funds to i) pay its professionals and other administrative expenses, ii) pay operating associated with the Property while it continues to produce no surplus income, and iii) fund the apparent pre-development of the Property through the performance of certain studies of the Property in support of marketing. The proposed DIP lender, Legalist, has refused to cooperate in discovery, and is known for financing law firms in contingent fee litigation, not bankrupt debtors.

5. The DIP Motion seeks to prime SSB's first priority deed of trust with what is essentially a "hard money" loan providing for $1.5 million in funding, bearing true interest costs of between fifteen and twenty percent (15-20%), and providing for a repayment period of *up to two full years*. Essentially, the Debtor is seeking funding to carry out the proposed development, marketing and *possible* sale of the Property over a period of up to two years, all without having filed a Plan or a Disclosure Statement.

6. The DIP Motion's proposal to obtain approval of the request to prime SSB's lien relies, in principal part, upon an appraisal obtained by the Debtor which provides a purported valuation of the Property at over twenty million dollars ($20,000.000.00). However, the appraisal relies upon a number of assumptions, many of which were labeled "extraordinary assumptions." The appraisal assumptions raise significant questions and concerns and include the following:

    a. The appraisal makes the extraordinary assumption that the current COVID pandemic and related crisis and governmental response have no material affect upon the marketability or the market price of the Property.

    b. The appraisal also makes the assumption that there are no existing geo-technical or soils related problems that would affect the value or development potential of the Property. This is of material significance because the majority of the Property was subject to surface mining for many years, and over the past decade or more the Debtor has been conducting Surcharge fill operations under which fill from third party sites has been received and dumped onto the mined portions of the Property under a mining permit from the Maryland Department of the Environment and a special exception from Prince George's County. As will be discussed in more detail below, the Property has been subjected to substantial overfill relating to the dumping and Surcharge fill operations, the Debtor has abjectly failed to comply with the requirements of its mining permits and special exception, and no entitlements have been obtained beyond rezoning, all of which materially and directly affect the risks and costs of potential development.

    c. The appraisal also makes the assumption that there are no environmental issues affecting the Property. Yet, the last Phase I and Phase II reports available from the Debtor appear to be from 2006 to 2008, long before the full impact of the surface mining and subsequent Surcharge operations.

**A. The PD Hyde Field Contract and Debtor's Subsequent Mismanagement of the Property for Personal Gain of its Principals.**

7. The Debtor's DIP Motion would have the Court believe that the Property is so inherently valuable that SSB is adequately protected notwithstanding the fact that $1.5 million in hard money is proposed to be placed in front of SSB's senior secured lien. SSB represents that the Property is more akin to an onion, and that the Court must peel back layer upon layer of

conflicting and damaging evidence to truly understand the development and economic risks associated with the Property.

8.     The Property was originally placed under contract for sale by the Debtor in 2013, initially to an entity known as WV/B Palisades Development, LLC ("Palisades")(the contract and all amendments thereto referred to hereinafter as the "Contract"). In 2015, the Contract was assigned to and assumed by PD Hyde Field, LLC ("PD Hyde").

9.     At the time of the assumption of the Contract by PD Hyde, Surcharge operations were then being conducted upon the Property and the substantial funds generated from the fill operations have been admitted by Dr. Asterbadi to have been completely withdrawn from the Debtor by the Shareholders. Upon information and belief, the Surcharge operations were providing between half and three quarters of a million dollars per year in cash income paid by entities for the ability to discharge their fill on the Property. Dr. Asterbadi has admitted that essentially all of this money, was withdrawn by or used for the benefit of the Shareholders since his retirement from medical practice about a decade ago.

10.    The Surcharge operations were required to be conducted pursuant to surcharge plans approved by the Maryland Department of the Environment ("MDE") as part of Debtor's mining permit. It appears that as early as 2010 the Debtor was out of compliance with its permits by exceeding the amounts of fill permitted in parts of the Property. Document production shows that the Debtor was habitually in default of his mining permit by, for example, failing to maintain adequate sedimentation control, failing to file *any* required compaction reports and exceeding the allowed elevations for the placing of the fill material. Subsequently, in late 2014 and early 2015, studies performed on a section of the Property definitively revealed that amounts of fill had been dumped in excess of the amounts permitted in the MDE approved plans, and also determined that

the presence of potential construction debris and other materials raised a significant prospect of unsuitable fill. In November of 2015, the Debtor entered into a letter agreement with PD Hyde agreeing to be solely responsible for the first two million dollars ($2,000,000.00) in costs associated with remediation of the excess or unsuitable fills, and agreed to make payment of eighty percent (80%) of costs above $2.0 million. The letter agreement was signed by Nabil Asterbadi and expressed reservation about obligating Zachair for the entirety of all costs over $2.0 million, in part, because of the uncertainties of determining what total costs might be.

