IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| In re: | ) |
| | ) |
| Zachair, Ltd., | )  Case No.:  20-10691-TJC |
| | ) |
| Debtor. | )  Chapter 11 |
| | ) |

**REPLY TO OBJECTIONS FILED BY SANDY SPRING
BANK AND PD HYDE FIELD LLC TO DEBTOR'S
MOTION AUTHORIZING POST-PETITION FINANCING**

Zachair, Ltd. (the "Debtor"), the debtor and debtor in possession in the above captioned case, files this reply (the "Reply") to the objections filed by Sandy Spring Bank ("Sandy Spring") [Docket No. 134] and PD Hyde Field LLC ("PD Hyde") [Docket No. 128] to the Debtor's *Motion Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364; 507 and Fed. R. Bankr. P. 2002, 4001 and 9014; and Local Bankruptcy Rules 4001-4 And 4001-5; (I) Authorizing the Debtor to Obtain Postpetition Financing, (II) Granting Liens and Super-Priority Claims, (III) Granting Adequate Protection to Prepetition Secured Lender, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* (the "DIP Motion").  In support of the DIP Motion, the Debtor states as follows:[1]

**REPLY**

I. **The DIP Facility should be approved because it satisfies the requirements of section 364(d) and is necessary to maximize the value of the Debtor's assets for the benefit of creditors.**

1.     The crux of Sandy Spring and PD Hyde's opposition to the DIP Motion is simple: They do not want to be primed by the DIP Facility and prefer to remain in their current priority lien positions.  But the preference of these creditors is not what controls.  Section 364(d)

---

[1] Terms not defined in this Reply shall have the meanings ascribed to them in the DIP Motion.

establishes clear standards under which debtors can obtain new post-petition financing on a senior secured basis.  Section 364(d)(1) states:

> The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if—
> (A) the trustee is unable to obtain such credit otherwise; and
> (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(1).  Additionally, as noted in the DIP Motion, courts also consider additional factors including:

   a. Whether the party subject to a priming lien has consented to such treatment;

   b. Whether alternative financing is available on any other basis (i.e., whether any better offers, bids or timely proposals are before the court);

   c. Whether the proposed financing is necessary to preserve estate assets and is necessary, essential, and appropriate for continued operation of the debtor's business;

   d. Whether the terms of the proposed financing are reasonable and adequate given the circumstances of both the debtors and proposed lender(s); and

   e. Whether the proposed financing agreement was negotiated in good faith and at arms' length and entry therein is an exercise of sound and reasonable business judgment and in the best interest of the debtor's estate and its creditors.

*See, e.g., In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990); *Bland v. Farmworker Creditors*, 308 B.R. 109, 113-14 (S.D. Ga. 2003); *In re Farmland Indus., Inc.*, 294 B.R. 855 (Bankr. W.D. Mo. 2003), *In re Lyondell Chem. Co.*, Case No. 09-10023 (Bankr. S.D.N.Y. March 5, 2009); *In re Barbara K. Enters., Inc.*, 2008 WL 2439649, at *10 (Bankr. S.D.N.Y. June 16, 2008).

2.    As detailed below, the proposed DIP Facility is the product of a thorough search of the lending market, the proposed lending terms are reasonable under the circumstances and are a sound exercise of the Debtor's business judgment, the DIP Facility is necessary to maximize the Debtor's Property for the benefit of all creditors and parties in interest, and the

interests of existing secured creditors are adequately protected through both a substantial equity cushion as well as the payment of expenses which directly preserve the value of the creditors' collateral.  As the DIP Motion and DIP Facility satisfy the requirements of section 364(d), the DIP Facility should be approved.

      **a. The Debtor conducted a reasonable and thorough search for DIP lenders sufficient to satisfy section 364(d)(1)(A).**

3.      Sandy Spring asserts that the DIP Motion should be denied because "the Debtor cannot establish that *no other sources of financing* less onerous to [Sandy Spring] are available." Docket No. 134 at 8 (emphasis added).  This is not the relevant test for priming existing secured creditors.

4.      Establishing that a debtor "is unable to obtain such credit otherwise" and that alternative financing is not available on another basis does not require the Debtor to prove that *no possible lender exists* that would make such a loan.  The Fourth Circuit long has held that section 364(d) "imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986).  "Rather, a debtor need only show that it has made reasonable efforts to seek other sources of credit." *First Sec. Bank & Tr. Co. v. Vander Vegt*, 511 B.R. 567, 579 (N.D. Iowa 2014); s*ee also In re YL West 87th Holdings I LLC*, 423 B.R. 421, 441 n.44 (Bankr. S.D.N.Y. 2010); *Suntrust Bank v. Den—Mark Constr., Inc.*, 406 B.R. 683, 689 (E.D.N.C. 2009).

