## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND

_____

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | |
| Zachair, Ltd., | ) | Case No.:  20-10691-TJC |
| | ) | |
| Debtor. | ) | Chapter 11 |

_____

**DEBTOR'S MOTION FOR AN ORDER (A) APPROVING THE SALE
OF THE DEBTOR'S PROPERTY FREE AND CLEAR OF LIENS, CLIAMS,
INTERESTS AND ENCUMBRANCES, (B) APPROVING THE SALES CONTRACT,
(C) APPROVING BID PROCEDURES, (D) SCHEDULING BID DEADLINE, AUCTION
AND SALE HEARING, (E) APPROVING FORM AND MANNER OF NOTICE
THEREOF, AND (F) GRANTING CERTAIN RELATED RELIEF**

**Summary Property Description**

**Parcel I – containing 285.101 acres of land, more or less, located at
4401 Steed Road, Clinton, Maryland (Tax Account No. 05-0328708);
Parcel II – containing 16.180 acres of land, more or less, located on
Piscataway Road, Clinton, Maryland (Tax Account No. 05-0327833);
Parcel B – containing 64.153 acres of land, more or less, located at
10651 Piscataway Road, Clinton, Maryland (Tax Account 05-0360651);
and Parcel C – containing 58.0204 acres of land, more or less, located
on Piscataway Road, Clinton, Maryland (Tax Account 09-0865121)**

Zachair, Ltd. (the "Debtor"), the debtor and debtor-in-possession in the above-captioned

case, submits this motion (this "Motion") for entry of an order (i) authorizing and approving the

sale of the Debtor's real property and improvements as more fully described in **Exhibit A** hereto

(the "Property") free and clear of liens, claims, interests, and encumbrances; (ii) approving the

Sales Contract attached hereto as **Exhibit B** subject only to the possibility of an overbid and the

other conditions described below; (iii) approving the proposed Bid procedures attached hereto as

**Exhibit C** (the "Bid Procedures"); (iv) scheduling the bid deadline, an auction (the "Auction") to

occur only if the Debtor receives one or more additional timely and acceptable Qualified Bids

(defined below), and a final hearing for approval of the Sale ("Sale Hearing"); (v) approving the

form and manner of notice thereof attached as **Exhibit D** hereto; and (vi) granting certain related relief.  In support of this Motion, the Debtor respectfully states as follows:

## I.    JURISDICTION AND VENUE

1.      The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue lies properly in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding pursuant to 28 U.S.C. § 157.

2.      The bases for the relief requested herein are sections 105 and 363 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 6004-1 of the Local Rule of Bankruptcy Procedures (the "Local Rules").

## II.    INTRODUCTION

3.      Following extensive marketing and negotiations, the Debtor has entered into a Sales Contract to sell substantially all of its real estate assets.  The Debtor seeks approval of the sale of the Property free and clear of liens, claims, interests and encumbrances to the Stalking Horse Purchaser.  Although marketing has been extensive, the Debtor has negotiated with the Stalking Horse Purchaser the right to continue marketing the Property to ensure that the estate receives the highest and best consideration.  Thus, in addition to seeking preliminary approval of the Sale Contract, the Debtor seeks approval of the Bid Procedures.

4.      The Motion is a key step in the Debtor's exit from bankruptcy.  The Debtor is preparing a plan of reorganization and disclosure statement, which will be filed on or before June 30, 2021.  In the event that the Debtor receives one or more additional Qualified Bids, the Debtor proposes to conduct an auction of the Property concurrently with the hearing on the confirmation of the Debtor's plan.

### III.   SUMMARY PURSUANT TO LOCAL RULE 6004-1[1]

5.        Pursuant to the requirements of Local Rule 6004-1, the following table highlights specific terms of the Sale Contract, Motion and Bid Procedures.  The information in the table is a summary.  Creditors and parties in interest are encouraged to review the attached documents and instruments.  In the event of any inconsistency, the applicable documents and instruments will govern.

| Local Bankruptcy Rule | Summary of Applicable Terms and Conditions |
| --- | --- |
| 6004-1(b)(1) | A copy of the "Real Estate Sales Contract – Hyde Field Property" dated as of June 1, 2021 (the "Contract"), by and between Zachair, Ltd. and JP Land Holdings LLC, a Delaware limited liability company (the "Stalking Horse Purchaser") is attached hereto as Exhibit B. |
| 6004-1(b)(2) | A copy of the proposed form of *ORDER (A) APPROVING THE SALE OF THE DEBTOR'S PROPERTY FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES, (B) APPROVING THE SALES CONTRACT, (C) APPROVING BID PROCEDURES, (D) SCHEDULING BID DEADLINE, AUCTION AND SALE HEARING, (E) APPROVING FORM AND MANNER OF NOTICE THEREOF, AND (F) GRANTING CERTAIN RELATED RELIEF* is attached to this Motion as **Exhibit E**. |
| 6004-1(b)(3) | Neither the Contract nor the Motion provide for the sale or transfer of personally identifiable information; thus, the Motion does not seek the appointment of a consumer privacy ombudsman. |
| 6004-1(b)(4)(A) | The proposed sale is not a sale to an insider. |
| 6004-1(b)(4)(B) | The Stalking Horse Purchaser has not discussed or entered into any agreements with management or key employees regarding compensation or future employment. |
| 6004-1(b)(4)(C) | The Motion does not provide for a waiver or release of any claim. |
| 6004-1(b)(4)(D) | The Motion contemplates an auction in the event that the Debtor receives one or more additional Qualified Bids. |
| 6004-1(b)(4)(E) | The Outside Closing Date for the sale, as set forth in the Contract, is June 1, 2022, subject to the Purchaser's right to a one-time 6-month extension of the Outside Closing Date, subject to the payment of an Extension Fee in the amount of $250,000. |

---

[1]        Defined terms are set forth in the Motion or the Sales Contract. In the event there is any conflict or inconsistency between the terms and conditions of this chart and the terms and conditions of the Sales Contract, the terms and conditions of the Sales Contract will control and control the rights and obligations of the parties.

