Entered: July 27th, 2021
Signed: July 27th, 2021

**SO ORDERED**

This Order amends the order entered on July 26, 2021, at ECF 234.



**THOMAS J. CATLIOTA**
**U.S. BANKRUPTCY JUDGE**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MARYLAND**

|  |  |  |
|---|---|---|
| **In re:** | ) | |
| | ) | |
| **Zachair, Ltd.,** | ) | **Case No.: 20-10691-TJC** |
| | ) | |
| **Debtor.** | ) | **Chapter 11** |
| | ) | |

**AMENDED ORDER (A) APPROVING THE SALE OF THE DEBTOR'S PROPERTY**
**FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES,**
**(B) APPROVING THE SALES CONTRACT, (C) APPROVING**
**BID PROCEDURES, (D) SCHEDULING BID DEADLINE, AUCTION**
**AND SALE HEARING, (E) APPROVING FORM AND MANNER OF NOTICE**
**THEREOF, AND (F) GRANTING CERTAIN RELATED RELIEF**

Upon the *DEBTOR'S MOTION FOR AN ORDER (A) APPROVING THE SALE OF THE*

*DEBTOR'S PROPERTY FREE AND CLEAR OF LIENS, CLIAMS, INTERESTS AND*

*ENCUMBRANCES, (B) APPROVING THE SALES CONTRACT, (C) APPROVING BID*

*PROCEDURES, (D) SCHEDULING BID DEADLINE, AUCTION AND SALE HEARING, (E)*

*APPROVING FORM AND MANNER OF NOTICE THEREOF, AND (F) GRANTING CERTAIN*

*RELATED RELIEF*, filed on June 11, 2021 [clerk's docket no. 215] (the "Motion")[1] of Zachair Ltd., the debtor and debtor in the above-captioned case (the "Debtor"), it appearing that the relief granted herein is in the best interests of the Debtor's estate, its creditors, and other parties in interest; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; and consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; notice of the Motion having been adequate and appropriate under the circumstances; and after due deliberation and sufficient cause appearing therefor, **THE COURT FINDS THAT:**

A.   <u>Findings of Fact and Conclusions of Law</u>.  The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

B.   <u>Jurisdiction and Final Order</u>. This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334. This proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper in this district and in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

C.   <u>Bases for Relief Requested</u>. The bases for the relief requested in the Motion are: (1) sections 105 and 363 of the Bankruptcy Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy

---

[1]   Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the attached Bid Procedures and the Motion.

Code"); (2) Rules 2002(a)(2), 6004, 9007, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"); and (3) Rule 6004-1 of the Local Bankruptcy Rules for the District of Maryland (the "Local Rules").

      D.    <u>Notice</u>. Notice of the Motion and the hearing on the Motion was sufficient under the circumstances and no other or further notice need be provided except as set forth in the Bid Procedures. A reasonable opportunity to object and be heard regarding the relief requested in the Motion has been afforded to parties in interest.

      E.    <u>Sale of the Property; Bid Procedures</u>. The Debtor is seeking authority to sell it real property, consisting of approximately 423.45 acres, located in Prince George's County, Maryland, as more fully described in **Exhibit A** hereto (the "Property"). The Debtor has entered into a Real Estate Sales Contract dated June 1, 2021 (the "Sales Contract"), which is attached hereto as **Exhibit B**. The Sales Contract is subject to potential overbid. The purchaser under the Sales Contract is JP Land Holdings LLC, a Delaware limited liability company (the "Stalking Horse Purchaser"). The Property has been marketed amply by the Debtor and its approved broker, Fraser Forbes Real Estate Services, LLC (the "Broker"). Notwithstanding the ample marketing efforts, the Debtor is permitted under the Sales Contract to continue marketing the Property. The Debtor has proposed Bid Procedures to maximize the recovery on the sale of the Property, and to ensure an orderly sale process (the "Sale"). A copy of the Bid Procedures is attached hereto as **Exhibit C**. The Debtor has articulated good and sufficient cause for authorizing and approving the Bid Procedures, which are fair, reasonable, and appropriate under the circumstances and designed to maximize the recovery on, and realizable value of, the Property. Both the sale to the Stalking Horse Purchaser under the Sales Contract, and the Bid Procedures, are a proper exercise of the Debtor's business judgment.

F.      Sale Notice.  The Sale Notice, substantially in the form attached hereto as **Exhibit D**, is reasonably calculated to provide all interested parties with timely and proper notice of the Sale, including, without limitation: (a) the date, time, and place of the Auction (if one is held); (b) the Bid Procedures; (c) reasonably specific identification of the Property to be sold; and (d) a description of the Sale as being free and clear of liens, claims, encumbrances, and other interests.  No other or further notice of the Sale shall be required.

G.      Best Interests of the Estate.  Approval of the Sales Contract and (subject to the outcome of any Auction) the consummation of the Sale under the Sales Contract is in the best interest of the Debtor, its creditors, its estate, and all other parties in interest.  The Debtor has demonstrated both (i) good, sufficient, and sound business purposes and justifications and (ii) compelling circumstances for this Court to approve the Sales Contract and consummation of the Sale.

H.      Good Faith Purchaser.  The Stalking Horse Purchaser is an arm's length, third-party purchaser and is unrelated to the Debtor.  Neither the Stalking Horse Purchaser, nor any of its affiliates, subsidiaries, officers, directors, members, partners, principals, or any of their respective representatives, successors, or assigns is an "insider" of the Debtor, as that term is defined in section 101(31) of the Bankruptcy Code. The Sales Contract was negotiated, proposed, and entered into by the Debtor and the Stalking Horse Purchaser without collusion or fraud, in good faith, and on an arm's-length basis.  Neither the Debtor, nor the Stalking Horse Purchaser, nor any affiliate of the Stalking Horse Purchaser has engaged in any conduct, action or inaction that would cause or permit the Sales Contract to be avoided under section 363(n) of the Bankruptcy Code.  The Stalking Horse Purchaser is purchasing the Property in good faith and is a good-faith buyer within the meaning of section 363(m) of the Bankruptcy Code.  The

Stalking Horse Purchaser is, therefore, entitled to all of the protections afforded thereby. The consideration provided by the Stalking Horse Purchaser pursuant to the Sales Contract is (a) reasonably equivalent value under the Bankruptcy Code and any Uniform Fraudulent Transfer Act, (b) fair consideration under any Uniform Fraudulent Conveyance Act, and (c) reasonably equivalent value, fair consideration, fair salable value, and fair value under any such laws as applicable or any other applicable laws of the United States, any state, territory, or possession thereof, or the District of Columbia. Neither the Debtor nor the Stalking Horse Purchaser has entered into the Sales Contract or is consummating the Sale with any fraudulent or otherwise improper purpose, including, but not limited to, the purpose of hindering, delaying, or defrauding present or future creditors of the Debtor or its estate. The terms of the Sale Contract and the transactions contemplated in connection therewith are fair and reasonable in light of the circumstances of the Debtor's business and the Chapter 11 Case.

I.    <u>Free and Clear</u>. Effective as of the Closing, pursuant and subject to the terms of the Sales Contract, the transfer of the Property and the Sale will effect a legal, valid, enforceable, and effective transfer of the Property and will vest the Stalking Horse Purchaser with all of the legal, equitable and beneficial right, title, and interest of the Debtor in the Property, free and clear of (i) all claims, liens, and encumbrances (including any liens as that term is defined in section 101(37) of the Bankruptcy Code and as the term "Liens" is defined in the Sales Contract) relating to, accruing, or arising at any time prior to the Closing Date, including but not limited to the Lien securing the claims of Sandy Spring, real estate taxes, and the alleged Lien of PD Hyde (collectively, the "Liens") and (ii) except as otherwise provided in this Order or the Sales Contract, all debts arising from, relating to, or in any way connected with the Debtor or the Property including any claims (as that term is defined in section 101(5) of the Bankruptcy Code),

5

liabilities, obligations, demands, guaranties, options in favor of third parties, rights, contractual commitments, restrictions, interests of any kind or nature, mortgages, hypothecations, charges, indentures, loan agreements, instruments, collective bargaining agreements, leases, licenses, deeds of trust, security interests, conditional sale or other title retention agreements, pledges, judgments, claims for reimbursement, contribution, indemnity, exoneration, infringement, products liability, covenant or other restrictions of any kind, restrictions, defects of title, attachments, rights of first refusal, charges of interests of any kind or nature, if any, including, without limitation, any restriction of use or transfer, voting, transfer, receipt of income or other exercise of any attributes of ownership, alter-ego, and matters of any kind and nature, whether arising prior to or subsequent to the commencement of this Chapter 11 case, and whether imposed by agreement, understanding, law, equity, or otherwise, known or unknown, contingent or matured, liquidated or unliquidated, including, without limitation, all rights and remedies with respect to the Liens in this clause (i) that purport to give to any party a right of setoff or recoupment against, or a right or option to effect any forfeiture, modification, profit sharing interest, right of first refusal, purchase or repurchase right or option, or termination of, any of the Debtor's or the Purchaser's interests in the Property, or any similar rights (collectively, as defined in this clause (ii), "Claims"), relating to, accruing or arising at any time prior to the Closing Date including but not limited to the PD Hyde Claim.  The Stalking Horse Purchaser would not have entered into the Sales Contract and will not consummate the Sale, thus adversely affecting the Debtor, its estate, and its creditors, unless the Sale is free and clear of all Liens, Claims, encumbrances, and other interests of any kind or nature whatsoever.

J.      <u>Section 363(f) is Satisfied</u>.  The Debtor may sell the Property free and clear of all Liens, Claims, encumbrances, and other interests of any kind or nature whatsoever, because,

6

in each case, one or more of the standards set forth in section 363(f)(l)-(5) of the Bankruptcy Code has been satisfied.  Specifically, the Court finds that the standards set forth in sections 363(f)(3), (4), and (5) of the Bankruptcy Code have been satisfied.  Without limiting the generality of the foregoing, the Court finds that (1) the affected interests are Liens, and that the price at which the Property is to be sold is greater than the aggregate value of all Liens on the Property; (2) the interests asserted by PD Hyde are in bona fide dispute; and (3) the holders of Liens and alleged interests in the Property could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such Liens or interests.

K.    Transaction Not a Sub Rosa Plan.  In the event that the Sale of the Property occurs separately from the confirmation of a chapter 11 plan, the sale and assignment of the Property outside of a plan of reorganization pursuant to the Sales Contract neither impermissibly restructures the rights of the Debtor's creditors nor impermissibly dictates the terms of a liquidating plan of reorganization for the Debtor.  The transaction of the Sale does not constitute a sub rosa chapter 11 plan.

L.    Executory Contracts and Unexpired Leases.  Nothing in this Order constitutes or approves the assumption or rejection of any executory contract or unexpired lease.

M.    Break-Up Fee and Reimbursement.  The Stalking Horse Purchaser has expended, and will continue to expend, considerable time, money and energy pursuing closing under the Sale Contract.  Recognizing this expenditure of time, energy and resources, the Debtor has agreed to pay a break-up fee (the "Break-Up Fee") in the amount of 2.0% of the Purchase Price stated in the Sales Contract (*i.e.*, $320,000), and to reimburse certain fees and expenses (the "Expense Reimbursement") that have been and may be incurred by the Stalking Horse Purchaser, all on the terms and conditions set forth in the Sales Contract.  The Break-Up Fee and Expense

7

Reimbursement are (i) the product of extensive negotiations between the Debtor and the Stalking Horse Purchaser, (ii) a material inducement for, and condition of, the Stalking Horse Purchaser's entry into the Sales Contract, and (iii) fair and reasonable in view of the fact that, if the Break-Up Fee and/or the Expense Reimbursement are triggered, the Stalking Horse Purchaser's efforts will have substantially increased the chances that the Debtor will receive the highest or otherwise best offer for the Property.  Payment of the Break-Up Fee and the Expense Reimbursement under the circumstances described in the Sales Contract is: (i) an actual and necessary cost and expense of preserving the Debtor's estate within the meaning of sections 503(b)(1) and 507(a)(2) of the Bankruptcy Code; (ii) commensurate to the real and substantial benefit conferred upon the Debtor's estate by the Stalking Horse Purchaser; (iii) reasonable and appropriate, in light of the size and nature of the proposed sale transaction and comparable transactions, the commitments that have been made, and the efforts that have been and will be expended by the Stalking Horse Purchaser; and (iv) necessary to induce the Stalking Horse Purchaser to continue to pursue closing under the Sales Contract and to continue to be bound by the Sales Contract.

N.    <u>Consumer Privacy Ombudsman</u>.  The Sale does not include the transfer of any personally identifiable information.  Thus, the appointment of a consumer privacy ombudsman is not required.

O.    <u>Immediate Effect of Order / Waiver of Stay</u>. Time    is    of    the    essence    in consummating the Sale.  The Court expressly finds that there is no just reason for delay in the implementation of this Order, waives any stay including as contemplated by Bankruptcy Rule 6004(h) directs that this Order be effective immediately upon its entry, and expressly directs entry of this Order as set forth herein.

**IT IS HEREBY ORDERED THAT:**

8

1.      The Motion is **GRANTED** as provided herein.

2.      All objections to the relief requested in the Motion that have not been withdrawn, waived, or settled as announced to this Court at the hearing on the Motion or by stipulation filed with this Court, are **OVERRULED**.

3.      The Sales Contract is **APPROVED** subject only to (i) potential Overbid(s) at the Auction, in which case the Debtor will seek approval of the Sale to the Prevailing Bidder at the Sale Hearing; (ii) the entry of an order (the "Confirmation Order") confirming the Debtor's plan of reorganization (the "Plan") providing for and authorizing the Sale of the Property to the Prevailing Bidder; and (iii) the finality of this Order and the Confirmation Order.  The Debtor reserves the right to waive either or both of the conditions set forth in subsections (ii) and (iii) of this paragraph and proceed to close on the Sale of the Property pursuant to the Sales Contract without further notice or hearing except as otherwise required pursuant to the Bid Procedures.

4.      The Debtor is authorized to execute and deliver, perform under, consummate, implement, comply with and close fully the Sales Contract, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Sales Contract and the Sale, consummate the Sale subject and pursuant to, and in accordance with, the terms and conditions of the Sales Contract, and to take all further actions as may be necessary or appropriate for the purpose of assigning, transferring, granting, conveying and conferring to the Stalking Horse Purchaser all of the Debtor's right, title and interest to the Property, free and clear of all Liens and Claims, or as may be reasonably necessary or appropriate to the performance of the obligations as contemplated by the Sales Contract.  Effective as of Closing (as such term is defined in the Sales Contract), the Sale of the Property shall be free and clear of all Liens and Claims of all persons and entities, including without limitation the Claims and Interests of Sandy Spring and PD Hyde.

9

Pending Closing, the Liens and Claims of all creditors shall remain in place, subject to all claims, counterclaims, causes of action, rights and defenses of the Debtor.

5.    Unless modified in the Plan or Confirmation Order, or otherwise ordered by the Court or agreed to by the Debtor and the affected creditor, the secured claims of Sandy Spring and any real estate tax claims then due and owing, shall be paid and discharged in full in cash at Closing.  The Court shall determine by separate order whether and to what extent PD Hyde is entitled to adequate protection and, if required, the manner of such adequate protection.

6.    Subject only to the restrictions set forth in this Order and the Sales Contract, the Debtor and the Stalking Horse Purchaser are hereby authorized to take any and all actions as may be necessary or desirable to implement the Sale, and any actions taken by the Debtor and the Stalking Horse Purchaser necessary or desirable to implement the Sale prior to the date of this Order (including without limitation the execution of the Sales Contract), are hereby approved and ratified.

7.    The sale of the Property to the Stalking Horse Purchaser pursuant to the Sales Contract and the consummation of the transactions contemplated by the Sales Contract do not require any consents other than as specifically provided for in the Sales Contract.  Each and every federal, state, and local governmental agency or department is hereby authorized to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Sales Contract.  A certified copy of this Order may be filed with the appropriate clerk or recorded with the recorder of any state, county, or local authority to act to cancel any of the Liens, Claims, and other encumbrances of record.

8.    This Order shall be binding in all respects upon the Debtor and its estate, successors, and assigns, all creditors of and equity holders in the Debtor, and any and all other

parties in interest, including, without limitation, any and all holders of Liens, Claims, encumbrances, and other interests (including holders of any rights or claims based on any putative successor or transferee liability) of any kind or nature whatsoever in the Property and any trustee or successor trustee appointed in this chapter 11 case or upon a conversion to chapter 7 under the Bankruptcy Code.

9.    The Purchaser is a good faith purchaser of the Property and is hereby granted and is entitled to all of the protections provided to a good faith purchaser under section 363(m) of the Bankruptcy Code.  Pursuant to section 363(m) of the Bankruptcy Code, if any or all of the provisions of this Order are hereafter reversed, modified or vacated by a subsequent order of the Bankruptcy Court or any other court, such reversal, modification or vacatur shall not affect the validity and enforceability of any sale, transfer or assignment under the Sales Contract or obligation or right granted pursuant to the terms of this Order (unless stayed pending appeal prior to the Closing Date) and, notwithstanding any reversal, modification or vacatur, any sale, transfer or assignment, shall be governed in all respects by the original provisions of this Order or the Sales Contract, as the case may be.

10.    The Sale to the Stalking Horse Purchaser approved by this Order is not subject to avoidance or any recovery of damages pursuant to section 363(n) of the Bankruptcy Code.

11.    Except as expressly permitted or otherwise specifically provided by the Sales Contract or this Order, upon Closing, all entities and persons (as defined in sections 101(15) and (41) of the Bankruptcy Code), including, but not limited to, all lenders, debt security holders, creditors, vendors, suppliers, equity security holders, governmental, tax, regulatory authorities, lenders, trade creditors, contract counterparties, customers, landlords, licensors, employees, litigation claimants and other persons and parties to executory contracts and unexpired leases

holding Liens or Claims, encumbrances or interests of any kind or nature whatsoever in or against the Debtor or any of the Property (whether known or unknown, legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, liquidated or unliquidated, senior or subordinated, asserted or unasserted, whether arising prior to or subsequent to the commencement of these chapter 11 cases, whether imposed by agreement, understanding, law, equity or otherwise, arising under or out of, in connection with, or in any way relating to, the Debtor, the Property, the operation of the Debtor's business before the Closing or the transfer of the Debtor's interests in the Property to the Purchaser) are and shall be forever barred, estopped, and permanently enjoined from asserting any such Liens, Claims, encumbrances or interests against the Purchaser, its successors, designees, assigns, or against the Property.

12.     PD Hyde shall take any and all necessary actions to release of record the Lis Pendens recorded on the Property within fourteen (14) calendar days following the entry of this Order.

13.     Within fourteen (14) calendar days following the Debtor's written request, PD Hyde shall take any and all necessary actions reasonably requested by the Debtor to remove any impediments to the approval of the Development, including but without limitations, withdrawing or terminating any pending comprehensive development plan(s), proposals, and applications previously submitted to the local, state, or federal governmental entity or entities.

14.     Neither the Stalking Horse Purchaser, nor any of its assignees, affiliates, agents, officers or employees (together, "Related Parties") are or shall be deemed, as a result of the consummation of the Sale contemplated herein, to: (a) be legal successors to the Debtor or its estate by reason of any theory of law or equity, (b) be an affiliate of the Debtor, (c) have, *de*

*facto* or otherwise, merged with or into the Debtor or its estate, (d) be an alter ego or a mere continuation or substantial continuation or successor of the Debtor in any respect. Except as expressly permitted or otherwise specifically provided for in the Sales Contract or this Order, neither the Purchaser nor any of its Related Parties shall (i) assume or in any way be responsible for any liability or obligation of any of the Debtor and/or its estate or (ii) have any liability or responsibility for any liability or other obligation or any acts or omissions of the Debtor in the conduct of business, arising under or related to the Property or otherwise, other than as set forth in the Sales Contract. Without limiting the generality of the foregoing, and except as otherwise specifically provided herein and in the Sales Contract, the Stalking Horse Purchaser and its Related Parties shall not be liable for any Liens, Claims, encumbrances or interests against the Debtor or the Property. The Stalking Horse Purchaser and its Related Parties shall have no successor or vicarious liabilities of any kind or character including but not limited to any theory of warranty, product liability, environmental, successor or transferee liability, labor law, merger or *de facto* merger, or substantial continuity, for Claims known or unknown, and whether asserted or unasserted at the time of the Closing Date including, but not limited to, liabilities on account of any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the operation of the Debtor's business prior to the Closing.

