## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| | ) | |
| In re: | ) | |
| | ) | |
| Zachair, Ltd., | ) | Case No.: 20-10691-TJC |
| | ) | |
| Debtor. | ) | Chapter 11 |
| | ) | |

**DEBTOR'S SECOND MOTION FOR AN ORDER (A) APPROVING THE SALE OF THE DEBTOR'S PROPERTY FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES, (B) APPROVING THE SALES CONTRACT, (C) APPROVING BID PROCEDURES, (D) SCHEDULING BID DEADLINE, AUCTION AND SALE HEARING, (E) APPROVING FORM AND MANNER OF NOTICE THEREOF, AND (F) GRANTING CERTAIN RELATED RELIEF**

### Summary Property Description

**Parcel I – containing 285.101 acres of land, more or less, located at 4401 Steed Road, Clinton, Maryland (Tax Account No. 05-0328708); Parcel II – containing 16.180 acres of land, more or less, located on Piscataway Road, Clinton, Maryland (Tax Account No. 05-0327833); Parcel B – containing 64.153 acres of land, more or less, located at 10651 Piscataway Road, Clinton, Maryland (Tax Account 05-0360651); and Parcel C – containing 58.0204 acres of land, more or less, located on Piscataway Road, Clinton, Maryland (Tax Account 09-0865121)**

Zachair, Ltd. (the "Debtor"), the debtor and debtor-in-possession in the above-captioned case, submits this second motion (this "Motion") for entry of an order (i) authorizing and approving the sale of the Debtor's real property and improvements as more fully described in **Exhibit A** hereto (the "Property") free and clear of liens, claims, interests, and encumbrances; (ii) approving the Real Estate Sales Contract dated June 1, 2022 between the Debtor and NVR, Inc. (the "Contract") attached hereto as **Exhibit B** subject only to the possibility of an overbid and the other conditions described below; (iii) approving the proposed bid procedures attached hereto as **Exhibit C** (the "Bid Procedures"); (iv) scheduling the bid deadline, an auction (the "Auction") to occur

only if the Debtor receives one or more additional timely and acceptable Qualified Bids (defined below), and a final hearing for approval of the Sale ("Sale Hearing"); (v) approving the form and manner of notice thereof attached as **Exhibit D** hereto; and (vi) granting certain related relief.  In support of this Motion, the Debtor respectfully states as follows:

I.    <u>INTRODUCTION</u>

1.      The Debtor previously entered into a sales contract with JP Land Holdings LLC ("JP Land Holdings") to sell the Property.  The Court preliminarily approved the JP Land contract. However, JP Land Holdings terminated that contract at the end of the study period.  Following the termination of the sales contract with JP Land Holdings, the Debtor continued to market the Property and negotiate with other potential purchasers.   After extensive marketing and negotiations, the Debtor ultimately selected NVR, Inc. ("NVR" or the "Stalking Horse Purchaser") as the new purchaser of the Property and has entered into the Contract with NVR to sell all of its real estate assets.  The Debtor seeks approval of the sale of the Property pursuant to the Contract free and clear of liens, claims, interests and encumbrances.  As provided in the Contract, the Debtor will continue to market the Property and, if other Qualified Bids are received, will conduct an auction concurrently with the hearing on the confirmation of the Debtor's Second Amended Plan of Reorganization, which the Debtor is required to file within 21 days following the execution of the Contract.

2.      This Motion is a key step in the Debtor's exit from bankruptcy.  Selling the Property in accordance with the Bid Procedures is necessary to preserve and maximize its value, consistent with the Debtor's fiduciary duties to its economic stakeholders.  Ultimately, the competitive bidding process and the "market check" that any potential Auction will provide, will, in the Debtor's reasonable business judgment, result in the highest or otherwise best offer for the

Property and will provide a greater recovery for the Debtor's estate than any known available alternative. For the foregoing and following reasons, the Debtor believes that the proposed Sale reflects a sound exercise of its business judgment and should be approved.

## II.    JURISDICTION AND VENUE

3.    The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue lies properly in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding pursuant to 28 U.S.C. § 157.

4.    The bases for the relief requested herein are sections 105 and 363 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 6004-1 of the Local Rule of Bankruptcy Procedures (the "Local Rules").

## III.    SUMMARY PURSUANT TO LOCAL RULE 6004-1[1]

5.    Pursuant to the requirements of Local Rule 6004-1, the following table highlights specific terms of the Sales Contract, Motion and Bid Procedures. The information in the table is a summary. Creditors and parties in interest are encouraged to review the attached documents and instruments. In the event of any inconsistency, the applicable documents and instruments will govern.

| Local Bankruptcy Rule | Summary of Applicable Terms and Conditions |
|---|---|
| 6004-1(b)(1) | A copy of the Real Estate Sales Contract dated June 1, 2022 (the "Contract"), by and between the Debtor and NVR is attached hereto as **Exhibit B**. |

---

[1]    Defined terms are set forth in the Motion or the Contract. In the event there is any conflict or inconsistency between the terms and conditions of this chart and the terms and conditions of the Contract, the terms and conditions of the Contract will control.

| 6004-1(b)(2) | A copy of the proposed form of *Order (A) Approving the Sale of the Debtor's Property Free and Clear of Liens, Claims, Interests and Encumbrances, (B) Approving the Sales Contract, (C) Approving Bid Procedures, (D) Scheduling Bid Deadline, Auction and Sale Hearing, (E) Approving Form and Manner of Notice Thereof, and (F) Granting Certain Related Relief* is attached to this Motion as **Exhibit E** (the "Sale and Bid Procedures Order"). |
|---|---|
| 6004-1(b)(3) | Neither the Contract nor the Motion provide for the sale or transfer of personally identifiable information; thus, the Motion does not seek the appointment of a consumer privacy ombudsman. |
| 6004-1(b)(4)(A) | The proposed sale is not a sale to an insider. |
| 6004-1(b)(4)(B) | The Stalking Horse Purchaser has not discussed or entered into any agreements with management or key employees regarding compensation or future employment. |
| 6004-1(b)(4)(C) | The Motion does not provide for a waiver or release of any claim. |
| 6004-1(b)(4)(D) | The Motion contemplates an auction in the event that the Debtor receives one or more additional Qualified Bids. *See* § 20 of Contract. |
| 6004-1(b)(4)(E) | The closing date for the sale is the later of: (i) August 1, 2023 or (ii) twelve (12) months after the Court's approval of the Plan,[2] extendable for up to 180 days (but no more than 15 months from the Court's approval of the Plan) upon payment into escrow of $250,000 extension fee (the "Extension Fee").  The Extension Fee is to be applied toward the purchase price under the Contract.  *See* § 6. |
| 6004-1(b)(4)(F) | A $500,000 deposit shall be posted into escrow upon the Court's approval of the Plan (the "Deposit").  The Deposit is non-refundable absent seller default, failure of specified conditions, or purchaser does not deliver the Notice of Intent to Proceed within the Study Period.  The Deposit is to be applied toward the purchase price under the Contract.  *See* §§ 3, 4 and 20. |
| 6004-1(b)(4)(G) | Other than customary pre-closing covenants relating to consummation of the Contract, access to the Property, and related matters, the Contract does not include any interim arrangements with the Stalking Horse Purchaser. |
| 6004-1(b)(4)(H) | The Motion seeks authority to pay the secured claims of Sandy Spring Bank and the real estate taxes owed to Prince George's County at Closing (unless other treatment is approved as part of a confirmed Plan), along with customary closing costs as may be applicable.  Otherwise, distribution of sale proceeds will remain subject to the Debtor's Plan and/or further order of the Court. |
| 6004-1(b)(4)(I) | The Debtor will retain its books and records. |
| 6004-1(b)(4)(J) | The proposed sale does not include the sale of avoidance actions. |
| 6004-1(b)(4)(K) | The Motion seeks a determination that the sale is free and clear of all liens, deeds of trust, mechanic's and materialmen's lien, judgment |

