## REAL ESTATE SALES CONTRACT

### HYDE FIELD PROPERTY

THIS REAL ESTATE SALES CONTRACT ("**Contract**") is made this 1st day of June____, 2022, by and between ZACHAIR, LTD., a Maryland corporation ("**Seller**") and NVR, Inc., a Virginia corporation, or an assignee, upon assignment pursuant to Section 18, below ("**Purchaser**"). Seller and Purchaser are sometimes jointly referred to herein as the "Parties" and individually as a "Party."

### RECITALS:

**Whereas,** Seller is the owner in fee simple of: (i) four (4) parcels of land, zoned R-S and LAC and located adjacent to Steed Road and Piscataway Road in Prince George's County, Maryland (the "**County**"), containing a total of approximately 423 acres, more or less, as more particularly described in the legal description attached hereto and incorporated herein as Exhibit "A" (the "**Land**"); (ii) all buildings and any other improvements situated on such land and all fixtures, machinery and systems necessary to operate such buildings (the "**Improvements**"); and (iii) all licenses, approvals and permits issued with respect to any of the foregoing property attached hereto as Exhibit "B" (the "**Permits**"). The foregoing Land, Improvements, and Permits are sometimes referred to collectively herein as the "**Property**".

**Whereas**, the Property is currently operated as an air field, and a portion of the remaining land stockpiled with fill dirt. Pursuant to a Comprehensive Design Plan dated July 24, 2018, prepared by Dewberry Engineers, Inc., and other information considered by Purchaser, it is anticipated that the Land will yield a minimum of 500 residential units (collectively, the "**Lots**").

**Whereas,** on January 17, 2020, Seller commenced a case, no. 20-10691-TJC (the "**Bankruptcy Case**") under the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.,* as amended (the "**Bankruptcy Code**") by filing a voluntary petition in the United States Bankruptcy Court for the District of Maryland (the "**Bankruptcy Court**").

**Whereas**, on or about June 1, 2021, the Seller entered in to a real estate sales contract (as amended, the "**JP Holdings Contract**") with JP Land Holdings LLC ("**JP Land Holdings**") for the sale of the Property to JP Land Holdings LLC.

**Whereas**, on June 28, 2021, Seller filed a plan [DE 224] (the "**Bankruptcy Plan**") and disclosure statement [DE 223] (the "**First Disclosure Statement**") under Chapter 11 of the Bankruptcy Code.

**Whereas**, on September 7, 2021, Seller filed an amended plan [DE 245] (the "**Amended Bankruptcy Plan**") and an amended disclosure statement [DE 246] (the "**Amended Disclosure Statement**").

1

**Whereas**, on October 15, 2021, the Bankruptcy Court entered an Order [DE 263] (the "**Disclosure Statement Order**") approving the Amended Disclosure Statement and setting deadlines for confirmation of the Amended Bankruptcy Plan.

**Whereas**, after the Bankruptcy Court's entry of the Disclosure Statement Order the JP Holdings Contract terminated on account of JP Land Holding's failure to submit a notice of intent to proceed, and the Seller renewed its efforts to secure an alternative purchaser.

**Whereas**, on or about February 10, 2022, the Purchaser and the Seller entered into a non-binding letter of intent, and now enter into this Contract.

NOW, THEREFORE, in consideration of the mutual covenants of Seller and Purchaser and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Purchaser agree as follows:

1.    **AGREEMENT OF SALE AND PURCHASE.** Seller hereby agrees to sell and convey to Purchaser and Purchaser hereby agrees to purchase from Seller the Property, in fee simple absolute, for the consideration and pursuant and subject to the terms and conditions set forth in this Contract. Purchaser hereby agrees and acknowledges that, except as otherwise expressly set forth in this Contract, neither Seller nor any principal (direct or indirect), affiliate, agent, attorney, employee or representative of Seller has made any representation or warranty whatsoever regarding the subject matter of this Contract, or any part hereof, including (without limiting the generality of the foregoing) representations as to the physical nature or physical condition of the Property or the capabilities thereof, and that Purchaser, in executing, delivering and/or performing this Contract, does not rely upon any statement and/or information to whomever made or given, directly or indirectly, orally or in writing, by any individual, firm or entity. Accordingly, Purchaser agrees that the Property shall be deemed acceptable to Purchaser and the acquisition of the Property shall be on an "as is, where is" basis, with all faults, subject to the provisions of this Contract. Purchaser further acknowledges that Seller would not agree to sell the Property to Purchaser for the Purchase Price stated herein (as hereinafter defined) without the disclaimers, agreements and other statements set forth in this Section. EXCEPT AS EXPRESSLY PROVIDED HEREIN, SELLER MAKES NO REPRESENTATIONS OR WARRANTIES AS TO THE PHYSICAL CONDITION OF THE PROPERTY OR THE SUITABILITY THEREOF FOR ANY PURPOSE. SELLER HEREBY EXPRESSLY DISCLAIMS ANY WARRANTIES OF MERCHANTABILITY AND/OR FITNESS FOR A PARTICULAR PURPOSE AND ANY OTHER WARRANTIES OR REPRESENTATIONS AS TO THE PHYSICAL CONDITION OF THE PROPERTY. Purchaser will conduct such investigations of the Property, including but not limited to, the physical and environmental conditions thereof, as Purchaser deems necessary or desirable to satisfy itself as to the condition of the Property and the existence or nonexistence or curative action to be taken with respect to any hazardous materials including lead paint on or discharged from the Property, and Purchaser will rely solely upon same and not upon any information provided by or on behalf of Seller or its agents or employees with respect thereto.

**2.** <u>**PURCHASE PRICE and PAYMENT OF PURCHASE PRICE.**</u> The total Purchase Price for the Property shall be capped at Seventeen Million Dollars ($17,000,000.00) (the "**Purchase Price**"). The Purchase Price shall be paid as follows:

a. <u>Initial Payment</u>. Ten Million Dollars ($10,000,000.00) of the Purchase Price (the "**Initial Payment**"), of which the Deposit (as hereinafter defined) and accrued interest thereon shall be a part, shall be payable by Purchaser in immediately available funds on the Closing Date (as hereinafter defined in Section 6(a)).

b. <u>Additional Lot Payments</u>. If the Residential Record Plat Approval process yields units in excess of 500 units ("**Additional Lot Success Payments**") Purchaser shall pay Seller Twenty Thousand Dollars ($20,000.00) per approved unit in excess of 500 units that are depicted on the approved site development plan that is in place at the time of the first Plat Approval Date (as defined below) for the Residential Record Plat Approval (as such term is defined in Section 5(b), below). The Additional Lot Success Payments shall be paid in one or more installments of Two Million Dollars ($2,000,000.00) per installment (or such amount due if less than $2,000,000) beginning with the first installment being due sixty (60) days after Plat Approval Date (as defined below), and each subsequent installment to be paid on each twelve (12) month anniversary of Plat Approval Date until the Additional Lot Success Payments has been made in full. The "**Plat Approval Date**" means the first to occur of: (i) the date on which an appeal of the first Residential Record Plat Approval may be taken as of right, with no such appeal having been filed; or (ii) if an appeal of the first Residential Record Plat Approval has been taken, the date on which all such appeals have been finally resolved.

c. <u>Alternative Land Payments</u>. Purchaser shall pay to Seller twenty percent (20%) of the Net Sale Proceeds (defined below) generated from the sale (or sales) of any portion of the Non-Residential Property (defined below) ("**Alternative Land Payment (Sale)**"). The Alternative Land Payment (Sale) shall be paid at closing on the sale of any portion of the Non-Residential Property. "**Residential Property**" means any portion of the Property that is for: (i) a unit principally intended and approved for use as a residential town home or single family dwelling; (ii) common areas deeded to a homeowner's association or government entity for the use and enjoyment of the general public or owners of dwellings constructed on the Property; (iii) portions of the Property that are subjected to a conservation easement or other similar restriction that prohibits the construction of any roads, dwellings, structures or other improvements (unless there is an agreement for, or expectation of, current or future receipt of any payment or valuable consideration on account of the imposition of such easement or restriction); or (iv) amenity buildings, ancillary structures, infrastructure (e.g., pump stations, water towers, etc.) intended for the primary use of the residential properties, storm water management facilities and other facilities necessary for the approval and development of homes on the Residential Property. All portions of the Property that are not Residential Property shall constitute, and are referred to as, "**Non-Residential Property**". "**Net Sale Proceeds**" means the gross Purchase Price (including without limitation the principal amount of any seller take-back financing) received or receivable on account of the sale of Non-Residential Property (or any portion thereof), reduced solely by: (v) the portion of such proceeds used for transfer and recordation taxes, closing costs, broker's fees and legal fees directly attributable to the sale of the Non-Residential Property (or a portion thereof); (w) entitling and permitting solely the Non-Residential Property; (x) grading allocable to the Non-Residential

Property; (y) costs of construction of buildings and other improvements required by a purchaser or lessee with respect to the Non-Residential Property (e.g., Purchaser builds a warehouse that is then subject to a lease); and (z) direct out-of-pocket costs of materials and labor incurred by Purchaser in favor of unaffiliated third-parties for the specific purpose of constructing infrastructure required under any contract between Purchaser and an unaffiliated third party for the sale or lease of the Non-Residential Property (items (v) through and including (z) above, being referred to as "**Purchaser's Costs**"). Upon request from time to time, Purchaser shall provide to Seller an accounting of all revenues and expenses relating to the computation of Alternative Land Payment (Sale).

d.    If Purchaser retains title, does not sell and instead leases any portion of the Non-Residential Property, Seller shall be entitled to a single lump sum payment equal to 20% of the Net Appraised Value, as such term is defined below (the "**Alternative Land Payment (Lease)**"). "**Net Appraised Value**" shall mean the fair market value of the entire Non-Residential Property owned by Purchaser as of the Valuation Date, as defined below (the "**Remaining Non-Residential Property**"), less the Purchaser's Costs actually incurred as of the Valuation Date with respect to the Remaining Non-Residential Property, excluding the value and cost of any improvements thereon paid for by Purchaser or any third party. The "**Valuation Date**" shall be the first to occur of (i) the lessee taking possession of any portion of the Remaining Non-Residential Property, or (ii) commencement of payments under the lease. For the sake of clarity, Purchaser's mere entry into an agreement for a lease option shall not trigger the Valuation Date.

Seller and Purchaser shall negotiate in good faith for a period of thirty (30) days after the Valuation Date. (the "**Negotiation Period**") to determine the fair market value of the Remaining Non-Residential Property and to calculate the amount of the Alternative Land Payment (Lease).

