**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MARYLAND**
**Greenbelt Division**

| | | |
|---|---|---|
| **In Re:** | : | |
| | : | |
| **ZACHAIR, LTD.,** | : | **Case No.  20-10691-TJC** |
| | : | **Chapter   11** |
| **Debtor(s)** | : | |
| | : | |

## [PROPOSED] DISCLOSURE STATEMENT OF
## <u>SANDY SPRING BANK</u>

Pursuant to the provisions of § 1125(b) of the United States Bankruptcy Code, Sandy Spring Bank ("SSB") respectfully submits this Disclosure Statement in connection with its proposed Plan of Reorganization filed herein.

## <u>INTRODUCTORY STATEMENT OF</u>
## <u>PLAN PROPONENT SANDY SPRING BANK</u>

Sandy Spring  Bank ("SSB") respectfully submits this Disclosure Statement in connection with its proposed Plan of Reorganization (the "SSB Plan") filed herein. The SSB Plan is filed as an alternative to the 2nd Amended Plan of Reorganization (the "Debtor Plan") filed by the Debtor, Zachair, Ltd. ("Debtor"). This introductory statement outlines SSB's concerns with respect to the Debtor Plan and its reasons for filing the SSB Plan to compete with the Debtor Plan.

The Debtor filed this Chapter 11 case on January 17, 2020 (the "Petition Date") and has been operating in Chapter 11 for almost two and a half years while engaging in ongoing efforts to sell the real estate comprising its' principal assets. After almost thirty months of post-petition efforts, the Debtor has had one contract purchaser terminate its contract and walk away from a proposed sale, and now presents the Debtor Plan incorporating a second proposed contract for sale of the Debtor's Property that represents little more than a thinly secured option contract. The NVR Contract[1] currently relied upon as the source of funding for the Debtor Plan essentially provides the proposed purchaser NVR, Inc. ("NVR") with up to fifteen months from a proposed Court approval of the Debtor Plan within which to determine whether or not it will close under the proposed contract. Depending on the timing of potential confirmation hearings herein, the terms of the NVR Contract provide that closing can be delayed till as late as the spring of 2024. The security deposit of NVR required during this time is grossly inadequate to account and pay for accruing real estate taxes, interest carry and professional fees expected to accrue over this time. When combined with the post-petition increase in secured claims (comprised of SSB interest and real estate taxes), as well as millions of dollars in professional fees already approved by the Court, SSB contends that the NVR Contract and the Debtor Plan place an unreasonable continuing risk and financial burden upon the shoulders of creditors herein.

During the two and a half year pendency of this case, the Debtor has been unable to make payment of accruing real estate taxes, interest payments on the SSB secured claims, and/or

---

[1] Defined terms shall have the meaning identified in the SSB Plan unless otherwise indicated herein.

1

professional fees incurred by the Debtor and that have been approved for payment through September of 2021 in amounts exceeding $2,250,000.00. Real estate taxes and post-petition accrued interest on SSB's secured claims are estimated to exceed $500,000.00 as of the date of filing of the SSB Plan. The amount of additional professional fees accrued through the current date is unknown, but SSB estimates that total (and unpaid) professional fees now exceed the sum of three million dollars ($3,000,000.00). The result is that after two and a half years in Chapter 11, general unsecured creditors of this estate are at least $3.5 million dollars further away from a sale of the Property resulting in payment on their claims. SSB submits that the prospect of another fifteen to twenty-two months of delay and additional accruals is not warranted given the lack of certainty of closing under the NVR Contract.

Under the Debtor's proposed 2nd Amended Plan, the Debtor proposes that claims and interests will be paid from proceeds of sale of the Debtor's Property under the NVR Contract. From SSB's perspective, the NVR Contract is little more than an approximately eighteen month option contract. Under its' current terms, the deadline for closing under the NVR Contract is twelve (12) months from the date of an order confirming the Debtor's 2nd Amended Plan. NVR can "purchase" an extension of an additional 180 days, or six months, by submitting an agreed extension fee of $250,000.00. All told, NVR can defer a final closing to sometime as late as early 2024, all the while subjecting the Property (and creditors' claims herein) to additional accruals of unpaid real estate taxes, secured interest, and continuing professional fees. Neither the initial deposit of $500,000.00, nor the supplemental $250,000.00 extension fee under the NVR Contract will be sufficient to overcome these additional accruals. The result could very well be that general creditors of this estate find themselves in late 2023 or early 2024 even further behind a growing balance of secured claims and administrative expenses, combined with a contraction in the residential real estate market that will not portend favorably towards an ultimate closing under the NVR Contract. Simply put, the lack of non-refundable deposits sufficient to fund the actual costs of time requested by NVR with respect to a closing render the NVR Contract a substantial and additional financial risk for creditors herein. Essentially the Debtor's Plan requires the creditors to wager that market conditions in the winter of 2023-2024 will be favorable. Only if they are favorable will NVR close, and if unfavorable the creditors will be worse off, and trying to regroup in an unfavorable market.

The SSB Plan also contemplates a sale of the Debtor's Property. However, rather than a multi-year process that permits a prospective purchaser to seek enhanced entitlements, the SSB Plan contemplates engaging a Plan Trustee to conduct an immediate marketing and sale of the Property. Under the SSB Plan, it is anticipated that a Plan Trustee will promptly commence marketing of the Property for a non-contingent, as-is, as zoned, but not entitled value. It is hoped that a marketing of the property in "as-is" condition would result in a sale that would provide for closing in not more than six months. SSB acknowledges that the sale price of the Property without any entitlements will be less than the maximum value potentially recoverable under the NVR Contract. SSB believes that the certainty of a prompt sale and the curtailment of additional accruals of secured debt, taxes and administrative expenses, combine to make this approach more desirable and beneficial to the potential payment of claims in this case, particularly in the current difficult and unstable macroeconomic conditions.

## I.      **PURPOSE**

The purpose of this Disclosure Statement ("Disclosure Statement") is to provide each holder of a Claim against the Debtor with adequate information about the Debtor and SSB's Plan of Reorganization ("Plan") so that each holder of a Claim may make an informed decision about whether to accept or reject the Plan. This Disclosure Statement summarizes the Plan's contents and provides information relating to the Plan and the process the Bankruptcy Court will follow in determining whether to confirm the Plan.

All holders of Claims should carefully review both the Disclosure Statement and the Plan before voting to accept or reject the Plan. Holders of Claims should not rely solely on the Disclosure Statement but should also read the Plan. The Plan provisions will control if there are any inconsistencies between the Plan and the Disclosure Statement.

Definitions: Unless otherwise indicated, capitalized terms appearing in this Disclosure Statement shall have the meanings ascribed to them under Article I (Definitions), § 1.2 of the Plan, a copy of which is attached to this Disclosure Statement as Exhibit 1.

## II.      **SUMMARY OF THE PLAN AND ANTICIPATED DISTRIBUTIONS**

THE FOLLOWING IS A BRIEF SUMMARY OF THE PLAN AND THE TREATMENT OF CREDITORS UNDER THE PLAN. CREDITORS AND OTHER PARTIES IN INTEREST ARE URGED TO REVIEW THE MORE DETAILED DESCRIPTION CONTAINED IN THE PLAN AND ELSEWHERE IN THIS DISCLOSURE STATEMENT.

THE PLAN CONTEMPLATES THE SALE OF SUBSTANTIALLY ALL OF THE PROPERTY PURSUANT TO A MARKETING AND SALES PROCESS TO BE MANAGED EXCLUSIVELY BY THE PLAN TRUSTEE.  IN ACCORDANCE WITH THE PLAN, SSB PROPOSES TO SATISFY CREDITOR CLAIMS USING THE PROCEEDS FROM SALE OF THE PROPERTY. ANTICIPATED DISTRIBUTIONS TO THE VARIOUS CLASSES OF CREDITORS UNDER THE PLAN, AND THE TIMING OF THOSE DISTRIBUTIONS, ARE SET FORTH HEREINBELOW.

