IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| Zachair, Ltd., | ) | Case No.:  20-10691-TJC |
| | ) | |
| Debtor. | ) | Chapter 11 |
| | ) | |

**SECOND AMENDED DISCLOSURE STATEMENT WITH RESPECT
TO DEBTOR'S SECOND AMENDED PLAN OF REORGANIZATION**

Whiteford, Taylor & Preston, LLP
Bradford F. Englander, Esq., Bar No. 11951
3190 Fairview Park Drive, Suite 800
Falls Church, Virginia 22042
Telephone: (703) 280-9081
Facsimile: (703) 280-3370
Email: benglander@wtplaw.com

*Counsel for the Debtor*

# TABLE OF CONTENTS

**ARTICLE I**    PLAN VOTING INSTRUCTIONS ................................................................ 2

Section 1.01    Notice to Holders of Claims and Interests ................................................ 2

Section 1.02    Holders of Claims Entitled to Vote ........................................................ 3

Section 1.03    Acceptance of Plan ............................................................................ 3

**ARTICLE II**    HISTORY AND BUSINESS OF THE DEBTOR ............................... 4

Section 2.01    Formation and Business of the Debtor ................................................... 4

Section 2.02    Ownership of the Debtor .................................................................... 4

Section 2.03    Events Leading to Bankruptcy ............................................................. 5

Section 2.04    Debts of the Debtor ........................................................................... 7

   (a)    Secured Claims ................................................................................ 7

   (b)    Unsecured Claims ............................................................................. 8

Section 2.05    Assets of the Debtor .......................................................................... 9

   (a)    Real Property .................................................................................. 9

   (b)    Leases ............................................................................................ 9

   (c)    General Assets ................................................................................. 9

   (d)    Loans to the Debtor .......................................................................... 9

   (e)    Claims Against PD Hyde Field ........................................................... 9

   (f)    Other Claims ................................................................................. 10

**ARTICLE III**    SIGNIFICANT EVENTS IN THIS BANKRUPTCY CASE .......... 10

Section 3.01    Petition, Claims Bar Date, and Schedules and Statements .................... 10

**ARTICLE IV**    Retention of Professionals ............................................................. 10

   (a)    Whiteford, Taylor & Preston, L.L.P. ................................................. 10

   (b)    Streamline Advisors, LLC and SC&H Group, Inc. ............................... 11

   (c)    William C. Harvey & Associates, Inc. ............................................... 11

   (d)    Fraser Forbes Company LLC ........................................................... 11

   (e)    Womble Bond Dickinson (US) LLP ................................................... 12

   (f)    Holland & Knight LLP .................................................................... 12

   (g)    Carl E. Mosley, CPA and CC Services Corporation ............................. 12

   (h)    O'Malley, Miles, Nylen & Gilmore, P.A. ........................................... 12

   (i)    Mendelson & Mendelson, CPAs, P.C. ............................................... 12

Section 4.02   Motion to Employ Development Consultants ................................................. 13

Section 4.03   Airport Management Agreement ................................................................... 13

Section 4.04   Compensation of Professionals .................................................................... 13

(a)   William C. Harvey & Associates, Inc. ......................................................... 13

(b)   Whiteford, Taylor & Preston, L.L.P. ............................................................ 14

(c)   Streamline Advisors, LLC ............................................................................ 14

(d)   SC&H Group, Inc. ........................................................................................ 14

(e)   Mendelson & Mendelson, CPAs, P.C. .......................................................... 14

(f)   O'Malley, Miles, Nylen & Gilmore, P.A. ..................................................... 15

(g)   Womble Bond Dickinson (US) LLP ............................................................. 15

(h)   Holland & Knight LLP ................................................................................. 15

Section 4.05   The Cash Collateral Motion ........................................................................ 15

Section 4.06   Debtor-in-Possession Financing Motion ..................................................... 16

Section 4.07   Mercedes-Benz Finance's Motion for Relief ............................................... 17

Section 4.08   Extensions of Exclusivity ............................................................................ 17

Section 4.09   Extensions of Time to Remove Civil Actions .............................................. 17

Section 4.10   Sale of the Property ..................................................................................... 18

Section 4.11   Exit Financing .............................................................................................. 23

**ARTICLE V**   SUMMARY OF PLAN ................................................................................. 23

Section 5.01   Purpose of Plan ............................................................................................ 23

Section 5.02   Claims Classification and Treatment ........................................................... 24

(a)   Introduction .................................................................................................. 24

(b)   Classification and Impairment ..................................................................... 24

Section 5.03   Treatment of Claims and Interests ............................................................... 25

(a)   Class 1 – Sandy Spring Bank Pre-Petition Loan .......................................... 25

(b)   Class 2 – Sandy Spring DIP Loan ................................................................ 25

(c)   Class 3 – Prince George's County Real Estate Taxes ................................... 26

(d)   Class 4 – TD Auto Finance Allowed Secured Claim .................................... 26

(e)   Class 5 – Mercedes-Benz Finance Allowed Secured Claim ......................... 27

(f)   Class 6 – PD Hyde Field Secured Claim ...................................................... 27

(g)   Class 7 – Other Priority Claims ................................................................... 28

(h)   Class 8 – General Unsecured Claims ............................................................ 28

(i)    Equity Interests ................................................................................................ 29

Section 5.04    Treatment of Unclassified Claims and Expenses ................................. 29

(a)    Administrative Claims ..................................................................................... 29

(b)    Professional Fee Claims ................................................................................. 30

(c)    Priority Tax Claims ........................................................................................ 30

(d)    U.S. Trustee Fee Claims ................................................................................ 30

Section 5.05    Means for Implementation of Plan ...................................................... 31

(a)    Revesting of Assets ........................................................................................ 31

(b)    Sale of the Property ....................................................................................... 31

(c)    Releases of Record ......................................................................................... 31

(d)    Exit Financing ................................................................................................ 31

(e)    Exemption from Transfer and Recordation Taxes ....................................... 31

(f)    Income Tax Reserve and Payment ................................................................ 32

(g)    Preservation of Priority .................................................................................. 32

(h)    Corporate Action ........................................................................................... 32

(i)    Effectuating Documents; Further Transactions ........................................... 32

(j)    Preservation of Rights of Action .................................................................. 32

(k)    Retention of Professionals After Effective Date .......................................... 33

(l)    Closing of Debtor's Case ............................................................................... 33

(m)   Operation of the Debtor Between the Confirmation Date and the Effective Date ..... 34

(n)    Automatic Stay ............................................................................................... 34

(o)    Destruction of Books and Records ............................................................... 34

(p)    Plan Administrator…………………………………………………………..34

**ARTICLE VI**   TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
LEASES                36

Section 6.01    Executory Contracts and Unexpired Leases .................................... 36

Section 6.02    Claims Based on the Rejection of Executory Contracts and Unexpired Leases
36

**ARTICLE VII**   DISTRIBUTIONS .................................................................................. 37

Section 7.01    Calculation of Amounts to be Distributed ....................................... 37

Section 7.02    Delivery of Distributions and Undeliverable or Unclaimed Distributions ...... 37

(a)    Record Date for Distribution ........................................................................ 37

(b)    Delivery of Distributions in General ............................................................. 37

(c)    Minimum; De Minimis Distributions ............................................................. 38

(d)    Undeliverable Distributions and Unclaimed Property.................................... 38

(e)    Manner of Payment Pursuant to the Plan ..................................................... 38

Section 7.03    Compliance with Tax Requirements/Allocations................................ 38

Section 7.04    Claims Paid or Payable to Third Parties ......................................... 39

(a)    Claims Paid by Third Parties; Recourse to Collateral ................................. 39

(b)    Claims Payable by Insurance, Third Parties; Recourse to Collateral ...................... 39

(c)    Applicability of Insurance Policies............................................................... 39

Section 7.05    Prepayment ........................................................................... 40

ARTICLE VIII   PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS AND EQUITY INTERESTS........................................................... 40

Section 8.01    Resolution of Disputed Claims ...................................................... 40

(a)    Allowance of Claims and Equity Interests ................................................... 40

(b)    Prosecution of Objections to Claims or Equity Interests.............................. 40

(c)    Claims Estimation........................................................................................ 40

(d)    Expungement or Adjustment to Claims Without Objection........................ 41

Section 8.02    Distribution Reserve Account ....................................................... 41

Section 8.03    Distributions After Allowance ...................................................... 41

Section 8.04    Disallowance of Claims.............................................................. 42

Section 8.05    Amendments .......................................................................... 42

Section 8.06    No Interest ............................................................................ 42

Section 8.07    Setoffs ................................................................................. 42

(a)    By the Debtor............................................................................................... 42

(b)    By Non-Debtors.......................................................................................... 42

ARTICLE IX   EFFECT OF PLAN CONFIRMATION............................................. 43

Section 9.01    Binding Effect........................................................................ 43

Section 9.02    Discharge.............................................................................. 43

Section 9.03    Injunction ............................................................................. 43

Section 9.04    Exculpation and Limitation of Liability ......................................... 44

ARTICLE X   CONFIRMATION AND CONSUMMATION OF THE PLAN ................... 44

Section 10.01    Conditions to Confirmation of the Plan ......................................... 44

Section 10.02    Conditions to the Effective Date ................................................ 44

Section 10.03    Waiver of Conditions .............................................................. 45

-iv-

Section 10.04   Consequences of Non-Occurrence of Effective Date ...................................... 45

Section 10.05   Retention Of Jurisdiction ...................................................................... 45

(a)   Retention of Jurisdiction by the Bankruptcy Court ........................................ 45

(b)   Failure of the Bankruptcy Court to Exercise Jurisdiction ........................................ 47

**ARTICLE XI**   MISCELLANEOUS PLAN PROVISIONS .................................................... 47

Section 11.01   Modifications and Amendments ........................................................ 47

Section 11.02   Severability of Plan Provisions ........................................................ 47

Section 11.03   Successors and Assigns ...................................................................... 48

Section 11.04   Payment of Statutory Fees ........................................................ 48

Section 11.05   Revocation, Withdrawal or Non-Consummation ........................................ 48

Section 11.06   Plan Supplements ...................................................................... 48

Section 11.07   Tax Reporting and Compliance ........................................................ 48

**ARTICLE XII**   CONFIRMATION ISSUES ...................................................... 49

Section 12.01   Compliance With the Bankruptcy Code ........................................ 49

Section 12.02   Good Faith ...................................................................... 49

Section 12.03   Bankruptcy Court Approval of Fees and Expenses ........................................ 49

Section 12.04   Disclosure of Management ........................................................ 49

Section 12.05   Governmental Approval of Rates ........................................................ 50

Section 12.06   Best Interest of Creditors ........................................................ 50

Section 12.07   Acceptance by Impaired Classes ........................................................ 51

Section 12.08   Priority Claims ...................................................................... 51

Section 12.09   Impaired Accepting Class ........................................................ 52

Section 12.10   Feasibility ...................................................................... 52

Section 12.11   U.S. Trustee Fees ...................................................................... 52

Section 12.12   Inapplicable Confirmation Requirements ........................................ 52

Section 12.13   Cram Down ...................................................................... 52

Section 12.14   Risk Factors ...................................................................... 54

Section 12.15   Tax Consequences ...................................................................... 55

**ARTICLE XIII**   FURTHER INFORMATION .................................................... 56

Section 13.01   Further Information; Additional Copies ........................................ 56

**ARTICLE XIV**   RECOMMENDATION AND CONCLUSION .......................................... 56

## INTRODUCTION

Zachair, Ltd (the "Debtor") submits this *Second Amended Disclosure Statement With Respect to Debtor's Second Amended Plan of Reorganization* (the "Disclosure Statement") in its above captioned bankruptcy case pursuant to Bankruptcy Code section 1125 for use in the solicitation of votes on the *Debtor's Second Amended Plan of Reorganization* dated June 22, 2022 (the "Plan"). The Debtor is the proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code. A copy of the Plan is attached hereto as **Exhibit A**.

This Disclosure Statement sets forth certain information regarding the Debtor's prepetition operating and financial history, the need to seek chapter 11 protection, and significant events that have occurred during this Chapter 11 Case. This Disclosure Statement also describes terms and provisions of the Plan, certain effects of Confirmation of the Plan, and the manner in which Distributions will be made under the Plan. In addition, this Disclosure Statement discusses the Confirmation process and the voting procedures that Holders of Claims entitled to vote under the Plan must follow in order for their votes to be counted.

Except as otherwise provided herein, capitalized terms not otherwise defined in this Disclosure Statement have the meanings ascribed to them in the Plan. Unless otherwise noted herein, all dollar amounts provided in this Disclosure Statement and in the Plan are given in United States dollars.

THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE PLAN, CERTAIN DOCUMENTS RELATED TO THE PLAN, CERTAIN EVENTS IN THIS CHAPTER 11 CASE AND CERTAIN FINANCIAL INFORMATION. ALTHOUGH THE DEBTOR BELIEVES THAT SUCH SUMMARIES ARE FAIR AND ACCURATE, SUCH SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE FULL TEXT OF SUCH DOCUMENTS. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTOR OR ITS REPRESENTATIVES, EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTOR DOES NOT WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN, INCLUDING FINANCIAL INFORMATION, IS WITHOUT ANY INACCURACY OR OMISSION.

**THE DEBTOR BELIEVES THAT THE PLAN WILL ENABLE THE DEBTOR TO ACCOMPLISH THE OBJECTIVES OF CHAPTER 11 AND THAT THE PLAN IS IN THE BEST INTERESTS OF THE DEBTOR AND ALL HOLDERS OF CLAIMS.**

## ARTICLE I          PLAN VOTING INSTRUCTIONS

### Section 1.01   Notice to Holders of Claims and Interests

This Disclosure Statement will be transmitted to Holders of Claims and Interests (together, "Claimholders") that are entitled to vote on the Plan.  A discussion and listing of those Claimholders that are entitled to vote on the Plan and those Claimholders that are not entitled to vote on the Plan is provided herein. The primary purpose of this Disclosure Statement is to provide adequate information to enable such Claimholders to make a reasonably informed decision with respect to the Plan prior to exercising their right to vote to accept or reject the Plan.

The Bankruptcy Court has been asked to approve this Disclosure Statement as containing information of a kind and in sufficient and adequate detail to enable such Claimholders to make an informed judgment with respect to acceptance or rejection of the Plan.  THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT (WHEN SUCH APPROVAL IS OBTAINED) DOES NOT CONSTITUTE EITHER A GUARANTY OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN, OR AN ENDORSEMENT OF THE PLAN BY THE BANKRUPTCY COURT.

WHEN AND IF CONFIRMED BY THE BANKRUPTCY COURT, THE PLAN WILL BIND ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTOR, WHETHER OR NOT SUCH HOLDERS ARE ENTITLED TO VOTE OR DID VOTE ON THE PLAN AND WHETHER OR NOT HOLDERS RECEIVE OR RETAIN ANY DISTRIBUTIONS OR PROPERTY UNDER THE PLAN.  THUS, YOU ARE ENCOURAGED TO READ THE PLAN AND THIS DISCLOSURE STATEMENT CAREFULLY.  IN PARTICULAR, ALL HOLDERS OF IMPAIRED CLAIMS WHO ARE ENTITLED TO VOTE ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND ITS EXHIBITS CAREFULLY AND IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

This Disclosure Statement contains important information about the Plan, the Debtor's business and operations, considerations pertinent to acceptance or rejection of the Plan, and developments concerning this Chapter 11 Case.

THIS DISCLOSURE STATEMENT IS THE ONLY DOCUMENT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ON THE PLAN.  No solicitation of votes may be made except after approval of and distribution of this Disclosure Statement, and no person has been authorized to distribute any information concerning the Debtor other than the information contained herein.

CERTAIN OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS BY ITS NATURE FORWARD LOOKING AND CONTAINS ESTIMATES AND ASSUMPTIONS THAT MAY BE MATERIALLY DIFFERENT FROM ACTUAL, FUTURE RESULTS.  Except as otherwise specifically and expressly stated herein, this Disclosure Statement does not reflect any events that may occur subsequent to the date hereof and that may have a material impact on the information contained in this Disclosure Statement.  The Debtor does not anticipate that any amendments or supplements to this Disclosure Statement will be distributed to reflect such occurrences.  Accordingly, the delivery of this Disclosure Statement shall not under

any circumstance imply that the information herein is correct or complete as of any time *subsequent* to the date hereof.

**THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTING FIRM AND HAS NOT BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.**

**Section 1.02    Holders of Claims Entitled to Vote**

Pursuant to the provisions of the Bankruptcy Code, only Holders of Allowed Claims or Interests that are Impaired and that are in a class that will receive a distribution under a proposed chapter 11 plan are entitled to vote to accept or reject a proposed chapter 11 plan. Classes of Claims in which the Holders of Claims are Unimpaired under a chapter 11 plan are deemed to have accepted the plan and are not entitled to vote to accept or reject the plan. Classes of Claims or Interests that receive no distribution on account of their Claims or Interests are deemed to have rejected the plan and are not entitled to vote to accept or reject the plan.

Under section 1124 of the Bankruptcy Code, a class of Claims or Interests is deemed to be "impaired" under a plan unless (i) the plan leaves unaltered the legal, equitable and contractual rights to which such Claim or Interest entitled the Holder thereof or (ii) notwithstanding any legal right to an accelerated payment of such Claim or Interest, the plan cures all existing defaults.

In addition, a Holder of an Impaired Claim or Interest which is entitled to receive or retain property under a plan may vote to accept or to reject a plan only if the Claim or Interest is "Allowed" for purposes of voting, which means generally that no party in interest has objected to such Claim or Interest or, if no proof of Claim was Filed, that such Claim or Interest has been scheduled by the Debtor on its schedules, without indicating that such Claim or Interest is contingent, unliquidated or disputed.

**Section 1.03    Acceptance of Plan**

The Bankruptcy Code defines "acceptance" of a plan by a Class of Claims as acceptance by creditors in that Class that hold at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Claims that cast ballots for acceptance or rejection of the plan. Acceptance of a plan by a Class of Interests requires acceptance by at least two-thirds (2/3) of the number of shares in such Class that cast ballots for acceptance or rejection of the plan.

Bankruptcy Code section 1129(b) permits the confirmation of a plan notwithstanding the non-acceptance of a plan by one or more Impaired Classes of Claims or Interests. Under that section, a plan may be confirmed by the Bankruptcy Court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each non-accepting Class.

After approval of this Disclosure Statement by the Bankruptcy Court, a copy of the Plan will be mailed to all Creditors and parties-in-interest entitled to vote on the Plan pursuant to section 1126 of the Bankruptcy Code, and within the manner specified by Bankruptcy Rule 3017(d), accompanied by a ballot. Pursuant to section 1126(a) of the Bankruptcy Code, any Holder of an Allowed Claim or an Allowed Interest may accept or reject the Plan. However, approval or

rejection of the Plan is measured by Classes of Claims and Interests rather than by each Claim Holder or Interest Holder. A Class of Claims or Interests which is not Impaired by the Plan is conclusively presumed to have accepted the Plan. Accordingly, no Class of Claims that is Unimpaired may vote on the Plan.

If this Disclosure Statement is approved, then pursuant to section 1128 of the Bankruptcy Code and Rules 2002(b), 3017 and 3018 of the Bankruptcy Rules, the Bankruptcy Court shall conduct a hearing to consider Confirmation of the Plan on at least twenty-eight (28) days' notice to creditors and parties in interest, unless shortened by order of the Bankruptcy Court. A party-in-interest may object to the Confirmation of the Plan. The date by which objections must be Filed to the Confirmation of the Plan and by which votes must be submitted shall be established at a date and in a manner as determined by the Bankruptcy Court.

## ARTICLE II        HISTORY AND BUSINESS OF THE DEBTOR

### Section 2.01   Formation and Business of the Debtor

The Debtor is a Maryland corporation formed on January 6, 1994. The Debtor owns the Property, an assemblage of real property totaling approximately 423.45 acres located in Prince George's County, Maryland, as more particularly described in the legal description attached as an exhibit to the Sale and Bid Procedures Motion.

The Debtor operates a portion of the Property as an airfield known as Hyde Field (the "Airfield"). The Airfield generates revenue for the Debtor through the rental of hangar and parking spaces for aircraft. Operation of the Airfield also has entitled the Debtor to a reduction in its real estate taxes. In addition to the Airfield, pursuant to a mining permit issued by the Maryland Department of the Environment ("MDE") portions of the Property previously were mined for sand and gravel. The cavities created by the sand and gravel mining were used for surcharge fill operations (the "Surcharge Operations"). The Debtor contracted for the acceptance of clean fill dirt removed from other third-party sites in exchange for a fee. For several years, such fees generated the majority of the Debtor's operating revenues. In early March 2020, MDE advised the Debtor that it must cease the surcharge fill operations.

As of the Petition Date, the Debtor has no employees. The Airfield and Surcharge Operations was managed pre-petition by Stan Fetter, d/b/a Fetter Aviation Company ("Fetter"), pursuant to an oral agreement with the Debtor. As discussed below, following the Petition Date, the Debtor entered into a written management agreement with Fetter, which was approved by the Court.

The appraiser engaged by the Debtor, William C. Harvey of William C. Harvey & Associates, Inc., has valued the Property between $19.3 million and $22.1 million [Dkt. Nos. 107, 160].

### Section 2.02   Ownership of the Debtor

The Debtor is and always has been owned by Dr. Nabil Asterbadi ("Dr. Asterbadi") and his wife Maureen Asterbadi ("Mrs. Asterbadi") as tenants by the entirety. Dr. Asterbadi and Mrs. Asterbadi also serve as the only directors of the Debtor. Dr. Asterbadi serves as the President and Secretary

of the Debtor, and Maureen Asterbadi serves as the Vice-President of the Debtor. There are no other officers or senior management.

## Section 2.03   Events Leading to Bankruptcy

### i.   The PD Hyde Field Litigation

On March 22, 2013, the Debtor entered into a contract to sell the Property to WV/B Palisades Development LLC ("Palisades Development") with the intent that the Property be developed into residential units as well as retail and commercial space. Palisades Development subsequently assigned its rights and obligations under the Contract to an affiliate, PD Hyde Field. PD Hyde Field was a venture formed for the purpose of acquiring and developing the Property.

On November 15, 2018, PD Hyde Field filed a complaint (the "PD Hyde Complaint") against the Debtor and Dr. Asterbadi in the Circuit Court for Prince George's County, Maryland (the "Circuit Court"), styled *PD Hyde Field LLC v. Zachair, Ltd., et al.,* Civil Action No. 18-42893, alleging breaches of the purchase contract for the Property. The PD Hyde Complaint alleges that the Debtor breached certain provisions of the parties' contract relating to the condition of the Property. Specifically, PD Hyde Field alleged that the Debtor allowed Surcharge Operations to continue to be conducted on the Property in violation of the purchase contract, as amended. Those operations allegedly were also conducted in violation of MDE permits and approved surcharge plans, resulting in excess and unsuitable fill being on the Property. PD Hyde Field alleges that the quantity of excess fill on the Property is substantial. PD Hyde Field claims that these breaches prevented it from closing on the Property by the outside closing date under the purchase contract. In September 2018, when PD Hyde Field failed to close as required by its sale contract with the Debtor, the Debtor notified PD Hyde Field that it was in default under the contract. The PD Hyde Complaint followed on November 15, 2018.

Thereafter, on March 14, 2019, PD Hyde Field recorded a Memorandum of Lis Pendens (the "Lis Pendens") in the Land Records of Prince George's County, Maryland. PD Hyde Field thereafter amended its Complaint on July 1, 2019, and again on December 31, 2019 (the "Second Amended Complaint"). The Second Amended Complaint asserts nine counts against Zachair and Dr. Asterbadi, including for declaratory judgment, injunctive relief, specific performance, breaches of contract, fraud in the inducement, and for establishment and enforcement of vendee's lien.

As a result of the Lis Pendens, the Debtor was unable to sell or refinance the Property outside of bankruptcy. Further, PD Hyde Field enjoyed substantial financial backing. In contrast, the Debtor lacked sufficient resources to fund the state court litigation. This lack of resources to contest PD Hyde Field's claims and inability to sell or refinance the Property caused the Debtor to file this Chapter 11 Case in order to stay the PD Hyde Field litigation and to facilitate a sale of the Property.

The Debtor denies any liability to PD Hyde Field and intends to vigorously defend itself against the PD Hyde Complaint. The Debtor asserts that the nature and condition of the Property was fully disclosed to PD Hyde Field prior to and during the feasibility period under the purchase contract. Despite this knowledge, PD Hyde Field decided to proceed with the contract. Further, MDE has not held the Debtor to be in violation of any permits or plans (be it with respect to the quality or quantity of the fill on the Property). Importantly, the Debtor and PD Hyde Field entered

into a letter agreement to address and mitigate any unsuitable fill on the Property to the extent it impacted PD Hyde Field's development plans. Zachair contends that PD Hyde Field used the unsuitable fill issue as a pretext to delay closing. PD Hyde Field was neither ready nor able to close and to begin development notwithstanding having exercised its contractual right to extend closing twice and having asked for 12 months without any consideration.

Following the Petition Date, on January 21, 2020, the Debtor filed a Suggestion of Bankruptcy with the Circuit Court. On March 3, 2020, Dr. Asterbadi filed his answer to the Second Amended Complaint, denying any liability. Thereafter, on October 14, 2020, the Circuit Court granted Dr. Asterbadi's motion to stay the litigation. The litigation is presently stayed as to both Dr. Asterbadi and the Debtor. Only minimal document discovery was conducted before the stay was implemented.

Under the Amended Sale Order (discussed below), PD Hyde Field was required to release the lis pendens. On August 5, 2021, PD Hyde Field released the lis pendens.

On September 8, 2021, PD Hyde Field, its affiliate, Watt Companies, Inc., the Debtor and its President, Dr. Asterbadi, entered into a Settlement and Plan Support Agreement, which provides in summary as follows:

| Item | Description |
|---|---|
| PD Proof of Claim | Effective on the Approval Date (as defined in the Agreement), PD Hyde shall have an allowed non-priority unsecured claim in the amount of $3,200,000.00. |
| Treatment of PD Proof of Claim if Exit Financing is Obtained | If the Debtor succeeds in obtaining Exit Financing and if the Exit Financing is funded prior to the end of 2021, the Debtor shall pay $1,600,000 to PD Hyde concurrently with the funding of such financing, and shall pay an additional $500,000 to PD Hyde concurrently with the Debtor's receipt of the second installment payment due under the Note, as such term is defined in the JP Sales Contract (as defined in the Agreement). Such payments will be in satisfaction of PD Hyde's claim. |
| Treatment of PD Proof of Claim if Exit Financing is Not Obtained | If the Debtor does not arrange and consummate Exit Financing, the Debtor shall pay the PD Proof of Claim in full, *pari passu* with the payment of principal to other allowed general unsecured claims. |
| Interest | No interest shall accrue or be payable with respect to the PD Proof of Claim. |
| Documents and Entitlements | Not later than five (5) business days following the Approval Date (as defined in the Agreement), the PD Parties shall deliver to the Debtor all plans, drawings, documents, permits, entitlements, appraisal reports, marketing materials, communications with builders and other materials relating to the Property. |
| Circuit Court Case | The Circuit Court Case shall be dismissed with prejudice within 10 days after entry of the Approval Order (as defined in the Agreement). |

| Plan Support | PD Hyde shall vote in favor of any plan proposed by the Debtor that implements and is consistent with the terms of the Agreement. |
| Bankruptcy Court Approval | The Agreement is subject to approval by the Bankruptcy Court and shall not be effective until the entry of an order by the Bankruptcy Court approving this Agreement, and expiration of any stay of such order. |

On September 9, 2021, the Debtor filed its *Motion for Approval of Settlement and Plan Support Agreement Under Bankruptcy Rule 9019* (the "PD Hyde Settlement Motion") [Docket No. 249]. On October 15, 2021, the Court entered an order granting the PD Hyde Settlement Motion. *See* Docket No. 264. As further discussed below under Section 4.11, the exit financing contemplated in the PD Hyde Settlement Motion did not close timely and the Debtor was unable to obtain Exit Financing prior to the end of 2021. The Debtor remains in discussions with a potential lender regarding the prospect of renewed financing arrangements.

**Section 2.04   Debts of the Debtor**

(a)   Secured Claims

The following chart summarizes all known Secured Claims against the Debtor:[1]

| Creditor | Basis | Secured Claim | Disputed | Nature of Claim |
|---|---|---|---|---|
| Prince George's County, Maryland[2]<br><br>Parcel 327833 | Claim Nos. 8-3, 23-2, and 27-1 | $768.87 | No | 2021, 2022, 2023 (estimate for 2023) Real Property Taxes |
| Prince George's County, Maryland<br><br>Parcel 865121 | Claim Nos. 11-3, 26-2, and 30-1 | $8,577.48 | No | 2021, 2022, 2023 (estimate for 2023) Real Property Taxes |
| Prince George's County, Maryland<br><br>Parcel 360651 | Claim Nos. 10-3, 25-2, and 29-1 | $14,139.72 | No | 2021, 2022, 2023 (estimate for 2023) Real Property Taxes |

---

1    Nothing contained in the chart shall be deemed to constitute, or shall be construed as, an admission of the existence or amount of any Secured Claim, or as a waiver by the Debtor of its right to object to any and all proofs of claim. The Debtor reserves all of its rights to litigate, disallow, or object to the claims on the basis of all equitable or legal grounds.

2    In addition to reviewing the proofs of claim filed on behalf of Prince George's County, the tax records are available on-line at   http://taxinquiry.princegeorgescountymd.gov/taxdetail.aspx (last reviewed May 27, 2022). The Debtor anticipates that additional real estate taxes will accrue in the ordinary course, and be payable, at the time of a closing.

| | | | | |
|---|---|---|---|---|
| Prince George's County, Maryland Parcel 328708 | Claim Nos. 9-3, 24-2, and 28-1 | $60,168.15 | No | 2021, 2022, 2023 (estimate for 2023) Real Property Taxes |
| Sandy Spring Bank | Claim No. 21-1 | $2,800,136 | No | Real Estate Loan (including post-petition interest through 8/31/2022) |
| Sandy Spring Bank | Docket No. 169 | $332,869 | No | Debtor-in-Possession Financing (including interest through 8/31/2022)[3] |
| **Total:** | | **$3,216,659.22** | | |

On the Petition Date, the Debtor's secured debt obligations primarily consisted of $2,392,410.30 owed to Sandy Spring pursuant to a certain *Deed of Trust Note* dated December 11, 2015 in the original principal amount of $2,300,000, as modified by certain *Modification and Extension Agreements* dated November 2, 2018, and April 3, 2019 (together, the "2015 Note"). The 2015 Note is secured by the Property and various other property of the Debtor pursuant to a *Deed of Trust and Security Agreement* dated December 11, 2015.

On November 9, 2020, the Bankruptcy Court entered the Final DIP Order (defined herein), approving the Sandy Spring DIP Loan in the amount of up to $360,000 provided by Sandy Spring to the Debtor pursuant to the DIP Financing Documents and authorizing the Debtor to use the cash collateral in accordance with the budget attached to the Final DIP Order as Exhibit A. The Property is therefore currently encumbered by Sandy Spring's Claim in the maximum aggregate principal amount of $2,660,000.

On May 20, 2020, PD Hyde Field filed Proof of Claim No. 18 asserting a Claim in the amount of $5,617,818.00, of which it asserts that $1,200,000.00 is secured by the Property (the "PD Hyde Claim"). As discussed above, pursuant to the Settlement and Plan Support Agreement, the claim of PD Hyde Field is allowed as a general unsecured claim.

Prince George's County, Maryland has filed Proofs of Claim Nos. 8, 9, 10, 11, 23, 24, 25, 26, 27, 28, 29, and 30 for real estate tax obligations totaling $83,654.22, secured by four parcels comprising of the Property.