11. Notwithstanding the existence in 2015 of excess and unsuitable fills, the Debtor continued full steam ahead with its Surcharge operations. Upon information and belief, the Property has been subjected to massive amounts of overfill, and undetermined amounts and depths of unsuitable fill. In a 2018 Notice of Default sent by PD Hyde to the Debtor with respect to the Contract, PD Hyde attached a soils analysis report which was prepared using then current grading and topography data from Dewberry Consultants. PD Hyde estimated that at that time approximately 3.8 million cubic yards of excess fill existed which required removal or relocation.

12. Upon information and belief, nothing has been done to date by the Debtor to correct the overfill or unsuitable fill conditions. In mid-2019, MDE instructed the Debtor to cease all fill operations and to promptly provide a plan for removal of the Surcharge. There is no indication that *any* plan for removal has been prepared or submitted to MDE, *any* of this work has been done, nor does *anyone*, including the Debtor and its appraiser, know the extent or cost of required removal or remediation.

13. The Debtor's designee, Dr. Asterbadi, has testified in this case that in 2019, the project engineers, Dewberry Consultants, prepared at the request of the Debtor, topographic

maps and analyses of the actual topo of the site versus both the permitted topo under the MDE Surcharge plan, and, alternatively, the comprehensive design plan ("CDP") initially proposed to Prince George's County by PD Hyde as part of its initial pursuit of entitlements. It is believed that these reports and maps will confirm that the Property is subject to removal from the Property of at least well over a million cubic yards of excess fill. The reports have not yet been made available and are the subject of a continuing demand for production by SSB.

14. As noted hereinabove, the Debtor's $20 million appraisal of the Property is premised, in part, upon an extraordinary assumption that there are no geo-technical or soils related issues, nor any environmental issues, which might require remediation and affect the costs, timing and likelihood of a successful development. There appears to be evidence from the Debtor's own engineers that would substantially contradict this assumption.

15. It is readily apparent that the reason for continuation of the Surcharge operations to the detriment of the Property, and in violation of the permits, is that the cash flow derived from the fill operations provided the Shareholders with their only source of income. In the Debtor's amended schedules filed in this proceeding (Dkt. #29), the Debtor has provided schedules attached to Statement of Financial Affairs ("SOFA") questions #4 and #13, detailing payments made by the Debtor to or for the benefit of the Shareholders. The attachment to SOFA #4 indicates that payments in the amount of $802,813.32 were made from the Debtor's funds in 2019 to the Shareholders. Attachment to SOFA #13 indicates that 2018 payments made to or for the benefit of the Shareholders totaled $743,411.98. The Shareholders live in a multi-million dollar home on Chain Bridge Road, NW, in the exclusive Kent neighborhood of Washington, D.C. and also have a multi-million dollar oceanfront beach house in Stone Harbor (Cape May),

New Jersey. The Debtor has two company cars, both Mercedes, an SUV and a 12-cylinder convertible, which cost the Debtor about $300,000 and are driven by Dr. Asterbadi.

16. In short, the Debtor and its Shareholders appear to have substantially impaired the Property with respect to the improper Surcharge operations and have stripped the Debtor of literally all cash flow generated from these activities, apparently in order to support the lifestyle of the Shareholders. When it became apparent that MDE would no longer permit the Surcharge operation, and therefore cut off the income being siphoned by the Shareholders, this proceeding was commenced.

II. **ARGUMENT**

   A. **The Debtor cannot establish that no other sources of financing less onerous to SSB are available.**

17. SSB made its loan to the Debtor in 2015, secured both by a first priority deed of trust recorded against the Property, *and* an assignment of the sales contract with PD Hyde and any proceeds generated therefrom. In connection with the underwriting of the loan, and as is reasonably consistent in closely held businesses, SSB evaluated the financial wherewithal of the Debtor's principal Nabil Asterbadi and required his personal guaranty of the SSB loan.