5.      The Debtor made "reasonable efforts to seek other sources of credit" in this case as required by section 364(d).  The Debtor, through its counsel, conducted a thorough search for possible debtor-in-possession ("DIP") financing lenders before selecting Legalist as its proposed DIP Lender.  The first party the Debtor contacted regarding DIP lending was Sandy Spring itself. The Debtor initially approached Sandy Spring in fall 2019, prior to the petition date, in an attempt to obtain DIP financing for this case.  Sandy Spring rejected the Debtor's request without explanation.

3

6.  Following the petition date, the Debtor (1) solicited recommendations for potential DIP lenders from the members of Whiteford, Taylor & Preston's 35-attorney strong bankruptcy group; (2) contacted two potential lenders referred by the Debtor's financial advisor; (3) contacted a local lender with prior involvement with the Debtor; (4) communicated with several potential lenders who solicited the Debtor regarding its DIP funding needs; and (5) contacted one conventional bank identified by the Debtor's principal.  After Sandy Spring communicated its intention to oppose the DIP Motion, the Debtor also affirmatively solicited suggestions for other potential DIP lenders from Sandy Spring.  Sandy Spring provided the name of one additional party, who declined to submit a proposal.

7.  The Debtor remains willing to consider any and all alternatives that would provide better terms than the proposed DIP Facility, consistent with its duties to the estate.  It has repeatedly asked Sandy Spring and PD Hyde to refer or recommend any other lenders that may be interested in providing the needed funding.  Other than the one name provided by Sandy Spring, the Debtor has received no suggestions from either party.[2]  There are no alternative DIP lending offers available to the Debtor.

8.  The Debtor's search identified Legalist as the only lender willing to provide the required financing.  The Debtor did not identify any potential lenders willing to provide the DIP Facility financing on a junior-secured basis.  The Debtor has satisfied its burden to show that it "is unable to obtain such credit otherwise" under section 364(d)(1)(A).[3]

---

[2] PD Hyde provided the names of several possible exit financers, but no DIP lenders.

[3] Sandy Spring also suggests that the Debtor's principals, Dr. Nabil and Maureen Asterbadi, should be required to liquidate their personal assets to provide funding to the Debtor before a DIP loan should be considered.  Not surprisingly, Sandy Spring cites no authority of any kind for this proposition.  But any such demand ultimately is futile.  The Asterbadis have no funds to contribute.  As Sandy Spring states in its objection, prior to the Petition Date the Asterbadis were living off of the proceeds generated by the Property.  The Asterbadis currently have no material income and have testified that they borrow money from friends and relatives to pay their bills.  Also, the Asterbadi's real property is subject to liens of other lenders.  Even if Sandy Spring could compel the Asterbadis to put additional money into this bankruptcy case, the money simply isn't there.

**b. The terms of the DIP Facility were heavily negotiated and are reasonable under the circumstances of this case.**

9. Sandy Spring and PD Hyde object to the DIP Facility on the grounds that the terms are "extremely expensive." Sandy Spring even declares the terms to be "unconscionable." But the question before the Court is not simply whether the DIP Facility terms are expensive, but rather whether materially better terms are available under the circumstances of the case.

10. Here, the DIP Facility is the product of a thorough and competitive search process for potential DIP lenders and an active negotiation of the loan terms with the selected DIP lender, Legalist. As described in Section I(a) of this Reply, the Debtor conducted a lengthy and thorough search for potential DIP Lenders. It solicited recommendations and referrals for potential lenders from numerous sources, including Sandy Spring and PD Hyde. At the end of this search process, the Debtor identified Legalist as the only party willing to make the the DIP loan needed in this case.

11. Despite that Legalist was the sole interested lender, the Debtor did not simply accept Legalist's proposed terms wholesale. The Debtor and Legalist actively negotiated the terms of the DIP Facility for several weeks. This negotiation resulted in many material and beneficial changes to Legalist's initial proposed terms. Among other improvements, the Debtor lowered the interest rate from a floating rate with a minimum of 14.75% to a fixed 12% rate; lowered the Undrawn Line Fee from 4.75% to 3.75%; extended the maturity date from 550 days to two years; excluded avoidance actions from the DIP collateral; eliminated the automatic right to relief from the stay upon an event of default; and excluded Legalist's legal fees from those expenses reimbursable by the Debtor. The initial term sheet received from Legalist is attached hereto as Exhibit A. Redlines showing incremental changes to the term sheet resulting from the Debtor's negotiations with Legalist are attached as Exhibits B and C. The final term sheet memorialized in the DIP Agreement is the result of an active, arm's length negotiation and represents the best loan terms the Debtor could achieve under these circumstances.

5

12. Further, the terms of the DIP Facility are well within the reasonable range of DIP financing terms seen in other chapter 11 bankruptcy cases. Exhibit D attached hereto contains a summary of material terms for seven recent DIP loans approved by other bankruptcy courts. The terms of these other DIP loans are substantially similar, and in many cases more expensive, than the proposed DIP Facility here. Many of the interest rates charged by the other DIP lenders include a fixed percentage rate plus an additional floating rate based on LIBOR, the Eurocurrency rate, or a unique specifically defined "base rate," almost always with a 1% or 2% base rate floor. The total interest rates charged range from a minimum of 9% up to 18%, with many in the 12-13% range. Many of the rates are subject to increase because of the floating nature of the base rate. Here, the Debtor negotiated Legalist down to a fixed interest rate of 12%, which is squarely within the range of interest rates approved by bankruptcy courts in these other cases.