| | |
|---|---|
| 6004-1(b)(4)(F) | The Purchaser has posted an Initial Deposit in the amount of $250,000, and, unless the Contract is terminated, within 5 days following the end of the Study Period (August 16, 2021), Purchaser is required to deliver an additional $250,000 (together, the "Deposit"). The Initial Deposit is refundable if the Contract is terminated prior to expiration of the Study Period.  The Deposit is non-refundable absent specified defaults by Seller. |
| 6004-1(b)(4)(G) | Other than customary pre-closing covenants relating to consummation of the Contract, access to the Property, and related matters, the Contract does not include any interim arrangements with the Stalking Horse Purchaser. |
| 6004-1(b)(4)(H) | The Motion seeks authority to pay the secured claims of Sandy Spring Bank and the real estate taxes owed to Prince George's County at Closing (unless other treatment is approved as part of a confirmed Plan), along with customary closing costs as may be applicable.  Otherwise, distribution of sale proceeds will remain subject to the Debtor's plan and/or further order of the Court. |
| 6004-1(b)(4)(I) | The Debtor will retain its books and records. |
| 6004-1(b)(4)(J) | The proposed sale does not include the sale of avoidance actions. |
| 6004-1(b)(4)(K) | The Motion seeks a determination that the sale is free and clear of all liens, deeds of trust, mechanic's and materialmen's lien, judgment liens, security interests, creditor claims, encumbrances and interests, including the disputed Lien of PD Hyde Field LLC.  Otherwise, the Motion does not seek any determination with respect to successor liability. |
| 6004-1(b)(4)(L) | The Debtor has leases of hangar and tie-down spaces.  To the best of Debtor's knowledge, all tenant leases are terminable on 30-days' written notice.  The Sales Contract requires that all leases be terminated prior to Closing.  The Debtor intends to provide notice of termination to the tenants in accordance with the lease terms.  However, out of an abundance of caution, the Motion also provides for a sale free and clear of the leases. |
| 6004-1(b)(4)(M) | The Motion does not affect credit Bid rights.  However, the Debtor reserves its rights with respect to any credit bid. |
| 6004-1(b)(4)(N) | The Motion seeks a waiver of the fourteen-day stay under Rule 6004(h). |
| 6004-1(c)(1)(A) | To be a bidder, interested parties must execute a confidentiality and non-circumvention agreement; provide financial information to the Debtor and its advisors; demonstrate its financial wherewithal to consummate a sale. |
| 6004-1(c)(1)(B) | Qualified Bids must: be submitted by the Bid Deadline, **5:00 p.m. prevailing Eastern Time on August 12, 2021**; be in the form of an executed binding contract; be for the purchase of the entire Property (other than rights relating to "front foot benefits" and the Retained Parcel, which may be excluded from the sale); be as-is, where-is, with all faults; remain open until the completion of the Bankruptcy |

| | |
|---|---|
| | Court approval process for the sale; include a deposit in an amount not less than $500,000, which will be refundable only in the event of a material uncured Seller default (and not subject to approval of entitlements); be accompanied by a signed letter pursuant to which the bidder agrees to the Bid Procedures.  A Qualified Bid must not be subject to any conditions or contingencies (e.g., due diligence, financing or internal approvals) other than (a) obtaining approvals for entitlements (failure of which shall not be grounds for refund of the Deposit), and (b) conditions relating to court approval. |
| 6004-1(c)(1)(C) | The Motion seeks approval of bidder protections for the Stalking Horse Purchaser as follows:  Provided that the Bid Procedures Order has been entered, the full Deposit has been posted, and the Stalking Horse Purchaser delivers its Notice of Intent to Proceed prior to the end of its Study Period, upon the occurrence of a triggering event, the Stalking Horse Purchaser shall be entitled to: (i) return of the Deposit; (ii) return of the Extension Fee (if such has been paid); (iii) reimbursement of its actual third party fees and costs incurred in connection with the Contract and the transaction, including without limitation its engineering and attorney's fees (the "Expense Reimbursement"); and (iv) a Break-Up Fee equal to 2.0% of the Purchase Price.  Triggering events for the foregoing relief are: (a) a sale is approved in favor of a competing bidder, and such sale closes, or (b) the Debtor's chapter 11 plan is not confirmed and the Debtor elects to terminate Contract on account of the failure to confirm the and the Debtor terminates the Sales Contract on account thereof.  The Contract further provides that if the Bid Procedures Order is not entered, the Stalking Horse Purchaser shall be entitled to the Expense Reimbursement.  The Motion seeks approval of Bid increments in the amount of $100,000. |
| 6004-1(c)(1)(D) | The Motion reserves the Debtor's right to modify the procedures governing the auction and sale as necessary or appropriate to discharge its fiduciary duty to maximize the value of the estate. |
| 6004-1(c)(1)(E) | The Motion requires Qualified Bidders to keep their bids open through the entry of the order approving the Prevailing Bidder. |

## IV.    BACKGROUND

### A.    The Property

6.    The Debtor is a Maryland corporation which owns an assemblage of real property totaling approximately 423.45 acres located in Prince George's County, Maryland, as more particularly described in the legal description attached hereto as **Exhibit A** (the "Property").

7.      The Debtor operates a portion of the Property as an airfield known as Hyde Field (the "Airfield").  The Airfield generates revenue for the Debtor through the rental of hangar and parking spaces for aircraft. Operation of the Airfield also has entitled the Debtor to a reduction in its real estate taxes.

8.      In addition to the Airfield, pursuant to a mining permit issued by the Maryland Department of the Environment ("MDE") portions of the Property previously were mined for sand and gravel. The cavities created by the sand and gravel mining were used for surcharge fill operations.  The Debtor contracted for the acceptance of clean fill dirt removed from other third-party sites in exchange for a fee.  For several years, such fees generated the majority of the Debtor's operating revenues.  In early March 2020, MDE advised the Debtor that it must cease the surcharge fill operations.

9.      The appraiser engaged by the Debtor, William C. Harvey ("Mr. Harvey"), has valued the Property between $19.3 million and $22.1 million.  *See Debtor's DIP Motion* [Docket No. 107]; *see also Debtor's Reply to Opp. to DIP Motion* [Docket No. 160].

**B.      The PD Hyde Field Litigation**

10.      Prior to the Petition Date, on November 15, 2018, PD Hyde Field, LLC ("PD Hyde") filed a complaint against the Debtor and Dr. Nabil Asterbadi ("Dr. Asterbadi") in the Circuit Court for Prince George's County, Maryland, styled, *PD Hyde Field LLC v. Zachair, Ltd., et al.,* Civil Action No. 18-42893, in connection with a contract to purchase the Property.

11.      Plaintiff PD Hyde Field LLC ("PD Hyde") was a venture formed for the purpose of acquiring and developing the Property.  The dispute arises from alleged breaches of the purchase contract for the Property.  PD Hyde alleges that Zachair breached certain provisions of the parties' contract relating to the condition of the Property.  Specifically, PD Hyde alleged that Zachair

allowed surcharge fill operations to continue to be conducted on the Property in violation of the purchase contract, as amended. Those operations allegedly were also conducted in violation of MDE permits and approved Surcharge Plans, resulting in excess and unsuitable fill being on the Property. PD Hyde claims that these breaches prevented it from closing on the Property by the outside closing date under the purchase contract. In September 2018, when PD Hyde failed to close, as it was contractually obligated to do, Zachair notified PD Hyde that it was in default.

12.    Thereafter, on November 15, 2018, PD Hyde filed suit against Zachair and its president, Dr. Nabil Asterbadi ("Dr. Asterbadi") (collectively, "Defendants") in Prince George's County, Maryland. On March 14, 2019, PD Hyde recorded a Memorandum of Lis Pendens (the "Lis Pendens") in the Land Records of Prince George's County, Maryland. PD Hyde thereafter amended its complaint on July 1, 2019 (the "First Amended Complaint"), and again on December 31, 2019 (the "Second Amended Complaint"). The Second Amended Complaint asserts 9 counts against Zachair and Dr. Asterbadi, including for declaratory judgment, injunctive relief, specific performance, breaches of contract, fraud in the inducement, and for establishment and enforcement of vendee's lien.