15.    All persons and entities are hereby forever prohibited and enjoined from taking any action that would adversely affect or interfere with the ability of the Debtor to sell and transfer the Property to the Stalking Horse Purchaser in accordance with the terms of the Sales Contract and this Order.

16.    The Break-Up Fee and Expense Reimbursement afforded to the Stalking Horse Purchaser are reasonable, necessary, and a proper exercise of the Debtor's business judgment,

and hereby are approved.  The Debtor's obligation to pay the Break-Up Fee and Expense Reimbursement shall constitute a priority administrative expense obligation under Section 503(b)(1)(A) and 507(a)(2) of the Bankruptcy Code.  No other person or entity (including without limitation a Potential Bidder, a Qualified Bidder, or a Prevailing Bidder) shall be entitled to allowance or payment of a break-up fee, expense reimbursement, or other compensation on account of any bid, offer or proposal that such person or entity may submit.

17.    The following dates and deadlines are hereby approved (and may be adjourned from time to time by the Debtor):

a.    **Bid Deadline: August 12, 2021, at 5:00 p.m., prevailing Eastern Time,** is the deadline by which all Bids must be actually received pursuant to the Bid Procedures; *provided,* that the Debtor, may extend the Bid Deadline in its reasonable business judgment for all or certain Potential Bidders without further order of the Court.

b.    **Auction:**  The Auction, if needed, will take place at the date, time and place this Court convenes a hearing on the Debtor's confirmation of a plan of reorganization, or at such other date, time and location as may be determined by the Debtor or the Court.

c.    **Notice of Prevailing Bidder:** If the Auction is held, as soon as reasonably practicable after the Auction, the Debtor shall notify all Qualified Bidders of the identity of the Prevailing Bidder.

d.    **Sale Hearing:** The Sale Hearing, if held, will be held at the Confirmation Hearing or at such other date, time and location as may be determined by the Debtor or this Court.  The Sale Hearing will be the hearing on approval of the

Sale of the Debtor's Property to the designated Prevailing Bidder in connection with the Auction and may be adjourned by announcement in open Court or by filing a notice of adjournment on the Court's docket without any additional notice required. The Sale Hearing may take place in open Court or by Zoom or similar platform, to be determined by further order of this Court.

18. The Bid Procedures are incorporated herein and are approved in their entirety. The Bid Procedures shall govern the submission, receipt, and analysis of all Bids related to the Sale. Any party desiring to submit a Bid shall comply with the Bid Procedures and this Order. The Debtor is authorized to take any and all actions necessary to implement the Bid Procedures.

19. Each Bidder participating at the Auction shall confirm in writing that it has not engaged in any collusion with respect to the Bid or the Sale.

20. If the Debtor receives no more than one Qualified Bid (including from the Stalking Horse Purchaser), the Debtor may determine in its discretion and in consultation with the Debtor's Advisors not to hold the Auction and shall have the right to declare such Qualified Bidder as the Prevailing Bidder and, if the Stalking Horse Purchaser is not in the Prevailing Bidder, request that the Court approve the applicable Sales Contract.

21. At or following the Auction, and subject to the Bid Procedures, the Debtor may, in consultation with the Debtor's Advisors: (a) select, in its business judgment, pursuant to the Bid Procedures, the highest or otherwise best Bid as the Prevailing Bidder; and (b) reject any Bid (regardless of whether such Bid is a Qualified Bid) that, in such Debtor's business judgment, is (i) inadequate, insufficient, or not the highest or best Bid, (ii) not in conformity with the requirements of the Bankruptcy Code, the Bankruptcy Rules, or the Bid Procedures, or (iii)

contrary to, or otherwise not in the best interests of the Debtor's estate, affected stakeholders, or other parties in interest, in each case subject to and in accordance with the Bid Procedures.

22.    The Sale Notice, substantially in the form attached to this Order, is approved. Within five (5) business days following entry of the Order, the Debtor shall cause the Sale Notice to be served upon:

(a)    All potential buyers previously identified or solicited by the Debtor or the Broker and any additional parties who have previously provided a written expression of interest to the Debtor or the Broker;

(b)    Other potentially interested parties identified by the Debtor or its Advisors;

(c)    The Office of the United States Trustee for the District of Maryland;

(d)    The holders of the 20 largest unsecured claims against the Debtor, as identified in the Debtor's chapter 11 petition;

(e)    All parties in interest who have requested notice under Bankruptcy Rule 2002; and

(f)    All parties who are known to possess or assert a lien, claim, encumbrance or interest in or upon any of the Property.

(collectively, the "Notice Parties").

23.    This Court retains exclusive jurisdiction to, among other things, interpret, enforce and implement the terms and provisions of the Sales Contract, all amendments thereto, any waivers and consents thereunder, and each of the agreements executed in connection therewith in all respects.

24.    The failure to include or reference a particular provision of the Sales Contract or other related documents in this Order shall not diminish or impair the effectiveness or enforceability of such provisions, it being the intent of the Court that the Sales Contract and other related documents be authorized and approved in their entirety.

16

25.    In the event of any inconsistencies between this Order and the Motion, this Order shall govern.

26.    Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

27.    The headings in this Order are for convenience of reference only and shall not be deemed to modify or limit the provisions of this Order or the Sales Contract.

28.    The Debtor is authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

**End of Order**

cc:

Nabil J. Asterbadi
2726 Chain Bridge Road
Washington, DC 20016-3404

Bradford F. Englander, Esq.
Whiteford, Taylor & Preston, LLP
3190 Fairview Park Drive, Suite 800
Falls Church, Virginia 22042

U.S. Trustee - Greenbelt
L. Jeanette Rice, Esq.
6305 Ivy Lane, Suite 600
Greenbelt, MD 20770-6305

Sandy Spring Bank
Attn: Bruce Henry, Esq.
300 N Washington Street, Suite 204
Alexandria, VA 22314-2530

*11791179*

EXHIBIT "A"

PROPERTY DESCRIPTION

Parcel I - containing 285.101 acres of land, more or less. Saving and excepting property conveyed by Deed recorded in Liber 3562, Folio 941. Tax Account No. 05-0328708 - 4401 Steed Road.

Parcel II - containing 16.180 acres of land, more or less. Tax Account No. 05-0327833 - Piscataway Road

Parcel B - containing 64.153 acres of land, more or less. Saving and excepting therefrom all that portion of the within property that lies in the land now known as Piscataway Road.  Tax Account No. 05-0360651 - 10651 Piscataway Road

Parcel C - containing 58.0204 acres of land, more or less.  Tax Account No. 09-0865121 - Piscataway Road

All Four (4) Parcels lying and being in the Piscataway District of Prince George's County, Maryland.   Said Four (4) Parcels being described in the Deed recorded in Liber 10110, folio 106 as follows:

22

Parcel 1

Being part of the land conveyed by Arthur C. Hyde, unmarried to Hyde Field, Incorporated by deed dated September 4, 1941 and recorded in Liber 620 at folio 276 among the Land Records of Prince George's County, Maryland and being more particularly described as follows:

BEGINNING for the same at an iron pipe set at a point where the Northwesterly right of way line of 40 foot wide Piscataway Road (Maryland State Route No. 223) intersects the 2nd or North 58°37' West 219-1/5 perch line of the 145 3/4 acre tract described as Tract 2 in Liber 620 at folio 276, thence leaving Piscataway Road and running with part of said 2nd line.

1. North 61°42'20" West 3575.76 feet to a corner fence post found at the end thereof, said corner fence post also being the end of the 2nd line of the 82 1/4 acre tract described in a Deed from Gussie B. Sansbury, Widow to Hency C. Padgett et ux. dated July 14, 1939 and recorded in Liber 532 at folio 275, thence running with the 3rd line of Tract 2 as described in Liber 620 at folio 276, as now surveyed,

2. North 45°40'00" East 1143.18 feet to an iron pipe set at the end thereof, thence running with the 4th line of Tract 2 as described in Liber 620 at folio 276 and also running with part of the 5th line of Tract 1 as described therein

3. North 47°40'00" East 2359.87 feet to an iron pipe set at a point where said 5[th] line is intersected by the Southwesterly right of way line of 50 foot wide Steed Road as shown on

23

Prince George's County R/W Plat No. 398, passing through the centerline of a 18 inch diameter cedar tree found at 2345.17 feet on line, said pipe set being opposite Centerline Station 32+26:95 and distant South 29°18'37" West 25.00 feet measured radially therefrom, thence running with the Southwesterly right of way line of 50 foot wide Steed Road per R/W Plat Nos. 398 and 397 by a curve to the left whose radius and central angle are 1457.40 feet and 08°38'24" respectively, whose long chord is

4. South 65°00'35" East 219.56 feet for an arc distance of 219.77 feet to a concrete monument found at a point of tangency opposite Centerline State 30+10.95. thence running with the Southwesterly right of way line of 50 foot wide Steed Road as per R/W Plat Nos. 397 and 396, the following four courses and distances:

5. South 69°19'47" East 624.07 feet to a point of curve, thence running by a curve to the right whose radius and central angle are 1407.40 feet and 10°36'50" respectively, whose long chord is

6. South 64°01'22" East 260.34 feet for an arc distance of 260.71 feet to a point of tangency, thence running

7. South 58°57' East 1849.03 feet to an iron pipe set at a point of curve opposite Centerline Station 2+73.29, thence running by a curve to the right whose radius and central angle are 1248.24 feet and 09°11'40" respectively, whose long chord is

8. South 54°07'07" East 200.09 feet for an arc distance of 200.31 feet to a point in the Northwesterly right of way line of Piscataway Road, as said Road was widened by virtue of Maryland State Roads Commission R/W Plat No. 33848, thence running with the said side of Piscataway Road, as widened by R/W Plat 33848, the following four courses and distances:

9. South 40°45'10" West 5.62 feet to an iron pipe set, thence running

10. South 04°17'51" East 40.31 feet to an iron pipe set, thence running

11. South 41°42'27" West 114.00 feet to an iron pipe set, thence running

12. South 20°54'03" West 53.49 feet to an iron pipe set in the Northwesterly right of way line of 40 foot wide Piscataway Road, as said Road is now being used, thence running with the Northwesterly right of way line of Piscataway Road (40 feet wide) as now being used, the following eight courses and distances:

13. South 41°32'53" West 769.87 feet to a point, thence running

14. South 40°55'14" West 455.15 feet to a point, thence running

15. South 41°23'14" West 321.88 feet to a point, thence running

16. South 41°38'13" West 136.33 feet to a point, thence running

17. South 41°18'21" West 408.52 feet to a point, thence running

18. South 40°52'31" West 309.66 feet to a point, thence running

19. South 41°15'00" West 433.06 feet to a point, thence running

20. South 41°24'18" West 838.32 feet to the beginning, containing 285.101 acres, more or less.

(Tax Account No. 05-0328708 - 4401 Steed Road)


## PARCEL II

Being part of the land conveyed as Parcel No. 2 in a Deed from Helen R. Houser, et al, to Nora C. Thorne dated February 25, 1948 and recorded in Liber 1016 at folio 413 among the Land Records of Prince George's County, Maryland and being more particularly described as follows:

BEGINNING for the same at an iron pipe set at a point where the Northwesterly side of 40 foot wide Piscataway Road (Maryland State Route No. 223) intersects the 6th or South 55°15' East 1581 foot line of the 16.52 acre tract conveyed as Parcel No. 2 in Liber 1016 at folio 413, thence running with the Northwesterly side of 40 foot wide Piscataway Road, parallel to and 20 feet from the existing centerline thereof

1. South 41°23'53" West 483.82 feet to an iron pipe set at a point where said right of way line intersects the 2nd line of said 16.52 acre tract, thence leaving Piscataway Road and running with part of said 2nd line

2. North 54°55'00" West 375.35 feet to an iron pipe set, thence running with the 3rd, 4th and 5th lines of the 16.52 acre tract conveyed as Parcel No. 2 in Liber 1016 at folio 413, the following three courses and distances:

3. South 35°05'00" West 100.00 feet to an iron pipe set, thence running

4. North 55°15'00" West 1120.00 feet to an iron pipe set, thence running

5. North 35°05'00" East 403.05 feet to an iron pipe set in the 2nd or North 58°37' West 219-1/5 perch line of the 145 3/4 acre tract conveyed as Tract 2 in a Deed to Arthur C. Hyde dated December 19, 1940 and recorded in Liber 609 at folio 42, thence running reversely with part of said 2nd line

6. South 61°42'20" East 1559.48 feet to the beginning, containing 16.180 acres of land more or less.

(Tax Account No. 05-0327833 - Piscataway Road)

Parcel B

BEING all of the land conveyed by Henry C. Padgett et ux. to Henry Cecil Padgett, Jr. et ux. by Deed dated November 14, 1955 and recorded in Liber 1929 at folio 146 and intended to be all of the land conveyed by Henry C. Padgett, Jr. personal representative of the estate of Henry C. Padgett To Henry C. Padgett, Jr. and Robert H. Padgett by Deed dated September 5, 1985 and recorded in Liber 6189 at folio 286 among the Land Records of Prince George's County, Maryland; both tracts being more particularly described as one tract as follows:

BEGINNING for the same at an iron pipe set in the North Westerly right of way line of 40 foot wide Piscataway Road at the end of the 1st line of a 16.18 acre tract conveyed by Arthur C. Hyde to W. A. Albright Investments, Inc. by Deed dated November 13, 1985 and recorded in Liber 6215 at folio 538, thence running with Piscataway Road (1) South 41°19'43" West 619.11' to a pipe set at the beginning point of the 82.25 acre tract described in Liber 6189 at folio 286, thence leaving Piscataway Road and running reversely with the 6th, 5th, 4th and 3rd lines of said 82.25 acre tract, the following four courses and distances: (2) North 50°59'08" West 682.45' to a pipe set, thence running (3) North 63°38'20' West 2335.56' to a fence post at an angle point in an existing fence, thence running (4) North 27°42'10" West 653.40' to a flint stone found, then running (5) North 46°42'27" East 696.48' to an iron pipe found at the end of the 1st line of the 285.101 acre tract conveyed as Parcel 1 in Liber 6215 at folio 538, thence running reversely with part of said 1st line (6) South 61°42'20" East 2016.38' to a pipe found at the end of the 5th line of the 16.180 acre tract conveyed as Parcel 2 in Liber 6215 at folio 538, thence running reversely with the 5th, 4th, 3rd and 2nd lines of said 16.180' acre tract, the following four courses and distances: (7) South 35°03'00" West 403.05' to a pipe found, thence running (8) South 55°15'00" East 1120.00" to a pipe found, thence running (9) North 35°05'00" East 100.00' to an iron pipe found, thence running (10) South 54°55'00" East 375.35' to the beginning.

Contaning 64.153 acres of land more or less. Saving and excepting therefrom however, all that portion of the within property that lies in the land now known as Piscataway Road.

(Tax Account No. 05-0360651 - 10651 Piscataway Road)

26

Parcel C

Being part of the 59.673 acre tract described as Parcel No. 2 in a Deed dated January 25, 1965 from Griffith S. Oursler et ux. to Clinton Manor, Inc. and duly recorded in Liber 3093 at folio 94 among the Land Records of Prince George's County, Maryland; and being more particularly described as follows:

Beginning for the same at an iron pipe set on the Northerly side of Piscataway Road (MD Route 223) at a point where the Northerly right of way line of Piscataway Road (80 feet wide) intersects the 9th line of Parcel No. 2, Liber 3098 at folio 94, thence running with Piscataway Road per right of way Plat No. 33848, the following two courses and distances: (1) South 55°33'25" west 519.37' to a pipe set at an angle point opposite base line station No. 141+10.602 and distant 40' therefrom, thence running (2) South 55°14'09" West 105.51' to a pipe set at a flare connection leading to Steed. Road (50' wide), thence running with said flare connection (3) North 80°40'25" West 44.55' to a pipe set in the Westerly right of way line of 50 foot wide Steed Road, thence running with said side of Steed Road, the following three courses and distances: (4) South 53°19'34" West 4.41' to a pipe set, thence running by a curve to the left whose radius and central angle are 1298.24' and 09°09'46" respectively, whose long chord is (5) North 40°36'17" West 207.39' for an arc distance of 207.61' to a pipe set at a point of tangency, thence running (6) North 45°11'15" West 1715.96' to a pipe set opposite centerline station No. 19+89.25 as per Prince George's County R/W Plat #397, thence leaving Steed Road and running with the 6th line of Parcel No. 2 as per Liber 3098 at Plat 94 (7) North 42°06'20" East 551.58' to a pipe set at the end thereof, thence running with the 7th line of said Parcel No. 2 (8) North 12°23'40" West 900.30' to a "PK" nail set in a fence post at the end of said 7th line, thence running with part of the 8th line of Parcel No. 2 as per Liber 3098 at folio 94 (9) North 80°22'20" East 381.10' to a pipe set at the end of the 5th or North 64°19'28" West 278.52 foot line of the 1,298 acre tract conveyed to Potomac Electric Power Company by Deed dated March 25, 1965 and recorded in Liber 3122 at folio 122, the following two courses and distances: (10) South 50°46'51" East 278.54' to a pipe set and (11) South 61°17'31" East 242.47' to a pipe set in the 9th line of Parcel No. 2 as per Liber 3098 at plat 94, distant 372.11' from the beginning of said 9th line, thence running with part of the 9th line of Parcel No. 2 of Liber 3098 at folio 94, (12) South 24°12'40" East 2277.55' to the beginning of the land now conveyed. Containing 58.0204 acres of land, more or less.

Subject to the Right of Way Agreement between Barry B. Early, et ux. and Potomac Electric Power Company in Liber 1293 at folio 2550

And subject to the "Limit of Denial of Vehicular Access" as shown on state roads commission R/W Plat No. 33848.

(Tax Account No. 09-0865121 - Piscataway Road)

27

## REAL ESTATE SALES CONTRACT

### HYDE FIELD PROPERTY

THIS REAL ESTATE SALES CONTRACT ("**Contract**") is made this 1st day of June, 2021, by and between ZACHAIR, LTD., a Maryland corporation ("**Seller**") and JP LAND HOLDINGS LLC, a Delaware limited liability company ("**Purchaser**"). Seller and Purchaser are sometimes jointly referred to herein as the "Parties" and individually as a "Party."

### RECITALS:

**Whereas,** Seller is the owner in fee simple of: (i) four (4) parcels of land, zoned R-S and LAC and located adjacent to Steed Road and Piscataway Road in Prince George's County, Maryland (the "**County**"), containing a total of approximately 423 acres, more or less, as more particularly described in the legal description attached hereto and incorporated herein as Exhibit "A" (the "**Land**"); (ii) all buildings and any other improvements situated on such land and all fixtures, machinery and systems necessary to operate such buildings (the "**Improvements**"); and (iii) all licenses, approvals and permits issued with respect to any of the foregoing property attached hereto as Exhibit "B" (the "**Permits**"). The foregoing Land, Improvements, and Permits are sometimes referred to collectively herein as the "**Property**".

**Whereas**, the Property is currently operated as an air field. Purchaser intends to entitle, subdivide and develop the Property into residential lots. Pursuant to a Comprehensive Design Plan dated July 24, 2018, prepared by Dewberry Engineers, Inc., and other information considered by Purchaser, it is anticipated that the Land will yield approximately 1,278 to 1,550 residential lots (collectively, the "**Lots**").

**Whereas,** on January 17, 2020, Seller commenced a case, no. 20-10691-TJC (the "**Bankruptcy Case**") under the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.,* as amended (the "**Bankruptcy Code**") by filing a voluntary petition in the United States Bankruptcy Court for the District of Maryland (the "**Bankruptcy Court**").