---

2     For timing purposes, the 12-month period shall commence upon the date the Court confirms the Plan, not the date of entry of the Confirmation Order.

| | |
|---|---|
| | liens, security interests, creditor claims, encumbrances and interests. Otherwise, the Motion does not seek any determination with respect to successor liability. |
| 6004-1(b)(4)(L) | The Debtor has leases of hangar and tie-down spaces.  The Contract requires that all leases be terminated prior to Closing.  The Debtor intends to provide notice of termination to the tenants in accordance with the lease terms.  However, out of an abundance of caution, the Motion also provides for approval of a sale free and clear of the leases.  *See* §§ 6 and 20. |
| 6004-1(b)(4)(M) | The Motion does not affect credit bid rights.  However, the Debtor reserves its rights with respect to any credit bid. |
| 6004-1(b)(4)(N) | The Motion seeks a waiver of the fourteen-day stay under Rule 6004(h). *See* § 11. |
| 6004-1(c)(1)(A) | To be a bidder, interested parties must execute a confidentiality and non-circumvention agreement; provide financial information to the Debtor and its advisors; demonstrate its financial wherewithal to consummate a sale. |
| 6004-1(c)(1)(B) | Qualified Bids must: be submitted by the Bid Deadline (a date to be set by the Court that is approximately 30 days prior to the confirmation hearing on the Plan); be in the form of an executed binding contract; be for the purchase of the entire Property; be as-is, where-is, with all faults; remain open until the completion of the Bankruptcy Court approval process for the sale; include a deposit in an amount not less than $500,000, which will be refundable only in the event of a material uncured seller default (and not subject to approval of entitlements); and be accompanied by a signed letter pursuant to which the bidder agrees to the Bid Procedures.  The Debtor may require that bidders supply redlines showing differences between their proposed form of contract and the Contract.  A Qualified Bid must not be subject to any conditions or contingencies (e.g., due diligence, financing or internal approvals) other than (a) obtaining approvals for entitlements (failure of which shall not be grounds for refund of the Deposit), and (b) conditions relating to court approval. |
| 6004-1(c)(1)(C) | The Motion seeks approval of bidder protections for the Stalking Horse Purchaser as follows:<br>• a break-up fee of $600,000 plus reimbursement of out-of-pocket expenses if either (i) the Property is sold to another purchaser, or (ii) the Debtor terminates the Contract on account of failure to obtain confirmation of its Plan (*see* §§ 12(b) and 20(a));<br>• the Stalking Horse Purchaser shall be deemed to have submitted a Qualified Bid (*see* § 20(b));<br>• the Stalking Horse Purchaser shall have the right to bid at the auction and to prevail if it matches a competing bid or makes a bid that is better than other bids.  The Stalking Horse |

| | Purchaser's right to recover the break-up fee and expense reimbursement is conditioned on is delivery of the Notice of Intent to Proceed prior to the expiration of the Study Period.[3] The Contract also provides that the Stalking Horse Purchaser shall be entitled to recover its actual third-party expenses (including legal fees) if the Court does not enter the order requested in this Motion (*see* § 20(a)). |
| --- | --- |
| 6004-1(c)(1)(D) | The Motion reserves the Debtor's right to modify the procedures governing the auction and sale as necessary or appropriate to discharge its fiduciary duty to maximize the value of the estate. |
| 6004-1(c)(1)(E) | The Motion requires Qualified Bidders to keep their bids open through the entry of the order approving the Prevailing Bidder. |

## IV.    BACKGROUND

**A.    The First Sale Motion**

6.      On June 11, 2021, the Debtor filed a *Motion for an Order (A) Approving the Sale of the Debtor's Property Free and Clear of Liens, Claims, Interests and Encumbrances, (B) Approving the Sales Contract, (C) Approving Bid Procedures, (D) Scheduling Bid Deadline, Auction and Sale Hearing, (E) Approving Form and Manner of Notice Thereof, and (F) Granting Certain Related Relief* [Docket No. 215] (the "First Sale Motion"), seeking to sell the Property to JP Land Holdings pursuant to the sales contract attached thereto as Exhibit B (the "First Sales Contract"), subject only to the possibility of an overbid and the other conditions described therein. The First Sale Motion, among other things, sought: (i) the approval of the sale of the Property free and clear of liens, claims, interests, and encumbrances; (ii) the approval of the Bid Procedures (as defined in the First Sale Motion); and (iii) the approval of the form and manner of notice thereof. *See id.*

---

3       The Stalking Horse Purchaser shall have 90 days commencing upon the later of: (i) the execution of the Sales Contract, and (ii) entry of the Court's order approving of the Bidding Procedures to evaluate all aspects of the project (the "Study Period").

7.       On July 27, 2021, the Court granted the First Sale Motion by entering the *Amended Order (A) Approving the Stale of the Debtor's Property Free and Clear of Liens, Claims, Interests and Encumbrances, (B) Approving the Sales Contract, (C) Approving Bid Procedures, (D) Scheduling Bid Deadline, Auction and Sale Hearing, (E) Approving Form and Manner of Notice Thereof, and (F) Granting Certain Related Relief* [Docket No. 235] (the "First Sale Order").

8.       Following the entry of the First Sale Order, the Debtor and JP Land Holdings entered into three amendments to the First Sales Contract.  The first amendment, among other things, extended the study period within which JP Land Holdings may perform due diligence in connection with the purchase of the Property from August 16, 2021, to November 15, 2021.  *See Motion for an Order (A) Authorizing and Approving the First Amendment to the Sales Contract and (B) Granting Related Relief* [Docket Nos. 242].  The second amendment further extended the study period through December 15, 2021.  *See Line re Second Amendment to Sale Contract* [Docket No. 276].  Finally, the third amendment extended the study period through January 14, 2022. *See Line re Third Amendment to Sale Contract* (the "Third Amendment") [Docket No. 299].

9.       After consideration and assessment of the First Sales Contract and the Property, JP Land Holdings ultimately decided to not proceed with the purchase of the Property.  The First Sales Contract therefore terminated upon the expiration of the study period on January 14, 2022. *See* Third Amendment, ¶ 2 ("If Purchaser does not deliver written notice to Seller of Purchaser's intent to proceed . . . with the purchase of the Property pursuant to the terms of this Contract prior to 5:00 pm ET on January 14, 2022 . . . , this Contract shall terminate and thereupon the parties shall have no further rights or obligations hereunder . . .").  Thereafter, the Debtor resumed its extensive marketing of the Property to identify another purchaser for the Property.  Following its

robust marketing process and extensive discussions with its advisors, the Debtor ultimately selected NVR as the purchaser of the Property.