If, by 5:00 p.m. Washington, D.C. time of the last day of the Negotiation Period, the Alternative Land Payment (Lease) is not agreed upon, then the Alternative Land Payment (Lease) will be determined through appraisals submitted pursuant to this Subparagraph. Seller and Purchaser shall have the right jointly and in writing to designate a sole appraiser to determine the Alternative Land Payment (Lease) and, if so jointly designated, the sole appraiser shall determine, as applicable, the Alternative Land Payment (Lease) in accordance with this Subparagraph. If Seller and Purchaser for any reason do not agree on a sole appraiser within ten (10) days after the expiration of the Negotiation Period, time being of the essence, then, in lieu thereof, Seller and Purchaser shall each separately designate an appraiser and shall deliver written notice thereof to the other party hereto no later than thirty (30) days following the last day of the Negotiation Period. The appraisers so designated thereafter independently shall determine the Alternative Land Payment (Lease). If Seller or Purchaser shall fail or refuse to timely designate an appraiser as or in the manner herein provided then such appraisal instead shall be conducted by the single appraiser designated by the other party. No designation of an appraiser hereunder shall be deemed to have been made unless the same shall be in writing.

If Seller and Purchaser timely designate an appraiser hereunder, and if the determination of the Alternative Land Payment (Lease) by the two (2) appraisers shall vary by less than five percent (5%), then the Alternative Land Payment (Lease) shall be the average of the two (2) appraisals. If the Alternative Land Payment (Lease) determined by the two (2) appraisers varies by five percent (5%) or more, then the two (2) appraisers so designated shall designate a third appraiser within ten (10) days of either party's written request therefore, and such third appraiser independently shall determine the Alternative Land Payment (Lease) and the Alternative Land Payment (Lease) shall be the average of the two determinations that are closest in value and the third determination of value shall be disregarded.

With respect to any appraisal(s) conducted pursuant to this Subparagraph, such appraisal(s) shall be: (i) prepared and conducted by an independent and licensed MAI appraiser duly qualified by appropriate experience and ability, and having no less than ten (10) years' experience in the appraisal of real estate projects comparable to the Property and located in the same or generally contiguous market area as the Property; (ii) prepared and conducted in accordance with the standards set forth in this Subparagraph and prevailing industry assumptions and standards; (iii) concluded and reduced to writing (which writing shall reasonably set forth the bases of the appraiser's opinion) within thirty (30) days of the date of the designation of the appraiser, with complete copies thereof delivered to Seller and Purchaser; provided, however, that if any appraiser designated hereunder shall be unwilling or unable for any reason to serve or continue to serve, a replacement shall be appointed in the same manner as the original appraiser. All appraisers to the extent reasonably practicable shall be disinterested and impartial, and no appraiser shall be directly or indirectly in the employ of Purchaser or Seller or any affiliate thereof during the pendency of the appraisal process under this Subparagraph or otherwise financially interested in the Property or the purchase, sale or lease thereof. Seller and Purchaser each shall be responsible for the payment of all fees, costs and expenses of any appraiser that they separately engage. Seller and Purchaser each shall be responsible for the payment of fifty percent (50%) of any and all costs or expenses of appraisers that they hire jointly, and for the payment of fees and costs of the appraiser who is selected by the other appraisers. The determination and resolution of fair market value of the Non-Residential Property hereunder shall be conclusive and binding upon the parties for all purposes of this Agreement. Seller and Purchaser shall cooperate with all appraisers and shall respond promptly to any reasonable requests for information that may be made by any appraiser. The appraisers shall have no power to modify any of the provisions of this Agreement or to make a monetary or other financial award except to determine Alternative Land Payment (Lease) as provided for in this Subparagraph. Purchaser and/or Seller shall have the right to specifically enforce the provisions of this Subparagraph regarding the appraisal(s), and Purchaser and Seller hereby acknowledge and agree that an action at law would be inadequate to protect the interests of the parties hereunder.

Purchaser shall pay the Alternative Land Payment (Lease) within thirty (30) days following the determination of the value of the Remaining Non-Residential Property, as set forth above (either through agreement at the conclusion of the Negotiation Period, or the appraisal process as set forth above).

In addition to payment of the Alternative Land Payment (Lease), in the event Purchaser enters into a lease option agreement, or other similar agreement, that provides for payment prior to the

Valuation Date of non-refundable fees or advances, Purchaser shall pay to Seller 20% of all such payments, net of Purchaser's Costs ("**Option Fees**")  within thirty (30) days of Purchaser's receipt of such payments.

        e.     Minimum Additional Payments.  A minimum payment of Two Million Dollars ($2,000,000.00) ("**Minimum Additional Payment**") shall be paid on or before the Outside Payment Date (defined below), all or a portion of which may be satisfied through a combination of the Additional Lot Success Payments, Alternative Land Payment (Sale) Alternative Land Payment (Lease) and Option Fees.  For purposes of clarity, any Additional Lot Success Payments, Alternative Land Payments (Sale), Alternative Land Payments (Lease) and Option Fees shall be credited against the Minimum Additional Payment.  For example, if $500,000 is paid as an Additional Lot Success Payment and $250,000 is paid as an Alternative Land Payment (Sale); a total of $1,250,000 shall remain as a Minimum Additional Payment ($2,000,000 - $500,000 - $250,000 = $1,250,000.  The outside date for the Minimum Additional Payment regardless of the amount of Additional Lot Success Payments, Alternative Land Payment (Sale) and Alternative Land Payment (Lease) shall be sixty (60) days after the Plat Approval Date (the "**Outside Payment Date**").  For purposes of clarity, any Additional Lot Success Payments, Alternative Land Payment (Sale), Alternative Land Payment (Lease) and Option Fees made prior to the Minimum Additional Payment shall be credited against the Minimum Additional Payment, and conversely, if the Minimum Additional Payment has been made, then any subsequent Additional Lot Success Payments, Alternative Land Payment (Sale), Alternative Land Payment (Lease) and Option Fees shall be reduced by the amount paid as a Minimum Additional Payment.

        f.     The Purchase Price, which is the total of the Initial Payment, Additional Lot Payments, Alternative Land Payment (Sale), Alternative Land Payment (Lease), Option Fees and, if any, Minimum Additional Payments shall be a minimum of $12,000,000 and, at a maximum, shall be capped and shall not exceed $17,000,000 (the "**Cap**").

        g.     On the Closing Date, Purchaser shall execute and deliver to Seller a first priority deed of trust on the Property (the "**Deed of Trust**"), to secure Purchaser's obligations under this Contract, including without limitation Purchaser's obligation to pay the Additional Lot Success Payments, the Alternative Land Payment (Sale), Alternative Land Payment (Lease), and the Minimum Additional Payment (all of the foregoing subject to the Cap).  The face amount of the Deed of Trust shall be Seven Million and no/100 ($7,000,000) in principal amount, which reflects the Cap less the $10,000,000 Initial Payment by Purchaser at Closing.

        (i)     Within thirty (30) days following the later of the Plat Approval Date and Purchaser's written designation specifying Lots to be released, Seller shall release 550 Lots from the Deed of Trust.  Thereafter, as Lots in excess of 550 are sold or refinanced pursuant to the Purchaser's development phasing, such Lots will be released from the Residential Property DOT upon the payment of an amount equal to $20,000.00 per Lot ("**Release Fee**"), which payments shall be credited against

amounts owed under this Contract and the Deed of Trust. Any payment made on account of the Minimum Additional Payment or Additional Lot Success Payments shall be counted toward the Release Fee.

(ii)    The Non-Residential Property that has been sold shall be released from the Deed of Trust upon payment to Seller of the corresponding Alternative Land Payment (Sale). The Deed of Trust shall be released from the Remaining Non-Residential Property upon (a) payment to Seller of the Alternative Land Payment (Lease) or (b) aggregate payments totaling the amount of the Cap.

(iii)    Intentionally Deleted.

(iv)    In the event that the Deed of Trust is not exempt under Section 1146(a) of the Bankruptcy Code, the Parties shall evenly split the payment of the transfer and recordation taxes with respect to the Deed of Trust.

(v)    Seller shall enter into a subordination agreement with any institutional lender who is not affiliated with Purchaser, and who provides construction and development financing with respect to the Property after the Closing Date. Subordination shall be limited to a subordination of Seller's lien priority to the institutional lender's principal, interest and other customary fees and charges, incurred or advanced for the purpose of funding the payment of direct out-of-pocket costs of materials and labor incurred by Purchaser in favor of unaffiliated third-parties for the specific purpose of developing the Property. Notwithstanding anything to the contrary in this Section 2, Seller shall not have any obligation to release or subordinate any portion of its lien if, at the time of such proposed release or subordination, an event of default has occurred under the Deeds of Trust, and has not been cured. Among other customary events of default, an event of default by Purchaser under the loan documents of the institutional lender shall constitute an event of default under the Deed(s) of Trust.

3.    **<u>DEPOSIT</u>**.

    a.    Upon the Bankruptcy Court's approval of the Seller's Second Amended Bankruptcy Plan, the Purchaser shall deliver to Watt Tieder Hoffar & Fitzgerald, LLP, 1765 Greensboro Station Place, Ste. 1000, McLean, Virginia 22102 (the "**Escrow Agent**") the sum of Five Hundred Thousand Dollars ($500,000.00) in immediately available funds, as a good faith deposit (the "**Deposit**").

    b.    Unless this Contract is terminated pursuant to Section 4 below, the Deposit shall be non-refundable except where expressly set forth, in this Agreement, including an event of Seller default as set forth in Section 14, and as set forth in Section 11(b), Section 12(b), Section 20(a), and Section 20(b) below.

    c.    Intentionally deleted.

d.      Escrow Agent shall hold the Deposit and the Extension Fee (defined below) in escrow in accordance with the terms set forth below:

i.      Upon receipt of the Deposit and the Extension Fee or any portion thereof (the Deposit, Extension Fee or any portion thereof are collectively referenced herein as the "**Escrowed Funds**"), Escrow Agent shall place the Escrowed Funds in an interest-bearing account at a federally insured financial institution (the "**Escrow Account**").  All interest earned on the Escrowed Funds shall be deemed to be a part of the Escrowed Funds and the Party entitled to the Escrowed Funds shall also have the benefit of the interest earned thereon.

ii.     In the event of any disagreement between the Parties regarding the application, distribution or other disposition of the Escrowed Funds, or should Escrow Agent receive conflicting claims, demands, or instructions regarding the Escrowed Funds, Escrow Agent shall continue to hold the Escrowed Funds in escrow until instructed otherwise by joint instructions from the Parties or as directed by a court of competent jurisdiction.

iii.    In the event this Contract is terminated by either Party as expressly permitted in this Contract, Escrow Agent is authorized and directed by the Parties to deliver the Escrowed Funds to the Party entitled thereto pursuant to the terms of this Contract not less than five (5) business days nor more than ten (10) business days after receipt by Escrow Agent (with a copy to non-terminating Party) of written notice of termination, unless, within five (5) Business days after the non-terminating Party's receipt of such termination notice, the non-terminating Party provides written notice to Escrow Agent and the other Party that it disputes the right of the terminating Party to receive the Escrowed Funds.  Escrow Agent shall not be required to inquire as to the merits of any claimed dispute but may accept a notice of its existence as grounds to act in accordance with this Section 3(c)(iii).  In such event, Escrow Agent shall continue to hold the Escrowed Funds or pay the Escrowed Funds into a court of competent jurisdiction in an action of interpleader until such dispute is resolved.  All attorneys' fees and costs of Escrow Agent (acting in such capacity, and not as counsel for a Party) incurred in connection with any such dispute or interpleader shall be assessed against the Party that is not awarded the Escrowed Funds, or if the Escrowed Funds are distributed in part to both Parties then in the inverse proportion of such distribution.

iv.     The Parties acknowledge and agree that Escrow Agent also serves as counsel to the Purchaser under this Contract and expressly waive any potential conflict that may arise from the diligent and good faith execution of the Escrow Agent's duties in such dual capacity. The Parties hereby jointly and severally agree that, except as provided otherwise herein, Escrow Agent shall incur no liability whatsoever in connection with its performance pursuant to this Contract.  Each Party hereby severally indemnifies and holds Escrow Agent harmless from any loss, damage, injury, or claims, including reasonable attorneys' fees and expenses caused by the actions of such Party and arising from Escrow Agent's due performance of its obligations under this Contract.  Purchaser and Seller hereby jointly and severally release and waive any claims they may or either of them may have against Escrow Agent that may result from its due performance of its functions under this Contract.  Escrow Agent shall be liable only for loss or damage directly

8

resulting from its, or any of its officers' or employees' acts of gross negligence, defalcation, willful misconduct, or breach of the express terms of this Contract, while performing as Escrow Agent.