A summary of the anticipated distributions to creditors under the Plan is as follows:

| Class(es) | Description of Class(es) | Impaired Y/N | Treatment of Class(es) |
|---|---|---|---|
| | | | |
| 1 | Sandy Spring Bank Secured Claim | Y | Payment of allowed Secured Claim plus interest and costs accrued through date of payment made from proceeds of sale of Property. |
| 2 | Sandy Spring Bank – Secured DIP Loan Claim | Y | Payment of allowed Secured DIP loan Claim plus interest and costs accrued through date of payment made from proceeds of sale of Property. |
| 3 | Prince George's County Secured Claim | Y | Payment of 100% of Secured Claim, plus interest, paid from proceeds of sale of Property. |
| 4 | TD Auto Finance | Y | The claim secured by the Mercedes SL shall be satisfied by the Plan Trustee's abandonment of any and all interests in the Mercedes SL. |
| 5 | Mercedes Benz Finance | Y | The claim secured by the Mercedes SUV shall be satisfied by the Plan Trustee's abandonment of any and all interests in the Mercedes SUV. |

| Class(es) | Description of Class(es) | Impaired Y/N | Treatment of Class(es) |
|---|---|---|---|
| 6 | PD Hyde Field, LLC Unsecured Claim | Y | Payment of $3.2 mm allowed claim paid, without interest, and *pari passu* with the principal of allowed general unsecured claims. Claim increases by 10% of any increase in sales price over pricing established under the NVR Contract and with any such increase capped at $500K. |
| 7 | Other Priority Claims | Y | The Internal Revenue Service has filed a priority claim as Claim #3, which has been amended five times. The current claim is $6,038.07. To the extent the priority claim is allowed, it will be paid from net proceeds of sale of the Property by the Plan Trustee, and after payment of Secured Claims, Administrative Expense Claims and Professional Fee Claims as allowed and provided for payment herein. |
| 8 | General Unsecured Claims | Y | Each allowed claim to be paid its pro rata share of the residual balance of net proceeds received upon closing under any contract(s) for sale of the Property by the Plan Trustee, after payment of Secured Claims, Administrative Expense Claims, Professional Fee Claims and Priority Claims |

| 9 | Equity Interest Holders | Y | It is anticipated that Equity Interests will receive no distributions under the Plan, are not entitled to vote on the Plan, and will be deemed to have rejected the Plan. In the event there is a surplus from the sale of the Property after payment of all Claims, such surplus shall be remitted to the Equity Interest holders. |
|---|---|---|---|

The business strategy embodied in the Plan is as follows:

A. <u>The Liquidation of the Property</u>

SSB proposes to have the Plan Trustee sell the entirety of the Property to one or more purchasers upon a marketing and sales process to be managed exclusively by the Plan Trustee. Payment of Allowed claims, fees and expenses shall be made within thirty (30) days of the closing under any such contract(s). All property sold or transferred under the SSB Plan will be sold free and clear of liens and interests, provided creditors whose Claims are secured by the Debtor's property receive the treatment provided under the Plan for such Secured Claims. In order to expedite the sale process, provide clear title to real property intended to be conveyed thereunder, and in order to satisfy any requirements of title insurance companies providing title insurance to the Debtor's property, SSB will ask the Court to include in the Confirmation Order provisions specifying that all property sold or transferred under the Plan, is sold free and clear of liens and interests, and shall be exempt from transfer taxes under section 1146 of the Code.

SSB proposes to effectuate the terms of the Plan by having the Court appoint David Bowman as Plan Trustee to commence serving immediately upon entry of an order confirming the SSB Plan. All property of the estate, including the Property and any other real property, personalty and any other choses in action available to the Debtor, shall vest in the Plan Trustee immediately upon confirmation of the SSB Plan. The Plan Trustee shall be specifically empowered to act with respect to any and all such property, including, but not limited to: i) the power to execute, deliver and perform any contracts on behalf of the bankruptcy estate, including, but not limited to, listing contracts, contracts for sale and related matters; ii) the power to execute and deliver deeds or other documents of title conveying the Debtor's or estate's right, title and interest in and to any portion of real or personal property, including any or all of the property included in the Project; iii) the power to engage and retain attorneys and/or other professionals to assist the Plan Trustee in connection with his duties under the SSB Plan, and the authority to make payment of fees and expenses of the Trustee's retained professionals from reserves held pursuant to the terms and conditions of the SSB Plan; iv) the power to open bank account(s) and to collect, preserve and eventually distribute proceeds from the liquidation of assets or property of the Debtor or this estate; and v) the power to perform any other act or to take any other action necessary to the completion of the terms and conditions of the SSB Plan, it being the intent by appointment of the Plan Trustee to vest exclusive authority in such Plan Trustee with respect to the administration of this bankrupt estate and the performance and execution of the SSB Plan.

Emphasis in marketing and sale by the Plan Trustee will be on seeking current, non-contingent sales opportunities that are capable of closing with a minimum of contingencies and delay.

### III.   HISTORY, CORPORATE STRUCTURE OF THE DEBTOR, AND EVENTS LEADING TO THE FILING OF THE CHAPTER 11 CASE

A.   History & Corporate Structure of the Debtor

The Debtor is a Maryland corporation formed on January 6, 1994.  The Debtor owns the Property, an assemblage of real property totaling approximately 423.45 acres located in Prince George's County, Maryland, as more particularly described in the legal description attached as an exhibit to the Sale and Bid Procedures Motion.

The Debtor operates a portion of the Property as an airfield known as Hyde Field (the "Airfield"). The Airfield generates revenue for the Debtor through the rental of hangar and parking spaces for aircraft. Operation of the Airfield also has entitled the Debtor to a reduction in its real estate taxes. In addition to the Airfield, pursuant to a mining permit issued by the Maryland Department of the Environment ("MDE") portions of the Property previously were mined for sand and gravel. The cavities created by the sand and gravel mining were used for surcharge fill operations (the "Surcharge Operations").  The Debtor contracted for the acceptance of clean fill dirt removed from other third-party sites in exchange for a fee.  For several years, such fees generated the majority of the Debtor's operating revenues.  In early March 2020, MDE advised the Debtor that it must cease the surcharge fill operations.

As of the Petition Date, the Debtor had no employees.  The Airfield and Surcharge Operations was managed pre-petition by Stan Fetter, d/b/a Fetter Aviation Company ("Fetter"), pursuant to an oral agreement with the Debtor. Following the Petition Date, the Debtor entered into a written management agreement with Fetter, which was approved by the Court.

The appraiser engaged by the Debtor, William C. Harvey of William C. Harvey & Associates, Inc., has valued the Property between $19.3 million and $22.1 million [Dkt. Nos. 107, 160]. SSB contends that this valuation, which was predicated on certain "extraordinary assumptions" does not properly account for development risks and potential attendant costs of remediating overflow of the Surcharge Operations conducted upon the Property.

The Debtor is and always has been owned by Dr. Nabil Asterbadi ("Dr. Asterbadi") and his wife Maureen Asterbadi ("Mrs. Asterbadi") as tenants by the entirety.  Dr. Asterbadi and Mrs. Asterbadi also serve as the only directors of the Debtor.  Dr. Asterbadi serves as the President and Secretary of the Debtor and Maureen Asterbadi serves as the Vice-President of the Debtor. There are no other officers or senior management.

B.   Events Leading to Chapter 11 Filing

On March 22, 2013, the Debtor entered into a contract to sell the Property to WV/B Palisades Development LLC ("Palisades Development") with the intent that the Property be developed into residential units as well as retail and commercial space. Palisades Development subsequently assigned its rights and obligations under the Contract to an affiliate, PD Hyde

Field.  PD Hyde Field was a venture formed for the purpose of acquiring and developing the Property.

On November 15, 2018, PD Hyde Field filed a complaint (the "PD Hyde Complaint") against the Debtor and Dr. Asterbadi in the Circuit Court for Prince George's County, Maryland (the "Circuit Court"), styled *PD Hyde Field LLC v. Zachair, Ltd., et al.,* Civil Action No. 18-42893, alleging breaches of the purchase contract for the Property.  The PD Hyde Complaint alleges that the Debtor breached certain provisions of the parties' contract relating to the condition of the Property. Specifically, PD Hyde Field alleged that the Debtor allowed Surcharge Operations to continue to be conducted on the Property in violation of the purchase contract, as amended. Those operations allegedly were also conducted in violation of MDE permits and approved surcharge plans, resulting in excess and unsuitable fill being on the Property. PD Hyde Field alleges that the quantity of excess fill on the Property is substantial. PD Hyde Field claims that these breaches prevented it from closing on the Property by the outside closing date under the purchase contract. In September 2018, when PD Hyde Field failed to close as required by its sale contract with the Debtor, the Debtor notified PD Hyde Field that it was in default under the contract.  The PD Hyde Complaint followed on November 15, 2018.

Thereafter, on March 14, 2019, PD Hyde Field recorded a Memorandum of Lis Pendens (the "Lis Pendens") in the Land Records of Prince George's County, Maryland.  PD Hyde Field thereafter amended its Complaint on July 1, 2019, and again on December 31, 2019 (the "Second Amended Complaint").  The Second Amended Complaint asserts nine counts against Zachair and Dr. Asterbadi, including for declaratory judgment, injunctive relief, specific performance, breaches of contract, fraud in the inducement, and for establishment and enforcement of vendee's lien.

It is important to note that at the time of the assumption of the contract by PD Hyde Field, Surcharge Operations were then being conducted upon the Property and the substantial funds generated from the fill operations have been admitted by Dr. Asterbadi to have been completely withdrawn from the Debtor by Dr. Asterbadi and his wife as shareholders. Upon information and belief, the Surcharge Operations were providing between half and three quarters of a million dollars per year in cash income paid by entities for the ability to discharge their fill on the Property. Dr. Asterbadi has admitted that essentially all of this money, was withdrawn by or used for the benefit of the Shareholders since his retirement from medical practice about a decade ago. Accordingly, the Debtor did not have sufficient resources to defend the PD Hyde Field litigation. The Chapter 11 filing was made in order to stay that litigation and with the stated intent of the Debtor to facilitate a sale of the Property.