    (b)   Unsecured Claims

The Debtor had no less than $4,980,762.24 in Unsecured Claims as of the Petition Date, consisting of (i) proofs of claim asserting Unsecured Claims filed on or before the Bar Date, and (ii)

---

[3]    The Court authorized the debtor-in-possession financing up to a principal sum of $360,000. The outstanding indebtedness from time to time may vary.

Unsecured Claims listed in the Debtor's Schedules as not as contingent, unliquidated, or disputed and for which no proof of claim was filed.

### Section 2.05    Assets of the Debtor

(a)  Real Property

The Debtor's primary asset is the Property.  The Debtor's appraiser, William C. Harvey of William C. Harvey & Associates, Inc., has valued the Property as of June 3, 2020 to have a fair market value of between $19.3 million and $22.1 million [Dkt. Nos. 107, 160].  While the Debtor previously used the Property for the Surcharge Operations, such operations ceased in March 2020.  The Property generates minimal income net of expenses from the Airport Operations.  The Property is encumbered by a deed of trust securing the Debtor's obligations to Sandy Spring, and Liens securing the Debtor's obligations to Prince George's County, Maryland.

(b)  Leases

The Debtor's Schedule G identifies thirty leases of hangar and tie-down spaces.  To the best of Debtor's knowledge, all tenant leases are terminable on 30-days' written notice.  The Sales Contract requires that all leases be terminated prior to Closing.  The Debtor intends to provide notice of termination to the tenants in accordance with the lease terms.  However, out of an abundance of caution, the Sale and Bid Procedures Motion also provides for a sale free and clear of the leases.

(c)  General Assets

The Debtor has minimal assets of value other than the Property.  The Debtor's office equipment and fixtures have no market value, and only de minimis replacement value.  The Schedules estimated the aggregate value of office fixtures and equipment at $5,500, and grounds and airport equipment with an estimated value of $1,625.  The Debtor also owns fuel storage tanks with an estimated value of $30,000, although the airport manager (Fetter Aviation) conducts all fuel operations at its cost and expense.  The Debtor owns no other assets.

(d)  Loans to the Debtor

The Debtor's 2019 federal tax return states that its shareholders, Dr. Asterbadi and Mrs. Asterbadi, owed the Debtor $831,809.00 in shareholder loans as of December 31, 2019.  The Debtor has not yet filed its 2020 federal tax return which may reflect changes in the shareholder loans owed to the Debtor.

(e)  Claims Against PD Hyde Field

Prior to the execution of the Settlement and Plan Support Agreement, the Debtor intended to assert affirmative claims for recovery against PD Hyde Field.  The bases for such claims include claims for breach of contract, specifically the Subordination and Standstill Agreement dated December 11, 2015, by and among Sandy Spring, the Debtor and PD Hyde (the "Subordination Agreement").  The Subordination Agreement, among other things, prohibited PD Hyde from proceeding in any

way against the Debtor to enforce any claims it has or may have, unless and until the obligations to Sandy Spring had been fully and indefeasibly paid and satisfied in full. In direct violation of the Subordination, PD Hyde filed a lawsuit against the Debtor, and filed a lis pendens against the Property. The actions of PD Hyde prevented the Debtor from selling or refinancing the Property, absent the filing of this Chapter 11 case. The Debtor has suffered serious damage, including without limitation incurring substantial expenses in connection with the Chapter 11 Case. Under the Settlement and Plan Support Agreement, all such claims have been released.

(f)   Other Claims

The Debtor continues to investigate possible claims against third parties. These include matters related to the condition of the Property, such as the quantity and quality of the fill placed on the Property. The investigation includes possible claims resulting from fill placed on the property by Metro Earthworks (a division of Shirley Contracting Company LLC) in breach of its contract with Zachair and/or in violation of applicable laws, regulations, and applicable permits.

## ARTICLE III          SIGNIFICANT EVENTS IN THIS BANKRUPTCY CASE

### Section 3.01   Petition, Claims Bar Date, and Schedules and Statements

On the January 17, 2020 Petition Date, the Debtor filed with the Bankruptcy Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code commencing the Chapter 11 Case. The Debtor is continuing in possession of its property and the management of its business as a debtor-in-possession, pursuant to sections 1107 and 1108 of the Bankruptcy Code. Dr. Asterbadi (the "Debtor Designee") was designated to perform the duties imposed on the Debtor by the Bankruptcy Code. As of the date hereof, no trustee, examiner, or official committee has been appointed in this chapter 11 case.

By its *Notice of Chapter 11 Bankruptcy Case* dated January 18, 2020 (the "Claims Bar Date Notice"), the Bankruptcy Court established May 26, 2020, as the last date by which proofs of claim could be filed in the Bankruptcy Proceeding for all creditors except a governmental unit, and July 15, 2020, as the proof of claim filing deadline for a governmental unit [Dkt. No. 4]. The Claims Bar Date Notice was mailed by the Bankruptcy Court clerk's office to all creditors on January 23, 2020.

On January 29, 2020, the Debtor filed its *Schedules and Statement of Financial Affairs* [Dkt. No. 11], as amended on February 18, 2020 [Dkt. No. 29]. The Schedules reflect that as of the Petition Date, the Debtor listed assets consisting of personal property with a value of $268,707 and real property of an unknown value, and liabilities of $3,039,075.94.

## ARTICLE IV          Retention of Professionals

(a)   Whiteford, Taylor & Preston, L.L.P.

On February 10, 2020, the Debtor filed its *Application for Authority to Employ Whiteford, Taylor & Preston L.L.P. as Counsel for the Debtor* (the "WTP Application") seeking to employ Whiteford, Taylor & Preston L.L.P. ("WTP") as its counsel [Dkt. No. 20]. The WTP Application

proposed to compensate WTP for work performed on an hourly basis. Prior to the Petition Date, WTP received a series of retainers totaling $125,000 for pre-petition restructuring advice and the preparation of the Debtor's chapter 11 petition. On June 10, 2020, the Bankruptcy Court entered an order approving the employment of WTP as counsel to the Debtor [Dkt. No. 78].

(b)    Streamline Advisors, LLC and SC&H Group, Inc.

On February 11, 2020, the Debtor filed its *Application for Authority to Employ Streamline Advisors, LLC as Financial Advisor for the Debtor* (the "Streamline Application") seeking to employ Streamline Advisors, LLC ("Streamline") as its financial advisor [Dkt. No. 21]. The Streamline Application proposed to compensate Streamline for work performed on an hourly basis. Prior to the Petition Date, Streamline received a series of retainers totaling $25,000 for pre-petition services and the preparation of the Debtor's chapter 11 petition. On March 3, 2020, the Bankruptcy Court entered an order approving the employment of Streamline as financial advisor to the Debtor [Dkt. No. 43].

On November 4, 2020, the Debtor filed its *Application for Authority to Substitute and Employ SC&H Group, Inc. as Financial Advisor for the Debtor In Place of Streamline Advisors LLC* (the "SC&H Application") seeking to substitute and employ SC&H Group, Inc. ("SC&H") as its financial advisor, effective as of September 1, 2020 [Dkt. No. 164]. The Debtor filed the SC&H Application to continue to retain and employ Robert L. Patrick who resigned from Streamline and joined SC&H effective September 1, 2020. The terms and conditions of SC&H's engagement are the same as the terms and conditions on which Streamline was engaged. On November 24, 2020, the Bankruptcy Court entered an order approving the employment of SC&H as financial advisor to the Debtor [Dkt. No. 173].

(c)    William C. Harvey & Associates, Inc.

On February 12, 2020, the Debtor filed its *Application for Authority to Employ William C. Harvey & Associates, Inc. as Appraiser for the Debtor* (the "WCH&A Application") seeking to employ William C. Harvey & Associates, Inc. ("WCH&A") as its appraiser [Dkt. No. 26]. The WCH&A Application proposed to compensate WCH&A for work performed on an hourly basis. Prior to the Petition Date, WCH&A received a series of retainers totaling $12,500 for pre-petition services. On March 5, 2020, the Bankruptcy Court entered an order approving the employment of WCH&A as appraiser to the Debtor [Dkt. No. 78].

(d)    Fraser Forbes Company LLC

On May 26, 2020, the Debtor filed its *Application for Authority to Employ Fraser Forbes Company LLC as Real Estate Agent and Broker for the Debtor* (the "Fraser Forbes Application") seeking to employ Fraser Forbes Company LLC ("Fraser Forbes") as its real estate agent and broker [Dkt. No. 67]. The Fraser Forbes Application proposed to compensate Fraser Forbes at a commission equal to five percent (5.0%) of the sale price of the Property, to be paid at closing on the sale of the Property (subject to terms and conditions set forth in the Fraser Forbes Application). On June 16, 2020, the Bankruptcy Court entered an order approving the employment of Fraser Forbes as real estate agent and broker to the Debtor [Dkt. No. 81].

(e)   Womble Bond Dickinson (US) LLP

On September 17, 2020, the Debtor filed its *Motion for Order Under 11 U.S.C. § 327(e) Authorizing Employment and Retention of Womble Bond Dickinson (US) LLP as Special Counsel for Debtor-in-Possession* (the "WBD Application") seeking to employ Womble Bond Dickinson (US) LLP ("WBD") as its conflicts counsel and special counsel in connection with a lawsuit against PD Hyde Field [Dkt. No. 110]. The WBD Application proposed to compensate WBD for work performed on an hourly basis. On October 8, 2020, the Bankruptcy Court entered an order approving the employment of WBD as conflicts and special counsel to the Debtor [Dkt. No. 120].

(f)   Holland & Knight LLP

On February 11, 2021, the Debtor filed its *Application for Authority to Employ Holland & Knight LLP, as Special Counsel for the Debtor* (the "H&K Application") seeking to substitute and employ Holland & Knight LLP ("H&K"), in place of WBD, as its special counsel in connection with a lawsuit against PD Hyde Field [Dkt. No. 197]. The Debtor filed the H&K Application to continue to retain and employ Louis J. Rouleau, Esq., the principal litigator for the Debtor in the litigation with PD Hyde Field, who resigned from WBD and joined H&K as of January 13, 2021. The H&K Application proposed to compensate H&K for work performed on an hourly basis. H&K did not require the payment of any retainer. On March 15, 2021, the Bankruptcy Court entered an order approving the employment of H&K as special counsel to the Debtor [Dkt. No. 208].

(g)   Carl E. Mosley, CPA and CC Services Corporation

On January 8, 2021, the Debtor filed its *Application for Authority to Employ Carl E. Mosley, CPA and CC Services Corporation as Tax Accountant for the Debtor* (the "Mosley Application") seeking to employ Carl E. Mosley and CC Services Corporation ("Mosley") as its tax accountant [Dkt. No. 190]. On January 22, 2021, the Debtor withdrew the Mosley Application by filing its *Line Withdrawing Debtor's Application for Authority to Employ Carl E. Mosley, CPA and CC Services Corporation as Tax Accountant for the Debtor* [Dkt. No. 192].

(h)   O'Malley, Miles, Nylen & Gilmore, P.A.

On January 15, 2021, the Debtor filed its *Application for Authority to Employ O'Malley, Miles, Nylen & Gilmore, P.A. as Land Use and Zoning Counsel for the Debtor* (the "OMNG Application") seeking to employ O'Malley, Miles, Nylen & Gilmore, P.A. ("OMNG") as its land use and zoning counsel [Dkt. No. 191]. The OMNG Application proposed to compensate OMNG for work performed on an hourly basis, with a general retainer of $5,000. On February 4, 2021, the Bankruptcy Court entered an order approving the employment of OMNG as land use and zoning counsel to the Debtor [Dkt. No. 194].

(i)   Mendelson & Mendelson, CPAs, P.C.

On January 22, 2021, the Debtor filed its *Application for Authority to Employ Mendelson & Mendelson, CPAs, P.C. as Tax Accountant for the Debtor* (the "Mendelson Application") seeking to employ Mendelson & Mendelson, CPAs, P.C. ("Mendelson") as its tax accountant [Dkt. No. 193]. The Mendelson Application proposed to compensate Mendelson for work performed on an

-12-

hourly basis. On February 11, 2021, the Bankruptcy Court entered an order approving the employment of Mendelson as tax accountant to the Debtor [Dkt. No. 196].

## Section 4.02    Motion to Employ Development Consultants

On December 8, 2020, the Debtor filed its *Motion for Order Authorizing Debtor to Employ and Compensate Consultants and Experts for Specific Services Rendered in Connection With the Debtor's Real Property* (the "Motion to Employ Development Consultants"), seeking the entry of an order authorizing the Debtor to employ and compensate consultants, engineers, and other experts for specific services rendered in connection with the marketing and sale of the Debtor's Property [Dkt. No. 175]. On December 16, 2020, the Debtor filed a *Line Identifying Initial Development Professionals to be Retained Pursuant to the Debtor's Motion for Order Authorizing Debtor to Employ and Compensate Consultants and Experts for Specific Services Rendered in Connection With the Debtor's Real Property*, in which the Debtor, in consultation with Fraser Forbes, identified the following professionals to be employed in the ordinary course of business: (1) ECS MidAtlantic, LLC for geotechnical engineering services; (2) Lenhart Traffic Consulting, Inc. for transportation planning and consulting services; (3) Soltesz, LLC for engineering services including the development of concept plans; and (4) Dewberry Engineering for engineering services [Dkt. No. 178] (together, the "Development Professionals"). On January 4, 2021, the Bankruptcy Court entered an order granting the Motion to Employ Development Consultants [Dkt. No. 182].

Pursuant to the request of the United States Trustee, the Plan requires the Debtor to file reports prior to the Confirmation Hearing and prior to entry of a final decree regarding the identity of the Development Professionals, the nature of the services provided, and the amounts paid to them. The monthly operating reports filed by the Debtor also identify the Development Professionals and amounts paid to them.

## Section 4.03    Airport Management Agreement

On March 3, 2020, the Debtor filed its *Motion for Authority to Enter Into Management Agreement With Stanley Fetter d/b/a Fetter Aviation Company* (the "Fetter Motion") seeking the entry of order authorizing the Debtor to enter into a management agreement (the "Management Agreement") between the Debtor and Stanley Fetter d/b/a Fetter Aviation Company ("Fetter") governing the terms under which Fetter will manage the airfield and oversee monitoring of the surcharge operations of the Debtor, effective as of January 17, 2020 [Dkt. No. 44]. A copy of the Management Agreement was attached to the Fetter Motion as Exhibit A thereto. On June 2, 2020, the Bankruptcy Court entered an order granting the Fetter Motion [Dkt. No. 71].

## Section 4.04    Compensation of Professionals

(a)    William C. Harvey & Associates, Inc.

On February 25, 2021, WCH&A filed its *First Interim Application of William C. Harvey & Associates, Inc., Appraiser for the Debtor, for Allowance of Compensation for the Period from January 17, 2020, through November 3, 2020* (the "First WCH&A Application for

Compensation") seeking the interim allowance of compensation in the amount of $45,923.25 for the period of January 17, 2020 through November 3, 2020 [Dkt. No. 201]. On March 24, 2021, the Bankruptcy Court entered an order granting the First WCH&A Application for Compensation [Dkt. No. 210].

       (b)     Whiteford, Taylor & Preston, L.L.P.

On November 5, 2021, WTP filed its *First Interim Application of Whiteford Taylor & Preston LLP for Allowance of Compensation and Reimbursement of Expenses as Counsel for the Debtor for the Period from January 17, 2020, through September 30, 2021* (the "First WTP Application for Compensation") seeking the interim allowance of compensation in the amount of $1,671,090.50 and expenses in the amount of $31,961.77 for the period of January 17, 2020 through September 30, 2021 [Dkt. No. 268]. On December 16, 2021, the Bankruptcy Court entered an order granting the First WTP Application for Compensation [Dkt. No. 283].

       (c)     Streamline Advisors, LLC

On November 5, 2021, Streamline Advisors filed its *First Interim Application of Streamline Advisors, LLC as Financial Advisor for the Debtor for Allowance of Compensation for the Period from January 17, 2020, through August 31, 2020* (the "First Streamline Application for Compensation") seeking the interim allowance of compensation in the amount of $61,215.00 for the period of January 17, 2020 through August 31, 2020 [Dkt. No. 269]. On December 16, 2021, the Bankruptcy Court entered an order granting the First Streamline Application for Compensation [Dkt. No. 284].

       (d)     SC&H Group, Inc.

On November 5, 2021, SC&H Group filed its *First Interim Application of SC&H Group, Inc. as Financial Advisor for the Debtor for Allowance of Compensation for the Period from September 1, 2020, through September 30, 2021* (the "First SC&H Application for Compensation") seeking the interim allowance of compensation in the amount of $44,170.00 for the period of September 1, 2020 through September 30, 2021 [Dkt. No. 270]. On December 16, 2021, the Bankruptcy Court entered an order granting the First SC&H Application for Compensation [Dkt. No. 285].

       (e)     Mendelson & Mendelson, CPAs, P.C.

On November 5, 2021, Mendelson filed its *First Interim Application of Mendelson & Mendelson, CPAs, P.C. as Tax Accountant for the Debtor for Allowance of Compensation and Reimbursement of Expenses for the Period from January 22, 2021, through September 30, 2021* (the "First Mendelson Application for Compensation") seeking the interim allowance of compensation in the amount of $9,866.25 and expenses in the amount of $1.61 incurred for the period of January 22, 2021 through September 30, 2021 [Dkt. No. 271]. On December 16, 2021, the Bankruptcy Court entered an order granting the First Mendelson Application for Compensation [Dkt. No. 286].

(f)      O'Malley, Miles, Nylen & Gilmore, P.A.

On November 5, 2021, OMNG filed its *First Interim Application of O'Malley, Miles, Nylen & Gilmore, P.A. as Land Use and Zoning Counsel for the Debtor for Allowance of Compensation for the Period from January 15, 2021, through September 30, 2021* (the "First OMNG Application for Compensation") seeking the interim allowance of compensation in the amount of $4,402.50 for the period of January 15, 2021 through September 30, 2021 [Dkt. No. 272]. On December 16, 2021, the Bankruptcy Court entered an order granting the First OMNG Application for Compensation [Dkt. No. 287].

On July 25, 2022, OMNG filed its *Second Interim Application of O'Malley, Miles, Nylen & Gilmore, P.A. as Land Use and Zoning Counsel for the Debtor for Allowance of Compensation for the Period from October 1, 2021, through June 9, 2022* (the "Second OMNG Application for Compensation") seeking the interim allowance of compensation in the amount of $9,198.00 for the period of October 1, 2021 through June 9, 2022 [Dkt. No. 348]. On August 23, 2022, the Bankruptcy Court entered an order granting the Second OMNG Application for Compensation [Dkt. No. 362].

(g)      Womble Bond Dickinson (US) LLP

On November 5, 2021, WBD filed its *First Interim Application of Womble Bond Dickinson (US) LLP as Special Counsel for the Debtor for Allowance of Compensation for the Period from November 5, 2020, through September 30, 2021* (the "First WBD Application for Compensation") seeking the interim allowance of compensation in the amount of $71,593.00 for the period of November 5, 2020 through September 30, 2021 [Dkt. No. 273]. On December 16, 2021, the Bankruptcy Court entered an order granting the First WBD Application for Compensation [Dkt. No. 288].

(h)      Holland & Knight LLP

On November 5, 2021, H&K filed its *First Interim Application of Holland & Knight LLP as Special Counsel for the Debtor for Allowance of Compensation and Reimbursement of Expenses for the Period from January 13, 2021, through September 30, 2021* (the "First H&K Application for Compensation") seeking the interim allowance of compensation in the amount of $348,722.50 and expenses in the amount of $5,312.58 for the period of January 13, 2021 through September 30, 2021 [Dkt. No. 274]. On December 16, 2021, the Bankruptcy Court entered an order granting the First H&K Application for Compensation [Dkt. No. 289].

**Section 4.05   The Cash Collateral Motion**

On February 7, 2020, the Debtor filed its *Consent Motion for Interim Order Authorizing the Debtor's Use of Cash Collateral* (the "Cash Collateral Motion") seeking to use cash collateral belonging to Sandy Spring and to provide adequate protection to Sandy Spring in the form of monthly payments [Dkt. No. 17]. On February 12, 2020, the Bankruptcy Court entered an *Interim Order Granting Authorizing the Debtor's Use of Cash Collateral and Granting Adequate*

*Protection Pursuant to 11 U.S.C. § 363*, approving the Cash Collateral Motion on an interim basis [Dkt. No. 24].

On May 19, 2020, the Bankruptcy Court entered its *Second Interim Order Granting Authorizing the Debtor's Use of Cash Collateral and Granting Adequate Protection Pursuant to 11 U.S.C. § 363* further authorizing the Cash Collateral Motion on an interim basis through and including the end of the week of July 17, 2020, pending a final hearing on the Cash Collateral Motion [Dkt. No. 66].

On August 21, 2020, the Bankruptcy Court entered its *Third Interim Order Granting Authorizing the Debtor's Use of Cash Collateral and Granting Adequate Protection Pursuant to 11 U.S.C. § 363* further authorizing the Cash Collateral Motion on an interim basis through and including the end of the week of October 16, 2020, pending a final hearing on the Cash Collateral Motion [Dkt. No. 101].

### Section 4.06    Debtor-in-Possession Financing Motion

On September 8, 2020, the Debtor filed its *Motion Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364; 507 and Fed. R. Bankr. P. 2002, 4001 and 9014; and Local Bankruptcy Rules 4001-4 And 4001-5; (I) Authorizing the Debtor to Obtain Postpetition Financing, (II) Granting Liens and Super-Priority Claims, (III) Granting Adequate Protection to Prepetition Secured Lender, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* (the "DIP Motion") seeking to obtain senior secured post-petition financing pursuant to the terms and conditions of that certain loan agreement by and between the Debtor, as borrower, and Legalist DIP SPV II, LP, as lender [Dkt. No. 107].

On October 21, 2020, PD Hyde filed an opposition to the DIP Motion [Dkt. No. 128].  On October 23, 2020, Sandy Spring filed an opposition to the DIP Motion [Dkt. No. 134].

On October 26, 2020, Sandy Spring filed its *Motion for Judicial View* (the "Motion for Judicial View") requesting that the Court and the parties visit the Property [Dkt. No. 137].  On October 30, 2020, the Bankruptcy Court entered an order granting the Motion for Judicial View [Dkt. No. 153] (the "Order Granting the Motion for Judicial Review").  Pursuant to the Order Granting the Motion for Judicial View, on November 3, 2020, the Bankruptcy Court and representatives of Sandy Spring, the U.S. Trustee, and the Debtor visited the Property to inspect the nature and condition of the Property in connection with various issues raised in Sandy Spring's opposition to the DIP Motion.

On November 4, 2020, the Debtor filed its *Line re DIP Loan Motion*, in which the Debtor disclosed that Sandy Spring would provide debtor-in-possession financing to the Debtor under the terms and conditions agreed upon by the parties [Dkt. No. 165].  On November 9, 2020, the Court entered the *Final Order Authorizing Debtor-in-Possession Financing and Use of Cash Collateral* (the "Final DIP Order"), authorizing the Debtor to obtain debtor-in-possession financing in the amount of up to $360,000 provided by Sandy Spring pursuant to the DIP Financing Documents and authorizing the Debtor to use Sandy Spring's cash collateral in accordance with the budget attached thereto as Exhibit A to such order [Dkt. No. 169].

**Section 4.07    Mercedes-Benz Finance's Motion for Relief**

On August 10, 2020, Mercedes-Benz Finance filed its *Motion Seeking Relief from Automatic Stay and to Reclaim Property* (the "Mercedes Motion for Relief") seeking to recover and dispose of the Mercedes SUV on the basis that the Debtor was in post-petition arrears on its monthly contractual payments on the vehicle [Dkt. No. 98].   Thereafter, Mercedes-Benz Finance and the Debtor resolved all then-pending issues raised in the Mercedes Motion for Relief.   On August 21, 2021, Mercedes-Benz Finance filed its *Withdrawal of Motion Seeking Relief from Automatic Stay and to Reclaim Property* withdrawing the Mercedes Motion for Relief [Dkt. No. 102].

**Section 4.08    Extensions of Exclusivity**

On May 1, 2020, the Debtor filed its *Motion to Extend the Exclusivity Periods and Emergency Request for Entry of Bridge Order* (the "First Exclusivity Motion") seeking an extension of the exclusive period set forth in section 1121(c)(2) of the Bankruptcy Code through and including September 14, 2020, and an extension of the exclusive period referenced in section 1121(c)(3) of the Bankruptcy Code through and including November 12, 2020 [Dkt. No. 58].   On May 5, 2020, the Court entered the *Bridge Order* granting the First Exclusivity Motion [Dkt. No. 59]. An objection to the First Exclusivity Motion was filed by PD Hyde [Dkt. No. 69].   On July 2, 2020, the Debtor filed its *Reply in Support of Debtor's Motion to Extend the Exclusivity Periods* [Dkt. No. 84].   On July 22, 2020, the Court entered an order granting the First Exclusivity Motion [Dkt. No. 93].

On August 10, 2020, the Debtor filed its *Second Motion to Extend the Exclusivity Periods* (the "Second Exclusivity Motion") seeking an extension of the exclusive period set forth in section 1121(c)(2) of the Bankruptcy Code through and including January 12, 2021, and an extension of the exclusive period referenced in section 1121(c)(3) of the Bankruptcy Code through and including March 14, 2021 [Dkt. No. 100].   On September 10, 2020, the Court entered an order granting the Second Exclusivity Motion [Dkt. No. 108].

On December 18, 2020, the Debtor filed its *Third Motion to Extend the Exclusivity Periods and Request for Entry of Bridge Order* (the "Third Exclusivity Motion") seeking an extension of the exclusive period set forth in section 1121(c)(2) of the Bankruptcy Code through and including June 30, 2021, and an extension of the exclusive period referenced in section 1121(c)(3) of the Bankruptcy Code through and including September 17, 2021 [Dkt. No. 179].   On January 5, 2021, the Court entered an order granting the Third Exclusivity Motion [Dkt. No. 183].

**Section 4.09    Extensions of Time to Remove Civil Actions**

On March 19, 2020, the Debtor filed its *Motion to Enlarge the Period Within Which the Debtor May Remove Civil Actions* (the "First Extension Motion") seeking to enlarge the period within which the Debtor may remove civil actions pursuant to 28 U.S.C. § 1452 and Rule 9027 of the Federal Rules of Bankruptcy Procedure through and including August 14, 2020 [Dkt. No. 54].   On June 2, 2020, the Court entered an order granting the First Extension Motion [Dkt. No. 70].

On August 4, 2020, the Debtor filed its *Second Motion to Enlarge the Period Within Which the Debtor May Remove Civil Actions* (the "Second Extension Motion") seeking to enlarge the period within which the Debtor may remove civil actions pursuant to 28 U.S.C. § 1452 and Rule 9027 of the Federal Rules of Bankruptcy Procedure through and including December 14, 2020 [Dkt. No. 97].  On August 24, 2020, the Court entered an order granting the Second Extension Motion [Dkt. No. 104].

On December 4, 2020, the Debtor filed its *Third Motion to Enlarge the Period Within Which the Debtor May Remove Civil Actions* (the "Third Extension Motion") seeking to enlarge the period within which the Debtor may remove civil actions pursuant to 28 U.S.C. § 1452 and Rule 9027 of the Federal Rules of Bankruptcy Procedure through and including March 15, 2021 [Dkt. No. 176]. On August 24, 2020, the Court entered an order granting the Third Extension Motion [Dkt. No. 180].

On March 12, 2021, the Debtor filed its *Fourth Motion to Enlarge the Period Within Which the Debtor May Remove Civil Actions* (the "Fourth Extension Motion") seeking to enlarge the period within which the Debtor may remove civil actions pursuant to 28 U.S.C. § 1452 and Rule 9027 of the Federal Rules of Bankruptcy Procedure through and including June 30, 2021 [Dkt. No. 206]. On March 30, 2021, the Court entered an order granting the Fourth Extension Motion [Dkt. No. 212].

On June 30, 2021, the Debtor filed its *Fifth Motion to Enlarge the Period Within Which the Debtor May Remove Civil Actions* (the "Fifth Extension Motion") seeking to enlarge the period within which the Debtor may remove civil actions pursuant to 28 U.S.C. § 1452 and Rule 9027 of the Federal Rules of Bankruptcy Procedure through and including June 30, 2021 [Dkt. No. 206].  On March 30, 2021, the Court entered an order granting the Fourth Extension Motion [Dkt. No. 212].

On September 30, 2021, the Debtor filed its *Sixth Motion to Enlarge the Period Within Which the Debtor May Remove Civil Actions* (the "Sixth Extension Motion") seeking to enlarge the period within which the Debtor may remove civil actions pursuant to 28 U.S.C. § 1452 and Rule 9027 of the Federal Rules of Bankruptcy Procedure through and including December 31, 2021 [Dkt. No. 256]. On October 22, 2021, the Court entered an order granting the Sixth Extension Motion [Dkt. No. 265].

## Section 4.10   Sale of the Property

Since the commencement of the case, the Debtor has focused intensively on selling its primary asset, the Property, to satisfy its obligations to creditors and parties in interest.  The Debtor has retained a number of experienced professionals in connection with marketing and sale of the Property since the Petition Date to assist it with these sale efforts, including Whiteford Taylor & Preston, LLP, William C. Harvey and Associates, Inc., Fraser Forbes, O'Malley, Miles, Nylen & Gilmore, P.A., and the Development Professionals [Dkt. Nos. 47, 81, 178, 182, and 194].

On June 11, 2021, the Debtor filed a *Motion for an Order (A) Approving the Sale of the Debtor's Property Free and Clear of Liens, Claims, Interests and Encumbrances, (B) Approving the Sales Contract, (C) Approving Bid Procedures, (D) Scheduling Bid Deadline, Auction and Sale Hearing,*

*(E) Approving Form and Manner of Notice Thereof, and (F) Granting Certain Related Relief* [Docket No. 215] (the "First Sale Motion"), seeking to sell the Property to JP Land Holdings LLC ("JP Land Holdings") pursuant to the sales contract attached thereto as Exhibit B (the "First Sales Contract"), subject only to the possibility of an overbid and the other conditions described therein. The First Sale Motion, among other things, sought: (i) the approval of the sale of the Property free and clear of liens, claims, interests, and encumbrances; (ii) the approval of the bid procedures; and (iii) the approval of the form and manner of notice thereof.  On July 27, 2021, the Court entered an order granting the First Sale Motion (the "First Sale Order") [Docket No. 235].

Following the entry of the First Sale Order, the Debtor and JP Land Holdings entered into three amendments to the First Sales Contract.  The first amendment, among other things, extended the study period within which JP Land Holdings may perform due diligence in connection with the purchase of the Property from August 16, 2021, to November 15, 2021.  *See Motion for an Order (A) Authorizing and Approving the First Amendment to the Sales Contract and (B) Granting Related Relief* [Docket Nos. 242].  The second amendment further extended the study period through December 15, 2021.  *See Line re Second Amendment to Sale Contract* [Docket No. 276]. Finally, the third amendment extended the study period through January 14, 2022.  *See Line re Third Amendment to Sale Contract* (the "Third Amendment") [Docket No. 299].

After consideration and assessment of the First Sales Contract and the Property, JP Land Holdings ultimately decided to not proceed with the purchase of the Property.  Pursuant to the Third Amendment, the First Sales Contract was therefore terminated upon the expiration of the study period on January 14, 2022.

Following the termination of the First Sales Contract, the Debtor's real estate broker, Fraser Forbes (the "Broker"), continued to market the Property by identifying and contacting a number of financial and strategic investors to garner interest in pursuing a potential sale of the Property. Several interested parties executed confidentiality agreements and were asked to submit initial non-binding letters of intent or expressions of interest. The interested parties that had executed confidentiality agreements were then given the opportunity to access an electronic data room.