18. As discussed above, the Shareholders currently own a personal residence on Chain Bridge Road, N.W. in Washington DC, and an ocean front home in Stone Harbor, New Jersey.

19. Based upon publicly available information pertaining to the market value of such properties and apparent liens existing against same, it appears that the Shareholders have several million dollars in equity in the properties. In other words, the Shareholders have substantial assets that could be pledged to secure a proposed DIP loan. It is simply unreasonable and totally inequitable to place the economic risks of ownership in this case upon the back of SSB where the

Debtor's Shareholders have both relieved the Debtor of all of its funds and also have the apparent financial ability to bear that burden themselves. The 364 Motion is entirely about shifting all of the economic risks of ownership to SSB.

20. Not only should the Shareholders bear the true economic risks of ownership in this case, but they also appear to owe the Debtor large amounts of money that should be first repaid from their personal assets before additional and onerous financing is forced upon the Debtor's creditors. Upon information and belief, the withdrawals made by the Shareholders from cash flow of the Debtor have been treated for accounting purposes as "loans" to shareholders. Dkt. 29, p. 4 (A/B 71). The transfers made in 2018 and 2019 alone equal $1.5 million. The Debtor's notes to its schedules filed back in February noted that these "loans to shareholders" were allegedly offset by contributions made to the Debtor by the Shareholders and that no a "reconciliation" of these balances was to be performed. Dkt. 29, pp. 4-5 (A/B 71). To date, no such reconciliation has even been *commenced* (now nine months into the case) much less prepared. SSB believes and represents that the Debtor's schedules should reflect a large receivable due from the Shareholders. This asset category on the schedules is shown as value "unknown". The Debtor's 2019 income tax return balance sheet shows loan to shareholders of $831,809. While SSB believes this amount to be significantly understated, the true amount is subject to the "reconciliation" to be performed someday in the indeterminate future. Before SSB should be subjected to a threat of subordination of its lien interests, the Debtor's principals should first repay the Surcharge income "borrowed" from the Debtor over the past several years.

    **B. The DIP Motion does not provide for adequate protection of SSB's secured interests so as to permit the granting of a senior secured lien to the DIP lender.**

21. The appraisal of the Property proffered by the Debtor herein defines "fair market value" as being the price a willing buyer would offer, and a willing seller would accept, on the open market. Notwithstanding the majestic values forecasted for the Property under the appraisal (which uses assumptions applicable to entitled properties, which the Property is not), in the end, the true measure of value is reflective of the offers to purchase made in the open market. Normally, these bits of indicia would not be available for inspection. However, because the Debtor has been actively marketing the Property during the pendency of this case, there are numerous offers and statements of intent or interest that provide a picture of the true value of the Property.

[Redacted]

23. The Debtor contends that the DIP Loan is needed, in part, to perform soils and environmental testing to confirm to potential purchasers that the Property is, in fact, capable of development without material impediment. Yet, because of the inherent risk associated with the known condition of the Property in the *absence* of these studies, valuation must be determined in "as is" condition because of the danger that any adverse testing results could force an abandonment of development efforts. PD Hyde's site development expert in the pre-petition state court litigation, Mr. May, on whose report the Debtor's appraiser wholly relied for his estimate of development costs, opined that the original project as conceived could not be feasibly

developed due to the costs associated with the excess Surcharge. He looked at different scenarios, only one of which, which laid the development out around the mountains of excess Surcharge was conceivably financially feasible.

24. ███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████. This valuation does not provide adequate protection of SSB's secured interests in the Property. It is noteworthy that the proposed DIP lender, in the face of the Debtor's appraisal, still apparently *required a priming lien*. This is not a confidence builder in the appraisal's valuation.

  C. **The DIP Motion seeks to impermissibly pay professional fees and administrative expenses from secured collateral *prior to* the payment of SSB's senior secured lien.**

25. In the first instance, it is important to note just how punitive the terms of the proposed DIP loan are. Notwithstanding that the Debtor claims that the Property is worth $20 million dollars and is more than sufficient to secure *all* proposed liens, the DIP lender has demanded both a first priority lien position, *and* repayment terms and conditions consistent with the most onerous of hard money loans.