13. Further, several of the approved DIP loans on Exhibit D have fees similar in type and amount to those charged by Legalist. But, the effective annual percentage rate ("APR") of many of those fees is significantly higher than those charged by Legalist because of the shorter duration of the loans. Many of the loans have terms of six months or less, which increases the APR for one-time fees based on the loan commitment or actual loan amount. In *In re Orchids Paper Products Company*, Case No. 19-10729 (Bankr. D. Del.) (Walrath, J.), the Court approved a maximum six-month loan with a 5% Commitment Fee and a Closing Fee of 2.5%. *See* Exhibit D. The combined fees of 7.5% on a maximum six month loan annualizes to an APR of no less than 15% for these fees alone. Here, DIP Facility has a loan term of up to 2 years. The flat 2.75% Commitment Fee and 1.75% Underwriting Fee charged by Legalist, a combined fee of 4.5%, results in an APR of 2.25% if spread across the full 2 year loan term. In sum, the terms of the DIP Facility are certainly comparable to, and in many cases superior to, DIP loans approved in other cases.

14. The terms of the DIP Facility also are equal to or better than the terms of a recent DIP loan made by Legalist to another debtor. In *In re Klausner Lumber Two LLC*, Case No. 20-

11518 (KBO) (Bankr. D. Del.), the bankruptcy court approved a $3,500,000 DIP loan provided by Legalist with the same 2.75% Commitment Fee and 1.75% Underwriting Fee amounts. But, the interest rate charged by Legalist in *Klausner Lumber* is the sum of (a) 10.75% and (b) the greater of (i) the Prime Rate and (ii) 4.00%, for a *minimum* total interest rate of 14.75%, and it is entitled to an Undrawn Line Fee of 4.75% per year. In *Klausner* Lumber, Legalist also received a lien on avoidance actions and is entitled to the reimbursement of its legal fees in connection with the DIP loan. Here, the Debtor's interest rate is 12%, the Undrawn Line Fee is 3.75%, and Legalist does not receive liens in avoidance actions or the reimbursement of its legal fees.

15. While the Debtor acknowledges that the DIP Facility is expensive as compared to standard bank loans, the DIP Facility reflects the best terms available to the Debtor. The terms negotiated by the Debtor are reasonable and customary compared to DIP Loans approved by courts in other cases.

### c. The DIP Facility is necessary to maximize the value of the Property for the benefit of all creditors and parties in interest.

16. A critical purpose of the DIP Facility is to fund the various experts and consultants needed to provide engineering, zoning, land use, and other specialized advice and information in connection with the Debtor's marketing and sale process. The Debtor is advised by its broker Fraser Forbes that by funding this work now, the Debtor likely can eliminate areas of risk and concern for potential purchasers and thus increase the ultimate purchase price for the Property. The proposed investment in such experts and consultants funded by the DIP Facility is likely to produce significant additional value for the Debtor and its creditors later in the sale process. The DIP Budget submitted with the DIP Motion estimates that $230,500 will be spent in connection with such consultants.

17. Sandy Spring declares that it is "shocking" that "only $230,500 in development costs will be spent from the $1.5 million dollar loan," and criticizes the Debtor for budgeting DIP Loan funds to pay administrative expenses, amounts due to the DIP Lender, operating costs including real estate taxes and insurance, and adequate protection payments. Sandy Spring

conveniently ignores the fact that the Debtor must continue to operate and this bankruptcy case will remain pending while the marketing and sale process progresses. The Debtor's airport operation generally breaks even on a cash flow basis, but yields a substantial benefit to the Debtor in the form of reduced property taxes on the Property. The Debtor needs an additional source of funds during this bankruptcy case to pay its other operational and chapter 11 expenses, including US Trustee fees, insurance premiums, property taxes, accounting charges, and other reasonable and necessary operating expenses. This case cannot continue, and the Property cannot be properly marketed and sold, unless these obligations are paid. Paying operational and chapter 11 expenses of the Debtor is a reasonable and necessary use of the DIP funds.[4] The DIP Budget allocates $298,286.63 over the twenty-four months of the DIP Facility to these administrative and operational expenses.

18. The remainder major expense in the DIP Budget is $286,477.92 to be paid as adequate protection payments to Sandy Spring.

19. In total, the DIP Budget proposes to borrow a total of $784,024.11 of the authorized DIP loan amount, which will utilize $1,082,767.14 of the available $1,500,000.00 lending commitment after interest and fees payable to Legalist are added. Assuming funds are drawn in accordance with the budget, the maximum funds remaining available under the loan would be approximately $370,000. The Debtor prudently has chosen to keep funds in reserve to address unexpected operating expenses, additional consulting expenses arising in connection with the sale and marketing process, and, if it deems necessary and appropriate, to make partial interim payments to its professionals to the extent approved by the Court.