13.    As a result of the Lis Pendens, the Debtor was unable to sell or refinance the Property outside of bankruptcy. Further, PD Hyde enjoyed substantial financial backing. In contrast, the Debtor lacked sufficient resources to fund the state court litigation. On January 17, 2020 (the "Petition Date"), the Debtor filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Case"). The Debtor is continuing in possession of its property and the management of its business as a debtor-in-possession, pursuant to sections 1107 and 1108 of the Bankruptcy Code. As of the date hereof, no trustee, examiner, or official committee has been appointed in this chapter 11 case.

14.     On January 21, 2020, Zachair filed a Suggestion of Bankruptcy with the Circuit Court.  On March 3, 2020,  Dr. Asterbadi filed his answer to the Second Amended Complaint, denying any liability.  Thereafter, on October 14, 2020, the Circuit Court granted Dr. Asterbadi's motion to stay the litigation.  The litigation is presently stayed as to both Defendants.  Only minimal document discovery was conducted before the stay was implemented.

15.     Zachair (as well as Dr. Asterbadi) denies any liability and intends to vigorously defend itself.  As an initial matter, the nature and condition of the Property was fully disclosed to PD Hyde prior to and during the feasibility period under the purchase contract. Despite this knowledge, PD Hyde decided to proceed.  Further, MDE has not held Zachair to be in violation of any permits or plans (be it with respect to the quality or quantity of the fill on the Property). Importantly, Zachair and PD Hyde entered into a letter agreement to address and mitigate any unsuitable fill on the Property to the extent it impacted PD Hyde's development plans (the "Letter Agreement").  Zachair contends and, the evidence will show, that PD Hyde was using the unsuitable fill issue as a pretext to delay closing.  PD Hyde was neither ready nor able to close and to begin development notwithstanding having exercised its contractual right to extend closing twice and having asked for 12 months without any consideration.

C.     The Debtor's Secured Indebtedness

16.     The following chart summarizes all known claims against the Debtor that are secured by an interest in the Property:[2]

---

2     Nothing contained in the chart shall be deemed to constitute, or shall be construed as, an admission of the existence or amount of any secured claim, or as a waiver by the Debtor of its right to object to any and all proofs of claim.  The Debtor reserves all of its rights to litigate, disallow, or object to the claims on the basis of all equitable or legal grounds.

| Creditor | Basis | Secured Claim | Disputed | Nature of Claim |
|---|---|---|---|---|
| PD Hyde Field, LLC | Claim No. 18-1 | $1,200,000.00 | Yes | Deposit Pursuant to 2013 Sale Contract |
| Prince George's County, Maryland[3] | Claim No. 8-1 | $256.29 | No | 2021 Real Property Taxes |
| Prince George's County, Maryland | Claim No. 11-1 | $2,859.16 | No | 2021 Real Property Taxes |
| Prince George's County, Maryland | Claim No. 10-1 | $4,713.24 | No | 2021 Real Property Taxes |
| Prince George's County, Maryland | Claim No. 9-1 | $20,056.05 | No | 2021 Real Property Taxes |
| Sandy Spring Bank | Claim No. 21-1 | $2,392,410.30 | No | Real Estate Loan |
| Sandy Spring Bank | Docket No. 169 | $360,000.00 | Estimate | Debtor-in-Possession Financing[4] |
| **Total:** | | $3,980,295.04 | | |

17.    On the Petition Date, the Debtor's secured debt obligations primarily consisted of $2,392,410.30 owed to Sandy Spring Bank ("Sandy Spring") pursuant to a certain *Deed of Trust Note* dated December 11, 2015 in the original principal amount of $2,300,000, as modified by certain *Modification and Extension Agreements* dated November 2, 2018, and April 3, 2019 (together, the "2015 Note"). *See* Claim No. 21. The 2015 Note is secured by the Property and various other property of the Debtor pursuant to a *Deed of Trust and Security Agreement* dated December 11, 2015.  On November 9, 2020, the Court entered the *Final Order Authorizing Debtor-in-Possession Financing and Use of Cash Collateral* [Docket No. 169] (the "Final DIP

---

3    In addition to reviewing the proofs of claim filed on behalf of Prince George's County, the tax records are available on-line at  http://taxinquiry.princegeorgescountymd.gov/taxdetail.aspx (last reviewed June 1, 2021).  The Debtor anticipates that the 2022 real estate taxes likely will become due and may remain payable as of Closing.  The Debtor has not determined the precise amount of the 2022 taxes, but estimates that they will be approximately the same as the 2021 taxes.

4    The Court authorized the debtor-in-possession financing up to a principal sum of $360,000. The outstanding indebtedness from time to time may vary.

Order"), approving the debtor-in-possession financing in the amount of up to $360,000 provided by Sandy Spring to the Debtor pursuant to the Sandy Spring DIP Loan Documents (as defined in the Final DIP Order) and authorizing the Debtor to use the cash collateral in accordance with the budget attached thereto as Exhibit A (the "DIP Facility").  The Property is therefore currently encumbered by Sandy Spring's claim in the maximum aggregate principal amount of $2,660,000 (collectively, the "Sandy Spring Lien").

18.      On May 20, 2020, PD Hyde filed a proof of claim asserting a claim in the amount of $5,617,818.00, of which it asserts that $1,200,000.00 is secured by the Property (the "PD Hyde Claim").  *See* Claim No. 18.  The Debtor disputes the PD Hyde Claim, including any allegedly secured claim.

19.      Prince George's County, Maryland has filed four proofs of claim for real estate tax obligations totaling $27,884.74, secured by four parcels comprising of the Property. *See* Claim Nos. 8, 9, 10, and 11.

**D.      Marketing**

20.      As noted in nearly every pleading filed in this Court since the Petition Date, the Debtor commenced this Chapter 11 Case to facilitate the sale of the Property.  Since the commencement of the case, the Debtor has focused its limited resources on selling its primary asset, the Property, to satisfy its obligations to creditors and parties in interest.  The Debtor has retained a number of experienced professionals in connection with marketing and sale of the Property since the Petition Date to assist it with these sale efforts.  *See* Docket Nos. 47, 78, 81, 164, 173 and 194.

21.      Using its proprietary database of hundreds of local, regional, national, and international prospective buyers, the Broker identified and contacted numerous financial and

strategic investors to garner interest in pursuing a potential sale of the Property.  Commencing on

July 7, 2020, the Broker contacted and sent teasers to 75 interested parties.  Twenty-four (24) of

the interested parties executed confidentiality agreements and were asked to submit initial non-

binding letters of intent or expressions of interest. The interested parties that had executed

confidentiality agreements were then given the opportunity to access an electronic data room.

22.     Following the receipt of indications of interest from several potential buyers, the

Broker began to engage in advanced discussions regarding a potential sale transaction for the

Property with such parties.  After reviewing and carefully considering the letters of intent or

expressions of interest, the Debtor determined, in consultation with its advisors, that the best and

highest offer was from the Stalking Horse Purchaser.  The Debtor and the Stalking Horse Purchaser

thereafter prepared, negotiated, and executed the Sales Contract.  The terms of the Sales Contract

– both economic and non-economic terms – are significantly higher and better than all letters of

intent and expressions of interest received by the Debtor.

23.     The Debtor, its Broker and consultants worked closely with the Stalking Horse

Purchaser to address critical design and planning consideration relating to the Property.  These

consultants have prepared and produced reports to assist the Debtor in dealing with the Stalking

Horse Purchaser and other prospective bidders.  Such reports include geotechnical reports,

engineering analyses, environmental studies, and preliminary design work.