NOW, THEREFORE, in consideration of the mutual covenants of Seller and Purchaser and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Purchaser agree as follows:

1.    **AGREEMENT OF SALE AND PURCHASE.** Seller hereby agrees to sell and convey to Purchaser and Purchaser hereby agrees to purchase from Seller the Property, in fee simple absolute, for the consideration and pursuant and subject to the terms and conditions set forth in this Contract. Purchaser hereby agrees and acknowledges that, except as otherwise expressly set forth in this Contract, neither Seller nor any principal (direct or indirect), affiliate, agent, attorney, employee or representative of Seller has made any representation or warranty whatsoever regarding the subject matter of this Contract, or any part hereof, including (without limiting the generality of the foregoing) representations as to the physical nature or physical condition of the Property or the capabilities thereof, and that Purchaser, in executing, delivering and/or performing this Contract, does not rely upon any statement and/or information to whomever made or given, directly or indirectly, orally or in writing, by any individual, firm or entity. Accordingly, Purchaser agrees that the Property shall be deemed acceptable to Purchaser and the acquisition of the Property shall be on an "as is, where is" basis, with all faults, subject to the provisions of this Contract. Purchaser further acknowledges that Seller would not agree to sell the Property to Purchaser for the Purchase Price stated herein (as hereinafter defined) without the disclaimers, agreements and other statements set forth in this Section. EXCEPT AS EXPRESSLY PROVIDED HEREIN, SELLER MAKES

1

NO REPRESENTATIONS OR WARRANTIES AS TO THE PHYSICAL CONDITION OF THE PROPERTY OR THE SUITABILITY THEREOF FOR ANY PURPOSE.    SELLER HEREBY EXPRESSLY DISCLAIMS ANY WARRANTIES OF MERCHANTABILITY AND/OR FITNESS FOR A PARTICULAR PURPOSE AND ANY OTHER WARRANTIES OR REPRESENTATIONS AS TO THE PHYSICAL CONDITION OF THE PROPERTY.  Purchaser will conduct such investigations of the Property, including but not limited to, the physical and environmental conditions thereof, as Purchaser deems necessary or desirable to satisfy itself as to the condition of the Property and the existence or nonexistence or curative action to be taken with respect to any hazardous materials including lead paint on or discharged from the Property, and Purchaser will rely solely upon same and not upon any information provided by or on behalf of Seller or its agents or employees with respect thereto.

2.    **PURCHASE PRICE and PAYMENT OF PURCHASE PRICE.**  The total Purchase Price for the Property shall be Sixteen Million Dollars ($16,000,000.00), plus the Transfer Tax Savings (as defined below) (the "**Purchase Price**").  The Purchase Price shall be paid as follows:

a.    Ten Million Dollars ($10,000,000.00) of the Purchase Price, plus the Transfer Tax Savings, of which the Deposit (as hereinafter defined) and accrued interest thereon shall be a part, shall be payable by Purchaser in immediately available funds on the Closing Date (as hereinafter defined in Section 6(a)).

b.    Seller Financing.

i.    The balance of the Purchase Price shall be in the form of Purchaser's promissory note in the principal amount of Six Million Dollars ($6,000,000.00) payable to Seller (the "**Note**"), which Note shall accrue interest at the rate of Four Percent (4%) per annum payable monthly and be secured by a first position deed of trust (the "**Deed of Trust**") on a portion of the Property, which portion shall be selected by Purchaser in the manner set forth below (the "**Encumbered Property**").  The value of the Encumbered Property shall be at least Six Million Dollars ($6,000,000.00) appraised on an "as is" basis, to be determined in accordance with Subsection (2)(b)(iii) below.  In the event the Property has not been subdivided into Lots prior to the Closing Date, the Deed of Trust shall encumber the entire Property until such time as the Property has been subdivided. The Encumbered Property shall have at least the following development rights and legal entitlements in place prior to the release of any portion of the Property subject to the Deed of Trust: (1) access to a public street; (2) tie-in rights for all utilities available to and serving the Property once installed: (3) sufficient adequate public facilities available for the full development of the Encumbered Property as determined by Maryland-National Capital Park & Planning Commission ("**M-NCP&PC**") and/or the County; (4) free of any additional lien or encumbrance including conservation easements, public improvement requirements, or reforestation requirements, except as required by M-NCP&PC and/or the County; and (5) no additional fill shall have been deposited by Purchaser, or with Purchaser's consent, on the Encumbered Property.  In no event shall the Retained Parcel (as hereinafter defined) be a part of the Encumbered Property, and the value of the Retained Parcel shall not be considered in the determining the value of the Encumbered Property.

ii.    One-half (1/2) of the outstanding principal of the Note as adjusted for principal curtailments, if applicable, plus all accrued and unpaid interest shall be due and payable on or before the first anniversary of the Closing Date and the balance of the outstanding principal and interest due thereon shall be due and payable on or before the second anniversary of the Closing Date.  The Note and Deed of Trust shall be in form as attached hereto as Exhibits "C" and "D", respectively.  The Note and Deed of Trust shall contain a "due on sale" clause whereby any transfer of the Encumbered Property

2

(excepting transfers of Lots for the Release Fee as described below) or any transfer of direct or indirect ownership interests in Purchaser or such entity that is to take title to the Property upon Closing, shall result in the outstanding principal and interest of the Note being due and payable in full. The principal of the Note may be offset by those certain Retained Parcel Design Fees as defined and described in Section 5(c)(ii) below, the costs of reconveyance of the Retained Parcel pursuant to Section 5(c)(ii) below and the Declaration Costs as defined and described in Section 19(c) below.

     iii.  The Encumbered Property. The portion of the Property that will constitute Encumbered Property securing the Note following completion of subdivision of the Property shall be determined as follows:

     a.  Valuation. As soon as practicable following completion of the subdivision of the Property into Lots, Purchaser shall propose in writing the identification of the Encumbered Property. The Parties shall negotiate in good faith regarding such identification of the Encumbered Property. In the event that the Parties, within twenty-one (21) days following Purchaser's delivery of the proposed identification of the Encumbered Property fail to reach agreement, then the Parties shall cause the matter to be submitted to appraisal, as follows:

     1.  Two Appraisers. Within five (5) business days after giving written notice to the other Party of its intention to have the matter submitted to appraisal, each Party, at its own cost and by giving notice to the other Party, shall appoint a qualified real estate appraiser who shall be a member of the Appraisal Institute and have at least ten years' full-time commercial appraisal experience in the commercial real estate industry within thirty (30) miles of the County, to appraise and determine the fair market value of the Encumbered Property proposed by Purchaser. The two (2) appraisers shall, within thirty (30) days, independently, and without consultation with each other, prepare a written appraisal of the fair market value of the Encumbered Property proposed by Purchaser. Each appraiser shall seal its respective appraisal after completion. After both appraisals are completed, the resulting estimates of the fair market value shall be opened by the Seller and Purchaser and compared. If the values of the appraisals differ by no more than ten percent (10%) of the value of the higher appraisal, then the fair market value of the Encumbered Property proposed by Purchaser shall be the average of the two (2) appraisals.

     2.  Three Appraisers. If the values of the appraisals differ by more than ten percent (10%) of the value of the higher appraisal, the two (2) appraisers shall designate in writing a third appraiser meeting the qualifications set out in Section 2(b)(iii)(a)(1) above. The third appraiser shall be a person who has not previously acted in any capacity for either Party. The third appraiser shall, within thirty (30) days after selection and without consultation with the first two (2) appraisers, make an appraisal of the fair market value of the Encumbered Property proposed by Purchaser. The fair market value of the Encumbered Property proposed by Purchaser shall be the value selected by the one of the two (2) appraisers that is closest, on a dollar basis, to the fair market value selected by the third appraiser. This determination of fair market value shall be binding and conclusive.

     3.  Final Determination of Encumbered Property. In the event that the fair market value of the proposed Encumbered Property, as determined pursuant to the procedure set forth above, does not equal or exceed $6,000,000, within ten (10) business days of such determination, Purchaser shall identify additional Lots to be added to the scope of the Encumbered Property that are sufficient to bring the value of the Encumbered Property to at least $6,000,000.

     b.  Costs. Each Party shall pay the fees and expenses of its own appraiser, and fifty percent (50%) of the fees and expenses of the third appraiser.

iv.    The foregoing notwithstanding, Seller agrees and acknowledges that as the Lots that are part of the Encumbered Property are sold pursuant to the Purchaser's development phasing, such Lots will be released from the Deed of Trust for a principal curtailment equal to $6,000,000 divided by the number of Lots that comprise the Encumbered Property per Lot, plus any accrued and unpaid interest under the Note ("**Release Fee**") to be paid at closing of the sale of the Lot.  Notwithstanding the foregoing, no Release Fee shall be due or payable upon the release of the Property that is not part of the Encumbered Property.  The Deed of Trust shall remain in first lien position on the Encumbered Property until the Note is paid in full.

v.    In the event the Property was not been subdivided into Lots prior to the Closing Date and the Deed of Trust encumbers the entire Property, after subdivision of the Property into Lots is completed and the Encumbered Property has been identified as set forth in Section 2(b)(iii) above, Seller shall, within five (5) business days of Purchaser's request, execute a release of its lien from the Property that is not part of the Encumbered Property.  Notwithstanding anything to the contrary in this Section 2, Seller shall not have any obligation to release any portion of its lien if, at the time of such proposed release, an Event of Default has occurred under the Note or the Deed of Trust, and has not been cured.

3.    **DEPOSIT**.

a.    Within two (2) business days following its execution of this Contract, Purchaser shall deliver to GPN Title, Inc., 700 King Farm Boulevard, Ste. 130, Rockville, MD  20850 (the "**Escrow Agent**") the sum of Two Hundred Fifty Thousand Dollars ($250,000.00) in immediately available funds, as a good faith deposit (the "**Initial Deposit**").

b.    Provided this Contract is not sooner terminated, Purchaser shall, within five (5) days after the expiration of the Study Period (as hereinafter defined), deliver the sum of Two Hundred Fifty Thousand Dollars ($250,000.00) in immediately available funds to the Escrow Agent (the "**Additional Deposit**" and together with the Initial Deposit, the "**Deposit**").  Following delivery of the Additional Deposit, the Deposit will total Five Hundred Thousand Dollars ($500,000.00).

c.    Unless this Contract is terminated pursuant to Section 4 below, the Deposit shall be non-refundable except in the event of a Seller default as set forth in Section 14, or as set forth in Section 20(a), Section 20(b), Section 11(b) and Section 12(b) below.

d.    Escrow Agent shall hold the Deposit in escrow in accordance with the terms set forth below:

i.    Upon receipt of the Deposit or any portion thereof, Escrow Agent shall place the Deposit in an interest-bearing account at a federally insured financial institution (the "**Escrow Account**").  All interest earned on the Deposit shall be deemed to be a part of the Deposit and the Party entitled to the Deposit shall also have the benefit of the interest earned thereon.

ii.    In the event of any disagreement between the Parties regarding the application, distribution or other disposition of the Deposit, or should Escrow Agent receive conflicting claims, demands, or instructions regarding the Deposit, Escrow Agent continue to hold the Deposit in escrow until instructed otherwise by joint instructions from the Parties or as directed by a court of competent jurisdiction.

4

        iii.     In the event this Contract is terminated by either Party as expressly permitted in this Contract, Escrow Agent is authorized and directed by the Parties to deliver the Deposit to the Party entitled thereto pursuant to the terms of this Contract not less than five (5) business days nor more than ten (10) business days after receipt by Escrow Agent (with a copy to non-terminating Party) of written notice of termination, unless, within five (5) Business days after Escrow Agent's receipt of such termination notice, the non-terminating Party provides written notice to Escrow Agent and the other Party that it disputes the right of the terminating Party to receive the Deposit. Escrow Agent shall not be required to inquire as to the merits of any claimed dispute but may accept a notice of its existence as grounds to act in accordance with this Section 3(c)(iii). In such event, Escrow Agent shall continue to hold the Deposit or pay the Deposit into a court of competent jurisdiction in an action of interpleader until such dispute is resolved. All attorneys' fees and costs of Escrow Agent incurred in connection with any such dispute or interpleader shall be assessed against the Party that is not awarded the Deposit, or if the Deposit is distributed in part to both Parties then in the inverse proportion of such distribution.

        iv.     The Parties hereby jointly and severally agree that, except as provided otherwise herein, Escrow Agent shall incur no liability whatsoever in connection with its performance pursuant to this Contract. Purchaser and Seller hereby jointly and severally indemnify and hold harmless Escrow Agent from any loss, damage, injury, or claims, including reasonable attorneys' fees and expenses arising from Escrow Agent's performance of its obligations under this Contract. Purchaser and Seller hereby jointly and severally release and waive any claims they may or either of them may have against Escrow Agent that may result from its performance of its functions under this Contract. Escrow Agent shall be liable only for loss or damage directly resulting from its, or any of its officers' or employees' acts of gross negligence, defalcation, or willful misconduct while performing as Escrow Agent.

        v.     The Parties shall execute such additional escrow instructions as Escrow Agent may reasonably require regarding the Escrow Account. Any such instructions shall not in any way modify the terms of this Contract or impose any fee, cost, expense or liability on Seller or Purchaser that is not provided for in this Contract.

The Escrow Agent is joining in the execution of this Contract solely to evidence its consent to and acceptance of this escrow, subject to the foregoing terms.

### 4.     PROPERTY DOCUMENTS; ENTRY ONTO PROPERTY; STUDY PERIOD.

        a.     Seller shall, within five (5) business days after the Effective Date (as hereinafter defined), deliver to Purchaser, at no cost or expense to Purchaser, and without any representation or warranty from Seller, copies of all title reports, title insurance policies, environmental, soil and other tests and studies, and copies of all surveys, engineering and other plans and plats relating to the Property to the extent within Seller's possession or control (collectively, the "**Property Documents**"). Purchaser acknowledges that Seller has made Property Documents available to Purchaser in an online data room maintained by Fraser Forbes, and that all Property Documents that are in the data room, or are added to the data room, shall be deemed delivered to Purchaser.

        b.     Commencing on the Effective Date and continuing for the entire term of this Contract, Purchaser, at Purchaser's sole cost and expense, shall have complete access to the Property for the purpose of conducting such soil borings, soil analyses, engineering tests and studies, environmental tests and studies, economic and/or topographic tests, studies, and/or investigations, including, but not limited to, a Phase I Environmental Report and a Phase II Environmental Report if expressly recommended by the Phase I Environmental Report (collectively, the "**Studies**"), with respect to the Property as Purchaser

may deem necessary in order to determine whether the Property is satisfactory to Purchaser. Purchaser shall keep all information obtained through its Studies confidential except that Purchaser may disclose such information as necessary, customary, or expedient for the development of the Property as contemplated by this Contract. Purchaser shall, without representation or warranty and at no cost or expense to Purchaser, provide Seller with copies of all reports and studies regarding the Property within three (3) business days of receipt, and at Seller's sole cost and expense promptly license their use and dissemination by Seller to the extent such use and dissemination is permitted by the prepare of such reports and studies. Effective upon termination of this Contract for any reason, Purchaser hereby assigns, without representation or warranty, all right, title and interest to such studies to Seller, absolutely and exclusively without further compensation to Purchaser.

c.    If Purchaser does not deliver written notice to Seller of Purchaser's intent to proceed (the "**Notice of Intent to Proceed**") with the purchase of the Property pursuant to the terms of this Contract prior to 5:00 pm ET on the seventy-fifth (75th) day after the Effective Date (the "**Study Period**"), this Contract shall terminate and thereupon the parties shall have no further rights or obligations hereunder except for those matters that specifically survive termination of this Contract, and the Deposit shall be promptly returned to Purchaser and the Property Documents and copies of any studies shall be returned to Seller.

d.    Purchaser's right to conduct due diligence on, at or otherwise with respect to the Property prior to the Closing Date shall be subject to Purchaser's continuing compliance with each and all of the following conditions: (i) Seller shall permit Purchaser, and its agents, representatives and contractors, to have reasonable access to the Property during normal business hours with not less than 24 hours prior notice by e-mail, subject to the rights of tenants and occupants of the Property; (ii) all such due diligence shall be conducted so as not to cause any unreasonable or material disruption to tenants or other occupants of the Property; (iii) Purchaser shall at all times comply with all laws, ordinances, rules and regulations applicable to the Property; (iv) promptly after entry onto the Property, Purchaser shall restore or repair (to substantially the same condition that existed prior to the entry) any damage thereto caused by or otherwise arising from any act or omission by Purchaser, its agents, representatives or contractors; and (v) prior to conducting any testing of the Property, Purchaser shall furnish to Seller satisfactory evidence that Purchaser or its agents and contractors have procured comprehensive liability insurance from an insurer authorized to do business in the State of Maryland which is reasonably acceptable to Seller protecting Seller from claims for property damage, bodily injury or death in single limit amount of not less than $1,000,000.00, and naming Seller as an additional insured and loss payee. Purchaser shall indemnify, defend, reimburse, and hold and save Seller harmless from and against any and all claims and liabilities for damage to personal property or bodily injury, loss, cost, damage, injury or other expense arising solely out of or in any way related to the activities, acts or omissions of Purchaser, its agents, employees and contractors on or about the Property. Purchaser's obligations under this Subsection 4(d), including without limitation the indemnification provisions, shall survive termination of this Contract and Closing.

5.    **APPROVALS; SUBDIVISION OF PROPERTY.**

a.    Purchaser, at its expense, shall be responsible for preparation and obtaining approval (the "**Required Approvals**") of the preliminary plan of subdivision and comprehensive design plan which plans will provide for the subdivision of the Property into the Lots and the Retained Parcel (collectively, the "**Plans**"). The Purchaser shall submit the Plans to the applicable governmental agencies within one hundred-twenty (120) days after expiration of the Study Period. Purchaser shall provide the

6

Plans to the Seller to review at least thirty (30) days prior to the submission of the Plans to the governmental agencies.

        b.      Seller, at no cost or expense to Seller, shall promptly cooperate with all reasonable requests from Purchaser to execute any and all documents reasonably necessary to effect the approval process for the Plans and Required Approvals.

        c.      The Parties anticipate that the governmental authorities may require a commercial parcel in the area zoned LAC adjacent to the intersection of Steed and Piscataway Roads, on either side of Steed Road, to approve the Plans for the residential Lots, and if so Purchaser shall reconvey to Seller, or its designee, an approximately 13-acre commercially zoned parcel (the "**Retained Parcel**") pursuant to the terms below.

        i.      If the Retained Parcel is a requirement of the approved Plans, and at the time of Closing the Retained Parcel is not a separate legal parcel, lot or condominium unit within the meaning and requirement of the Prince George's County Code, then at Closing, Seller shall convey all of the Property to Purchaser and Purchaser shall hold legal title to all of the Property, including that from which the Retained Parcel shall be created and the beneficial ownership of the Retained Parcel shall remain with Seller. Except for the Deed of Trust, Purchaser shall not encumber title to the Retained Parcel at any time or in any manner while holding legal title thereto. Immediately following and coincident with the recordation of the final subdivision plat, Purchaser shall re-convey to Seller (or party designated by the Seller) by special warranty deed, for no consideration, the Retained Parcel, and Seller shall accept from Purchaser, title to the Retained Parcel.

        ii.      Purchaser shall be entitled to apply the costs incurred in connection with the Plans that are directly attributable to the Retained Parcel, including without limitation, planning and engineering (the "**Retained Parcel Design Fees**") and all costs arising from the re-conveyance of the Retained Parcel from Purchaser to Seller, including without limitation, all transfer and recordation taxes, recording fees, title examination, title insurance, and settlement fees, , as a principal curtailment of the then-outstanding principal due under the Note. Notwithstanding anything in this Contract to the contrary, no Release Fee shall be due on such re-conveyance.

        iii.      If the Retained Parcel is not a requirement of the Required Approvals, the Parties may mutually agree to include the Retained Parcel in the sale of the Property and otherwise in accordance with the terms and conditions of this Agreement. The increased Purchase Price shall be determined by further agreement of the Parties. If the Parties do not reach a mutual agreement regarding the price for the Retained Parcel by approval of the Plans by the applicable governmental agencies, Purchaser shall subdivide the Property to create the Retained Parcel and Seller shall retain, or if applicable Purchaser shall re-convey to Seller, the Retained Parcel (subject to the fees and costs set forth in Subsection 5(c)(ii)), without encumbrance in favor of any person other than Seller.

        d.      The provisions of this Section 5 shall survive termination of this Contract.