10.     The Debtor files this Motion seeking the Court's approval of: the sale of the Property to NVR pursuant to the Contract; the sale of the Property free and clear of liens, claims, interests, and encumbrances to the Prevailing Bidder; and approval of the bid procedures, the sale notice, and other related relief.

**B.     Plan of Reorganization**

11.     On June 28, 2021, the Debtor filed its *Plan of Reorganization* [Docket No. 224] and *Disclosure Statement with Respect to Debtor's Plan of Reorganization* [Docket No. 225]. On September 7, 2021, the Debtor filed its *First Amended Plan of Reorganization* (as subsequently modified or amended, the "Plan") and *First Amended Disclosure Statement with Respect to Debtor's First Amended Plan of Reorganization* (as subsequently modified or amended, the "Disclosure Statement"). *See* Docket Nos. 245 and 246.

12.     On October 15, 2021, the Court entered an order approving the Disclosure Statement and setting a hearing on confirmation of the Plan (the "Confirmation Hearing"). *See* Docket No. 263. On November 18, 2021, the Debtor filed its *Motion to Continue the Confirmation Hearing* (the "Motion to Continue") in order to afford JP Land Holdings an opportunity to conclude its due diligence in connection with the purchase of the Property. *See* Docket No. 279. On November 29, 2021, the Court entered an order granting the Motion to Continue and rescheduled the Confirmation Hearing to a later date and time to be determined by the Court. The Court also set a status conference regarding the Plan for December 22, 2021 (the "December Status Conference"). *See id.* At the December Status Conference, the Court adjourned the status conference to March 1, 2022 (the "March Status Conference"). *See* Docket No. 303. On January

-8-

27, 2022, the Debtor filed a motion to continue the March Status Conference due to the Debtor's counsel's unavoidable scheduling conflicts. *See* Docket No. 310. The Court thereafter entered an order adjourning the March Status Conference to March 9, 2022. *See* Docket No. 311. At the March Status Conference, the Court set a further status conferencing regarding the Plan for June 6, 2022. *See* Docket No. 319.

**C.     Property**

13.     The Debtor is a Maryland corporation that owns an assemblage of real property totaling approximately 423.45 acres located in Prince George's County, Maryland, as more particularly described in the legal description attached hereto as Exhibit A.

14.     The Debtor operates a portion of the Property as an airfield known as Hyde Field (the "Airfield"). The Airfield generates revenue for the Debtor through the rental of hangar and parking spaces for aircraft. Operation of the Airfield also has entitled the Debtor to a reduction in its real estate taxes.

15.     In addition to the Airfield, pursuant to a mining permit issued by the Maryland Department of the Environment ("MDE"), portions of the Property previously were mined for sand and gravel. The cavities created by the sand and gravel mining were used for surcharge fill operations. The Debtor contracted for the acceptance of clean fill dirt removed from other third-party sites in exchange for a fee. For several years, such fees generated the majority of the Debtor's operating revenues. In early March 2020, MDE advised the Debtor that it must cease the surcharge fill operations.

16.     The appraiser engaged by the Debtor, William C. Harvey ("Mr. Harvey"), has valued the Property between $19.3 million and $22.1 million. *See Debtor's DIP Motion* [Docket No. 107]; *see also Debtor's Reply to Opp. to DIP Motion* [Docket No. 160].

D.       **The PD Hyde Field Settlement**

17.       As more fully described in the First Sale Motion, prior to the Petition Date, PD Hyde Field, LLC ("PD Hyde") filed a complaint against the Debtor and Dr. Nabil Asterbadi ("Dr. Asterbadi") in the Circuit Court for Prince George's County, Maryland, styled *PD Hyde Field LLC v. Zachair, Ltd., et al.,* Civil Action No. 18-42893, in connection with a prior contract to purchase the Property (the "State Court Litigation").  PD Hyde also filed a lis pendens on the Property in connection with the State Court Litigation, but subsequently released the lis pendens pursuant to the requirements of the First Sale Order.  *See* Docket No. 235.

18.       On May 20, 2020, PD Hyde filed a proof of claim asserting a claim in the amount of $5,617,818.00, of which it asserted that $1,200,000.00 is secured by the Property (the "PD Hyde Claim").  *See* Claim No. 18.  The Debtor disputed the PD Hyde Claim, including any allegedly secured claim.

19.       Following the Debtor's and PD Hyde's extensive discussions and arms-length negotiations, the parties entered into a Settlement and Plan Support Agreement (the "Settlement Agreement") to settle and resolve the disputes described above.  To effectuate the settlement, the Debtor filed its *Motion for Approval of Settlement and Plan Support Agreement Under Bankruptcy Rule 9019* (the "Settlement Motion") seeking entry of an order approving the Settlement Agreement.  *See* Docket No. 249.  On October 15, 2021, the Court entered an order granting the Settlement Motion.  *See* Docket No. 264.  As part of the Settlement Agreement, PD Hyde dismissed the State Court Litigation with prejudice and agreed to vote in favor of the Plan.  *See id.* Further, the Settlement Agreement provided for the allowance of the PD Hyde Claim solely as a general unsecured claim in the amount of $3,200,000, which represents a $2,417,818 reduction in the amount of the PD Hyde's proof of claim.  *See id.*

E.      **Exit Financing**

20.      On August 23, 2021, the Debtor filed the *Motion for Order (A) Authorizing and Approving the Term Sheet and Payment of Fees With Regard To Exit Financing; (B) Granting Super-Priority Claim; and (C) Granting Related Relief* [Docket No. 241] (the "Exit Financing Motion"), seeking a commitment for a loan in an amount not less than $7,550,000 from Three Line Capital, LLC (or a nominee thereof) ("Three Line") to, among other things, repay the DIP Facility (as defined below) provided by Sandy Spring Bank, fund distributions to creditors and administrative claimants under the Plan, and provide working capital (the "Exit Facility").   On September 13, 2021, the Court entered an order granting the Exit Financing Motion.  *See* Docket No. 251.

21.      Under the Term Sheet attached to the Exit Financing Motion, Three Line issued a commitment letter in which it agreed to provide financing if the loan closed prior to the end of 2021.  Because the contract with JP Land Holdings was terminated, the financing did not close timely.  The Debtor remains in discussions with Three Line regarding the prospect of renewed financing arrangements.