> v.    The Parties shall execute such additional escrow instructions as Escrow Agent may reasonably require regarding the Escrow Account.  Any such instructions shall not in any way modify the terms of this Contract or impose any fee, cost, expense or liability on Seller or Purchaser that is not provided for in this Contract.

The Escrow Agent is joining in the execution of this Contract solely to evidence its consent to and acceptance of this escrow, subject to the foregoing terms.

**4.** **PROPERTY DOCUMENTS; ENTRY ONTO PROPERTY; STUDY PERIOD**.

> a.    Seller shall, no later than five (5) business days after the Contract Execution Date (as hereinafter defined), deliver to Purchaser, at no cost or expense to Purchaser, and without any representation or warranty from Seller, copies of all title reports, title insurance policies, environmental, soil and other tests and studies, and copies of all surveys, engineering and other plans and plats relating to the Property to the extent within Seller's possession or control (collectively, the "**Property Documents**").  Seller shall make the Property Documents available to Purchaser in an online data room maintained by Fraser Forbes, and that all Property Documents that are in the data room, or are added to the data room, shall be deemed delivered to Purchaser.

> b.    Commencing on the Effective Date and continuing for the entire term of this Contract, Purchaser, at Purchaser's sole cost and expense, shall have complete access to the Property for the purpose of conducting such soil borings, soil analyses, engineering tests and studies, environmental tests and studies, economic and/or topographic tests, studies, and/or investigations, including, but not limited to, a Phase I Environmental Report and a Phase II Environmental Report if expressly recommended by the Phase I Environmental Report (collectively, the "**Studies**"), with respect to the Property as Purchaser may deem necessary in order to determine whether the Property is satisfactory to Purchaser.  Purchaser shall keep all information obtained through its Studies confidential except that Purchaser may disclose such information as necessary, customary, or expedient for the development of the Property as contemplated by this Contract.  Purchaser shall, without representation or warranty and at no cost or expense to Purchaser, provide Seller with copies of all reports, studies, easements, licenses and permits, contracts, agreements or memoranda of understanding that Purchaser obtains or enters into regarding the Property during the Study Period (collectively, "**Study Documents**"), within three (3) business days of receipt, and at Seller's sole cost and expense promptly license their use and dissemination by Seller to the extent such use and dissemination is permitted by the preparer of such reports and studies.  Except, however, Purchaser shall not be required to provide to Seller any of its conceptual, engineering and design reports and studies, nor shall Purchaser be required to provide any of its internal analysis regarding the Property.  Effective upon termination of this Contract for any reason, Purchaser hereby assigns, without representation or warranty, all right, title and interest to all Study Documents (and Purchaser's rights against third parties under such Study Documents) to Seller, absolutely and exclusively without further compensation to Purchaser.

c.      Purchaser shall have ninety (90) days commencing upon the later of: (i) the execution of this Contract by Purchaser and Seller, and (ii) entry of the Bid Procedures Order (defined herein) to evaluate all aspects of the project, including but not limited to financial feasibility, and the likelihood of obtaining government and regulatory approvals (the "**Study Period**").  Purchaser may elect to terminate this Contract for any reason through the expiration of the Study Period.  Further, if Purchaser does not deliver written notice to Seller of Purchaser's intent to proceed (the "**Notice of Intent to Proceed**") with the purchase of the Property pursuant to the terms of this Contract prior to 5:00 pm ET on the last day of the Study Period, this Contract shall terminate and thereupon the parties shall have no further rights or obligations hereunder except for those matters that specifically survive termination of this Contract, and the Deposit shall be promptly returned to Purchaser and the Property Documents and copies of any studies performed by Purchaser or on behalf of Purchaser shall be returned to Seller.  Except, however, Purchaser shall not be required to provide to Seller any of its conceptual, engineering and design reports and studies, nor shall Purchaser be required to provide any of its internal analysis regarding the Property.

d.      Purchaser's right to conduct due diligence on, at or otherwise with respect to the Property prior to the Closing Date shall be subject to Purchaser's continuing compliance with each and all of the following conditions: (i) Seller shall permit Purchaser, and its agents, representatives and contractors, to have reasonable access to the Property during normal business hours with not less than 24 hours prior notice by e-mail, subject to the rights of tenants and occupants of the Property; (ii) all such due diligence shall be conducted so as not to cause any unreasonable or material disruption to tenants or other occupants of the Property; (iii) Purchaser shall at all times comply with all laws, ordinances, rules and regulations applicable to the Property; (iv) promptly after entry onto the Property, Purchaser shall restore or repair (to substantially the same condition that existed prior to the entry) any damage thereto caused by or otherwise arising from any act or omission by Purchaser, its agents, representatives or contractors; and (v) Purchaser's certificate of liability insurance attached as Exhibit D is satisfactory evidence that Purchaser or its agents and contractors have procured comprehensive liability insurance from an insurer authorized to do business in the State of Maryland which is reasonably acceptable to Seller. Purchaser shall indemnify, defend, reimburse, and hold and save Seller harmless from and against liquidated, actual damage to personal property or bodily injury, loss, cost, damage, injury or other expense arising solely out of or in any way related to the activities, acts or omissions of Purchaser, its agents, employees and contractors on or about the Property.  Purchaser's obligations under this Subsection 4(d), including without limitation the indemnification provisions, shall survive termination of this Contract and Closing.

## 5.      <u>APPROVALS; SUBDIVISION OF PROPERTY.</u>

a.      Purchaser, at its expense, shall be responsible for preparation and submitting for approval the preliminary plan of subdivision and revised comprehensive design plan for the residential portion of the project (the "**Required Residential Approvals**") which plans will provide for the subdivision of the Property into the Lots, and shall include all amendments

10

and supplements to such plans, including without limitation the approved site development plan that is in effect as of the first Plat Approval Date (collectively, the "**Plans**"). The Purchaser shall submit the Plans to the applicable governmental agencies within one hundred-twenty (120) days after expiration of the Study Period. Purchaser shall provide a courtesy copy of the Plans to the Seller to review seven (7) days prior to the submission of the Plans to the governmental agencies.

        b.     Seller, at no cost or expense to Seller, shall promptly cooperate with all reasonable requests from Purchaser to execute any and all documents reasonably necessary to effect the approval process for the Plans and Required Residential Approvals (the "**Residential Record Plat Approval**").

        c.     The Purchaser shall endeavor to maximize residential density in the Plans in effect as of the first Plat Approval Date, with the understanding that the Purchaser will be using a mix of at least three product types currently anticipated to be approximately one third each of: 50' to 60' single family lots, 20' townhomes, and 24' townhomes.

**6.**     **CLOSING; CLOSING DATE; ADJUSTMENTS AT CLOSING; CLOSING COSTS.**

        a.     In the event that all of the conditions precedent to Purchaser's obligations hereunder have been satisfied or waived by written notice of same pursuant to this Contract, and this Contract has not been sooner terminated, settlement under the terms of this Contract ("**Closing**") shall be held at the offices of NVR Settlement Services, 3701 Pender Drive, Suite 210, Fairfax, VA 22030 ATTN: Dy Welch, or other closing attorney or settlement agent selected by Purchaser, the later of August 1, 2023 or twelve (12) months after the Bankruptcy Court's approval of the Seller's Second Amended Bankruptcy Plan at the confirmation hearing on the Second Amended Bankruptcy Plan (the "**Closing Date**").

        b.     Notwithstanding the foregoing, absent an uncured default by Purchaser under this Contract, or satisfaction of conditions to closing, at Purchaser's election, the Closing Date can be extended for a period of up to one-hundred eighty (180) days (the "**Extension Option**"), provided, however, such extension may not go beyond fifteen (15) months from the Bankruptcy Court's approval of the Seller's Second Amended Bankruptcy Plan at the confirmation hearing (the "**Outside Closing Date**"), by notifying the Seller in writing at least ten (10) business days prior to the Closing Date and simultaneously delivering to Seller an extension fee in the amount of Two Hundred Fifty Thousand Dollars ($250,000.00) (the "**Extension Fee**"). The Extension Fee shall be non-refundable except where expressly set forth below, in the event of Seller's default as set forth in Section 14, or a failure of conditions in Sections 11 and 12(a)(ii-iv) below. The Extension Fee shall be delivered to the Escrow Agent as set forth herein and shall be applied to the Purchase Price at closing, or delivered to Seller if required under Section 13.

        c.     Seller agrees to execute the usual special warranty deed, with covenant of further assurance and right to convey, containing the usual covenants of title, in proper form for recording in the County.

d.      At Closing, Seller shall deliver to Purchaser a "Certification of Non-Foreign Status" which meets the requirements of Section 1445 of the Internal Revenue Code and Internal Revenue Regulations for the purpose of informing the transferee that withholding of Federal taxes is not required.

e.      Possession of the Property shall be given to Purchaser or its agents and assigns at the time of settlement, free from any parties in possession.  Prior to Closing, Seller shall terminate air field operations and shall terminate all leases with respect thereto.  Prior to Closing, operation of the airport located on the Property shall have ceased with all leases terminated; all aircraft and third-party property removed; and all fuel, oil and other regulated chemicals stored at the Property shall be properly removed from the site.

f.      Real estate taxes, general and special, and usual water and sewer charges are to be adjusted to the date of settlement and thereafter assumed and paid for by Purchaser.  Seller shall pay, when and if due, any agricultural recapture tax or any similar tax imposed on the Property, whether imposed prior to or within one year subsequent to the last to occur of Closing.  Further, pursuant to section 1146(a) of the Bankruptcy Code, the purchase contemplated by this Contract shall be exempt from all documentary stamps, recordation and transfer taxes.