Following the Petition Date, on January 21, 2020, the Debtor filed a Suggestion of Bankruptcy with the Circuit Court.  On March 3, 2020, Dr. Asterbadi filed his answer to the Second Amended Complaint, denying any liability.  Thereafter, on October 14, 2020, the Circuit Court granted Dr. Asterbadi's motion to stay the litigation.  The litigation is presently stayed as to both Dr. Asterbadi and the Debtor.  Only minimal document discovery was conducted before the stay was implemented.

Pursuant to orders entered in this case, PD Hyde Field released the lis pendens.

On September 8, 2021, PD Hyde Field, its affiliate Watt Companies, Inc. and the Debtor entered into a Settlement and Plan Support Agreement, which provides in summary as follows:

| Item | Description |
|---|---|
| PD Proof of Claim | Effective on the Approval Date (as defined in the Agreement), PD Hyde shall have an allowed non-priority unsecured claim in the amount of $3,200,000.00. |
| Treatment of PD Proof of Claim if Exit Financing is Obtained | If the Debtor succeeds in obtaining Exit Financing and if the Exit Financing is funded prior to the end of 2021, the Debtor shall pay $1,600,000 to PD Hyde concurrently with the funding of such financing and shall pay an additional $500,000 to PD Hyde concurrently with the Debtor's receipt of the second installment payment due under the Note, as such term is defined in the JP Sales Contract (as defined in the Agreement). Such payments will be in satisfaction of PD Hyde's claim. |
| Treatment of PD Proof of Claim if Exit Financing is Not Obtained | If the Debtor does not arrange and consummate Exit Financing, the Debtor shall pay the PD Proof of Claim in full, *pari passu* with the payment of principal to other allowed general unsecured claims. |
| Interest | No interest shall accrue or be payable with respect to the PD Proof of Claim. |
| Documents and Entitlements | Not later than five (5) business days following the Approval Date (as defined in the Agreement), the PD Parties shall deliver to the Debtor all plans, drawings, documents, permits, entitlements, appraisal reports, marketing materials, communications with builders and other materials relating to the Property. |
| Circuit Court Case | The Circuit Court Case shall be dismissed with prejudice within 10 days after entry of the Approval Order (as defined in the Agreement). |
| Plan Support | PD Hyde shall vote in favor of any plan proposed by the Debtor that implements and is consistent with the terms of the Agreement. |
| Bankruptcy Court Approval | The Agreement is subject to approval by the Bankruptcy Court and shall not be effective until the entry of an order by the Bankruptcy Court approving this Agreement, and expiration of any stay of such order. |

On October 15, 2021, the Court approved the Debtor's motion seeking approval of the Settlement and Plan Support Agreement (Dkt. #264).

## IV.    **THE CHAPTER 11 CASE**

### A.    Commencement of Case

The Debtor filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Case") in the United States Bankruptcy Court for the Eastern District of Virginia (the "Court") on January 17, 2020 (the "Petition Date"). Since the Petition Date, the Debtor has remained in possession of its Assets and has continued to manage its business and financial affairs as a debtor in possession under §§ 1007(a) and 1108 of the Bankruptcy Code.

### B.    Events in the Chapter 11 Case

The United States Trustee conducted a meeting of creditors under § 341 of the Bankruptcy Code on February 24, 2020. No official committee creditors, trustee, or examiner has been appointed in the Chapter 11 Case.

### i.    *Cash Collateral Motion*

On February 7, 2020, the Debtor filed its *Consent Motion for Interim Order Authorizing the Debtor's Use of Cash Collateral* (the "Cash Collateral Motion") seeking to use cash collateral belonging to SSB and to provide adequate protection to Sandy Spring in the form of replacement liens and proposed monthly payments [Dkt. No. 17].  On February 12, 2020, the Bankruptcy Court entered an *Interim Order Granting Authorizing the Debtor's Use of Cash Collateral and Granting Adequate Protection Pursuant to 11 U.S.C. § 363*, approving the Cash Collateral Motion on an interim basis [Dkt. No. 24]. Subsequent interim orders approving the Debtor's continued use of cash collateral have been entered by the Court. Despite original proposals to make adequate protection payments to SSB, no interest payments or adequate protection payments have been made during the pendency of the case and interest on the SSB Secured Claim has continued to accrue since the Petition Date. Post-petition interest accrued to date on the SSB Secured Claim exceeds Three Hundred Forty Thousand and no/100 Dollars ($340,000.00). To avoid the expense of seriatim amendments to the cash collateral order, SSB has, on an informal basis consented to use of cash collateral on a monthly basis.

### ii.    *DIP Loan*

On November 4, 2020, the Debtor filed its *Line re DIP Loan Motion*, in which the Debtor disclosed that Sandy Spring would provide certain debtor-in-possession financing to the Debtor under the terms and conditions agreed upon by the parties [Dkt. No. 165].  On November 9, 2020, the Court entered the *Final Order Authorizing Debtor-in-Possession Financing and Use of Cash Collateral* (the "Final DIP Order"), authorizing the Debtor to obtain debtor-in-possession financing in the amount of up to $360,000 provided by Sandy Spring pursuant to the DIP Financing Documents and authorizing the Debtor to use Sandy Spring's cash collateral in accordance with the budget attached thereto as Exhibit A to such order [Dkt. No. 169]. Similar to the accruals under the SSB Secured Claim, no interest payments have been made on the SSB DIP Loan, and interest has continued to accrue on such loan throughout the pendency of this case. The purpose of the DIP Loan was principally to fund expert reports as due diligence on the Property to expedite the sale of the Property. While such reports were prepared and funded under the DIP Loan, the desired result, namely a prompt sale of the Property, was not achieved.

iii.     *Retention and Compensation of Professionals*

The Debtor has sought and obtained approval for its retention of numerous professionals, including several law firms, accountants and other professionals for which the Debtor asserts engagement was necessary to effectuate an ultimate sale of the Property. The Court has entered orders approving employment of the following professionals/professional firms:

- Whiteford, Taylor & Preston, L.L.P.
- Streamline Advisors, LLC and SC&H Group, Inc.
- William C. Harvey & Associates, Inc.
- Fraser Forbes Company LLC
- Womble Bond Dickinson (US) LLP
- Holland & Knight LLP
- Carl E. Mosley, CPA and CC Services Corporation
- O'Malley, Miles, Nylen & Gilmore, P.A.
- Mendelson & Mendelson, CPAs, P.C.

The Debtor has filed fee applications on behalf of each of the retained professionals identified above, and on March 24 & December 16, 2021, the Court entered orders approving allowance of professional fees and expenses earned through September 30, 2022 in amounts totaling over two and a quarter million dollars ($2,250,000.00) (Dkt. Nos. 283-289 & 210). SSB is unable to estimate additional professional fees that may have accrued since September of 2021.

iv.     *Efforts to Effect Sale of the Property*

On June 11, 2021, the Debtor filed a Motion for an Order (A) Approving the Sale of the Debtor's Property Free and Clear of Liens, Claims, Interests and Encumbrances, (B) Approving the Sales Contract, (C) Approving Bid Procedures, (D) Scheduling Bid Deadline, Auction and Sale Hearing, (E) Approving Form and Manner of Notice Thereof, and (F) Granting Certain Related Relief [Docket No. 215] (the "First Sale Motion"), seeking to sell the Property to JP Land Holdings LLC ("JP Land Holdings") pursuant to the sales contract attached thereto as Exhibit B (the "First Sales Contract"), subject only to the possibility of an overbid and the other conditions described therein. On July 27, 2021, the Court entered an order granting the First Sale Motion (the "First Sale Order") [Docket No. 235].

Following the entry of the First Sale Order, the Debtor and JP Land Holdings entered into three amendments to the First Sales Contract. The first amendment, among other things, extended the study period within which JP Land Holdings may perform due diligence in connection with the purchase of the Property from August 16, 2021, to November 15, 2021. The second amendment further extended the study period through December 15, 2021. Finally, the third amendment extended the study period through January 14, 2022. After consideration and assessment of the First Sales Contract and the Property, JP Land Holdings ultimately decided to not proceed with the purchase of the Property. Pursuant to the Third Amendment, the First Sales Contract was therefore terminated upon the expiration of the study period on January 14, 2022.

The Debtor and NVR thereafter prepared, negotiated, and executed the NVR Contract, and on June 5, 2022, the Debtor filed its Second Motion for an Order (A) Approving the Sale of the Debtor's Property Free and Clear of Liens, Claims, Interests and Encumbrances, (B) Approving the Sales Contract, (C) Approving Bid Procedures, (D) Scheduling Bid Deadline, Auction and Sale Hearing, (E) Approving Form and Manner of Notice Thereof, and (F)

Granting Certain Related Relief [Docket No. 321] (the "Second Sale Motion"), seeking to sell the Property to NVR pursuant to the NVR Contract attached thereto as Exhibit B, subject only to the possibility of an overbid and the other conditions described therein.