After receiving indications of interest from several potential buyers, the Broker began to engage in advanced discussions regarding a potential sale transaction for the Property with such parties. After reviewing and carefully considering the letters of intent or expressions of interest, the Debtor determined, in consultation with its advisors, that the best and highest offer was from NVR, Inc. ("NVR").  The Debtor and NVR thereafter prepared, negotiated, and executed the Sales Contract. The terms of the Sales Contract – both economic and non-economic terms – are significantly higher and better than any other letters of intent and expressions of interest received by the Debtor.

In conjunction with the marketing of the Property, and the efforts to facilitate a satisfactory conclusion of the studies period under the First Sales Contract, the Debtor procured various reports and analyses, including geotechnical reports, engineering analyses, environmental studies, and preliminary design work.  The Debtor also engaged land use counsel and a consultant to assist discussions with representatives of Prince Georges' County.  Following the termination of the First Sales Contract, the Debtor and its advisers met with County and State representatives to gain a better understanding of the likelihood of obtaining development approvals with respect to the

-19-

Property. The information that the Debtor obtained through the foregoing efforts informed the Debtor regarding development expectations and aided the Debtor in negotiating the Sales Contract. Following its robust marketing process and extensive discussions with its advisors, the Debtor ultimately selected NVR as the purchaser of the Property.

On June 5, 2022, the Debtor filed its *Second Motion for (A) Approving the Stale of the Debtor's Property Free and Clear of Liens, Claims, Interests and Encumbrances, (B) Approving the Sales Contract, (C) Approving Bid Procedures, (D) Scheduling Bid Deadline, Auction and Sale Hearing, (E) Approving Form and Manner of Notice Thereof, and (F) Granting Certain Related Relief* [Docket No. 321] (the "Sale and Bid Procedures Motion"), seeking the Court's approval of: (i) the sale of the Property to NVR pursuant to the Sales Contract; (ii) the sale of the Property free and clear of liens, claims, interests, and encumbrances to the Prevailing Bidder; (iii) approval of the bid procedures and the sale notice; and (iv) other related relief. On July 1, 2022, the Court entered an order approving the Sale and Bid Procedures Motion, subject to terms and conditions set forth therein. *See* Docket No. 343.

The material terms of the Sales Contract with NVR and the now-terminated First Sales Contract with JP Land Holdings are summarized in the following table for purposes of comparison.

| ITEM[4] | DESCRIPTION | |
|---|---|---|
| | **NVR Sales Contract** | **JP Land Holdings Sales Contract** |
| Seller | Zachair, Ltd. | Zachair, Ltd. |
| Purchaser | NVR, Inc. | JP Land Holdings LLC |
| Property See §§ 1, 19 | 423.45 acres of land and improvements located in Clinton, Maryland (the "Property"), including front foot benefit rights. | 423.45 acres of land and improvements located in Clinton, Maryland (the "Property"), less (a) approximately 13 acres located adjacent to the intersections of Piscataway and Steed Roads (the "Retained Parcel"), and (b) front foot benefit rights. The Debtor expects to sell the Retained Parcel to a commercial developer. The Debtor may sell the front foot benefit rights or enter into a contract with respect to administration of such rights. |
| Purchase Price See § 2 | Initial payment of $10,000,000 (the "Initial Payment"), plus the following contingent payments: (i) $20,000 per unit in excess of 500 units if the Residential Record Plat Approval (as defined in the Sales Contract) process results units in excess of 500 units (the "Additional Lot Payments"); and (ii) 20% of net proceeds generated from the sale of the Non-Residential Property (as defined in the Sales Contract), or 20% of net appraised value of the Non-Residential | $16,000,000, plus one half of transfer and recordation tax savings if sold pursuant to a plan. Subject to possible adjustment for specified costs relating to Retained Parcel. |

---

4    All citations in this table refer to the section(s) in the Sales Contract with NVR.

| | | |
|---|---|---|
| | Property if disposed of pursuant to a lease (the "Alternative Land Payments", and together with the Initial Payment and the Additional Lot Payments, the "Purchase Price"). The Purchase Price shall be capped at $17,000,000, and shall have a minimum floor of $12,000,000. | |
| Payment terms See § 2 | $10,000,000 cash at closing, with the Additional Lot Payments and the Alternative Land Payments due upon satisfaction of the applicable performance thresholds and terms outlined in the Contract. The Deposit and the Extension Fee apply toward the purchase price. | $10,000,000 cash at closing; balance paid pursuant to two year promissory bearing interest at 4% per annum; principal paid in two installments on first and second anniversary of note. The Deposit would apply to the Purchase Price, but the Extension Fee would not. |
| Deposit See § 3 | A $500,000 deposit to be posted into escrow upon the Court's approval of the Plan. The deposit is non-refundable absent: (i) seller default, (ii) failure of specified bankruptcy conditions, or (iii) purchaser does not deliver the Notice of Intent to Proceed within the Study Period. | Initial deposit of $250,000, increases to $500,000 upon satisfactory completion of test and studies period. Initial deposit is refundable if Sales Contract is terminated before end of test and studies; thereafter, deposit is non-refundable absent seller default or failure of specified bankruptcy conditions. |
| Test and studies See § 4 | Test and studies period is open for 90 days commencing the later of: (i) the execution of the Contract, and (ii) entry of the Court's order approving of the Bidding Procedures. The Contract automatically terminates unless Purchaser delivers notice of intent to proceed on or before 90th day. | Test and studies period was open initially until August 16, 2021, and January 14, 2022 as extended. The Sales Contract automatically terminated unless Purchaser delivers notice of intent to proceed on or before the deadline. |
| Closing See § 6 | The later of: (i) August 1, 2023 or (ii) 12 months after the Court's approval of the Plan, extendable for 6 months (but no more than 15 months from the Court's approval of the Plan) upon payment of $250,000 extension fee. | One year following date of Sales Contract (i.e., June 1, 2022), extendable for 6 months (i.e., December 1, 2022) for payment of $250,000 extension fee. |
| Conditions precedent to purchaser's obligation to close See § 11 | (i) Title to Property must be good, marketable and insurable (other than "Permitted Exceptions"); (ii) Seller representations and warranties must be true, and seller covenants must be satisfied; and (iii) Bankruptcy Court must enter the Sale and Bid Procedures Order and the Confirmation Order authorizing the sale of the Property to purchaser, and such | (i) Title to Property must be good, marketable and insurable (other than "Permitted Exceptions"); (ii) Seller representations and warranties must be true, and seller covenants must be satisfied; and (iii) Bankruptcy Court must enter the Preliminary Approval Order or the Confirmation Order authorizing the sale of the Property to purchaser, and such order must not be subject to a stay. |

| | | |
|---|---|---|
| | orders must not be subject to a stay; and | |
| Conditions precedent to seller's obligation to close See § 12 | (i) Bankruptcy Court shall have entered the Sale and Bid Procedures Order; <br><br> (ii) Unless waived by seller, Bankruptcy Court shall have entered the Confirmation Order; <br><br> (iii) Unless waived by seller, the effective date of seller's plan shall have occurred; <br><br> (iv) Unless waived by seller, Sale and Bid Procedures Order and Confirmation Order shall have become final orders; and <br><br> (v) Purchaser representations and warranties shall be true, and purchaser covenants must be satisfied. | (i) Bankruptcy Court shall have entered the Preliminary Approval and Sale and Bid Procedures Order; <br><br> (ii) Unless waived by seller, Bankruptcy Court shall have entered the Confirmation Order; <br><br> (iii) Unless waived by seller, the effective date of seller's plan shall have occurred; <br><br> (iv) Unless waived by seller, Preliminary Approval and Sale and Bid Procedures Order and Confirmation Order shall have become final orders; and <br><br> (v) Purchaser representations and warranties shall be true, and purchaser covenants must be satisfied. <br><br> In the event seller terminates on account of failure of conditions (i)-(iv), purchaser will be entitled to refund of Deposit and any Extension Fee. Additionally, in the event seller terminate on account of failure of conditions (ii)-(iv), purchaser shall be entitled to the Expense Reimbursement (defined below). |
| Seller remedies See § 13 | Except as set forth in the Contract, Seller's sole remedies for purchaser default are termination of contract and forfeiture of Deposit as liquidated damages. | Seller's sole remedies for purchaser default are termination of contract and forfeiture of Deposit as liquidated damages. |
| Purchaser remedies See § 14 | Purchaser's remedies are: <br><br> (i) Specific performance; or, alternatively <br><br> (ii) Termination of contract and refund of Deposit (and in certain circumstances refund of the Extension Fee). <br><br> If specific performance is not available to Purchaser because Seller has intentionally sold the Property to another party, Purchaser shall have all other rights and remedies, including claims for actual damages, consequential damages, lost profits or punitive damages. | Purchaser's remedies are: <br><br> (i) Specific performance; or, alternatively <br><br> (ii) Termination of contract and refund of Deposit (and in certain circumstances refund of the Extension Fee). <br><br> Purchaser waives all other rights and remedies, including claims for actual damages, consequential damages, lost profits or punitive damages. |

| Bankruptcy provisions See § 20 | In the event of a closing on a sale of the Property to a bidder other than purchaser:<br><br>(i)    Deposit will be refunded;<br>(ii)   Extension Fee, if any, will be refunded;<br>(iii)  Purchaser shall be entitled to a "break-up" fee of $600,000; and<br>(iv)  Purchaser shall be entitled to reimbursement of its actual third party fees and costs in connection with contract, including without limitation engineering and attorneys' fees (the "Expense Reimbursement") | In the event of a closing on a sale of the Property to a bidder other than purchaser:<br><br>(i)    Deposit will be refunded;<br>(ii)   Extension Fee, if any, will be refunded;<br>(iii)  Purchaser shall be entitled to a break-up fee equal to 2% of the purchase price; and<br>(iv)  Purchaser shall be entitled to reimbursement of its actual third party fees and costs in connection with contract, including without limitation engineering and attorneys' fees (the "Expense Reimbursement") |

**Section 4.11   Exit Financing**

To facilitate its ability to accelerate consummation of the Plan and payments to creditors, the Debtor solicited interest from numerous potential lenders to provide Exit Financing. Ultimately, the Debtor selected Three Line Capital LLC ("Three Line") as its potential lender. On August 13, 2021, the Debtor and Three Line entered into a term sheet regarding Exit Financing. The term sheet is not binding, except with respect to the payment of Three Line's in connection with due diligence fees and costs, and a break-up fee. On August 23, 2021, the Debtor filed its *Motion for an Order (A) Authorizing and Approving the Term Sheet and Payment of Fees with Regard to Exit Financing; (B) Granting Super-Priority Claim; and (C) Granting Related Relief* [Dkt. No. 241] (the "Exit Fee Motion"). On September 13, 2021, the Court entered its order granting the Exit Fee Motion. *See* Dkt. No. 251. On September 30, 2021, Three Line delivered a commitment letter for Exit Financing (the "Commitment Letter"). However, because the First Sales Contract with JP Land Holdings was terminated, as discussed above, the Exit Financing did not close timely. The Debtor remains in discussions with Three Line regarding the prospect of renewed financing arrangements.

**ARTICLE V          SUMMARY OF PLAN**

**Section 5.01   Purpose of Plan**

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11, a debtor is authorized to reorganize its business for the benefit of its creditors and shareholders. The Debtor has filed the Plan as a means to maximize the value of its estate for the benefit of its creditors and equity Holders.

The following is a summary of the significant provisions of the Plan. All statements made below are general in nature and are qualified in their entirety by reference to the complete terms of the Plan attached hereto. Creditors and parties-in-interest are urged to read the entire Plan and consult with their respective counsel, accountants, and business advisors in order to fully understand the Plan.

The Plan, upon confirmation by the Bankruptcy Court, shall be legally binding upon the Debtor, its creditors, and other parties-in-interest designated by section 1141(a) of the Bankruptcy Code. It is essential that Creditors fully understand the Plan in order to make an informed decision with respect to the treatment of their respective Claims or Interests.  Unless otherwise defined herein, all capitalized terms shall have the respective meanings assigned in the Plan.  In the event that any disclosure herein provided appears to conflict with an express provision of the Plan, the explicit terms of the Plan are controlling.

The Debtor believes the Plan provides for the greatest and earliest feasible return to the Holders of Allowed Claims and Interests in a fair and equitable manner.  The following is a summary of the Plan and a description of the treatment of the Classes of Claims and Interests.

## Section 5.02   Claims Classification and Treatment

    (a)   Introduction

The Plan places all Claims and Interests, except Administrative Claims and Priority Tax Claims in the Classes set forth below.  A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class, and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes.  A Claim is also placed in a particular Class for the purpose of receiving Distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released or otherwise settled prior to the Effective Date.

    (b)   Classification and Impairment

The following Classes are established under the Plan and are Impaired or Unimpaired, as indicated below:

| Class | Designation | Impairment | Entitled to Vote |
|---|---|---|---|
| 1 | Sandy Spring Prepetition Loan | Impaired | Yes |
| 2 | Sandy Spring DIP Loan | Unimpaired | No |
| 3 | Prince George's County Real Estate Taxes | Impaired | Yes |
| 4 | TD Bank Auto Loan | Impaired | Yes |
| 5 | Mercedes Benz Auto Loan | Impaired | Yes |
| 6 | PD Hyde Field Deposit Claim | Impaired | Yes |
| 7 | Other Priority Claims | Impaired | Yes |
| 8 | General Unsecured Claims | Impaired | Yes |
| 9 | Equity Interests | Impaired | Yes |

**Section 5.03    Treatment of Claims and Interests**

 (a) Class 1 – Sandy Spring Bank Pre-Petition Loan

<u>Classification</u>:  Class 1 consists of the Secured Claim of Sandy Spring under the Sandy Spring Pre-Petition Loan.

<u>Treatment</u>:  Except to the extent that the Holder of the Allowed Class 1 Claim agrees in writing to less favorable treatment:

1. On the Effective Date, the Class 1 Claim shall be deemed Allowed in the amount set forth in proof of claim no. 21-1 (the "Sandy Spring Proof of Claim"), without prejudice to the Allowance of additional legal fees and costs, or post-petition interest.
2. The Debtor shall pay in full the Allowed Class 1 Claim on the Effective Date.
3. Interest shall accrue post-petition through December 31, 2021 at the rate of 6.25% per annum on the outstanding principal amount of the Class 1 Claim.  In the event that the Class 1 Claim is paid in full prior to January 1, 2023, the rate for January 1, 2022 through the pay off shall be computed at 8.0%.  In the event that the Class 1 Claim has not been repaid prior to January 1, 2023, the Class 1 Claim shall bear interest from January 1, 2022 through the pay off at the rate of prime plus 4.0%.
4. The Holder of the Allowed Class 1 Claim shall retain its Lien on the Property to secure the Allowed Class 1 Claim until such Claim is paid.

<u>Voting</u>:  Class 1 is Impaired by the Plan.  The Holder of the Allowed Class 1 Claim is entitled to vote to accept or reject the Plan.

 (b) Class 2 – Sandy Spring DIP Loan

<u>Classification</u>:  Class 2 consists of the Allowed Secured Claim of Sandy Spring under the Sandy Spring DIP Loan.

<u>Treatment</u>:  Except to the extent that the Holder of the Allowed Class 2 Claim agrees in writing to less favorable treatment:

1. On the Effective Date, the Debtor shall pay, in Cash, the then outstanding principal amount of the Sandy Spring DIP Loan, along with any unpaid interest and legal fees accrued as of the Effective Date.
2. Interest shall accrue post-petition through December 31, 2021 at the rate of 6.25% per annum on the outstanding principal amount of the Class 2 Claim.  In the event that the Class 2 Claim is paid in full prior to January 1, 2023, the rate for January 1, 2022 through the pay off shall be computed at 8.0%.  In the event that the Class 2 Claim has not been repaid prior to January 1, 2023, the Class 2 Claim shall bear interest from January 1, 2022 through the pay off at the rate of prime plus 4.0%.
3. Sandy Spring shall not be required to file a proof of claim with respect to the Class 2 Claim.
4. The Holder of the Allowed Class 2 Claim shall retain its Lien on the Property to secure the Allowed Class 2 Claim until such Claim is paid.

<u>Voting</u>:  Class 2 is Unimpaired by the Plan.  The Holder of the Allowed Class 2 Claim is not entitled to vote to accept or reject the Plan.

(c)  Class 3 – Prince George's County Real Estate Taxes

<u>Classification</u>:  Class 3 consists of the Allowed Secured Claims of Prince George's County, Maryland, for unpaid real estate taxes that are secured by the Property, plus any interest or penalties now existing or arising with respect to such tax claims, and less any available credits, including without limitation credits available on account of the Debtor's operation of an airfield.

<u>Treatment</u>:  Except to the extent that the Holder of the Allowed Class 3 Claim agrees in writing to less favorable treatment:

1. If the Debtor obtains Exit Financing on or before the Effective Date, on the Effective Date the Debtor shall pay, in Cash, the then outstanding amount of the Allowed Class 3 Claim to the extent that payment of such Claim is then required to avoid the imposition of any penalty.
2. If the Debtor has not obtained Exit Financing on or before the Effective Date, on the Closing Date the Debtor shall pay, in Cash, the then outstanding amount of the Allowed Class 3 Claim to the extent that payment of such Claim is then required to avoid the imposition of any penalty.
3. Any Class 3 Claim that has accrued, but is not due and payable as of the Closing Date, shall be paid by the then-owner of the Property when and as such payment is due under applicable law.
4. The Holder of the Allowed Class 3 Claim shall retain its Lien on the Property to secure the Allowed Class 3 Claim until such Claim is paid.

<u>Voting</u>:  Class 3 is Impaired by the Plan.  The Holder of the Allowed Class 3 Claim is entitled to vote to accept or reject the Plan.

(d)  Class 4 – TD Auto Finance Allowed Secured Claim

<u>Classification</u>:  Class 4 consists of the Allowed Secured Claim of TD Auto Finance, which is secured by the Mercedes SL that is co-owned by the Debtor and Dr. Asterbadi.

<u>Treatment</u>:  Except to the extent that the Holder of the Allowed Class 4 Claim agrees in writing to less favorable treatment, in satisfaction of its Class 4 Claim:

1. The Holder of the Class 4 Claim shall retain its lien in the Mercedes SL pending payment in full of the Allowed Class 4 Claim.
2. The Debtor shall pay the Allowed Class 4 Claim in full on the Effective Date.
3. Pending the occurrence of the Effective Date and pursuant to the agreement of the parties:
   a. Dr. Asterbadi, at his expense, shall continue making payments to TD Auto Finance in the amount of $1,000 per month until the Closing Date.
   b. Any payments made by Dr. Asterbadi post-petition shall be credited against the Class 4 Claim.
   c. Pending payment in full of the Allowed Class 4 Claim, Dr. Asterbadi, at his sole cost and expense, shall maintain property and liability insurance on the Mercedes

SL.  TD Auto Finance shall be identified as the first lien holder and loss payee with respect to property insurance on the Mercedes SL.  Dr. Asterbadi shall provide proof of insurance to TD Auto Finance from time to time upon request.

d.  Pending further order of the Bankruptcy Court, TD Auto Finance shall be stayed from exercising remedies with respect to the Mercedes SL.  Should payment(s) not be received timely and in good funds, or upon any other default with respect to Class 4, TD Auto Finance may send the Debtor and Dr. Asterbadi a notice of default and if the default is not cured within fifteen (15) days, TD Auto Finance shall be entitled to relief from the stay to permit TD Auto Finance to take possession of, and dispose of, the Mercedes SL in accordance with the contract and state law.

<u>Voting</u>:  Class 4 is Impaired by the Plan.  The Holder of the Allowed Class 4 Claim is entitled to vote to accept or reject the Plan.

(e)  Class 5 – Mercedes-Benz Finance Allowed Secured Claim

<u>Classification</u>:  Class 5 consists of the Allowed Secured Claim of Mercedes-Benz Finance, secured by the Mercedes SUV that is co-owned by the Debtor and Dr. Asterbadi.

<u>Treatment</u>:  Except to the extent that the Holder of the Allowed Class 5 Claim agrees in writing to less favorable treatment, in satisfaction of its Class 5 Claim:

1.  The Holder of the Class 5 Claim shall retain its lien in the Mercedes SUV pending payment in full of the Allowed Class 5 Claim.
2.  The Debtor shall pay the Allowed Class 5 Claim in full on the Effective Date.

<u>Voting</u>:  Class 5 is Impaired by the Plan.  The Holder of the Allowed Class 5 Claim is entitled to vote to accept or reject the Plan.

(f)  Class 6 – PD Hyde Field Secured Claim

<u>Classification</u>:  Class 6 consists of the Allowed Secured Claim of PD Hyde Field.

<u>Treatment</u>:  Except to the extent that the Holder of the Allowed Class 6 Claim agrees in writing to less favorable treatment:

1.  PD Hyde Field shall be deemed to have an allowed non-priority unsecured claim in the Bankruptcy Case in the amount of Three Million Two Hundred Thousand and No/100 Dollars ($3,200,000.00).
2.  If the Debtor obtains Exit Financing prior to the Effective Date, and if the Effective Date occurs on or before December 31, 2022, the Debtor shall pay a sum as may be agreed upon (the "<u>Effective Date Payment</u>") to PD Hyde Field concurrently with the funding of such financing, and shall pay an additional sum to be agreed upon (the "<u>Back End Payment</u>") to PD Hyde Field at the time of payments with respect to other general unsecured claims under the Plan.
3.  If the Debtor is not able to arrange or consummate Exit Financing, or the Debtor and PD Hyde Field do not reach agreement with respect to the amount of the payments

referenced in the foregoing subsection, the Debtor shall pay the Allowed Class 6 Claim in full *pari passu* with the payment of principal to other allowed general unsecured claims.

4. No interest shall be paid on or with respect to the Class 6 Claim.

Voting: Class 6 is impaired under the Plan. The Holder of Allowed Class 6 Claim is entitled to vote to accept or reject the Plan.

(g) Class 7 – Other Priority Claims

Classification: Class 7 consists of all Other Priority Claims against the Debtor. The Debtor does not believe that there are any Class 7 Claims. Nevertheless, in the event that any such Claims are Allowed, they shall be treated as follows.

Treatment: Except to the extent that a Holder of an Allowed Class 7 Claim agrees to a less favorable treatment, in satisfaction of its Class 7 Claim:

1. The Holder of an Allowed Class 7 Claim shall be paid the amount of its Allowed Class 7 Claim, plus interest from the Effective Date through the date of payment at the Post-Effective Date Interest Rate.
2. Subject to the payment in full of all Allowed Secured Claims, Allowed Administrative Claims, and Allowed Professional Fee Claims, Allowed Class 7 Claims shall be paid on the Closing Date (or such later date on which funds are available, but not later than the Purchaser Payment Date); provided, however, that all Allowed Class 7 Claims shall be paid no later than the fifth anniversary of the Petition Date.

Voting: Class 7 is Impaired by the Plan. The Holders of Allowed Class 7 Claims are entitled to vote to accept or reject the Plan.

(h) Class 8 – General Unsecured Claims

Classification: Class 8 consists of Allowed General Unsecured Claims, except for the Claim of PD Hyde Field, which has been separately classified.

Treatment: Except to the extent that a Holder of an Allowed Class 8 Claim agrees to a less favorable treatment, in satisfaction of its Class 8 Claim, each Holder of an Allowed Class 8 Claim shall be treated as follows:

1. Each Holder of an Allowed Class 8 Claim shall be paid the Allowed Amount of such Claim in full, as set forth below.
2. Interest shall accrue on the outstanding amount of each Allowed Class 8 Claim from the Petition Date through the Effective Date at the Pre-Effective Date Interest Rate
3. Interest shall accrue on the outstanding amount of the Allowed Class 8 Claim from the Effective Date through the date of payment of such Claims: (a) if Class 8 rejects the Plan, at the Post-Effective Date Interest Rate; or (b) if Class 8 accepts the Plan, at the rate of six percent (6.0%) per annum.

4. Except as provided below, payments shall be made in Cash on the later of the Closing Date, or the date such Claim becomes an Allowed Claim by a Final Order (or as soon as reasonably practicable thereafter).

5. Payments to Holders of Allowed Class 8 Claims shall be made only to the extent that Net Closing Funds and/or Net Purchase Funds are available. Each Holder of an Allowed Class 8 Claim shall be paid its Pro Rata Share of the Net Closing Funds and Net Purchase Funds.

Voting: Class 8 is Impaired by the Plan. The Holders of Allowed Class 8 Claims are entitled to vote to accept or reject the Plan.

(i) Equity Interests

Classification: Class 9 consists of the Equity Interests in the Debtor.

Treatment: The Holders of Equity Interests in the Debtor shall retain such interests. Unless and until the Debtor has paid or reserved funds for the payment of all Allowed and Disputed Claims and anticipated post-Effective Date operating expenses, the Debtor shall not make any distributions or loans to Holders of any Equity Interests. Notwithstanding the foregoing limitation, but conditioned upon the payment or reserve for payment of all Claims and expenses required under law or this Plan to be paid on the Effective Date, on the Effective Date: (a) the Debtor shall be authorized to pay or reimburse customary business expenses incurred on behalf of the Debtor, and consistent with past practices, by Holders of Equity Interests; and (b) to pay deferred compensation to Dr. Asterbadi at the rate of $2,000 per month retroactively to the Petition Date. Subject to satisfaction of the conditions set forth above, and the additional conditions set forth below, he Debtor further shall be authorized to make distributions to Holders of Equity Interests to the extent that: (i) such distributions do not impair the Debtor's ability to make any payments required under the Plan in amounts, and at the times, projected in the exhibits to the Disclosure Statement; and (ii) after reserving for all projected operating expenses, the Debtor's cash on deposit is not less than $200,000. Upon payment and satisfaction of all Allowed Claims and Administrative Expenses, and repayment and satisfaction of all obligations and indebtedness with respect to Exit Financing, all restrictions on distributions imposed by the Plan shall terminate and be of no further force or effect.

Voting: Class 9 is Impaired by the Plan. The Holders of Class 9 Equity Interests are entitled to vote to accept or reject the Plan.

**Section 5.04    Treatment of Unclassified Claims and Expenses**

(a) Administrative Claims

The Plan provides that, in full satisfaction, and settlement of and in exchange for each Allowed Administrative Claim, except to the extent that any Holder of an Allowed Administrative Claim has received payment prior to the Effective Date, agrees with the Debtor to different treatment or as otherwise provided for in the Plan, each Holder of an Allowed Administrative Claim shall receive payment in full, in Cash, on the later of (i) the Effective Date if due on or before that date and unpaid on the Effective Date, (ii) as soon as practicable after the date upon which such

Administrative Claim becomes an Allowed Claim, or (iii) such other date as may be agreed upon between the Holder of such Allowed Administrative Claim and the Debtor.

Any Holder of an Other Administrative Claim shall, no later than the Administrative Claims Bar Date, File an application for allowance of such Other Administrative Claim. **The failure to File an application seeking the allowance of any Other Administrative Claim by the Administrative Claims Bar Date shall constitute a bar against the assertion or collection of any such Administrative Claim, and shall relieve the Debtor from any liability, responsibility or obligation with respect to such Administrative Claim. Without limiting the generality of the foregoing, no Distribution shall be made pursuant to this Plan with respect to any Other Administrative Claim (other than Professional Fee Claims) that is not Filed by the Administrative Claims Bar Date. The Debtor shall not be required to File any objection in order to confirm or determine the disallowance of any late-Filed motion for the allowance or payment of any Administrative Claim (other than Professional Fee Claims).**

      (b)  Professional Fee Claims

Any Professional seeking an award by the Bankruptcy Court of an Allowed Professional Fee Claim on account of Professional Fees incurred from the Petition Date through and including the Effective Date (i) shall, no later than forty five (45) days after the Effective Date, File a final application for allowance of compensation for services rendered and reimbursement of expenses incurred through and including the Effective Date, and (ii) shall receive, as soon as reasonably practicable after such Claim is Allowed, in full settlement, and satisfaction of, and in exchange for, such Allowed Professional Fee Claims, Cash in the amount of the Allowed Professional Fee Claims.

      (c)  Priority Tax Claims

Except to the extent that an Allowed Priority Tax Claim has been paid prior to the Effective Date or unless otherwise agreed by the Debtor and the Holder of an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim shall receive payment in full of its Allowed Priority Tax Claim: (i) over a period ending not later than 5 years after the date of the order for relief under section 301, 302, or 303; (ii) in for by the Plan; and (iii) in a manner not less favorable than the most favored nonpriority Unsecured Claim.

      (d)  U.S. Trustee Fee Claims

The Plan provides that the Debtor shall pay all U.S. Trustee Fees for each quarter (including any fraction thereof) until the Chapter 11 Case is converted, dismissed, or closed, whichever occurs first. The U.S. Trustee shall not be required to File any proof(s) of claim regarding quarterly fees.

**Section 5.05    Means for Implementation of Plan**

   (a)    Revesting of Assets

On the Effective Date, all property of the Estate shall revest in the Debtor, subject to the Liens expressly preserved by the Plan, and to the terms and conditions of the Plan, but otherwise free and clear of all other liens, claims, interests and encumbrances.

   (b)    Sale of the Property

On the Closing Date, the Debtor shall transfer the Property to the Stalking Horse Purchaser, or if applicable, another Prevailing Bidder, pursuant to the terms of the Sales Contract. If the Stalking Horse Purchaser is the Prevailing Bidder, the Sales Contract between the Debtor and the Stalking Horse Purchaser shall be deemed finally approved pursuant to the Confirmation Order. In the event that another party is determined to be the Prevailing Bidder, the Sales Contract between the Debtor and such Prevailing Bidder shall be approved pursuant to the Confirmation Order. The sale of the Property shall be free and clear of all Liens, Claims and Encumbrances pursuant to sections 363(f) and 1141 of the Bankruptcy Code.

   (c)    Releases of Record

Upon the request of the Debtor, any Entity that is entitled to receive any Distribution under the Plan, or whose Lien is extinguished or modified pursuant to the Plan, shall execute and deliver such documents and instruments as are necessary to release, modify or preserve of record any Lien, to the extent such Lien is extinguished, modified or preserved pursuant to the Plan. Notwithstanding any provision in the Plan, the Debtor shall not be required to make any Distribution, or deliver any document or instrument, to any Entity, unless and until such Entity has complied with this obligation. The obligations set forth in this paragraph shall not be waived by any action or inaction of the Debtor, including without limitation commencement of Distributions to the affected Entity.

   (d)    Exit Financing

In the event that the Debtor arranges Exit Financing, the Debtor reserves the right to seek approval of Exit Financing either in connection with the Confirmation Hearing or upon separate motion. The Debtor may use the proceeds of Exit Financing for the purpose of payment of Claims, Administrative Expenses, pre-Confirmation and post-confirmation Professional Fees and other business expenses that are consistent with the terms of the Plan.

   (e)    Exemption from Transfer and Recordation Taxes

Pursuant to Bankruptcy Code section 1146(a), any transfers from the Debtor to any Entity, including without limitation the sale of the Property, and the provision of any deed of trust or other Lien on the Property, pursuant to the Plan in the United States shall not be subject to any stamp tax, transfer tax, or similar tax, and the Confirmation Order shall prohibit and enjoin the appropriate state or local governmental officials or agents from collecting any such tax or governmental assessment, from delaying or conditioning the recordation of any instrument on

account of the non-payment of transfer or recordation taxes, and shall require such officials or agents to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment. Without limiting the generality of the foregoing, the following transactions will be exempt from all recordation and transfer taxes: (a) the deed conveying the Property to the Stalking Horse Purchaser (or Prevailing Bidder); (b) the Deed of Trust; and (c) any deed of trust securing the Exit Financing.