26. While the proposed DIP loan carries a face amount of interest to be charged at twelve percent (12%), the true costs of capital end up being somewhere between fifteen and twenty percent (15-20%) depending on the time of proposed repayment. The loan requires payment of lump sum commitment and underwriting fees equal to four and a half percent (4.5%), in addition to monthly "monitoring fees *and* an "Undrawn Line Fee" which actually charges interest on any component of the $1.5 million commitment that has *not yet* been drawn.

The terms and conditions, given the Debtor's own estimates of value of collateral, are unconscionable if the DIP lender is to be granted a priming lien.

27. More significantly, the DIP Motion references that proceeds of the proposed DIP loan may be used to make payment of a "Carveout" which is defined in the motion to include all professional fees and expenses of the Debtor's counsel and other retained professionals. Yet, nowhere in the DIP budget attached as an exhibit does the Debtor quantify the amount of fees and expenses expected to be paid from DIP loan proceeds. Creditors and parties in interest who have reviewed and relied upon the DIP budget to understand the proposed uses of loan proceeds have literally no idea how much in professional fees are intended to be paid from loan proceeds.

28. Upon information and belief, the Debtor's professionals will seek to utilize as much as three hundred seventy thousand dollars ($370,000.00) in DIP loan proceeds to make payment of their incurred fees and expenses. Based on discussions with counsel to the Debtor, SSB has been advised that professional fees exceeding that amount already have been incurred by the Debtor's professionals to date

29. Effectively, the Debtor is utilizing the DIP motion to permit administrative expenses to be surcharged to SSB's collateral and to be paid from that collateral prior to the payment of SSB's senior secured lien.[1] The Bankruptcy Code does not permit such an inversion of statutory priorities. Not only does the DIP Motion result in paying as much as $370,000.00 in professional fees from SSB's secured collateral, but it then subjects SSB to between 15 to 20% in real interest costs to *finance* the payment of administrative expenses from SSB's collateral.

---

[1] The Bankruptcy Code specifically and expressly limits the circumstances under which a trustee or debtor in possession may surcharge the interests of a secured creditor in collateral. See, 11 U.S.C. 506(c).

**D. The DIP Motion seeks to impermissibly approve financing and transactions that are the equivalent of a *sub-rosa* plan of reorganization.**

30. Courts have generally held that a Debtor may not achieve through a Sec. 364 loan, the equivalent of a plan of reorganization. See, *e.g.,* In re Seth Co., Inc., 281 B.R. 150 (Bankr. D Conn. 2002) (stating that the court "[c]annot, under the guise of section 364, approve financing arrangements that amount to a plan of reorganization but evade confirmation requirements.").

31. The Debtor's proposed terms of the DIP loan provide for money to be borrowed for a period of twenty-four months, during which the Debtor proposes to facilitate certain "development" activities provided for in the DIP budget, and to eventually sell the Property and make payment of claims and interests. The financing proposal purportedly deals with the alleged development and sale of the entirety of the Debtor's sole asset: the Property. Sale of the Property is the only projected source from which payment of creditors is expected to be provided unless the Debtor pursues avoidance claims or its loan to its Shareholders. The process of priming SSB's senior lien in order obtain funding to facilitate the sale of the Debtor's sole asset operates as the equivalent of a plan of reorganization, but without the attendant safeguards and protections available to creditors and parties in interest.

32. In the case of In re Latam Airlines Grp. S.A., 2020 WL 5506407, at *56 (Bankr. S.D.N.Y. Sept. 10, 2020), the Bankruptcy Court for the Southern District of New York observed that "[c]ourts will reject proposed DIP loans as improper sub rosa plans where the terms of the loan include concessions to creditors or parties in interest that are unauthorized under, or in conflict with, provisions under the Bankruptcy Code." Not only does the provisions of the proposed DIP loan propose to improperly surcharge SSB's secured collateral for the payment of professional fees, but approval of the DIP loan permits the Debtor to confirm loan terms that would be subject to greater scrutiny in a Chapter 11 confirmation process.