20. Sandy Spring and PD Hyde's allegations that the Debtor intends to pay hundreds of thousands of dollars to its professionals are nothing but alarmist speculation. *See* Docket No. 128 ("[U]pon information and belief, approximately $500,000.00 of the proposed DIP funds are

---

[4] Notably, the budget includes monthly adequate protection payments to Sandy Spring in the amount of $11,935.33, for a total of $286,447.92, the same monthly payment that the Debtor made pursuant to the first cash collateral order [Docket No. 24].

to be used to pay the Debtor's professional fees in this case."); Docket No. 134 ("Upon information and belief, the Debtor's professionals will seek to utilize as much as three hundred seventy thousand dollars ($370,000.00) in DIP loan proceeds to make payment of their incurred fees and expenses."). Supposition and conjecture are not bases for "information and belief." Any request to pay professionals from the DIP Facility will be made following careful consideration of the Debtor's cash needs and the need to reserve for future unanticipated expenses, and will be subject to a fee application approved by the Court.

### d. The interests of secured creditors are adequately protected by the substantial equity in the Property.

21. Sandy Spring and PD Hyde argue that they are not adequately protected despite the fact that the Debtor's appraisal prepared by William Harvey of William C. Harvey & Associates (the "Harvey Appraisal") values the Property at $19.3 to $22.1 million. *See* Exhibit E. Sandy Spring holds a secured claim of approximately $2.5 million (including anticipated fees and expenses). PD Hyde asserts a highly disputed secured claim of $1.2 million.[5] The proposed priming DIP Facility is up to $1.5 million. Sandy Spring thus is adequately protected if the value of the Property exceeds approximately $4 million. PD Hyde is adequately protected (assuming it has a valid secured claim entitled to protection) if the value of the Property exceeds approximately $5.2 million. For Sandy Spring and PD Hyde to prevail on their claim that they are not adequately protected requires the Debtor's $19.3 million low-end appraised value to be *reduced by over $14 million*. Such a substantial reduction has no basis in reality.

### 1. Sandy Spring's own appraisal obtained in February 2020 shows substantial equity in the Property.

22. Sandy Spring's own appraisal obtained in February 2020 demonstrates that both Sandy Spring and PD Hyde have an equity cushion of multiples of their claim amounts. Sandy Spring obtained a post-petition appraisal from Arthur Smail of Smail and Associates (the "Sandy

---

[5] While PD Hyde is correct that no objection has been filed to its alleged secured claim, the Debtor disputes both the secured and unsecured portions of PD Hyde's asserted claim and anticipates filing an objection to such claim at the appropriate time.

9

Spring Appraisal") with an effective date of February 6, 2020. The Sandy Spring Appraisal is attached hereto as Exhibit F. The effective date of the Sandy Spring Appraisal is substantially contemporaneous with the January 27, 2020 effective date of the Harvey Appraisal. The Sandy Spring Appraisal values the property at $13.25 million. While the Debtor believes that this $13.25 million value is low, it is still substantially greater than the sum of all of the claims of any kind in this case. Sandy Spring has refused to acknowledge its $13.25 million appraisal throughout this case, as the valuation is plainly unhelpful to Sandy Spring's claim that its $2.5 million claim is not adequately protected. It did not identify Mr. Smail as an expert witness in connection with the DIP Motion, seek to depose Mr. Smail, disclose the Sandy Spring Appraisal or its valuation in its objection to the DIP Motion, or include the Sandy Spring Appraisal among its 87 listed trial exhibits. Sandy Spring even is actively fighting to exclude its Sandy Spring Appraisal from being considered at the hearing on the DIP Motion, as it objected to its own appraisal on *hearsay and foundation grounds* in its late-filed objection to the Debtor's trial exhibits. *See* Docket No. 147. Sandy Spring's own evidence shows that its interest is adequately protected.

      **2. The challenges raised to the Harvey Appraisal are based on faulty assumptions and improper appraisal practices.**

23.    While ignoring the conclusions of Sandy Spring's own appraiser, Sandy Spring and PD Hyde also lodge attacks on the Harvey Appraisal in an effort to depress the value of the Property. The PD Hyde objection directly challenges the discount rate, sales comparisons, effect of allegedly "unsuitable fill" on the Property, and lot yield used in the Harvey Appraisal, among other things. Beyond just questioning the appraisal's methodology, however, PD Hyde also supplies specific discount rates, sales comparison corrections, and various other "adjustments" that it asserts Mr. Harvey should have used instead. Both PD Hyde's approach and its proposed alternative figures and calculations are fraught with error.

24.    As a predicate matter, PD Hyde's assertions constitute impermissible expert testimony which can only be provided by a trained appraiser. PD Hyde has neither identified nor

submitted an expert report for any witness to provide expert testimony in connection with the DIP Motion.  Nevertheless, PD Hyde not only identifies alleged problems with the Harvey Appraisal, but substitutes in its own purportedly correct facts and figures and then "calculates" what it believes to be the ultimate value of the Property after such adjustments and other alleged corrections.  PD Hyde's counsel is not qualified to opine on which specific discount rates Mr. Harvey should have employed or the specific dollar adjustment due to alleged excess dirt on the Property.  Any purported conclusions or statements of value regarding the Property in the PD Hyde objection must be disregarded.