**E.     The Sales Contract**

24.     The Debtor's and its advisors' efforts have resulted in the entry into the Real Estate

Sales Contract dated June 1, 2021 (the "Sales Contract")[5] with JP Land Holdings, LLC (the

---

5     Capitalized terms used but not otherwise defined herein have the meanings given to them
in the Sales Contract.

"Stalking Horse Purchaser" or "JP Land Holdings"), a copy of which is attached as **Exhibit B** to this Motion.

25.    The Stalking Horse Purchaser is a subsidiary of JEN Partners, LLC ("JEN Partners"), a New York-based private equity firm that specializes in homebuilder financing and residential land investment services.  JEN Partners is the financial backer for the Stalking Horse Purchaser's proposed acquisition of the Debtor's Property.  JEN Partners has a significant presence in the metro areas around suburban Washington, D.C., and has substantial experience investing in undeveloped, infill lots that are similar to the Property.

26.    The principal involved in the transaction on behalf of the Stalking Horse Purchaser is John Petrella ("Mr. Petrella"), the owner of Holly Ridge Development, LLC ("Holly Ridge"). Holly Ridge specializes in developing large residential parcels in Maryland and Virginia for finished lot sales to national builders.  Raised in Clinton, Maryland, Mr. Petrella has significant ties with the area where the Property is located and has over three decades of experience in the real estate development industry.  Mr. Petrella began his career as a professional Land Surveyor and Project Manager at several large civil engineering firms in Maryland.  In the last 32 years, Mr. Petrella has been involved in entitling and developing approximately 10,000 residential lots in the Greater Washington area, as well as several million square feet of retail and office space.  Mr. Petrella also is affiliated with JEN Partners.

27.    The material terms of the Sales Contract are summarized in the following table. Creditors and parties in interest are encouraged to review the attached Sales Contract.  In the event of any inconsistency, the Sales Contract will govern.

| Item | Description |
| --- | --- |
| Seller | Zachair, Ltd. |
| Purchaser | JP Land Holdings LLC, a Delaware limited liability company. |

| Property<br>See §§ 1, 4, 19 | 423.45 acres of land and improvements located in Clinton Maryland (the "Property"), less (a) approximately 13 acres located adjacent to the intersections of Piscataway and Steed Roads (the "Retained Parcel"), and (b) front foot benefit rights. The Debtor expects to sell the Retained Parcel to a commercial developer. The Debtor may sell the front foot benefit rights or enter into a contract with respect to administration of such rights. |
|---|---|
| Purchase Price<br>See § 2 | $16,000,000, plus one half of transfer and recordation tax savings if sold pursuant to a plan.[6] Subject to possible adjustment for specified costs relating to Retained Parcel. |
| Payment terms<br>See § 2 | $10,000,000 cash at closing; balance paid pursuant to two year promissory bearing interest at 4% per annum; principal paid in two installments on first and second anniversary of note. |
| Collateral<br>See § 2 | Promissory note to be secured by first lien on the Property until subdivision; at time of subdivision, lien will be reduced to a portion of the Property valued at $6,000,000, and remainder of lien on the Property will be released. |
| Deposit<br>See § 3 | Initial deposit of $250,000, increases to $500,000 upon satisfactory completion of test and studies period. Initial deposit is refundable if Sales Contract is terminated before end of test and studies; thereafter, deposit is non-refundable absent seller default or failure of specified bankruptcy conditions. |
| Test and studies<br>See § 4 | Test and studies period is open for 75 days following execution of contract (*i.e.*, until August 16, 2021). The Sales Contract automatically terminates unless Purchaser delivers notice of intent to proceed on or before 75th day. |
| Closing<br>See § 6 | One year following date of Sales Contract (*i.e.*, June 1, 2022), extendable for 6 months (*i.e.*, December 1, 2022) for payment of $250,000 extension fee.[7] |

[6]    The Sales Contract provides that transfer and recordation taxes will be paid half by Seller and half by Purchaser. However, if the Property is sold pursuant to the Debtor's anticipated plan of reorganization, transfer taxes may be eliminated pursuant to 11 U.S.C. § 1146(a). Under the Sales Contract, the payment that otherwise would have been Purchaser's responsibility will be added to the Purchase Price. The Debtor estimates that absent the plan, the transfer and recordation taxes would be approximately $392,000. Thus, under the Sales Contract, selling pursuant to the plan will result in the Debtor saving approximately $196,000 in expense, and recognizing approximately $196,000 in additional cash at closing.

[7]    The timetable for closing is based principally by the time that the Stalking Horse Purchaser expects will be needed to obtain preliminary site plan approval. Preliminary site plan approval is an important milestone in the entitlement process. However, it is not the only material milestone. Completion of the entitlement process could take years more than the time allotted in the Sales Contract. The Sales Contract is attractive in part because the Stalking Horse Purchaser – unlike other bidders – is willing to assume the remaining entitlement risk once preliminary site plan

| | |
|---|---|
| Conditions precedent to purchaser's obligation to close See § 11 | (i) Title to Property must be good, marketable and insurable (other than "Permitted Exceptions"); (ii) Seller representations and warranties must be true, and seller covenants must be satisfied; and (iii) Bankruptcy Court must enter the Preliminary Approval Order or the Confirmation Order authorizing the sale of the Property to purchaser, and such order must not be subject to a stay. |
| Conditions precedent to seller's obligation to close See § 12 | (i) Bankruptcy Court shall have entered the Preliminary Approval and Bid Procedures Order; (ii) Unless waived by seller, Bankruptcy Court shall have entered the Confirmation Order; (iii) Unless waived by seller, the effective date of seller's plan shall have occurred; (iv) Unless waived by seller, Preliminary Approval and Bid Procedures Order and Confirmation Order shall have become final orders; and (v) Purchaser representations and warranties shall be true, and purchaser covenants must be satisfied. In the event seller terminates on account of failure of conditions (i)-(iv), purchaser will be entitled to refund of Deposit and any Extension Fee.  Additionally, in the event seller terminate on account of failure of conditions (ii)-(iv), purchaser shall be entitled to the Expense Reimbursement (defined below). |
| Seller remedies See § 13 | Seller's sole remedies for purchaser default are termination of contract and forfeiture of Deposit as liquidated damages. |
| Purchaser remedies See § 14 | Purchaser's remedies are: (i) Specific performance; or, alternatively (ii) Termination of contract and refund of Deposit (and in certain circumstances refund of the Extension Fee). Purchaser waives all other rights and remedies, including claims for actual damages, consequential damages, lost profits or punitive damages. |
| Bankruptcy provisions See § 20 | In the event of a closing on a sale of the Property to a bidder other than purchaser: (i) Deposit will be refunded; (ii) Extension Fee, if any, will be refunded; (iii) Purchaser shall be entitled to a break-up fee equal to 2% of the purchase price; and (iv) Purchaser shall be entitled to reimbursement of its actual third party fees and costs in connection with |

approval has been obtained.  The prospect of closing based on preliminary site plan approval means that creditors may be paid much sooner under the Sales Contract than would occur under other customary contracts for the acquisition of unentitled land.

| | contract, including without limitation engineering and attorneys' fees (the "Expense Reimbursement") |
|---|---|

## V.    RELIEF REQUESTED

28.    The Debtor intends to pursue approval for the sale of the Property in two stages. First, pursuant to this Motion, the Debtor seeks an order, substantially in the form attached hereto as **Exhibit E**, approving the sale of the Property to the Stalking Horse Purchaser pursuant to the Sales Contract (if no other Qualified Bid is received); approving the sale of the Property free and clear of liens, claims, interests, and encumbrances to the Stalking Horse Purchaser or such other party as may submit the highest or otherwise best offer for such Property; approving the Bid Procedures, including the Bid Deadline, the Auction, and the Sale Hearing; and approving the form and manner of notice thereof.  Second, the Debtor will solicit additional bids for the Property and, if any Qualified Bids are received, conduct an auction and subsequently seek entry of an order approving the Prevailing Bidder at the Sale Hearing.  The Debtor proposes that the Auction and Sale Hearing take place concurrently with the Confirmation Hearing on the Debtor's plan of reorganization.