**6.**      **CLOSING; CLOSING DATE; ADJUSTMENTS AT CLOSING; CLOSING COSTS.**

        a.      In the event that all of the conditions precedent to Purchaser's obligations hereunder have been satisfied or waived by written notice of same pursuant to this Contract, and this Contract has not been sooner terminated, settlement under the terms of this Contract ("**Closing**") shall be

held at the offices of GPN Title, Inc., 700 King Farm Boulevard, Ste. 130, Rockville, MD 20850, or other closing attorney or settlement agent selected by Purchaser, within ten (10) business days of satisfaction of the condition precedent to Purchaser's obligations and receipt of unappealable approval of the Plans from all appropriate governmental authorities ("**Closing Date**") but no later than one (1) year after the Effective Date ("**Outside Closing Date**").

        b.     Notwithstanding the foregoing, Purchaser may, only if receipt of unappealable approval of the Plans from all appropriate governmental authorities has not been received or any condition in Section 11 below has not been satisfied, extend the Closing Date beyond the Outside Closing Date for up to an additional six (6) months by notifying the Seller in writing at least ten (10) business days prior to the Outside Closing Date and simultaneously delivering to Seller an extension fee in the amount of Two Hundred Fifty Thousand Dollars ($250,000.00) (the "**Extension Fee**"). The Extension Fee shall be non-refundable except in the event of Seller's default as set forth in Section 14, or a failure of conditions in Sections 11 and 12(a)(ii-iv) below. The Extension Fee shall not be applied to the Purchase Price.

        c.     Seller agrees to execute the usual special warranty deed, with covenant of further assurance and right to convey, containing the usual covenants of title, in proper form for recording in the County.

        d.     At Closing, Seller shall deliver to Purchaser a "Certification of Non-Foreign Status" which meets the requirements of Section 1445 of the Internal Revenue Code and Internal Revenue Regulations for the purpose of informing the transferee that withholding of Federal taxes is not required.

        e.     Possession of the Property shall be given to Purchaser or its agents and assigns at the time of settlement, free from any parties in possession. Prior to Closing, Seller shall terminate air field operations and shall terminate all leases with respect thereto.

        f.     Real estate taxes, general and special, and usual water and sewer charges are to be adjusted to the date of settlement and thereafter assumed and paid for by Purchaser. Seller shall pay, when and if due, any agricultural recapture tax or any similar tax imposed on the Property, whether imposed prior to or within one year subsequent to the last to occur of Closing or any reconveyance of the Retained Parcel.

        g.     Examination of title, owner's and mortgagee's title insurance, Survey (as hereinafter defined) (if Purchaser elects to have a Survey prepared), tax certificates, and recording charges are to be at the cost of Purchaser. Seller shall pay the cost of preparation of the deed, and obtaining releases of all monetary liens encumbering the Property. All documentary stamps and recordation and transfer taxes shall be paid equally by Seller and Purchaser. Each party shall pay for the cost of their respective legal counsel. In the event that the Bankruptcy Court issues an order that the Property shall be sold in connection with the chapter 11 bankruptcy plan and recordation and transfer taxes are not assessed, the Purchase Price shall be increased by the Purchaser's proportionate share of the savings realized less the amount of recordation and transfer taxes attributable to the Retained Parcel if the same is not being purchased by Purchaser ("**Transfer Tax Savings**").

        h.     At or before Closing, Seller at Seller's sole cost and expense, shall prepare and submit to the Maryland Department of Environment ("**MDE**") an "Application for Transfer for a Surface Mine Permit" to cause the transfer to Purchaser of Seller's mining permit issued by **MDE** with respect to the Property (the "**Mining Permit**") and a transfer of the haul road permit

8

issued to Seller by the County (the "**Haul Road Permit**"), which transfers shall release Seller from responsibility under the Mining Permit and Haul Road Permit. Purchaser shall, at no cost or expense to Purchaser, cooperate with Seller's reasonable requests in connection with preparing the Mining Permit transfer and Haul Road Permit transfer, and Purchaser shall assume all post-closing obligations under the Mining Permit and Haul Road Permit. Purchaser acknowledges the authorized activities and terms and conditions of the Mining Permit and Haul Road Permit and Seller shall not be responsible or liable for any changes, modifications, expansions, or revisions to the Mining Permit or Haul Permit, including, but not limited to, the authorized activities or terms and conditions of the Mining Permit or Haul Road Permit. Notwithstanding anything in this Contract to the contrary, Purchaser shall, at Purchaser's sole cost and expense, undertake any actions necessary on its part to accept the transfer of the Mining Permit and Haul Road Permit, including, but not limited to, obtaining an MDE Mining License. At Closing, Purchaser, at its expense, shall obtain replacement surety bonds in its name securing obligations under the Mining Permit and the Haul Road Permit, sufficient in terms and amounts to permit the release of Seller's existing bonds that secure the foregoing permits.

7. **TITLE**

a. At Closing, Seller will convey to Purchaser good and marketable and insurable fee simple title to the Property. For the purposes of this Contract, "good and marketable and insurable fee simple title" shall mean fee simple ownership, free of all liens, encumbrances, judgments, covenants, restrictions, easements and rights of way, recorded or unrecorded; subject, however, to those matters (if any) affecting title to the Property which are set forth in the Title Commitment referred to below and accepted or deemed accepted by Purchaser in accordance with Subsection 7(b) (the "**Permitted Exceptions**"). Such title shall also be insurable by a recognized and reputable title insurance company selected by Purchaser which is licensed to do business in the State of Maryland, at then-current standard rates under the standard form of ALTA owner's policy of title insurance in effect on the Closing Date, with the standard printed exceptions deleted and without exception other than for the Permitted Exceptions.

b. Purchaser shall, at its own expense, order a report of title or a standard ALTA form B commitment for owner's title insurance for the Property (either being referred to herein as the "**Title Commitment**"). If Purchaser, in its sole discretion, finds that any of the exceptions to title set forth in the Title Commitment would interfere with its contemplated development of the Property ("**Objectionable Exceptions**"), Purchaser shall, no later than thirty (30) days of receipt of the Title Commitment but in all events no later than ten (10) business days prior to the expiration of the Study Period deliver written notice to Seller setting forth the Objectionable Exceptions (the "**Objectionable Exceptions Notice**"). If Purchaser fails to deliver an Objectionable Exceptions Notice, Purchaser shall be deemed to have accepted all title exceptions which are reported in the Title Commitment; if Purchaser does give such notice, Purchaser shall be deemed to have accepted all title exceptions reported in the Title Commitment other than the Objectionable Exceptions expressly set forth in the Objectionable Exceptions Notice. After receipt of the Objectionable Exceptions Notice, Seller, in its sole discretion, shall have the option to cure or not to cure any of the Objectionable Exceptions. Within ten (10) business days after receipt of Objectionable Exceptions Notice, Seller shall give Purchaser written notice whether it will or will not cure the Objectionable Exceptions. If Seller does not give Purchaser such notice, within the ten (10) business day period, Seller shall be deemed to have elected not to cure the Objectionable Exceptions. If Seller does elect to cure the Objectionable Exceptions, Seller shall promptly commence and diligently pursue good faith and reasonable efforts to cure the Objectionable Exceptions and the Closing Date, if necessary, shall be extended for the period of time required to allow Seller to cure the Objectionable Exceptions.

9

c.      Purchaser shall, at its sole option, have until the expiration of the Study Period to procure a Survey (as defined below). If Purchaser, in its sole discretion, finds that any matter disclosed by such Survey would interfere with its contemplated development of the Property ("**Objectionable Survey Exceptions**"), Purchaser shall, no later than thirty (30) days after receipt of the Survey, but in all events within ten (10) business days prior to expiration of the Study Period, deliver written notice to Seller setting forth such Objectionable Survey Exceptions (the "**Survey Exceptions Notice**"). If Purchaser fails to deliver a Survey Exceptions Notice, Purchaser shall be deemed to have accepted all matters disclosed by the Survey. If Purchaser does give such notice, Purchaser shall be deemed to have accepted all matters shown in the Survey other than the Objectionable Survey Exceptions expressly set forth in the Survey Exceptions Notice. After receipt of the Survey Exceptions Notice, Seller, in its sole discretion, shall have the option to cure or not to cure any of the Objectionable Survey Exceptions. Within ten (10) business days after receipt of Survey Exceptions Notice, Seller shall give Purchaser written notice whether it will or will not cure the Objectionable Survey Exceptions. If Seller does not give Purchaser such notice within such ten (10) business day period, Seller shall be deemed to have elected not to cure the Objectionable Survey Exceptions. If Seller does elect to cure the Objectionable Survey Exceptions, Seller shall promptly commence and diligently pursue good faith and reasonable efforts to cure the Objectionable Survey Exceptions and the Closing Date, if necessary, shall be extended for the period of time required to allow Seller to cure the Objectionable Survey Exceptions.

d.      If Seller shall not have succeeded in curing the Objectionable Exceptions and/or the Objectionable Survey Exceptions despite its good faith and reasonable efforts, within one hundred eighty (180) days from receipt of the applicable notice of such exceptions, or if Seller elects in the first instance not to cure any Objectionable Exceptions or Objectionable Survey Exceptions, Purchaser shall have the right either (i) to purchase the Property subject to the Objectionable Exceptions and/or the Objectionable Survey Exceptions not cured by Seller, or (ii) to terminate this Contract. In the event of termination pursuant to this Subsection 7(d), the Deposit shall be promptly returned to Purchaser and thereafter the parties shall be relieved of further liability to one another. Notwithstanding the foregoing, the Lis Pendens (as hereinafter defined) due and unpaid taxes, any deeds of trust, mortgages, judgment liens, and other monetary liens against the Property shall be deemed Objectionable Exceptions, whether Purchaser gives written notice of such or not, and shall be removed by Seller at or before the time of Closing.

e.      Upon request by Purchaser, Seller shall, at no cost to Seller, execute such affidavits, certifications, and other instruments as are reasonably required by Purchaser's title insurance company for the elimination of any standard or printed exceptions in Purchaser's final policy of title insurance or to comply with tax reporting or disclosure requirements. The term "**Survey**" shall mean an ALTA/NSPS Land Title Survey of the Property prepared, at Purchaser's expense, by a registered Maryland land surveyor designated by Purchaser.

f.      Lis Pendens. The Parties acknowledge the pending Memorandum of Lis Pendens ("**Lis Pendens**") recorded in the Land Records of Prince George's County, Maryland by PD Hyde Field, LLC on March 14, 2019 in Liber 41885, folio 52, which is related to a lawsuit for specific performance filed by PD Hyde Field, LLC related to a prior contract for the sale of the Property. Seller shall seek an order from the Bankruptcy Court to have the Lis Pendens released of record. If Seller shall not have succeeded in obtaining a release of the Lis Pendens, Purchaser shall have the right to terminate this Contract, whereupon the Deposit and the Extension Fee, if delivered prior to such termination, shall be promptly returned to Purchaser and thereafter the Parties shall be relieved of further liability to one another.

10

**8.** **REPRESENTATIONS AND WARRANTIES OF SELLER.** Seller represents and warrants to Purchaser as follows:

a.        Seller is a corporation, duly organized and validly existing, licensed under the laws of the State of Maryland, and qualified to do business in the State of Maryland, in good standing.

b.        Subject to the approval of the Bankruptcy Court, Seller has the full right, power and authority to enter into and carry out and perform this Contract, without obtaining any further approvals or consents. Seller is the owner of the Property in fee simple absolute, and has all right, power and authority to enter into this Contract. Subject to the approval of the Bankruptcy Court, the entering into this Contract and consummation of this transaction by Seller will not violate any law or governmental regulation, order or decree to which Seller is subject or any agreement or other instrument to which Seller is a party or by which it is bound.

c.        Seller has not made any commitments or representations to the applicable governmental authorities, any adjoining or surrounding property owners, any civic association, any utility, or any other person or entity which would in any manner be binding upon Purchaser, except as provided for in this Contract and as set forth on Exhibit "E" and except as provided in the Property Documents, Title Commitment and Survey.

d.        There are no leases, tenancies, licenses, or other rights of occupancy or use for any portion of the Property except for airport tenant leases, which will be terminated prior to Closing.

e.        To the Seller's actual knowledge without any duty or obligation to investigate, there is no threatened in writing or pending annexation, condemnation or other judicial or administrative proceedings against or affecting any part of the Property other than the Lis Pendens and associated litigation.

f.        To Seller's actual knowledge without any duty or obligation to investigate (i) there are no "Hazardous Materials" (defined below) located on or within the Property except as routinely used in the ordinary course of business of a commercial airport including aviation gas and jet fuel, (ii) no portion of the Property has been used for the storage, use, generation, treatment or disposal of Hazardous Materials Property except as routinely used in the ordinary course of business of a commercial airport including aviation gas and jet fuel; and (iii) there are no underground fuel tanks located upon the Property, except as provided for in this Contract and as set forth in that Phase I Environmental Site Assessment Report, Hyde Field, prepared by ECS Mid-Atlantic, LLC, dated April 26, 2021, and except as provided in the Property Documents. The term "**Hazardous Materials**" means any substance, material or waste that is defined or regulated as hazardous or toxic, or is a pollutant or contaminant, by or that gives rise to liability under, any Law, regulation, permit or judicial, administrative or governmental order, including without limitation (A) oil petroleum products and their byproducts, (B) polychlorinated biphenyls ("**PCBs**"), and (C) urea formaldehyde, but expressly excludes asbestos. Seller makes no representation or warranty with respect to the presence of asbestos.

All of Seller's representations and warranties shall be repeated and true at and as of the Closing Date. Seller's representations and warranties shall survive until Closing. When referring to the "actual knowledge" of Seller, such phrase shall mean the actual knowledge of Nabil Asterbadi, who is the President of Seller, provided, however that this provision shall not cause Nabil Asterbadi, to be individually liable under this Contract if a breach of a Seller representation and warranty occurs.

11

9. **COVENANTS OF SELLER.** Seller covenants with Purchaser that from the Effective Date through the Closing Date:

a. Seller shall not bring or allow to be brought onto the Property any Hazardous Materials, except as routinely used in the ordinary course of business of a commercial airport including aviation gas and jet fuel.

b. Seller shall promptly advise Purchaser in writing of any matters coming to Seller's attention indicating the material inaccuracy of any of Seller's representations or warranties set forth in this Contract and give to Purchaser copies of any written notices which Seller receives from governmental authorities relating to the Property.

c. Seller shall reasonably cooperate with Purchaser, without expenditure of funds, in obtaining the Required Approvals or permits reasonably necessary for the subdivision, development, sitework or other construction of the Property, including executing any and all documentation reasonably required to obtain such approvals or permits.

d. After the Effective Date, Seller shall not voluntarily alter title to the Property or voluntarily seek any zoning changes or other governmental approvals with respect to the Property, except for the zoning changes and government approvals provided for in this Contract, without Purchaser's prior written approval, which approval shall not be unreasonably withheld, conditioned, or delayed.

e. The Property is currently encumbered by a Deed of Trust and Security Agreement securing that loan from Sandy Spring Bank in the maximum aggregate principal amount of $2,660,000, recorded in Liber 37703, folio 452 among the Land Records for the County, as modified by that certain First Modification to Deed of Trust and Security Agreement dated as of March 1, 2021 (recordation pending) (the "**Existing Debt**"). The Seller contemplates the Existing Debt may be refinanced with exit financing. Purchase acknowledges and agrees that Seller may obtain exit financing and put a lien on the Property in connection with the Bankruptcy Case provided that: i) the exit financing lender is made aware of this Contract; ii) the aggregate principal balance of such financing does not exceed Ten Million Dollars ($10,000,000.00); and iii) such financing shall be satisfied in full at or prior to Closing.

f. Prior to the Closing Date, Seller shall wind down the air field operations on the Property and terminate all leases and service contracts related to the Property.

g. Seller shall file a motion with the Bankruptcy Court seeking entry of the Preliminary Approval and Bidding Procedures Order (as defined below) as provided in Section 20(b) herein.

h. From and after the Effective Date of this Contract, no additional fill shall be deposited on the Property by Seller or by Seller's agent, employees, contractors or subcontractors, or with Seller's consent.

10. **COVENANTS OF PURCHASER.** Purchaser covenants with Seller that from the Effective Date through the Closing Date, Purchaser shall use best efforts to obtain the Required Approvals for the subdivision of the Lots in accordance with the Plans and satisfy all conditions precedent to Purchaser's obligation to Close that are within Purchaser's control.

12

11.    <u>**CONDITIONS PRECEDENT TO PURCHASER'S OBLIGATION TO CLOSE:**</u>

a.    The obligation of the Purchaser to purchase the Property and to perform under this Contract shall be subject to satisfaction of the following conditions:

i.    Title to the Property shall be in the condition required pursuant to Section 7 above.

ii.    The representations and warranties made by Seller in this Contract shall be true in all respects as of the Effective Date and as of the Closing Date, and (subject to notice and cure rights) Seller shall have performed all covenants and obligations and complied with all conditions required of Seller under this Contract.

iii.    The Bankruptcy Court shall have entered the Preliminary Approval Order or the Confirmation Order (defined below) (or such other order, or orders) authorizing the sale of the Property to Purchaser in accordance with the terms of this Contract, and no stay of such orders shall be in effect.

b.    In the event any of the conditions set forth in Subsection 11(a) are not satisfied as of the Outside Closing Date, Purchaser shall have the right, in its sole discretion, to terminate this Contract by giving written notice to Seller.  In the event Purchaser elects to terminate this Contract due to the Seller's default or pursuant to Subsection 11(a), Purchaser shall have the remedies set forth in Section 14 of this Contract.

12.    <u>**CONDITIONS PRECEDENT TO SELLER'S OBLIGATION TO CLOSE:**</u>

a.    The obligation of the Seller to purchase the Property and to perform under this Contract shall be subject to satisfaction of the following conditions:

i.    The Bankruptcy Court shall have entered an order the Preliminary Approval and Bidding Procedures Order (defined in Section 20(b)), in form and substance reasonably acceptable to Seller.

ii.    Unless waived in writing by Seller, the Bankruptcy Court shall have entered an order approving the Seller's Chapter 11 Bankruptcy Plan, in form and substance reasonably acceptable to Seller (the "**Confirmation Order**").

iii.    Unless waived in writing by Seller, the effective date of the Seller's Bankruptcy Plan shall have occurred, or shall occur concurrently with the Closing.

iv.    Unless waived in writing by Seller, the Preliminary Approval and Bidding Procedures Order and the Confirmation Order shall have become a final order, without reversal or modification, and all rights of appeal of the Preliminary Approval and Bidding Procedures Order and the Confirmation Order shall have lapsed.

v.    The representations and warranties made by Purchaser in this Contract shall be true in all respects as of the Effective Date and as of the Closing Date, and (subject to notice and cure rights) Purchaser shall have performed all covenants and obligations and complied with all conditions required of Purchaser under this Contract.

13

b.      In the event any of the conditions set forth in Subsection 12(a)(ii-iv) are not satisfied as of the Outside Closing Date, Seller shall have the right, in its sole discretion, either to waive such conditions and proceed to Closing or to terminate this Contract by giving written notice to Purchaser. In the event Seller elects to terminate this Contract due to the conditions in Subsection 12(a)(i-iv) not being met, the Deposit and the Extension Fee shall be promptly returned to Purchaser and thereupon the Parties shall have no further rights or obligations hereunder, except for such rights and obligations that expressly survive termination of this Contract.  Additionally, in the event Seller elects to terminate this Agreement due to the conditions in Subsection 12(a)(ii-iv) not being met, Purchaser shall be entitled to the Break-Up Fee and Expense Reimbursement.  In the event Seller elects to terminate this Contract due to the conditions in Subsection 12(a)(v) not being met, the Deposit shall be released to Seller and thereupon the Parties shall have no further rights or obligations hereunder, except for such rights and obligations that expressly survive termination of this Contract.