F.      **The Debtor's Secured Indebtedness**

22.      The following chart summarizes all presently-existing known claims against the Debtor that are secured by an interest in the Property:[4]

---

4        Nothing contained in the chart shall be deemed to constitute, or shall be construed as, an admission of the existence or amount of any secured claim, or as a waiver by the Debtor of its right to object to any and all proofs of claim.  The Debtor reserves all of its rights to litigate, disallow, or object to the claims on the basis of all equitable or legal grounds.

| Creditor | Basis | Secured Claim | Disputed | Nature of Claim |
|---|---|---|---|---|
| Prince George's County, Maryland[5]<br><br>Parcel 327833 | Claim Nos. 8-3, 23-2, and 27-1 | $768.87 | No | 2021, 2022, 2023 (estimate for 2023) Real Property Taxes |
| Prince George's County, Maryland<br><br>Parcel 865121 | Claim Nos. 11-3, 26-2, and 30-1 | $8,577.48 | No | 2021, 2022, 2023 (estimate for 2023) Real Property Taxes |
| Prince George's County, Maryland<br><br>Parcel 360651 | Claim Nos. 10-3, 25-2, and 29-1 | $14,139.72 | No | 2021, 2022, 2023 (estimate for 2023) Real Property Taxes |
| Prince George's County, Maryland<br><br>Parcel 328708 | Claim Nos. 9-3, 24-2, and 28-1 | $60,168.15 | No | 2021, 2022, 2023 (estimate for 2023) Real Property Taxes |
| Sandy Spring Bank | Claim No. 21-1 | $2,800,136 | No | Real Estate Loan (including post-petition interest through 8/31/2022) |
| Sandy Spring Bank | Docket No. 169 | $332,869 | No | Debtor-in-Possession Financing (including interest through 8/31/2022)[6] |
| **Total:** | | **$3,216,659.22** | | |

23.     On the Petition Date, the Debtor's secured debt obligations primarily consisted of

$2,392,410.30 owed to Sandy Spring Bank ("Sandy Spring") pursuant to a certain *Deed of Trust*

*Note* dated December 11, 2015 in the original principal amount of $2,300,000, as modified by

certain *Modification and Extension Agreements* dated November 2, 2018, and April 3, 2019

---

5       In addition to reviewing the proofs of claim filed on behalf of Prince George's County, the tax records are available on-line at  http://taxinquiry.princegeorgescountymd.gov/taxdetail.aspx (last reviewed May 27, 2022).  The Debtor anticipates that additional real estate taxes will accrue in the ordinary course, and be payable, at the time of a closing.

6       The Court authorized the debtor-in-possession financing up to a principal sum of $360,000. The outstanding indebtedness from time to time may vary.

(together, the "2015 Note").  *See* Claim No. 21. The 2015 Note is secured by the Property and various other property of the Debtor pursuant to a *Deed of Trust and Security Agreement* dated December 11, 2015.  On November 9, 2020, the Court entered the *Final Order Authorizing Debtor-in-Possession Financing and Use of Cash Collateral* [Docket No. 169] (the "Final DIP Order"), approving the debtor-in-possession financing in the amount of up to $360,000 provided by Sandy Spring to the Debtor pursuant to the Sandy Spring DIP Loan Documents (as defined in the Final DIP Order) and authorizing the Debtor to use the cash collateral in accordance with the budget attached thereto as Exhibit A (the "DIP Facility").  The Property is therefore currently encumbered by Sandy Spring's claim in the maximum aggregate principal amount of $2,660,000.

24.      Prince George's County, Maryland has filed proofs of claim for real estate tax obligations for each of the tax years 2021, 2022 and 2023.  *See* Claim Nos. 8, 9, 10, 11, 23, 24, 25, 26, 27, 28, 29 and 30.  The total amounts asserted for all four parcels for such tax years is $83,654.22.  The real estate taxes are secured by the Property.  Additional real estate tax claims may accrue prior to payment.  To the extent such claims accrue, they will be considered, and treated as, secured claims subject to payment.

25.      PD Hyde does not hold a secured claim, and its *lis pendens* has been terminated, as more fully described above.  *See supra* Section D.

## G.    Marketing

26.      Following the termination of the First Sale Contract, the Debtor's real estate broker, Fraser Forbes (the "Broker"), continued to market the Property by identifying and contacting a number of financial and strategic investors to garner interest in pursuing a potential sale of the Property.  Several interested parties executed confidentiality agreements and were asked to submit initial non-binding letters of intent or expressions of interest. The interested parties that had

executed confidentiality agreements were then given the opportunity to access an electronic data room.

27.    After receiving indications of interest from several potential buyers, the Broker began to engage in advanced discussions regarding a potential sale transaction for the Property with such parties.  After reviewing and carefully considering the letters of intent or expressions of interest, the Debtor determined, in consultation with its advisors, that the best and highest offer was from the Stalking Horse Purchaser.  The Debtor and the Stalking Horse Purchaser thereafter prepared, negotiated, and executed the Contract.  The terms of the Contract – both economic and non-economic terms – are significantly higher and better than any other letters of intent and expressions of interest received by the Debtor.

28.    In conjunction with the marketing of the Property, and the efforts to facilitate a satisfactory conclusion of the studies period under the First Sale Contract, the Debtor, procured various reports and analyses, including geotechnical reports, engineering analyses, environmental studies, and preliminary design work.  The Debtor also engaged land use counsel and a consultant to assist discussions with representatives of Prince Georges' County.  Following the termination of the First Sale Contract, the Debtor and its advisers met with County and State representatives to gain a better understanding of the likelihood of obtaining development approvals with respect to the Property.  The information that the Debtor obtained through the foregoing efforts informed the Debtor regarding development expectations and aided the Debtor in negotiating the Contract.

H.    **The Contract**[7]

29.    The efforts of the Debtor and its advisors have resulted in the entry into the Contract with NVR, a copy of which is attached as Exhibit B to this Motion.

30.    NVR, a Virginia corporation, was formed in 1980 and engages in the construction and sale of single-family detached homes, townhomes and condominium buildings, all of which are primarily constructed on a pre-sold basis.  NVR is one of the largest homebuilders in the U.S. operating in thirty-four metropolitan areas in fourteen states and Washington, D.C.  NVR has a significant presence in the metro areas around suburban Washington, D.C. and has substantial experience investing in undeveloped, infill lots that are similar to the Property.  Indeed, during 2021, approximately 16% of NVR's home settlements accounting for approximately 22% of its homebuilding revenue nationally occurred in the Washington, D.C. metropolitan area.[8]

31.    The material terms of the Contract with NVR and the now-terminated sales contract with JP Land Holdings are summarized in the following table for purposes of comparison. Creditors and parties in interest are encouraged to review the attached Contract.  In the event of any inconsistency between this summary and the Contract, the Contract will govern.

| ITEM[9] | DESCRIPTION | |
|---|---|---|
| | **NVR Sales Contract** | **JP Land Holdings Sales Contract** |
| Seller | Zachair, Ltd. | Zachair, Ltd. |
| Purchaser | NVR, Inc. | JP Land Holdings LLC |
| Property See §§ 1, 19 | 423.45 acres of land and improvements located in Clinton, Maryland (the "Property"), including front foot benefit rights. | 423.45 acres of land and improvements located in Clinton, Maryland (the "Property"), less (a) approximately 13 acres located adjacent to the intersections of Piscataway and Steed Roads (the "Retained Parcel"), and (b) front foot benefit rights.  The Debtor expects to sell the |

---

7    Capitalized terms used but not otherwise defined herein have the meanings given to them in the Contract.

8    Form 10-K, NVR, Inc., U.S. Securities and Exchange Commission, https://nvri.gcs-web.com/static-files/b9ecb1c5-c475-49b3-8b8d-cad236e42cf2 (last visited on May 27, 2022).