g.      Examination of title, owner's and mortgagee's title insurance, Survey (as hereinafter defined) (if Purchaser elects to have a Survey prepared), tax certificates, and recording charges are to be at the cost of Purchaser.  Seller shall pay the cost of preparation of the deed, and obtaining releases of all monetary liens encumbering the Property.  Each party shall pay for the cost of their respective legal counsel.  In the unlikely event that any documentary stamps, recordation or transfer taxes are charged, notwithstanding the fact that the purchase contemplated by this Contract shall be facilitated through section 1146(a) of the Bankruptcy Code, such charges shall be split equally and paid by Seller and Purchaser.

h.      No later than 90 days before Closing, unless such other time is agreed to in writing by Seller and Purchaser, Purchaser shall prepare and submit to the Maryland Department of Environment ("**MDE**") an "Application for Transfer for a Surface Mine Permit" to cause the transfer to Purchaser of Seller's mining permit issued by **MDE** with respect to the Property (the "**Mining Permit**") and a transfer of the haul road permit issued to Seller by the County (the "**Haul Road Permit**"), which transfers shall release Seller from responsibility under the Mining Permit and Haul Road Permit.  Seller, at its own expense, shall review such application, shall provide any customary consent effective as of the Closing, and shall cooperate with Purchaser in connection with the transfer of the permits.  Notwithstanding the foregoing, Seller shall not be required to undertake any action required to satisfy any conditions to transfer as MDE may impose.  Purchaser shall assume all post-closing obligations under the Mining Permit and Haul Road Permit.  Purchaser acknowledges the authorized activities and terms and conditions of the Mining Permit and Haul Road Permit and Seller shall not be responsible or liable for any changes, modifications, expansions, or revisions to the Mining Permit or Haul Permit, including, but not limited to, the authorized activities or terms and conditions of the Mining Permit or Haul Road Permit.  Notwithstanding anything in this Contract to the contrary, Purchaser shall, at Purchaser's sole cost

12

and expense, undertake any actions necessary on its part to accept the transfer of the Mining Permit and Haul Road Permit, including, but not limited to, obtaining an MDE Mining License. At Closing, Purchaser, at its expense, shall obtain replacement surety bonds in its name securing obligations under the Mining Permit and the Haul Road Permit, sufficient in terms and amounts to permit the release of Seller's existing bonds that secure the foregoing permits.

7.    **TITLE**

a.    At Closing, Seller will convey to Purchaser good and marketable and insurable fee simple title to the Property. For the purposes of this Contract, "good and marketable and insurable fee simple title" shall mean fee simple ownership, free of all liens, encumbrances, judgments, covenants, restrictions, easements and rights of way, recorded or unrecorded; subject, however, to those matters (if any) affecting title to the Property which are set forth in the Title Commitment referred to below and accepted or deemed accepted by Purchaser in accordance with Subsection 7(b) (the "**Permitted Exceptions**"). Such title shall also be insurable by a recognized and reputable title insurance company selected by Purchaser which is licensed to do business in the State of Maryland, at then-current standard rates under the standard form of ALTA owner's policy of title insurance in effect on the Closing Date, with the standard printed exceptions deleted and without exception other than for the Permitted Exceptions.

b.    Purchaser shall, at its own expense, order a report of title or a standard ALTA form B commitment for owner's title insurance for the Property (either being referred to herein as the "**Title Commitment**"). If Purchaser, in its sole discretion, finds that any of the exceptions to title set forth in the Title Commitment would interfere with its contemplated development of the Property ("**Objectionable Exceptions**"), Purchaser shall, no later than thirty (30) days of receipt of the Title Commitment but in all events no later than ten (10) business days prior to the expiration of the Study Period deliver written notice to Seller setting forth the Objectionable Exceptions (the "**Objectionable Exceptions Notice**"). If Purchaser fails to deliver an Objectionable Exceptions Notice, Purchaser shall be deemed to have accepted all title exceptions which are reported in the Title Commitment; if Purchaser does give such notice, Purchaser shall be deemed to have accepted all title exceptions reported in the Title Commitment other than the Objectionable Exceptions expressly set forth in the Objectionable Exceptions Notice. After receipt of the Objectionable Exceptions Notice, Seller, in its sole discretion, shall have the option to cure or not to cure any of the Objectionable Exceptions. Within ten (10) business days after receipt of Objectionable Exceptions Notice, Seller shall give Purchaser written notice whether it will or will not cure the Objectionable Exceptions. If Seller does not give Purchaser such notice, within the ten (10) business day period, Seller shall be deemed to have elected not to cure the Objectionable Exceptions. If Seller does elect to cure the Objectionable Exceptions, Seller shall promptly commence and diligently pursue good faith and reasonable efforts to cure the Objectionable Exceptions and the Closing Date, if necessary, shall be extended for the period of time required to allow Seller to cure the Objectionable Exceptions.

c.    Purchaser shall, at its sole option, have until the expiration of the Study Period to procure a Survey (as defined below). If Purchaser, in its sole discretion, finds that any matter disclosed by such Survey would interfere with its contemplated development of the Property ("**Objectionable Survey Exceptions**"), Purchaser shall, no later than thirty (30) days

after receipt of the Survey, but in all events within ten (10) business days prior to expiration of the Study Period, deliver written notice to Seller setting forth such Objectionable Survey Exceptions (the "**Survey Exceptions Notice**"). If Purchaser fails to deliver a Survey Exceptions Notice, Purchaser shall be deemed to have accepted all matters disclosed by the Survey. If Purchaser does give such notice, Purchaser shall be deemed to have accepted all matters shown in the Survey other than the Objectionable Survey Exceptions expressly set forth in the Survey Exceptions Notice. After receipt of the Survey Exceptions Notice, Seller, in its sole discretion, shall have the option to cure or not to cure any of the Objectionable Survey Exceptions. Within ten (10) business days after receipt of Survey Exceptions Notice, Seller shall give Purchaser written notice whether it will or will not cure the Objectionable Survey Exceptions. If Seller does not give Purchaser such notice within such ten (10) business day period, Seller shall be deemed to have elected not to cure the Objectionable Survey Exceptions. If Seller does elect to cure the Objectionable Survey Exceptions, Seller shall promptly commence and diligently pursue good faith and reasonable efforts to cure the Objectionable Survey Exceptions and the Closing Date, if necessary, shall be extended for the period of time required to allow Seller to cure the Objectionable Survey Exceptions.

d.      If Seller shall not have succeeded in curing the Objectionable Exceptions and/or the Objectionable Survey Exceptions despite its good faith and reasonable efforts, within one hundred eighty (180) days from receipt of the applicable notice of such exceptions, or if Seller elects in the first instance not to cure any Objectionable Exceptions or Objectionable Survey Exceptions, Purchaser shall have the right either (i) to purchase the Property subject to the Objectionable Exceptions and/or the Objectionable Survey Exceptions not cured by Seller, or (ii) to terminate this Contract. In the event of termination pursuant to this Subsection 7(d), the Deposit and Extension Fee, if applicable, shall be promptly returned to Purchaser and thereafter the parties shall be relieved of further liability to one another. Notwithstanding the foregoing, due and unpaid taxes, any deeds of trust, mortgages, judgment liens, and other monetary liens against the Property shall be deemed Objectionable Exceptions, whether Purchaser gives written notice of such or not, and shall be removed by Seller at or before the time of Closing.

e.      Upon request by Purchaser, Seller shall, at no cost to Seller, execute such affidavits, certifications, and other instruments as are reasonably required by Purchaser's title insurance company for the elimination of any standard or printed exceptions in Purchaser's final policy of title insurance or to comply with tax reporting or disclosure requirements. The term "**Survey**" shall mean an ALTA/NSPS Land Title Survey of the Property prepared, at Purchaser's expense, by a registered Maryland land surveyor designated by Purchaser.

**8.      REPRESENTATIONS AND WARRANTIES OF SELLER.** Except as set forth in the Disclosure Schedule (Exhibit C to the Contract), and in the Property Documents, Seller represents and warrants to Purchaser as follows:

a.      Seller is a corporation, duly organized and validly existing, licensed under the laws of the State of Maryland, and qualified to do business in the State of Maryland, in good standing.

b.      Subject to the approval of the Bankruptcy Court, Seller has the full right, power and authority to enter into and carry out and perform this Contract, without obtaining any further approvals or consents.  Seller is the owner of the Property in fee simple absolute, and has all right, power and authority to enter into this Contract.  Subject to the approval of the Bankruptcy Court, the entering into this Contract and consummation of this transaction by Seller will not violate any law or governmental regulation, order or decree to which Seller is subject or any agreement or other instrument to which Seller is a party or by which it is bound.

c.      Seller has not made any binding commitments or representations to the applicable governmental authorities, any adjoining or surrounding property owners, any civic association, any utility, or any other person or entity which would in any manner be binding upon Purchaser, except as provided for in this Contract and as set forth on Exhibit "C" and except as provided in the Property Documents, Title Commitment and Survey.

d.      There are no leases, tenancies, licenses, or other rights of occupancy or use for any portion of the Property except for airport tenant leases, which will be terminated prior to Closing.

e.      To the Seller's actual knowledge without any duty or obligation to investigate, there is no threatened in writing or pending annexation, condemnation or other judicial or administrative proceedings against or affecting any part of the Property.

f.      To Seller's actual knowledge without any duty or obligation to investigate (i) there are no "Hazardous Materials" (defined below) located on or within the Property except as routinely used in the ordinary course of business of a commercial airport including aviation gas and jet fuel, (ii) no portion of the Property has been used for the storage, use, generation, treatment or disposal of Hazardous Materials Property except as routinely used in the ordinary course of business of a commercial airport including aviation gas and jet fuel; and (iii) there are no underground fuel tanks located upon the Property, except as provided for in this Contract and as set forth in that Phase I Environmental Site Assessment Report, Hyde Field, prepared by ECS Mid-Atlantic, LLC, dated April 26, 2021, and except as provided in the Property Documents.  The term "**Hazardous Materials**" means any substance, material or waste that is defined or regulated as hazardous or toxic, or is a pollutant or contaminant, by or that gives rise to liability under, any Law, regulation, permit or judicial, administrative or governmental order, including without limitation (A) oil petroleum products and their byproducts, (B) polychlorinated biphenyls ("**PCBs**"), and (C) urea formaldehyde, but expressly excludes asbestos.  Seller makes no representation or warranty with respect to the presence of asbestos.

g.      The Memorandum of Lis Pendens recorded in the Land Records of Prince George's County, Maryland by PD Hyde Field, LLC on March 19, 2019 in Liber 41885, folio 52 has been released.

h.      All of Seller's representations and warranties shall be repeated and true at and as of the Closing Date.  Except as set forth in Section 14 of this Contract, Seller's representations and warranties shall terminate at Closing.  When referring to the "actual

knowledge" of Seller, such phrase shall mean the actual knowledge of Nabil Asterbadi, who is the President of Seller, provided, however that this provision shall not cause Nabil Asterbadi, to be individually liable under this Contract if a breach of a Seller representation and warranty occurs.