In connection with the First Sales Contract to JP Land Holdings, the Debtor had additionally negotiated a commitment for exit financing to be provided by Three Line Capital, LLC ("Three Line"). The exit financing was intended to provide for a timely payment of real estate taxes, the SSB Secured Claim, the SSB DIP Loan Claim, and other administrative expenses pending proposed staged closings under the First Sales Contract. Upon termination of that contract, the Debtor has apparently lost its exit financing commitment, although it claims to "remain in discussion" with Three Line. The loss of exit financing is of particular concern because the Debtor's proposed current sale of the Property under the NVR Contract provides a time line for closing that could extend as much as an additional two years. During such time, there is no income and no projections for funding from which payment of real estate taxes, interest accruals or any administrative expenses would be paid. The result would be to leave real estate tax claims and secured mortgage claims unpaid for as much as five (5) years, in addition to the accrual of literally millions of dollars in professional fees and other administrative expenses that must be paid before general creditors receive distributions in this case. SSB contends that the additional delays and imposition of accrued liabilities impose an unconscionable financial burden upon the shoulders of creditors herein.

C.    Claims Bar Dates

The Bar Date (i.e., the deadline) for filing proofs of claim with the Court, other than for governmental units, was May 26, 2020. The Bar Date for governmental units to file proofs of claim was July 15, 2020.

Since the Petition Date, approximately 30 proofs of claim have been filed with the Bankruptcy Court, with such proofs totaling $8,521,604.72.

D.    Potential Litigation

Any causes of action to be pursued by or on behalf of the Debtor's estate may be commenced prior to or after the Effective Date. The proceeds thereof, if any, will be applied to payment of administrative, priority, and unsecured Claims pursuant to the priorities of the Bankruptcy Code and orders of the Court.

In Sections 3 and 4 of its Statement of Financial Affairs ("SOFA") and exhibits filed in connection therewith (Dkt. No. 11), the Debtor listed all payments made to or for the benefit of Dr. Asterbadi and his wife in the one year prior to filing. The attachment to SOFA #4 indicates that payments in the amount of $802,813.32 were made from the Debtor's funds in 2019 to or for the benefit of Dr. Asterbadi and his wife. Attachment to SOFA #13 indicates that 2018 payments made to or for the benefit of the Asterbadi's totaled $743,411.98. On December 22, 2021 the Debtor filed an Notice of Abandonment of Avoidance Actions (Dkt. No. 301). Accordingly, all avoidance actions held by the Debtor have been abandoned, and the statute of limitations has expired.

-12-

**THE FAILURE TO INCLUDE ANY DESCRIPTION OF A SPECIFIC CAUSE OF ACTION IN THIS DISCLOSURE STATEMENT SHOULD NOT BE CONSIDERED AS AN ADMISSION OR ACKNOWLEDGMENT THAT ANY SUCH CAUSE OF ACTION DOES NOT EXIST.**

**ALL SUCH CAUSES OF ACTION, IF ANY, WILL VEST IN A PLAN TRUSTEE APPOINTED BY THE COURT PURSUANT TO THE TERMS OF SSB'S PLAN, AND MAY BE PROSECUTED BY SUCH TRUSTEE AFTER CONFIRMATION OF THE PLAN, SUBJECT TO ITS PROVISIONS FOR DISTRIBUTIONS TO CREDITORS.**

**NO CREDITOR SHOULD VOTE TO ACCEPT THE PLAN BASED UPON THE ANY FAILURE SPECIFICALLY TO DESCRIBE OR ASSERT ANY SPECIFIC BANKRUPTCY CAUSE OF ACTION. TO THE CONTRARY, EACH CREDITOR THAT RECEIVED A PAYMENT IDENTIFIED ON EXHIBITS TO THE DEBTOR'S STATEMENT OF FINANCIAL AFFAIRS, SHOULD RECOGNIZE THAT IT MAY HEREAFTER BECOME THE TARGET OF A BANKRUPTCY CAUSE OF ACTION ASSERTED BY A PLAN TRUSTEE ON BEHALF OF THE DEBTOR'S ESTATE.**

E.    Value of Assets. Lien Priorities, and Likely Distributions to Creditors in a Chapter 7

NOTE THAT ALL VALUATIONS INCLUDED HEREIN ARE BASED UPON (1)THE EVALUATION OF THE PROJECT BY AN INDEPENDENT APPRAISER AND/OR THE EXPERIENCE AND EXPERTISE OF THE SSB'S MANAGEMENT AND PROFESSIONALS, RELYING UPON ON THEIR EXPERIENCE IN VALUATION OF THE PROJECT, AND (2) EXPERIENCE WITH THE LOCAL REAL ESTATE MARKET IN THE WASHINGTON, DC METROPOLITAN AREA. ALL VALUES PROVIDED HEREIN ARE ESTIMATES AND SUBJECT TO CHANGE.

1.    Assets.

The appraiser engaged by the Debtor, William C. Harvey of William C. Harvey & Associates, Inc., has valued the Property between $19.3 million and $22.1 million [Dkt. Nos. 107, 160]. SSB contends that this valuation, which was predicated on certain "extraordinary assumptions" does not properly account for development risks and potential attendant costs of remediating overflow of the Surcharge Operations conducted upon the Property.
.

2.    Liabilities.

(i)    Secured Claims.

Sandy Spring Bank: SSB has a secured claim and DIP Loan claim, each of which is secured by all of the real estate and improvements comprising the Property. SSB values its' pre-petition secured claim as of the Petition Date at $2,392,410.30. As noted hereinabove, the SSB Secured Claim has accrued post-petition interest in amounts exceeding $340,000.00 and has additionally incurred post-petition attorneys' fees and costs that are currently undetermined. The balance of the SSB Secured Claim as of the date of this Disclosure Statement is estimated to be not less than $2,875,400.00 and the balance of the SSB DIP Loan Claim is estimated as of the date of this Disclosure Statement to be not less than $329,600.00. Thus, as of this date, SSB is owed a bit over $3.2 million.

<u>TD Auto Finance</u>: TD Auto Finance holds a claim which is secured by the Mercedes SL that is co-owned by the Debtor and Dr. Asterbadi. The amount of the secured claim was alleged to be $103,108.77 pursuant to a proof of claim filed by TD Auto Finance.

<u>Mercedes-Benz Finance</u>: Mercedes Benz Finance holds a claim which is secured by the Mercedes SUV that is co-owned by the Debtor and Dr. Asterbadi. The amount of the secured claim was alleged to be $35,303.30 pursuant to a proof of claim filed by Mercedes Benz Finance.

<u>Real Estate Taxes</u>: The Debtor owes approximately three years of real estate taxes assessed and payable with respect to the Property, with the total liability through the date of this Disclosure Statement estimated to be not less than $83,000.00. The real estate tax claims constitute first priority liens against the Property, senior in interest and payment to the SSB Secured Claim.

(ii)   Administrative Expenses.

Unpaid administrative expenses in this Chapter 11 Case include administrative claims for professional fees for counsel to the Debtor and other professionals approved for retention and employment. Other administrative expenses include fees payable to the office of the U.S. Trustee. Administrative expense claims are entitled to priority pursuant to § 507(a)(2) of the Bankruptcy Code.

The Debtor has obtained approval and allowance of incurred professional fees and expense reimbursements, constituting administrative expenses of the bankruptcy estate, in the following amounts:

| **Administrative Claimant** | **Amount Approved** |
| --- | --- |
| Whiteford, Taylor & Preston, L.L.P. | $ 1,703,052.27 |
| Streamline Advisors, LLC and SC&H Group, Inc. | $ 61,215.00 |
| William C. Harvey & Associates, Inc. | $ 45,923.25 |
| Womble Bond Dickinson (US) LLP | $ 71,593.00 |
| Holland & Knight LLP | $ 354,035.08 |
| O'Malley, Miles, Nylen & Gilmore, P.A. | $ 4,402.50 |
| Mendelson & Mendelson, CPAs, P.C. | $ 9,867.86 |

The professional fees referenced above are for fees incurred through approximately September of 2021. In addition to over $2,250,000.00 in professional fees already approved, additional professional fees and other administrative expenses are continuing to accrue and are expected to be material, although the amount is unknown to SSB.

(iii)   Pre-Petition Unsecured Non-Priority Claims.

In addition to the filed proofs of claim, numerous liquidated, undisputed, non-contingent unsecured claims were Scheduled by the Debtor on its schedules of assets and liabilities, filed with the Court under Bankruptcy Rule 1007(d). The deadline for the filing non-governmental proofs of claim was May 26, 2020, and the Debtor estimates that the amount of its general unsecured claims is not less than $4,980,762.24, including the claim of PD Hyde Field as approved by the Court.

ANY CREDITOR VOTING ON THE PLAN SHOULD ASSUME IN CONNECTION WITH SUCH VOTE THAT CAUSES OF ACTION EXIST AGAINST SUCH CREDITOR OR PARTY IN INTEREST AND THAT THE PLAN TRUSTEE MAY PURSUE SUCH CAUSES OF ACTION. LIKEWISE, ANY CREDITOR VOTING ON THE PLAN SHOULD ASSUME IN CONNECTION WITH SUCH VOTE THAT SSB OR THE PLAN TRUSTEE MAY OBJECT TO A PORTION, OR ALL, OF THE CREDITOR'S CLAIM AS SET FORTH IN A PROOF OF CLAIM.