(f)    Income Tax Reserve and Payment

The Holders of Equity Interests in the Debtor shall be responsible for the payment of income taxes resulting from the sale of the Debtor's property and operations of the Debtor's business. The Debtor believe that the funds projected to be available to the Holders of Equity Interests from payments on the Purchaser Note will be sufficient to pay tax liabilities arising in connection with the sale of the Debtor's Property and operations of its business.

(g)    Preservation of Priority

Notwithstanding the occurrence of the Confirmation Date or the Effective Date, all Claims, including without limitations Administrative Claims, shall retain their respective priority under the Bankruptcy Code and applicable non-bankruptcy law.

(h)    Corporate Action

Upon the Effective Date, by virtue of the solicitation of votes in favor of the Plan and entry of the Confirmation Order, all actions contemplated by the Plan shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by Holders of Claims or Equity Interests, the Debtor, or any other Entity or Person or further Order of the Bankruptcy Court. All matters provided for in the Plan involving the corporate structure of the Debtor, and any corporate action required by the Debtor in connection therewith, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Debtor or the Estate. The authorizations and approvals contemplated by the Plan shall be effective notwithstanding any requirements under applicable non-bankruptcy law.

(i)    Effectuating Documents; Further Transactions

The Debtor is authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, without the need for any further Bankruptcy Court Order, approvals, authorization, or consents except for those expressly required pursuant to the Plan.

(j)    Preservation of Rights of Action

Other than Causes of Action against an Entity that are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or by a Bankruptcy Court order, the Debtor reserves any and all Causes of Action, including without limitation any actions specifically enumerated

-32-

in this Disclosure Statement. On and after the Effective Date, the Debtor may pursue such Causes of Action.

No Entity may rely on the absence of a specific reference in the Plan or this Disclosure Statement to any Cause of Action against them as any indication that the Debtor will not pursue any and all available Causes of Action against them. No preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Debtor reserves the Causes of Action notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Case or pursuant to the Plan. The Debtor shall retain and shall have, including through its authorized agents or representatives, the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court to the fullest extent permitted by section 1123 of the Bankruptcy Code and all other applicable law.

Except for Claims, causes of action, counterclaims and defenses against PD Hyde Field and its Affiliates, all of which are expressly reserved, on the Effective Date, the Debtor hereby waives and releases all Avoidance Actions against all Persons and Entities.

    (k)  Retention of Professionals After Effective Date

        *1.*    *Retention Arrangements*

From and after the Effective Date, the Debtor may, without further order of the Bankruptcy Court, employ, or continue the employment of, various professionals, including, but not limited to, counsel, consultants, and financial advisors, as needed to assist the Debtor in fulfilling its obligations under the Plan, and on whatever fee arrangement it deems appropriate, including, without limitation, hourly fee arrangements and contingency fee arrangements.

        *2.*    *Payment of Professionals*

Professionals engaged by, or who continue to provide services to, the Debtor after the Effective Date shall not be required to File applications for compensation in order to receive the compensation provided for herein, but rather may be compensated in the ordinary course of business pursuant to their respective agreements with the Debtor.

    (l)  Closing of Debtor's Case

For the avoidance of doubt, the closing of the Debtor's Chapter 11 Case shall not have any effect, in any manner, on the Causes of Action that the Debtor may assert in accordance with the Plan. Notwithstanding anything to the contrary in the Bankruptcy Rules providing for earlier closure of the Chapter 11 Case, and all Claims have been adjudicated, the Debtor reserves the right to seek

authority from the Bankruptcy Court to close the Chapter 11 Case in accordance with the Bankruptcy Code, the Bankruptcy Rules and the Plan.

(m)  Operation of the Debtor Between the Confirmation Date and the Effective Date

During the period from the Confirmation Date through and until the Effective Date, the Debtor shall continue to manage its estate as a debtor in possession, subject to the oversight of the Bankruptcy Court as provided in the Bankruptcy Code, the Bankruptcy Rules, and all orders of the Bankruptcy Court that are then in full force and effect.

(n)  Automatic Stay

Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays provided for in this Chapter 11 Case under sections 105 or 362 of the Bankruptcy Code or otherwise, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date.

(o)  Destruction of Books and Records

The Debtor has the right to seek authority to destroy or abandon any books and records of the Debtor or its Estate.  However, prior to closing the Chapter 11 Case, the Debtor shall not destroy or abandon any such books and records without obtaining prior approval of the Bankruptcy Court after notice to creditors of any such request.

(p)  Plan Administrator

(i)  Appointment of Plan Administrator: The Plan contains an alternative provision for marketing and selling the Property in the event that the NVR Contract is terminated.  In such event, a Plan Administrator will be appointed.  The Plan Administrator will be Black Dog Receiver, LLC, whose principal is David Bowman.  Mr. Bowman has substantial experience with respect to the sale of distressed real estate, and is familiar with land sale and development in Prince George's County, Maryland.  In the event that Mr. Bowman or Black Dog Receiver resign or are not able to serve, Sandy Spring and the Debtor shall appoint a replacement by mutual agreement, and absent agreement, a replacement Plan Administrator shall be appointed at the direction of the Court.

Notwithstanding the foregoing, a termination of the NVR Contract will not result in the appointment of a Plan Administrator if the Debtor can confirm the Plan based on a sale to another bidder whose contract (either directly or via Exit Financing) provides for the payment, not later than December 31, 2022, of at least the Allowed and reasonably projected Claims of: Sandy Spring, real estate tax claims secured by the Property, Administrative Expenses (including United States Trustee fees), and Priority Tax Claims and costs of sale.

(ii)  Duties and Powers of Plan Administrator: Upon its appointment, the Plan Administrator shall have the power and duty to market and sell the Property in a commercially reasonable manner on an as is, where is basis, for a net sales price that, at a minimum, equals the Threshold Sale Price.  As defined in the Plan, the "Threshold Sale Price" means: the Allowed and

-34-

reasonably projected: Claims of: Sandy Spring, real estate tax claims secured by the Property, Administrative Expenses (including United States Trustee fees), Priority Tax Claims, compensation and expenses of the Plan Administrator and the Plan Administrator's broker and legal counsel, compensation and expenses of the Plan Administrator Consultants, and costs of sale.

If, after marketing the Property, the Plan Administrator does not obtain a contract with a cash purchase price that equals or exceeds the Threshold Sale Price, the parties whose claims and liens comprise the Threshold Sale Price reserve the right to negotiate discounts sufficient to allow Court approval and closing on the proposed sale. If the affected parties agree upon such discounts (and other legal requirements are satisfied), the Plan Administrator may seek Court approval of the sale. If any affected party does not agree to the proposed disposition, the Plan Administrator shall not be authorized to seek or obtain Court approval of the sale, or the authority to consummate the proposed sale, and shall file a report with the Court as to status and shall cease marketing the Property.

(iii)  <u>Compensation of Plan Administrator, Broker and Counsel</u>: The Plan Administrator shall be entitled to payment of $300.00 per hour for its services, plus 1.5% of the gross sale price obtained in a sale of the Property by the Plan Administrator. Additionally, Allowance of such payment shall be subject to Court approval upon duly noticed application. Compensation for the Plan Administrator, broker and Plan Administrator's legal counsel shall have the same priority as chapter 11 Administrative Expenses and, if a sale is approved and closes, shall be paid from the proceeds of such sale.

(iv)  <u>Plan Administrator Expenses</u>:  Sandy Spring, in its sole discretion, may agree to make advances for the fees and costs incurred with respect to Plan Administrator Consultants (as defined in the Plan) incurred in connection with the Plan Administrator's conduct of his duties, other than the Plan Administrator's fees, broker's commission and legal fees and costs. No advance or payment may be made with respect to the compensation of the Plan Administrator, broker or legal counsel. Such advances shall be secured pursuant to the Sandy Spring deeds of trust.

(v)  <u>Plan Administrator Sale Procedures</u>:  Any sale of the Property by the Plan Administrator shall be subject to Court approval upon motion and shall be deemed to be a sale pursuant to this Plan. Such sale shall be free and clear of liens, claims and encumbrances, and the purchaser shall be entitled to all protections available under the Bankruptcy Code, including under Section 363(f) and Section 363(m). Any sale by the Plan Administrator shall be exempt from transfer and recordation taxes as set forth in Section 5.05 of this Plan.

(vi)  <u>Plan Committee</u>:  Upon the appointment of the Plan Administrator, the Plan Committee (as defined in the Plan) shall be deemed appointed. In the event that any member of the Plan Committee declines to serve or resigns, the Debtor, in consultation with the remaining members of the Plan Committee, shall select and appoint a replacement member who is within the same class or type of creditor as the creditor who declined or resigned. The members of the Plan Committee shall serve without compensation on account of their services on the Plan Committee. The Plan Administrator shall consult with the Plan Committee regarding the sale of the Property. In the event that the Plan Administrator communicates with any member of the

-35-

Plan Committee, all members of the Plan Committee shall be included in such communication (or provided a reasonable opportunity to participate). Communications among the Plan Administrator and the Plan Committee shall be maintained in confidence, subject to their further agreement or order of the Court.

(vii) <u>Debtor Cooperation; Non-Interference</u>: The Debtor shall cooperate in all regards with the Plan Administrator's sale efforts, and shall not interfere in such sale efforts. Notwithstanding the foregoing, the Debtor shall have standing to support, respond to, or oppose any motion by the Plan Administrator to obtain Court approval of any sale.

(viii) <u>Payment by Equity; Termination of Plan Administrator</u>: In the alternative to a sale by the Plan Administrator, the Debtor's equity owners, or their assignees, shall have the right to arrange payment to the Debtor in full and in cash at closing in an amount that is not less than the amount necessary to pay <u>all</u> allowed Administrative Expenses and <u>all</u> Allowed Claims (including without limitation compensation of the Plan Administrator, broker and counsel), with interest as required under law. The amount of the payment by the Debtor's equity owners or assignees may be reduced solely to the extent of a written agreement signed by a Creditor or holder of an Administrative Expense, agreeing to a discount with respect to such Claim or Administrative Expense. Upon closing of such a transaction and payment in full of all amounts due, the appointment of the Plan Administrator shall be terminated. Nothing in this paragraph or the corresponding provisions of the Plan shall affect the Debtor's obligations regarding the Sales Contract or the Stalking Horse Purchaser.

## ARTICLE VI          TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### Section 6.01    Executory Contracts and Unexpired Leases

Except as otherwise provided in the Confirmation Order, the Plan, or any other Plan Document, the Confirmation Order shall constitute an order under section 365 of the Bankruptcy Code rejecting all Executory Contracts and Unexpired Leases to which the Debtor is a party on and subject to the occurrence of the Effective Date, unless such contract or lease (a) previously shall have been assumed, assumed and assigned, or rejected by the Debtor, (b) previously shall have expired or terminated pursuant to its own terms before the Petition Date or (c) is the subject of a pending motion to assume or reject on the Confirmation Date. For the avoidance of doubt, this section shall not be deemed to reject any insurance policy in which the Debtor is a beneficiary.

### Section 6.02    Claims Based on the Rejection of Executory Contracts and Unexpired Leases

Unless otherwise provided by an Order of the Bankruptcy Court, any Proofs of Claim based upon the rejection of the Debtor's Executory Contracts or Unexpired Leases pursuant to the Plan or otherwise, must be Filed no later than 30 days after the Effective Date.

## ARTICLE VII          DISTRIBUTIONS

**Section 7.01   Calculation of Amounts to be Distributed**

Each Holder of an Allowed Claim against the Debtor shall receive the full amount of the Distributions that the Plan provides for Allowed Claims in the applicable Class from the Debtor. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, in which case such payment shall be deemed to have occurred when due. If and to the extent that there are Disputed Claims, Distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in this Article VI.  Notwithstanding anything to the contrary in the Plan, no Holder of an Allowed Claim shall, on account of such Allowed Claim, receive a Distribution in excess of the Allowed amount of such Claim plus any interest accruing on such Claim that is actually payable in accordance with the Plan.

**Section 7.02   Delivery of Distributions and Undeliverable or Unclaimed Distributions**

(a)   Record Date for Distribution

On the Distribution Record Date, the Claims Register shall be closed and the Debtor or any other party responsible for making Distributions shall instead be authorized and entitled to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date.

(b)   Delivery of Distributions in General

### 1.   Payments and Distributions on Disputed Claims

Distributions made after the Effective Date to Holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall, in the Debtor's reasonable discretion, be deemed to have been made by the Debtor on the Effective Date, unless the Debtor and the applicable Holder of such Claim agree otherwise.

### 2.   Special Rules for Distributions to Holders of Disputed Claims

Notwithstanding any provision otherwise in the Plan and except as may be agreed to by the Debtor, on the one hand, and the Holder of a Disputed Claim, on the other hand, no partial payments and no partial Distributions shall be made with respect to any Disputed Claim, other than with respect to Professional Fee Claims, until all Disputed Claims held by the Holder of such Disputed Claim have become Allowed Claims or have otherwise been resolved by settlement or Final Order.

### 3.   Distributions

On and after the Effective Date, the Debtor shall make the Distributions required to be made on account of Allowed Claims under the Plan on such date.  Any Distribution that is not made on the Initial Distribution Date or on any other date specified in the Plan because the Claim that would

have been entitled to receive that Distribution is not an Allowed Claim on such date, shall be held by the Debtor in the Distribution Reserve Account and distributed on the next Distribution Date that occurs after such Claim is Allowed in accordance with the Plan. Except as expressly stated with respect to the treatment of a particular Class, no interest shall accrue or be paid on the unpaid amount of any Distribution paid pursuant to the Plan.

(c)    Minimum; De Minimis Distributions

Notwithstanding any other provision of the Plan to the contrary (including the treatment of any Claims or Classes), (a) the Debtor shall not be required to make Distributions or payments of fractions of dollars, and whenever any Distribution of a fraction of a dollar under the Plan would otherwise be required, the actual Distribution made shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars being rounded down, and (b) the Debtor shall have no duty to make a Distribution on account of any Allowed Claim (i) if the aggregate amount of all Distributions authorized to be made on such date is less than $5,000.00, in which case such Distributions shall be deferred to the next Distribution date, or (ii) if the amount to be distributed to that Holder on the particular Distribution date is less than $100.00, unless such Distribution constitutes the final Distribution to such Holder.

(d)    Undeliverable Distributions and Unclaimed Property

In the event that any Distribution to any Holder is returned as undeliverable, no Distribution to such Holder shall be made unless and until the Debtor has determined the then current address of such Holder, at which time such Distribution shall be made to such Holder without accrual of interest during that time; provided, however, such Distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of 120 days from the date the initial Distribution is made. After such date, all unclaimed property or interests in property shall revert (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary) to the Debtor automatically and without need for a further order by the Bankruptcy Court for Distribution in accordance with the Plan and the Claim of any Holder to such property or interest in property shall be settled, compromised, and forever barred.

(e)    Manner of Payment Pursuant to the Plan

Cash payments under the Plan shall be in U.S. funds, and shall be made, at the option, and in the sole discretion, of the Debtor by (i) checks drawn on or (ii) wire transfers from a domestic bank selected by the Debtor. Cash payments made pursuant to the Plan in the form of checks issued by the Debtor shall be null and void if not cashed within 120 days of the date of the issuance thereof. Requests for reissuance of any check shall be made directly to the Debtor.

**Section 7.03    Compliance with Tax Requirements/Allocations**

In connection with the Plan, to the extent applicable, the Debtor shall comply with all tax withholding and reporting requirements imposed on it by any Governmental Unit, and all Distributions pursuant thereto shall be subject to such withholding and reporting requirements. Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the

consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

In connection with the Plan and all Distributions hereunder, to the extent applicable, the Debtor is authorized to take any and all actions that may be necessary or appropriate to comply with all tax withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority, and all Distributions pursuant to the Plan shall be subject to any such withholding and reporting requirements. Each Creditor is required to provide the Debtor with an executed Form W-9 or similar tax form as a condition precedent to being sent a Distribution. If a Holder of an Allowed Claim does not provide the Debtor with an executed Form W-9 or similar form within 90 days of written request, said Creditor shall be deemed to have forfeited their Distribution and the Claim of such Creditor shall be forever barred.

**Section 7.04   Claims Paid or Payable to Third Parties**

(a)   Claims Paid by Third Parties; Recourse to Collateral

The Debtor shall be authorized to reduce in whole or in part a Claim, and such Claim shall be Disallowed without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor, including on account of recourse to collateral held by third parties that secure such Claim. To the extent a Holder of a Claim receives a Distribution on account of such Claim and receives payment, in whole or in part, from a party that is not a Debtor on account of such Claim, such Holder shall, within 14 days of receipt thereof, repay or return the Distribution to the Debtor to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such Distribution under the Plan.

(b)   Claims Payable by Insurance, Third Parties; Recourse to Collateral

No Distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtor's insurance policies, surety agreements, other non-Debtor payment agreements, or collateral held by a third party, until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy, surety agreement, other non-Debtor payment agreement, or collateral, as applicable. To the extent that one or more of the Debtor's insurers, sureties, or non-Debtor payors pays or satisfies in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), or such collateral or proceeds from such collateral is used to satisfy such Claim, then immediately upon such payment, the applicable portion of such Claim shall be expunged without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

(c)   Applicability of Insurance Policies

Notwithstanding anything to the contrary in the Plan or Confirmation Order, Confirmation and consummation of the Plan shall not limit or affect the rights of any third-party beneficiary of any of the Debtor's insurance policies with respect to such policies, and the rights of the Debtor under any such insurance policies shall vest in the Debtor as of the Effective Date.

**Section 7.05   Prepayment**

Except as otherwise expressly provided in the Plan or the Confirmation Order, the Debtor shall have the right to prepay, without any fee, charge, premium or penalty, all or any portion of an Allowed Claim, at any time on or after the Effective Date.

**ARTICLE VIII**     **PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS AND EQUITY INTERESTS**

**Section 8.01   Resolution of Disputed Claims**

    (a)   Allowance of Claims and Equity Interests

Prior to the Effective Date, the Debtor shall have and shall retain any and all rights and defenses that the Debtor has with respect to any Claim or Equity Interest, except with respect to any Claim or Equity Interest deemed Allowed as of the Effective Date.   Except as expressly provided in the Plan or in any order entered in the Chapter 11 Case prior to the Effective Date (including the Confirmation Order), no Claim or Equity Interest shall become an Allowed Claim or Equity Interest unless and until such Claim or Equity Interest is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order, including the Confirmation Order, in the Chapter 11 Case allowing such Claim or Equity Interest.

    (b)   Prosecution of Objections to Claims or Equity Interests

Subject in all respects to the provisions hereof, other than with respect to Professional Fee Claims, the Debtor shall have the authority to File objections to Claims or Equity Interests, and the exclusive authority to settle, compromise, withdraw, or litigate to judgment objections on behalf of the Debtor's Estate to any and all Claims or Equity Interests, regardless of whether such Claims or Equity Interests are in a Class or otherwise.   For the avoidance of doubt the U.S. Trustee's right to object to Claims, including Professional Fee Claims and Claims asserted under section 503(b)(3) and (b)(4) of the Bankruptcy Code, is reserved.

    (c)   Claims Estimation

The Debtor may, at any time, request that the Bankruptcy Court estimate (a) any Disputed Claim pursuant to applicable law and (b) any contingent or unliquidated Claim pursuant to applicable law, including section 502(c) of the Bankruptcy Code, regardless of whether the Debtor has previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to the maximum extent permitted by law as determined by the Bankruptcy Court to estimate any Disputed Claim, contingent Claim, or unliquidated Claim, including during the litigation concerning any objection to any Claim or during the pendency of any appeal relating to any such objection.   Notwithstanding any provision otherwise in the Plan to the contrary, a Claim that has been expunged from the Claims Register but that is subject to appeal or has not been the subject

of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.

In the event that the Bankruptcy Court estimates any Disputed Claim, contingent Claim, or unliquidated Claim, that estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim for all purposes under the Plan, including for purposes of Distributions, and the Debtor may elect to pursue additional objections to the ultimate Distribution on such Claim. If the estimated amount constitutes a maximum limitation on such Claim, the Debtor may elect to pursue any supplemental proceedings to object to any ultimate Distribution on account of such Claim. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before 21 days after the date on which such Claim is estimated. All of the aforementioned Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

(d) Expungement or Adjustment to Claims Without Objection

Any Claim that has been paid, satisfied, or superseded may be expunged on the Claims Register by the Debtor, and any Claim that has been amended may be adjusted thereon by the Debtor without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

## Section 8.02   Distribution Reserve Account

Distributions with respect to Disputed Claims shall be deposited into the Distribution Reserve Account in accordance with the terms of the Plan. The amount deposited shall be determined by the Debtor. The Debtor may invest any Cash that is withheld in the Distribution Reserve Account. Notwithstanding any such investment and the addition to the Distribution Reserve Account of any income earned in respect thereof, in the event such Claim ultimately becomes an Allowed Claim, nothing in the Plan shall be deemed to entitle the Holder of a Disputed Claim to post-petition or post-Effective Date interest on such Claim, except to the extent expressly provided with respect to the treatment of each Class.

## Section 8.03   Distributions After Allowance

On the next Distribution Date after the date when the order or judgment of the Bankruptcy Court allowing all or part of a Disputed Claim becomes a Final Order, the Debtor will (1) distribute to the Holder of such Claim any property in the Distribution Reserve Account that would have been distributed to such beneficiary on the Distribution Dates on which distributions previously were made to beneficiaries if the Claim in issue had been an Allowed Claim (in whole or in part, as applicable) on such earlier Distribution Dates; and (2) distribute any remaining property held in the Distribution Reserve Account on account of any resolved Disputed Claim in accordance with the Plan. After a Final Order has been entered, or other final resolution has been reached with

respect to all Disputed Claims, any remaining property held in the Distribution Reserve Account will revert to the Debtor.

## Section 8.04    Disallowance of Claims

Any Claim that has been paid, satisfied, or superseded may be expunged on the Claims Register by, as applicable, the Debtor, and any Claim that has been amended may be adjusted thereon by the Debtor without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

## Section 8.05    Amendments

After the Bar Date, as applicable, a Claim may not be filed or amended without the authorization of the Bankruptcy Court and any such new or amended Claim Filed shall be deemed Disallowed and expunged without any further notice to or action, order, or approval of the Bankruptcy Court; provided that, even with such Bankruptcy Court authorization, a Claim may be amended by the Holder of such Claim solely to decrease, but not to increase, unless otherwise provided by the Bankruptcy Court, the amount, number or priority.

## Section 8.06    No Interest

Unless otherwise specifically provided for in the Plan, by applicable law, or agreed-to by the Debtor, interest shall not accrue or be paid on any Claim, and no Holder of any Claim shall be entitled to interest accruing on and after the Petition Date on account of any Claim.  Without limiting the foregoing, interest shall not accrue or be paid on any Claim after the Effective Date to the extent the final Distribution paid on account of such Claim occurs after the Effective Date. Notwithstanding the foregoing, if Holders of Allowed General Unsecured Claims receive a distribution of 100%, they shall be paid interest from the Petition Date until the date their Allowed General Unsecured Claims are paid in full at the federal judgment interest rate that was in effect on the Petition Date.

## Section 8.07    Setoffs

(a)    By the Debtor

Except as otherwise provided in the Plan, the Debtor may, pursuant to Bankruptcy Code sections 553, 558 or applicable non-bankruptcy laws, but shall not be required to, set off against any Claim, and the payments or other Distributions to be made pursuant to the Plan in respect of such Claim, Claims of any nature whatsoever that the Debtor may have against the Holder of such Claim; provided, however, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtor of any such Claim that the Debtor may have against such Holder.

(b)    By Non-Debtors

Unless otherwise stipulated in writing by the Debtor, or asserted pursuant to a timely filed Proof of Claim, any party against whom a claim or counterclaim is asserted by the Estate must assert or must have asserted any setoff rights, right of subrogation, or recoupment of any kind against

such claim at the time it answers such claim, or such right of setoff, subrogation or recoupment will be deemed waived and forever barred.  Notwithstanding the foregoing, nothing herein shall affect the setoff rights of any taxing authority.  In no event shall any Holder of a Claim be entitled to set off any Claim against any Claim, right, or Cause of Action of the Debtor unless (i) such Holder has Filed a Proof of Claim in this Chapter 11 Case by the applicable Claims Bar Date asserting the Claim forming the basis for such setoff, (ii) such Holder has filed a motion with the Bankruptcy Court authorizing it to effect such setoff, and (iii) a Final Order of the Bankruptcy Court has been entered, authorizing and approving such setoff.

## ARTICLE IX          EFFECT OF PLAN CONFIRMATION

### Section 9.01   Binding Effect

The Plan shall be binding upon and inure to the benefit of the Debtor, all present and former Holders of Claims and Equity Interests, and their respective successors and assigns.

### Section 9.02   Discharge

Pursuant to Bankruptcy Code section 1141(d)(1), and subject to the occurrence of the Effective Date, Confirmation will discharge all Claims against the Debtor except for the obligations and Liens expressly created or preserved by the Plan.

### Section 9.03   Injunction

**Except as otherwise provided in the Plan, the Confirmation Order shall provide, among other things, that from and after the Effective Date all entities who have held, hold, assert or asserted, or may hold Claims, Administrative Claims or against, or Equity Interests in, the Debtor are permanently enjoined from taking any of the following actions against the Debtor, its Estate, any of its property or Assets, on account of any such actual or asserted Claims, Administrative Claims or Equity Interests that arose before the Effective Date, except for the obligations and Liens expressly created or preserved by the Plan:**

> **(a)    commencing or continuing, in any manner or in any place, any action or other proceeding;**

> **(b)    enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree or order;**

> **(c)    creating, perfecting, or enforcing any lien or encumbrance;**

> **(d)    asserting a setoff (except as to those setoffs that were asserted prior to the petition date), or right of subrogation against any debt, liability, or obligation due to the Debtor, except as set forth in Section 8.07 of the Plan; and**

> **(e)    commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan; provided, however, that nothing contained in the Plan shall preclude such entities from**

-43-

**exercising their rights pursuant to and consistent with the terms of the Plan or the Confirmation Order.**

**Section 9.04    Exculpation and Limitation of Liability**

**Notwithstanding anything to the contrary herein, the Debtor, its Professionals retained in the Chapter 11 Case, its officers and employees, shall not have or incur any liability to any Holder of a Claim or Equity Interest for any act, event, or omission in connection with, or arising out of, the Chapter 11 Case, formulating, negotiating, soliciting, preparing, disseminating, confirming, or implementing the Plan, consummating the Plan, or the administration of the Plan or the property to be distributed under the Plan, unless it shall be determined in a Final Order to have constituted willful misconduct or gross negligence.**

## ARTICLE X          <u>CONFIRMATION AND CONSUMMATION OF THE PLAN</u>

**Section 10.01  Conditions to Confirmation of the Plan**

In addition to any other condition to Confirmation as may be imposed by law, the following are conditions to the Confirmation of the Plan:

1. The Bankruptcy Court has entered an order finding that this Disclosure Statement contains adequate information pursuant to Bankruptcy Code § 1125.

2. The Sales Contract, as may be amended, shall be in effect.

3. The Bankruptcy Court shall have granted the Sale and Bid Procedures Motion.

4. The Debtor shall have obtained a commitment letter, satisfactory in form and substance to the Debtor in its sole discretion, with respect to Exit Financing.

**Section 10.02  Conditions to the Effective Date**

The following are conditions precedent to the occurrence of the Effective Date, each of which must be satisfied or waived in writing in accordance with Section 10.03 of the Plan:

1. The Confirmation Order shall have been entered in this Chapter 11 Case in a form and substance reasonably acceptable to the Debtor.

2. The Confirmation Order shall have become a Final Order.

3. The Sales Contract shall be in effect.

4. All Exhibits shall be, in form and substance, reasonably acceptable to the Debtor, and, to the extent applicable, shall have been executed and delivered by all parties who are signatory thereto.

5. All documents executed, entered into in connection with, or necessary for the

consummation of the Plan have been reviewed, approved, and consented to by the Debtor.

## Section 10.03  Waiver of Conditions

Each of the conditions set forth in Sections 10.01 and 10.02 of the Plan, except for entry of the Confirmation Order, may be waived in whole or in part by the Debtor.  The failure to satisfy or waive any condition to the Effective Date may be asserted by the Debtor as a basis to not consummate the Plan regardless of the circumstances giving rise to the failure of such condition to be satisfied.  The failure of the Debtor to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right that may be asserted at any time.

## Section 10.04  Consequences of Non-Occurrence of Effective Date

In the event that the Effective Date does not occur, the Debtor reserves all rights to seek an order from the Bankruptcy Court directing that the Confirmation Order be vacated, that the Plan be null and void in all respects, and/or that any settlement or treatment of Claims provided for in the Plan be null and void.  In the event that the Bankruptcy Court shall enter an order vacating the Confirmation Order, the time within which the Debtor may assume and assign or reject all executory contracts and unexpired leases not previously assumed, assumed and assigned, or rejected, shall be extended for a period of thirty (30) days after the date the Confirmation Order is vacated, without prejudice to further extensions as may be approved by the Bankruptcy Court either before or after the expiration of such 30-day period.

## Section 10.05  Retention Of Jurisdiction

(a)  Retention of Jurisdiction by the Bankruptcy Court

Under sections 105(a) and 1142 of the Bankruptcy Code, and notwithstanding entry of the Confirmation Order and occurrence of the Effective Date, and except as otherwise ordered by the Bankruptcy Court, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, and related to, this Chapter 11 Case and the Plan to the fullest extent permitted by law (provided, however, that notwithstanding the foregoing, with respect to all civil proceedings arising under the Bankruptcy Code or arising in or related to this Chapter 11 Case and the Plan, the Bankruptcy Court shall have original but not exclusive jurisdiction, in accordance with section 1334(b) of Title 28 of the United States Code), including, among other things, jurisdiction to:

a)  allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured, or unsecured status of any Claim or Equity Interest not otherwise Allowed under the Plan (other than personal injury or wrongful death Claims, unless agreed by the Holder), including the resolution of any request for payment of any Administrative Claim and the resolution of any objections to the allowance or priority of Claims or Equity Interests;

b)  hear and determine all applications for compensation and reimbursement of Professional Fee Claims; provided, however, that the payment of the fees and expenses of the Professionals of the Debtor incurred from and after the Effective Date shall be made in

the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court;

c)  hear and determine all matters with respect to the assumption or rejection of any Executory Contract or Unexpired Lease to which the Debtor is a party or with respect to which the Debtor may be liable, including, if necessary, the nature or amount of any required Cure or the liquidation or allowance of any Claims arising therefrom;

d)  effectuate performance of and payments under the provisions of the Plan and enforce remedies upon any default under the Plan;

e)  hear and determine any and all adversary proceedings, motions, applications, and contested or litigated matters arising out of, under, or related to, this Chapter 11 Case, any litigation rights or the Plan;

f)  enter such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan, this Disclosure Statement or the Confirmation Order;

g)  hear and determine any and all disputes arising in connection with the interpretation, implementation, consummation, or enforcement of the Plan, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

h)  consider any modifications of the Plan, cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

i)  issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with the implementation, consummation, or enforcement of the Plan or the Confirmation Order;

j)  enter and implement such orders as may be necessary or appropriate if the Confirmation Order is for any reason reversed, stayed, revoked, modified, or vacated;

k)  hear and determine any matters arising in connection with or relating to the Plan, the schedules to the Plan, this Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with the Plan, the schedules to the Plan, this Disclosure Statement, or the Confirmation Order;

l)  enforce, interpret, and determine any disputes arising in connection with any stipulations, orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with this Chapter 11 Case;

m)  except as otherwise limited herein, recover all assets of the Debtor and property of the Estate, wherever located;

-46-

n)  hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

o)  hear and determine such other matters as may be provided in the Confirmation Order or as may be authorized under, or not inconsistent with, provisions of the Bankruptcy Code; and

p)  enter a final decree closing the Chapter 11 Case.