33. Under Sec. 1129(a) of the Code, the Debtor would be required to show that confirmation of a plan would not be likely to be followed by a liquidation or further reorganization of the Debtor. 11 U.S.C. 1129(a)(11). Given the significant development issues facing the Debtor, this would require a material evidentiary burden. Similarly, approval of the DIP Motion permits the Debtor to avoid an examination and evaluation of compliance with the provisions of Sec. 1129(b)(2) of the Code, including the requirement that the Debtor provide SSB with the "indubitable equivalent" of its secured interests. Moreover, the plan must be 'fair and equitable". Given the conduct of the Shareholders, it is hard to imagine how this test could be met.

34. The DIP Motion provides for funding of a proposed twenty-four month budget and an eventual sale of the Property to pay claims and interests. It is an exit strategy, the equivalent of a plan of confirmation, and should not be allowed under the guise of a Sec. 364 motion.

    **E. DIP loan terms are unconscionable on their face.**

35. The DIP Motion proposes to borrow $1.5 million dollars and to secure this amount by a lien recorded against the Debtor's property which is granted priority over SSB's senior secured lien. While the ostensible and primary purpose of the proposed loan is represented to be the costs of the Debtor's "development" work necessary to support a planned sale, it is literally shocking to see how little of the $1.5 million is proposed to be used for development activities.

36. Under the Debtor's DIP budget, only $230,500.00 in development costs will be spent from the $1.5 million dollar loan. The balance of funds will purportedly go to pay i) professional fees and administrative expenses, ii) interest, fees and charges of the DIP lender,

iii) general and administrative operating costs, to include real estate taxes, payments on a company car and insurance for the company car; and iv) "adequate protection" payments to SSB.[2]

37. It is simply unreasonable that SSB's pre-petition secured claim of $2.4 million should be subordinated to $1.5 million in hard money under these circumstances. This loan allocates a mere fifteen percent (15%) of its total proceeds to actual costs of real estate pre-development to support marketing the Property and rather is truly more about "feeding the beast" than it is anything else.

38. Finally, the Debtor's principal argument in advancing the DIP Motion is that SSB has nothing to worry about and is more than adequately protected given the alleged "equity cushion" based on the Debtor's appraisal of the Property. Were this true, the transaction should not require both a first priority lien against the Property, *and* costs of capital that bear all the hallmarks of a hard money loan. It is simply unreasonable and inequitable to subject SSB to a subordination of its lien interests under the circumstances of this case and as proposed in the DIP Motion.

39. SSB reserves the right to supplement or amplify this Objection.

WHEREFORE, SSB prays that the Court deny the Debtor's request for relief as made in the DIP Motion, and that SSB have such other and further relief as this Court may deem just.

S

---

[2] In what can only be described as adding insult to injury, the DIP Motion provides at par. 41 that the Debtor will provide "additional adequate protection" to SSB in the form of interim interest payments (at SSB's rate of interest at 6.25%) and payment of real estate taxes for the duration of the DIP loan. However, these "adequate protection" payments will be made from borrowed funds that have a true interest cost of between 15-20% and are placed *in front of* SSB's secured lien as to repayment. How this constitutes adequate protection is anyone's guess. "*With friends like these, ...*" Author unknown.

SANDY SPRING BANK
By Counsel

/s/ Bruce W. Henry
Bruce W. Henry, #05873
Kevin M. O'Donnell
HENRY & O'DONNELL, P.C.
300 N. Washington Street
Suite 204
Alexandria, VA  22314
(703) 548-2100
(703) 548-2105 (fax)
bwh@henrylaw.com
Counsel to Sandy Spring Bank

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 23, 2020, I served a true and correct copy of the foregoing Motion by ECF notification to:

>Bradford F. Englander (benglander@wtplaw.com; rodom@wtplaw.com)
>Michael J. Lichtenstein (mjl@shulmanrogers.com)
>tlockwood@shulmanrogers.com)
>M. Evan Meyers (bdept@mrrlaw.net)
>L. Jeanette Rice (Jeanette.Rice@usdoj.gov,
>USTPRegion04.GB.ECF@USDOJ.GOV)
>Jeffrey L. Tarkenton (Jeffrey.tarkenton@wbd-us.com,
>karla.radtke@wbdus.com,pascal.naples@wbd-us.com,morgan.patterson@wbdus.com,matthew.ward@wbd-us.com)
>US Trustee - Greenbelt (USTPRegion04.GB.ECF@USDOJ.GOV)

/s/ *Bruce W. Henry*
Bruce W. Henry