25.    Further, PD Hyde's attempted analysis of the Harvey Appraisal does not follow anything even remotely resembling generally accepted appraisal practices.  In one section of the PD Hyde objection, PD Hyde claims without any stated basis that "a two year entitlement process should be discounted by at least 20 to 25% per year to reward the equity investor for the risk."  Docket No. 128 at 2.  In another, it declares that two elements of comparison in the sales comparison approach simply "cancel each other."  *Id.* at 3.  PD Hyde also reduces its recalculated value of the Property by another $3-$5 million for what it declares to be a "$3 to $5 million credit for fewer units and for land fill remediation" due to alleged excess surcharge dirt on the Property, but does not provide any basis for the amount of the reduction.  *Id.*  These conclusions are not based on any sort of market evidence or other accepted appraisal practices. PD Hyde's attempted revision of the Harvey Appraisal does not follow proper, generally accepted appraisal practices and is wholly unreliable.

26.    But putting aside how PD Hyde arrived at its conclusions and calculations, the various alternative discount rates and other purported corrections that PD Hyde asserts should be made to the Harvey Appraisal simply are not accurate.  Mr. Harvey is prepared to testify at trial in support of the Harvey Appraisal and demonstrate to the Court that the issues alleged by PD Hyde have been accounted for in his analysis and appraisal methodology.  For example, PD Hyde erroneously claims that the Harvey Appraisal "assumes the entitlement process is complete (which it is not)."  Docket No. 128 at ¶3.  The Harvey Appraisal assumes that the entitlement

process is ongoing. The Dictionary of Real Estate Appraisal defines "entitlement" as "governmental approval for annexation, zoning, utility extensions, number of lots, total floor area, construction permits, and occupancy or use permits." *See* Exhibit G. The Property has obtained rezoning and thus is partially through the entitlement process. Based upon communications with the Prince George's County Planning Department, the Harvey Appraisal states that obtaining the remaining necessary entitlements is "reasonably probable within one year" if no appeal is filed, and within two years if an appeal is filed. *See* Exhibit E at 12. The discount rate applied by Mr. Harvey accounts for this entitlement period, mooting PD Hyde's objection on this point.

27. Sandy Spring also challenges Mr. Harvey's estimate that entitlements are reasonably probable within one year if no appeals are filed. Sandy Spring commissioned an expert report by Eliot Powell of Whitehall Development, LLC (the "Powell Report"), which claims that entitlements will take up to three years if no appeal is filed, and up to four years with an appeal. While Mr. Harvey disputes the conclusions of the Powell Report, whether entitlements will take one year or three years ultimately has no effect on the DIP Motion. Mr. Harvey prepared a supplemental analysis in response to the Powell Report showing the effect on his appraisal of the Property if the entitlement period is extended to three or four years. Adjusting the entitlement period to three to four years results in a Property value between $15.4 and $21 million, depending on the discount rate and price escalation used. *See* Exhibit H. Even if the Powell Report is correct on the timing of entitlements, the interests of Sandy Spring and PD Hyde still are adequately protected.

28. As Mr. Harvey will demonstrate at trial, each of the challenges that PD Hyde and Sandy Spring raise to the Harvey Appraisal have either been properly accounted for or do not change the ultimate conclusion that their interests are adequately protected by the substantial value of the Property in excess of secured claims.

### 3. The Harvey Appraisal appropriately accounts for the impact of any excess surcharge fill on the Property.

29. Sandy Spring and PD Hyde particularly attack the Harvey Appraisal for its treatment of what they alleged to be substantial amounts of excess surcharge fill (i.e. dirt) deposited on the Property. The Debtor previously mined portions of the Property for sand and gravel which left cavities in the ground which needed to be re-filled. The Debtor generated revenue by accepting excess dirt from other off-site locations, which it used to fill the cavities left by the mining operations. To ensure that the dirt was properly compacted and stabilized, dirt was piled above ground level to compact the underlying soil. The Debtor's surcharge fill operation continued under the oversight and with the consent of the Maryland Department of the Environment ("MDE") until March 2020, when MDE informed the Debtor that it must stop accepting additional fill. The Debtor immediately complied with MDE's directive.

30. Sandy Spring and PD Hyde allege that the Debtor accepted surcharge fill in excess of the permitted amount, although PD Hyde and Sandy Spring's characterizations of the actual quantity of the excess dirt vary widely from pleading to pleading. As Sandy Spring wishes to depress the value of the Property in order to defeat the DIP Motion, it hyperbolically portrays the Property as "having been used as a *landfill*" (emphasis in original) and containing a "mountain range" of dirt. *See* Docket No. 137 at 2-3. Sandy Spring and PD Hyde claim that the presence of this excess surcharge fill significantly devalues the Property because the excess material allegedly must be *physically removed from the Property* at great cost. *See, e.g.* Docket No. 134 at ¶13 ("It is believed that . . . the Property is subject to removal from the Property of at least well over a million cubic yards of excess fill."). Sandy Spring and PD Hyde therefore allege that the Property value in the Harvey Appraisal must be lowered significantly because it fails to properly address the impact of the excess surcharge fill on the Property. As Mr. Harvey will testify, however, the Harvey Appraisal adequately accounts for the presence of this excess fill.