### A.    Approval of the Bid Procedures

29.    To ensure that the Debtor can continue to solicit, receive, and evaluate bids in a fair and orderly manner, the Debtor proposes to adopt the Bid Procedures.  The Bid Procedures are designed to encourage all entities to put their best bids forward and to maximize the value of the Debtor's estate.  The key provisions of the Bid Procedures are summarized below:[8]

---

8    This summary is qualified in its entirety by the Bid Procedures attached as **Exhibit C**  to this Motion.  To the extent there are any conflicts between this summary and the Bid Procedures, the terms of the Bid Procedures shall govern.

| Item | Description |
|---|---|
| Bid Deadline | August 12, 2021 |
| Auction | If Qualified Bids are received, Auction will occur concurrently with the hearing on confirmation of Debtor's plan (projected to occur during first two weeks of September, 2021).  Debtor reserves right to schedule Auction separately from confirmation hearing.  Only Qualified Bidders will be permitted to participate in Auction. |
| Due Diligence | Upon execution of confidentiality agreement and provision of information regarding financial capacity, Potential Bidders  will be provided access to reports and additional documents maintained in the Broker's online data room.  Debtor, in its sole discretion, may permit Potential Bidders to conduct on-site tests and studies upon execution of appropriate agreement indemnifying Debtor.  All due diligence must be completed by the Bid Deadline. |
| Qualified Bids | For the purpose of determining eligibility to participate in the Auction, Qualified Bids must: <ul><li>be formal, binding and unconditional, except for conditions relating to development entitlements and court approval;</li><li>not be conditioned on any unperformed due diligence;</li><li>be supported by documentation showing financial wherewithal;</li><li>Be accompanied by a non-refundable deposit in an amount not less than $500,000; and</li><li>be irrevocable until the first to occur of (i) conclusion of the Confirmation Hearing (or Sale Hearing, if conducted separately from the Confirmation Hearing), or (ii) the Debtor's written rejection of such bid.</li></ul> |
| Conduct of Auction | Unless otherwise determined by the Debtor or the Court, the Auction will take place in open court.  Bid increments shall be not less than $100,000.  Bids made at Auction shall be irrevocable until entry of an order approving sale to the Prevailing Bidder.  Bidders will be required to certify that they have not engaged in any collusion with respect to the Bid or the sale. |
| Deposits | Deposits posted by non-prevailing bidders shall be refunded within five days following entry of the order approving the Prevailing Bidder. |
| As Is, Where Is | The Sale of the Property shall be on an "as is, where is" basis and without representations of warranties of any kind, nature, or description by the Debtor, its agents or estate, except to the extent set forth in the Sales Contract (or such form of sales contract submitted by the Prevailing Bidder and agreed upon by the Debtor and approved by the Court). |
| Reservation of Rights | The Debtor reserves its rights to modify the Bid Procedures in any manner that will best promote the goals of the Bid process, or impose, at or prior to the conclusion of the Auction, additional customary terms and conditions on the sale of the Property, including, without limitation: (a) extending the deadlines set forth in these Bid Procedures; (b) adjourning the Auction and/or adjourning the Sale Hearing; (c) adding procedural rules that are reasonably necessary or advisable under the circumstances |

| | for conducting the Auction; (d) rescheduling or canceling the Auction; and (e) rejecting any or all Bids or Qualified Bids. |
|---|---|

## B.  Proposed Notice Procedures

30.     The Debtor will serve (i) the notice of the Sale, Bid Procedures, Potential Auction, and Sale Hearing (the "Sale Notice"), and (ii) the Sale and Bid Procedures Order within five (5) business days after entry of the Sale and Bid Procedures Order, or as soon thereafter as practicable, by U.S. first-class mail, postage prepaid, upon the following parties (collectively, the "Notice Parties"):

(a)     All potential buyers previously identified or solicited by the Debtor or the Broker and any additional parties who have previously provided a written expression of interest to the Debtor or the Broker;

(b)     Other potentially interested parties identified by the Debtor or its Advisors;

(c)     The Office of the United States Trustee for the District of Maryland;

(d)     The holders of the 20 largest unsecured claims against the Debtor, as identified in the Debtor's chapter 11 petition;

(e)     All parties in interest who have requested notice under Bankruptcy Rule 2002; and

(f)     All parties who are known to possess or assert a lien, claim, encumbrance or interest in or upon any of the Property.

## C.  Approval of Proposed Sale

31.     The Debtor requests that the Court enter the Sale and Bid Procedures Order approving the Sale of the Property, free and clear of liens, claims, interests, and encumbrances, in accordance with the terms and conditions contained in the Sales Contract to the Stalking Horse Purchaser or, if applicable, the Prevailing Bidder, and granting such other relief as is necessary to effectuate the transactions contemplated by the Sales Contract (or such other form of sales contract submitted by the Prevailing Bidder and agreed to by the Debtor).

-17-

32.     The Debtor also requests that the Court waive the fourteen (14) day stay that otherwise may be applicable under Bankruptcy Rules 6004(h), so that the Sale and Bid Procedures Order is effective immediately upon entry.

33.     The Debtor is not seeking to assume and assign any of the Leases (as defined in the Sales Contract) pursuant to 11 U.S.C. § 365 as the Debtor has terminated or will terminate all Leases with respect to the Property.   There are no leases, tenancies, licenses, or other rights of occupancy or use for any portion of the Property except the Leases identified in the Sales Contract. The Debtor will terminate the Leases prior to Closing by giving written notice of termination.[9]

## VI.     GROUNDS FOR RELIEF

**A.     Approval of the Sale Is Warranted Under Section 363 of the Bankruptcy Code.**

34.     Section 363 of the Bankruptcy Code provides that the debtor "after a notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b).   While the Bankruptcy Code does not specify the standard for approving the sale of property outside of the ordinary course under section 363, courts routinely hold that the business judgment standard applies.  *See, e.g., In re Fischer*, 2010 WL 2746329, at *10 (Bankr. D. Md. July 9, 2010) (stating that in determining whether to approve a proposed sale under section 363, courts apply standards that "represent essentially a business judgment test."); *In re On-Site Sourcing, Inc.,* 412 B.R. 817, 824 (Bankr. E.D. Va. 2009) ("the bankruptcy court must conclude, from the evidence, that the movant satisfied its fiduciary obligations and established a valid business justification."); *In re U.S. Airways Grp.,* 2002 WL 31829093, at *1 (Bankr. E.D. Va. Dec. 16, 2002) (holding that the debtors' sound business judgement was

---

9       The Debtor believes that all of the tenant leases are terminable by giving 30-days' written notice.  However, copies of certain leases have not been located.  Thus, out of an abundance of caution, the Debtor is seeking to sell free and clear of all Leases effective as of closing.

sufficient to allow for the termination of mortgages); *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 147-49 (3d Cir. 1986) (implicitly adopting the "sound business judgment test" of Lionel); *In re Dura Auto. Sys., Inc.*, 2007 WL 7728109, at *5 (Bankr. D. Del. Aug. 15, 2007) (finding that "[t]he Debtors have demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the Sale prior to, and outside of, a plan of reorganization"); *Titusville Country Club v. Pennbank (In re Titusville Country Club)*, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991) (same).