**13.    PURCHASER'S DEFAULT.**  If Purchaser fails to tender Closing on the Property on the Closing Date and Seller is ready, willing and able to perform, or if Purchaser shall otherwise breach or default under any of the provisions of this Contract, then, provided Purchaser has received written notice from Seller specifying the nature of the breach or default and Purchaser fails to cure the specified breach or default within ten (10) business days after receipt of the notice, Seller's sole remedy shall be to receive the Deposit from Escrow Agent, and the Extension Payment, as applicable, as complete and liquidated damages, not as a penalty.  In the event of Purchaser's default that is not timely cured, Seller, at its election, may terminate this Contract by giving written notice to Purchaser, and Seller shall be relieved of further liability hereunder, at law or equity (except for obligations that expressly survive termination of this Contract).  Seller expressly waives all rights of action against Purchaser for specific performance and any other equitable remedies or damages for any matter arising out of or relating to this Contract.  Any attendance at Closing by either Party shall not nullify this provision for payment of liquidated damages as Seller's sole remedy.

**14.    SELLER'S DEFAULT.**  In the event Seller shall fail to tender and complete Closing or otherwise fail to perform any of its obligations hereunder, then, provided Seller has received written notice from Purchaser specifying the nature of the breach or default and Seller fails to cure the specified breach or default within ten (10) business days after receipt of the notice, Purchaser shall (i) have the right to seek specific performance of this Contract if the failure is not due to actions required by the Bankruptcy Court or (ii) may, in the alternative, elect to terminate this Contract, whereupon the Escrow Agent shall deliver to Purchaser a complete refund of the Deposit, and thereupon the parties shall have no further rights or obligations hereunder, except as stated in this Section 14.  If the failure of the parties to complete Closing is due to a Seller default that occurs after the initial Outside Closing Date, and is not cured, and the default thereby causes a material condition not to be satisfied, or Seller refuses to tender and complete Closing after all conditions thereto have been satisfied or waived, then the Seller shall deliver to Purchaser a complete refund of the Extension Fee as has been paid by Purchaser, in addition to the complete refund of the Deposit pursuant to subsection (i).  In order to exercise the remedy of specific performance, Purchaser shall file suit within one hundred eighty (180) days after Purchaser's notice of default.  Other than the right to seek specific performance or alternatively to terminate this Contract on account of Seller's default that is not timely cured, Purchaser shall have no other right or remedy, including without limitation claims for actual damages, consequential damages, lost profits or punitive damages.  Nothing in this Section 14 shall limit Purchaser's rights to recover its costs or break-up fee, if applicable under Section 20 of this Contract.

**15.    RISK OF LOSS.**  Until execution and delivery of the deed at Closing, the risk of loss or damage by fire or other casualty is assumed by Seller.

14

16. **CONDEMNATION.** If, at or prior to the time of Closing, any portion of the Property shall be condemned or taken pursuant to any governmental or other power of eminent domain, any written notice of taking or condemnation is issued, or any proceedings are instituted by any governmental authority having the power of eminent domain, and any such condemnation or taking has an adverse effect upon Purchaser's intended development of the Property, as reasonably determined by Purchaser in Purchaser's sole and absolute discretion, the Purchaser shall have the right to terminate this Contract by delivering written notice to Seller to that effect within fifteen (15) days after receiving written notice from Seller advising of the condemnation or taking. In that event, the Deposit shall be promptly returned to Purchaser and thereafter the Parties shall be relieved of further liability under this Contract, at law or in equity. In the event of condemnation, if Purchaser is entitled to terminate this Contract but elects not to do so or if Purchaser is not entitled to terminate this Contract, Purchaser shall proceed to settlement with an equitable reduction in the Purchase Price equal to the condemnation award paid to Seller. If Purchaser shall proceed to Closing and the portion of the Property to be condemned has not yet been taken and paid for by the condemning authority by the time of Closing then there shall be no abatement in the Purchase Price and Seller shall assign to Purchaser at the time of settlement of all Seller's right to any unpaid condemnation awards, and Seller shall convey the entire Property to Purchaser. Purchaser shall be entitled to participate jointly with Seller in all negotiations with the concerning authority and any settlement of any pending or threatened condemnation proceedings shall be subject to Purchaser's approval, such approval not to be unreasonably withheld, conditioned, or delayed. If Seller has knowledge of any pending or threatened condemnation proceedings or actions, Seller will promptly advise Purchaser in writing.

17. **BROKERAGE.** Seller and Purchaser warrant to each other that they have not dealt with any real estate broker, agent or finder in connection with this transaction other than Fraser Forbes Real Estate Services who will be compensated by Seller pursuant to a separate agreement and that no other right to or claim for commission or other compensation has been created by their actions with respect to this Contract. Seller and Purchaser agree to indemnify and hold each other harmless from any and all liability, loss or damage, including reasonable attorneys' fees and related costs arising out of, or resulting from, any and all brokerage claims arising from this Contract other than as stated above.

18. **ASSIGNMENT.** Purchaser shall have the right to assign its rights, but not its obligations, under this Contract without Seller's consent and/or at its election to designate an alternative grantee to take title from Seller at Closing, provided such assignment is to or such designated alternative grantee is an entity related to Purchaser. Seller shall have the right to assign its rights, but not its obligations, under this Contract and the Note, absolutely or for collateral purposes.

19. **DEFERRED WATER AND SEWER CHARGES.**

a. Purchaser shall be responsible, at its sole expense, for constructing the water systems for the Property including all water pipes required by the County in the streets and the physical connection from the water pipes in the streets to each individual lot line and all other facilities related to public water service required by the Washington Suburban Sanitary Commission ("WSSC") (all such pipes, appurtenances, connections, facilities and associated components being herein collectively referred to as **"Water Systems"**). Purchaser shall be responsible, at its sole expense, for constructing all sanitary sewer mains and appurtenances and sewer pipes required by WSSC in the streets, the physical sewer connection from the sewer pipes in the streets to each individual lot line and all other facilities relating to public sanitary sewer services required by WSSC (all of such pipes, appurtenances, connections and associated components being herein referred to collectively as the **"Sewer Systems"**).

15

b.        As consideration for this Contract, Seller or its assignee is or will be entitled to charge a fee or assessment against the Lots that purports to reimburse all or part of the cost of installing all or part of the Water Systems installed in and for the Lots and the Sewer Systems installed in and for the Lots (collectively, hereinafter the "**Water and Sewer Charges**").

c.        Purchaser understands and agrees that Seller shall retain the right to impose a private utility declaration on the Lots pursuant to a Deferred Water and Sewer Charges Declaration (the "**Declaration**") which will impose Deferred Water and Sewer Charges ("**DWSC**") on each Lot, which DWSC shall be a lien on the Lots and commercially reasonable in all events.  The Declaration shall not require any person or entity other than a homebuyer to be responsible for paying any DWSC.  Seller and Purchaser agree that the anticipated annual private utility assessment for the DWSC as stated in the Declaration shall be established by Seller based on market conditions and shall not exceed Seven Hundred Fifty Dollars ($750.00) per annum for each single family detached Lot subject to this Contract, Six Hundred Fifty Dollars ($650.00) per annum for each duplex unit and each townhouse subject to this Contract, and Five Hundred Fifty Dollars ($550.00) per annum for each 2-over-2 unit subject to this Contract.  Purchaser shall provide evidence to Seller of all costs incurred for the development and construction of the Water Systems and Sewer Systems.  Seller shall deliver the Declaration to Purchaser no later than one hundred twenty (120) days from the end of the Study Period (so long as Purchaser delivers the Notice of Intent to Proceed) for Purchaser's review and approval.  Purchaser shall provide its comments, if any, within fifteen (15) days after receipt of the Declaration from Seller.  Seller shall be entitled to record the Declaration on the Closing Date and if not so recorded, Purchaser, as a surviving obligation hereof and as a condition to the release of any Property subject to the Deed of Trust, shall, at Seller's sole cost and expense, execute and record the Declaration to encumber the Property and execute an assignment of its rights thereunder to Seller promptly upon receipt of same from Seller.  The costs and expenses incurred by Purchaser in connection with the forgoing surviving obligation (the "**Declaration Costs**") shall be applied as a principal curtailment to the then-outstanding principal balance due pursuant to the Note.  Seller shall no later than one hundred twenty (120) days from the end of the Study Period, provide Purchaser with a Notice of Deferred Water and Sewer Charges (the "**Notice of DWSC**") to be signed by each party home buyer of the Lots.  Purchaser shall ensure that any lot purchase agreement (each an "**LPA**") executed by Purchaser will require builders to obtain and provide to Seller a copy of the signed Notice of DWSC signed by each of the builder's third-party homebuyers provided Seller timely delivers the same to Purchaser.  In no event will Seller's delay or failure to deliver the Notice of DWSC delay Purchaser's execution of any LPA.  Notwithstanding anything herein to the contrary, Seller agrees and acknowledges that Purchaser shall have no liability for any DWSC payments.  Notwithstanding anything in this Contract to the contrary after recording of the Declaration as required hereunder, Seller acknowledges and understands that in no event shall Purchaser have any liability or responsibility in connection with the Declaration and/or the DWSC or the enforcement thereof.  Seller shall indemnify, defend, reimburse, and hold and save harmless Purchaser, Purchaser's officers, members, agents, employees, and Purchaser's successors and assigns, from and against any and all claims, liabilities, damages, loss, cost, legal fees and costs, or other expense arising out of or in any way related to the Declaration or DWSC, acts or omissions of Seller, its agents, employees, shareholders, contractors or subcontractors.  Seller's obligations under this Subsection 19(c), including without limitation the indemnification provisions, shall survive termination of this Contract and Closing.

d.        Purchaser hereby agrees to incorporate the Notice of DWSC into LPAs and to provide a copy of the DWSC Declaration to all such builders, including any amended Notice of DWSC or DWSC Declaration, which may from time to time be provided to Purchaser by Seller.  Purchaser also agrees to provide to the home builders all notices and disclosures relating to the DWSC as may be required, from time to time, by law.  Seller agrees that the foregoing shall not be effective unless and until Seller timely provides Purchaser with the Notice of DWSC.

16

e.      Purchaser shall include in all LPAs a requirement that any home builder keep Seller (or its assign) reasonably apprised of sales to and closing with homebuyers, including furnishing to Seller the names and addresses of all homebuyers, promptly after they close on their homes and collect from homebuyers at closing and promptly remit to Seller such advance payments of the Water and Sewer Charges as are customarily required and disclosed in advance payments of the Water and Sewer Charge as are customarily required and disclosed in the Notice of DWSC.

f.      The provisions set forth in this Section 19 shall survive Closing.  If Purchaser sells any of the Property to a homebuilder, the Purchaser shall cause that homebuilder to agree in writing to comply with the provisions of this Section 19 with respect to the portion of the Property purchased by that homebuilder. Such document shall expressly name Seller and its assigns as third party beneficiaries of such homebuilder's agreement and a copy of such document shall be furnished to Seller.

## 20.      **BANKRUPTCY PROVISIONS.**

(a)      Subject to and conditioned upon the Purchaser delivering the Notice of Intent to Proceed prior to the expiration of the Study Period, and timely posting the Deposit, if the Property is sold to someone other than Purchaser or Purchaser's permitted assign pursuant to an order of the Bankruptcy Court (an "**Alternative Transaction**"), and closing occurs with respect to such Alternative Transaction, then, in addition to the return of the Deposit and the Extension Fee if applicable, Purchaser shall be entitled to receive reimbursement of its actual third party fees and costs incurred in connection with this Contract and the transaction contemplated hereby, including without limitation, engineering and attorneys' fees, plus an amount equal to two percent (2%) of the Purchase Price (the "**Break-Up Fee**").  Additionally, in the event that the bankruptcy court fails to enter the Preliminary Approval and Bidding Procedures Order (defined below), the Purchaser shall be entitled to receive reimbursement of its actual third party fees and costs incurred in connection with this Contract and the transaction contemplated hereby, including without limitation, engineering and attorneys' fees (the "**Expense Reimbursement**").

(b)      Within ten (10) business days following the Effective Date, Seller shall file a motion seeking entry of an order (the "**Preliminary Approval and Bidding Procedures Order**") seeking authorization by, and approval of, the Bankruptcy Court for: (a) the reimbursement and break-up fee described herein; (b) preliminary approval of this Contract; (c) conveyance of the Property to Purchaser at Closing (upon the satisfaction or waiver of conditions in this Contract) free and clear of all liens, deeds of trust, mechanics' and materialmen's liens, judgment liens, security interests, creditor claims, encumbrances and interests, including without limitation the Lis Pendens (collectively, the "**Liens**"); (d) reasonable and customary bidding procedures; and (e) finding that Purchaser is a "good faith" purchaser under §363(m) of the Bankruptcy Code and entitled to all of the protections of a good faith purchaser.  In addition to other customary terms and conditions, the bidding procedures shall permit Purchaser to participate in any auction or other sale process for the sale of the Property, and shall provide that Purchaser shall be the successful bidder if it matches the terms of any competing proposal.  If the Bankruptcy Court does not enter the Preliminary Approval and Bidding Procedures Order by the end of the Study Period, Purchaser may terminate this Contract by declining to deliver the Notice of Intent to Proceed.

(c)      On or before June 30, 2021, Seller shall file a plan (the "**Bankruptcy Plan**") and disclosure statement (the "**Disclosure Statement**") under Chapter 11 of the Bankruptcy Code and shall diligently seek approval of the Disclosure Statement and confirmation of the Bankruptcy Plan.  The Bankruptcy Plan shall include terms and provisions that are consistent with this Contract, subject to the possibility of a higher and better bid for the sale of the Property to a third party.

17

21. **MISCELLANEOUS.**

      a.    Purchaser reserves the right to waive any of the terms and conditions of this Contract for its benefit, including, without limitation, conditions precedent to Closing, title, and warranty provisions, and to purchase the Property in accordance with the terms and conditions of this Contract which have not been so waived. Any and all such waiver(s) must be in writing signed by Purchaser.

      b.    All notices and other communications hereunder shall be in writing, and be deemed to have been received (i) immediately upon personal delivery or confirmed fax receipt, (ii) one (1) business day after being sent by confirmed overnight mail, or (iii) three (3) days after mailing, if mailed by certified mail, return receipt requested, postage prepaid:

| to Seller: | Zachair Ltd.<br>Attn: Dr. Nabil J. Asterbadi<br>2726 Chain Bridge Road, NW<br>Washington, DC 20016<br>Email: nasterbadi@aol.com |
|---|---|
| with a copy to: | Whiteford, Taylor & Preston, LLP<br>Attn: Bradford F. Englander, Esq.<br>3190 Fairview Park Drive, Suite 800<br>Falls Church, VA 22042<br>Email: benglander@wtplaw.com |
| to Purchaser: | JP Land Holdings, LLC<br>Attn: Adam Peterson<br>680 5th Avenue, 25th Floor<br>New York, NY 10019<br>Telephone: (212) 755-5163<br>E-mail: apeterson@jenpartners.com |
| with a copy to: | Holly Ridge Development, LLC<br>Attn: John Petrella<br>15115 Ganley Road<br>Boyds, Maryland 20841<br>Telephone: (301) 528-9494<br>E-mail: hollyridgedevelopment@verizon.net |
| with a copy to: | Freedman & Friedman, LLC<br>Attn: Debra S. Friedman, Esq.<br>3570 Olney Laytonsville Road, #682<br>Olney, MD 20832<br>E-mail: dfriedman@fsquaredlaw.com |

      The parties shall be responsible for notifying each other of any change of address or facsimile number.

18

c.      This Contract and the Non-Circumvention Agreement of even date herewith contain the entire agreement between the parties regarding the subject matter of this Contract. There are no promises, agreements, conditions, undertakings, warranties or representations, oral or written, express or implied, between them, relating to this subject matter, other than as herein and therein set forth. This Contract may not be modified orally or in any other manner than by an agreement in writing signed by all the parties or their respective successors in interest. This Contract may be executed in several counterparts, each of which shall be an original, but all of which shall constitute one and the same instrument. The Recitals set forth on page one are incorporated in and made a part of this Contract. The terms of this Contract are mutually agreed to be clear and unambiguous, shall be considered the workmanship of all the parties and shall not be construed against the drafting party.

d.      The terms and provisions of this Contract shall not survive Closing unless specifically stated in this Contract and otherwise shall be merged with the deed executed and delivered at Closing.

e.      If any terms, covenants or condition of this Contract or its application to any person or circumstances shall be invalid or unenforceable, the remainder of this Contract, or the application of such term or provision to persons or circumstances other than those to which it is held invalid or unenforceable, shall not be affected, unless the result would frustrate the purpose of this Contract.

f.      All questions with respect to the construction of this Contract, shall be determined in accordance with the laws of the jurisdiction in which the Property is located, without regard to conflict of law rules. Time is hereby declared to be of the essence in the performance of each of party's obligations hereunder.

g.      If any date upon which action is required under this Contract shall be a Saturday, Sunday or legal holiday, the date for such action shall be extended to the first regular business day after such date which is not a Saturday, Sunday or legal holiday.

h.      In the event of any dispute or controversy arising out of or relating to this Contract or the parties' compliance therewith, it is agreed that the exclusive forum for determination of any and all such disputes or controversies shall be the Bankruptcy Court. The Parties hereby consent to the Bankruptcy Court hearing and determining all factual and legal disputes arising under or in connection with this Contract, without requiring the Bankruptcy Court to prepare or submit proposed findings or conclusions to the United States District Court. In the event that the Bankruptcy Court lacks subject matter jurisdiction to hear or determine any dispute, the exclusive forum for determination of any and all such disputes or controversies shall be the appropriate state or federal trial court for the jurisdiction in which the Property is located. Moreover, in addition to any other relief to which it may be entitled, the prevailing party shall be entitled to recover its attorneys' fees and costs incurred in regard to such dispute or controversy. **THE PARTIES WAIVE THEIR RESPECTIVE RIGHTS OF TRIAL BY JURY**.

i.      All of the covenants, conditions and obligations contained in this Contract shall be binding upon and inure to the benefit of the respective heirs, legal representatives, successors and assigns of Seller and Purchaser. Upon any assignment of this Contract by Purchaser, and that assignee's express assumption of Purchaser's obligations under this Contract the term "Purchaser" shall mean and refer to the assignee only and the assignor Purchaser shall be released from any further obligation under this Contract, unless and until (i) Purchaser resumes its status as contract purchaser under the terms of such assignment, or (ii) the assignment otherwise becomes null and void pursuant to its terms; in either such event Purchaser shall resume its status as the sole Purchaser, assignment notwithstanding.

19

22.    **RULE AGAINST PERPETUITIES.**  Solely for purposes of avoiding the rule against perpetuities, and not to modify any provision of this Contract, Closing shall take place no later than twenty one (21) years from the Effective Date.

23.    **FORCE MAJEURE.**  If either party hereto shall be delayed, hindered, adversely affected or prevented from the performance of any act required hereunder, by reason of labor disputes of any kind, inability to procure materials or unusual delay in deliveries, delays or actions caused by government authority, government refusal to issue any necessary permits, delays caused by utility service providers, war, acts of terrorism, civil commotion or other casualty, damage caused by fire, earthquake, flood, hurricane or severe weather, disruptions resulting from a health crisis, such as an epidemic or pandemic, any form of act of God, or any other events of a similar nature not the fault of the party delayed in performing work or doing acts required under the terms of this Contract, whether or not the underlying event is foreseeable at the time of execution of this Contract, then performance of such act shall be excused for the period of the delay, and thereafter the period for the performance of any such act shall be extended for the lesser of (i) a period equivalent to the period of such delay, or (ii) twenty-four (24) months.

Beginning with the expiration of the extension period set forth above, if the required performance remains unperformed or assignment remains unavailable, either party may either waive the foregoing in writing, or either party may at its option either continue to wait for the performance or declare this Contract null and void and in such event the Deposit shall be returned to Purchaser within ten (10) days and there shall be no further liability on the part of either party to the other.

24.    **EFFECTIVE DATE.**  This Contract shall become effective on the date last signed by Seller and Purchaser ("**Effective Date**").

The parties have signed, sealed and delivered this Contract as of the dates written below each signature.