9    All citations in this table refer to the section(s) in the Contract with NVR.

-15-

| | | Retained Parcel to a commercial developer. The Debtor may sell the front foot benefit rights or enter into a contract with respect to administration of such rights. |
|---|---|---|
| Purchase Price See § 2 | Initial payment of $10,000,000 (the "Initial Payment"), plus the following contingent payments: (i) $20,000 per unit in excess of 500 units if the Residential Record Plat Approval (as defined in the Sales Contract) process results units in excess of 500 units (the "Additional Lot Payments"); and (ii) 20% of net proceeds generated from the sale of the Non-Residential Property (as defined in the Sales Contract), or 20% of net appraised value of the Non-Residential Property if disposed of pursuant to a lease (the "Alternative Land Payments", and together with the Initial Payment and the Additional Lot Payments, the "Purchase Price"). The Purchase Price shall be capped at $17,000,000, and shall have a minimum floor of $12,000,000. | $16,000,000, plus one half of transfer and recordation tax savings if sold pursuant to a plan. Subject to possible adjustment for specified costs relating to Retained Parcel. |
| Payment terms See § 2 | $10,000,000 cash at closing, with the Additional Lot Payments and the Alternative Land Payments due upon satisfaction of the applicable performance thresholds and terms outlined in the Contract. The Deposit and the Extension Fee apply toward the purchase price. | $10,000,000 cash at closing; balance paid pursuant to two year promissory bearing interest at 4% per annum; principal paid in two installments on first and second anniversary of note. The Deposit would apply to the Purchase Price, but the Extension Fee would not. |
| Deposit See § 3 | A $500,0000 deposit to be posted into escrow upon the Court's approval of the Plan. The deposit is non-refundable absent: (i) seller default, (ii) failure of specified bankruptcy conditions, or (iii) purchaser does not deliver the Notice of Intent to Proceed within the Study Period. | Initial deposit of $250,000, increases to $500,000 upon satisfactory completion of test and studies period. Initial deposit is refundable if Sales Contract is terminated before end of test and studies; thereafter, deposit is non-refundable absent seller default or failure of specified bankruptcy conditions. |
| Test and studies See § 4 | Test and studies period is open for 90 days commencing the later of: (i) the execution of the Contract, and (ii) entry of the Court's order approving of the Bidding Procedures. The Contract automatically terminates unless Purchaser delivers notice of intent to proceed on or before 90th day. | Test and studies period was open initially until August 16, 2021, and January 14, 2022 as extended. The Sales Contract automatically terminated unless Purchaser delivers notice of intent to proceed on or before the deadline. |
| Closing See § 6 | The later of: (i) August 1, 2023 or (ii) 12 months after the Court's approval of the Plan, extendable for 6 months (but no more | One year following date of Sales Contract (*i.e.*, June 1, 2022), extendable for 6 months (*i.e.*, |

| | | | |
|---|---|---|---|
| | than 15 months from the Court's approval of the Plan) upon payment of $250,000 extension fee. | December 1, 2022) for payment of $250,000 extension fee. |
| Conditions precedent to purchaser's obligation to close See § 11 | (i) Title to Property must be good, marketable and insurable (other than "Permitted Exceptions"); (ii) Seller representations and warranties must be true, and seller covenants must be satisfied; and (iii) Bankruptcy Court must enter the Sale and Bid Procedures Order and the Confirmation Order authorizing the sale of the Property to purchaser, and such orders must not be subject to a stay; and | (i) Title to Property must be good, marketable and insurable (other than "Permitted Exceptions"); (ii) Seller representations and warranties must be true, and seller covenants must be satisfied; and (iii) Bankruptcy Court must enter the Preliminary Approval Order or the Confirmation Order authorizing the sale of the Property to purchaser, and such order must not be subject to a stay. |
| Conditions precedent to seller's obligation to close See § 12 | (i) Bankruptcy Court shall have entered the Sale and Bid Procedures Order; (ii) Unless waived by seller, Bankruptcy Court shall have entered the Confirmation Order; (iii) Unless waived by seller, the effective date of seller's plan shall have occurred; (iv) Unless waived by seller, Sale and Bid Procedures Order and Confirmation Order shall have become final orders; and (v) Purchaser representations and warranties shall be true, and purchaser covenants must be satisfied. | (i) Bankruptcy Court shall have entered the Preliminary Approval and Sale and Bid Procedures Order; (ii) Unless waived by seller, Bankruptcy Court shall have entered the Confirmation Order; (iii) Unless waived by seller, the effective date of seller's plan shall have occurred; (iv) Unless waived by seller, Preliminary Approval and Sale and Bid Procedures Order and Confirmation Order shall have become final orders; and (v) Purchaser representations and warranties shall be true, and purchaser covenants must be satisfied. In the event seller terminates on account of failure of conditions (i)-(iv), purchaser will be entitled to refund of Deposit and any Extension Fee. Additionally, in the event seller terminate on account of failure of conditions (ii)-(iv), purchaser shall be entitled to the Expense Reimbursement (defined below). |
| Seller remedies See § 13 | Except as set forth in the Contract, Seller's sole remedies for purchaser default are termination of contract and forfeiture of Deposit as liquidated damages. | Seller's sole remedies for purchaser default are termination of contract and forfeiture of Deposit as liquidated damages. |

-17-

| Purchaser remedies See § 14 | Purchaser's remedies are: <br> (i)   Specific performance; or, alternatively <br> (ii)   Termination of contract and refund of Deposit (and in certain circumstances refund of the Extension Fee). <br> If specific performance is not available to Purchaser because Seller has intentionally sold the Property to another party, Purchaser shall have all other rights and remedies, including claims for actual damages, consequential damages, lost profits or punitive damages. | Purchaser's remedies are: <br> (i)   Specific performance; or, alternatively <br> (ii)   Termination of contract and refund of Deposit (and in certain circumstances refund of the Extension Fee). <br> Purchaser waives all other rights and remedies, including claims for actual damages, consequential damages, lost profits or punitive damages. |
|---|---|---|
| Bankruptcy provisions See § 20 | In the event of a closing on a sale of the Property to a bidder other than purchaser: <br> (i)   Deposit will be refunded; <br> (ii)   Extension Fee, if any, will be refunded; <br> (iii)   Purchaser shall be entitled to a "break-up" fee of $600,000; and <br> (iv)   Purchaser shall be entitled to reimbursement of its actual third party fees and costs in connection with contract, including without limitation engineering and attorneys' fees (the "Expense Reimbursement") | In the event of a closing on a sale of the Property to a bidder other than purchaser: <br> (i)   Deposit will be refunded; <br> (ii)   Extension Fee, if any, will be refunded; <br> (iii)   Purchaser shall be entitled to a break-up fee equal to 2% of the purchase price; and <br> (iv)   Purchaser shall be entitled to reimbursement of its actual third party fees and costs in connection with contract, including without limitation engineering and attorneys' fees (the "Expense Reimbursement") |

## V.    RELIEF REQUESTED

32.      The Debtor intends to pursue approval for the sale of the Property in two stages.

First, pursuant to this Motion, the Debtor seeks an order, substantially in the form attached hereto

as **Exhibit E**, approving the sale of the Property to the Stalking Horse Purchaser pursuant to the

Sales Contract (if no other Qualified Bid is received); approving the sale of the Property free and

clear of liens, claims, interests, and encumbrances to the Stalking Horse Purchaser or such other

party as may submit the highest or otherwise best offer for such Property; approving the Bid

Procedures, including the Bid Deadline, the Auction, and the Sale Hearing; and approving the form

and manner of notice thereof.  Second, the Debtor will solicit additional bids for the Property and, if any Qualified Bids are received, conduct an auction and subsequently seek entry of an order approving the Prevailing Bidder at the Sale Hearing.  The Debtor proposes that the Auction and Sale Hearing take place concurrently with the Confirmation Hearing.