9. **COVENANTS OF SELLER.** Seller covenants with Purchaser that from the Effective Date through the Closing Date:

a. Seller shall not bring or allow to be brought onto the Property any Hazardous Materials, except as routinely used in the ordinary course of business of a commercial airport including aviation gas and jet fuel. Seller shall not install or permit the installation of any underground fuel tanks on the Property.

b. Seller shall promptly advise Purchaser in writing of any matters coming to Seller's attention indicating the material inaccuracy of any of Seller's representations or warranties set forth in this Contract and give to Purchaser copies of any written notices which Seller receives from governmental authorities relating to the Property.

c. Seller shall reasonably cooperate with Purchaser, without expenditure of funds, in obtaining the Required Residential Approvals or permits reasonably necessary for the subdivision, development, sitework or other construction of the Property, including executing any and all documentation reasonably required to obtain such approvals or permits.

d. After the Effective Date, Seller shall not voluntarily alter title to the Property or voluntarily seek any zoning changes or other governmental approvals with respect to the Property, except for the zoning changes and government approvals provided for in this Contract, without Purchaser's prior written approval, which approval shall not be unreasonably withheld, conditioned, or delayed.

e. The Property is currently encumbered by a Deed of Trust and Security Agreement securing that loan from Sandy Spring Bank in the maximum aggregate principal amount of $2,660,000, recorded in Liber 37703, folio 452 among the Land Records for the County, as modified by that certain First Modification to Deed of Trust and Security Agreement dated as of March 1, 2021 (recordation pending) (the "**Existing Debt**"). The Seller contemplates the Existing Debt may be refinanced with exit financing. Purchaser acknowledges and agrees that Seller may obtain exit financing and put a lien on the Property in connection with the Bankruptcy Case provided that: i) the exit financing lender is made aware of this Contract; ii) the aggregate principal balance of such financing does not exceed Ten Million Dollars ($10,000,000.00); and iii) such financing shall be satisfied in full at or prior to Closing.

f. Prior to the Closing Date, Seller shall: (i) wind down the air field operations on the Property and terminate all leases and service contracts related to the Property; (ii) remove all aircraft and third-party property from the Property; and (iii) properly remove all fuel, oil, and other regulated chemicals stored at the Property.

16

g.      Seller shall file a motion with the Bankruptcy Court seeking entry of the Bid Procedures Order (as defined below) as provided in Section 20(b) herein.

h.      From and after Effective Date, no additional fill shall be deposited on the Property by Seller or by Seller's agent, employees, contractors or subcontractors, or with Seller's consent.

i.      From and after the Effective Date, Seller shall use commercially reasonable efforts to satisfy the Conditions Precedent to Seller's Obligation to Close in Section 12 of this Contract.

**10.     COVENANTS OF PURCHASER.**  Purchaser covenants with Seller that from and after the Bankruptcy Court's approval of the Second Amended Bankruptcy Plan, Purchaser shall use commercially reasonable efforts to (a) obtain the Required Residential Approvals for the subdivision of the Lots in accordance with the Plans; (b) satisfy all conditions precedent to Purchaser's obligation to Close that are within Purchaser's control; and (c) sell or lease the Non-Residential Property.

**11.     CONDITIONS PRECEDENT TO PURCHASER'S OBLIGATION TO CLOSE:**

a.      The obligation of the Purchaser to purchase the Property and to perform under this Contract shall be subject to satisfaction of the following conditions:

i.      Title to the Property shall be in the condition required pursuant to Section 7 above.

ii.      The representations and warranties made by Seller in this Contract shall be true in all respects as of the Effective Date and as of the Closing Date, and (subject to notice and cure rights) Seller shall have performed all covenants and obligations and complied with all conditions required of Seller under this Contract, including those covenants set forth in Section 9 above.

iii.      The Bankruptcy Court shall have entered the Bid Procedures Order and the Confirmation Order (defined below) (or such other order, or orders) authorizing the sale of the Property to Purchaser in accordance with the terms of this Contract, and no stay of such orders shall be in effect.

b.      In the event any of the conditions set forth in Subsection 11(a) are not satisfied as of the Closing Date, Purchaser shall have the right, in its sole discretion, (i) to terminate this Contract by giving written notice to Seller, (ii) to waive them and proceed to Closing; or (iii) to extend the Outside Closing Date until such conditions have been satisfied or failed.  In the event Purchaser elects to terminate this Contract due to the Seller's default or pursuant to Subsection 11(a), Purchaser shall have the remedies set forth in Section 14 of this Contract.

**12.     CONDITIONS PRECEDENT TO SELLER'S OBLIGATION TO CLOSE:**

a.    The obligation of the Seller to sell the Property and to perform under this Contract shall be subject to satisfaction of the following conditions:

i.    The Bankruptcy Court shall have entered the Bid Procedures Order (defined in Section 20(b)), in form and substance reasonably acceptable to Seller.

ii.    Unless waived in writing by Seller, the Bankruptcy Court shall have entered an order approving the Seller's Second Amended Bankruptcy Plan, in form and substance reasonably acceptable to Seller (the "**Confirmation Order**").

iii.    Unless waived in writing by Seller, the effective date of the Seller's Second Amended Bankruptcy Plan shall have occurred, or shall occur concurrently with the Closing.

iv.    Unless waived in writing by Seller, the Bid Procedures Order and the Confirmation Order shall have become final orders, without reversal or modification, and all rights of appeal of the Bid Procedures Order and the Confirmation Order shall have lapsed.

v.    The representations and warranties made by Purchaser in this Contract shall be true in all respects as of the Effective Date and as of the Closing Date, and (subject to notice and cure rights) Purchaser shall have performed all covenants and obligations and complied with all conditions required of Purchaser under this Contract.

b.    In the event any of the conditions set forth in Subsection 12(a)(i-iv) have failed (e.g., one or more of the required orders have been denied, or been reversed or materially modified), Seller shall have the right, in its sole discretion, either to waive such conditions and proceed to Closing or to terminate this Contract by giving written notice to Purchaser, whereupon, the Escrowed Funds shall be promptly returned to Purchaser and thereupon the Parties shall have no further rights or obligations hereunder, except for such rights and obligations that expressly survive termination of this Contract.  Additionally, in the event Seller elects to terminate this Agreement due to the conditions in Subsection 12(a)(ii-iv) not being met, Purchaser shall be entitled to the Break-Up Fee and Expense Reimbursement.

In the event that any of the conditions set forth in Subsection 12(a)(i-iv) have not been satisfied prior to the Outside Closing Date, but remain susceptible to satisfaction (e.g., an appeal was filed and remains pending), Seller shall have the right, in its sole discretion, either to waive such conditions and proceed to Closing, or to extend the Outside Closing Date; provided, however, that if the conditions set forth in Section 12(a)(i-iv) remain susceptible to satisfaction, Seller shall not be entitled to terminate the Contract based merely on the continued pendency of such conditions.  In the event Seller elects to terminate this Contract due to the conditions in Subsection 12(a)(v) not being met, the Escrowed Fundsshall be released to Seller and thereupon the Parties shall have no further rights or obligations hereunder, except for such rights and obligations that expressly survive termination of this Contract.

**13.    PURCHASER'S DEFAULT.**  If Purchaser fails to tender Closing on the Property on the Closing Date and Seller is ready, willing and able to perform, or if Purchaser shall otherwise breach or default under any of the provisions of this Contract, then, provided Purchaser has received written notice from Seller specifying the nature of the breach or default and Purchaser fails to cure the specified breach or default within ten (10) business days after receipt of the notice, or five (5) days written notice  for failure to close by the Outside Closing Date, Seller may declare a default. Seller's sole remedy for Purchaser's failure to close shall be to receive the Deposit from Escrow Agent, and if the Extension Payment is held in escrow, and not released to Seller, then upon Purchaser's default and notice, as set forth herein, the Escrow Agent shall also deliver the Extension Payment to Seller, as complete and liquidated damages, not as a penalty.  In the event of Purchaser's default that is not timely cured, Seller, at its election, may terminate this Contract by giving written notice to Purchaser, and Seller shall be relieved of further liability hereunder, at law or equity (except for obligations that expressly survive termination of this Contract).  Seller expressly waives all rights of action against Purchaser for specific performance and any other equitable remedies or damages for any matter arising out of or relating to Purchaser's failure to close under this Contract.  Any attendance at Closing by either Party shall not nullify this provision for payment of liquidated damages as Seller's sole remedy.

**14.    SELLER'S DEFAULT.**  In the event Seller shall fail to tender and complete Closing, breaches its representations and warranties, or otherwise fails to perform any of its obligations hereunder, then, provided Seller has received written notice from Purchaser specifying the nature of the breach or default and Seller fails to cure the specified breach or default within ten (10) business days after receipt of the notice, Purchaser shall (i) have the right to seek specific performance of this Contract if the failure is not due to actions required by the Bankruptcy Court or (ii) may, in the alternative, elect to terminate this Contract, whereupon the Escrow Agent shall deliver to Purchaser a complete refund of the Deposit, and thereupon the parties shall have no further rights or obligations hereunder, except as stated in this Section 14 or expressly set forth elsewhere in this Contract.  In the event that: (a)  Seller's representations and warranties prove to be materially false; (b) Closing has occurred; and (c) Purchaser did not know and, with the exercise of reasonable diligence could not have known, of the falsity of such representations and warranties prior to Closing, then Purchaser shall have the right to deduct actual damages (but not consequential damages, lost profits or punitive damages) from payments as may be due in excess of the Initial Payment.  If the failure of the parties to complete Closing is due to a Seller default that occurs after the initial Closing Date, and is not cured, and the default thereby causes a material condition not to be satisfied, or Seller refuses to tender and complete Closing after all conditions thereto have been satisfied or waived, then the Seller shall also deliver to Purchaser a complete refund of the Extension Fee as has been paid by Purchaser, in addition to the complete refund of the Deposit pursuant to subsection (i).  In order to exercise the remedy of specific performance, Purchaser shall file suit within one hundred eighty (180) days after Purchaser's notice of default. Subject to the timely satisfaction of all of the conditions to the Seller's obligations to close as set forth in Section 12(a), above, if specific performance is not available due to Seller intentionally (e.g., not by foreclosure or other similar remedy with respect to exit financing, obligations under the Second Amended Bankruptcy Plan or other financing arrangements) selling or transferring the Property to a party other than Purchaser or Purchaser's designee, Purchaser shall have all rights and remedies against the Seller available to Purchaser at law or in equity.  Other than as expressly

19

stated in this Section 14, Purchaser shall have no other right or remedy, including without limitation claims for actual damages, consequential damages, lost profits or punitive damages. Nothing in this Contract shall provide any basis for a claim by Purchaser against any owner, insider, agent, employee, officer or director of Seller.  Nothing in this Section 14 shall limit Purchaser's rights to recover its costs or break-up fee, if applicable under Section 20 of this Contract.

15. **RISK OF LOSS.**  Until execution and delivery of the deed at Closing, the risk of loss or damage by fire or other casualty is assumed by Seller.