## V.  TREATMENT OF ADMINISTRATIVE EXPENSE CLAIMS, PROFESSIONAL FEE CLAIMS AND PRIORITY TAX CLAIMS UNDER THE PLAN

A.    Administrative Expense Claims. Each holder of an Allowed Administrative Expense Claim shall be entitled to receive, in full satisfaction, settlement, release and discharge of and in exchange for such Allowed Administrative Expense Claim, (a) Cash equal to the unpaid portion of such Allowed Administrative Expense Claim, or (b) such other treatment as to which the Plan Trustee and such holder shall have agreed upon in writing. Payment shall be made within thirty (30) days from the date of closing under a contract for sale of the Property as effected by the Plan Trustee. All Disputed Administrative Expense Claims shall be reserved for in full on the Effective Date. Administrative Expense Claims that are allowed by a Final Order of the Bankruptcy Court shall be paid from the proceeds available at closing after the payment of costs of sale and all claims secured by any interest in the Property. To the extent proceeds available after payment of claims secured by an interest in the Property are insufficient to make payment of all allowed Administrative Expense Claims, such claims shall be paid on a *pro-rata* basis from remaining proceeds of sale.

B.    Bar Date for Administrative Expense Claims. Any Person that fails or failed, as the case may be, to file a proof of Administrative Expense Claim or request for payment thereof on or before the Administrative Bar Date pursuant to the Administrative Bar Date Order is forever barred from asserting such Claim against any of the Debtor, the Estate, the Property or any other property of the Estate, and the holder thereof shall be enjoined from commencing or continuing any action, employment of process or act to collect, offset or recover such Administrative Expense Claim.

C.    Professional Fee Claims. Each Person seeking an award by the Bankruptcy Court of a Professional Fee Claim incurred through and including the Effective Date shall, unless otherwise ordered by the Bankruptcy Court, file its respective final application for allowance of compensation for services rendered and reimbursement of expenses incurred by the date that is no later than twenty (20) days after the Effective Date. The Plan Trustee shall reserve sufficient funds from the proceeds of the sale of the Property to effect payment of all pending Professional Fee Claims filed on a timely basis.

D.    Post-Effective Date Professional Fee Claims. The Plan Trustee shall reserve funds sufficient to facilitate payment of any fees and expenses charged or incurred by the Plan Trustee or

his retained professionals in connection with the administration of this estate and performance of a confirmed Plan. Such fees and expenses may be paid in the ordinary course of business without the necessity for any approval of the Bankruptcy Court. Such professional fees and expenses may be incurred in connection with the implementation and consummation of the SSB Plan, the claims reconciliation process, or any other matters as to which such professionals may be engaged by the Plan Trustee.

       E.     <u>United States Trustee Fees</u>. The Plan Trustee shall pay all fees due to the United States trustee under 28 U.S.C. § 1930(a)(6) within thirty (30) days of closing under a contract for sale of the Property and shall pay all such fees that come due following the Effective Date until such time as the Chapter 11 Case is closed or the Plan Trustee completes all distributions under the Plan, whichever occurs first.

## VI.  **CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS**

Pursuant to § 1122 of the Bankruptcy Code, set forth below is a designation of classes of Claims against and Equity Interests in the Debtor. A Claim or Equity Interest is also placed in a particular Class for the purposes of voting on the Plan and of receiving distributions pursuant to the Plan only to the extent that such Claim or Equity Interest is an Allowed Claim or Equity Interest in that Class and such Claim or Equity Interest has not been paid, released or otherwise settled prior to the Effective Date. In accordance with § 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, Professional Fee Claims and Priority Tax Claims of the kinds specified in §§ 507(a)(2) and 507(a)(8) of the Bankruptcy Code have not been classified and the treatment of such Claims is set forth in Article III above. Only an Allowed Claim within any of the Classes identified below shall be entitled to the treatment and distributions provided for Claims within that Class.

Class 1.     Class 1 consists of the SSB Secured Claim. SSB shall retain its lien against the Debtor's Property until such time as all or any portion of the Property is sold and conveyed by the Plan Trustee as provided herein. Sale of the entirety of the Property by the Plan Trustee is contemplated under the terms of this Plan. Such sale(s) will be made free and clear of SSB's lien, with SSB's lien attaching to the proceeds of such sale(s). The holder of the SSB Secured Claim shall paid in full from proceeds of such sale(s) within thirty days after closing under contract(s) for sale.

Class 2.     Class 2 consists of the SSB DIP Loan Claim. SSB shall retain its lien against the Debtor's Property until such time as all or any portion of the Property is sold and conveyed by the Plan Trustee as provided herein. Sale of the entirety of the Property by the Plan Trustee is contemplated under the terms of this Plan. Such sale(s) will be made free and clear of SSB's lien, with SSB's lien attaching to the proceeds of such sale(s). The holder of the SSB DIP Loan Claim shall paid in full from proceeds of such sale(s) within thirty days after closing under contract(s) for sale.

-16-

Class 3.        Class 3 consists of the Secured Claim of Prince Georges County, Maryland arising from real estate tax obligations secured by tax liens against the Property. Except to the extent that a holder of the Class 3 Secured Claim agrees to a different treatment, the holder of the Class 3 Secured Claim shall receive, in full satisfaction, settlement, release and discharge of, and in exchange for such Secured Claim (i) payment in full from net proceeds of sale of the Property by the Plan Trustee, or (ii) such other treatment as to which the Plan Trustee and such holder shall have agreed upon in writing. Cash payments shall be made to the holder of the Class 3 Secured Claim within five business days of closing under any contract(s) for sale of the Property.

Class 4        Class 4 consists of the Secured Claim of TD Auto Finance arising from the financing of a Mercedes SL co-owned by the Debtor and its principal, Dr. Asterbadi. Except to the extent that a holder of the Class 4 Secured Claim agrees to a different treatment, the holder of the Class 4 Secured Claim shall be satisfied by the Plan Trustee's abandonment of any and all interests in the Mercedes SL. No payments are projected on account of the Class 4 Secured Claim under the Plan. To the extent any unsecured portion of the Class 4 claim is determined or approved by the Court, such claim shall be treated as a General Unsecured Claim pursuant to Class 8 herein.

Class 5.        Class 5 consists of the Secured Claim of Mercedes Benz Finance arising from the financing of a Mercedes SUV co-owned by the Debtor and its principal, Dr. Asterbadi. Except to the extent that a holder of the Class 5 Secured Claim agrees to a different treatment, the holder of the Class 4 Secured Claim shall be satisfied by the Plan Trustee's abandonment of any and all interests in the Mercedes SUV. No payments are projected on account of the Class 5 Secured Claim under the Plan. To the extent any unsecured portion of the Class 5 claim is determined or approved by the Court, such claim shall be treated as a General Unsecured Claim pursuant to Class 8 herein.

Class 6.        Class 6 consists of the Claim of PD Hyde Field, LLC as more fully set forth and resolved pursuant to that certain Settlement and Plan Support Agreement ("PD Hyde Settlement") dated September 8, 2021 by and between the Debtor and PD Hyde Field and approved by the Court on October 15, 2021 (Dkt. #264). Pursuant to prior order of the Court (and the subsequent failure of the Debtor to effect sale of the Property on or before December 31, 2021), treatment of the Class 6 Claim shall be as follows:

1. PD Hyde Field shall be deemed to have an allowed non-priority unsecured claim in the Bankruptcy Case in the amount of Three Million Two Hundred Thousand and No/100 Dollars ($3,200,000.00).
2. The Class 6 Claim shall be paid *pari passu* with the payment of principal to other allowed general unsecured claims in Class 8 under the Plan and as funds are available from sale of the Property by the Plan Trustee.
3. Should the Plan Trustee sell the Property for a sales price greater than the purchase price set forth in the NVR Contract, then, the Class 6 Claim shall be increased by an amount equal to 10% of the net increase in the purchase price, capped at $500,000.
4. No interest shall be paid on or with respect to the Class 6 Claim.

Class 7        Class 7 consists of other Priority Claims. The Debtor does not believe that any such claims exist, although the Internal Revenue Service has filed a priority claim as Claim #3. To the extent any are determined and allowed, such Class 7 Claims shall be paid from net proceeds of sale of the Property by the Plan Trustee, and after payment of Secured Claims, Administrative Expense Claims and Professional Fee Claims as allowed and provided for payment herein.