(b)  Failure of the Bankruptcy Court to Exercise Jurisdiction

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to this Chapter 11 Case, including the matters set forth in Section 11.01 of the Plan, the provisions of Article XI of the Plan shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having jurisdiction with respect to such matter.

## ARTICLE XI         <u>MISCELLANEOUS PLAN PROVISIONS</u>

### Section 11.01 Modifications and Amendments

The Debtor may alter, amend or modify the Plan or any Exhibits thereto under Bankruptcy Code section 1127(a) at any time prior to the Confirmation Date.  If any material amendments to the Plan are made after the solicitation package is sent out, but before the Confirmation Hearing, the Debtor reserves the right to seek a determination from the Bankruptcy Court as to whether re-solicitation is necessary.  After the Confirmation Date and prior to substantial consummation of the Plan, as defined in Bankruptcy Code section 1101(2), the Debtor may, under Bankruptcy Code section 1127(b), institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement or the Confirmation Order, and such matters as may be necessary to carry out the purpose and effect of the Plan.

### Section 11.02 Severability of Plan Provisions

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, then the Bankruptcy Court, at the request of the Debtor, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

**Section 11.03  Successors and Assigns**

The rights, benefits and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of that Entity.

**Section 11.04  Payment of Statutory Fees**

All fees payable pursuant to section 1930 of Title 28 of the United States Code shall be paid on the Effective Date.  All fees payable pursuant to section 1930 of Title 28 of the United States Code that are outstanding and assessed after the Effective Date shall be paid on a quarterly basis until the Chapter 11 case is closed, converted, or dismissed.  The reorganized Debtor liable for the payment of all quarterly fees due pursuant to section 1930 of Title 28 after the Effective Date.  The reorganized Debtor shall each provide the United States Trustee with post-confirmation quarterly reports that shall include all of their respective disbursements for that quarter using the data embedded Form 11-PCR.  The Debtor will file a Notice of Effective Date within seven days of the Effective Date.

**Section 11.05  Revocation, Withdrawal or Non-Consummation**

The Debtor reserves the right to revoke or withdraw the Plan prior to the Confirmation Date and to file subsequent plans.  If the Debtor revokes or withdraws the Plan, or if Confirmation or consummation of the Plan does not occur, then (a) the Plan shall be null and void in all respects, (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Class of Claims), assumption or rejection of Executory Contracts or leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void, and (c) nothing contained in the Plan, and no acts taken in preparation for consummation of the Plan, shall (i) constitute or be deemed to constitute a waiver or release of any Claims by or against, or any Interests in, the Debtor or any other Entity, (ii) prejudice in any manner the rights of the Debtor or any other Entity, or (iii) constitute an admission of any sort by the Debtor or any other Entity.

**Section 11.06  Plan Supplements**

Exhibits to the Plan not attached thereto shall be filed in one or more Plan Supplements.  Any Plan Supplement (and amendments thereto) filed by the Debtor shall be deemed an integral part of the Plan and shall be incorporated by reference as if fully set forth herein.  Substantially contemporaneously with their filing, the Plan Supplements may be viewed at the office of the clerk of the Bankruptcy Court or its designee during normal business hours, by visiting the Bankruptcy Court's website at ecf.mdb.uscourts.gov (PACER or CM/ECF account required).  Holders of Claims and/or Interests may obtain a copy of any Plan Supplements free of charge upon reasonable written request to the Debtor.

**Section 11.07  Tax Reporting and Compliance**

The Plan authorizes the Debtor to request an expedited determination under Bankruptcy Code section 505(b) of the tax liability of the Debtor for all taxable periods ending after the Petition Date

through and including the Effective Date.

## ARTICLE XII        <u>**CONFIRMATION ISSUES**</u>

### Section 12.01  Compliance With the Bankruptcy Code

Section 1129(a)(1) of the Bankruptcy Code requires that a plan comply with the applicable provisions of the Bankruptcy Code.  Section 1129(a)(2) of the Bankruptcy Code requires that the proponent of a plan comply with the applicable provisions of the Bankruptcy Code.  The Debtor and its Professionals have reviewed the applicable provisions of the Bankruptcy Code and believe that the Plan fully complies with the Bankruptcy Code.  Further, the Debtor has complied with all applicable provisions of the Bankruptcy Code in seeking confirmation of the Plan.

### Section 12.02  Good Faith

Section 1129(a)(3) of the Bankruptcy Code requires that a plan be proposed in good faith and not by any means forbidden by law.  The Debtor has proposed the Plan in good faith.  The Plan contemplates and provides for a value-maximizing sale of the Debtor's assets and the payment in full of all Allowed Claims, where applicable with interest.  The sale embodied in the Plan seeks to obtain the highest and best value for the Debtor's assets and avoids the damage, disruption and losses that would arise in the event of an uncontrolled liquidation.  The Plan contemplates a return to the Holders of Interests in the Debtor.  The Plan does not rely on any means that are forbidden by law.  Thus, the Debtor believes that the Plan satisfies the requirements of section 1129(a)(3).

### Section 12.03  Bankruptcy Court Approval of Fees and Expenses

Section 1129(a)(4) of the Bankruptcy Code requires that any payments to be made by the Debtor for services or for costs and expenses in or in connection with the Chapter 11 Case, or in connection with the Plan and incident to the Chapter 11 Case, have been approved by, or are subject to approval by, the Bankruptcy Court as being reasonable.  Each order approving the engagement of a Professional in the Chapter 11 Case has either required that the fees and expenses sought by any Professional be approved by subsequent order of the Bankruptcy Court as being reasonable, or approved in advance the formulae for computing the fees of Professionals.  All applications for approval of such engagements were served in accordance with the Bankruptcy Code and Bankruptcy Rules.  The Plan preserves the obligation of Professionals to seek final approval of their fees and expenses.  The Plan thus complies with section 1129(a)(4).

### Section 12.04  Disclosure of Management

Section 1129(a)(5) of the Bankruptcy Code requires the disclosure of the identity and affiliation of any individual who is proposed to serve as a director, officer or voting trustee of the Debtor following confirmation of the Plan.    Section 1129(a)(5) also requires disclosure of the compensation proposed to be paid to insiders of the Debtor following confirmation.  Both before and during the Chapter 11 Case, Dr. Nabil J. Asterbadi has served as President of the Debtor and has been responsible for its management.  Dr. Asterbadi shall continue as President following confirmation and the Effective Date.  Dr. Asterbadi shall be entitled to compensation and

distributions as described in Section 3.03(i) of the Plan and Section 5.03(i) of this Disclosure Statement.

## Section 12.05  Governmental Approval of Rates

Section 1129(a)(6) of the Bankruptcy Code requires that any governmental regulatory commission with jurisdiction over the rates of the Debtor has approved any rate change provided for in a plan. There is no governmental regulatory commission with such jurisdiction over the Debtor. Accordingly, section 1129(a)(6) is inapplicable in this Chapter 11 Case.

## Section 12.06  Best Interest of Creditors

Section 1129(a)(7) requires that, with respect to each Impaired class of Claims or Interests, each Holder of a Claim or Interest in such Class either (i) has accepted the Plan, or (ii) will receive or retain under the Plan on account of such Claim or interest property of a value, as of the Effective Date, that is not less than the amount that such Holder would so receive or retain if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code as of the Effective Date.  This test is known colloquially as the "best interest test."

Under the Plan, all Classes of Claims and Interests are Impaired.  The treatment of each Class is set out in Section 3.03 of the Plan.  If Allowed Claims in any Class are not paid in full on the Effective Date, the Holders of any Allowed Claims entitled to interest shall receive interest on such Allowed Claims as set forth in Section 3.03 of the Plan.

Because all creditors are receiving the full amount of their Allowed Claims, with interest, all creditors are receiving at least as much as they would receive in a Chapter 7 liquidation.  Further, if the Property were liquidated in Chapter 7, rather than through the terms of the Sale Contract, the proceeds of sale likely would be substantially less than the Sales Contract.  During the course of marketing the property, the Debtor received certain proposals that were based on the immediate transfer of the Property, without providing time for, or conditioning the sale, on the purchaser obtaining entitlements.  At least one of these proposals would not have provided sufficient cash proceeds to repay the indebtedness to Sandy Spring, much less pay for Administrative Expenses or provide for any distribution to unsecured creditors.  Even if a sale pursuant to the existing Sales Contract were consummated, the proceeds of sale would be substantially diminished.  This is because all of the benefits available under Section 1146(b) of the Bankruptcy Code (i.e., the exemption from transfer and recordation taxes) would be lost in a Chapter 7 sale.  Section 1146(b) only applies when property is sold pursuant to a confirmed Chapter 11 plan.  In this case, the transfer and recordation taxes are estimated to be approximately $384,000.  Under the Sales Contract, the cost of these taxes would be split 50/50 between the Debtor and the Stalking Horse Purchaser if the 1146(b) exemption did not apply.  However, if sold pursuant to the Plan, the Debtor will save its share of the taxes, i.e., $192,000, and the purchase price will be augmented by the amount of the Stalking Horse Purchaser's savings, i.e., another $192,000.  Thus, in Chapter 7, even assuming consummation of the Sales Contract, the Debtor would forfeit $384,000 that is available for a sale under the Plan.  In either a Chapter 7 liquidation or the Plan, the Debtor will incur costs of administering the bankruptcy estate, including the fees and expenses of professionals necessary to sell the assets of the Estate.  A Chapter 7 liquidation, however, would involve the additional cost of the statutory fees owed to the Chapter 7 trustee.  The Debtor submits that all

Holders of Claims and Interests would receive or retain as much or more under the Plan than a Chapter 7 liquidation. The Plan therefore satisfies the requirements of section 1129(a)(7).

## Section 12.07  Acceptance by Impaired Classes

Section 1129(a)(8) of the Bankruptcy Code requires that with respect to each Class of Claims or Interests, either (a) such Class has accepted the Plan, or (b) such Class is not Impaired under the Plan. The Debtor believes that many, if not all, Classes of Claims and Interests will vote to accept the Plan. In the event of rejection of the Plan by one or more Classes of Impaired Claims, the Plan nevertheless may be confirmed pursuant to the "cram down" provisions set forth in § 1129(b) of the Bankruptcy Code. The "cram down" provisions are discussed below.

## Section 12.08  Priority Claims

Section 1129(a)(9) imposes requirements for the treatment of priority Claims under section 507 of the Bankruptcy Code. As theoretically applicable to this Chapter 11 Case, there are three types of priority Claims that could be subject to section 1129(a)(9): Administrative Claims; Non-Tax Priority Claims; and Priority Tax Claims.

With respect to Administrative Claims, section 1129(a)(9) requires that each Holder of an Allowed Administrative Claim be paid in cash in full on the Effective Date, except to the extent that the Holder of such a Claim and the Debtor agree to different treatment. Section 3.02(a) of the Plan specifically provides for such treatment with respect to Administrative Claims. Clearly, funds necessary to pay Allowed Administrative Claims are not expected to be available on the Effective Date. The Debtor does not believe that there will be any Allowed Administrative Claims, other than Professional Fee Claims. The Debtor believes that all Professionals will agree to defer payment of compensation and reimbursement of expenses until the Closing Date (other than payment from existing retainers, which may be used for payment of those Professionals who have a retainer upon Allowance of their fees and costs).

Section 1129(a)(9) further provides that with respect to Non-Tax Priority Claims (i.e., Claims entitled to priority under sections 507(a)(1), 507(a)(4), 507(a)(5), 507(a)(6), or 507(a)(7)), the Plan must provide for the payment of deferred cash payments of a value, as of the Effective Date, equal to the Allowed Amount of such Claims, if such Class accepts the Plan, or cash on the Effective Date equal to the Allowed Amount of such Claims, if the Class does not accept the Plan. The Debtor does not believe that any Non-Tax Priority Claims exist in this Chapter 11 Case. However, to the extent that such Claims are determined to exist, the Plan provides for payment of such Claims, with interest, on the Closing Date.

Section 1129(a)(9) finally provides that with respect to Priority Tax Claims under section 507(a)(8), the Plan must provide for "regular installment payments in cash – (i) of a total value, as of the effective date of the plan, equal to the allowed amount of such Claim; (ii) over a period ending not later than 5 years after the date of the order for relief under section 301, 302, or 303; and (iii) in a manner not less favorable than the most favored nonpriority Unsecured Claim provided for by the plan (other than cash payments made to a class of creditors under section 1122(b))." Unless otherwise agreed by the Debtor and the Holder of an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim shall receive payment in full of its Allowed Priority

Tax Claim: (i) over a period ending not later than 5 years after the date of the order for relief under section 301, 302, or 303; (ii) in for by the Plan; and (iii) in a manner not less favorable than the most favored nonpriority Unsecured Claim.

For the foregoing reasons, the Debtor believes that the Plan satisfies the requirements of section 1129(a)(9).

### Section 12.09  Impaired Accepting Class

Section 1129(a)(10) of the Bankruptcy Code requires that if a Class of Claims is Impaired under the Plan, at least one class of Claims that is Impaired under the Plan has accepted the Plan, determined without including any acceptance of the Plan by any insider.  The Debtor believes that one or more Impaired Classes of non-insider Claims will vote to accept the Plan in satisfaction of the requirements of section 1129(a)(10).

### Section 12.10  Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor under the Plan.  This is known as the "feasibility" test.

The Debtor believes that the Plan is feasible.  The Plan Projections attached hereto as **Exhibit B**, demonstrates that upon a sale of the Property, the Debtor will be able to meet all financial obligations under the Plan.  All creditors will be paid in full with interest.  The Debtor is under contract to sell the Property to the Stalking Horse Purchaser, and has filed the Sale and Bid Procedures Motion to obtain preliminary approval of the Sales Contract.  The Sales Contract, if approved by the Court, will generate sufficient proceeds to meet all obligations under the Plan.  The Debtor believes that the Plan is feasible and that a need for further reorganization is not likely, thus satisfying the requirements of section 1129(a)(11).

### Section 12.11  U.S. Trustee Fees

Section 1129(a)(12) requires that all fees payable under 28 U.S.C. § 1930 have been paid, or that the Plan provides for the payment of such fees.  Section 3.02(d) of the Plan so provides.

### Section 12.12  Inapplicable Confirmation Requirements

Sections 1129(a)(13)-(16) of the Bankruptcy Code are inapplicable to the Debtor.

### Section 12.13  Cram Down

In the event that any Impaired Class of Claims or Interests were to reject the Plan, the Plan could be confirmed because the Debtor has requested confirmation pursuant to the "cram down" provisions set forth in section 1129(b) of the Bankruptcy Code.  To satisfy the requirements of section 1129(b), the Debtor must demonstrate to the Bankruptcy Court that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to each Impaired, non-accepting Class of Claims and Interests.   The Debtor believes that the Plan satisfies the foregoing

requirements for Confirmation under the provisions of section 1129(b) with respect to any Class of Claims or Interests that rejects the Plan.

The prohibition against "unfair discrimination" applies to Classes of Claims or Interests that are of equal priority and are receiving different treatment under the Plan. A chapter 11 plan does not discriminate unfairly, within the meaning of the Bankruptcy Code, if the legal rights of a dissenting Class are treated in a manner consistent with the treatment of other Classes whose legal rights are substantially similar to those of the dissenting Class and if no Class of Claims or Interests receives more than it legally is entitled to receive for its Claims or Interests. This test does not require that the treatment be the same or equivalent, but that such treatment be "fair." The Debtor believes the Plan satisfies the "unfair discrimination" test. Claims of equal priority are receiving comparable treatment and such treatment is fair under the circumstances.

The Plan also is fair and equitable. Section 1129(b)(2) of the Bankruptcy Code provides the following non-exclusive definition of the phrase "fair and equitable," as it applies to Secured Creditors, Unsecured Creditors and Equity Holders:

> A. <u>Secured Creditors</u>. Either (i) each impaired secured creditor retains its liens securing its secured claim and receives on account of its secured claim deferred cash payments having a value as of the Effective Date of the Plan equal to the amount of its allowed secured claim, (ii) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim, or (iii) the property securing the claim is sold free and clear of liens with such liens attaching to the proceeds of the sale and the treatment of such liens on proceeds is provided in clause (i) or (ii) immediately above.

> B. <u>Unsecured Creditors</u>. Either (i) each impaired Unsecured Creditor receives or retains under the Plan property of a value equal to the allowed amount of its claim, or (ii) the Holders of claims and interests that are junior to the claims of the rejecting class of Unsecured Creditors will not receive or retain any property under the Plan.

> C. <u>Equity Interests</u>. Either (i) each impaired Holder of an equity interest receives or retains under the Plan on account of such interest, property of a value, as of the Effective Date of the Plan, equal to the greater of (A) the allowed amount of any fixed liquidation preference to which such Holder is entitled, (B) any fixed redemption price to which such Holder is entitled or (C) the value of such interest, or (ii) the Holders of any equity interests that are junior to the interests of the rejecting class of equity Holders will not receive or retain any property under the Plan.

With respect to Secured Creditors, Creditors holding Secured Claims in Classes 1, 2, 3, 4 and 5 will retain their Liens until their Allowed Secured Claims are paid in full. In the event that the Closing Date occurs before a Secured Claim secured by the Property becomes an Allowed Secured Claim, any Lien securing such Claim shall attach to the proceeds of the sale. Further, the interest rates that the Debtor proposes to pay to Secured Creditors on account of their Allowed Secured

Claims is sufficient to ensure that such Creditors receive payments totaling at least the value of such Allowed Claims as of the Effective Date. The Plan satisfies section 1129(b)(2)(A).

With respect to Unsecured Creditors, Holders of Claims and Interests that are junior to the Claims of any rejecting Class of Unsecured Creditors will not receive or retain any property under the Plan unless and until the Debtor has paid or reserved funds for the payment of all Allowed and Disputed Claims and anticipated post-Effective Date operating expenses. The interest rates that the Debtor proposes to pay to Unsecured Creditors on account of their Allowed Unsecured Claims is sufficient to ensure that such Creditors receive payments totaling at least the value of such Allowed Claims as of the Effective Date. The Plan satisfies section 1129(b)(2)(B).

With respect to Class 9 Interests, the Plan provides that all Holders of Equity Interests in the Debtor, which Holders consist of Dr. Asterbadi and Mrs. Asterbadi, shall retain such interests. There are no Holders of Interests junior to the Equity Interests of Dr. Asterbadi and Mrs. Asterbadi. Section 1129(b)(2)(C) is satisfied.

**Section 12.14 Risk Factors**

The Debtor has identified various risk factors that could affect confirmation of the Plan. The risk factors identified by the Debtor are:

i.      Failure to Satisfy Requirements Set Forth In the Bankruptcy Code. As discussed above, the Bankruptcy Code contains numerous requirements that must be satisfied in order to confirm a plan of reorganization. Each of the material requirements is discussed above. As discussed, the Debtor believes that the Plan will satisfy each of these requirements. However, the risk exists, as in any litigation, that the Bankruptcy Court may disagree with the Debtor's views. To the extent that the Bankruptcy Court rules against the Debtor on one or more of the confirmation requirements, the Plan, as presently drafted, may be unconfirmable. In such event, the Debtor anticipates reviewing the Bankruptcy Court's determinations, and reserves the right to modify the Plan as may be necessary to obtain confirmation.

ii.      Non-Consensual Confirmation. In the event that any Impaired Class of Claims or Interests does not accept or is deemed not to accept the Plan, the Bankruptcy Court may nevertheless confirm such plan at the Debtor's request if at least one Impaired Class has voted to accept the Plan (with such acceptance being determined without including the vote of any "insider" in such class), and as to each Impaired Class that has not accepted the Plan, the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting Impaired Classes. In the event that any Class of Claims or Interests vote to reject the Plan, the Debtor believes that the Plan satisfies the requirements for non-consensual Confirmation.

iii.      Failure of the Purchaser to Close. As discussed above, the Plan proposes to sell the Property for an amount sufficient to pay all Claims in full. The Stalking Horse Purchaser has executed the Sales Contract which, upon closing, will generate sufficient proceeds to pay all Allowed Claims in full, and has agreed to pay a $500,000 deposit which will become non-refundable at the conclusion of the test and studies period under the Sales Contract. But, the Debtor cannot guarantee that the Stalking Horse Purchaser, or such other buyer as may prevail if an

auction of the Property occurs, will close under the Sales Contract. If such buyer fails to close, the Debtor's ability to pay Creditors in accordance with the Plan may be adversely affected. Similarly, even if the sale is consummated, a portion of the purchase price in the amount varying from $200,000 to $700,000 is to be paid upon satisfaction of the applicable performance thresholds and terms outlined in the Sales Contract. Although it remains hopeful, the Debtor cannot provide assurance that such thresholds and terms will be satisfied.

iv.    Risk of Non-Occurrence of Effective Date. There can be no assurance as to the timing of the Effective Date. If the conditions precedent to the Effective Date set forth in the Plan have not occurred or have not been waived as set forth in Section 10.03 of the Plan, then the Confirmation Order may be vacated, in which event no distributions would be made under the Plan, the Debtor and all Holders of Claims and Interests would be restored to the status quo as of the day immediately preceding the Confirmation Date, and the Debtor's obligations with respect to Claims and Interests would remain unchanged.

v.    Risks with Respect to Exit Financing. As discussed above, the proposed Exit Finance lender and the Debtor are currently in discussions regarding the prospect of renewed financing arrangements for Exit Facility. In the event that Exit Financing is not obtained, the Effective Date of the Plan may be deferred until Closing under the Sales Contract. This could defer the timing of payments to Creditors under the Plan, and subject Creditors to the risk of failure of the Purchaser to Close, as discussed above.

vi.    Conversion into Chapter 7 Case. If no Chapter 11 plan can be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interests of Holders of Claims and Interests, the Chapter 11 Case may be converted to case under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate the Debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code.

**Section 12.15 Tax Consequences**

The Debtor is organized as a pass-through entity (a Subchapter S corporation), which generally means that it is not responsible for the payment of state or federal income taxes. The exception to this general rule is that the State of Maryland imposes non-resident income taxes on corporations and other entities with respect to income in favor of non-residents. Dr. and Mrs. Asterbadi reside in the District of Columbia. Thus, the Debtor has incurred, and likely will incur under the Plan, non-resident income tax obligations to the State of Maryland. The Debtor has consulted with its CPA regarding the estimate amount of tax – both state and federal – that is expected to result from the sale of the Property. Under the Plan, there is no requirement to reserve for taxes that arise from payments coming due under the Purchaser Note. Rather, the normal pass-through rules will apply, and the Holders of the Equity Interests will be responsible for any taxes as may accrue on account of those receipts. NEITHER THE DEBTOR NOR ITS UNDERSIGNED COUNSEL ARE PROVIDING TAX ADVICE OR OPINIONS IN CONNECTION WITH THE PLAN. EACH CREDITOR AND HOLDER OF AN INTEREST IS ENCOURAGED TO OBTAIN ITS OWN TAX ADVICE.

## ARTICLE XIII　　　**FURTHER INFORMATION**

### Section 13.01 Further Information; Additional Copies

If you have any questions or require further information about the voting procedure for voting your Claim or about the packet of material you received, or if you wish to obtain an additional copy of the Plan, the Disclosure Statement, or any exhibits or appendices to such documents, please contact:

> Bradford F. Englander
> Whiteford Taylor Preston LLP
> 3190 Fairview Park Drive, Suite 800
> Falls Church, Virginia 22042
> Phone: (703) 280-9081
> benglander@wtplaw.com

## ARTICLE XIV　　　**RECOMMENDATION AND CONCLUSION**

For all of the reasons set forth in this Disclosure Statement, the Debtor believes that confirmation and consummation of the Plan is preferable to all other alternatives.

Dated: August 31, 2022

*/s/ Bradford F. Englander*
Whiteford, Taylor & Preston, LLP
Bradford F. Englander, Esq., Bar No. 11951
3190 Fairview Park Drive, Suite 800
Falls Church, Virginia 22042
Telephone: (703) 280-9081
Facsimile: (703) 280-3370
Email: benglander@wtplaw.com

*Counsel for the Debtor*

*/s/ Nabil J. Asterbadi*
Nabil J. Asterbadi,
President of Zachair Ltd.

### **Schedule of Exhibits to Disclosure Statement**

Exhibit A – Plan

Exhibit B – Plan Projections

*12347005*

**<u>EXHIBIT A</u>**

**Plan**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| Zachair, Ltd., | ) | Case No.:  20-10691-TJC |
| | ) | |
| Debtor. | ) | Chapter 11 |
| | ) | |

## <u>DEBTOR'S SECOND AMENDED PLAN OF REORGANIZATION</u>

Whiteford, Taylor & Preston, LLP
Bradford F. Englander, Esq., Bar No. 11951
3190 Fairview Park Drive, Suite 800
Falls Church, Virginia 22042
Telephone: (703) 280-9081
Facsimile: (703) 280-3370
Email: <u>benglander@wtplaw.com</u>

*Counsel for the Debtor*

## TABLE OF CONTENTS

**ARTICLE I**      DEFINED TERMS AND RULES OF INTERPRETATION ............................. 1

Section 1.01    Rules of Interpretation ...................................................................... 1

Section 1.02    Defined Terms ................................................................................. 2

**ARTICLE II**     CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS ................... 11

Section 2.01    Classification ................................................................................ 11

**ARTICLE III**    TREATMENT OF CLAIMS AND EQUITY INTERESTS ........................... 12

Section 3.01    General ........................................................................................ 12

Section 3.02    Unclassified Claims ....................................................................... 12

Section 3.03    Impaired/Voting Classes of Claims Against the Debtor ...................... 13

**ARTICLE IV**     ACCEPTANCE OR REJECTION OF THE PLAN ................................. 18

Section 4.01    Impaired Classes of Claims and Equity Interests Entitled to Vote ......... 18

Section 4.02    Acceptance by an Impaired Class ..................................................... 18

Section 4.03    Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code ........ 19

Section 4.04    Elimination of Vacant Classes ......................................................... 19

**ARTICLE V**      MEANS FOR IMPLEMENTATION OF THE PLAN ............................... 19

Section 5.01    Revesting of Assets ....................................................................... 19

Section 5.02    Sale of the Property ....................................................................... 19

Section 5.03    Releases of Record ........................................................................ 19

Section 5.04    Exit Financing .............................................................................. 20

Section 5.05    Exemption from Transfer and Recordation Taxes ............................... 20

Section 5.06    Income Tax Payments ..................................................................... 20

Section 5.07    Preservation of Priority .................................................................. 20

Section 5.08    Corporate Action ........................................................................... 20

Section 5.09    Effectuating Documents; Further Transactions .................................... 21

Section 5.10    Preservation of Rights of Action ...................................................... 21

Section 5.11    Retention of Professionals After Effective Date .................................. 21

Section 5.12    Closing of Debtor's Case ................................................................ 22

Section 5.13    Operation of the Debtor Between the Confirmation Date and the Effective
Date                22

Section 5.14    Automatic Stay ............................................................................. 22

Section 5.15    Destruction of Books and Records .................................................... 22

-i-

Section 5.16    Plan Administrator ............................................................................. 22

   (a)    Appointment of Plan Administrator ................................................... 22

   (b)    Duties and Powers of Plan Administrator .......................................... 23

   (c)    Compensation of Plan Administrator, Broker and Counsel ................ 23

   (d)    Plan Administrator Expenses.............................................................. 24

   (e)    Plan Administrator Sale Procedures ................................................... 24

   (f)    Plan Committee ................................................................................... 24

   (g)    Debtor Cooperation; Non-Interference............................................... 24

   (h)    Payment by Equity; Termination of Plan Administrator..................... 24

**ARTICLE VI**    EXECUTORY CONTRACTS AND UNEXPIRED LEASES ...................... 25

Section 6.01    Executory Contracts and Unexpired Leases ...................................... 25

Section 6.02    Claims Based on the Rejection of Executory Contracts and Unexpired Leases 25

**ARTICLE VII**    PROVISIONS GOVERNING DISTRIBUTIONS.......................................... 25

Section 7.01    Calculation of Amounts to be Distributed ........................................ 25

Section 7.02    Delivery of Distributions and Undeliverable or Unclaimed Distributions...... 26

Section 7.03    Compliance with Tax Requirements/Allocations............................... 27

Section 7.04    Claims Paid or Payable to Third Parties ........................................... 28

Section 7.05    Prepayment ........................................................................................ 28

**ARTICLE VIII**    PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS AND EQUITY INTERESTS........................................ 28

Section 8.01    Resolution of Disputed Claims.......................................................... 28

Section 8.02    Distribution Reserve Account ........................................................... 30

Section 8.03    Distributions After Allowance ........................................................... 30

Section 8.04    Disallowance of Claims..................................................................... 30

Section 8.05    Amendments ...................................................................................... 30

Section 8.06    No Interest ......................................................................................... 31

Section 8.07    Setoffs ............................................................................................... 31

**ARTICLE IX**    EFFECT OF PLAN CONFIRMATION................................................. 31

Section 9.01    Binding Effect.................................................................................... 31

Section 9.02    Discharge ........................................................................................... 32

Section 9.03    Injunction .......................................................................................... 32

Section 9.04    Exculpation and Limitation of Liability ............................................ 32

**ARTICLE X**          CONFIRMATION AND CONSUMMATION OF THE PLAN .................... 33

    Section 10.01   Conditions to Confirmation of the Plan ........................................ 33

    Section 10.02   Conditions to the Effective Date ................................................ 33

    Section 10.03   Waiver of Conditions ................................................................ 33

    Section 10.04   Consequences of Non-Occurrence of Effective Date .................... 33

**ARTICLE XI**         RETENTION OF JURISDICTION ............................................... 34

    Section 11.01   Retention of Jurisdiction .......................................................... 34

    Section 11.02   Failure of the Bankruptcy Court to Exercise Jurisdiction .............. 35

**ARTICLE XII**        MISCELLANEOUS PROVISIONS ............................................. 36

    Section 12.01   Modifications and Amendments ................................................ 36

    Section 12.02   Severability of Plan Provisions ................................................ 36

    Section 12.03   Successors and Assigns ............................................................ 36

    Section 12.04   Payment of Statutory Fees ........................................................ 36

    Section 12.05   Revocation, Withdrawal or Non-Consummation ........................... 37

    Section 12.06   Service of Documents ............................................................... 37

    Section 12.07   Plan Supplements .................................................................... 37

    Section 12.08   Tax Reporting and Compliance .................................................. 37

## INTRODUCTION

Zachair, Ltd (the "Debtor"), hereby proposes the following chapter 11 plan of reorganization. The Debtor is the proponent of the Plan within the meaning of section 1129 of title 11 of the United States Code (the "Bankruptcy Code"). This Plan contemplates the distribution of the proceeds of the sale of a portion of the Debtor's assets and the resolution of the outstanding Claims against and Equity Interests in the Debtor. Reference is made to the Disclosure Statement, distributed contemporaneously herewith, for a discussion of (i) the Debtor's history, business and operations, (ii) a summary of this Plan, and (iii) certain related matters, including risk factors relating to the consummation of this Plan. All Holders of Claims who are eligible to vote on the Plan are encouraged to read the Plan and the accompanying Disclosure Statement (including all exhibits thereto) in their entirety before voting to accept or reject the Plan. Subject to certain restrictions and requirements set forth in Bankruptcy Code section 1127 of the Bankruptcy Code and Rule 3019 of the Bankruptcy Rules, the Debtor reserves the right to alter, amend, modify, revoke, or withdraw this Plan prior as provided herein.

The Plan is a plan of reorganization. The Debtor has sought preliminary authority to sell substantially all of its Property to the Stalking Horse Purchaser, its designee or, subject to the terms of the Sale and Bid Procedures Order, another Purchaser. The Plan provides for the disposition of proceeds of the sale of the Property. The Plan also provides for Distributions to certain Holders of Administrative Claims and Priority Claims and to other Claim Holders and Interest Holders. The Plan further provides for the revesting of all remaining Estate assets to the Debtor on the Effective Date.