13

31. The options for dealing with any excess dirt is not just a binary choice between leaving it in place or physically removing it from the Property entirely as Sandy Spring and PD Hyde currently suggest. Other feasible options exist, including moving the dirt to low-lying areas of the Property, mining the airport runway and depositing any excess dirt in the resulting cavities, re-grading the property pursuant to an approved development plan, or a combination of the foregoing.

32. One such option for resolving the impact of excess fill on the Property is outlined in a development plan labeled "Pro Forma No. 4" prepared by Gregory C. May of Jansen Land Consulting at the request of PD Hyde, which reflects the Property's current condition including the excess fill and the probable costs to redevelop the Property as of September 2019. *See* Exhibit I at Bates Nos. 7, 31-37. Pro Forma No. 4 envisions a revised/partial redevelopment of the Property including a grading plan to address the excess fill, and will yield approximately 1,428 residential lots.[6] Importantly, PD Hyde's Pro Forma No. 4 acknowledges that the surcharge fill can be addressed by redistributing it on the Property and does not contemplate the actual removal of dirt from the Property. Pro Forma No. 4 explicitly includes all costs involved in redeveloping the Property, including the cost of addressing the excess surcharge fill. *See* Exhibit I at Bates No. 35 ("[Pro Forma No. 4's] total projected land development cost includes all projected expenses associated with the entitlement, engineering, permitting, bonding, site development, bond release and all related costs required to provide finished lots for sale to homebuilders.").

33. This development plan was prepared for PD Hyde in connection with litigation against the Debtor over the condition of the Property, which included allegations by PD Hyde of

---

[6] The "Product Mix" chart for Pro Forma No. 4 includes a total of 1,278 total lots. *See* Exhibit I at Bates No. 31-32. But, this chart omits a section of the Property located in the bottom right corner of the Pro Forma No. 4 Layout map labeled as Section 1-L. *See* Exhibit I at Bates No. 37. The Pro Forma No. 4 Layout map shows that Section 1-L will be developed into homes. The omission of Section 1-L from the Product Mix chart thus appears to be in error. Mr. Harvey accordingly added this missing Section 1-L to the Product Mix calculation and concluded that a total of 1,428 lots could be developed pursuant to Pro Forma No. 4.

14

damages caused by the presence of the surcharge fill. As PD Hyde's best interest in the litigation was served by maximizing its damages, the Debtor believes that Pro Forma No. 4 likely represents a very conservative projection of the number of possible residential lots and utilizes high estimates of the associated development costs. Even with this likely pro-PD Hyde bias, PD Hyde's Pro Forma No. 4 estimates development costs for 1,278 lots to be $76,840.07 per lot. *See* Exhibit I, at Bates Nos. 31-32. Based on Mr. Harvey's corrected 1,428 lot yield after adding the missing Section 1-L as described in Footnote 4 of this Reply, the per lot development cost is $74,490. *See* Exhibit E at 32.

34. Mr. Harvey used this $74,490 per-lot development cost based on PD Hyde's own Pro Forma No. 4 in preparing his appraisal. Because Pro Forma No. 4 was prepared specifically to deal with the excess surcharge fill, this per lot cost already includes the cost of addressing the dirt on the Property. Accordingly, further reductions of the Property value in the Harvey Appraisal due to excess surcharge fill would be redundant.

### 4. The $19.3 to $22.1 million value in the Harvey Appraisal reflects the "as-is" value of the Property.

35. Sandy Spring declares that the "as-is" value of the Property should be $██████ because that sum is the highest offer received for the Property without further entitlements. *See* Docket No. 134 at ¶22. Like PD Hyde, Sandy Spring fails in its attempt to play appraiser. Both the Harvey Appraisal ($19.3 to $22.1 million value) and the Sandy Spring Appraisal ($13.25 million value) reflect the "as-is" value of the Property assuming a twelve month exposure to the market. The Debtor is only approximately two to three months into its marketing and sale process with its broker, Fraser Forbes. Mr. Harvey will testify that the $██████ offer thus reflects a forced liquidation value, which is not the highest and best use of the Property. Valuing the Property using the liquidation value (which assumes, among other things, the consummation of a sale within a short time period, that the seller is under extreme compulsion to sell, and that a normal marketing effort is not possible due to the brief exposure

15

time) is inappropriate at this time, especially considering the ongoing marketing process and the active interest expressed by other potential buyers.