35.     When a debtor articulates a valid business justification for disposition of estate property outside of the ordinary course of business, the business judgment rule is a presumption that the debtor's decision was made "on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *See Official Comm. Of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom,* 488 A.2d 858, 872 (Del. 1985)).

36.     As set forth in this Motion, the Debtor has a sound business justification for selling the Property.  After a rigorous selection process, the Debtor engaged the Broker, a top local real estate agent and broker.  The Broker has considerable experience in marketing and selling real property similar to the Property and is well qualified to render real estate agent and broker services to the Debtor.

37.     Immediately upon its retention in June 2020, the Broker commenced a thorough marketing process for the Property.  Using its proprietary database of hundreds of local, regional, national, and international prospective buyers, the Broker identified and contacted numerous financial and strategic investors to garner interest in pursuing a potential sale of the Property.  Commencing on July 7, 2020, the Broker contacted and sent teasers to 75 interested parties.

Twenty-four (24) of them executed confidentiality agreements and were asked to submit initial non-binding letters of intent or expressions of interest. The interested parties that had executed confidentiality agreements were then given the opportunity to access an electronic data room. Five prospective purchasers submitted letters of intent.

38.    Following the Broker's receipt of indications of interest from several potential buyers, the Broker negotiated a potential sale of the Property with several parties. Ultimately, the Debtor, in consultation with its Advisors (as well as its secured lender, Sandy Spring Bank), determined that the best and highest offer was from the Stalking Horse Purchaser. The Debtor and the Stalking Horse Purchaser thereafter prepared, negotiated, and executed the Sales Contract.

39.    In connection with the Broker's marketing efforts, the Debtor engaged consultants who worked collaboratively with the Debtor, the Broker and the Stalking Horse Purchaser to address critical design and planning considerations relating to the Property. These consultants have prepared and produced reports to assist the Debtor in dealing with the Stalking Horse Purchaser, and other prospective purchasers. Such reports include geotechnical reports, engineering analyses, environmental studies, and preliminary design work.

40.    The terms of the Sales Contract – both price and non-economic terms – are significantly higher and better than all other letters of intent received by the Debtor to date. In addition to providing for the highest price offered so far, other aspects distinguish the Sales Contract from other bids that the Debtor received. For example, other proposals received by the Debtor required completion of the full entitlement process; the Sales Contract provides for closing upon receipt of preliminary site plan approval. Awaiting final approval of all entitlements could result in more than an additional year before closing would occur.

41.     The purchase price under the Sales Contract is enough to pay all creditors in full (including disputed claims). Indeed, the first payment at closing will be at least $10,000,000. The aggregate amount of the secured claims is approximately $4,000,000, leaving approximately $6,000,000 for the payment of administrative expenses and unsecured claims. Furthermore, at closing, the Sales Contract requires the delivery of a promissory note in the amount of $6,000,000 (subject to possible adjustments for costs payable by the Debtor). The Debtor estimates that the Sales Contract will provide for payment in full of all claims, and provide a return to the Debtor's equity owners.

42.     Even though the Debtor and the Broker engaged in extensive marketing efforts, which are more than sufficient to complete a fair and open sale process, the Debtor insisted on retaining the right to conduct additional marketing to ensure that the Debtor would obtain the best and highest terms available in the market. The Sales Contract expressly permits ongoing marketing efforts.

43.     For the foregoing reasons, the Debtor believes that the proposed Sale reflects a sound exercise of its business judgment and should be approved.

**B.      The Bid Procedures Are Fair, Designed to Maximize the Value Received for the Property.**

44.     The Bid Procedures are designed to maximize the value received for the Property. The process set forth in the Bid Procedures builds on the ample marketing that already has taken place. The Property has been exposed to the market for a year, and the most likely bidders already are familiar with the Property and the development criteria required in Prince Georges' County. To further facilitate the review by potential bidders, the Debtor engaged various consultants, who have generated tests and studies that land purchasers customarily require. These include a geotechnical report, an environmental report, and preliminary engineering design work. All of

these reports will be available to potential bidders.  Additionally, as part of the Sales Contract, the Stalking Horse Purchaser has agreed to provide to the Debtor a copy of any report that it obtains, and the Debtor will be permitted to share any such report with prospective bidders.

**C.    The Sale Should be Approved "Free and Clear" Under Section 363(f).**

45.    Section 363(f) of the Bankruptcy Code permits a debtor to sell property free and clear of any interest in such property of an entity other than estate if: (a) applicable nonbankruptcy law permits sale of such property free and clear of such interest; (b) the holder of the interest consents; (c) the interest is a lien and the sale price of the property exceeds the value of all liens on the property; (d) the interest is in bona fide dispute; or (e) the holder of the interest could be compelled in a legal or equitable proceeding to accept a money satisfaction of such interest. *See* 11 U.S.C. § 363(f).  This provision is supplemented by section 105(a) of the Bankruptcy Code, which provides that "[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

46.    As section 363(f) is stated in the disjunctive, it is only necessary to satisfy one of the five requirements enumerated therein to warrant the sale of the Debtor's property free and clear of all liens, claims, rights, interests, charges, or encumbrances.  *In re Collins,* 180 B.R. 447, 450 (Bankr. E.D. Va. 1995) ("Section 363(f) is phrased in the disjunctive, such that only one of the enumerated conditions must be met. . . ."); *see also In re Kellstrom Indus., Inc.,* 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("[I]f any of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens.").

47.    The Debtor has demonstrated satisfaction of the requirements of Bankruptcy Code 363(f).  First, the sale price manifestly exceeds the aggregate amount of the liens on the Property. *See* 11 U.S.C. § 363(f)(3). The total alleged secured debt in this Chapter 11 Case is less than

-22-

$4,000,000 (including the disputed lien asserted by PD Hyde).  The initial cash payment at closing is $10,000,000, and the Debtor additionally will receive a promissory note in the amount of approximately $6,000,000.  Thus, the proceeds of the Sale Contract far exceed the aggregate amount of all liens (disputed and undisputed).