**[SIGNATURES BEGIN ON FOLLOWING PAGE]**

20

**SELLER:**

ZACHAIR LTD., a Maryland corporation

By:_____
Name: Dr. Nabil J. Asterbadi
Title: President
Date: _____


**PURCHASER:**

JP LAND HOLDINGS, LLC, a Delaware
limited liability company

By:_____
Name: John D. Petrella
Title:_____
Date: _____

**ESCROW AGENT:**

GPN TITLE, INC., a Maryland corporation

By:_____
Name:
Title:_____
Date: _____

21

**SELLER:**

ZACHAIR LTD., a Maryland corporation

By:
Name: Dr. Nabil J. Asterbadi
Title: President
Date: 6/1/2021

**PURCHASER:**

JP LAND HOLDINGS, LLC, a Delaware
limited liability company

By:_____
Name: John D. Petrella
Title:_____
Date: _____

**ESCROW AGENT:**

GPN TITLE, INC., a Maryland corporation

By:_____
Name: Mary M. Moon
Title: attorney
Date: 6/3/2021

21

EXHIBIT "A"

PROPERTY DESCRIPTION

Parcel I - containing 285.101 acres of land, more or less. Saving and excepting property conveyed by Deed recorded in Liber 3562, Folio 941. Tax Account No. 05-0328708 - 4401 Steed Road.

Parcel II - containing 16.180 acres of land, more or less. Tax Account No. 05-0327833 - Piscataway Road

Parcel B - containing 64.153 acres of land, more or less. Saving and excepting therefrom all that portion of the within property that lies in the land now known as Piscataway Road.  Tax Account No. 05-0360651 - 10651 Piscataway Road

Parcel C - containing 58.0204 acres of land, more or less.  Tax Account No. 09-0865121 - Piscataway Road

All Four (4) Parcels lying and being in the Piscataway District of Prince George's County, Maryland.   Said Four (4) Parcels being described in the Deed recorded in Liber 10110, folio 106 as follows:

22

Parcel 1

Being part of the land conveyed by Arthur C. Hyde, unmarried to Hyde Field, Incorporated by deed dated September 4, 1941 and recorded in Liber 620 at folio 276 among the Land Records of Prince George's County, Maryland and being more particularly described as follows:

BEGINNING for the same at an iron pipe set at a point where the Northwesterly right of way line of 40 foot wide Piscataway Road (Maryland State Route No. 223) intersects the 2nd or North 58°37' West 219-1/5 perch line of the 145 3/4 acre tract described as Tract 2 in Liber 620 at folio 276, thence leaving Piscataway Road and running with part of said 2nd line.

1. North 61°42'20" West 3575.76 feet to a corner fence post found at the end thereof, said corner fence post also being the end of the 2nd line of the 82 1/4 acre tract described in a Deed from Gussie B. Sansbury, Widow to Hency C. Padgett et ux. dated July 14, 1939 and recorded in Liber 532 at folio 275, thence running with the 3rd line of Tract 2 as described in Liber 620 at folio 276, as now surveyed,

2. North 45°40'00" East 1143.18 feet to an iron pipe set at the end thereof, thence running with the 4th line of Tract 2 as described in Liber 620 at folio 276 and also running with part of the 5th line of Tract 1 as described therein

3. North 47°40'00" East 2359.87 feet to an iron pipe set at a point where said 5[th] line is intersected by the Southwesterly right of way line of 50 foot wide Steed Road as shown on

23

Prince George's County R/W Plat No. 398, passing through the centerline of a 18 inch diameter cedar tree found at 2345.17 feet on line, said pipe set being opposite Centerline Station 32+26:95 and distant South 29°18'37" West 25.00 feet measured radially therefrom, thence running with the Southwesterly right of way line of 50 foot wide Steed Road per R/W Plat Nos. 398 and 397 by a curve to the left whose radius and central angle are 1457.40 feet and 08°38'24" respectively, whose long chord is

4. South 65°00'35" East 219.56 feet for an arc distance of 219.77 feet to a concrete monument found at a point of tangency opposite Centerline State 30+10.95. thence running with the Southwesterly right of way line of 50 foot wide Steed Road as per R/W Plat Nos. 397 and 396, the following four courses and distances:

5. South 69°19'47" East 624.07 feet to a point of curve, thence running by a curve to the right whose radius and central angle are 1407.40 feet and 10°36'50" respectively, whose long chord is

6. South 64°01'22" East 260.34 feet for an arc distance of 260.71 feet to a point of tangency, thence running

7. South 58°57' East 1849.03 feet to an iron pipe set at a point of curve opposite Centerline Station 2+73.29, thence running by a curve to the right whose radius and central angle are 1248.24 feet and 09°11'40" respectively, whose long chord is

8. South 54°07'07" East 200.09 feet for an arc distance of 200.31 feet to a point in the Northwesterly right of way line of Piscataway Road, as said Road was widened by virtue of Maryland State Roads Commission R/W Plat No. 33848, thence running with the said side of Piscataway Road, as widened by R/W Plat 33848, the following four courses and distances:

9. South 40°45'10" West 5.62 feet to an iron pipe set, thence running

10. South 04°17'51" East 40.31 feet to an iron pipe set, thence running

11. South 41°42'27" West 114.00 feet to an iron pipe set, thence running

12. South 20°54'03" West 53.49 feet to an iron pipe set in the Northwesterly right of way line of 40 foot wide Piscataway Road, as said Road is now being used, thence running with the Northwesterly right of way line of Piscataway Road (40 feet wide) as now being used, the following eight courses and distances:

13. South 41°32'53" West 769.87 feet to a point, thence running

14. South 40°55'14" West 455.15 feet to a point, thence running

15. South 41°23'14" West 321.88 feet to a point, thence running

16. South 41°38'13" West 136.33 feet to a point, thence running

17. South 41°18'21" West 408.52 feet to a point, thence running

18. South 40°52'31" West 309.66 feet to a point, thence running

19. South 41°15'00" West 433.06 feet to a point, thence running

20. South 41°24'18" West 838.32 feet to the beginning, containing 285.101 acres, more or less.

(Tax Account No. 05-0328708 - 4401 Steed Road)


## PARCEL II

Being part of the land conveyed as Parcel No. 2 in a Deed from Helen R. Houser, et al, to Nora C. Thorne dated February 25, 1948 and recorded in Liber 1016 at folio 413 among the Land Records of Prince George's County, Maryland and being more particularly described as follows:

BEGINNING for the same at an iron pipe set at a point where the Northwesterly side of 40 foot wide Piscataway Road (Maryland State Route No. 223) intersects the 6th or South 55°15' East 1581 foot line of the 16.52 acre tract conveyed as Parcel No. 2 in Liber 1016 at folio 413, thence running with the Northwesterly side of 40 foot wide Piscataway Road, parallel to and 20 feet from the existing centerline thereof

1. South 41°23'53" West 483.82 feet to an iron pipe set at a point where said right of way line intersects the 2nd line of said 16.52 acre tract, thence leaving Piscataway Road and running with part of said 2nd line

2. North 54°55'00" West 375.35 feet to an iron pipe set, thence running with the 3rd, 4th and 5th lines of the 16.52 acre tract conveyed as Parcel No. 2 in Liber 1016 at folio 413, the following three courses and distances:

3. South 35°05'00" West 100.00 feet to an iron pipe set, thence running

4. North 55°15'00" West 1120.00 feet to an iron pipe set, thence running

5. North 35°05'00" East 403.05 feet to an iron pipe set in the 2nd or North 58°37' West 219-1/5 perch line of the 145 3/4 acre tract conveyed as Tract 2 in a Deed to Arthur C. Hyde dated December 19, 1940 and recorded in Liber 609 at folio 42, thence running reversely with part of said 2nd line

6. South 61°42'20" East 1559.48 feet to the beginning, containing 16.180 acres of land more or less.

(Tax Account No. 05-0327833 – Piscataway Road)

25

Parcel B

BEING all of the land conveyed by Henry C. Padgett et ux. to Henry Cecil Padgett, Jr. et ux. by Deed dated November 14, 1955 and recorded in Liber 1929 at folio 146 and intended to be all of the land conveyed by Henry C. Padgett, Jr. personal representative of the estate of Henry C. Padgett To Henry C. Padgett, Jr. and Robert H. Padgett by Deed dated September 5, 1985 and recorded in Liber 6189 at folio 286 among the Land Records of Prince George's County, Maryland; both tracts being more particularly described as one tract as follows:

BEGINNING for the same at an iron pipe set in the North Westerly right of way line of 40 foot wide Piscataway Road at the end of the 1st line of a 16.18 acre tract conveyed by Arthur C. Hyde to W. A. Albright Investments, Inc. by Deed dated November 13, 1985 and recorded in Liber 6215 at folio 538, thence running with Piscataway Road (1) South 41°19'43" West 619.11' to a pipe set at the beginning point of the 82.25 acre tract described in Liber 6189 at folio 286, thence leaving Piscataway Road and running reversely with the 6th, 5th, 4th and 3rd lines of said 82.25 acre tract, the following four courses and distances: (2) North 50°59'08" West 682.45' to a pipe set, thence running (3) North 63°38'20' West 2335.56' to a fence post at an angle point in an existing fence, thence running (4) North 27°42'10" West 653.40' to a flint stone found, then running (5) North 46°42'27" East 696.48' to an iron pipe found at the end of the 1st line of the 285.101 acre tract conveyed as Parcel 1 in Liber 6215 at folio 538, thence running reversely with part of said 1st line (6) South 61°42'20" East 2016.38' to a pipe found at the end of the 5th line of the 16.180 acre tract conveyed as Parcel 2 in Liber 6215 at folio 538, thence running reversely with the 5th, 4th, 3rd and 2nd lines of said 16.180' acre tract, the following four courses and distances: (7) South 35°03'00" West 403.05' to a pipe found, thence running (8) South 55°15'00" East 1120.00" to a pipe found, thence running (9) North 35°05'00' East 100.00' to an iron pipe found, thence running (10) South 54°55'00" East 375.35' to the beginning.

Contaning 64.153 acres of land more or less. Saving and excepting therefrom however, all that portion of the within property that lies in the land now known as Piscataway Road.

(Tax Account No. 05-0360651 - 10651 Piscataway Road)

26

Parcel C

Being part of the 59.673 acre tract described as Parcel No. 2 in a Deed dated January 25, 1965 from Griffith S. Oursler et ux. to Clinton Manor, Inc. and duly recorded in Liber 3093 at folio 94 among the Land Records of Prince George's County, Maryland; and being more particularly described as follows:

Beginning for the same at an iron pipe set on the Northerly side of Piscataway Road (MD Route 223) at a point where the Northerly right of way line of Piscataway Road (80 feet wide) intersects the 9th line of Parcel No. 2, Liber 3098 at folio 94, thence running with Piscataway Road per right of way Plat No. 33848, the following two courses and distances: (1) South 55°33'25" west 519.37' to a pipe set at an angle point opposite base line station No. 141+10.602 and distant 40' therefrom, thence running (2) South 55°14'09" West 105.51' to a pipe set at a flare connection leading to Steed. Road (50' wide), thence running with said flare connection (3) North 80°40'25" West 44.55' to a pipe set in the Westerly right of way line of 50 foot wide Steed Road, thence running with said side of Steed Road, the following three courses and distances: (4) South 53°19'34" West 4.41' to a pipe set, thence running by a curve to the left whose radius and central angle are 1298.24' and 09°09'46" respectively, whose long chord is (5) North 40°36'17" West 207.39' for an arc distance of 207.61' to a pipe set at a point of tangency, thence running (6) North 45°11'15" West 1715.96' to a pipe set opposite centerline station No. 19+89.25 as per Prince George's County R/W Plat #397, thence leaving Steed Road and running with the 6th line of Parcel No. 2 as per Liber 3098 at Plat 94 (7) North 42°06'20" East 551.58' to a pipe set at the end thereof, thence running with the 7th line of said Parcel No. 2 (8) North 12°23'40" West 900.30' to a "PK" nail set in a fence post at the end of said 7th line, thence running with part of the 8th line of Parcel No. 2 as per Liber 3098 at folio 94 (9) North 80°22'20" East 381.10' to a pipe set at the end of the 5th or North 64°19'28" West 278.52 foot line of the 1,298 acre tract conveyed to Potomac Electric Power Company by Deed dated March 25, 1965 and recorded in Liber 3122 at folio 122, the following two courses and distances: (10) South 50°46'51" East 278.54' to a pipe set and (11) South 61°17'31" East 242.47' to a pipe set in the 9th line of Parcel No. 2 as per Liber 3098 at plat 94, distant 372.11' from the beginning of said 9th line, thence running with part of the 9th line of Parcel No. 2 of Liber 3098 at folio 94, (12) South 24°12'40" East 2277.55' to the beginning of the land now conveyed. Containing 58.0204 acres of land, more or less.

Subject to the Right of Way Agreement between Barry B. Early, et ux. and Potomac Electric Power Company in Liber 1293 at folio 2550

And subject to the "Limit of Denial of Vehicular Access" as shown on state roads commission R/W Plat No. 33848.

(Tax Account No. 09-0865121 - Piscataway Road)

27

Exhibit B
Permits

| Permit | Identification Number | Expiration |
|---|---|---|
| PG County Haul Road Permit | 12963-2009-00 | 9/24/2021 |
| FCC Radio Station License | WRMI580 | 4/14/2031 |
| MDE License to Surface Mine | 21-SL-0725 | |
| MDE Surface Mine Permit | 91-SP-0385 | |
| MAA Airport Operating License | #135 | 9/30/2021 |
| MDE Stormwater Pollution Prevention Plan, General Discharge Permit 12SW | 12SR3455 | |
| MDE General Discharge Permit for Stormwater Associated with Industrial Activity | 12SR3455 | |

28

Exhibit C
Note

## DEFERRED PURCHASE MONEY PROMISSORY NOTE

$6,000,000.00                                           _____, Maryland
                                                    _____, 2021

FOR VALUE RECEIVED, JP LAND HOLDINGS LLC, a Delaware limited liability company, having its principal office at 680 5th Avenue, 25th Floor, New York, NY 10019 ("**Maker**" or "**Borrower**"), hereby unconditionally promises to pay to the order of ZACHAIR LTD., a Maryland corporation, having an office at 2726 Chain Bridge Road, NW, Washington, DC 20016, or its assigns ("**Lender**") the principal amount of Six Million Dollars ($6,000,000.00) ("**Loan Amount**'), at Lender's office or such other place as the holder of this DEED OF TRUST PROMISSORY NOTE (this "**Note**") may from time to time designate in writing or so much thereof as may be outstanding from time to time (the "**Loan**") until the date the entire principal sum hereof has been paid in full. Said principal shall be payable as set forth herein below. The entire unpaid principal balance, together with accrued and unpaid interest, if any, and all other obligations of Borrower hereunder, if not sooner paid shall be due and payable on _____ _____, 2023 (the "**Maturity Date**").

1.     <u>PAYMENTS AND INTEREST</u>.

      a.     Except as otherwise provided in this Note, the outstanding Loan Amount shall accrue interest at an annual rate equal to Four Percent (4%) from the date of this Note until the entire Loan Amount is paid in full, whether at maturity, upon acceleration, by prepayment, or otherwise.

      b.     Borrower shall make monthly interest only payments commencing _____.

      c.     Borrower shall pay Fifty Percent (50%) of the outstanding Loan Amount after adjustment for allowable principal curtailments plus accrued and unpaid interest to on or before _ _____.

      d.     On or before the Maturity Date, Borrower shall pay the outstanding and unpaid Loan Amount, together with all accrued and unpaid interest thereon. Lender is under no obligation to refinance the Loan at maturity. Upon full payment in accordance with this Note, Lender shall release the lien of the Security Instrument (as hereinafter defined) by recording a full reconveyance thereof.

      e.     In the event of a default hereunder that remains uncured after the expiration of the applicable grace and notice and cure periods, if any, Borrower shall pay as the interest rate, the lesser of: (i) twelve percent (12%) per annum; or (ii) the highest rate allowed by law for so long as said default continues ("**Default Rate**"). The Default Rate shall remain in effect as long as the default continues, and such period shall be recalculated for each default occurring hereunder.

29

f.      Notwithstanding the foregoing, under no circumstances will interest accrue or be payable at a rate in excess of the maximum rate allowed by the laws of the State of Maryland.  If the Lender has collected interest in excess of such maximum rate, then the Borrower's only remedy will be that the Lender will apply such excess interest as a full or partial prepayment of the unpaid balance of the principal amount of the Loan and refund any additional excess amount to the Borrower.

g.      The face amount of this Note is the maximum principal amount that may be outstanding hereunder at any one time.  Any repayment of the principal amount of this Note shall be credited against the unpaid principal balance due on this Note, but shall not extinguish this Note in whole or in part.

h.      All amounts received by Lender from Borrower shall be applied first to late charges and fees, next to outstanding interest, then to unpaid expenses and charges payable hereunder, or otherwise as determined solely by Lender, and then to principal, and Lender, at its option, may make such other application as it may deem appropriate from time to time.

i.      All payments on this Note shall be payable in immediately available funds in lawful money of the United States which shall be legal tender for public and private debts at the time of payment.  Any payment by other than immediately available funds which Lender, at its option, elects to accept shall be subject to collection, and interest shall continue to accrue until the funds by which payment is made are available to Lender for its use.

This Note, when executed and delivered by Borrower, will constitute the legal, valid and binding obligation of Borrower in accordance with its terms.

2.      <u>LATE CHARGES</u>.  If Borrower does not pay principal, interest or any other amount when due, Lender shall collect a late charge equal to five percent (5%) of the amount of any payment which is not paid in full within ten (10) days after such payment is due (each such payment a "Late Charge").  Notwithstanding the foregoing, no Late Charge shall exceed Five Hundred Dollars ($500.00).

3.      <u>PREPAYMENT</u>.  Borrower shall have the right to prepay the unpaid balance hereof, in whole or in part, at any time, without penalty.

4.      <u>SECURITY FOR THE LOAN</u>. This Note and the Loan Amount are secured by, and Lender is entitled to the benefits of, that certain Deed of Trust dated as of _____, 2021 from Borrower, as grantor, to Lender, as beneficiary, encumbering the real property known as Hyde Field in Prince George's County, Maryland as more particularly described therein and which shall be recorded in the land records of Prince George's County immediately after the execution and delivery of this Note, as the same may be amended, restated, supplemented, or otherwise modified from time to time in accordance with its terms (the "**Security Instrument**").

30

5.    DEFAULT.

a.    If Borrower defaults in the payment of principal, interest, fees, costs or expenses due pursuant to this Note and the Deed of Trust, and any such default shall continue for a period of fifteen (15) days after delivery of written notice thereof, by registered or certified mail, return receipt requested, first class postage repaid or by messenger or by a nationally recognized, overnight commercial express service to Borrower by Lender, then Lender, at its option, may accelerate this Note, whereupon the total outstanding principal, together with accrued interest, fees, costs and expenses shall be immediately due and payable.

b.    No waiver by Lender of any default shall be effective unless made in writing nor shall any such waiver operate as a waiver of any other default or future default.

c.    Upon default, Borrower shall pay Lender all expenses incurred by Lender in collecting the debt evidenced by this Note. Those expenses include, without limitation, reasonable attorneys' (and paralegal) fees, but not more than the amount permitted by applicable law. If a judgment is entered against Borrower or either Borrower's estate for any sum due under this Note, Borrower or Borrower's estate will also pay Lender interest at the statutory interest rate on the judgment.

6.    MISCELLANEOUS.

a.    Any notices or other communications required, desired or permitted hereunder shall be given either by certified or registered mail, postage prepaid, return receipt requested; by hand delivery (with written receipt therefor); or by messenger or by a nationally recognized, overnight commercial express service, and shall be sent to the parties' respective address set forth on page one, or to such other address as may be prescribed by written notice given pursuant to this Paragraph. Notices shall be deemed given hereunder upon personal delivery, one (1) business day after said notice shall be deposited with an overnight commercial express service or two (2) business days after the date on which said notice is mailed. Whenever in this Note the giving of notice by mail or otherwise is required, the giving of such notice may be waived in writing by the party entitled to receive such notice.

b.    All matters pertaining to this Note shall be governed by the laws of the State of Maryland, even if Maryland rules on conflicts of law would otherwise require that the law of another state govern this Note.

c.    Each right, power and remedy under this Note and under applicable law, shall be cumulative and concurrent and the exercise of any one or more of them shall not preclude the simultaneous or later exercise by Lender of any or all such other rights, powers or remedies. Captions are inserted only as a matter of convenience and for reference and in no way define, limit or describe the scope or intent of this Note nor any provision hereof. The use of the singular herein may also refer to the plural and vice versa, and the use of the neuter or any gender shall be applicable to any other gender or the neuter.