## A.    Approval of the Bid Procedures

33.    As previously approved by the Court in the First Sale Motion (the "JP Land Holdings Bid Procedures"), the Debtor reserves its "rights to modify the Bid Procedures in any manner that will best promote the goals of the Bid process, or impose, at or prior to the conclusion of the Auction, additional customary terms and conditions on the sale of the Property, including, without limitation: (a) extending the deadlines set forth in these Bid Procedures; (b) adjourning the Auction and/or adjourning the Sale Hearing; (c) adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction; (d) rescheduling or canceling the Auction. . . "  First Sale Motion; *see also* First Sale Order.

34.    As with the JP Land Holdings Bid Procedures, the Debtor proposes to adopt the Bid Procedures to ensure that it can continue to solicit, receive, and evaluate bids in a fair and orderly manner.  The Bid Procedures are designed to encourage all entities to put their best bids forward and to maximize the value of the Debtor's estate.   The key provisions of the Bid Procedures are summarized below:[10]

| Item | Description |
| --- | --- |
| Bid Deadline | **To be determined by the Court; date to be approximately 30 days prior to confirmation hearing.** |
| Auction | If Qualified Bids are received, Auction will occur concurrently with the Confirmation Hearing. The Debtor reserves right to schedule the Auction |

---

10    This summary is qualified in its entirety by the Bid Procedures attached as **Exhibit C** to this Motion.  To the extent there are any conflicts between this summary and the Bid Procedures, the terms of the Bid Procedures shall govern.

| | |
|---|---|
| | separately from the confirmation hearing.  Only Qualified Bidders will be permitted to participate in the Auction. |
| Due Diligence | Upon execution of a confidentiality agreement and provision of information regarding financial capacity, Potential Bidders  will be provided access to reports and additional documents maintained in the Broker's online data room.  The Debtor, in its sole discretion, may permit Potential Bidders to conduct on-site tests and studies upon execution of appropriate agreement indemnifying the Debtor.  All due diligence must be completed by the Bid Deadline. |
| Qualified Bids | For the purpose of determining eligibility to participate in the Auction, Qualified Bids must:<br>• be formal, binding and unconditional, except for conditions relating to development entitlements and court approval;<br>• not be conditioned on any unperformed due diligence;<br>• be supported by documentation showing financial wherewithal;<br>• be accompanied by a non-refundable deposit in an amount not less than $500,000; and<br>• be irrevocable until the first to occur of (i) conclusion of the Confirmation Hearing (or Sale Hearing, if conducted separately from the Confirmation Hearing), or (ii) the Debtor's written rejection of such bid.<br><br>The Stalking Horse Purchaser shall be automatically deemed a Qualified Bidder without the need to take any action. The Stalking Horse Purchaser may submit additional higher bids, and match any competing bid. |
| Conduct of Auction | Unless otherwise determined by the Debtor or the Court, the Auction will take place in open court.  Bid increments shall be not less than $100,000.  Bids made at Auction shall be irrevocable until entry of an order approving sale to the Prevailing Bidder.  Bidders will be required to certify that they have not engaged in any collusion with respect to the Bid or the sale. |
| Deposits | Deposits posted by non-prevailing bidders shall be refunded within five (5) days following entry of the order approving the Prevailing Bidder. |
| As Is, Where Is | The Sale of the Property shall be on an "as is, where is" basis and without representations of warranties of any kind, nature, or description by the Debtor, its agents or estate, except to the extent set forth in the Sales Contract (or such form of sales contract submitted by the Prevailing Bidder and agreed upon by the Debtor and approved by the Court). |
| Reservation of Rights | The Debtor reserves its rights to modify the Bid Procedures in any manner that will best promote the goals of the Bid process, or impose, at or prior to the conclusion of the Auction, additional customary terms and conditions on the sale of the Property, including, without limitation: (a) extending the deadlines set forth in these Bid Procedures; (b) adjourning the Auction and/or adjourning the Sale Hearing; (c) adding procedural rules that are reasonably necessary or advisable under the circumstances |

| | for conducting the Auction; (d) rescheduling or canceling the Auction; and (e) rejecting any or all Bids or Qualified Bids. |
|---|---|

## B.     Proposed Notice Procedures

35.     The Debtor will serve (i) the notice of the Sale, Bid Procedures, Potential Auction, and Sale Hearing (the "Sale Notice"), and (ii) the Sale and Bid Procedures Order within five (5) business days after entry of the Sale and Bid Procedures Order, or as soon thereafter as practicable, by U.S. first-class mail, postage prepaid, upon the following parties (collectively, the "Notice Parties"):

(a)     All potential buyers previously identified or solicited by the Debtor or the Broker and any additional parties who have previously provided a written expression of interest to the Debtor or the Broker;

(b)     Other potentially interested parties identified by the Debtor or its Advisors;

(c)     The Office of the United States Trustee for the District of Maryland;

(d)     The holders of the 20 largest unsecured claims against the Debtor, as identified in the Debtor's chapter 11 petition;

(e)     All parties in interest who have requested notice under Bankruptcy Rule 2002; and

(f)     All parties who are known to possess or assert a lien, claim, encumbrance or interest in or upon any of the Property.

## C.     Approval of Proposed Sale

36.     The Debtor requests that the Court enter the Sale and Bid Procedures Order approving the Sale of the Property, free and clear of liens, claims, interests, and encumbrances, in accordance with the terms and conditions contained in the Sales Contract to the Stalking Horse Purchaser or, if applicable, the Prevailing Bidder, and granting such other relief as is necessary to effectuate the transactions contemplated by the Sales Contract (or such other form of sales contract submitted by the Prevailing Bidder and agreed to by the Debtor).

37.     The Debtor also requests that the Court waive the fourteen (14) day stay that otherwise may be applicable under Bankruptcy Rules 6004(h), so that the Sale and Bid Procedures Order is effective immediately upon entry.

38.     The Debtor is not seeking to assume and assign any of the Leases (as defined in the Sales Contract) pursuant to 11 U.S.C. § 365 as the Debtor will terminate all Leases with respect to the Property.  The Debtor will terminate the Leases prior to Closing by giving written notice of termination.[11]

## VI.     GROUNDS FOR RELIEF

### A.     Approval of the Sale Is Warranted Under Section 363 of the Bankruptcy Code.

39.     Section 363 of the Bankruptcy Code provides that the debtor "after a notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b).  While the Bankruptcy Code does not specify the standard for approving the sale of property outside of the ordinary course under section 363, courts routinely hold that the business judgment standard applies.  *See, e.g., In re Fischer*, 2010 WL 2746329, at *10 (Bankr. D. Md. July 9, 2010) (stating that in determining whether to approve a proposed sale under section 363, courts apply standards that "represent essentially a business judgment test."); *In re On-Site Sourcing, Inc.,* 412 B.R. 817, 824 (Bankr. E.D. Va. 2009) ("the bankruptcy court must conclude, from the evidence, that the movant satisfied its fiduciary obligations and established a valid business justification."); *In re U.S. Airways Grp.,* 2002 WL 31829093, at *1 (Bankr. E.D. Va. Dec. 16, 2002) (holding that the debtors' sound business judgement was sufficient to allow for the termination of mortgages); *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d

---

11     The Debtor believes that all of the tenant leases are terminable by giving 30-days' written notice.  However, copies of certain leases have not been located.  Thus, out of an abundance of caution, the Debtor is seeking to sell free and clear of all Leases effective as of closing.  The Court previously granted the same relief in the First Sale Order. *See* Docket No. 235.