16. **CONDEMNATION.**  If, at or prior to the time of Closing, any portion of the Property shall be condemned or taken pursuant to any governmental or other power of eminent domain, any written notice of taking or condemnation is issued, or any proceedings are instituted by any governmental authority having the power of eminent domain, and any such condemnation or taking has an adverse effect upon Purchaser's intended development of the Property, as reasonably determined by Purchaser in Purchaser's sole and absolute discretion, the Purchaser shall have the right to terminate this Contract by delivering written notice to Seller to that effect within fifteen (15) days after receiving written notice from Seller advising of the condemnation or taking.  In that event, the Deposit and Extension Fee shall be promptly returned to Purchaser and thereafter the Parties shall be relieved of further liability under this Contract, at law or in equity. In the event of condemnation, if Purchaser is entitled to terminate this Contract but elects not to do so or if Purchaser is not entitled to terminate this Contract, Purchaser shall proceed to settlement with an equitable reduction in the Purchase Price equal to the condemnation award paid to Seller. If Purchaser shall proceed to Closing and the portion of the Property to be condemned has not yet been taken and paid for by the condemning authority by the time of Closing then there shall be no abatement in the Purchase Price and Seller shall assign to Purchaser at the time of settlement of all Seller's right to any unpaid condemnation awards, and Seller shall convey the entire Property to Purchaser.  Purchaser shall be entitled to participate jointly with Seller in all negotiations with the concerning authority and any settlement of any pending or threatened condemnation proceedings shall be subject to Purchaser's approval, such approval not to be unreasonably withheld, conditioned, or delayed.  If Seller has knowledge of any pending or threatened condemnation proceedings or actions, Seller will promptly advise Purchaser in writing.

17. **BROKERAGE.**  Seller warrants that it has not dealt with any real estate broker, agent or finder in connection with this transaction other than Fraser Forbes Real Estate Services who will be compensated by Seller pursuant to a separate agreement and that no other right to or claim for commission or other compensation has been created by their actions with respect to this Contract.  Purchaser warrants that it is not represented by a broker in this transaction.  The Parties agree to indemnify and hold each other harmless from any and all liability, loss or damage, including reasonable attorneys' fees and related costs arising out of, or resulting from, any and all brokerage claims arising from breaches of the representations and warranties set forth in this section.

18. **ASSIGNMENT.**

20

(A) Purchaser shall have the right, following conclusion of the Confirmation Hearing, and without Seller's consent, to assign its rights and obligations under this Contract to a single entity, or to designate a single alternative grantee to take title to the Property from Seller prior at Closing, (an "**Assignee**"), provided that such Assignee demonstrates that it: (a) has the financial wherewithal to perform all obligation of Purchaser under this Contract; (b) has experience, or contracts with an organization with experience, in developing land and obtaining entitlements in Prince George's County, Maryland; and (c) that it has a reputation in the community for consummating the development of residential land development.

Assignee must assume all liabilities and obligations of Purchaser under this Contract.  At least ten (10) days prior to the proposed assignment, Purchaser, and upon request by Seller for further information, Purchaser and the proposed Assignee shall provide to Seller information and documentation regarding: the proposed Assignee's financial condition, operating history, development experience, and reputation in the community; the proposed Assignee's relationship to Purchaser; the terms of the proposed transaction as between the Purchaser and the proposed Assignee; and other matters relevant to the proposed assignment.

(B)  Seller shall have the right (a) to assign its rights, but not its obligations, under this Contract, for collateral purposes to secure an obligation of Seller; or (b) to assign its rights and obligations to a successor, plan administrator, trustee, or similar party pursuant to Seller's Second Amended Bankruptcy Plan.

## 19.    DEFERRED WATER AND SEWER CHARGES.

a.    Purchaser shall be responsible, at its sole expense, for constructing the water systems for the residential portion of the Property including all water pipes required by the County in the streets and the physical connection from the water pipes in the streets to each individual lot line and all other facilities related to public water service required by the Washington Suburban Sanitary Commission ("**WSSC**")  (all such pipes, appurtenances, connections, facilities and associated components being herein collectively referred to as "**Water Systems**").  Purchaser shall be responsible, at its sole expense, for constructing all sanitary sewer mains and appurtenances and sewer pipes required by WSSC in the streets, the physical sewer connection from the sewer pipes in the streets to each individual lot line and all other facilities relating to public sanitary sewer services required by WSSC (all of such pipes, appurtenances, connections and associated components being herein referred to collectively as the "**Sewer Systems**").

b.    Purchaser shall retain all rights to charge a fee or assessment against the Lots that purports to reimburse all or part of the cost of installing all or part of the Water Systems installed in and for the Lots and the Sewer Systems installed in and for the Lots, i.e., "front foot" water and sewer charges on the Property (collectively, hereinafter the "**Water and Sewer Charges**"), including all rights to impose a private utility declaration on the Lots pursuant to a Deferred Water and Sewer Charges Declaration (the "**Declaration**") which will impose Deferred Water and Sewer Charges ("**DWSC**") on each Lot, which DWSC shall be a lien on the Lots and commercially reasonable in all events.

## 20.    BANKRUPTCY PROVISIONS.

a.      Subject to and conditioned upon the Purchaser delivering the Notice of Intent to Proceed prior to the expiration of the Study Period, and timely posting the Deposit, if the Property is sold to someone other than Purchaser or Purchaser's permitted assign pursuant to an order of the Bankruptcy Court (an "**Alternative Transaction**"), and closing occurs with respect to such Alternative Transaction, then, in addition to the return of the Deposit and the Extension Fee if applicable, Purchaser shall be entitled to receive reimbursement of its actual third party fees and costs incurred in connection with this Contract and the transaction contemplated hereby, including without limitation, engineering and attorneys' fees, plus an amount equal to Six Hundred Thousand Dollars ($600,000.00) (the "**Break-Up Fee**"). Additionally, in the event that the Bankruptcy Court fails to enter the Bid Procedures Order (defined below), the Purchaser shall be entitled to receive reimbursement of its actual third-party fees and costs incurred in connection with this Contract and the transaction contemplated hereby, including without limitation, engineering and attorneys' fees (the "**Expense Reimbursement**").

b.      Within ten (10) business days following the Effective Date, Seller shall file a motion seeking entry of an order (the "**Bid Procedures Order**") seeking authorization by, and approval of, the Bankruptcy Court for: (a) the reimbursement and Break-Up Fee described herein; (b) preliminary approval of this Contract; (c) conveyance of the Property to Purchaser at Closing (upon the satisfaction or waiver of conditions in this Contract) free and clear of all liens, deeds of trust, mechanics' and materialmen's liens, judgment liens, security interests, creditor claims, encumbrances and interests (collectively, the "**Liens**"); (d) reasonable and customary bid procedures (the "**Bid Procedures**"); and (e) finding that Purchaser is a "good faith" purchaser under §363(m) of the Bankruptcy Code and entitled to all of the protections of a good faith purchaser. In addition to other customary terms and conditions, the Seller shall seek approval of Bid Procedures that are substantially the same as the Bid Procedures previously approved by the Bankruptcy Court for JP Land Holdings, LLC at DE 235, except as is reasonably necessary to conform to the terms, timing and conditions set forth in this Contract. In addition, in the Bid Procedures, the Purchaser: (i) shall be identified as the stalking horse purchaser; (ii) shall be deemed a Qualified Bidder without the need to take any further action; (iii) may submit additional higher bids, (vi) shall permit Purchaser to participate in any auction or other sale process for the sale of the Property; and (v) shall provide that Purchaser shall be the successful bidder if it matches the terms of any competing proposal. Seller further shall request that the Bid Procedures require any competing purchaser to submit a redline or summary of all material differences between this Contract and the terms of the competing bidder's proposed contract. If the Bankruptcy Court does not enter the Bid Procedures Order, Purchaser may terminate this Contract by declining to deliver the Notice of Intent to Proceed.

c.      No later than 21 days following the Effective Date, Seller shall file a second amended bankruptcy plan (the "**Second Amended Bankruptcy Plan**") under Chapter 11 of the Bankruptcy Code and shall diligently seek confirmation of the Second Amended Bankruptcy Plan. The Second Amended Bankruptcy Plan shall include terms and provisions that are consistent with this Contract, subject to the possibility of a higher and better bid for the sale of the Property to a third party under the Bid Procedures Order.

21.    <u>**MISCELLANEOUS.**</u>

a.    Purchaser reserves the right to waive any of the terms and conditions of this Contract for its benefit, including, without limitation, conditions precedent to Closing, title, and warranty provisions, and to purchase the Property in accordance with the terms and conditions of this Contract which have not been so waived.  Any and all such waiver(s) must be in writing signed by Purchaser.

b.    All notices and other communications hereunder shall be in writing, and be deemed to have been received (i) immediately upon personal delivery or confirmed fax receipt, (ii) one (1) business day after being sent by confirmed overnight mail, or (iii) three (3) days after mailing, if mailed by certified mail, return receipt requested, postage prepaid:

<table>
<tr><td>to Seller:</td><td>Zachair Ltd.<br>Attn: Dr. Nabil J. Asterbadi<br>2726 Chain Bridge Road, NW<br>Washington, DC  20016<br>Email:  nasterbadi@aol.com</td></tr>
<tr><td>with a copy to:</td><td>Whiteford, Taylor & Preston, LLP<br>Attn: Bradford F. Englander, Esq.<br>3190 Fairview Park Drive, Suite 800<br>Falls Church, VA 22042<br>Email:  benglander@wtplaw.com</td></tr>
<tr><td>to Purchaser:</td><td>NVR, Inc.<br>Attn:  Patrick Donahue<br>Vice President, Regional Land Operations<br>656 Quince Orchard Road, Suite 500<br>Gaithersburg, Maryland 20878<br>E-mail:  pdonahue@nvrinc.com<br>E-mail:  jmcmahon@nvrinc.com<br>E-Mail:  rborleis@nvrinc.com</td></tr>
<tr><td>with a copy to:</td><td>Watt, Tieder, Hoffar & Fitzgerald, LLP<br>Attn:  Jennifer L. Kneeland, Esq.<br>1765 Greensboro Station Place, Suite 1000<br>McLean, Virginia 22102<br>E-mail:  jkneeland@watttieder.com</td></tr>
</table>

The parties shall be responsible for notifying each other of any change of address or facsimile number.

c.    This Contract contains the entire agreement between the parties regarding the subject matter of this Contract.  There are no promises, agreements, conditions, undertakings, warranties or representations, oral or written, express or implied, between them, relating to this

subject matter, other than by an agreement in writing signed by all the parties or their respective successors in interest. This Contract may be executed in several counterparts, each of which shall be an original, but all of which shall constitute one and the same instrument. The Recitals set forth on pages 1-2 are incorporated in and made a part of this Contract. The terms of this Contract are mutually agreed to be clear and unambiguous, shall be considered the workmanship of all the parties and shall not be construed against the drafting party. Other than the sections of this Contract referenced in the following sentence, the terms and provisions of this Contract shall not survive Closing and otherwise shall be merged with the deed executed and delivered at Closing. Surviving sections are: Section 2; Section 5; Section 10; Section 18; Section 19; and Section 21.