Class 8        Class 8 consists of all General Unsecured Claims. Except to the extent that a holder of a General Unsecured Claim agrees to a different treatment, each holder of a General Unsecured Claim shall receive, in full satisfaction, settlement, release and discharge of, and in exchange for such Claim (i) its pro rata share of the residual balance of net proceeds received upon closing under any contract(s) for sale of the Property by the Plan Trustee, after payment of Secured Claims, Administrative Expense Claims, Professional Fee Claims and Priority Claims as outlined hereinabove. To the extent the Plan Trustee is authorized to reserve funds for payment of any claim(s) or expense(s) hereunder, or to the extent the Plan Trustee generates additional funds from avoidance actions or any other settlement of such claim(s) or right(s), a final and supplemental distribution shall be made, pro-rata, to the holders of Allowed Class 8 Claims upon the Plan Trustee's completion of administration of this estate. To the extent funds available for distribution are sufficient to permit, Class 8 claims will be paid, with interest calculated at a rate of six percent (6%) per annum, from the Petition Date through the date of payment.

Class 9        Class 9 consists of all Equity Interests. Holders of Class 9 Equity Interests shall receive no distributions under the Plan on account of their Equity Interests, unless there is a surplus from the sale of the Property after payment of all Claims, which SSB believes to be highly unlikely. Class 9 is impaired by the Plan and deemed to reject the Plan and, consequently, is not entitled to vote to accept or reject the Plan.

## VII.    IDENTIFICATION OF CLASSES OF CLAIMS AND EQUITY INTERESTS IMPAIRED AND UNIMPAIRED BY THE PLAN

A.    <u>Unimpaired Classes of Claims and Equity Interests</u>. There are no unimpaired Classes under the SSB Plan.

B.    <u>Impaired Classes of Claims and Equity Interests</u>. Every Class under the Plan, including all numbered classes from and including Class 1 through and including Class 9 is an Impaired Class under the Plan.

## VIII.    MEANS OF EXECUTION AND DISTRIBUTION OF SALES PROCEEDS

A.    <u>Sale of the Property</u>. SSB proposes to have the Plan Trustee sell the entirety of the Property to one or more purchasers upon a marketing and sales process to be managed exclusively by the Plan Trustee. Payment of Allowed claims, fees and expenses shall be made from proceeds of sale within thirty (30) days of the closing under any such contract(s).

B.  <u>Sales free and clear of liens and interests</u>. All property sold or transferred under the SSB Plan will be sold free and clear of liens and interests, provided creditors whose Claims are secured by the Debtor's property receive the treatment provided under the Plan for such Secured Claims. In order to expedite the sale process, provide clear title to real property intended to be conveyed thereunder, and in order to satisfy any requirements of title insurance companies providing title insurance to the Debtor's property, SSB will ask the Court to include in the Confirmation Order provisions specifying that all property sold or transferred under the Plan, is sold free and clear of liens and interests.

C.  <u>Appointment of Plan Trustee.</u> In order to effectuate the terms of the Plan, the Court will appoint David Bowman as Plan Trustee to commence serving immediately upon entry of an order confirming the SSB Plan. All property of the estate, including the Property and any other real property, personalty and any choses in action available to the Debtor, shall vest in the Plan Trustee immediately upon confirmation of the SSB Plan. The Plan Trustee shall be specifically empowered to act with respect to any and all such property, including, but not limited to: i) the power to execute, deliver and perform any contracts on behalf of the bankruptcy estate, including, but not limited to, listing contracts, contracts for sale and related matters; ii) the power to execute and deliver deeds or other documents of title conveying the Debtor's or estate's right, title and interest in and to any portion of real or personal property, including any or all of the property included in the Project; iii) the power to file and prosecute any lawsuit or other legal proceeding held by the Debtor or this estate; iv) the power to engage and retain attorneys and/or other professionals to assist the Plan Trustee in connection with his duties under the SSB Plan, and the authority to make payment of fees and expenses of the Trustee's retained professionals from reserves held pursuant to the terms and conditions of the SSB Plan; v) the power to open bank account(s) and to collect, preserve and eventually distribute proceeds from the liquidation of assets or property of the Debtor or this estate; and vi) the power to perform any other act or to take any other action necessary to the completion of the terms and conditions of the SSB Plan, it being the intent by appointment of the Plan Trustee to vest exclusive authority in such Plan Trustee with respect to the administration of this bankrupt estate and the performance and execution of the SSB Plan.

D.  <u>Exemption from Certain Transfer Taxes</u>. Pursuant to § 1146(c) of the Bankruptcy Code, any transfers (i) from the Plan Trustee or this bankrupt estate to any Person pursuant to the Plan or (ii) from any other Person pursuant to the Plan, shall not be subject to any stamp tax or similar tax, including any document recording tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment, and the Confirmation Order or supplemental order under § 1146 of the Bankruptcy Code shall direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the transfer instruments or like documents without the payment of any such tax or governmental assessment. SSB will ask the Court to include provisions in the Confirmation Order expressly directing that any sale(s) of the Property will be subject to the exclusion from applicable taxes under § 1146(c) of the Bankruptcy Code.

E.  <u>Proceeds of Choses in Action</u>. As noted hereinabove, any and all rights to recover with respect to choses in action, if any, shall vest in the Plan Trustee upon confirmation and the Plan Trustee shall thereafter be empowered to pursue recovery or settlement of such claim(s). To

the extent proceeds are generated from the Plan Trustee's litigation or settlement of such claim(s), the Plan Trustee will make supplemental distributions to Class 8 creditors on a pro- rata basis.

F.      Procedures for Disputed Claims. After the Effective Date, the Plan Trustee shall be entitled to object to all Claims. Unless otherwise extended by the Court, any objections to such Claims shall be served and filed on or before one hundred twenty (120) days after the Effective Date. Notwithstanding any authority to the contrary, an objection to a Claim shall be deemed properly served on the claimant if the Plan Trustee or his agent(s) effect service in any of the following manners: (a) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004; (b) to the extent counsel for a claimant is unknown, by first class mail, postage prepaid, on the signatory on the proof of claim or other representative identified in the proof of claim or any attachment thereto; or (c) by first class mail, postage prepaid, on any counsel that has appeared on the claimant's behalf in the Chapter 11 Case.

Notwithstanding any other provision of the Plan, if any portion of a Claim is a Disputed Claim, no payment or distribution provided hereunder shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

After a Disputed Claim becomes, in whole or in part, an Allowed Claim, the holder of such Allowed Claim shall be entitled to distributions, if any, to which such holder is then entitled under the Plan in accordance with the provisions hereof. Notwithstanding anything to the contrary in the Plan, no holder of an Allowed Claim shall receive any distribution of a value in excess of the Allowed amount of such Claim.

G.      Executory Contracts and Unexpired Leases

The Fetter Management Agreement was approved post-petition by this Court and currently provides for management of the airfield and certain surcharge operations upon the Property by Fetter Aviation Company ("Fetter"). The Plan Trustee is expected to seek a continuation or assumption of such Agreement to provide for continuing management of these functions pending sale of the Property. Upon sale of the Property, any and all agreements shall be continued or terminated as specified in any contract for sale of the Property. Any other executory contract not expressly assumed herein shall be deemed rejected upon confirmation of the SSB Plan.[2]

1.      Rejection Claims.

Except as otherwise ordered by the Bankruptcy Court, in the event that the rejection of an executory contract or unexpired lease under the SSB Plan results in damages to the other party or parties to such contract or lease, a Claim for such damages shall be forever barred and shall not be enforceable against the estate unless a proof of claim has been filed and served upon counsel for the Plan Trustee on or before thirty (30) days after the Effective Date.

---

[2] The Debtor's Schedule G identifies thirty leases of hangar and tie-down spaces. To the best of SSB's knowledge, all tenant leases are terminable on 30-days' written notice and none are proposed to be assumed under the SSB Plan.

### IX.  <u>DISCLAIMER</u>

All parties are advised and encouraged to read this Disclosure Statement and the Plan in their entirety before voting to accept or reject the Plan or before voting on any other matter as provided for herein.

Plan summaries and statements made in this Disclosure Statement are qualified in their entirety by reference to the Plan itself, this Disclosure Statement, and all exhibits annexed thereto. The statements contained in this Disclosure Statement are made only as of the date hereof. No assurances exist that the statements contained herein will be correct any time hereafter.

The information contained in this Disclosure Statement is included herein for purposes of soliciting acceptances of the Plan and may not be relied upon for any purpose other than to determine how to vote on the Plan. No representations with respect to the Plan or its proponent are authorized by SSB other than as set forth in this Disclosure Statement. Any other representations or inducements made to solicit your acceptance that are not contained in this Disclosure Statement should not be relied upon by you in arriving at your decision to accept or reject the Plan.

This Disclosure Statement shall not be admissible in any non-bankruptcy proceeding involving the Debtor or any other party. Furthermore, this Disclosure Statement shall not be construed to be conclusive advice on the legal effects, including, but not limited to the tax effects, of the Plan. You should consult your legal or tax advisor on any questions or concerns regarding the tax or other legal consequences of the Plan.

The information contained herein has not been the subject of an external or certified audit. For the foregoing reason, as well as because of the impossibility of making assumptions, estimates, and projections into the future with absolute accuracy, SSB is unable to warrant or represent that the information contained in this Disclosure Statement is complete and accurate, although substantial efforts has been made to present complete and accurate information. Counsel for SSB has not independently verified any of the information provided herein and does not make any representations or warranties with respect to the truth or accuracy of any of the information presented.