No solicitation materials, other than the Disclosure Statement and related materials transmitted therewith have been approved for use in soliciting acceptances and rejections of the Plan. Nothing in the Plan should be construed as constituting a solicitation of acceptances of the Plan unless and until the Disclosure Statement has been approved and distributed to all Holders of Claims and Equity Interests to the extent required by section 1125 of the Bankruptcy Code.

**ALL HOLDERS OF CLAIMS AGAINST THE DEBTOR THAT ARE ENTITLED TO VOTE ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. SUBJECT TO CERTAIN RESTRICTIONS AND REQUIREMENTS SET FORTH IN SECTION 1127 OF THE BANKRUPTCY CODE, BANKRUPTCY RULE 3019, AND THE PLAN, THE DEBTOR RESERVES THE RIGHT TO ALTER, AMEND, MODIFY, REVOKE OR WITHDRAW THE PLAN AS PROVIDED HEREIN.**

## ARTICLE I         DEFINED TERMS AND RULES OF INTERPRETATION

### Section 1.01   Rules of Interpretation

For purposes of this Plan, except as expressly provided herein or unless the context otherwise requires, all capitalized terms not otherwise defined, including those capitalized terms used in the preceding Introduction, shall have the meanings ascribed to them in Article I of this Plan. Any term used in this Plan that is not defined herein, but is defined in the Bankruptcy Code or the

Bankruptcy Rules, shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable. To the extent that there is an inconsistency between a definition in this Plan and a definition set forth in the Bankruptcy Code, the definition set forth herein shall control. Whenever the context requires, such terms shall include the plural as well as the singular number, the masculine gender shall include the feminine, and the feminine gender shall include the masculine. In addition to the foregoing, any defined terms used in the Exhibits shall have the meaning ascribed to them in either the applicable Exhibit or in Article I of this Plan.

## Section 1.02 Defined Terms

"**Administrative Claim**" means a Claim for costs and expenses of administration of this Chapter 11 Case allowed under sections 503(b), 507(b), including but not limited to: (a) any actual and necessary costs and expenses incurred between the Petition Date and the Effective Date for preserving the Debtor's estate and operating the businesses of the Debtor (including, but not limited to, wages, salaries, commissions for services and payments for inventories, leased equipment and premises) and Claims by governmental units for taxes (including Claims in respect of taxes that accrued after the Petition Date, but excluding Claims in respect of taxes that accrued on or before the Petition Date unless such taxes are entitled to be treated as administrative claims under the Bankruptcy Code); and for which an application is filed with the Bankruptcy Court prior to the Administrative Claims Bar Date; (b) Professional Fee Claims, and (c) all fees and charges assessed against the Debtor's estate under section 1930, chapter 123 of title 28 of the United States Code.

"**Administrative Claims Bar Date**" means thirty (30) calendar days after the Effective Date.

"**Affiliate**" means "affiliate" as defined in section 101(2) of the Bankruptcy Code.

"**Allowed**" means, with respect to any Claim (including any Administrative Claim) or portion thereof (to the extent such Claim is not Disputed or Disallowed) or any Equity Interest, (a) any Claim, proof of which (i) was Filed with the Bankruptcy Court, (ii) was deemed Filed pursuant to section 1111(a) of the Bankruptcy Code, or (iii) by a Final Order, was not required to be Filed; (b) any Claim or Equity Interest that has been, or hereafter is, listed in the Schedules as liquidated in an amount other than zero or unknown and which is not Disputed or contingent (or as to which the applicable Proof of Claim has not been withdrawn or Disallowed); (c) any Claim or Equity Interest which has been allowed (whether in whole or in part) by a Final Order (but only to the extent so allowed), and, in the case of (b) and (c) above, as to which no objection to the allowance thereof, or action to subordinate, avoid, classify, reclassify, expunge, estimate or otherwise limit recovery with respect thereto, has been Filed within the applicable period of limitation fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules or a Final Order; (d) any Claim or Equity Interest allowed under or pursuant to the terms of the Plan; (e) any Claim arising from the recovery of property under sections 550 or 553 of the Bankruptcy Code which has been allowed in accordance with section 503(h) of the Bankruptcy Code; (f) a Claim in respect of an Executory Contract or Unexpired Lease that either (1) is not a Disputed Claim or (2) has been allowed by a Final Order, in either case only if a Proof of Claim has been Filed or has otherwise been deemed Filed under applicable law; or (g) which is a Professional Fee Claim for which a fee award amount has been approved by order of the Bankruptcy Court; provided, however, that Claims or Equity Interests allowed solely for the purpose of voting to accept or reject the Plan pursuant to an order of the Bankruptcy Court shall not be considered "Allowed" hereunder.

-2-

"**Avoidance Actions**" means any and all causes of action and the proceeds thereof which a trustee, debtor-in-possession, the estate or other appropriate party in interest may assert under sections 502(d), 510, 541, 542, 543, 544, 545, 547, 548, 549, 550, 551, or 553 of the Bankruptcy Code or under related state or federal statutes and common law, including, without limitation, fraudulent transfer laws (whether or not litigation is commenced to prosecute such Causes of Action) and including the Debtor's rights of setoff, recoupment, contribution, reimbursement, subrogation or indemnity (as those terms are defined by the non-bankruptcy law of any relevant jurisdiction) and any other indirect claim of any kind whatsoever, whenever and wherever arising or asserted.

"**Ballot**" means each of the ballot forms distributed to each Holder of a Claim entitled to vote to accept or reject this Plan.

"**Bankruptcy Code**" means the Bankruptcy Reform Act of 1978, as codified in Title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as in effect on the Petition Date, together with all amendments and modifications thereto that are subsequently made applicable to this Chapter 11 Case.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Maryland.

"**Bankruptcy Rules**" means (i) the Federal Rules of Bankruptcy Procedure and the Official Bankruptcy Forms, as amended and promulgated under section 2075 of Title 28 of the United States Code, (ii) the applicable Federal Rules of Civil Procedure, as amended and promulgated under section 2072 of Title 28 of the United States Code, (iii) the applicable Local Rules of Bankruptcy Practice and Procedure for the Bankruptcy Court, and (iv) any standing orders governing practice and procedure issued by the Bankruptcy Court, each as in effect on the Petition Date, together with all amendments and modifications thereto that were subsequently made applicable to this Chapter 11 Case or proceedings therein, as the case may be.

"**Bar Date**" means the dates established by the Bankruptcy Court as deadlines for the Holders of Claims to File proofs of Claim.

"**Business Day**" means any day, excluding Saturdays, Sundays, or "legal holidays" (as defined in Bankruptcy Rule 9006(a)), on which commercial banks are open for business in the State of Maryland.

"**Cash or $**" means legal tender of the United States of America or the equivalent thereof, including bank deposits, checks and cash equivalents.

"**Chapter 11 Case**" means the chapter 11 case commenced by the Debtor administered under case number 20-10691 in the Bankruptcy Court.

"**Claim**" or "**Claims**" means a claim or claims against the Debtor, as such term is defined in section 101(5) of the Bankruptcy Code.

"**Claims Register**" means the official register of Claims maintained by the Bankruptcy Court.

"**Class**" means a category of Holders of Claims or Equity Interests pursuant to section 1122(a) of the Bankruptcy Code, as described in Article III of the Plan.

"**Closing Date**" means the date of closing under the Sales Contract.

"**Confirmation**" means the entry of the Confirmation Order on the docket of this Chapter 11 Case, subject to all conditions specified having been (a) satisfied, or (b) waived.

"**Confirmation Date**" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of this Chapter 11 Case, within the meaning of Bankruptcy Rules 5003 and 9021.

"**Confirmation Hearing**" means the hearing held by the Bankruptcy Court to consider Confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

"**Confirmation Order**" means the order of the Bankruptcy Court confirming the Plan pursuant to, among others, section 1129 of the Bankruptcy Code.

"**Creditor**" means any Holder of a Claim against any of the Debtor or its Estate.

"**Cure**" means the Distribution of Cash, or such other property as may be agreed upon by the parties or ordered by the Bankruptcy Court, with respect to the assumption or assumption and assignment of an Executory Contract or Unexpired Lease, pursuant to section 365(b) of the Bankruptcy Code, in an amount equal to all unpaid monetary obligations, without interest, or such other amount as may be agreed upon by the parties, under such Executory Contract or Unexpired Lease, to the extent such obligations are enforceable under the Bankruptcy Code and applicable bankruptcy law.

"**Debtor**" means Zachair, Ltd, a corporation organized and existing under the laws of the State of Maryland.

"**Deed of Trust**" means a first priority deed of trust on the Property, securing Stalking Horse Purchaser's obligations under the Sales Contract.

"**DIP Financing Documents**" means the Commercial Promissory Note dated March 1, 2021, First Modification to Deed of Trust and Security Agreement dated as of March 1, 2021, each in favor of Sandy Spring.

"**Disallowed**" means, with respect to any Claim, Equity Interest or portion thereof, any Claim against or Equity Interest in the Debtor which: (i) has been disallowed, in whole or part, by a Final Order; (ii) has been withdrawn by agreement of the Holder thereof and the applicable Debtor, in whole or in part; (iii) has been withdrawn, in whole or in part, by the Holder thereof; (iv) if listed in the Schedules as zero or as Disputed, contingent or unliquidated and in respect of which a Proof of Claim has not been Filed or deemed Filed or Allowed or deemed Allowed pursuant to the Plan, the Bankruptcy Code or any Final Order or other applicable law in a liquidated non-contingent amount; (v) has been reclassified, expunged, subordinated or estimated to the extent that such reclassification, expungement, subordination or estimation results in a reduction in the Filed amount of any Proof of Claim; (vi) is evidenced by a Proof of Claim which has been Filed, or which has been deemed to be

Filed under applicable law or order of the Bankruptcy Court or which is required to be Filed by order of the Bankruptcy Court but as to which such Proof of Claim was not properly Filed; (vii) is unenforceable to the extent provided in section 502(b) of the Bankruptcy Code; (viii) where the holder of a Claim or Equity Interest is a Person or Entity from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, unless such Person, Entity or transferee has paid the amount, or turned over any such property, for which such Person, Entity or transferee is liable under sections 522(i), 542, 543, 550, or 553 of the Bankruptcy Code; or (ix) is for reimbursement or contribution that is contingent as of the time of allowance or disallowance of such Claim or Equity Interest. In each case, a Disallowed Claim or Equity Interest is Disallowed only to the extent of disallowance, withdrawal, reclassification, expungement, subordination or estimation.

"**Disclosure Statement**" means the Second Amended Disclosure Statement for the Plan, as amended, supplemented or modified from time to time, describing the Plan, that is prepared and distributed in accordance with, among others, sections 1125, 1126(b) and 1145 of the Bankruptcy Code, Bankruptcy Rule 3018 and other applicable law.

"**Disputed**" means with respect to any Claim or any portion thereof (a) as to which the Debtor or any other party in interest, has Filed an objection, and such objection has not been withdrawn or overruled by a Final Order; (b) that is listed on the Debtor's Schedules as disputed (unless and to the extent such Claim has been deemed Allowed or deemed Allowed pursuant to the Plan, the Bankruptcy Code or any Final Order or other applicable law); or (c) a tort claim.

"**Disputed Claim Amount**" means (a) if a liquidated amount is set forth in a Proof of Claim relating to a Disputed Claim, (i) the liquidated amount or any portion thereof set forth in the Proof of Claim relating to the Disputed Claim; (ii) an amount agreed to by the Debtor and the Holder of such Disputed Claim; or (iii) if a request for estimation is Filed by any party, the amount at which such Disputed Claim is estimated by the Bankruptcy Court; (b) if no liquidated amount is set forth in a Proof of Claim relating to a Disputed Claim, (i) an amount agreed to by the Debtor and the Holder of such Disputed Claim or (ii) the amount estimated by the Bankruptcy Court with respect to such Disputed Claim; or (c) zero, if the Disputed Claim was listed on the Schedules as unliquidated, contingent or disputed and no Proof of Claim was Filed, or deemed to have been Filed, as applicable, and the Claim has not been resolved by written agreement of the parties or an order of the Bankruptcy Court.

"**Distribution**" means any Distribution pursuant to the Plan to the Holders of Allowed Claims or Equity Interests.

"**Distribution Date**" means the date on which a Distribution is made pursuant to this Plan.

"**Distribution Record Date**" means (i) the Confirmation Date as to the Holders of Allowed Administrative Claims entitled to Distributions pursuant to the Plan and (ii) any such date established by the Debtor as to Holders of Other Secured Claims, Holders of Other Priority Claims and Holders of General Unsecured Claims.

"**Distribution Reserve Account**" means an account established by the Debtor on or prior to the Initial Distribution Date for the purpose of reserving funds for the payment of Disputed Claims.

"**Effective Date**" means the first Business Day following the date on which all conditions to Confirmation and the Effective Date, as set forth in Section 10.02 of the Plan have been satisfied or, if capable of being duly and expressly waived, as provided in Section 10.03 of the Plan, any such conditions has been waived.

"**Entity**" shall have the meaning ascribed to such term in section 101(15) of the Bankruptcy Code.

"**Equity Interests**" means the legal interests, equitable interests, contractual interests, equity interests or ownership interests, or other rights of any Person in the Debtor including all capital stock, stock certificates, common stock, preferred stock, partnership interests, limited liability company or membership interests, rights, treasury stock, options, warrants, contingent warrants, convertible or exchangeable securities, investment securities, subscriptions or other agreements and contractual rights to acquire or obtain such an interest or share in the Debtor, membership interests, partnership interests in the Debtor's stock appreciation rights, conversion rights, repurchase rights, redemption rights, dividend rights, preemptive rights, subscription rights and liquidation preferences, puts, calls, awards or commitments of any character whatsoever relating to any such equity, common stock, preferred stock, ownership interests or other shares of capital stock of the Debtor or obligating the Debtor to issue, transfer or sell any shares of capital stock whether or not certificated, transferable, voting or denominated "stock" or a similar security.

"**Estate(s)**" means the estate of the Debtor created by section 541 of the Bankruptcy Code upon the commencement of this Chapter 11 Case on the Petition Date.

"**Executory Contract**" means a contract to which the Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

"**Exit Financing**" means any loan, including without limitation a term loan and/or a line of credit, as may be entered into between the Debtor and lender (or lenders), either prior to or after the entry of the Confirmation Order, in the amount of at least $7,550,000 (net of lender's points, fees, prepaid interest, escrows and closing costs), or such lesser amount as the Debtor, in its sole discretion, may elect, the proceeds of which are to be used, in whole or part, to fund payments under or in connection with the Plan.

"**File, Filed or Filing**" means, respectively, file, filed, or filing with the Bankruptcy Court or its authorized designee in this Chapter 11 Case.

"**Final Order**" means an order, ruling, judgment, the operation or effect of a judgment or other decree issued and entered by the Bankruptcy Court or by any state or other federal court or other court of competent jurisdiction which has not been reversed, vacated, stayed, modified or amended and as to which (i) the time to appeal or petition for review, rehearing, certiorari, re-argument or retrial has expired and as to which no appeal or petition for review, rehearing, certiorari, reargument or retrial is pending or (ii) any appeal or petition for review, rehearing,

certiorari, reargument or retrial has been finally decided and no further appeal or petition for review, rehearing, certiorari, reargument or retrial can be taken for granted.

"**General Unsecured Claim**" means an unsecured Claim against a Debtor, including any Claim arising from the rejection of an Executory Contract or Unexpired Lease, but excluding any Administrative Claims, Priority Tax Claims, and Other Priority Claims; provided, however, that any deficiency claim asserted by a holder of a Secured Claim shall be deemed a General Unsecured Claim.

"**Governmental Unit**" means all governmental units, which shall include all entities defined in section 101(27) of the Bankruptcy Code, including such entities that hold a Claim arising from prepetition tax years or periods or prepetition transactions to which Debtor was a party.

"**Holder**" or "**Holders**" means the legal or beneficial holder of a Claim or Equity Interest (and, when used in conjunction with a Class or type of Claim or Equity Interest, means a Holder of a Claim or Equity Interest in such Class or of such type).

"**Impaired**" means, when used with reference to a Claim or Equity Interest, a Claim or Equity Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

"**Impaired Class**" means a Class or Claims or Equity Interests that are Impaired.

"**Initial Distribution Date**" means the date on which the Debtor makes initial distributions to Holders of Allowed Claims pursuant to the Plan.

"**Lien**" means, with respect to any asset or property (or the rents, revenues, income, profits or proceeds therefrom), and in each case, whether the same is consensual or nonconsensual or arises by contract, operation of law, legal process or otherwise: (a) any and all mortgages or hypothecation to secure payment of a debt or performance of an obligation, liens, pledges, attachments, charges, leases evidencing a capitalizable lease obligation, conditional sale or other title retention agreement, or other security interest or encumbrance or other legally cognizable security devices of any kind in respect of any asset or property, or upon the rents, revenues, income, profits or proceeds therefrom; or (b) any arrangement, express or implied, under which any property is transferred, sequestered or otherwise identified for the purpose of subjecting or making available the same for the payment of debt or performance of any other obligation in priority to the payment of holders of General Unsecured Claims; provided, however, that a lien that has or may be avoided pursuant to any Avoidance Action shall not constitute a lien hereunder.

"**Mercedes-Benz Finance**" means Mercedes-Benz Financial Services USA LLC.

"**Mercedes SUV**" means the 2014 Mercedes-Benz GL63, VIN 4JGDF7EE3EA300402, co-owned by the Debtor and Dr. Asterbadi.

"**Mercedes SL**" means the 2015 Mercedes-Benz SL65 AMG, VIN WDDJK7KAXFF035220, co-owned by the Debtor and Dr. Asterbadi.

-7-

"**Net Closing Funds**" means the funds received by the Debtor on the Closing Date from the purchaser under the Sales Contract, less the aggregate amount of payments, or reserves for the payment of: (a) Allowed Claims, interest and other compensation under the Plan with respect to Classes 1, 2, 3, 4, 5, 6 and 7; (b) Administrative Claims; (c) Professional Fee Claims; (d) accrued and projected operating expenses; (e) U.S. Trustee fees; (f) the Tax Reserve; and (g) accrued and projected principal, interest, fees and charges with respect to Exit Financing.

"**Net Purchase Funds**" means the funds received by the Debtor on account of the Purchaser Payment, less the aggregate amount of payments, or reserves for the payment of: (a) Allowed Claims, interest and other compensation under the Plan with respect to Classes 1, 2, 3, 4, 5, 6 and 7; (b) Administrative Claims; (c) Professional Fee Claims; (d) accrued and projected operating and litigation expenses; (e) U.S. Trustee fees; (f) the Tax Reserve; and (g) accrued and projected principal, interest, fees and charges with respect to Exit Financing.

"**Order(s)**" means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction, as entered on the docket in any case or the docket of any other court of competent jurisdiction.

"**Other Administrative Claims**" means any and all Administrative Claims arising after the Administrative Claims Bar Date, other than Professional Fee Claims.

"**Other Priority Claims**" means any and all Allowed Claims accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than an Administrative Claim or a Priority Tax Claim.

"**PD Hyde Field**" means PD Hyde Field LLC, a limited liability company organized under the laws of the State of Maryland.

"**Person**" shall have the meaning provided in section 101(41) of the Bankruptcy Code.

"**Petition Date**" means the date on which the Debtor Filed its petition for relief commencing the Chapter 11 Case, January 17, 2020.

"**Plan**" means this plan of liquidation under chapter 11 of the Bankruptcy Code, as it may be altered, amended, modified or supplemented from time to time including in accordance with its terms and the Bankruptcy Code or the Bankruptcy Rules.

"**Plan Administrator**" means Black Dog Receiver LLC, or such other person as Sandy Spring and the Debtor may agree upon in writing or, absent agreement, as directed by the Court.

"**Plan Administrator Consultants**" means consultants and advisors as may be hired by the Plan Administrator to assist and advise with respect to the marketing, sale and disposition of the Property, other than brokers and lawyers.

"**Plan Committee**" means a committee consisting of Sandy Spring Bank; Whiteford Taylor & Preston LLP in its capacity as an administrative creditor; and PD Hyde Field, in its capacity as a general unsecured creditor.

"**Post-Effective Date Interest Rate**" means the United States prime rate of interest published by the Wall Street Journal prior to the commencement of the Confirmation Hearing, or the lowest interest rate that the Bankruptcy Court determines is required to satisfy Section 1129(b) of the Bankruptcy Code with respect to a particular Class.

"**Pre-Effective Date Interest Rate**" means the federal judgment rate under 28 U.S.C. § 1961 in effect as of the Petition Date.

"**Priority Tax Claim**" means any and all Claims of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

"**Professional**" means any professional employed in this Chapter 11 Case pursuant to Bankruptcy Code sections 327, 328, 1103, 105(a), 363(c) or other order of the Bankruptcy Court.

"**Professional Fee Claims**" means compensation for legal, financial, advisory, accounting and other services by Professionals and reimbursement of expenses Allowed by the Bankruptcy Court under sections 328, 330, 331, 363 or 503(b) of the Bankruptcy Code to the extent incurred on or prior to the Effective Date.

"**Proof of Claim**" means a proof of claim Filed with the Bankruptcy Court in this Chapter 11 Case.

"**Property**" means the real property owned by the Debtor, consisting of approximately 423.45 acres, located in Prince George's County, Maryland, as more specifically described in Exhibit A to the Sale and Bid Procedures Motion.

"**Property Consultants**" means the consultants and other advisors engaged by the Debtor pursuant to the *Order Granting Motion For Order Authorizing The Debtor To Employ And Compensate Consultants And Experts For Specific Services Rendered In Connection With The Debtor's Property*, entered on January 4, 2021, clerk's docket no. 182.

"**Pro Rata Share**" means with respect to any Distribution to a Class under the Plan, the ratio (expressed as a percentage) of the amount of an Allowed Claim or Equity Interest in such Class to the aggregate amount of all Allowed Claims or Equity Interests plus the Disputed Claim Amount of all Disputed Claims or the amount of Equity Interests that are Disputed in the same Class; provided that, Priority Tax Claims and Other Priority Tax Claims shall be aggregated for the purposes of calculating the Distribution to Holders of Priority Tax Claims and Holders of Other Priority Claim; provided further, that to the extent any Disputed Claims or Equity Interests are not Allowed by the Bankruptcy Court in whole or in part, the Pro Rata Share of all Allowed Claims or Equity Interests in such Class shall be adjusted to take into account the Disputed Claim Amount or the amount of Equity Interests that are Disputed (or portion thereof) associated with the Disputed Claim or Equity Interest that was not Allowed.

"**Purchaser Payment**" means the payments to be paid by the Stalking Horse Purchaser under the Sales Contract, or in the event of a sale to another Prevailing Purchaser, any contractual obligation to make payment to the Debtor on account of the sale of the Property.

"**Purchaser Payment Date**" means any date on which the Debtor receives payment under the Purchaser Payment.

"**Sale and Bid Procedures Motion**" means the *Debtor's Second Motion for an Order (A) Approving the Sale of the Debtor's Property Free and Clear of Liens, Claims, Interests and Encumbrances, (B) Approving the Contract, (C) Approving Bid Procedures, (D) Scheduling Bid Deadline, Auction and Sale Hearing, (E) Approving Form and Manner of Notice Thereof, and (F) Granting Certain Related Relief*, filed on June 5, 2022, clerk's docket no. 321, including all exhibits thereto.

"**Sale and Bid Procedures Order**" means the proposed *Order (A) Approving the Sale of the Debtor's Property Free and Clear of Liens, Claims, Interests and Encumbrances, (B) Approving the Contract, (C) Approving Bid Procedures, (D) Scheduling Bid Deadline, Auction and Sale Hearing, (E) Approving Form and Manner of Notice Thereof, and (F) Granting Certain Related Relief*, annexed as Exhibit E to the Sale and Bid Procedures Motion.

"**Sales Contract**" means the *Real Estate Sales Contract* dated June 1, 2022 (attached as Exhibit B to the Sale and Bid Procedures Motion), by and among the Debtor, the Stalking Horse Purchaser, and Watt Tieder Hoffar & Fitzgerald, LLP , as escrow agent, , as such contract may be amended; and, in the event of a sale of the Property to a Prevailing Bidder other than the Stalking Horse Purchaser, any contract between the Debtor and such Prevailing Bidder.

"**Sandy Spring**" means Sandy Spring Bank, a Maryland corporation.

"**Sandy Spring DIP Loan**" means that certain post-petition loan made by Sandy Spring to the Debtor pursuant to the *Line re DIP Loan Motion* Filed on November 4, 2020, clerk's docket no. 165, *Final Order Authorizing Debtor-In-Possession Financing and Use of Cash Collateral*, entered on November 9, 2020, clerk's docket no. 169.

"**Schedules**" means the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases and statements of financial affairs Filed by the Debtor pursuant to section 521 of the Bankruptcy Code and in substantial accordance with the Official Bankruptcy Forms, as the same may have been amended, modified or supplemented from time to time.

"**Secured Claim**" means a Claim that is secured by a Lien which is not subject to avoidance under the Bankruptcy Code or otherwise invalid under the Bankruptcy Code or applicable state law, on property in which the Estate has an interest, or a Claim that is subject to setoff under section 553 of the Bankruptcy Code; to the extent of the value of the Holder's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable; as determined by a Final Order pursuant to section 506(a) of the Bankruptcy Code, or in the case of setoff, pursuant to section 553 of the Bankruptcy Code, or in either case as otherwise agreed upon in writing by the Debtor and the Holder of such Claim. If the amount of any Claim exceeds the value of the Holder's interest in the Estate's interest in property or the amount subject to setoff, it shall be treated as a General Unsecured Claim.

"**Settlement and Plan Support Agreement**" means the Settlement and Plan Support Agreement dated September 8th, 2021, by and among the Debtor, PD Hyde Field and Watt Companies, Inc.

"**Solicitation Procedures Order**" means the Order of the Bankruptcy Court approving the Debtor's solicitation of acceptances of the Plan and providing for the manner of such solicitation.

"**Stalking Horse Purchaser**" means NVR, Inc., a Virginia corporation organized and existing under the laws of the Commonwealth of Virginia.

"**Subordination Agreement**" means that certain Subordination and Standstill Agreement dated December 11, 2015 by and among the Debtor, Sandy Spring and PD Hyde Field.

"**Tax Reserve**" means a reserve to be established on the Closing Date with respect to estimated state and federal income taxes resulting from the sale of the Property.

"**TD Auto Finance**" means TD Auto Finance, LLC.

"**Tenant Leases**" means Unexpired Leases to tenants at the Property, whether entered into pre-petition or post-petition.

"**Unexpired Lease**" means a lease of non-residential real property to which the Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

"**Unimpaired**" means Claims in an Unimpaired Class.

"**Unimpaired Class**" means an unimpaired Class within the meaning of section 1124 of the Bankruptcy Code.

"**Unsecured Claim**" means a Claim arising prior to the Petition Date against the Debtor that is neither a Secured Claim nor entitled to priority under section 507 of the Bankruptcy Code or any order of the Bankruptcy Court, which Claim may be a General Unsecured Claim.

"**U.S. Trustee**" means the Office of the United States Trustee for Region 4.

"**U.S. Trustee Fee Claims**" means fees arising under 28 U.S.C. § 1930(a)(6) of Title 28 of the United States Code with respect to this Chapter 11 Case.

"**Voting Deadline**" means the date and time by which all Ballots to accept or reject the Plan must be received in order to be counted, as set forth by the Solicitation Procedures Order.

## ARTICLE II    CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS

### Section 2.01   Classification

Claims against the Debtor, other than Administrative Claims and Priority Tax Claims, are classified for all purposes (unless otherwise specified), including voting and Distribution pursuant to the Plan, as follows:

-11-

| Class | Designation | Impairment | Entitled to Vote |
|-------|-------------|------------|------------------|
| 1 | Sandy Spring Prepetition Loan | Impaired | Yes |
| 2 | Sandy Spring DIP Loan | Unimpaired | No |
| 3 | Prince George's County Real Estate Taxes | Impaired | Yes |
| 4 | TD Bank Auto Loan | Impaired | Yes |
| 5 | Mercedes Benz Auto Loan | Impaired | Yes |
| 6 | PD Hyde Field Claim | Impaired | Yes |
| 7 | Other Priority Claims | Impaired | Yes |
| 8 | General Unsecured Claims | Impaired | Yes |
| 9 | Equity Interests | Impaired | Yes |

## ARTICLE III          TREATMENT OF CLAIMS AND EQUITY INTERESTS

### Section 3.01   General

Pursuant to section 1122 of the Bankruptcy Code, a Claim or Equity Interest is classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of the Class and is classified in a different class to the extent that the Claim or Equity Interest qualifies within the description of that different Class. A Claim or Equity Interest is placed in a particular Class for the purposes of receiving Distributions pursuant to the Plan only to the extent that such Claim or Equity Interest is an Allowed Claim or an Allowed Equity Interest in that Class and such Claim or Equity Interest has not been paid, released, settled or otherwise satisfied prior to the Effective Date.

### Section 3.02   Unclassified Claims

*(a)      Administrative Claims*

In full satisfaction, and settlement of and in exchange for each Allowed Other Administrative Claim, except to the extent that any Holder of an Other Allowed Administrative Claim has received payment prior to the Effective Date, agrees with the Debtor to different treatment or as otherwise provided for in the Plan, each Holder of an Allowed Other Administrative Claim shall receive payment in full, in Cash, on the later of (i) the Effective Date if due on or before that date and unpaid on the Effective Date, (ii) as soon as practicable after the date upon which such Other Administrative Claim becomes an Allowed Claim, or (iii) such other date as may be agreed upon between the Holder of such Allowed Other Administrative Claim and the Debtor.

Any Holder of an Other Administrative Claim shall, no later than the Administrative Claims Bar Date, File an application for allowance of such Other Administrative Claim. **The failure to File an application seeking the allowance of any Other Administrative Claim by the Administrative Claims Bar Date shall constitute a bar against the assertion or collection of any such Administrative Claim, and shall relieve the Debtor from any liability, responsibility or obligation with respect to such Administrative Claim. Without limiting the generality of the foregoing, no Distribution shall be made pursuant to this Plan with respect to any Other Administrative Claim (other than Professional Fee Claims) that is**

-12-

**not Filed by the Administrative Claims Bar Date. The Debtor shall not be required to File any objection in order to confirm or determine the disallowance of any late-Filed motion for the allowance or payment of any Administrative Claim (other than Professional Fee Claims).**

Prior to the Confirmation Hearing, and again prior to entry of the final decree, the Debtor shall file reports regarding compensation paid to the Property Consultants. Such reports shall: (a) identify each of the Property Consultants; (b) briefly describe the services performed by each of the Property Consultants; and (c) set forth the aggregate amount paid to each of the Property Consultants.

*(b)     Professional Fee Claims*

Any Professional seeking an award by the Bankruptcy Court of an Allowed Professional Fee Claim on account of Professional Fees incurred from the Petition Date through and including the Effective Date (i) shall, no later than forty five (45) days after the Effective Date, File a final application for allowance of compensation for services rendered and reimbursement of expenses incurred through and including the Effective Date, and (ii) shall receive, as soon as reasonably practicable after such Claim is Allowed, in full settlement, and satisfaction of, and in exchange for, such Allowed Professional Fee Claims, Cash in the amount of the Allowed Professional Fee Claims.

*(c)     Priority Tax Claims*

Except to the extent that an Allowed Priority Tax Claim has been paid prior to the Effective Date or unless otherwise agreed by the Debtor and the Holder of an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim shall receive payment in full of its Allowed Priority Tax Claim: (i) over a period ending not later than 5 years after the date of the order for relief under section 301, 302, or 303; (ii) in for by the Plan; and (iii) in a manner not less favorable than the most favored nonpriority unsecured claim.