36. Further, to the extent that Sandy Spring wants to consider liquidation value, it cannot rely on a single offer to establish the value of the Property. The Debtor is not soliciting liquidation-value offers. It is near the beginning of the comprehensive marketing and sale process run by Fraser Forbes designed to ensure that the Debtor receives offers based on the highest and best use of the property, which is expected to take several months. The $█████ offer cited by Sandy Spring as definitive evidence of the Property's value is a low-ball offer received thirteen days after Fraser Forbes released its initial "teaser" communication about the Property and before Fraser Forbes even released the Offering Memorandum. Even if the Debtor were to sell the Property based on liquidation value, the offer seized upon by Sandy Spring is not a reliable indication of the ultimate sale price.

      **e. The proceeds of the DIP Facility will be used to protect the interests of secured creditors.**

37. In addition to the equity cushion, the DIP funds are being used to protect the interests of secured creditors. The DIP Budget provides for the payment of monthly adequate protection payments to Sandy Spring totaling more than $286,000. The DIP Budget also funds expenses which protect and preserve the value of secured creditors' collateral. The loan provides funds for the payment of real estate taxes, which prime secured creditors by operation of law. The budget contains a line item for maintenance of the Property ($32,400). The funds earmarked for payment of Property consultants will enhance the prospect of a sale. Further, although there is no commitment that any of the loan proceeds will be used to pay the Debtor's bankruptcy professionals, a substantial portion of the services are reasonable and necessary costs and expenses of preserving and disposing of the Property.

   **II.**    **The DIP Motion is not a "sub rosa plan."**

38. Sandy Spring correctly states that courts will not approve DIP agreements "that amount to a plan of reorganization but evade confirmation requirements." *In re Seth Co., Inc.*,

281 B.R. 150 (Bankr. D. Conn. 2002). But even a cursory review of the applicable case law makes clear that the DIP Agreement contains none of the provisions which trigger concerns about *sub rosa* plans.

39. Courts evaluating whether DIP agreements constitute *sub rosa* plans "look to whether the proposed terms would prejudice the powers and rights that the Code confers for the benefit of all creditors and leverage the Chapter 11 process by granting the lender excessive control over the debtor or its assets as to unduly prejudice the rights of other parties in interest." *In re Def. Drug Stores, Inc.*, 145 B.R. 312, 317 (B.A.P. 9th Cir. 1992). Provisions causing particular concern include those which dictate the terms of any future reorganization plan, dictate the rights and treatment of creditors, or require releases in favor of the debtor, its officers, directors, and secured creditors. *See In re Belk Props., LLC*, 421 B.R. 221, 225-26 (Bankr. N.D. Miss. 2009) (denying motion to approve secured DIP facility which called for the lender to act as debtor's chief manager and detailed the manner in which existing creditors were to be treated); *In re Braniff Airways, Inc.*, 700 F.2d 935, 939-40 (5th Cir. 1983) (denying approval of a 363 sale as a *sub rosa* plan).

40. Here, Sandy Spring's primary complaints are that (a) the DIP Facility "purportedly deals with the alleged development and sale of the entirety of the Debtor's sole asset: the Property"; (b) "priming [Sandy Spring's] senior lien in order to obtain funding to facilitate the sale of the Debtor's sole asset operates as the equivalent of a plan of reorganization"; and (c) the DIP Facility "is an exit strategy, the equivalent of a plan of confirmation." Docket No. 134 at ¶¶31, 34. These grievances are not supported by the case law and do not support Sandy Spring's allegation that the DIP Facility is *sub rosa* plan.

41. Sandy Spring cites no authority for its suggestion that the sale of a debtor's primary assets must be done through a chapter 11 plan. If selling a debtor's primary asset automatically constituted a *sub rosa* plan, then a substantial portion, if not the majority, of 363 sale motions in chapter 11 cases would be *per se* impermissible. It is routine for debtors to

liquidate their assets, or establish a mechanism for doing so, early in a case and later file a chapter 11 plan to address the disposition of the resulting sale proceeds.

42. Further, Sandy Spring's argument that priming its senior lien to fund the Debtor's chapter 11 process is impermissible except through a chapter 11 plan would render every financing motion under section 364(d) to be a *sub rosa* plan and effectively write section 364(d) out of the Bankruptcy Code. Obtaining financing secured by priming liens is often the very first thing that debtors do in chapter 11 cases. Demanding that priming financing under 364(d) be approved through a plan is nonsensical.

43. Last, that the DIP Facility sets the Debtor on a path to its exit strategy is not immediately disqualifying. As Sandy Spring points out, the Property is the Debtor's sole significant asset. It should come as no surprise to anyone that selling the Property will form the basis for the Debtor's exit strategy. What matters is whether the DIP Facility dictates the specific terms of a yet-to-be-filed plan. Here, the DIP Agreement does not restrict or seek to control in any material way the terms of a chapter 11 plan. The only restriction imposed by the DIP Agreement is that a real estate purchase and sale agreement must be filed by October 29, 2021, and that a chapter 11 plan and disclosure statement must be filed by November 30, 2021. Such deadlines give the Debtor nearly fourteen months from the filing of the DIP Motion to obtain a sale contract for the Property, and nearly fifteen months to file a plan. These milestones do not come even close to constituting impermissible *sub rosa* provisions.[7] The DIP Facility is not a *sub rosa* plan and should be approved.