48.    Second, the alleged lien (and indeed the entire claim) asserted by PD Hyde is subject to a bona fide dispute.  Under section 363(f)(4), a sale free and clear of liens may be authorized when a bona fide dispute exists.  *See Atlas Mach. & Iron Works, Inc. v. Bethlehem Steel Corp.,* 986 F.2d 709, 715 (4th Cir.1993) (although courts have not agreed on a precise definition of 'bona fide dispute,' it entails some sort of meritorious, existing conflict."); *In re Mitchell*, 525 B.R. 38, 41 (Bankr. M.D.N.C. 2014) (trustee must show factual grounds supporting an 'objective basis' for the dispute; the Court need not "resolve the underlying dispute, just determine its existence"); *In re L.L. Murphrey Co.*, 2013 WL 2451368, at *4 (Bankr. E.D.N.C. June 6, 2013) (the phrase "bona fide dispute" is not defined by the Bankruptcy Code; however, courts have found the existence of a "bona fide dispute" for purposes of § 363(f)(4) when "there is an objective basis for either a factual or legal dispute as to the validity of the asserted interest"); *In re Millerburg,* 61 B.R. 125, 127 (Bankr.E.D.N.C.1986) (finding that the trustee's "potential" adversary proceeding to avoid a lien "qualif[ied] as a bona fide dispute for purposes of § 363(f)(4)").

49.    A bona fide dispute plainly exists with respect to the claim and lien of PD Hyde.  Despite three extensions of the closing date, PD Hyde failed to close under its 2013 contract with the Debtor.  In 2018, PD Hyde asked for a fourth extension of the closing deadline.  Frustrated with PD Hyde's unjustified lack of progress toward closing, the Debtor denied the request.  PD Hyde filed suit in Prince George's County in November 2018.  That litigation has lingered ever since.  Documentary discovery has not been completed, and no depositions have been taken.  PD

Hyde accuses the Debtor of impeding the development of the Property by bringing fill dirt on to the Property.  PD Hyde's argument is belied by the fact that the documents between the parties expressly allocate responsibilities and costs related to any excess fill dirt.  The Sales Contract between the Debtor and the Stalking Horse Purchaser itself casts tremendous doubt on PD Hyde's position; with full knowledge of the status of fill dirt on the Property, a highly experienced and competent developer signed a contract and is proceeding.

50.    Finally, Section 363(f)(5) permits a sale free and clear where entities holding such interests could be compelled to accept money satisfaction in legal or equitable proceedings.  All of the interests in the Property are liens, which can be satisfied with a money payment.  The liens of Sandy Spring and the real estate tax liens will be paid in the ordinary course at closing.  The disputed claim of PD Hyde, which arises only Section 365(j) under the Bankruptcy Code, can be satisfied by a payment of money.  As discussed above, the proceeds of the sale far exceed the amount of all liens, and the proposed sale order provides for the Court to determine what, if any, adequate protection would be appropriate for PD Hyde.  *See In re Barkats*, 2019 WL 3774104, at *2 (Bankr. D.D.C. Aug. 9, 2019) (approving a sale of property free and clear pursuant to section 363(f)(5) where amount of bank's secured claim was undetermined as of closing, but would eventually be paid).  Accordingly, pursuant to Bankruptcy Code section 363(f)(5), the Debtor may sell the Property free and clear of all liens, claims, and encumbrances.

51.    Accordingly, the Debtor requests that the Property be transferred to the Prevailing Bidder free and clear of any and all liens, claims and interests other than any permitted encumbrances.

**D.      Requiring PD Hyde to Release the Lis Pendens on the Property is Essential.**

52.      In conjunction with the Debtor's request for "free and clear" sale of the Property under section 363(f) of the Bankruptcy Code, the Debtor seeks an order requiring PD Hyde to release of record the Lis Pendens on the Property within fourteen (14) calendar days following the entry of the Sale and Bid Procedures Order.  The need to clear record title to the Property is clear. First, no title company will close the Sale unless and until the Lis Pendens is released from the official land records.  If a buyer cannot close the Sale, the underlying goal of this Motion would be frustrated.  *See Rosen v. Andresen*, Adv. Pro. No. 06-01753 (TJC), 2006 Bankr. LEXIS 4204 (Bankr. D. Md.  Nov. 1, 2006) (J. Catliota) (". . . [A]s a result of the Debtor's filing of the Lis Pendens, the prospective buyer of the Property have been unable to obtain title insurance for the Property.").  The inability to obtain title insurance for the Property also could deter potential buyers from submitting Bids that otherwise would be evaluated for value maximizing sale process.  *See, e.g., In re Kent Manor Inn, LLC*, No. 16-18048-TJC, 2017 WL 2267241, at *5 (Bankr. D. Md. May 23, 2017) ("the purpose of allowing the sale of an asset 'free and clear' of third-party interests is to 'maximize the value of the asset, and thus enhance the payout made to creditors.'") (quoting *In re Mundy Ranch, Inc*., 484 B.R. at 422).

53.      Second, the Sales Contract specifically requires the Debtor to obtain an order from this Court to have the Lis Pendens released of record.  *See* Sales Contract, Exhibit B, § 20(b). Without a requirement that the Lis Pendens be released, the Stalking Horse Purchaser may terminate the Sales Contract.  Thus, an order requiring PD Hyde to release the Lis Pendens is essential.

54.      Requiring release of lis pendens and similar clouds on title is routinely approved in connection with sales free and clear.  In *In re Hampton Ventures, LLC*, 2019 WL 1216810, at *4

(Bankr. D. Conn. Mar. 12, 2019), the Court specifically ordered, among other things, the subject property to be transferred to the buyer free and clear of the following: "*Lis pendens* filed by Ms. St. George and Mr. Nappo and recorded on April 7, 2014 in Volume 4844, Page 453 of the West Hartford Land Records relating to a pre-petition constructive trust claim in *St. George v. Hampton Ventures, LLC*, Superior Court, judicial district of Hartford, Docket No. CV-14-6050185-S." Other courts have similarly allowed a sale of property free and clear of any notices that could create a cloud on title. *See In re Borders Grp., Inc.*, 2011 WL 5520261, at *8 (Bankr. S.D.N.Y. Sept. 27, 2011) (authorizing the purchaser to remove "any record, **notice filing** or financing statement recorded to attached, perfect or otherwise notice any lien or encumbrance") (emphasis added); *In re GWLS Holdings, Inc.*, 2009 WL 7215668, at *9 (Bankr. D. Del. Jan. 27, 2009) (same).

### E.   The Sale is Proposed in Good Faith and Without Collusion, and the Purchaser is a Good Faith Purchaser.

55.    The Debtor requests that the Court find that the Prevailing Bidder is entitled to the benefits and protections provided by section 363(m) of the Bankruptcy Code in connection with the Sale.  Section 363(m) of the Bankruptcy Code is designed to protect the sale of a debtor's assets to a good faith purchaser, and provides that:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale . . . were stayed pending appeal.

11 U.S.C. § 363(m).

56.    While the Bankruptcy Code does not define good faith, many courts have held that a purchaser shows its good faith through the integrity of its conduct during the course of the sale

process. *Willemain v. Kivitz,* 764 F.2d 1019, 1023 (4th Cir. 1985) ("Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.") (quoting *In re Rock Industries Machinery Corp.,* 572 F.2d 1195, 1198 (7th Cir. 1978)); *Andy Frain Services,* 798 F.2d 1113, 1125 (7th Cir. 1986); *In re Sasson Jeans,* 90 B.R. 608, 610 (S.D.N.Y. 1988).