31

d.     If any part of this Note shall be adjudged invalid or not enforceable then such invalidity or unenforceability shall not cause the remainder of the Note to be or to become invalid or unenforceable and if a provision hereof is held invalid or unenforceable in one or more of its applications, the parties hereto agree that said provisions shall remain in effect in all valid or enforceable applications that are severable from the invalid or unenforceable application or applications.  This Note may not be amended except in a writing specifically intended for such purpose and executed by the party against whom enforcement of the amendment is sought.

e.     This Note, when executed and delivered by Borrower, will constitute the legal, valid and binding obligation of Borrower in accordance with its terms.

f.     Waiver of Jury Trial.  Borrower acknowledges that it has had the opportunity to obtain the advice of experienced counsel of its own choosing in connection with the negotiation and execution of this Note and to obtain the advice of such counsel with respect to all matters contained herein, including, without limitation, the provisions related to the following waiver of trial by jury.  The Borrower further acknowledges that it is experienced with respect to financial and credit matters and that it has each made its own independent decision to execute and deliver this Note.  The terms and provisions of the Note are for the benefit of the Borrower, Lender and their respective successors, assigns, endorsers, transferees and all persons claiming under or through them.

**The Borrower and Lender hereby voluntarily and knowingly waive any right they may have to a trial by jury in respect of any litigation arising out of, under of in connection with this Note, or the transactions contemplated therein.  The Borrower hereby certifies that no representative or agent of the Lender (including its counsel) has represented, expressly or otherwise, that the Lender would not, in the event of such litigation, seek to enforce this waiver of rights to jury trial.  The Borrower acknowledges that the Lender has been induced to enter into this loan transaction by, _inter alia_, the provisions of this jury waiver.**

IN WITNESS WHEREOF, and intending to be legally bound hereby, the undersigned executed this Note under seal as Borrower.

BORROWER:

JP LAND HOLDINGS LLC

By: _____(SEAL)
Name:  John D. Petrella
Title: _____

32

Exhibit D
Deed of Trust

## PURCHASE MONEY DEED OF TRUST

THIS PURCHASE MONEY DEED OF TRUST (hereinafter referred to as "**Security Instrument**") is made on the _____ day of _____, 2021, by JP Land Holdings LLC, a Delaware limited liability company, having its principal office at 680 5th Avenue, 25th Floor, New York, NY 10019 ("**Grantor**") to _____ (herein "**Trustee**"), for the benefit of Zachair Ltd., a Maryland corporation, have an office at 2726 Chain Bridge Road, NW, Washington, DC 20016 ("**Lender**").

**WHEREAS**, the Grantor is justly indebted unto Lender in the principal amount of Six Million Dollars ($6,000,000.00) (the "**Loan**") which principal amount with interest thereon is evidenced by the Grantor's Deed of Trust Promissory Note of even date herewith, payable to the order of Lender (as the same may from time to time be extended, amended, restated, supplemented or otherwise modified, the "**Note**"), and as provided therein; the entire unpaid balance of principal together with accrued interest thereon being due as set forth therein, shall be due and payable not later than _____, 2023 (the "**Maturity**" or "**Maturity Date**"); and

**WHEREAS,** the Grantor desires to secure the payment of all sums evidenced by the Note, all other moneys now or hereinafter advanced or expended by the Trustee or the Lender as provided for herein or by applicable law and all documented, third-party out-of-pocket costs, expenses, charges, liabilities, commissions, half-commissions and reasonable attorney's fees now or hereafter chargeable to, incurred by or disbursed by the Trustee, the Lender or the Grantor as provided herein (collectively, the "**Obligations**") and the performance of the terms, conditions and provisions of the Note and of any other instruments, agreements and documents, previously, simultaneously or hereafter executed and delivered by the Grantor or any other person, singly or jointly with another person or persons, evidencing, securing, guarantying or in connection with the Obligations. The Note, this Security Instrument and all such other instruments, agreements and documents executed in connection with the Loan are hereinafter sometimes referred to collectively as the "**Loan Documents**".

**NOW, THEREFORE**, Grantor in consideration of the Indebtedness (hereinafter defined) and the trust herein created, irrevocably grants and conveys to Trustee, in trust, with power of sale, a portion of the commercial land and premises lying and being in Prince George's County, Maryland known as Hyde Field and more particularly described on Exhibit "A" attached hereto and incorporated herein.

Together with the buildings and improvements thereon, and the rights, alleys, ways, easements, waters, privileges, appurtenances and advantages thereto belonging or in anywise appertaining, including without limitation, all of the Grantor's right, title, interest, estate, claim or demand, either at law or in equity, in and to all architectural, engineering and similar plans, specifications, drawings, renderings, profiles, studies, shop drawings, reports, plats, permits, surveys and the like; and all sewer taps, permits and allocations, agreements for utilities, bond, sureties and the like, relating to said building and improvements now erected or to be erected upon or about the land (all collectively "**Property**"), in order to secure repayment of the Grantor's indebtedness to Lender, in the principal sum of Six Million Dollars ($6,000,000.00), and any extensions, future advances, renewals, modifications, or refinancing thereof; and the payment of all other sums, with interest thereon, advanced in accordance herewith to protect the security of

33

this Security Instrument and the performance of the covenants and agreements herein contained (the "**Indebtedness**").

Provided that if the said Grantor, its successors or assigns shall pay, or cause to be paid, the Indebtedness and the interest thereon, when and as due and payable pursuant to the Note and shall perform each and all of the covenants herein on their part to be performed, then this Security Instrument shall be void.

Grantor covenants that Grantor is lawfully seized of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record as of the date of this Security Instrument. Grantor warrants and will defend specially the title to the Property against all claims and demands.

Grantor and Lender further covenant and agree as follows:

1.      **Payment of Principal and Interest**. Grantor shall promptly pay when due the debt evidenced hereby. Payments are deemed received by Lender when received at the mailing address set forth in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Paragraph 12. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Indebtedness current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted.

2.      **Application of Payments**. Unless applicable law provides otherwise, all payments received by Lender shall be applied first to any charges due hereunder, then to any interest due hereunder and last to principal due.

3.      **Charges; Liens**. Grantor shall pay as and when due all taxes, assessments, charges, fines and impositions attributable to the Property which may attain priority over this Security Instrument, provided, however, that the Grantor is not required hereby to pay and discharge or to cause to be paid and discharged any such indebtedness, obligation, tax, assessment, charge, levy or claim so long as the validity thereof shall be contested in good faith by appropriate proceedings and the Grantor shall set aside on its books reserves which the Lender reasonably deems adequate with respect to any such tax, assessment, charge, levy or claim so contested. Grantor shall pay these obligations on time directly to the party owed payment. Upon written request from Lender, Grantor shall promptly furnish to Lender copies of all notices of amounts to be paid under this paragraph. Upon written request from Lender, Grantor shall promptly furnish to Lender receipts evidencing the payments. Grantor shall promptly discharge any lien which has priority over this Security Instrument unless Grantor: (a) agrees in writing to the payment of the obligation secured by the lien in a manner reasonably acceptable to Lender; (b) contests in good faith the lien by, or defends against enforcement of the lien in legal proceedings which, in the Lender's opinion, operate to prevent the enforcement of the lien; or (c) secures from the holder of the lien an agreement reasonably satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien that may attain priority over this Security Instrument, Lender may give Grantor a written notice identifying the lien. Grantor shall satisfy the lien or take one or more of the actions set forth above within 10 days of the giving of written notice. Grantor shall pay, upon written demand of Lender after Grantor's default under the terms of the Note, a sum equal to the taxes, assessments, and insurance premiums next due on the Property (all as estimated by Lender) less all sums already paid therefore, divided by the number of months to elapse before one month prior to the date when such taxes, assessments, and

34

premiums become due, such sums to be held by Lender in a non-interest bearing account to pay said taxes, assessments, and premiums.

4. **Liability Insurance**. Grantor shall maintain commercial general public liability insurance in an amount of not less than One Million Dollars ($1,000,000.00) per occurrence and Two Million Dollars ($2,000,000.00) general aggregate, which shall include worker's compensation insurance. All insurance policies, including any policies in excess of the requirements set forth in this Paragraph 4 shall be with an insurance company or companies reasonably satisfactory to the Lender, shall be in form reasonably satisfactory to the Lender, shall meet all coinsurance requirements of the Lender, shall be maintained in full force and effect, shall be endorsed with a standard mortgagee/loss payee clause in favor of Lender in the case of the hazard or property insurance, and shall provide for at least thirty (30) days' notice of cancellation, termination or non-renewal to the Lender. The commercial general public liability policy shall also name Lender as an additional insured.

5.     **Preservation, Maintenance and Protection of the Property**. Grantor shall not destroy, damage, impair the Property, allow the Property to deteriorate, or commit waste on the Property, except in connection with the anticipated development of the Property. Grantor shall be in default if any forfeiture action or proceeding, whether civil or criminal, is begun that in Lender's good faith judgment could result in forfeiture of the Property or otherwise materially impair the lien created by this Security Instrument or Lender's security interest. Grantor may cure such a default and reinstate, as provided herein, by causing the action or proceeding to be dismissed with a ruling that, in Lender's good faith determination, precludes forfeiture of the Grantor's interest in the Property or other material impairment of the lien created by this Security Instrument or Lender's security interest. Grantor shall also be in default if Grantor knowingly gave materially false or inaccurate information or statements when made to Lender (or failed to provide Lender with any information) in connection with the Indebtedness.

6.     **Protection of Lender's Rights in the Property**. If Grantor fails to perform the covenants and agreements contained in this Security Instrument, or there is a legal proceeding that may significantly affect Lender's rights in the Property (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture or to enforce laws or regulations), then Lender may do and pay for whatever is necessary to protect the value of the Property and Lender's rights in the Property. Lender's actions may include paying any sums secured by a lien which has priority over this Security Instrument, appearing in court, paying reasonable attorneys' fees and entering on the Property to make repairs. Although Lender may take action under this Paragraph 6, Lender does not have to do so. Any amounts disbursed by Lender under this Paragraph 6 shall become additional debt of Grantor secured by this Security Instrument. Unless Grantor and Lender agree to other terms of payment, these amounts shall accrue interest at the rate of interest set forth in the Note from the date of Lender's disbursal to the date repaid by Grantor and shall be payable upon notice from Lender to Grantor requesting payment.

7.     **Inspection**. During normal business hours, Lender or its agent may make reasonable entries upon and inspections of the Property. Lender shall give Grantor at least two (2) business days' prior notice of an inspection except in the case of an emergency which shall not require such notice.

8.     **Condemnation**. In the event of a taking of all or a portion of the Property, unless Grantor and Lender otherwise agree in writing or unless applicable law otherwise provides, the proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then

35

due. Unless Lender and Grantor otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of any payments or change the amount of such payments due Lender.

9.     **Grantor Not Released; Forbearance by Lender Not a Waiver**. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to any successor in interest of Grantor shall not operate to release the liability of the original Grantor or Grantor's successors in interest. Lender shall not be required to commence proceedings against any successor in interest or refuse to extend time for payment or to otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Grantor or Grantor's successors in interest. Any forbearance by Lender in exercising any right or remedy shall not be a waiver of or preclude the exercise of any right or remedy.

10.    **Successors and Assigns Bound**. The covenants and agreements of this Security Instrument shall bind and benefit the successors and assigns of Lender and Grantor, subject to the provisions of Paragraph 15 below.

11.    **Loan Charges**. If the Indebtedness secured by this Security Instrument is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Indebtedness exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit and (b) any sums already collected from Grantor which exceeded permitted limits will be refunded to Grantor. Lender may choose to make this refund by reducing the amount of the Indebtedness or by making a direct payment to Grantor. If a refund reduces principal, the reduction will be treated as a partial repayment without any prepayment charge.

12.    **Notices**. Any notice to Grantor provided for in this Security Instrument shall be given by delivering it or by mailing it by first class mail unless applicable law requires use of another method. The notice shall be directed to the Grantor at the address set forth in the Note or any address Grantor designates by notice to Lender. Any notice to Lender shall be given by first class mail to Lender's address stated herein or any other address lender designated by notice to Grantor. Any notice provided for in this Security Instrument shall be deemed to have been given to Grantor or Lender when given as provided in this Paragraph.

13.    **Governing Law; Severability**. This Security Instrument shall be governed by the laws of the State of Maryland and federal law as applicable. In the event that any provision or clause of this Security Instrument conflicts with applicable law, such conflict shall not affect other provisions of this Security Instrument which can be given effect without the conflicting provision.

14.    **Grantor's Copy**. Grantor shall be given one confirmed copy of this Security Instrument.

15.    **Due on Transfer of Property**. If all or any part of the Property or any interest therein is sold or transferred in violation of this Security Instrument, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by applicable law as of the date of this Security Instrument. If Lender exercises this option, Lender shall give Grantor notice of acceleration. The notice shall provide a period of not less than fifteen (15) days from the date the notice is delivered or mailed within which Grantor must pay all sums secured by this Security Instrument. If Grantor fails to pay these sums prior to the expiration of this period, Lender may

36

invoke any remedies permitted by this Security Agreement without further notice or demand on Grantor.

16.     **Grantor's Right to Reinstate**. If Grantor meets certain conditions, Grantor shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earlier of: (a) 5 days (or such other period as applicable law may specify for reinstatement) before sale of the Property pursuant to any power of sale contained in this Security Instrument; or (b) entry of a judgment enforcing this Security Instrument. Those conditions are that Grantor (a) pays Lender all sums which then would be due under this Security Instrument as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all reasonable, documented, out-of-pocket third-party expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees; and (d) takes such action as Lender may reasonably require to assure that the lien of this Security Instrument, Lender's rights in the Property and Grantor's obligation to pay the sums secured by this Security instrument shall continue unchanged. Upon reinstatement by Grantor, this Security Instrument and the obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Paragraph 15.

17.     **Intentionally Omitted**.

18.     **Hazardous Substances**. Grantor shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substance on or in the Property. Grantor shall not do, nor allow anyone else to do, anything affecting the Property that is in violation of any Environmental Law. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property. Grantor shall promptly give Lender written notice of any investigation, claim, demand, lawsuit or other action by an governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Grantor has actual knowledge, if Grantor learns or is notified in writing by any governmental or regulatory authority, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Grantor shall promptly take all necessary remedial actions in accordance with Environmental law. As used in this paragraph "**Hazardous Substances**" are those substances defined as toxic or hazardous substances by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. Hazardous Substances do not include small quantities of materials present on the Property in retail containers, which would not be prohibited, regulated or controlled under applicable environmental laws. As used in this Paragraph, "Environmental Law" means state and federal laws and laws that relate to health, safety or environmental protection.

19.     **Acceleration; Remedies**. Lender shall give notice to Grantor prior to acceleration following Grantor's breach of any covenant or agreement in this Security Instrument (but not subject to acceleration under Paragraph 15 unless applicable law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than ten (10) days from the date the notice is given to Grantor, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Grantor of its rights to reinstate after acceleration and right to assert in the foreclosure preceding the nonexistence of a default or any other defense of Grantor to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender, at its

37

option, may require immediate payment in full of all sums secured by this Security instrument without further demand and may invoke the power of sale and any other remedies permitted by applicable law. Lender shall be entitled to collect all documented out-of-pocket third-party expenses incurred in pursuing the remedies provided in this Paragraph, including, but not limited to, reasonable attorneys' fees and costs of title evidence. If Lender invokes the power of sale, Lender shall mail or cause Trustee to mail a notice of sale to Grantor in the manner prescribed by applicable law. Trustee shall give notice of sale by public advertisement for the time and in the manner prescribed by applicable law. Trustee, without demand on Grantor, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated inn the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale. Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be *prima facie* evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all usual and customary documented expenses of the sale, including, but not limited to, Trustee's fees not in excess of three percent (3%) of the gross sale price and reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it. Grantor, in accordance with the Maryland Rules of Procedure, does hereby declare and assent to the passage of a decree to sell the Property in one or more parcels by the equity court having jurisdiction for the sale of the Property and consents to the granting to any trustee appointed by the assent to decree of all the rights, powers and remedies granted to the trustee in this Security Instrument together with any and all rights, powers and remedies granted by the decree. Neither the assent to decree nor the power of sale granted in this Paragraph shall be exhausted in the event the proceeding is dismissed before the payment in full of all sums secured by this Security Instrument.

20.    **Release**. Upon payment of all sums secured by this Security Instrument, Lender or Trustee shall release this Security Instrument to Grantor. Grantor shall pay any recordation costs. Lender or Trustee may charge Grantor a fee for releasing this Security Instrument, not to exceed $50.00, if permitted under applicable law. In addition, following final subdivision of the Property, Lender or Trustee shall release a portion of the Property as agreed upon by Lender and Grantor so that the value of the Property encumbered by this Security Instrument shall be approximately Six Million Dollars ($6,000,000.00).

21.    **Substitute Trustee**. Lender, at its option, may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder by an instrument recorded in the county in which this Security Instrument is recorded without conveyance of the Property. The successor trustee shall succeed to all title, power and duties conferred upon Trustee herein and by applicable law.

22.    **Possession of the Property**. Grantor shall have possession of the Property until Lender has given Grantor notice of default pursuant to Paragraph 19 of this Security Instrument.

23.    **Business Purpose**. Grantor hereby certifies that the Loan evidenced by the Note and this Security Instrument is a Loan for business purposes only and that the transaction is not subject to any truth-in-lending or consumer protection laws whatsoever.

IN WITNESS WHEREOF, the Grantor has executed this Security Instrument under seal.

38

WITNESS:                    GRANTOR:
                                     JP Land Holdings LLC

_____    _____(SEAL)
                                     By: John D. Petrella
                                   Title: _____

STATE OF MARYLAND
COUNTY OF _____
      I hereby certify that on this ___ day of _____, 2021, before me, the
subscriber, a Notary Public in and for the State of Maryland, County of _____,
personally appeared John D. Petrella, who acknowledged himself to be the Vice President of JP
Land Holdings LLC, the Grantor named in the foregoing Deed of Trust , and acting in said
capacity and being authorized to do so, executed the foregoing instrument on behalf of the
Grantor for the purposes therein contained, by signing in my presence the name of the Grantor
by himself as Vice President.
      WITNESS my hand and notarial seal.

                                   _____
                                   Notary Public
                                   My commission expires: _____

This is to certify that the foregoing Deed of Trust was prepared by the undersigned, an attorney
duly admitted to practice before the Court of Appeals in Maryland,

                                   _____

After recording, please return to:

_____
_____
_____

39

**EXHIBIT "A"**
LEGAL DESCRIPTION OF PROPERTY

Exhibit E
Disclosure Schedule

NONE

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| Zachair, Ltd., | ) | Case No.:  20-10691-TJC |
| | ) | |
| Debtor. | ) | Chapter 11 |

## BID PROCEDURES

On [●], the United States Bankruptcy Court for the District of Maryland entered the *Order (A) Approving the Sale of the Debtor's Property Free and Clear of Liens, Claims, Interests and Encumbrances, (B) Approving the Sales Contract, (C) Approving Bid Procedures, (D) Scheduling Bid Deadline, Auction and Sale Hearing, (E) Approving Form and Manner of Notice Thereof, and (F) Granting Certain Related Relief* [Docket No. [●]] (the "Order"), by which the Court approved procedures setting forth the process by which the Debtor is authorized to solicit bids for and conduct an auction (the "Auction") for a sale or disposition (the "Sale") of the Debtor's Property (the "Bid Procedures").