143, 147-49 (3d Cir. 1986) (implicitly adopting the "sound business judgment test" of Lionel); *In re Dura Auto. Sys., Inc*., 2007 WL 7728109, at *5 (Bankr. D. Del. Aug. 15, 2007) (finding that "[t]he Debtors have demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the Sale prior to, and outside of, a plan of reorganization"); *Titusville Country Club v. Pennbank (In re Titusville Country Club)*, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991) (same).

40.     When a debtor articulates a valid business justification for disposition of estate property outside of the ordinary course of business, the business judgment rule is a presumption that the debtor's decision was made "on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *See Official Comm. Of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom,* 488 A.2d 858, 872 (Del. 1985)).

41.     As set forth in this Motion, the Debtor has a sound business justification for selling the Property.  After a rigorous selection process, the Debtor engaged the Broker, a top local real estate agent and broker.  The Broker has considerable experience in marketing and selling real property similar to the Property and is well qualified to render real estate agent and broker services to the Debtor.

42.     Immediately upon termination of the First Sale Contract, the Broker commenced a further thorough marketing process for the Property.  Using its proprietary database of hundreds of local, regional, national, and international prospective buyers, the Broker identified and contacted a number of financial and strategic investors to garner interest in pursuing a potential sale of the Property.  Several interested parties thereafter executed confidentiality agreements and were asked to submit initial non-binding letters of intent or expressions of interest.  The interested

parties that had executed confidentiality agreements were then given the opportunity to access an electronic data room.

43.     Following the Broker's receipt of indications of interest from several potential buyers, the Broker negotiated a potential sale of the Property with several parties.  Ultimately, the Debtor, in consultation with its Advisors, determined that the best and highest offer was from the Stalking Horse Purchaser.  The Debtor and the Stalking Horse Purchaser thereafter prepared, negotiated, and executed the Sales Contract.

44.     The terms of the Sales Contract – both price and non-economic terms – are significantly higher and better than all other letters of intent received by the Debtor to date.  In addition to providing for the highest price offered so far, other aspects distinguish the Sales Contract from other bids that the Debtor received.

45.     The Debtor believes that the purchase price under the Sales Contract should be sufficient to pay all creditors in full.

46.     Even though the Debtor and the Broker engaged in extensive marketing efforts, which are more than sufficient to conduct a fair and open sale process, the Debtor insisted on retaining the right to conduct additional marketing to ensure that the Debtor would obtain the best and highest terms available in the market.  Accordingly, the Sales Contract expressly permits ongoing marketing efforts.

47.     For the foregoing reasons, the Debtor believes that the proposed Sale reflects a sound exercise of its business judgment and should be approved.

**B.    The Bid Procedures Are Fair, and Designed to Maximize the Value Received for the Property.**

48.     The Bid Procedures are designed to maximize the value received for the Property. The process set forth in the Bid Procedures builds on the ample marketing that already has taken

place.  The Property has been exposed to the market for more than a year, and most likely bidders already are familiar with the Property and the development criteria required in Prince Georges' County.  To further facilitate the review by potential bidders, the Debtor engaged various consultants, who have generated tests and studies that land purchasers customarily require.  These include a geotechnical report, an environmental report, and preliminary engineering design work. All of these reports have been provided to NVR and will be available to other potential bidders.

**C.    The Sale Should be Approved "Free and Clear" Under Section 363(f).**

49.    To the extent applicable, all arguments previously raised in the Debtor's First Sale Motion with respect to its request to approve the sale of the Property free and clear under Section 363(f) of the Bankruptcy Code are hereby incorporated herein by reference.

50.    Section 363(f) of the Bankruptcy Code permits a debtor to sell property free and clear of any interest in such property of an entity other than estate if: (a) applicable nonbankruptcy law permits sale of such property free and clear of such interest; (b) the holder of the interest consents; (c) the interest is a lien and the sale price of the property exceeds the value of all liens on the property; (d) the interest is in bona fide dispute; or (e) the holder of the interest could be compelled in a legal or equitable proceeding to accept a money satisfaction of such interest. *See* 11 U.S.C. § 363(f).  This provision is supplemented by section 105(a) of the Bankruptcy Code, which provides that "[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

51.    As section 363(f) is stated in the disjunctive, it is only necessary to satisfy one of the five requirements enumerated therein to warrant the sale of the Debtor's property free and clear of all liens, claims, rights, interests, charges, or encumbrances.  *In re Collins*, 180 B.R. 447, 450 (Bankr. E.D. Va. 1995) ("Section 363(f) is phrased in the disjunctive, such that only one of the

enumerated conditions must be met. . . ."); *see also In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("[I]f any of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens.").

52.     The Debtor has demonstrated satisfaction of the requirements of Bankruptcy Code 363(f).  First, the sale price manifestly exceeds the aggregate amount of the liens on the Property. *See* 11 U.S.C. § 363(f)(3). The total alleged secured debt in this Chapter 11 Case is less than $2,800,000 (which reflects the resolution of the disputed lien previously asserted by PD Hyde). The initial cash payment at closing is $10,000,000, and the Debtor will receive additional payments subject to certain conditions specified herein.  Thus, the proceeds of the Sales Contract far exceed the aggregate amount of all liens.

53.     Further, Section 363(f)(5) permits a sale free and clear where entities holding such interests could be compelled to accept money satisfaction in legal or equitable proceedings.  All of the interests in the Property are liens, which can be satisfied with a money payment.  The liens of Sandy Spring and the real estate tax liens will be paid in the ordinary course at closing. Accordingly, pursuant to Bankruptcy Code section 363(f)(5), the Debtor may sell the Property free and clear of all liens, claims, and encumbrances.

54.     For the foregoing reasons, the Debtor requests that the Property be transferred to the Prevailing Bidder free and clear of any and all liens, claims and interests other than any permitted encumbrances.

**D.     The Sale is Proposed in Good Faith and Without Collusion, and the Purchaser is a Good Faith Purchaser.**

55.     The Debtor requests that the Court find that the Prevailing Bidder is entitled to the benefits and protections provided by section 363(m) of the Bankruptcy Code in connection with

the Sale.  Section 363(m) of the Bankruptcy Code is designed to protect the sale of a debtor's assets to a good faith purchaser, and provides that:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale . . . were stayed pending appeal.

11 U.S.C. § 363(m).

56.    While the Bankruptcy Code does not define good faith, many courts have held that a purchaser shows its good faith through the integrity of its conduct during the course of the sale process.  *Willemain v. Kivitz,* 764 F.2d 1019, 1023 (4th Cir. 1985) ("Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.") (quoting *In re Rock Industries Machinery Corp.,* 572 F.2d 1195, 1198 (7th Cir. 1978)); *Andy Frain Services,* 798 F.2d 1113, 1125 (7th Cir. 1986); *In re Sasson Jeans,* 90 B.R. 608, 610 (S.D.N.Y. 1988).