d. If any terms, covenants or condition of this Contract or its application to any person or circumstances shall be invalid or unenforceable, the remainder of this Contract, or the application of such term or provision to persons or circumstances other than those to which it is held invalid or unenforceable, shall not be affected, unless the result would frustrate the purpose of this Contract.

e. All questions with respect to the construction of this Contract, shall be determined in accordance with the laws of the jurisdiction in which the Property is located, without regard to conflict of law rules. Time is hereby declared to be of the essence in the performance of each of party's obligations hereunder.

f. If any date upon which action is required under this Contract shall be a Saturday, Sunday or legal holiday, the date for such action shall be extended to the first regular business day after such date which is not a Saturday, Sunday or legal holiday.

g. In the event of any dispute or controversy arising out of or relating to this Contract or the parties' compliance therewith, it is agreed that the exclusive forum for determination of any and all such disputes or controversies shall be the Bankruptcy Court. The Parties hereby consent to the Bankruptcy Court hearing and determining all factual and legal disputes arising under or in connection with this Contract, without requiring the Bankruptcy Court to prepare or submit proposed findings or conclusions to the United States District Court. In the event that the Bankruptcy Court lacks subject matter jurisdiction to hear or determine any dispute, the exclusive forum for determination of any and all such disputes or controversies shall be the appropriate state or federal trial court for the jurisdiction in which the Property is located. Moreover, in addition to any other relief to which it may be entitled, the prevailing party shall be entitled to recover its attorneys' fees and costs incurred in regard to such dispute or controversy. **THE PARTIES WAIVE THEIR RESPECTIVE RIGHTS OF TRIAL BY JURY**.

h. All of the covenants, conditions and obligations contained in this Contract shall be binding upon and inure to the benefit of the respective heirs, legal representatives, successors and assigns of Seller and Purchaser. Subject to the provisions of Section 18 of this Contract, upon any assignment of this Contract by Purchaser, and that assignee's express assumption of Purchaser's obligations under this Contract the term "Purchaser" shall mean and refer to the assignee only and, except as expressly provided in this Contract, the assignor Purchaser

24

shall be released from any further obligation under this Contract, unless and until (i) Purchaser resumes its status as contract purchaser under the terms of such assignment, or (ii) the assignment otherwise becomes null and void pursuant to its terms; in either such event Purchaser shall resume its status as the sole Purchaser, assignment notwithstanding.

22. **RULE AGAINST PERPETUITIES.**  Solely for purposes of avoiding the rule against perpetuities, and not to modify any provision of this Contract, Closing shall take place no later than twenty one (21) years from the Contract Effective Date.

23. **FORCE MAJEURE.**  If either party hereto shall be delayed, hindered, adversely affected or prevented from the performance of any act required hereunder, by reason of labor disputes of any kind, inability to procure materials or unusual delay in deliveries, delays or actions caused by government authority, government refusal to issue any necessary permits, delays caused by utility service providers, war, acts of terrorism, civil commotion or other casualty, damage caused by fire, earthquake, flood, hurricane or severe weather, disruptions resulting from a health crisis, such as an epidemic or pandemic, any form of act of God, or any other events of a similar nature not the fault of the party delayed in performing work or doing acts required under the terms of this Contract, whether or not the underlying event is foreseeable at the time of execution of this Contract, then performance of such act shall be excused for the period of the delay, and thereafter the period for the performance of any such act shall be extended for the lesser of (i) a period equivalent to the period of such delay, or (ii) twenty-four (24) months.

Beginning with the expiration of the extension period set forth above, if the required performance remains unperformed or assignment remains unavailable, either party may either waive the foregoing in writing, or either party may at its option either continue to wait for the performance or declare this Contract null and void and in such event the Deposit shall be returned to Purchaser within ten (10) days and there shall be no further liability on the part of either party to the other.

24. **EFFECTIVE DATE.**  This Contract shall become effective on the date last signed by Seller and Purchaser; provided that Purchaser's signature is only valid upon execution of the Contract by a Senior Vice President and two other officers of the Purchaser ("**Effective Date**").

The parties have signed, sealed and delivered this Contract as of the dates written below each signature.

**[SIGNATURES BEGIN ON FOLLOWING PAGE]**

**SELLER:**

ZACHAIR LTD., a Maryland corporation

By: _Dr. Nabil J. Asterbadi_
Name: Dr. Nabil J. Asterbadi
Title: President
Date: _6/1/2022_


**PURCHASER:**

NVR, INC., a Virginia corporation

By: _Brett Hetrick_
Name: Brett Hetrick
Title: Senior Vice President, Operations
Date: _5/31/2022_


By: _Ry. Bor_
Name: Ryan Borleis
Title: Vice President/Regional Manager
Date: _5/31/2022_


By: _Patrick Donahue_
Name: Patrick Donahue
Title: Vice President, Regional Land Operations
Date: _5/31/2022_


By: _Matthew McHale_
Name: Matthew McHale
Title: Vice President/Division Manager
Date: _5/31/2022_

26

**ESCROW AGENT:**

WATT, TIEDER, HOFFAR & FITZGERALD, LLP

By: _Jennifer L. Kneeland, Esq._

Name: _____

Title: _Senior Partner_

Date: _5/31/2022_

EXHIBIT "A"

## PROPERTY DESCRIPTION

Parcel I - containing 285.101 acres of land, more or less. Saving and excepting property conveyed by Deed recorded in Liber 3562, Folio 941. Tax Account No. 05-0328708 - 4401 Steed Road.

Parcel II - containing 16.180 acres of land, more or less. Tax Account No. 05-0327833 - Piscataway Road

Parcel B - containing 64.153 acres of land, more or less. Saving and excepting therefrom all that portion of the within property that lies in the land now known as Piscataway Road. Tax Account No. 05-0360651 - 10651 Piscataway Road

Parcel C - containing 58.0204 acres of land, more or less. Tax Account No. 09-0865121 - Piscataway Road

All Four (4) Parcels lying and being in the Piscataway District of Prince George's County, Maryland. Said Four (4) Parcels being described in the Deed recorded in Liber 10110, folio 106 as follows:

Parcel I

Being part of the land conveyed by Arthur C. Hyde, unmarried to Hyde Field, Incorporated by deed dated September 4, 1941 and recorded in Liber 620 at folio 276 among the Land Records of Prince George's County, Maryland and being more particularly described as follows:

BEGINNING for the same at an iron pipe set at a point where the Northwesterly right of way line of 40 foot wide Piscataway Road (Maryland State Route No. 223) intersects the 2nd or North 58°37' West 219-1/5 perch line of the 145 3/4 acre tract described as Tract 2 in Liber 620 at folio 276, thence leaving Piscataway Road and running with part of said 2nd line.

1. North 61°42'20" West 3575.76 feet to a corner fence post found at the end thereof, said corner fence post also being the end of the 2nd line of the 82 1/4 acre tract described in a Deed from Gussie B. Sansbury, Widow to Hency C. Padgett et ux. dated July 14, 1939 and recorded in Liber 532 at folio 275, thence running with the 3rd line of Tract 2 as described in Liber 620 at folio 276, as now surveyed,

2. North 45°40'00" East 1143.18 feet to an iron pipe set at the end thereof, thence running with the 4th line of Tract 2 as described in Liber 620 at folio 276 and also running with part of the 5th line of Tract 1 as described therein

3. North 47°40'00" East 2359.87 feet to an iron pipe set at a point where said 5[th] line is intersected by the Southwesterly right of way line of 50 foot wide Steed Road as shown on

Prince George's County R/W Plat No. 398, passing through the centerline of a 18 inch diameter cedar tree found at 2345.17 feet on line, said pipe set being opposite Centerline Station 32+26:95 and distant South 29°18'37" West 25.00 feet measured radially therefrom, thence running with the Southwesterly right of way line of 50 foot wide Steed Road per R/W Plat Nos. 398 and 397 by a curve to the left whose radius and central angle are 1457.40 feet and 08°38'24" respectively, whose long chord is

4. South 65°00'35" East 219.56 feet for an arc distance of 219.77 feet to a concrete monument found at a point of tangency opposite Centerline State 30+10.95. thence running with the Southwesterly right of way line of 50 foot wide Steed Road as per R/W Plat Nos. 397 and 396, the following four courses and distances:

5. South 69°19'47" East 624.07 feet to a point of curve, thence running by a curve to the right whose radius and central angle are 1407.40 feet and 10°36'50" respectively, whose long chord is

6. South 64°01'22" East 260.34 feet for an arc distance of 260.71 feet to a point of tangency, thence running

7. South 58°57' East 1849.03 feet to an iron pipe set at a point of curve opposite Centerline Station 2+73.29, thence running by a curve to the right whose radius and central angle are 1248.24 feet and 09°11'40" respectively, whose long chord is

8. South 54°07'07" East 200.09 feet for an arc distance of 200.31 feet to a point in the Northwesterly right of way line of Piscataway Road, as said Road was widened by virtue of Maryland State Roads Commission R/W Plat No. 33848, thence running with the said side of Piscataway Road, as widened by R/W Plat 33848, the following four courses and distances:

9. South 40°45'10" West 5.62 feet to an iron pipe set, thence running

10. South 04°17'51" East 40.31 feet to an iron pipe set, thence running

11. South 41°42'27" West 114.00 feet to an iron pipe set, thence running

12. South 20°54'03" West 53.49 feet to an iron pipe set in the Northwesterly right of way line of 40 foot wide Piscataway Road, as said Road is now being used, thence running with the Northwesterly right of way line of Piscataway Road (40 feet wide) as now being used, the following eight courses and distances:

13. South 41°32'53" West 769.87 feet to a point, thence running

14. South 40°55'14" West 455.15 feet to a point, thence running

15. South 41°23'14" West 321.88 feet to a point, thence running

16. South 41°38'13" West 136.33 feet to a point, thence running

17. South 41°18'21" West 408.52 feet to a point, thence running

18. South 40°52'31" West 309.66 feet to a point, thence running

19. South 41°15'00" West 433.06 feet to a point, thence running

20. South 41°24'18" West 838.32 feet to the beginning, containing 285.101 acres, more or less.

(Tax Account No. 05-0328708 - 4401 Steed Road)

## PARCEL II

Being part of the land conveyed as Parcel No. 2 in a Deed from Helen R. Houser, et al, to Nora C. Thorne dated February 25, 1948 and recorded in Liber 1016 at folio 413 among the Land Records of Prince George's County, Maryland and being more particularly described as follows:

BEGINNING for the same at an iron pipe set at a point where the Northwesterly side of 40 foot wide Piscataway Road (Maryland State Route No. 223) intersects the 6th or South 55°15' East 1581 foot line of the 16.52 acre tract conveyed as Parcel No. 2 in Liber 1016 at folio 413, thence running with the Northwesterly side of 40 foot wide Piscataway Road, parallel to and 20 feet from the existing centerline thereof

1. South 41°23'53" West 483.82 feet to an iron pipe set at a point where said right of way line intersects the 2nd line of said 16.52 acre tract, thence leaving Piscataway Road and running with part of said 2nd line