### X.  <u>TAX CONSEQUENCES OF THE PLAN</u>

The Debtor is a pass through entity that is treated as a partnership for federal and state income tax purposes. As a result, all items of income, gain, loss, deduction, and credit pass through to the shareholders of the Debtor in proportion to their ownership interests in the Debtor. The sole shareholders are Dr. Asterbadi and his wife.

SSB does not offer an opinion on the tax consequences of the Plan, and each user of this Disclosure Statement is advised to seek counsel or advice as to the tax consequences of the Plan.

## XI.  **EFFECT OF CONFIRMATION**

A.     Vesting of Assets

On the Effective Date, all property of the Debtor's bankruptcy estate shall vest in the Plan Trustee, including all claims, rights and causes of action and any property acquired by the Debtor or the Plan Trustee under or in connection with the Plan, free and clear of all Claims, liens, encumbrances, charges, and other interests, except as otherwise provided in the Plan and the Plan Documents. On and after the Effective Date, the Plan Trustee may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules and in all respects as if there were no pending case under any chapter or provision of the Bankruptcy Code, except as provided herein.

B.     Binding Effect

Except as otherwise provided in § 1141(d)(3) of the Bankruptcy Code, and subject to the occurrence of the Effective Date, on and after the Confirmation Date, the provisions of the Plan shall bind any holder of a Claim against, or Equity Interest in, the Debtor and such holder's respective successors and assigns, whether or not the Claim or Equity Interest of such holder is impaired under the Plan and whether or not such holder has accepted the Plan.

C.     Term of Injunction or Stays and Injunction against Interference with Plan

Unless otherwise provided in the Plan, all injunctions or stays arising prior to the Confirmation Date in accordance with §§ 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

Upon the entry of the Confirmation Order, all holders of Claims and Equity Interests and other parties in interest, along with their respective present or former affiliates, employees, agents, officers, directors, or principals, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan.

## XII.  **MODIFICATION OF THE PLAN**

SSB reserves the right in accordance with the Bankruptcy Code to amend or modify the Plan prior to the Confirmation Date. Should SSB file a modification with the Bankruptcy Court, the Plan, as modified, becomes the Plan.

SSB or the Plan Trustee may also modify the Plan at any time after the Confirmation Date regardless of whether the Plan has been substantially consummated within the meaning of §§ 1101(2) and 1127(b) of the Bankruptcy Code, if circumstances warrant such modification, if all required disclosure under § 1125 of the Bankruptcy Code has been given, and if the Bankruptcy Court, after notice and a hearing, confirms the Plan as modified.

Before or after the Confirmation Date, SSB or the Plan Trustee may, with the approval of the Bankruptcy Court and so long as it does not materially and adversely affect the interests of creditors who have accepted the Plan, remedy any defect or omission, reconcile any

22

inconsistencies in the Plan, or amend the Plan in such a manner as may be necessary to carry out the purposes and the effect of the Plan without the necessity of re-soliciting acceptances.

## XIII.  **RETENTION OF JURISDICTION**

The Bankruptcy Court shall retain jurisdiction after confirmation of the Plan for the following purposes:

(a)    to determine the allowance and classification of any Claim, the reexamination of Claims which have been Allowed for purposes of voting, and the determination of any objections to Claims that may be or may have been filed;

(b)    to determine motions to estimate Claims at any time, regardless of whether the Claim to be estimated is the subject of a pending objection, a pending appeal, or otherwise;

(c)    to determine motions to subordinate Claims at any time and on any basis permitted by applicable law;

(d)    to construe or take any action to enforce the Plan, and to issue such orders as may be necessary for the implementation, execution, and consummation of the Plan;

(e)    to determine any and all applications for allowance of compensation or reimbursement of expenses;

(f)    to determine any other requests for payment of administrative expenses incurred prior to the Effective Date;

(g)    to resolve any disputes arising under or relating to the Plan incurred prior to the Effective Date;

(h)    to modify the Plan pursuant to § 1127 of the Bankruptcy Code and applicable Bankruptcy Rules;

(i)    to take any action to correct any defect, cure any omission, or reconcile any inconsistency in the Plan or the Confirmation Order as may be necessary to carry out the purposes and intent of the Plan;

(k)    to enter any order, including injunctions, necessary to enforce the rights, title and powers of the Debtor or the Plan Trustee and to impose such limitations, restrictions, terms and conditions of such rights, title and powers as the Bankruptcy Court may deem necessary;

(1)    to enforce any order previously entered by the Bankruptcy Court in this case and to enter the Closing Order;

(m)    to determine pending applications for the assumption or rejection of executory contracts or unexpired leases to which the Debtor is a party or with respect to which the Debtor may be liable, and to hear and determine, and if need be to adjudicate, any and all Claims arising therefrom;

(n)     to determine applications, adversary proceedings and contested or litigated matters and all causes of action, whether pending on the Effective Date or commenced thereafter, whether or not the Chapter 11 Case has been closed and final decree entered;

(o)     to issue orders in aid of execution of the Plan to the extent authorized by § 1142 of the Bankruptcy Code; and

(p)     to determine such other matters as may be set forth in the Confirmation Order.

## XIV.  <u>**ALTERNATIVES TO THE PLAN**</u>

It is SSB's belief that the Plan represents the best method of generating and maximizing funds for distribution to creditors. The Debtor's only material asset is the Property. SSB's Plan contemplates that the Plan Trustee will facilitate a prompt marketing and sale of the Property on a non-contingent basis, priced for attendant development risks.

The alternative to SSB's Plan is the Debtor's Plan which relies solely on the NVR Contract for payment of claims. SSB contends that the NVR Contract is nothing more than an "option contract" under which NVR may pursue entitlements and other improvements to the Property over a period of almost two additional years, before determining whether or not to close under the contract. Performance under the NVR Contract is secured only by a deposit in the initial amount of $500,000.00 and a potential supplemental deposit of $250,000.00. These amounts are grossly inadequate to cover the interest, real estate tax accruals, and the additional professional fees expected to accrue under the Debtor's Plan pending a potential closing.

A.     Distributions Under The Plan and Liquidation Analysis

If the Plan cannot be confirmed under §§ 1129(a) and (b) of the Bankruptcy Code, the Chapter 11 Case may be converted to a case under chapter 7 of the Bankruptcy Code, in which case a chapter 7 trustee would be appointed or elected to liquidate any remaining assets of the estate for distribution to creditors pursuant to chapter 7 of the Bankruptcy Code.

A liquidation analysis projects the estimated amount of money expected to be available for distribution to creditors if the case is converted to chapter 7. In the event of a conversion to chapter 7 in this case, SSB would likely be granted relief from the automatic stay and then conduct a foreclosure sale as to the Property. SSB does not believe that a forced sale through foreclosure would result in funds sufficient to make distribution to any unsecured claims herein.

Given that the general unsecured creditors would likely receive nothing under a chapter 7 liquidation, the Plan's projection of potential distributions to holders of Class 8 General Unsecured Claims will result in a far greater recovery for unsecured creditors than the conversion of the case to chapter 7, the appointment of a chapter 7 trustee and the liquidation of the Debtor's Assets.

B.     Debtor's Proposed Chapter 11 Plan

The Debtor has filed its own proposed Chapter 11 Plan in this case, and you are referred to the 2nd Amended Disclosure Statement and 2nd Amended Plan of the Debtor for further information relating thereto. The success of the Debtor's proposed Plan is wholly contingent upon

the potential closing under the NVR Contract as referenced hereinabove. SSB believes that the terms and conditions of the NVR Contract, combined with deteriorating macroeconomic conditions, increasing interest rates, the existence of a ground war in Eastern Europe and the apparently consequent developing softness in the residential real estate market, raise significant questions about the likelihood of timely and complete performance under the contract. The Debtor's Plan proposes no new capital or borrowing to be injected into the Debtor, and contemplates material accruals of additional secured claims, real estate taxes and administrative expenses while awaiting NVR's final determination as to closing under the NVR Contract. For these reasons, SSB represents that its Plan is superior to any other alternative.

## XV.    <u>VOTING ON THE PLAN</u>

Under § 1126(f) of the Bankruptcy Code, if a class of creditors or interest holders is not impaired, such class is conclusively deemed to have accepted the plan and solicitation of votes from the holders of such Claims is not required. Under § 1126(g) of the Bankruptcy Code, if a class of creditors or interest holders will not receive or retain any property under the Plan, such class is conclusively deemed to have rejected the Plan and its votes will not be solicited. Class 9 (Equity Interests) are deemed to have rejected the Plan because such claimants or holders Interests will receive no distributions or property under the Plan.

Under § 1126(a) of the Bankruptcy Code, only holders of Allowed Claims or Interests may vote to accept or reject the Plan. Disputed Claims may be Allowed solely for the purpose of voting on the Plan. Procedures to allow Disputed Claims solely for the purpose of voting on the Plan will be outlined in a subsequent motion of the Debtor (1) to approve a form of ballot, (2) establish a voting deadline, and (3) approve a form of Notice establishing deadlines, which the Debtor anticipates it will file soon.