*(d)     U.S. Trustee Fee Claims*

All fees payable pursuant to section 1930 of Title 28 of the United States Code shall be paid on the Effective Date.

All fees payable pursuant to section 1930 of Title 28 of the United States Code that are outstanding and assessed after the Effective Date shall be paid on a quarterly basis until the Chapter 11 case is closed, converted, or dismissed. The reorganized Debtor liable for the payment of all quarterly fees due pursuant to section 1930 of Title 28 after the Effective Date.

The reorganized Debtor shall each provide the United States Trustee with post-confirmation quarterly reports that shall include all of their respective disbursements for that quarter using the data embedded Form 11-PCR.

The Debtor will file a Notice of Effective Date within seven days of the Effective Date.

**Section 3.03   Impaired/Voting Classes of Claims Against the Debtor**

*(a)     Sandy Spring Bank Pre-Petition Loan ("Class 1")*

-13-

Classification:  Class 1 consists of the Secured Claim of Sandy Spring under the Sandy Spring Pre-Petition Loan.

Treatment:  Except to the extent that the Holder of the Allowed Class 1 Claim agrees in writing to less favorable treatment:

1. On the Effective Date, the Class 1 Claim shall be deemed Allowed in the amount set forth in proof of claim no. 21-1 (the "Sandy Spring Proof of Claim"), without prejudice to the Allowance of additional legal fees and costs, or post-petition interest.
2. The Debtor shall pay in full the Allowed Class 1 Claim on the Effective Date.
3. Interest shall accrue post-petition through December 31, 2021 at the rate of 6.25% per annum on the outstanding principal amount of the Class 1 Claim.  In the event that the Class 1 Claim is paid in full prior to January 1, 2023, the rate for January 1, 2022 through the pay off shall be computed at 8.0%.  In the event that the Class 1 Claim has not been repaid prior to January 1, 2023, the Class 1 Claim shall bear interest from January 1, 2022 through the pay off at the rate of prime plus 4.0%.
4. The Holder of the Allowed Class 1 Claim shall retain its Lien on the Property to secure the Allowed Class 1 Claim until such Claim is paid.

Voting:  Class 1 is Impaired by the Plan.  The Holder of the Allowed Class 1 Claim is entitled to vote to accept or reject the Plan.

(b)     *Sandy Spring DIP Loan ("Class 2")*

Classification:  Class 2 consists of the Allowed Secured Claim of Sandy Spring under the Sandy Spring DIP Loan.

Treatment:  Except to the extent that the Holder of the Allowed Class 2 Claim agrees in writing to less favorable treatment:

1. On the Effective Date, the Debtor shall pay, in Cash, the then outstanding principal amount of the Sandy Spring DIP Loan, along with any unpaid interest and legal fees accrued as of the Effective Date.
2. Interest shall accrue post-petition through December 31, 2021 at the rate of 6.25% per annum on the outstanding principal amount of the Class 2 Claim.  In the event that the Class 2 Claim is paid in full prior to January 1, 2023, the rate for January 1, 2022 through the pay off shall be computed at 8.0%.  In the event that the Class 2 Claim has not been repaid prior to January 1, 2023, the Class 2 Claim shall bear interest from January 1, 2022 through the pay off at the rate of prime plus 4.0%.
3. Sandy Spring shall not be required to file a proof of claim with respect to the Class 2 Claim.
4. The Holder of the Allowed Class 2 Claim shall retain its Lien on the Property to secure the Allowed Class 2 Claim until such Claim is paid.

Voting:  Class 2 is unimpaired by the Plan.  The Holder of the Allowed Class 2 Claim is not entitled to vote to accept or reject the Plan.

(c)     *Prince George's County Real Estate Taxes ("Class 3")*

-14-

Classification:   Class 3 consists of the Allowed Secured Claims of Prince George's County, Maryland, for unpaid real estate taxes that are secured by the Property, plus any interest or penalties now existing or arising with respect to such tax claims, and less any available credits, including without limitation credits available on account of the Debtor's operation of an airfield.

Treatment:  Except to the extent that the Holder of the Allowed Class 3 Claim agrees in writing to less favorable treatment:

1. If the Debtor obtains Exit Financing on or before the Effective Date, on the Effective Date the Debtor shall pay, in Cash, the then outstanding amount of the Allowed Class 3 Claim to the extent that payment of such Claim is then required to avoid the imposition of any penalty.
2. If the Debtor has not obtained Exit Financing on or before the Effective Date, on the Closing Date the Debtor shall pay, in Cash, the then outstanding amount of the Allowed Class 3 Claim to the extent that payment of such Claim is then required to avoid the imposition of any penalty.
3. Any Class 3 Claim that has accrued, but is not due and payable as of the Closing Date, shall be paid by the then-owner of the Property when and as such payment is due under applicable law.
4. The Holder of the Allowed Class 3 Claim shall retain its Lien on the Property to secure the Allowed Class 3 Claim until such Claim is paid.

Voting:  Class 3 is Impaired by the Plan.  The Holder of the Allowed Class 3 Claim is entitled to vote to accept or reject the Plan.

*(d)*     *TD Auto Finance Secured Claim ("Class 4")*

Classification:   Class 4 consists of the Allowed Secured Claim of TD Auto Finance, which is secured by the Mercedes SL that is co-owned by the Debtor and Dr. Asterbadi.

Treatment:  Except to the extent that the Holder of the Allowed Class 4 Claim agrees in writing to less favorable treatment, in satisfaction of its Class 4 Claim:

1. The Holder of the Class 4 Claim shall retain its lien in the Mercedes SL pending payment in full of the Allowed Class 4 Claim.
2. The Debtor shall pay the Allowed Class 4 Claim in full on the Effective Date.
3. Pending the occurrence of the Effective Date and pursuant to the agreement of the parties:
   a. Dr. Asterbadi, at his expense, shall continue making payments to TD Auto Finance in the amount of $1,000 per month until the Closing Date.
   b. Any payments made by Dr. Asterbadi post-petition shall be credited against the Class 4 Claim.
   c. Pending payment in full of the Allowed Class 4 Claim, Dr. Asterbadi, at his sole cost and expense, shall maintain property and liability insurance on the Mercedes SL.  TD Auto Finance shall be identified as the first lien holder and loss payee with respect to property insurance on the Mercedes SL.  Dr. Asterbadi shall provide proof of insurance to TD Auto Finance from time to time upon request.

d.  Pending further order of the Bankruptcy Court, TD Auto Finance shall be stayed from exercising remedies with respect to the Mercedes SL. Should payment(s) not be received timely and in good funds, or upon any other default with respect to Class 4, TD Auto Finance may send the Debtor and Dr. Asterbadi a notice of default and if the default is not cured within fifteen (15) days, TD Auto Finance shall be entitled to relief from the stay to permit TD Auto Finance to take possession of, and dispose of, the Mercedes SL in accordance with the contract and state law.

Voting:  Class 4 is Impaired by the Plan. The Holder of the Allowed Class 4 Claim is entitled to vote to accept or reject the Plan.

(e)     *Mercedes-Benz Finance Allowed Secured Claim ("Class 5")*

Classification:  Class 5 consists of the Allowed Secured Claim of Mercedes-Benz Finance, secured by the Mercedes SUV that is co-owned by the Debtor and Dr. Asterbadi.

Treatment:  Except to the extent that the Holder of the Allowed Class 5 Claim agrees in writing to less favorable treatment, in satisfaction of its Class 5 Claim:

1.  The Holder of the Class 5 Claim shall retain its lien in the Mercedes SUV pending payment in full of the Allowed Class 5 Claim.
2.  The Debtor shall pay the Allowed Class 5 Claim in full on the Effective Date.

Voting:  Class 5 is Impaired by the Plan. The Holder of the Allowed Class 5 Claim is entitled to vote to accept or reject the Plan.

(f)     *PD Hyde Field Claim ("Class 6")*

Classification:  Class 6 consists of the Allowed Claim of PD Hyde Field as set forth in the Settlement and Plan Support Agreement.

Treatment:  Except to the extent that the Holder of the Allowed Class 6 Claim agrees in writing to less favorable treatment as set forth in the Settlement and Plan Support Agreement:

1.  PD Hyde Field shall be deemed to have an allowed non-priority unsecured claim in the Bankruptcy Case in the amount of Three Million Two Hundred Thousand and No/100 Dollars ($3,200,000.00).
2.  If the Debtor obtains Exit Financing prior to the Effective Date, and if the Effective Date occurs on or before December 31, 2022, the Debtor shall pay a sum to be agreed upon by the Debtor and PD Hyde Field (the "Effective Date Payment") to PD Hyde Field concurrently with the funding of such financing, and shall pay an additional sum to be agreed upon (the "Back End Payment") to PD Hyde Field at the time of payments with respect to other general unsecured claims under the Plan.
3.  If the Debtor is not able to arrange or consummate Exit Financing, or the Debtor and PD Hyde Field do not reach agreement with respect to the amount of the payments referenced in the foregoing subsection, the Debtor shall pay the Allowed Class 6 Claim

-16-

in full *pari passu* with the payment of principal to other allowed general unsecured claims.

4. No interest shall be paid on or with respect to the Class 6 Claim.

<u>Voting</u>:  Class 6 is impaired under the Plan.  The Holder of Allowed Class 6 Claim is entitled to vote to accept or reject the Plan.

*(g)    Other Priority Claims ("Class 7")*

<u>Classification</u>:  Class 7 consists of all Other Priority Claims against the Debtor.

<u>Treatment</u>:  Except to the extent that a Holder of an Allowed Class 7 Claim agrees to a less favorable treatment, in satisfaction of its Class 7 Claim:

1. The Holder of an Allowed Class 7 Claim shall be paid the amount of its Allowed Class 7 Claim, plus interest from the Effective Date through the date of payment at the Post-Effective Date Interest Rate.
2. Subject to the payment in full of all Allowed Secured Claims, Allowed Administrative Claims, and Allowed Professional Fee Claims, Allowed Class 7 Claims shall be paid from available funds within thirty (30) days following each Purchaser Payment Date); provided, however, that all Allowed Class 7 Claims shall be paid no later than the fifth anniversary of the Petition Date.

<u>Voting</u>:  Class 7 is Impaired by the Plan.  The Holders of Allowed Class 7 Claims (if any) are entitled to vote to accept or reject the Plan.

*(h)    General Unsecured Claims ("Class 8")*

<u>Classification</u>:  Class 8 consists of Allowed General Unsecured Claims, other than the Claim of PD Hyde Field, which is separately classified.

<u>Treatment</u>:  Except to the extent that a Holder of an Allowed Class 8 Claim agrees to a less favorable treatment, in satisfaction of its Class 8 Claim, each Holder of an Allowed Class 8 Claim shall be treated as follows:

1. Each Holder of an Allowed Class 8 Claim shall be paid the Allowed Amount of such Claim in full, as set forth below.
2. Interest shall accrue on the outstanding amount of each Allowed Class 8 Claim from the Petition Date through the Effective Date at the Pre-Effective Date Interest Rate.
3. Interest shall accrue on the outstanding amount of the Allowed Class 8 Claim from the Effective Date through the date of payment of such Claims: (a) if Class 8 rejects the Plan, at the Post-Effective Date Interest Rate; or (b) if Class 8 accepts the Plan, at the rate of six percent (6.0%) per annum.
4. Except as provided below, payments shall be made in Cash on the later of the Closing Date, or the date such Claim becomes an Allowed Claim by a Final Order (or as soon as reasonably practicable thereafter).
5. Payments to Holders of Allowed Class 8 Claims shall be made only to the extent that Net Closing Funds and/or Net Purchase Funds are available.  Each Holder of an Allowed

-17-

Class 8 Claim shall be paid its Pro Rata Share of the Net Closing Funds and Net Purchase Funds.

Voting:  Class 8 is Impaired by the Plan.  The Holders of Allowed Class 8 Claims are entitled to vote to accept or reject the Plan.

*(i)      Equity Interests ("Class 9")*

Classification:  Class 9 consists of the Equity Interests in the Debtor.

Treatment:  The Holders of Equity Interests in the Debtor shall retain such interests.  Unless and until the Debtor has paid or reserved funds for the payment of all Allowed and Disputed Claims and anticipated post-Effective Date operating expenses, the Debtor shall not make any distributions or loans to Holders of any Equity Interests.  Notwithstanding the foregoing limitation, but conditioned upon the payment or reserve for payment of all Claims and expenses required under law or this Plan to be paid on the Effective Date, on the Effective Date: (a) the Debtor shall be authorized to pay or reimburse customary business expenses incurred on behalf of the Debtor, and consistent with past practices, by Holders of Equity Interests; and (b) to pay deferred compensation to Dr. Asterbadi at the rate of $2,000 per month retroactively to the Petition Date. Subject to satisfaction of the conditions set forth above, and the additional conditions set forth below, the Debtor further shall be authorized to make distributions to Holders of Equity Interests to the extent that: (i) such distributions do not impair the Debtor's ability to make any payments required under the Plan in amounts, and at the times, projected in the exhibits to the Disclosure Statement; and (ii) after reserving for all projected operating expenses, the Debtor's cash on deposit is not less than $200,000.  Upon payment and satisfaction of all Allowed Claims and Administrative Expenses, and repayment and satisfaction of all obligations and indebtedness with respect to Exit Financing, all restrictions on distributions imposed by this Plan shall terminate and be of no further force or effect.

Voting:  Class 9 is Impaired by the Plan.  The Holders of Class 9 Equity Interests are entitled to vote to accept or reject the Plan.

## ARTICLE IV          ACCEPTANCE OR REJECTION OF THE PLAN

### Section 4.01   Impaired Classes of Claims and Equity Interests Entitled to Vote

Only Holders of Allowed Claims in each Impaired Class of Claims receiving a Distribution under the Plan, and Equity Interests, are entitled to vote as a Class to Accept or reject the Plan. Accordingly, the votes of Holders of Claims and Equity Interests in all Classes shall be solicited with respect to the Plan.

### Section 4.02   Acceptance by an Impaired Class

In accordance with section 1126(c) of the Bankruptcy Code, and except as provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims shall have accepted the Plan if the Plan is accepted by the Holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims or Equity Interests in such Class that have timely and properly voted to accept or reject the Plan.

-18-

**Section 4.03    Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code**

To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtor hereby requests Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. The Debtor reserves the right to alter, amend, modify, revoke, or withdraw the Plan or any schedule or exhibit, including to amend or modify it to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.

**Section 4.04    Elimination of Vacant Classes**

Any Class of Claims or Equity Interests that does not contain, as of the date of the commencement of the Confirmation Hearing, a Holder of an Allowed Claim or Equity Interest, or a Holder of a Claim temporarily allowed under Bankruptcy Rule 3018, shall be deemed deleted from the Plan for all purposes, including for purposes of determining acceptance of the Plan by such Class under section 1129(a)(8) of the Bankruptcy Code.

##  ARTICLE V            MEANS FOR IMPLEMENTATION OF THE PLAN

**Section 5.01    Revesting of Assets**

On the Effective Date, all property of the Estate shall revest in the Debtor, subject to the Liens expressly preserved by this Plan, and to the terms and conditions of this Plan, but otherwise free and clear of all other liens, claims, interests and encumbrances.

**Section 5.02    Sale of the Property**

On the Closing Date, the Debtor shall transfer the Property to the Stalking Horse Purchaser, or if applicable, another Prevailing Bidder, pursuant to the terms of the Sales Contract. If the Stalking Horse Purchaser is the Prevailing Bidder, the Sales Contract between the Debtor and the Stalking Horse Purchaser shall be deemed finally approved pursuant to the Confirmation Order. In the event that another party is determined to be the Prevailing Bidder, the Sales Contract between the Debtor and such Prevailing Bidder shall be approved pursuant to the Confirmation Order. The sale or lease of the Property shall be free and clear of all Liens, Claims and Encumbrances pursuant to Sections 363(f) and 1141 of the Bankruptcy Code.

**Section 5.03    Releases of Record**

Upon the request of the Debtor, any Entity that is entitled to receive any Distribution under this Plan, or whose Lien is extinguished or modified pursuant to this Plan, shall execute and deliver such documents and instruments as are necessary to release, modify or preserve of record any Lien, to the extent such Lien is extinguished, modified or preserved pursuant to this Plan. Notwithstanding any provision in this Plan, the Debtor shall not be required to make any Distribution, or deliver any document or instrument, to any Entity, unless and until such Entity has complied with this obligation. The obligations set forth in this paragraph shall not be waived by any action or inaction of the Debtor, including without limitation commencement of Distributions to the affected Entity.

-19-

**Section 5.04    Exit Financing**

In the event that the Debtor arranges Exit Financing, the Debtor reserves the right to seek approval of Exit Financing either in connection with the Confirmation Hearing or upon separate motion. The Debtor may use the proceeds of Exit Financing for the purpose of payment of Claims, Administrative Expenses, pre-Confirmation and post-confirmation Professional Fees and other business expenses that are consistent with the terms of the Plan.

**Section 5.05    Exemption from Transfer and Recordation Taxes**

Pursuant to Bankruptcy Code section 1146(a), any transfers from the Debtor to any Entity, including without limitation: the sale or lease of the Property; or the issuance of any deed of trust or the granting of any Lien on the Property, pursuant to this Plan in the United States shall not be subject to any stamp tax, transfer tax, or similar tax, and the Confirmation Order shall prohibit and enjoin the appropriate state or local governmental officials or agents from assessing or collecting any such tax or governmental assessment, from delaying or conditioning the recordation of any instrument on account of the non-payment of transfer or recordation taxes, and shall require such officials or agents to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.  Without limiting the generality of the foregoing, the following transactions will be exempt from all recordation and transfer taxes: (a) the deed conveying the Property to the Stalking Horse Purchaser (or Prevailing Bidder); (b) the Deed of Trust; and (c) any deed of trust securing the Exit Financing.  The foregoing bar against the assessment and collection of stamp tax, transfer tax, or similar tax applies regardless whether such tax is assessed against, or collectible from, the transferor or the transferee.  Except as set forth above, nothing herein is intended to extend the exemption under section 1146(a) to any subsequent transfer of the Property or any portion thereof by a purchaser to any other person, including any deed of trust that secures financing obtained by such purchaser.

**Section 5.06    Income Tax Payments**

The Holders of Equity Interests in the Debtor shall be responsible for the payment of income taxes resulting from the sale of the Debtor's property and operations of the Debtor's business.

**Section 5.07    Preservation of Priority**

Notwithstanding the occurrence of the Confirmation Date or the Effective Date, all Claims, including without limitations Administrative Claims, shall retain their respective priority under the Bankruptcy Code and applicable non-bankruptcy law.

**Section 5.08    Corporate Action**

Upon the Effective Date, by virtue of the solicitation of votes in favor of this Plan and entry of the Confirmation Order, all actions contemplated by the Plan shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by Holders of Claims or Equity Interests, the Debtor, or any other Entity or Person or further Order of the Bankruptcy Court.  All matters provided for in the Plan involving the corporate structure of the Debtor, and any corporate action required by the Debtor in connection therewith, shall be deemed to have occurred and shall be in effect, without any

requirement of further action by the Debtor or the Estate. The authorizations and approvals contemplated by this Plan shall be effective notwithstanding any requirements under applicable non-bankruptcy law.

## Section 5.09   Effectuating Documents; Further Transactions

The Debtor is authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, without the need for any further Bankruptcy Court Order, approvals, authorization, or consents except for those expressly required pursuant to the Plan.

## Section 5.10   Preservation of Rights of Action

Other than causes of action against an Entity that are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or by a Bankruptcy Court order, the Debtor reserves any and all Causes of Action, including without limitation any actions specifically enumerated in the Disclosure Statement. On and after the Effective Date, the Debtor may pursue such Causes of Action.

No Entity may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against them as any indication that the Debtor will not pursue any and all available Causes of Action against them. No preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Debtor reserves the Causes of Action notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Case or pursuant to the Plan. The Debtor shall retain and shall have, including through its authorized agents or representatives, the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court to the fullest extent permitted by section 1123 of the Bankruptcy Code and all other applicable law.

Except for Claims, causes of action, counterclaims and defenses against PD Hyde Field and its Affiliates, all of which are expressly reserved, on the Effective Date, the Debtor hereby waives and releases all Avoidance Actions against all Persons and Entities.

## Section 5.11   Retention of Professionals After Effective Date

(1)    Retention Arrangements. From and after the Effective Date, the Debtor may, without further order of the Bankruptcy Court, employ, or continue the employment of, various professionals, including, but not limited to, counsel, consultants, and financial advisors, as needed to assist the Debtor in fulfilling its obligations under this Plan, and on whatever fee arrangement it deems appropriate, including, without limitation, hourly fee arrangements and contingency fee arrangements.

(2)     <u>Payment of Professionals</u>.  Professionals engaged by, or who continue to provide services to, the Debtor after the Effective Date shall not be required to file applications for compensation in order to receive the compensation provided for herein, but rather may be compensated in the ordinary course of business pursuant to their respective agreements with the Debtor.

**Section 5.12    Closing of Debtor's Case**

For the avoidance of doubt, the closing of the Debtor's Bankruptcy Case shall not have any effect, in any manner, on the Causes of Action that the Debtor may assert in accordance with the Plan. Notwithstanding anything to the contrary in the Bankruptcy Rules providing for earlier closure of the Bankruptcy Case, and all Claims have been adjudicated, the Debtor reserves the right to seek authority from the Bankruptcy Court to close the Bankruptcy Case in accordance with the Bankruptcy Code, the Bankruptcy Rules and this Plan.

**Section 5.13    Operation of the Debtor Between the Confirmation Date and the Effective Date**

During the period from the Confirmation Date through and until the Effective Date, the Debtor shall continue to manage its estate as a debtor in possession, subject to the oversight of the Bankruptcy Court as provided in the Bankruptcy Code, the Bankruptcy Rules, and all orders of the Bankruptcy Court that are then in full force and effect.

**Section 5.14    Automatic Stay**

Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays provided for in this Chapter 11 Case under sections 105 or 362 of the Bankruptcy Code or otherwise, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date.

**Section 5.15    Destruction of Books and Records**

The Debtor has the right to seek authority to destroy or abandon any books and records of the Debtor or its Estate.  However, prior to closing the Case, the Debtor shall not destroy or abandon any such books and records without obtaining prior approval of the Bankruptcy Court after notice to creditors of any such request.

**Section 5.16    Plan Administrator**

**(a)  <u>Appointment of Plan Administrator</u>**

The Plan Administrator shall be appointed if, and only if, prior to the conclusion of the Confirmation Hearing: (1) the Stalking Horse Purchaser terminates the Sales Contract, and (2) no alternative sale contract has been approved that provides sufficient cash (either through direct payment by the purchaser or Exit Financing) for payment on or before December 31, 2022 of at least: the Allowed and reasonably projected Claims of Sandy Spring, real estate tax claims secured by the Property, Administrative Expenses (including United States Trustee fees), Priority Tax Claims, and closing costs.

### (b)  Duties and Powers of Plan Administrator

Upon its appointment, the Plan Administrator shall have the power and duty to market and sell the Property in a commercially reasonable manner on an "as is, where is" basis, for a net sales price that, at a minimum, equals the sum of the Allowed and reasonably projected: Claims of Sandy Spring, real estate tax claims secured by the Property, Administrative Expenses (including United States Trustee fees), Priority Tax Claims, compensation and expenses of the Plan Administrator and the Plan Administrator's broker and legal counsel, compensation and expenses of the Plan Administrator Consultants, and costs of sale (the "**Threshold Sale Price**"), The Plan Administrator shall have the authority: (1) to engage a licensed real estate broker who is qualified and approved by the Court pursuant to the terms of Section 327 of the Bankruptcy Code and Rule 2014 of the Federal Rules of Bankruptcy Procedures; (2) to market the Property; (3) to enter into one or more contracts on behalf of the Debtor for the sale of the Property that are consistent with the terms of this Plan; (4) to sell the Property free and clear of liens, claims and encumbrances; (5) to engage legal counsel who is qualified an approved by the Court pursuant to the terms of Section 327 of the Bankruptcy Code and Rule 2014 of the Federal Rules of Bankruptcy Procedures.

If, after marketing the Property, the Plan Administrator does not obtain a contract with a cash purchase price that equals or exceeds the Threshold Sale Price, the parties whose claims and liens comprise the Threshold Sale Price reserve the right to negotiate discounts sufficient to allow Court approval and closing on the proposed sale.  If the affected parties agree upon such discounts (and other legal requirements are satisfied), the Plan Administrator may seek Court approval of the sale.  If any affected party does not agree to the proposed disposition, the Plan Administrator shall not be authorized to seek or obtain Court approval of the sale, or the authority to consummate the proposed sale, and shall file a report with the Court as to status and shall cease marketing the Property.

The Plan Administrator shall exercise reasonable efforts to maximize the sale price of the Property.  However, provided that the sale equals or exceeds the Threshold Sale Price, the Plan Administrator shall be authorized to file a motion seeking approval of the proposed sale.

### (c)  Compensation of Plan Administrator, Broker and Counsel

The Plan Administrator shall be entitled to payment of $300.00 per hour for its services, plus 1.5% of the gross sale price obtained in a sale of the Property by the Plan Administrator. Additionally,  Allowance of such payment shall be subject to Court approval upon duly notices application.  Compensation for the Plan Administrator, broker and Plan Administrator's legal counsel shall have the same priority as chapter 11 Administrative Expenses and, if a sale is approved and closes, shall be paid from the proceeds of such sale.  Although payment to the Plan Administrator, broker, and legal counsel shall not be authorized absent a sale that either meets the Threshold Sale Price or is subject to an agreed discount, the fees of the Plan Administrator, broker and legal counsel shall be allowed with the same priority of payment as chapter 11 Administrative Expenses and shall be paid when other Administrative Expense are paid, and in accordance with such priority.

### (d)  Plan Administrator Expenses

Sandy Spring, in its sole discretion, may agree to make advances for the fees and costs incurred with respect to Plan Administrator Consultants incurred in connection with the Plan Administrator's conduct of his duties, other than the Plan Administrator's fees, broker's commission and legal fees and costs.  No advance or payment may be made with respect to the compensation of the Plan Administrator, broker or legal counsel.  Such advances shall be secured pursuant to the Sandy Spring deeds of trust.

### (e)  Plan Administrator Sale Procedures

Any sale of the Property by the Plan Administrator shall be subject to Court approval upon motion and shall be deemed to be a sale pursuant to this Plan.  Such sale shall be free and clear of liens, claims and encumbrances, and the purchaser shall be entitled to all protections available under the Bankruptcy Code, including under Section 363(f) and Section 363(m).  Any sale by the Plan Administrator shall be exempt from transfer and recordation taxes as set forth in Section 5.05 of this Plan.

### (f)  Plan Committee

Upon the appointment of the Plan Administrator, the Plan Committee shall be deemed appointed.  In the event that any member of the Plan Committee declines to serve or resigns, the Debtor, in consultation with the remaining members of the Plan Committee, shall select and appoint a replacement member who is within the same class or type of creditor as the creditor who declined or resigned.   The members of the Plan Committee shall serve without compensation on account of their services on the Plan Committee.  The Plan Administrator shall consult with the Plan Committee regarding the sale of the Property, including without limitation by: (1) providing to the Plan Committee all letters of intent, expressions of interest and draft contracts, prior to the execution thereof; (2) conducting periodic status calls or meetings; (3) providing copies of all work product of, and material communications with, the Plan Administrator Consultants and advisors (excepting privileged attorney/client communications) In the event that the Plan Administrator communicates with any member of the Plan Committee, all members of the Plan Committee shall be included in such communication (or provided a reasonable opportunity to participate).  Communications among the Plan Administrator and the Plan Committee shall be maintained in confidence, subject to their further agreement or order of the Court.

### (g)  Debtor Cooperation; Non-Interference

The Debtor shall cooperate in all regards with the Plan Administrator's sale efforts, and shall not interfere in such sale efforts.  Notwithstanding the foregoing, the Debtor shall have standing to support, respond to, or oppose any motion by the Plan Administrator to obtain Court approval of any sale.

### (h)  Payment by Equity; Termination of Plan Administrator

In the alternative to a sale by the Plan Administrator, the Debtor's equity owners, or their assignees, shall have the right to arrange payment to the Debtor in full and in cash at closing in

an amount that is not less than the amount necessary to pay <u>all</u> allowed Administrative Expenses and <u>all</u> Allowed Claims (including without limitation compensation of the Plan Administrator, broker and counsel), with interest as required under law. The amount of the payment by the Debtor's equity owners or assignees may be reduced solely to the extent of a written agreement signed by a Creditor or holder of an Administrative Expense, agreeing to a discount with respect to such Claim or Administrative Expense. Upon closing of such a transaction and payment in full of all amounts due, the appointment of the Plan Administrator shall be terminated. Nothing in this subsection 5.16(h) shall affect the Debtor's obligations regarding the Sales Contract or the Stalking Horse Purchaser.

## ARTICLE VI        EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### Section 6.01   Executory Contracts and Unexpired Leases

Except as otherwise provided herein of in the Confirmation Order, the Plan, or any other Plan Document, the Confirmation Order shall constitute an order under section 365 of the Bankruptcy Code rejecting all Executory Contracts and Unexpired Leases to which the Debtor is a party on and subject to the occurrence of the Effective Date, unless such contract or lease (a) previously shall have been assumed, assumed and assigned, or rejected by the Debtor, (b) previously shall have expired or terminated pursuant to its own terms before the Petition Date or (c) is the subject of a pending motion to assume or reject on the Confirmation Date. For the avoidance of doubt, this section shall not be deemed to reject any insurance policy in which the Debtor is a beneficiary.

For the avoidance of doubt, the Settlement and Plan Support Agreement and the Sales Contract are assumed as of the Effective Date.

### Section 6.02   Claims Based on the Rejection of Executory Contracts and Unexpired Leases

Unless otherwise provided by an Order of the Bankruptcy Court, any Proofs of Claim based upon the rejection of the Debtor's Executory Contracts or Unexpired Leases pursuant to the Plan or otherwise, must be Filed no later than 30 days after the Effective Date. **Any Claim based upon the rejection of the Debtor's Executory Contracts or Unexpired Leases pursuant to the Plan which is not Filed and served on the Debtor within thirty (30) days after the Effective Date shall be forever barred and shall not be enforceable against the Debtor or its Estate, or its successors, assigns, or properties.**

## ARTICLE VII        PROVISIONS GOVERNING DISTRIBUTIONS

### Section 7.01   Calculation of Amounts to be Distributed

Each Holder of an Allowed Claim against the Debtor shall receive the full amount of the Distributions that the Plan provides for Allowed Claims in the applicable Class from the Debtor. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, in which case such payment shall be deemed to have occurred when due. If and to the extent that there are Disputed Claims, Distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in this Article VII. Notwithstanding anything to the contrary in the Plan, no Holder of

an Allowed Claim shall, on account of such Allowed Claim, receive a Distribution in excess of the Allowed amount of such Claim plus any interest accruing on such Claim that is actually payable in accordance with the Plan.

**Section 7.02    Delivery of Distributions and Undeliverable or Unclaimed Distributions**

*(a)    Record Date for Distribution*

On the Distribution Record Date, the Claims Register shall be closed and the Debtor or any other party responsible for making Distributions shall instead be authorized and entitled to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date.

*(b)    Delivery of Distributions in General*

      1.    Payments and Distributions on Disputed Claims

Distributions made after the Effective Date to Holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall, in the Debtor's reasonable discretion, be deemed to have been made by the Debtor on the Effective Date, unless the Debtor and the applicable Holder of such Claim agree otherwise.