---

[7] The case of *In re LATAM Airlines Grp. S.A.* cited by Sandy Spring does not help them here. Sandy Spring cites this case for the proposition that "courts will reject proposed DIP loans as improper *sub rosa* plans where the terms of the loan include concessions to creditors or parties in interest that are unauthorized under, or in conflict with, provisions under the Bankruptcy Code." *In re LATAM Airlines Grp. S.A.*, 2020 Bankr. LEXIS 2405, at *207 (Bankr. S.D.N.Y. Sep. 10, 2020). The issue in *LATAM Airlines* was that the terms of the DIP facility gave all shareholders the right to acquire stock in the reorganized debtor at a set value, whether or not such shareholders participated in the DIP loan. The court held that this provision "violates the absolute priority rule since the shareholders will be receiving the stock solely by reason of their status as shareholders, and without the benefit of market testing the transaction." *Id.* at *216-17. The DIP Agreement here contains no such provisions.

18

## CONCLUSION

44. The DIP Facility satisfies each of the elements of Section 364(d). The Debtor properly and thoroughly marked the DIP loan and heavily negotiated the initial terms offered by Legalist. The DIP Facility represents the best terms available to the Debtor, and is comparable (if not favorable) to other recent DIP financing transactions. The objecting parties, Sandy Spring and PD Hyde, are adequately protected to a degree rarely seen in chapter 11 cases. The value of the Property established by the Harvey Appraisal, and supported by Sandy Spring's own appraisal, means that Sandy Spring and PD Hyde are adequately protected by an equity cushion of multiples of their secured claim amounts. The DIP Facility also will be used to protect the interests of secured creditors, including more than $286,000 in adequate protection payments to Sandy Spring and payment of real estate taxes, property maintenance costs, and other amounts necessary to preserve and protect the secured creditors' collateral. Approving the DIP Facility will give the Debtor the necessary funding to retain the experts and consultants required to maximize the value of the Property through the ongoing marketing and sale process, and to fund this bankruptcy case while the sale process moves forward. The DIP Facility thus is in the best interest of all creditors and parties in interest in this case.

**WHEREFORE**, the Debtor respectfully requests that the Court enter a final order substantially in the form of the Proposed Order attached hereto: (i) granting the Motion, (ii) overruling any objections to the DIP Motion, (iii) authorizing the Debtor to enter into the proposed DIP Agreement, and (iv) granting such other and further relief as the Court deems just and proper.

Dated: November 2, 2020            WHITEFORD TAYLOR & PRESTON, LLP

                                                 */s/  Bradford F. Englander*
                                                 Bradford F. Englander, Esq., Bar No. 11951
                                                 David W. Gaffey (admitted pro hac vice)
                                                 3190 Fairview Park Drive, Suite 800
                                                 Falls Church, Virginia 22042
                                                 Telephone: (703) 280-9081
                                                 Facsimile: (703) 280-3370
                                                 Email:  benglander@wtplaw.com

                                                 *Counsel for the Debtor*

## CERTIFICATE OF SERVICE

        I hereby certify that on November 2, 2020, I reviewed the Court's CM/ECF system and it reports that an electronic copy of the foregoing Motion will be served electronically by the Court's CM/ECF system on the following parties:

- Bradford F. Englander    benglander@wtplaw.com, rodom@wtplaw.com
- Nancy D. Greene    ndg@ndglaw.com
- Bruce W. Henry    bwh@henrylaw.com, kmo@henrylaw.com;jtm@henrylaw.com;mbp@henrylaw.com
- Patrick J. Kearney    pkearney@sgrwlaw.com, jnam@sgrwlaw.com
- Nicole C. Kenworthy    bdept@mrrlaw.net
- Michael J. Klima    bankruptcy@peroutkalaw.com
- Michael J. Lichtenstein    mjl@shulmanrogers.com, tlockwood@shulmanrogers.com
- Jeffery Thomas Martin    jtm@henrylaw.com, mbp@henrylaw.com
- M. Evan Meyers    bdept@mrrlaw.net
- L. Jeanette Rice    Jeanette.Rice@usdoj.gov, USTPRegion04.GB.ECF@USDOJ.GOV
- Jeffrey L. Tarkenton    Jeffrey.tarkenton@wbd-us.com, karla.radtke@wbd-us.com,pascal.naples@wbd-us.com,morgan.patterson@wbd-us.com,matthew.ward@wbd-us.com
- US Trustee - Greenbelt    USTPRegion04.GB.ECF@USDOJ.GOV
- Jacob Christian Zweig    jzweig@evanspetree.com, crecord@evanspetree.com

        I hereby further certify that on September 8, 2020, a copy of the foregoing *Motion* was also served on the parties listed on the attached service list in the manner indicated.

                                                 */s/ Bradford F. Englander*
                                                 Counsel