57.     The Sales Contract has been pursued and proffered in good faith, and negotiated at arm's length, with both parties represented by their own counsel.  There has not been (and will not be) any fraud or collusion between the Debtor and the Stalking Horse Purchaser.  There is no relationship of any kind between the Debtor and Mr. Petrella or his firm, other than the ordinary seller-purchaser relationship created by the Sales Contract.

58.     The Debtor believes that providing any Prevailing Bidder with the "good faith" purchaser protection will ensure the maximum price will be received by the Debtor for the Property.  As such, the Debtor submits that any Prevailing Bidder is or will be a good faith purchaser, entitled to the protections of section 363(m) of the Bankruptcy Code, and that none of the Debtor, the Prevailing Bidder, nor their respective affiliates, principals, employees or their representatives has engaged in any conduct that would cause the Sale to be avoided under Section 363(n).

**F.     The Proposed Bid Protections Are Reasonable.**

59.     The Debtor believes that the Bid Protections afforded to the Stalking Horse Purchaser are reasonable and appropriate in light of the circumstances.

60.     Approval of Bid Protections in connection with the sale of significant assets pursuant to Bankruptcy Code section 363 has become established practice in chapter 11 cases.

*See, e.g., Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527 (3d Cir. 1999); *Integrated Res., Inc.*, 147 B.R. at 656–57 (break-up fee arrangements that have been negotiated by a debtor are to be reviewed according to the deferential "business judgment" standard, under which such procedures and arrangements are "presumptively valid"); *In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (the business judgment standard protects breakup fees and other contractual provisions negotiated in good faith); *see also Order (I) Approving Asset Purchase Agreement and Authorizing The Sale of Certain Assets of Debtor Outside the Ordinary Course of Business, (II) Authorizing the Sale of Assets Free and Clear of All Liens, Claims, Encumbrances and Interests, (III) Authorizing the Assumption, Sale and Assignment of Certain Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief, In re Neogenix Oncology, Inc.*, No. 12-23557-TJC (Bankr. D. Md. Sept. 9, 2012) [Docket No. 176] (approving $475,000 break-up fee with respect to asset sale that had a cash purchase price of less than $4,000,000, plus common stock and rights).

61.    Here, the proposed 2.0% break-up fee is well within the range of reasonableness and supported by a sound business justification.  Courts have found break-up fees to be reasonable, and approved the same, ranging up to approximately five percent (5%) of the consideration to be received.  *See Integrated Res., Inc.*, 147 B.R. at 662 (expert testimony that 3.3% is industry average for break-up fees); *In re Enron Corp.* (Bankr. S.D.N.Y., Apr. 8, 2004) (approving break-up fee equal to 5% of the purchase price); *see also, e.g., In re Stone Energy Corp.* (Bankr. S.D. Tex. Jan. 18, 2017) (approving 3% break-up fee).  Likewise, the proposed Expense Reimbursement is fair and reasonable in light of the nature of the proposed Sale.  *See In re Chesapeake Hardwood Prod., Inc.*, 2010 WL 5240048, at *2 (Bankr. E.D. Va. Sept. 23, 2010) (approving the out-of-pocket costs for due diligence investigation of the property, including, but not limited to, investigating the title

of the property, obtaining an updated survey, an engineering property condition report and environmental report for the property).

62.    The Debtor believes that the Bid Protections increase the likelihood of a sale to a contractually committed bidder at a price the Debtor believes is fair, while providing the Debtor with an opportunity to enhance the value to its estate through an auction process. The amount of the Bid Protections are a result of good-faith efforts and reasonable and appropriate in light of the size and nature of the Sale. Payment of the Bid Protections also will not diminish the value of Debtor's estate, as the Debtor does not intend to terminate the Sales Contract and pay the Bid Protections, unless doing so would permit the Debtor to accept a materially higher and better Bid.

**G.    Existing Secured Creditors Are Adequately Protected.**

63.    The holders of secured claims are adequately protected and will not be impaired by the proposed Sale of the Property. Adequate protection serves to protect a secured creditor's "interests against the diminution in value of [its] security during a bankruptcy proceeding." *In re Health Diagnostic Lab., Inc.,* 2015 Bankr. LEXIS 4471, at *25 (Bankr. E.D. Va. Aug. 17, 2015) (quoting *Contrarian Funds LLC v. Aretex LLC (In re WestPoint Stevens, Inc.),* 600 F.3d 231, 257 (2d Cir. 2010)). *See also In re 495 Central Park Ave. Corp.,* 136 B.R. at 631 ("The goal of adequate protection is to safeguard the secured creditor from diminution in the value of its interest during the Chapter 11 reorganization."); *In re Beker Indus. Corp.,* 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986); *In re Hubbard Power & Light,* 202 B.R. 680, 685 (Bankr. E.D.N.Y. 1996).

64.    Sandy Spring and Prince George's County will be adequately protected as the Debtor will make a full payment of their respective liens at closing (unless otherwise agreed or ordered by the Court).  The Court will determine the extent to which PD Hyde's disputed lien is entitled to adequate protection.

**H.      The Sale Notice Should Be Approved.**

65.      As noted above, within five (5) business days after the entry of the Sale and Bid Procedures Order, or as soon as reasonably practicable thereafter, the Debtor will serve the Sale Notice upon the Notice Parties.

66.      The notice of this Motion and the related hearing to consider entry of the Order, coupled with service of the Sale Notice constitutes good and adequate notice of the Auction. Accordingly, the Debtor requests that the Court approve the form and manner of the Sale Notice.

**I.      Waiver of Stay Bankruptcy Rule 6004(H).**

67.      The Debtor also requests that the Court waive the stay imposed by Bankruptcy Rule 6004(h). *See* Fed. R. Bankr. P. 6004(h).  As set forth above, the relief requested herein is necessary and appropriate to maximize the value of the Debtor's estate for the benefit of its economic stakeholders.

68.      Accordingly, the Debtor respectfully requests that the Court waive the 14-day stays imposed by Bankruptcy Rule 6004(h), as the nature of the relief sought herein justifies immediate relief.

**J.      Reservation of Rights.**

69.      Nothing contained herein is intended or shall be construed as: (a) an admission as to the amount of, basis for, or validity of any claim against the Debtor under the Bankruptcy Code, any foreign bankruptcy or insolvency law, or other applicable nonbankruptcy law; (b) a waiver of the Debtor's or any other party in interest's right to dispute any claim on any grounds, (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion; (e) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property

of the Debtor's estate; or (f) a waiver of any claims or causes of action which may exist against

any entity under the Bankruptcy Code or any other applicable law.

Dated: June 11, 2021                              */s/ Bradford F. Englander*
                                                  Whiteford, Taylor & Preston, LLP
                                                  Bradford F. Englander, Esq., Bar No. 11951
                                                  3190 Fairview Park Drive, Suite 800
                                                  Falls Church, Virginia 22042
                                                  Telephone: (703) 280-9081
                                                  Facsimile: (703) 280-3370
                                                  Email: benglander@wtplaw.com

                                                  *Counsel for the Debtor*