## I.    PARTICIPATION REQUIREMENTS

    a.    **Preliminary Bid Documents**. Unless previously provided, any person or entity that wishes to participate in the bidding process for the Property must submit to counsel for the Debtor the following documents (the "Preliminary Bid Documents"):

        a.    an executed Confidentiality and Non-Circumvention Agreement, or a similar confidentiality agreement, in form and substance satisfactory to the Debtor; and

        b.    written evidence of the person's or entity's financial and other capacity to consummate the Sale, in form and substance reasonably satisfactory to the Debtor.

    b.    **Potential Bidder**. Promptly following receipt of any Preliminary Bid Documents, the Debtor shall determine and shall notify such person or entity whether such person or entity has submitted acceptable Preliminary Bid Documents so that such person or entity may access the Due Diligence (such person or entity so designated as eligible by the Debtor, a "Potential Bidder").  Any person or entity that is not designated as a Potential Bidder by the Debtor will not receive access to the Due Diligence Materials (as defined below).

    c.    **Bid Deadline**. Anyone that desires to become a Qualified Bidder (as defined below) shall deliver a written copy of its Qualified Bid (as defined below) to the parties specified below, so as to be received no later than **5:00 p.m. (prevailing Eastern**

**Time), on Thursday, August 12, 2021** (the "Bid Deadline") on counsel to the Debtor ("Debtor's Counsel") and Debtor's real estate agent and broker (the "Broker") (together, "Debtor's Advisors" or "Advisors") as follows:

    i.    Debtor's Counsel:  Whiteford, Taylor & Preston, LLP, Attn: Bradford F. Englander, Esq., 3190 Fairview Park Drive, Suite 800, Falls Church, VA 22042 (e-mail: benglander@wtplaw.com); and

    ii.    Broker:  Fraser Forbes Real Estate Services, LLC, a/k/a Fraser Forbes Company LLC, 7811 Montrose Road, Suite 500, Potomac, MD  20854 (attn: Richard O. Samit) (e-mail: rsamit@fraserforbes.com).

d.   **Additional Evidence**. The Debtor may (i) at any time require a Potential Bidder to provide additional evidence of its financial or other ability to consummate the Sale, and (ii) based on the additional evidence provided, exclude any Potential Bidder from conducting a due diligence investigation or otherwise participating in the Auction. The Debtor may work with parties who submit offers on or before the Bid Deadline in an attempt to qualify the same as a Qualified Bid such that said party may participate at the Auction.

e.   **Information**. Interested bidders requesting information about the qualification process should contact the Broker and/or Debtor's Counsel.

f.   **Due Diligence**.  Only Potential Bidders and the Stalking Horse Purchaser will have access to the Due Diligence Materials (as defined below).  Upon the execution of the Confidentiality and Non-Circumvention Agreement, or a similar confidentiality agreement, in form and substance satisfactory to the Debtor, Potential Bidders shall be given access to copies of all title reports, title insurance policies, environmental, soil and other tests and studies, and copies of all surveys, engineering and other plans and plats relating to the Property to the extent within Debtor's possession or control (collectively, the "Due Diligence Materials") via an online data room maintained by the Broker. The Debtor, in its sole discretion, reserves the right to permit Potential Bidders to conduct on-site tests and studies at the Property, subject to the Potential Bidder's satisfactory explanation of the need for additional on-site testing, and its execution of documents indemnifying the Debtor for any potential damage to the Property, as well as all costs and expenses related to such on-site tests and studies. The Debtor and its Advisors are not required to furnish any information of any kind whatsoever relating to the Property to any person or entity that is not a Potential Bidder.  The Debtor and its Advisors shall coordinate the efforts of all Potential Bidders in conducting a due diligence investigation in connection with a potential bid.  Except for obligations set forth in the Sales Contract, upon the expiration of the Bid Deadline, the Debtor and its Advisors are not required to furnish any information of any kind whatsoever relating to the Property to any person or entity that is not a Qualified Bidder (as defined below).

## II.   **QUALIFIED BIDS**

a. **Forms and Content of a Qualified Bid**. A "Qualified Bid" is a bid received by the Debtor's Advisors on or before the Bid Deadline that:

    i.     is formal, binding and unconditional, except for conditions relating to development entitlements and court approval;

    ii.     is not conditioned on any unperformed due diligence, feasibility analyses, tests or studies;

    iii.     includes the following documents:

        1.     unless previously provided, current financial statements of the Potential Bidder for the Potential Bidder's last fiscal year (or, if the Potential Bidder is an entity created to purchase the Property, such financial statements from the Potential Bidder's parent or other appropriate affiliated company), current financial statements for any subsequent fiscal quarter, or such other financial documentation reasonably satisfactory to the Debtor, and written evidence of a financing commitment (not subject to any conditions) or other source of cash, and tables setting forth the sources and uses of funds for the Sale, that demonstrate such Potential Bidder's financial and other capability to close the Sale, in all cases which are in form and substance reasonably acceptable to the Debtor (the "Financial Documents");

        2.     a clearly marked executed written agreement that is in form and substance acceptable to the Debtor;

        3.     a letter (i) stating that the Potential Bidder has read and agrees to be bound by the terms and conditions of the Bid Procedures, (ii) setting forth contact information for the Potential Bidder, its authorized representative and its counsel, and as to each, such person's full name, company or firm, physical address or other address at which such person receives overnight deliveries, telephone number, facsimile number and email address, (iii) stating that the Potential Bidder has not engaged in any collusion with respect to its bid, and (iv) acknowledging that: (a) the Potential Bidder has had an opportunity to examine the Debtor's assets and liabilities before making its bid, (b) the Potential Bidder has relied solely upon its own independent review, investigation or inspection of any documents in making its bid and (c) the Potential Bidder did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied, by operation of law or otherwise, regarding the Debtor's assets or liabilities, or the completeness of any information provided in connection with the

Debtor's implementation of the Bid Procedures, in each case except as expressly stated in such letter; and

    4.   evidence of authority such as a copy of a board resolution or similar document demonstrating the authority of the Potential Bidder to make a binding and irrevocable bid on the terms proposed;

  iv.  except for conditions relating to development entitlements and court approval, is not subject to any material condition precedent to closing, including obtaining financing, any internal or equity holder approval contingency, the outcome of unperformed due diligence, or any bid protections (including a breakup fee, termination fee, expense reimbursement or similar type of payment);

  v.  the Debtor determines is reasonably likely (based on the Financial Documents, the Potential Bidder's history and experience in consummating similar transactions, transaction structure and execution risk, or other considerations) to be consummated if selected as the Prevailing Bid (as defined below);

  vi.  includes a good faith deposit in the form of a cashier's check, wire transfer or other immediately available funds in the amount of not less than Five Hundred Thousand Dollars ($500,000.00) to the Debtor's escrow agent (the "Bidder Deposit"); and

  vii.  clearly sets forth the purchase price to be paid for the Property and provides for such purchase price to be paid for entirely in cash (unless otherwise agreed by the Debtor).

b.  **Qualified Bid**. The Debtor shall notify any Potential Bidder promptly upon the Debtor's determination of whether its bid is a Qualified Bid. Any Potential Bidder so notified shall be a "Qualified Bidder" and its bid shall be a "Qualified Bid" for purposes of these Bid Procedures and the Auction. Between the date the Debtor notifies a Potential Bidder that it is a Qualified Bidder and the Auction, the Debtor may discuss, negotiate or seek clarification of any Qualified Bid from a Qualified Bidder. Each Potential Bidder, whether or not submitting a Qualified Bid, is deemed to have submitted to the exclusive jurisdiction of the U.S. Bankruptcy Court for the District of Maryland, Greenbelt Division, with respect to all matters related to bids, the Auction and the Sale. A Qualified Bidder shall not be permitted to withdraw its bid prior to the conclusion of the Auction, if held.

c.  **Rejection of Bid**. The Debtor may, in its discretion and in consultation with the Debtor's Advisors, reject any Bid (regardless of whether such Bid is a Qualified Bid) that, in such Debtor's business judgment, is (i) inadequate, insufficient, or not the highest or best Bid, (ii) not in conformity with the requirements of the Bankruptcy Code, the Bankruptcy Rules, or the Bid Procedures, or (iii) contrary to, or otherwise

4

not in the best interests of the Debtor's estate, affected stakeholders, or other parties in interest, in each case subject to and in accordance with the Bid Procedures.

d. **Irrevocable**. NOTWITHSTANDING ANY CONDITIONS LISTED IN THE APPLICABLE AGREEMENT, ALL BIDS SHALL BE DEEMED IRREVOCABLE UNTIL THE FIRST TO OCCUR OF (i) THE CONCLUSION OF THE HEARING ON THE CONFIRMATION OF THE DEBTOR'S PLAN (OR, IF THE SALE HEARING IS CONDUCTED SEPARATELY FROM THE CONFIRMATION HEARING, THE CONCLUSION OF THE SALE HEARING), OR (ii) THE DEBTOR'S WRITTEN REJECTION OF SUCH BID. IN THE EVENT THAT A BIDDER SEEKS TO REVOKE ITS BID, THE DEBTOR SHALL BE ENTITLED TO KEEP SUCH BIDDER'S DEPOSIT AND PURSUE ALL OTHER CONTRACTUAL REMEDIES UNDER LAW OR EQUITY.

## III.  THE AUCTION AND OVERBIDS

If the Debtor receives more than one Qualified Bid, the Debtor shall conduct the Auction to determine the Prevailing Bidder. If the Debtor does not receive more than one Qualified Bid, the Debtor may cancel the Auction and declare the Stalking Horse Purchaser as the Prevailing Bidder by filing on the Court's docket a *Notice of Cancellation of Auction and Designation of Stalking Horse Bidder as the Prevailing Bidder* (the "Notice of Sale to Stalking Horse Purchaser"). The Auction, if needed, shall take place at the date, time and place this Court convenes a hearing on the Debtor's confirmation of a plan of reorganization (the "Confirmation Hearing"), or at such other date, time and location as may be determined by the Debtor or the Court. Only a Qualified Bidder may participate at the Auction. Unless otherwise agreed by the Court and the Debtor, a Qualified Bidder participating in the Auction may appear at the Auction only in person or through a representative who is duly authorized to bind the Qualified Bidder to any overbid. In addition to the foregoing, the Auction shall be conducted as follows until otherwise modified by this Court:

a. the Court, or the Debtor, as applicable, will conduct an open Auction on the record, calling for incremental bids from the Qualified Bidders participating in the Auction, with minimum overbid increments being in an amount not less than $100,000 (the "Overbid Increment");

b. subject to subparagraph (e) below, Qualified Bidders may increase their bids at the Auction, in accordance with the conditions set forth herein, as many times as they wish; but a Qualified Bidder that wishes to submit a bid that is less than the minimum incremental amount of $100,000 may do so, but only by announcing that such bid is such Qualified Bidder's highest or otherwise best bid and, if topped, such Qualified Bidder shall no longer participate in the Auction. Bidding among any remaining Qualified Bidders shall continue to be in $100,000 Overbid Increments;

c. each Qualified Bid, and each and every bid made at the Auction, shall remain open, irrevocable and subject to acceptance by the Debtor (notwithstanding the Debtor's designation of any other or subsequent bid as a "higher or better" bid, or a Prevailing Bid) until the Court enters its order identifying and approving the Prevailing Bidder;

d.      the Debtor may consult with the Stalking Horse Purchaser and its counsel regarding Qualified Bids; provided, however, the Debtor reserves the right, in its reasonable business judgment, not to consult if consultation regarding any issue, selection, or determination may likely have a chilling effect on potential bidding;

e.      the Court or the Debtor, as applicable, may announce reductions or increases in the Overbid Increment at any time during the Auction and may restrict Qualified Bidders from passing in more than one round of bidding;

f.      bidding at the Auction will begin with the Qualified Bid(s) that the Debtor had determined prior to the commencement of the Auction is/are the highest and otherwise best bid(s) for the Property and continue, in one or more rounds of bidding, so long as during each round at least one subsequent bid (a "Subsequent Bid") is submitted by a Qualified Bidder that the Debtor determines is higher or better than the previous bid. The Debtor shall announce the material terms of each Subsequent Bid at the Auction;

g.      to the extent that Qualified Bidders seek to modify the noneconomic terms of their sales contract in connection with Subsequent Bids, they shall disclose such modifications in connection with a Subsequent Bid;

h.      the Auction may be conducted in person or by Zoom or other similar platform.  The Debtor shall provide details regarding the manner of the Auction to Qualified Bidders; and

i.      as required by Local Bankruptcy Rule 6004-1(c)(2)(B), each bidder participating at the Auction will be required to confirm that it has not engaged in any collusion with respect to the bidding or the sale.

## IV.    **PREVAILING BIDDER**

As soon as reasonably practicable after the conclusion of the Auction, the Debtor shall (a) determine, consistent with the Bid Procedures and in consultation with its Advisors, which Bid constitutes the highest or otherwise best Bid ("Prevailing Bid"); and (b) notify all Qualified Bidders of the identity of the Qualified Bidder that submitted the Prevailing Bid ("Prevailing Bidder") and the amount of the Stalking Horse Purchase Price and other material terms of the Prevailing Bid. The Stalking Horse Purchaser, who shall be permitted to participate in the Auction or other sale process for the sale of the Property as a Qualified Bidder, shall be the Prevailing Bidder if it matches the terms of any competing Qualified Bid.

## V.    **SALE HEARING**

Subject to Court availability and subject to the results of the Auction, if necessary, the hearing to consider approval of the sale of the Debtor's Property to the Prevailing Bidder (the "Sale Hearing") will be held at the Confirmation Hearing or at such other date, time and location as may be determined by the Debtor or the Court.  The Sale Hearing may be continued to a later date by the

6

Debtor by sending notice prior to, or making an announcement at, the Sale Hearing. No further notice of any such continuance will be required to be provided to any party.

## VI.    RETURN OF BIDDER DEPOSIT

The Bidder Deposits for each Qualified Bidder shall be held in one or more accounts on terms acceptable to the Debtor in its sole discretion and shall be returned (other than with respect to the Prevailing Bidder) on or before the date that is five (5) business days after the entry of the order approving the Sale to the Prevailing Bidder.

## VII.    AS IS, WHERE IS

The Sale of the Property shall be on an "as is, where is" basis and without representations of warranties of any kind, nature, or description by the Debtor, its agents or estate, except to the extent set forth in the Sales Contract (or such form of sales contract submitted by the Prevailing Bidder and agreed upon by the Debtor and approved by the Court).

## VIII.    RESERVATION OF RIGHTS

The Debtor reserves its rights to modify the Bid Procedures in its reasonable business judgment and in consultation with its Advisors in any manner that will best promote the goals of the bidding process, or impose, at or prior to the conclusion of the Auction, additional customary terms and conditions on the sale of the Property, including, without limitation: (a) extending the deadlines set forth in these Bid Procedures; (b) adjourning the Auction at the Auction and/or adjourning the Sale Hearing without further notice; (c) adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction; (d) rescheduling or canceling the Auction; and (e) rejecting any or all Bids or Qualified Bids.  The Bankruptcy Court will retain jurisdiction over any matters related to or arising from the implementation of these Bid Procedures.

## IX.    CONSENT TO JURISDICTION AS CONDITION TO BIDDING

All Qualified Bidders, including the Stalking Horse Bidder, at the Auction shall be deemed to have consented to the exclusive jurisdiction of the Bankruptcy Court and to have waived any right to a jury trial in connection with any disputes among any Qualified Bidder and the Debtor relating to the Auction and the construction and enforcement of the Qualified Bidder's contemplated Transaction documents, as applicable.

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| Zachair, Ltd., | ) | Case No.:  20-10691-TJC |
| | ) | |
| Debtor. | ) | Chapter 11 |

## NOTICE OF SALE, BID PROCEDURES, <br> POTENTIAL AUCTION, AND SALE HEARING

     **PLEASE TAKE NOTICE** that, on January 17, 2020 (the "Petition Date"), the above-captioned debtor and debtor in possession (the "Debtor") filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Maryland (the "Court"), commencing this chapter 11 case (the "Chapter 11 Case").

     **PLEASE TAKE FURTHER NOTICE** that, on June 11, 2021, the Debtor filed a motion (the "Motion")[1] seeking entry of an order (the "Sale and Bid Procedures Order") (a) approving the sale (the "Sale") of the Debtor's property (the "Property") free and clear of liens, claims, interests, and encumbrances, (b) approving the Sales Contract, (c) approving bid procedures (the " Bid Procedures"), (d) establishing certain dates and deadlines for the sale process, including scheduling an auction of the Property (the "Auction"), if applicable, in accordance with the Bid Procedures, and the hearing with respect to the approval of the Sale (the "Sale Hearing"), (e) approving the form and manner of notice of the Bid Procedures, the Auction, if any, and the Sale Hearing, and (f) granting related relief.

     **PLEASE TAKE FURTHER NOTICE** that, on [●], 2021, the Court entered the Sale and Bid Procedures Order [Docket No. [●]], approving, among other things, the Sale free and clear of liens, claims, interests, and encumbrances and approving the Sales Contract on a final basis, subject only to certain conditions, and the Bid Procedures, which establish key dates and times relating to the Sale and the Auction. All interested bidders should carefully read the Sale and Bid Procedures Order and the Bid Procedures in their entirety.[2]

## Contact Persons for Parties Interested in Submitting a Bid

---

[1]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

[2]    To the extent of any inconsistencies between the Bid Procedures and the summary descriptions of the Bid Procedures in this notice, the terms of the Bid Procedures shall control in all respects.

The Bid Procedures set forth in detail the requirements for submitting Qualified Bids, and any person interested in making an offer to purchase the Property must comply strictly with the Bid Procedures. Only Qualified Bids that are submitted in accordance with the Bid Procedures will be considered by the Debtor.

A copy of the Bid Procedures and the Sale and Bid Procedures Order is attached hereto as **Exhibit A** and **Exhibit B**, respectively.

**Any persons interested in making an offer to purchase the Property should contact the Debtor's real estate agent and broker: Fraser Forbes Real Estate Services, LLC, a/k/a Fraser Forbes Company LLC, 7811 Montrose Road, Suite 500, Potomac, Maryland 20854; Attn. Richard O. Samit (e-mail rsamit@fraserforbes.com; phone 703-462-6820)**

### Important Dates and Deadlines[3]

- **Bid Deadline.** The deadline to submit a Qualified Bid is **August 12, 2021, at 5:00 p.m. (prevailing Eastern Time).**

- **Auction.** If a Qualified Bid (in addition to the Stalking Horse Bid) is received by the Bid Deadline, the Debtor will conduct the Auction, which shall take place at the Confirmation Hearing, or at such other date, time and location as may be determined by the Debtor or the Bankruptcy Court.  Only Qualified Bidders are eligible to participate in the Auction, subject to other limitations as may be reasonably imposed by the Debtor in accordance with the Bid Procedures. The Auction shall be governed by the Bid Procedures, subject to the Debtor's right to modify such procedures in its reasonable business judgment.  If the Debtor receives no additional Qualified Bids, the Debtor may determine, in its discretion, not to conduct the Auction and shall have the right to declare the Stalking Horse Purchaser as the Prevailing Bidder.  In such event, the Debtor shall file a *Notice of Cancellation of Auction and Designation of Stalking Horse Bidder as the Prevailing Bidder.*

- **Sale Hearing.** Subject to Court availability and subject to the results of the Auction, if necessary, the Sale Hearing to consider the proposed Sale will be held at the Confirmation Hearing or at such other date, time and location as may be determined by the Debtor or the Court.  The Sale Hearing may be continued to a later date by the Debtor by sending notice prior to, or making an announcement at, the Sale Hearing. No further notice of any such continuance will be required to be provided to any party.

### Consequences of Failing to Abide by the Applicable Procedures and Orders

**FAILURE TO ABIDE BY THE BID PROCEDURES, THE SALE AND BID PROCEDURES ORDER, OR ANY OTHER ORDER OF THE COURT IN THE CHAPTER 11 CASE MAY RESULT IN THE REJECTION OF YOUR BID.**

---

[3] The following dates and deadlines may be extended by the Debtor or the Court pursuant to the terms of the Bid Procedures and the Sale and Bid Procedures Order.