57.    The Contract has been pursued and proffered in good faith, and negotiated at arm's length, with both parties represented by their own counsel.  There has not been (and will not be) any fraud or collusion between the Debtor and the Stalking Horse Purchaser.  There is no relationship of any kind between the Debtor and NVR, other than the ordinary seller-purchaser relationship created by the Sales Contract.

58.    The Debtor believes that providing any Prevailing Bidder with the "good faith" purchaser protection will ensure the maximum price will be received by the Debtor for the Property.  As such, the Debtor submits that any Prevailing Bidder is or will be a good faith

purchaser, entitled to the protections of section 363(m) of the Bankruptcy Code, and that none of the Debtor, the Prevailing Bidder, nor their respective affiliates, principals, employees or their representatives has engaged in any conduct that would cause the Sale to be avoided under Section 363(n).

**E.      The Proposed Bid Protections Are Reasonable.**

59.      The Debtor believes that the Bid Protections afforded to the Stalking Horse Purchaser are reasonable and appropriate in light of the circumstances.

60.      Approval of Bid Protections in connection with the sale of significant assets pursuant to Bankruptcy Code section 363 has become established practice in chapter 11 cases. *See, e.g., Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527 (3d Cir. 1999); *Integrated Res., Inc*., 147 B.R. at 656–57 (break-up fee arrangements that have been negotiated by a debtor are to be reviewed according to the deferential "business judgment" standard, under which such procedures and arrangements are "presumptively valid"); *In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (the business judgment standard protects breakup fees and other contractual provisions negotiated in good faith); *see also Order (I) Approving Asset Purchase Agreement and Authorizing The Sale of Certain Assets of Debtor Outside the Ordinary Course of Business, (II) Authorizing the Sale of Assets Free and Clear of All Liens, Claims, Encumbrances and Interests, (III) Authorizing the Assumption, Sale and Assignment of Certain Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief, In re Neogenix Oncology, Inc.*, No. 12-23557-TJC (Bankr. D. Md. Sept. 9, 2012) [Docket No. 176] (approving $475,000 break-up fee with respect to asset sale that had a cash purchase price of less than $4,000,000, plus common stock and rights).

61.     Here, the proposed $600,000 break-up fee, approximately 3.5% of the total maximum purchase price (*i.e.*, $17,000,000), is well within the range of reasonableness and supported by a sound business justification.  Courts have found break-up fees to be reasonable, and approved the same, ranging up to approximately five percent (5%) of the consideration to be received.  *See Integrated Res., Inc.*, 147 B.R. at 662 (expert testimony that 3.3% is industry average for break-up fees); *In re Enron Corp.* (Bankr. S.D.N.Y., Apr. 8, 2004) (approving break-up fee equal to 5% of the purchase price); *see also, e.g., In re Stone Energy Corp.* (Bankr. S.D. Tex. Jan. 18, 2017) (approving 3% break-up fee); *In re Geokinetics Inc.*, No. 18-33410 (Bankr. S.D. Tex. July 2, 2018) (authorizing a 5% break-up fee and expense reimbursement with no cap).  Likewise, the proposed Expense Reimbursement is fair and reasonable in light of the nature of the proposed Sale.  *See In re Chesapeake Hardwood Prod., Inc.*, 2010 WL 5240048, at *2 (Bankr. E.D. Va. Sept. 23, 2010) (approving the out-of-pocket costs for due diligence investigation of the property, including, but not limited to, investigating the title of the property, obtaining an updated survey, an engineering property condition report and environmental report for the property).

62.     The Debtor believes that the Bid Protections increase the likelihood of a sale to a contractually committed bidder at a price the Debtor believes is fair, while providing the Debtor with an opportunity to enhance the value to its estate through an auction process. The amount of the Bid Protections are a result of good-faith efforts and reasonable and appropriate in light of the size and nature of the Sale. Payment of the Bid Protections also will not diminish the value of Debtor's estate, as the Debtor does not intend to terminate the Sales Contract and pay the Bid Protections, unless doing so would permit the Debtor to accept a materially higher and better Bid.

**F.      Existing Secured Creditors Are Adequately Protected.**

63.      The holders of secured claims are adequately protected and will not be impaired by the proposed Sale of the Property. Adequate protection serves to protect a secured creditor's "interests against the diminution in value of [its] security during a bankruptcy proceeding." *In re Health Diagnostic Lab., Inc.,* 2015 Bankr. LEXIS 4471, at *25 (Bankr. E.D. Va. Aug. 17, 2015) (quoting *Contrarian Funds LLC v. Aretex LLC (In re WestPoint Stevens, Inc.),* 600 F.3d 231, 257 (2d Cir. 2010)). *See also In re 495 Central Park Ave. Corp.,* 136 B.R. at 631 ("The goal of adequate protection is to safeguard the secured creditor from diminution in the value of its interest during the Chapter 11 reorganization."); *In re Beker Indus. Corp.,* 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986); *In re Hubbard Power & Light,* 202 B.R. 680, 685 (Bankr. E.D.N.Y. 1996).

64.      Sandy Spring and Prince George's County will be adequately protected as the Debtor will make a full payment of their respective liens at closing (unless otherwise agreed or ordered by the Court).

**G.      The Sale Notice Should be Approved.**

65.      As noted above, within five (5) business days after the entry of the Sale and Bid Procedures Order, or as soon as reasonably practicable thereafter, the Debtor will serve the Sale Notice upon the Notice Parties.

66.      The notice of this Motion and the related hearing to consider entry of the Order, coupled with service of the Sale Notice constitutes good and adequate notice of the Auction. Accordingly, the Debtor requests that the Court approve the form and manner of the Sale Notice.

**H.      Waiver of Stay Bankruptcy Rule 6004(H).**

67.      The Debtor also requests that the Court waive the stay imposed by Bankruptcy Rule 6004(h). *See* Fed. R. Bankr. P. 6004(h).  As set forth above, the relief requested herein is necessary

and appropriate to maximize the value of the Debtor's estate for the benefit of its economic stakeholders.

68.      Accordingly, the Debtor respectfully requests that the Court waive the 14-day stays imposed by Bankruptcy Rule 6004(h), as the nature of the relief sought herein justifies immediate relief.

## I.      Reservation of Rights.

69.      Nothing contained herein is intended or shall be construed as: (a) an admission as to the amount of, basis for, or validity of any claim against the Debtor under the Bankruptcy Code, any foreign bankruptcy or insolvency law, or other applicable nonbankruptcy law; (b) a waiver of the Debtor's or any other party in interest's right to dispute any claim on any grounds, (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion; (e) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtor's estate; or (f) a waiver of any claims or causes of action which may exist against any entity under the Bankruptcy Code or any other applicable law.

Dated: June 5, 2022

/s/ Bradford F. Englander
Whiteford, Taylor & Preston, LLP
Bradford F. Englander, Esq., Bar No. 11951
3190 Fairview Park Drive, Suite 800
Falls Church, Virginia 22042
Telephone: (703) 280-9081
Facsimile: (703) 280-3370
Email: benglander@wtplaw.com

Counsel for the Debtor