2. North 54°55'00" West 375.35 feet to an iron pipe set, thence running with the 3rd, 4th and 5th lines of the 16.52 acre tract conveyed as Parcel No. 2 in Liber 1016 at folio 413, the following three courses and distances:

3. South 35°05'00" West 100.00 feet to an iron pipe set, thence running

4. North 55°15'00" West 1120.00 feet to an iron pipe set, thence running

5. North 35°05'00" East 403.05 feet to an iron pipe set in the 2nd or North 58°37' West 219-1/5 perch line of the 145 3/4 acre tract conveyed as Tract 2 in a Deed to Arthur C. Hyde dated December 19, 1940 and recorded in Liber 609 at folio 42, thence running reversely with part of said 2nd line

6. South 61°42'20" East 1559.48 feet to the beginning, containing 16.180 acres of land more or less.

(Tax Account No. 05-0327833 - Piscataway Road)

Parcel B

BEING all of the land conveyed by Henry C. Padgett et ux. to Henry Cecil Padgett, Jr. et ux. by Deed dated November 14, 1955 and recorded in Liber 1929 at folio 146 and intended to be all of the land conveyed by Henry C. Padgett, Jr. personal representative of the estate of Henry C. Padgett To Henry C. Padgett, Jr. and Robert H. Padgett by Deed dated September 5, 1985 and recorded in Liber 6189 at folio 286 among the Land Records of Prince George's County, Maryland; both tracts being more particularly described as one tract as follows:

BEGINNING for the same at an iron pipe set in the North Westerly right of way line of 40 foot wide Piscataway Road at the end of the 1st line of a 16.18 acre tract conveyed by Arthur C. Hyde to W. A. Albright Investments, Inc. by Deed dated November 13, 1985 and recorded in Liber 6215 at folio 538, thence running with Piscataway Road (1) South 41°19'43" West 619.11' to a pipe set at the beginning point of the 82.25 acre tract described in Liber 6189 at folio 286, thence leaving Piscataway Road and running reversely with the 6th, 5th, 4th and 3rd lines of said 82.25 acre tract, the following four courses and distances: (2) North 50°59'08" West 682.45' to a pipe set, thence running (3) North 63°38'20' West 2335.56' to a fence post at an angle point in an existing fence, thence running (4) North 27°42'10" West 653.40' to a flint stone found, then running (5) North 46°42'27" East 696.48' to an iron pipe found at the end of the 1st line of the 285.101 acre tract conveyed as Parcel 1 in Liber 6215 at folio 538, thence running reversely with part of said 1st line (6) South 61°42'20" East 2016.38' to a pipe found at the end of the 5th line of the 16.180 acre tract conveyed as Parcel 2 in Liber 6215 at folio 538, thence running reversely with the 5th, 4th, 3rd and 2nd lines of said 16.180' acre tract, the following four courses and distances: (7) South 35°03'00" West 403.05' to a pipe found, thence running (8) South 55°15'00" East 1120.00" to a pipe found, thence running (9) North 35°05'00" East 100.00' to an iron pipe found, thence running (10) South 54°55'00" East 375.35' to the beginning.

Contaning  64.153 acres of land more or less. Saving and excepting therefrom however, all that portion of the within property that lies in the land now known as Piscataway Road.

(Tax Account No. 05-0360651 - 10651 Piscataway Road)

Parcel C

Being part of the 59.673 acre tract described as Parcel No. 2 in a Deed dated January 25, 1965
from Griffith S. Oursler et ux. to Clinton Manor, Inc. and duly recorded in Liber 3093 at folio 94
among the Land Records of Prince George's County, Maryland; and being more particularly
described as follows:

Beginning for the same at an iron pipe set on the Northerly side of Piscataway Road (MD Route
223) at a point where the Northerly right of way line of Piscataway Road (80 feet wide)
intersects the 9th line of Parcel No. 2, Liber 3098 at folio 94, thence running with Piscataway
Road per right of way Plat No. 33848, the following two courses and distances: (1) South
55°33'25" west 519.37' to a pipe set at an angle point opposite base line station No. 141+10.602
and distant 40' therefrom, thence running (2) South 55°14'09" West 105.51' to a pipe set at a flare
connection leading to Steed. Road (50' wide), thence running with said flare connection (3)
North 80°40'25" West 44.55' to a pipe set in the Westerly right of way line of 50 foot wide Steed
Road, thence running with said side of Steed Road, the following three courses and distances: (4)
South 53°19'34" West 4.41' to a pipe set, thence running by a curve to the left whose radius and
central angle are 1298.24' and 09°09'46" respectively, whose long chord is (5) North 40°36'17"
West 207.39' for an arc distance of 207.61' to a pipe set at a point of tangency, thence running (6)
North 45°11'15" West 1715.96' to a pipe set opposite centerline station No. 19+89.25 as per
Prince George's County R/W Plat #397, thence leaving Steed Road and running with the 6th line
of Parcel No. 2 as per Liber 3098 at Plat 94 (7) North 42°06'20" East 551.58' to a pipe set at the
end thereof, thence running with the 7th line of said Parcel No. 2 (8) North 12°23'40" West
900.30' to a "PK" nail set in a fence post at the end of said 7th line, thence running with part of
the 8th line of Parcel No. 2 as per Liber 3098 at folio 94 (9) North 80°22'20" East 381.10' to a
pipe set at the end of the 5th or North 64°19'28" West 278.52 foot line of the 1,298 acre tract
conveyed to Potomac Electric Power Company by Deed dated March 25, 1965 and recorded in
Liber 3122 at folio 122, the following two courses and distances: (10) South 50°46'51" East
278.54' to a pipe set and (11) South 61°17'31" East 242.47' to a pipe set in the 9th line of Parcel
No. 2 as per Liber 3098 at plat 94, distant 372.11' from the beginning of said 9th line, thence
running with part of the 9th line of Parcel No. 2 of Liber 3098 at folio 94, (12) South 24°12'40"
East 2277.55' to the beginning of the land now conveyed. Containing 58.0204 acres of land,
more or less.

Subject to the Right of Way Agreement between Barry B. Early, et ux. and Potomac Electric
Power Company in Liber 1293 at folio 2550

And subject to the "Limit of Denial of Vehicular Access" as shown on state roads commission
R/W Plat No. 33848.

(Tax Account No. 09-0865121 - Piscataway Road)

Exhibit B
Permits

| Permit | Identification Number | Expiration |
|---|---|---|
| PG County Haul Road Permit | 12963-2009-00 | 9/24/2022 |
| FCC Radio Station License | WRMI580 | 4/14/2031 |
| MDE License to Surface Mine | 21-SL-0725 | 12/31/2022 |
| MDE Surface Mine Permit | 91-SP-0385 | 3/31/2026 |
| MAA Airport Operating License | #135 | 9/30/2022 |
| MDE Stormwater Pollution Prevention Plan, General Discharge Permit 12SW | 12SR3455 | |
| MDE General Discharge Permit for Stormwater Associated with Industrial Activity | 12SR3455 | |

Exhibit C
Disclosure Schedule

All matters appearing of record in any of the following cases filed in the Prince George's County Circuit Court:

CAL97-20084

CAL04-16402

CAL09-29788

CAL09-31386

CAL09-32017

CAL13-02398

CAL13-09817

CAL13-23483

CAL13-23484

CAL13-24972

CAL14-07971

CAL18-42893

Exhibit D
Purchaser's Certificate of Insurance

## CERTIFICATE OF LIABILITY INSURANCE

DATE (MM/DD/YYYY): 12/23/2021

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must have ADDITIONAL INSURED provisions or be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: |
|---|---|
| Marsh USA Inc. 1717 Arch Street Philadelphia, PA 19103-2797 | PHONE (A/C, No, Ext): / FAX (A/C, No): / E-MAIL ADDRESS: |

CN101288850-NVR-GAWUX-22-23

| | INSURER(S) AFFORDING COVERAGE | NAIC # |
|---|---|---|
| | INSURER A : Liberty Mutual Fire Insurance Company | 23035 |
| INSURED NVR, Inc. 11700 Plaza America Drive, Suite 500 Reston, VA 20190-4792 | INSURER B : Liberty Insurance Corporation | 42404 |
| | INSURER C : Allied World Assurance Company (U.S.) Inc. | 19489 |
| | INSURER D : | |
| | INSURER E : | |
| | INSURER F : | |

| COVERAGES | CERTIFICATE NUMBER: CLE-006229948-10 | REVISION NUMBER: 4 |
|---|---|---|

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | X COMMERCIAL GENERAL LIABILITY CLAIMS-MADE [X] OCCUR X $500,000 SIR X $1,000,000 SIR NY ONLY GEN'L AGGREGATE LIMIT APPLIES PER: POLICY [X] PRO-JECT [ ] LOC OTHER: | | | EB2-631-510577-012 "GL - PREMISES" | 01/01/2022 | 01/01/2023 | EACH OCCURRENCE DAMAGE TO RENTED PREMISES (Ea occurrence) MED EXP (Any one person) PERSONAL & ADV INJURY GENERAL AGGREGATE PRODUCTS - COMP/OP AGG | $ 1,000,000 $ 100,000 $ 5,000 $ 1,000,000 $ 2,000,000 $ |
| A | AUTOMOBILE LIABILITY X ANY AUTO OWNED AUTOS ONLY SCHEDULED AUTOS HIRED AUTOS ONLY NON-OWNED AUTOS ONLY | | | AS2-631-510577-042 | 01/01/2022 | 01/01/2023 | COMBINED SINGLE LIMIT (Ea accident) BODILY INJURY (Per person) BODILY INJURY (Per accident) PROPERTY DAMAGE (Per accident) | $ 2,000,000 $ $ $ $ |
| C | X UMBRELLA LIAB X OCCUR EXCESS LIAB CLAIMS-MADE DED RETENTION $ | | | 03062342 | 01/01/2022 | 01/01/2023 | EACH OCCURRENCE AGGREGATE | $ 10,000,000 $ 10,000,000 $ |
| B | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY Y/N ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? [N] (Mandatory in NH) If yes, describe under DESCRIPTION OF OPERATIONS below | | N/A | WA7-63D-510577-032 | 01/01/2022 | 01/01/2023 | X PER STATUTE OTH-ER E.L. EACH ACCIDENT E.L. DISEASE - EA EMPLOYEE E.L. DISEASE - POLICY LIMIT | $ 1,000,000 $ 1,000,000 $ 1,000,000 |
| A | Products Liability Retention $1,000,000 | | | EB2-631-510577-022 Products/Comp Ops | 01/01/2022 | 01/01/2023 | Occurrence Aggregate | $ 1,000,000 2,000,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
Evidence of coverage.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| NVR, Inc. 11700 Plaza America Drive, Ste 500 Reston, VA 20190 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. |
| | AUTHORIZED REPRESENTATIVE *Marsh USA Inc.* |

© 1988-2016 ACORD CORPORATION. All rights reserved.

ACORD 25 (2016/03)       The ACORD name and logo are registered marks of ACORD