## XVI.    <u>IMPAIRMENT UNDER THE PLAN</u>

A.    Definition of Impairment

Under § 1124 of the Bankruptcy Code, a class of Claims or Equity Interests is "impaired" under a plan of reorganization unless such plan (a) leaves unaltered the legal, equitable and contract rights of each holder of a Claim or Equity Interest in such class, or (b) provides, among other things, for the cure of existing defaults and reinstatement of the maturity of the Claims or Equity Interests in such class.

B.    Impaired Classes.

The Debtor believes that Classes 1 through 8 are impaired under the Plan. Holders of Class 9 Equity Interests will not receive or retain any property under the Plan and will be deemed to reject the Plan in accordance with § 1126(g) of the Bankruptcy Code and its votes will not be solicited. Accordingly, only holders of Allowed Claims in Classes 1 through 8 are entitled to vote to accept or reject the Plan.

# XVII.  CONFIRMATION OF THE PLAN

The Bankruptcy Court will confirm the Plan only if all of the requirements of § 1129 of the Bankruptcy Code are met. Among the requirements for confirmation are that the Plan: (i) is accepted by all impaired classes of Claims and Equity Interests entitled to vote or, if rejected by an impaired class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such class and as to the impaired classes that are deemed to reject the Plan; (ii) is feasible; and (iii) is in the "best interests" of the holders of Claims impaired under the Plan. The Plan is feasible on its face because its distributions are greater than those that would be made under § 726 of the Bankruptcy Code. Additionally, while SSB that certain classes of creditors are impaired, SSB nonetheless believes that the Plan conforms to the requirements of § 1129 of the Bankruptcy Code.

    A.    <u>Acceptance of the Plan</u>

The Bankruptcy Code defines acceptance of a plan of reorganization by a class of creditors as acceptance by creditors holding two-thirds (2/3) in dollar amount and a majority in number of the Claims in such class (other than any such creditor designated under § 1126(e) of the Bankruptcy Code), but for that purpose counts only those creditors that actually cast ballots. Holders of Claims that fail to vote are not counted as either accepting or rejecting a plan.

    B.    <u>No Unfair Discrimination/Fair and Equitable Test</u>

In the event that any impaired class of Claims does not accept the Plan, the Bankruptcy Court may still confirm the Plan at the request of SSB if, as to each impaired class of Claims that has not accepted the Plan, the Plan "does not discriminate unfairly" and is "fair and equitable."

A Chapter 11 plan does not discriminate unfairly within the meaning of the Bankruptcy Code if the legal rights of a dissenting class are treated in a manner consistent with the treatment of other classes whose legal rights are substantially similar to those of the dissenting class and if no class of Claims receives more than it legally is entitled to receive for its Claims. Under the Bankruptcy Code, "fair and equitable" has different meanings for secured and unsecured Claims. With respect to a secured Claim, "fair and equitable" means (i) the impaired secured creditor retains its liens to the extent of its Allowed Claim and receives deferred cash payments at least equal in value to the Allowed amount of its Claim with a present value as of the effective date of the plan at least equal in value to such creditor's interest in the estate's interest in the property securing its Claim, (ii) if property subject to the lien of the impaired secured creditor is sold free and clear of that lien, the lien attaches to the proceeds of the sale, and such lien proceeds are treated in accordance with clause (i) or (iii) of this paragraph, or (iii) if the impaired secured creditor realizes the "indubitable equivalent" of its Claim under the plan.

With respect to an unsecured Claim, "fair and equitable" means either (i) each impaired unsecured creditor receives or retains property of a value, as of the Effective Date of the Plan, equal to the amount of its Allowed Claim, or (ii) the holders of Claims or Equity Interests that are junior to the Claims or Equity Interests of the dissenting class will not receive or retain any property under the plan.

Under the Plan, no holder in a class of Claims is to receive cash or other property in excess of the full amount of its Allowed Claim, plus interest where expressly provided. As to the holders of Allowed Secured Claims, the Plan provides that Allowed Secured Claimholders will receive distributions in payment of their Allowed Secured Claim as provided for herein within thirty (30) days from the date of closing under a sale of the Property. As to holders of Unsecured Claims, the Plan provides that they will be paid pro rata from remaining cash proceeds of the sale of the Property, and from proceeds of any avoidance actions, after payment of Allowed Administrative Claims and Allowed Claims in classes 1, 2, 3, 6 and 7 as identified hereinabove. Unless holders of Unsecured Claims are paid in full, with interest, no distributions will be made to Equity Interest Holders. Thus, SSB believes that the Plan does not discriminate unfairly as to any impaired class of Claims and is fair and equitable with respect to each such class.

C.    "Best Interests" Test

The Bankruptcy Code provides that the Plan will not be confirmed, regardless of whether or not anyone objects to confirmation of the Plan, unless the Bankruptcy Court finds that the Plan is in the "best interests" of all classes of Claims that are impaired. The "best interests" test will be satisfied by a finding of the Bankruptcy Court that either (i) all holders of impaired Claims have accepted the Plan, or (ii) the Plan will provide such a holder that has not accepted the Plan with a recovery at least equal in value to the recovery such holder would receive if the estate were distributed under Chapter 7 of the Bankruptcy Code.

SSB believes that the Plan meets the "best interests" test. The starting point in determining whether the Plan meets the "best interests" test is a determination of the amount of proceeds that would be generated from the distribution of the estate's remaining assets in a chapter 7 liquidation. The amount to be distributed must be reduced by the additional costs of converting to a case under chapter 7, including the costs incurred during the Chapter 11 case and those allowed under chapter 7 of the Bankruptcy Code (such as trustee's commission and the fees and expenses of professionals retained by a trustee). The potential chapter 7 distribution in respect to each class must be further reduced by the costs imposed by the delay caused by conversion to chapter 7. The net present value of a hypothetical chapter 7 distribution in respect to an impaired class is then compared to the recovery in respect to such class provided for in the Plan. It is SSB's position that unsecured creditors would receive no distributions upon a conversion to chapter 7. Accordingly, SSB submits that the "best interest" test is met.

D.    Feasibility

Section 1129(a)(1 1) of the Bankruptcy-Code provides that a Chapter 11 plan may be confirmed only if the Bankruptcy Court finds that such plan is feasible. A feasible plan is one which will not lead to a need for further reorganization or liquidation. Because the Plan anticipates the liquidation of all of the Debtor's real property interests via a sale of the Property, SSB believes that the Bankruptcy Court will find that the Plan is feasible.

E.    Confirmation

1.    Conditions to Confirmation and the Effective Date

27

Under the Plan, the following conditions to the Effective Date must occur:

(a) The Bankruptcy Court approval of this Disclosure Statement by order entered on the docket of the Chapter 11 Case;

(b) The presentment of a Confirmation Order to the Bankruptcy Court in the Chapter 11 Case for entry to confirm the Plan in a form and substance acceptable to SSB; and

(c) The filing of all Plan documents necessary to implement the Plan;

(d) The Confirmation Order, in a form and substance acceptable to SSB becoming a Final Order;

(e) The execution of all Plan documents necessary to implement the Plan, and those documents remaining in full force and effect.

2.      Confirmation Hearing.

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of the Plan (the "Confirmation Hearing"). Section 1128(b) provides that any party in interest may object to confirmation of a plan.

## XVIII.  <u>RECOMMENDATION AND CONCLUSION</u>

**SSB BELIEVES THAT THE PLAN PROVIDES THE GREATEST RECOVERY TO CREDITORS AND IS IN THE BEST INTEREST OF CREDITORS, THEREFORE, SSB RECOMMENDS THAT ALL CREDITORS VOTE TO ACCEPT THE PLAN.**

## XIX.  <u>OTHER SOURCES OF INFORMATION AVAILABLE TO CREDITORS AND PARTIES IN INTEREST</u>

Additional motions, affidavits, orders or other documentation that might be of interest to any holder of a Claim against the Debtor in this proceeding are shown on the docket sheets maintained by the Clerk's office. Copies of the docket sheets and actual items can be obtained from the office of the Clerk of the Bankruptcy Court:

Office of the Clerk
United States Bankruptcy Court for the District of Maryland
6500 Cherrywood Lane, Suite 300
Greenbelt, Maryland 20770
Telephone: (301) 344-8018

### XX.  <u>CONCLUSION</u>

SSB SUBMITS THAT THE PLAN COMPLIES IN ALL RESPECTS WITH CHAPTER 11 OF THE BANKRUPTCY CODE AND RECOMMENDS THAT THE PLAN BE CONFIRMED.


**SANDY SPRING BANK**
**By Counsel**



/s/ Bruce W. Henry
**Bruce W. Henry, VSB #23951**
**Kevin M. O'Donnell, VSB #30086**
**HENRY & O'DONNELL, P.C.**
300 N. Washington Street
Suite 204
Alexandria, Virginia 22314
(703) 548-2100
Counsel for Sandy Spring Bank