      2.    Special Rules for Distributions to Holders of Disputed Claims

Notwithstanding any provision otherwise in the Plan and except as may be agreed to by the Debtor, on the one hand, and the Holder of a Disputed Claim, on the other hand, no partial payments and no partial Distributions shall be made with respect to any Disputed Claim, other than with respect to Professional Fee Claims, until all Disputed Claims held by the Holder of such Disputed Claim have become Allowed Claims or have otherwise been resolved by settlement or a Final Order.

      3.    Distributions

On and after the Effective Date, the Debtor shall make the Distributions required to be made on account of Allowed Claims under the Plan on such date.  Any Distribution that is not made on the Initial Distribution Date or on any other date specified in the Plan because the Claim that would have been entitled to receive that Distribution is not an Allowed Claim on such date, shall be held by the Debtor in the Distribution Reserve Account and distributed on the next Distribution Date that occurs after such Claim is Allowed in accordance with the Plan.  Except as expressly stated with respect to the treatment of a particular Class, no interest shall accrue or be paid on the unpaid amount of any Distribution paid pursuant to the Plan.

*(c)    Minimum; De Minimis Distributions*

Notwithstanding any other provision of the Plan to the contrary (including the treatment of any Claims or Classes), (a) the Debtor shall not be required to make Distributions or payments of fractions of dollars, and whenever any Distribution of a fraction of a dollar under the Plan would otherwise be required, the actual Distribution made shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars being rounded down, and (b) the Debtor shall have no duty to make a Distribution on account of any Allowed Claim (i) if the aggregate amount

of all Distributions authorized to be made on such date is less than $5,000.00, in which case such Distributions shall be deferred to the next Distribution date, or (ii) if the amount to be distributed to that Holder on the particular Distribution date is less than $100.00, unless such Distribution constitutes the final Distribution to such Holder.

*(d)      Undeliverable Distributions and Unclaimed Property*

In the event that any Distribution to any Holder is returned as undeliverable, no Distribution to such Holder shall be made unless and until the Debtor has determined the then current address of such Holder, at which time such Distribution shall be made to such Holder without accrual of interest during that time; provided, however, such Distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of 120 days from the date the initial Distribution is made.  After such date, all unclaimed property or interests in property shall revert (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary) to the Debtor automatically and without need for a further order by the Bankruptcy Court for Distribution in accordance with the Plan and the Claim of any Holder to such property or interest in property shall be settled, compromised, and forever barred.

*(e)      Manner of Payment Pursuant to the Plan*

Cash payments under this Plan shall be in U.S. funds, and shall be made, at the option, and in the sole discretion, of the Debtor by (i) checks drawn on or (ii) wire transfers from a domestic bank selected by the Debtor.  Cash payments made pursuant to this Plan in the form of checks issued by the Debtor shall be null and void if not cashed within 120 days of the date of the issuance thereof.  Requests for reissuance of any check shall be made directly to the Debtor.

**Section 7.03   Compliance with Tax Requirements/Allocations**

In connection with the Plan, to the extent applicable, the Debtor shall comply with all tax withholding and reporting requirements imposed on it by any Governmental Unit, and all Distributions pursuant hereto shall be subject to such withholding and reporting requirements.

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

In connection with the Plan and all Distributions hereunder, to the extent applicable, the Debtor is authorized to take any and all actions that may be necessary or appropriate to comply with all tax withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority, and all Distributions pursuant to the Plan shall be subject to any such withholding and reporting requirements.  Each Creditor is required to provide the Debtor with an executed Form W-9 or similar tax form as a condition precedent to being sent a Distribution.  If a Holder of an Allowed Claim does not provide the Debtor with an executed Form W-9 or similar form within 90 days of written request, said Creditor shall be deemed to have forfeited their Distribution and the Claim of such Creditor shall be forever barred.

**Section 7.04   Claims Paid or Payable to Third Parties**

*(a)      Claims Paid by Third Parties; Recourse to Collateral*

The Debtor shall be authorized to reduce in whole or in part a Claim, and such Claim shall be Disallowed without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor, including on account of recourse to collateral held by third parties that secure such Claim.  To the extent a Holder of a Claim receives a Distribution on account of such Claim and receives payment, in whole or in part, from a party that is not a Debtor on account of such Claim, such Holder shall, within 14 days of receipt thereof, repay or return the Distribution to the Debtor to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such Distribution under the Plan.

*(b)      Claims Payable by Insurance, Third Parties; Recourse to Collateral*

No Distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtor's insurance policies, surety agreements, other non-Debtor payment agreements, or collateral held by a third party, until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy, surety agreement, other non-Debtor payment agreement, or collateral, as applicable.  To the extent that one or more of the Debtor's insurers, sureties, or non-Debtor payors pays or satisfies in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), or such collateral or proceeds from such collateral is used to satisfy such Claim, then immediately upon such payment, the applicable portion of such Claim shall be expunged without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

*(c)      Applicability of Insurance Policies*

Notwithstanding anything to the contrary in the Plan or Confirmation Order, Confirmation and consummation of the Plan shall not limit or affect the rights of any third-party beneficiary of any of the Debtor's insurance policies with respect to such policies, and the rights of the Debtor under any such insurance policies shall vest in the Debtor as of the Effective Date.

**Section 7.05   Prepayment**

Except as otherwise expressly provided in this Plan or the Confirmation Order, the Debtor shall have the right to prepay, without any fee, charge, premium or penalty, all or any portion of an Allowed Claim, at any time on or after the Effective Date.

**ARTICLE VIII          PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS AND EQUITY INTERESTS**

**Section 8.01   Resolution of Disputed Claims**

*(a)      Allowance of Claims and Equity Interests*

-28-

Prior to the Effective Date, the Debtor shall have and shall retain any and all rights and defenses that the Debtor has with respect to any Claim or Equity Interest, except with respect to any Claim or Equity Interest deemed Allowed as of the Effective Date. Except as expressly provided in the Plan or in any order entered in the Chapter 11 Case prior to the Effective Date (including the Confirmation Order), no Claim or Equity Interest shall become an Allowed Claim or Equity Interest unless and until such Claim or Equity Interest is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order, including the Confirmation Order, in the Chapter 11 Case allowing such Claim or Equity Interest.

(b)      *Prosecution of Objections to Claims or Equity Interests*

Subject in all respects to the provisions hereof, other than with respect to Professional Fee Claims, the Debtor shall have the authority to File objections to Claims or Equity Interests, and the exclusive authority to settle, compromise, withdraw, or litigate to judgment objections on behalf of the Debtor's Estate to any and all Claims or Equity Interests, regardless of whether such Claims or Equity Interests are in a Class or otherwise. For the avoidance of doubt the U.S. Trustee's right to object to Claims, including Professional Fee Claims and Claims asserted under section 503(b)(3) and (b)(4) of the Bankruptcy Code, is reserved.

(c)      *Claims Estimation*

The Debtor may, at any time, request that the Bankruptcy Court estimate (a) any Disputed Claim pursuant to applicable law and (b) any contingent or unliquidated Claim pursuant to applicable law, including section 502(c) of the Bankruptcy Code, regardless of whether the Debtor has previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to the maximum extent permitted by law as determined by the Bankruptcy Court to estimate any Disputed Claim, contingent Claim, or unliquidated Claim, including during the litigation concerning any objection to any Claim or during the pendency of any appeal relating to any such objection. Notwithstanding any provision otherwise in the Plan to the contrary, a Claim that has been expunged from the Claims Register but that is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.

In the event that the Bankruptcy Court estimates any Disputed Claim, contingent Claim, or unliquidated Claim, that estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim for all purposes under the Plan, including for purposes of Distributions, and the Debtor may elect to pursue additional objections to the ultimate Distribution on such Claim. If the estimated amount constitutes a maximum limitation on such Claim, the Debtor may elect to pursue any supplemental proceedings to object to any ultimate Distribution on account of such Claim. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before 21 days after the date on which such Claim is estimated. All of the aforementioned Claims and objection, estimation, and resolution procedures are cumulative and

-29-

not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

(d)    *Expungement or Adjustment to Claims Without Objection*

Any Claim that has been paid, satisfied, or superseded may be expunged on the Claims Register by the Debtor, and any Claim that has been amended may be adjusted thereon by the Debtor without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

## Section 8.02    Distribution Reserve Account

Distributions with respect to Disputed Claims shall be deposited into the Distribution Reserve Account in accordance with the terms of this Plan. The amount deposited shall be determined by the Debtor. The Debtor may invest any Cash that is withheld in the Distribution Reserve Account. Notwithstanding any such investment and the addition to the Distribution Reserve Account of any income earned in respect thereof, in the event such Claim ultimately becomes an Allowed Claim, nothing in this Plan shall be deemed to entitle the holder of a Disputed Claim to post-petition or post-Effective Date interest on such Claim, except to the extent expressly provided with respect to the treatment of each Class.

## Section 8.03    Distributions After Allowance

On the next Distribution Date after the date when the order or judgment of the Bankruptcy Court allowing all or part of a Disputed Claim becomes a Final Order, the Debtor will (1) distribute to the holder of such Claim any property in the Distribution Reserve Account that would have been distributed to such beneficiary on the Distribution Dates on which distributions previously were made to beneficiaries if the Claim in issue had been an Allowed Claim (in whole or in part, as applicable) on such earlier Distribution Dates; and (2) distribute any remaining property held in the Distribution Reserve Account on account of any resolved Disputed Claim in accordance with this Plan. After a Final Order has been entered, or other final resolution has been reached with respect to all Disputed Claims, any remaining property held in the Distribution Reserve Account will revert to the Debtor.

## Section 8.04    Disallowance of Claims

Any Claim that has been paid, satisfied, or superseded may be expunged on the Claims Register by, as applicable, the Debtor, and any Claim that has been amended may be adjusted thereon by the Debtor without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

## Section 8.05    Amendments

After the Bar Date, as applicable, a Claim may not be filed or amended without the authorization of the Bankruptcy Court and any such new or amended Claim Filed shall be deemed Disallowed and expunged without any further notice to or action, order, or approval of the Bankruptcy Court; provided that, even with such Bankruptcy Court authorization, a Claim may be amended by the Holder of such Claim solely to decrease, but not to increase, unless otherwise provided by the Bankruptcy Court, the amount, number or priority.

**Section 8.06   No Interest**

Unless otherwise specifically provided for in the Plan, by applicable law, or agreed-to by the Debtor, interest shall not accrue or be paid on any Claim, and no Holder of any Claim shall be entitled to interest accruing on and after the Petition Date on account of any Claim. Without limiting the foregoing, interest shall not accrue or be paid on any Claim after the Effective Date to the extent the final Distribution paid on account of such Claim occurs after the Effective Date. Notwithstanding the foregoing, if Holders of Allowed General Unsecured Claims receive a distribution of 100%, they shall be paid interest from the Petition Date until the date their Allowed General Unsecured Claims are paid in full at the federal judgment interest rate that was in effect on the Petition Date.

**Section 8.07   Setoffs**

*(a)      By the Debtor*

Except as otherwise provided in this Plan, the Debtor may, pursuant to Bankruptcy Code sections 553, 558 or applicable non-bankruptcy laws, but shall not be required to, set off against any Claim, and the payments or other Distributions to be made pursuant to this Plan in respect of such Claim, Claims of any nature whatsoever that the Debtor may have against the Holder of such Claim; provided, however, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtor of any such Claim that the Debtor may have against such Holder.

*(b)      By Non-Debtors*

Unless otherwise stipulated in writing by the Debtor, or asserted pursuant to a timely filed Proof of Claim, any party against whom a claim or counterclaim is asserted by the Estate must assert or must have asserted any setoff rights, right of subrogation, or recoupment of any kind against such claim at the time it answers such claim, or such right of setoff, subrogation or recoupment will be deemed waived and forever barred. Notwithstanding the foregoing, nothing herein shall affect the setoff rights of any taxing authority. In no event shall any Holder of a Claim be entitled to set off any Claim against any Claim, right, or Cause of Action of the Debtor unless (i) such Holder has Filed a Proof of Claim in this Chapter 11 Case by the applicable Claims Bar Date asserting the Claim forming the basis for such setoff, (ii) such Holder has filed a motion with the Bankruptcy Court authorizing it to effect such setoff, and (iii) a Final Order of the Bankruptcy Court has been entered, authorizing and approving such setoff.

## ARTICLE IX            EFFECT OF PLAN CONFIRMATION

**Section 9.01   Binding Effect**

This Plan shall be binding upon and inure to the benefit of the Debtor, all present and former Holders of Claims and Equity Interests, and their respective successors and assigns.

-31-

**Section 9.02   Discharge**

Pursuant to Bankruptcy Code section 1141(d)(1), and subject to the occurrence of the Effective Date, Confirmation will discharge all Claims against the Debtor except for the obligations and Liens expressly created or preserved by this Plan.

**Section 9.03   Injunction**

**Except as otherwise provided in this Plan, the Confirmation Order shall provide, among other things, that from and after the Effective Date all entities who have held, hold, assert or asserted, or may hold Claims, Administrative Claims or against, or Equity Interests in, the Debtor are permanently enjoined from taking any of the following actions against the Debtor, its Estate, any of its property or Assets, on account of any such actual or asserted Claims, Administrative Claims or Equity Interests that arose before the Effective Date, except for the obligations and Liens expressly created or preserved by this Plan:**

    **(a)    commencing or continuing, in any manner or in any place, any action or other proceeding;**

    **(b)    enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree or order;**

    **(c)    creating, perfecting, or enforcing any lien or encumbrance;**

    **(d)    asserting a setoff (except as to those setoffs that were asserted prior to the petition date), or right of subrogation against any debt, liability, or obligation due to the Debtor, except as set forth in Section 8.07 of this Plan; and**

    **(e)    commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of this Plan; provided, however, that nothing contained in this Plan shall preclude such entities from exercising their rights pursuant to and consistent with the terms of this Plan or the Confirmation Order.**

**Section 9.04   Exculpation and Limitation of Liability**

**Notwithstanding anything to the contrary herein, the Debtor, its Professionals retained in the Chapter 11 Case, its officers and employees, shall not have or incur any liability to any holder of a Claim or Equity Interest for any act, event, or omission in connection with, or arising out of, the Chapter 11 Case, formulating, negotiating, soliciting, preparing, disseminating, confirming, or implementing the Plan, consummating the Plan, or the administration of the Plan or the property to be distributed under the Plan, unless it shall be determined in a Final Order to have constituted willful misconduct or gross negligence.**

**ARTICLE X**          **CONFIRMATION AND CONSUMMATION OF THE PLAN**

**Section 10.01  Conditions to Confirmation of the Plan**

In addition to any other condition to Confirmation as may be imposed by law, the following are conditions to the Confirmation of the Plan:

1. The Court has entered an order finding that the Disclosure Statement contains adequate information pursuant to Bankruptcy Code § 1125 shall have been entered by the Bankruptcy Court.
2. The Sales Contract, as may be amended, shall be in effect.
3. The Bankruptcy Court shall have granted the Sale and Bid Procedures Motion.
4. The Debtor shall have obtained a commitment letter, satisfactory in form and substance to the Debtor in its sole discretion, with respect to Exit Financing.

**Section 10.02  Conditions to the Effective Date**

The following are conditions precedent to the occurrence of the Effective Date, each of which must be satisfied or waived in writing in accordance with Section 10.03 of this Plan:

1. The Confirmation Order shall have been entered in this Chapter 11 Case in a form and substance reasonably acceptable to the Debtor.
2. The Confirmation Order shall have become a Final Order.
3. The Confirmation Order shall not be subject to any stay.
4. Concurrently with or prior to the occurrence of the Effective Date, either (a) Exit Financing shall have been procured and funded, or (b) Closing shall have occurred under the Sales Contract and the Debtor shall have received the cash payment due at closing under the Sales Contract.
5. All Exhibits shall be, in form and substance, reasonably acceptable to the Debtor, and, to the extent applicable, shall have been executed and delivered by all parties who are signatory thereto.
6. All documents executed, entered into in connection with, or necessary for the consummation of this Plan have been reviewed, approved, and consented to by the Debtor.

**Section 10.03  Waiver of Conditions**

Each of the conditions set forth in Sections 10.01 and 10.02 of this Plan, except for entry of the Confirmation Order, may be waived in whole or in part by the Debtor.  The failure to satisfy or waive any condition to the Effective Date may be asserted by the Debtor as a basis not to consummate this Plan regardless of the circumstances giving rise to the failure of such condition to be satisfied.  The failure of the Debtor to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right that may be asserted at any time.

**Section 10.04  Consequences of Non-Occurrence of Effective Date**

In the event that the Effective Date does not occur, the Debtor reserves all rights to seek an order

-33-

from the Bankruptcy Court directing that the Confirmation Order be vacated, that this Plan be null and void in all respects, and/or that any settlement or treatment of Claims provided for in this Plan be null and void.  In the event that the Bankruptcy Court shall enter an order vacating the Confirmation Order, the time within which the Debtor may assume and assign or reject all executory contracts and unexpired leases not previously assumed, assumed and assigned, or rejected, shall be extended for a period of thirty (30) days after the date the Confirmation Order is vacated, without prejudice to further extensions as may be approved by the Court either before or after the expiration of such 30-day period.

## ARTICLE XI    RETENTION OF JURISDICTION

### Section 11.01 Retention of Jurisdiction

Under sections 105(a) and 1142 of the Bankruptcy Code, and notwithstanding entry of the Confirmation Order and occurrence of the Effective Date, and except as otherwise ordered by the Bankruptcy Court, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, and related to, this Chapter 11 Cases and the Plan to the fullest extent permitted by law (provided, however, that notwithstanding the foregoing, with respect to all civil proceedings arising under the Bankruptcy Code or arising in or related to this Chapter 11 Cases and the Plan, the Bankruptcy Court shall have original but not exclusive jurisdiction, in accordance with section 1334(b) of Title 28 of the United States Code), including, among other things, jurisdiction to:

a) allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured, or unsecured status of any Claim or Equity Interest not otherwise Allowed under the Plan (other than personal injury or wrongful death Claims, unless agreed by the Holder), including the resolution of any request for payment of any Administrative Claim and the resolution of any objections to the allowance or priority of Claims or Equity Interests;

b) hear and determine all applications for compensation and reimbursement of Professional Fee Claims; provided, however, that the payment of the fees and expenses of the Professionals of the Debtor incurred from and after the Effective Date shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court;

c) hear and determine all matters with respect to the assumption or rejection of any Executory Contract or Unexpired Lease to which the Debtor is a party or with respect to which the Debtor may be liable, including, if necessary, the nature or amount of any required Cure or the liquidation or allowance of any Claims arising therefrom;

d) effectuate performance of and payments under the provisions of the Plan and enforce remedies upon any default under the Plan;

e) hear and determine any and all adversary proceedings, motions, applications, and contested or litigated matters arising out of, under, or related to, this Chapter 11 Case, any litigation rights or the Plan;

f) enter such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, and other

agreements or documents created in connection with the Plan, the Disclosure Statement or the Confirmation Order;

g) hear and determine any and all disputes arising in connection with the interpretation, implementation, consummation, or enforcement of the Plan, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

h) consider any modifications of the Plan, cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

i) issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with the implementation, consummation, or enforcement of the Plan or the Confirmation Order;

j) enter and implement such orders as may be necessary or appropriate if the Confirmation Order is for any reason reversed, stayed, revoked, modified, or vacated;

k) hear and determine any matters arising in connection with or relating to the Plan, the schedules to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with the Plan, the schedules to the Plan, the Disclosure Statement, or the Confirmation Order;

l) enforce, interpret, and determine any disputes arising in connection with any stipulations, orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with this Chapter 11 Case;

m) except as otherwise limited herein, recover all assets of the Debtor and property of the Estate, wherever located;

n) hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

o) hear and determine such other matters as may be provided in the Confirmation Order or as may be authorized under, or not inconsistent with, provisions of the Bankruptcy Code; and

p) enter a final decree closing the Chapter 11 Case.

## Section 11.02  Failure of the Bankruptcy Court to Exercise Jurisdiction

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to this Chapter 11 Case, including the matters set forth in Section 11.01 of the Plan, the provisions of this Article XI shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having jurisdiction with respect to such matter.

**ARTICLE XII        MISCELLANEOUS PROVISIONS**

**Section 12.01  Modifications and Amendments**

The Debtor may alter, amend or modify this Plan or any Exhibits thereto under Bankruptcy Code section 1127(a) at any time prior to the Confirmation Date.  If any material amendments to this Plan are made after the solicitation package is sent out, but before the Confirmation Hearing, the Debtor reserves the right to seek a determination from the Bankruptcy Court as to whether re-solicitation is necessary.  After the Confirmation Date and prior to substantial consummation of the Plan, as defined in Bankruptcy Code section 1101(2), the Debtor may, under Bankruptcy Code section 1127(b), institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in this Plan, the Disclosure Statement or the Confirmation Order, and such matters as may be necessary to carry out the purpose and effect of this Plan.

**Section 12.02  Severability of Plan Provisions**

If, prior to Confirmation, any term or provision of this Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, then the Bankruptcy Court, at the request of the Debtor, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of this Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

**Section 12.03  Successors and Assigns**

The rights, benefits and obligations of any Entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of that Entity.

**Section 12.04  Payment of Statutory Fees**

All fees payable pursuant to section 1930 of Title 28 of the United States Code shall be paid on the Effective Date.

All fees payable pursuant to section 1930 of Title 28 of the United States Code that are outstanding and assessed after the Effective Date shall be paid on a quarterly basis until the Chapter 11 case is closed, converted, or dismissed.  The reorganized Debtor liable for the payment of all quarterly fees due pursuant to section 1930 of Title 28 after the Effective Date.

The reorganized Debtor shall each provide the United States Trustee with post-confirmation quarterly reports that shall include all of their respective disbursements for that quarter using the data embedded Form 11-PCR.

-36-

The Debtor will file a Notice of Effective Date within seven days of the Effective Date.

## Section 12.05  Revocation, Withdrawal or Non-Consummation

The Debtor reserves the right to revoke or withdraw this Plan prior to the Confirmation Date and to file subsequent plans.  If the Debtor revokes or withdraws this Plan, or if Confirmation or consummation of this Plan does not occur, then (a) this Plan shall be null and void in all respects, (b) any settlement or compromise embodied in this Plan (including the fixing or limiting to an amount certain any Claim or Class of Claims), assumption or rejection of Executory Contracts or leases effected by this Plan, and any document or agreement executed pursuant to this Plan, shall be deemed null and void, and (c) nothing contained in this Plan, and no acts taken in preparation for consummation of this Plan, shall (i) constitute or be deemed to constitute a waiver or release of any Claims by or against, or any Interests in, the Debtor or any other Entity, (ii) prejudice in any manner the rights of the Debtor or any other Entity, or (iii) constitute an admission of any sort by the Debtor or any other Entity.

## Section 12.06  Service of Documents

Any notice, request or demand required or permitted to be made or provided to or upon the Debtor under this Plan shall be (a) in writing, (b) served by (i) certified mail, return receipt requested, (ii) hand delivery, (iii) overnight delivery service, or (iv) first class mail, and (c) deemed to have been duly given or made when actually delivered, and shall be delivered to:

> Dr. Nabil Asterbadi
> 2726 Chain Bridge Road, N.W.
> Washington, D.C. 20016

With a required copy to:

> Bradford F. Englander
> Whiteford Taylor & Preston LLP
> 3190 Fairview Park Drive, Suite 800
> Falls Church, VA  22042

## Section 12.07  Plan Supplements

Exhibits to this Plan not attached hereto shall be filed in one or more Plan Supplements.  Any Plan Supplement (and amendments thereto) filed by the Debtor shall be deemed an integral part of this Plan and shall be incorporated by reference as if fully set forth herein.  Substantially contemporaneously with their filing, the Plan Supplements may be viewed at the office of the clerk of the Bankruptcy Court or its designee during normal business hours, by visiting the Bankruptcy Court's website at ecf.mdb.uscourts.gov (PACER or CM/ECF account required).  Holders of Claims and/or Interests may obtain a copy of any Plan Supplements free of charge upon reasonable written request to the Debtor.

## Section 12.08  Tax Reporting and Compliance

The Debtor is hereby authorized to request an expedited determination under Bankruptcy Code

section 505(b) of the tax liability of the Debtor for all taxable periods ending after the Petition Date through and including the Effective Date.

Dated: August 31, 2022

/s/ Bradford F. Englander

Whiteford, Taylor & Preston, LLP
Bradford F. Englander, Esq., Bar No. 11951
3190 Fairview Park Drive, Suite 800
Falls Church, Virginia 22042
Telephone: (703) 280-9081
Facsimile: (703) 280-3370
Email: benglander@wtplaw.com

*Counsel for the Debtor*

/s/ Nabil J. Asterbadi

Nabil J. Asterbadi,
President of Zachair Ltd.

*12347009*

-38-

# **EXHIBIT B**

**Plan Projections**

**Zachair, Ltd**
**Plan Projections/NVR sale - With Exit Financing**

| Item | Opening Balances | Effective Date | Initial Closing Date | Extended Closing Date | Initial Lot Payments | First Lot and Alt. Land Payments | Later Lot and Alt. Land Payments |
|---|---|---|---|---|---|---|---|
| **Dates (beginning with Petition Date)** | 1/17/2020 | 11/15/2022 | 10/19/2023 | 1/19/2024 | 11/15/2024 | 11/15/2025 | 11/15/2026 |
| **Number of days from Petition Date** | | 1,033 | | | | | |
| **Number of days from Effective Date** | | | 338 | 430 | 731 | 1,096 | 1461 |
| **Number of days from Closing Date** | | | | | 301 | 666 | 1031 |
| **Sources of Funds** | | | | | | | |
| Exit Financing - principal | | 7,050,000 | | | | | |
| Sales Contract/Purchaser Note (not to exceed $17MM in the aggregate) | | | | 10,000,000 | 2,000,000 | 2,000,000 | 3,000,000 |
| Extension Fee | | | | | | | |
| Less: Fraser Forbes commission | | | | 500,000 | 100,000 | 100,000 | 150,000 |
| Less: miscellaneous closing costs | | | | 50,000 | 10,000 | 10,000 | 10,000 |
| Net Sources of Funds: | | 7,050,000 | | 9,450,000 | 1,890,000 | 1,890,000 | 2,840,000 |
| **Uses of Funds** | | | | | | | |
| **Exit Financing** | | | | | | | |
| Principal | | | | 7,050,000 | | | |
| Interest (floor of 15.5% and cap of 17.00%) | | 15.50% | | 1,496,629 | | | |
| Exit Fees | | 3.25% | | 229,125 | | | |
| Costs and Expenses | | 25,000 | | | | | |
| Total Exit Financing Payments: | | | 0 | 8,775,754 | 0 | 0 | 0 |
| **Funds Available for Payment of Claims and Expenses:** | | 7,025,000 | 12,210 | 686,455 | 1,890,000 | 1,890,000 | 3,314,360 |
| **Secured Claims** | | | | | | | |
| Sandy Spring Bank - principal under pre-petition loan | 2,291,583 | 2,291,583 | | | | | |
| Sandy Spring Bank - interest and other charges under pre-petition loan (as of Petition Date | 100,827 | 100,827 | | | | | |
| Sandy Spring Bank - post-petition interest on pre-petition principal (at 6.25% per annum) | | 405,343 | | | | | |
| Sandy Spring Bank - additional interest accruing during 2022 (1.75% per annum) | | 35,159 | | | | | |
| Sandy Spring Bank - asserted legal fees and appraisal charges (estimated) | | 180,000 | | | | | |
| Sandy Spring Bank - projected principal under DIP Loan | 360,000 | 360,000 | | | | | |
| Sandy Spring Bank - interest under DIP loan | | 22,500 | | | | | |
| Real estate taxes | 101,005 | 101,005 | | | | | |
| TD Auto Finance | 100,000 | 100,000 | | | | | |
| Mercedes-Benz Finance | 36,000 | 36,000 | | | | | |
| Total Secured Claims: | 2,989,415 | 3,632,417 | 0 | 0 | 0 | 0 | 0 |
| **Administrative and Operating Expenses** | | | | | | | |

Date: August 30, 2022

**Zachair, Ltd**

**Plan Projections/NVR sale - With Exit Financing**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Whiteford Taylor & Preston (bankruptcy counsel) | 2,200,000 | 2,200,000 | 100,000 | 100,000 | | | |
| Womble Bond Dickinson (former litigation and conflicts counsel) | 10,000 | 10,000 | | | | | |
| Holland & Knight (litigation counsel) | 400,000 | 400,000 | | | | | |
| William C. Harvey (appraiser) | 46,000 | 46,000 | | | | | |
| Streamline Advisors/SCH Group (financial advisor) | 150,000 | 150,000 | | | | | |
| Lou Rubelmann (CPA/tax accountant) | 35,000 | 35,000 | | | | | |
| Three Line Break Up Fee | | | | | | | |
| Airport closing costs | | 100,000 | | | | | |
| Compensation for equity owners | | 68,000 | | 32,000 | 16,000 | 24,000 | 24000 |
| *Total Administrative Expenses:* | 2,841,000 | 3,009,000 | 100,000 | 132,000 | 16,000 | 24,000 | 24,000 |
| | | | | | | | |
| **Priority Tax Claims** | | | | | | | |
| Maryland and IRS | 99,580 | 99,580 | | | | | |
| Pre-Effective Date Interest on Priority Tax Claims | 0 | 4,340 | | | | | |
| *Total Priority Tax Claims:* | 99,580 | 103,920 | 0 | 0 | 0 | 0 | 0 |
| *Contribution to (Deduction from) Operating Reserve* | | 200,000 | -100,000 | 100,000 | | | -200,000 |
| *Amount available for distribution to GUCs and further uses* | | 79,663 | 12,210 | 454,455 | 1,874,000 | 1,866,000 | 3,490,360 |
| *Distributions to General Unsecured Claims* | | | | | | | |
| PD Hyde Field early payment | | | | | | | |
| PD Hyde Field unsecured claim (per settlement agreement) (88%) | 3,200,000 | | | 383,018 | 1,649,120 | 1,167,862 | |
| Undisputed general unsecured creditors (12%) | 440,700 | | | 52,230 | 224,880 | 163,590 | |
| Pre-Effective Date Interest re GUCs (1.54%) | 19,208 | | | 19,208 | | | |
| Post-Effective Date Interest re GUCs (6.0%) | | | | | | 60,188 | |
| *Total  Nonpriority Unsecured Creditors:* | 3,659,908 | 0 | 0 | 454,455 | 1,874,000 | 1,391,640 | 0 |
| **US Trustee Quarterly Fees:** | | 67,453 | | | | | |
| **Total Projected Plan Payments:** | | 6,812,790 | 100,000 | 586,455 | 1,890,000 | 1,415,640 | 24,000 |
| **Projected Cash Balance (excluding reserve):** | | 12,210 | 12,210 | 0 | 0 | 474,360 | 3,490,360 |

**Zachair, Ltd**

**Assumptions - With Exit Financing**

### General Assumptions

A.  Effective Date occurs on November 15, 2022.  Exit Financing is arranged and closes on Effective Date.

B.  Closing is extended pursuant to Sales Contract and occurs on March 15, 2024.

C.  No Other Priority Claims (Class 7) are asserted or allowed.

D.  PD Hyde Field proof of claim is allowed and treated as set forth in the Settlement Agreement.

E.  Class 8 accepts plan and that the 6.0% Post-Effective Date Interest Rate thus applies.

F.  Case is closed prior to distributions of proceeds received on Closing Date.

G.  Airfield operations will be breakeven, and will not materially contribute to distributions under Plan.

H.  Revenue from airfield operations will continue to provide sufficient revenue to pay US Trustee fees pending receipt of funds at Closing.

I.  Sale will be treated as installment sale for tax purposes, and tax obligations from receipt of payments under Purchaser Note will be paid by Equity Interest holders.

J.  NVR is the successful bidder and, thus, no break up fee is payable.  Assumes that purchase price reaches maximum of $17,000,000

Date: August 30, 2022