Entered: November 1st, 2022
Signed: October 31st, 2022

**SO ORDERED**



**THOMAS J. CATLIOTA**
**U.S. BANKRUPTCY JUDGE**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| | ) | |
| **In re:** | ) | |
| | ) | |
| **Zachair, Ltd.,** | ) | **Case No.:  20-10691-TJC** |
| | ) | |
| **Debtor.** | ) | **Chapter 11** |
| | ) | |

**ORDER GRANTING NVR, INC.'S EMERGENCY MOTION TO
ENFORCE (DE 383), APPROVING THE SALE OF THE DEBTOR'S
PROPERTY FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS
AND ENCUMBRANCES TO NVR, INC. AND DIRECTING THE
<u>DEBTOR TO EXECUTE AND PERFORM UNDER THE NVR CONTRACT</u>**

Upon the *Emergency Motion to (I) Enforce the Court's Order (A) Conditionally Approving the Sale of the Debtor's Property Free and Clear of Liens, Claims, Interests and Encumbrances, (B) Conditionally Approving the Contract, (C) Approving the Bid Procedures, (D) Scheduling Bid Deadline, Auction and Sale Hearing, (E) Approving Form and Manner of Notice Thereof, and (F) Granting Certain Related Relief (DE 383); and (II) Declare NVR, Inc.*

*as Prevailing Bidder*, filed on October 14, 2022 [clerk's docket no. 383] (the "<u>Motion</u>")[1] of NVR, Inc. ("<u>NVR</u>"), the *Joinder of Sandy Spring Bank with Emergency Motion to Enforce Filed by NVR, Inc.*, filed on October 17, 2022 [clerk's docket no, 388] (the "<u>Joinder</u>") of Sandy Spring Bank ("<u>Sandy Spring</u>"), and the evidence and argument received on the Motion at a duly noticed hearing held before this Court on October 19, 2022 at 10:30 a.m. (the "<u>Hearing</u>"), it appearing that the relief granted herein is in the best interests of the estate of Zachair, Ltd. (the "<u>Debtor</u>"), its creditors, and other parties in interest; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; and consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and notice of the Motion having been adequate and appropriate under the circumstances; and after due deliberation and sufficient cause appearing therefor, **THE COURT FINDS THAT:**

    A.   <u>Final Order.</u>  This Sale Order constitutes a final order within the meaning of 28 U.S.C. § 158(a).  Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), this Court expressly finds that there is no just reason for delay in the implementation of this Sale Order, waives any stay, and expressly directs entry of judgment as set forth herein.  The Sale of the Property to the NVR Purchaser (defined below) is approved, as set forth herein, and NVR Purchaser is authorized, at NVR Purchaser's sole option, to close on the Sale of the Property outside the context of a confirmed plan of reorganization or liquidation of the Debtor or as part of and pursuant to an order (the "<u>Confirmation Order</u>") confirming the Debtor's plan of reorganization

---

[1] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

(the "Plan") that incorporates the provisions of this Sale Order and provides that the Sale of the Property will be subject to the provisions of section 1146 of the Bankruptcy Code.

B.      Findings of Fact and Conclusions of Law.  All findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

C.      Jurisdiction. This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334. This proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper in this district and in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

D.      Bases for Relief Requested. The bases for the relief requested in the Motion are: (1) sections 105, 1107, and 363 of the Bankruptcy Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"); (2) Rules 2002(a)(2), 6004, 9001, 9007, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"); and (3) Rule 6004-1 of the Local Bankruptcy Rules for the District of Maryland (the "Local Rules").

E.      Notice. Notice of the Motion and the hearing on the Motion was sufficient under the circumstances and no other or further notice need be provided.  A reasonable opportunity to object and be heard regarding the relief requested in the Motion has been afforded to parties in interest.

F.      Bid Procedures Order.   On July 1, 2022, this Court entered its *Order (A) Conditionally Approving the Sale of the Debtor's Property Free and Clear of Liens, Claims, Interests and Encumbrances, (B) Conditionally Approving the Contract, (C) Approving the Bid*

*Procedures, (D) Scheduling Bid Deadline, Auction and Sale Hearing, (E) Approving Form and Manner of Notice Thereof, and (F) Granting Certain Related Relief* [clerk's docket no. 343] (the "Bid Procedures Order").  Among other things, pursuant to the Bid Procedures Order, the Debtor was conditionally authorized to sell its real property, consisting of approximately 423.45 acres located in Prince George's County, Maryland, as more fully described in **Exhibit A** hereto (the "Property").  The Debtor was further authorized to conduct an Auction of the Property pursuant to the Bid Procedures approved by the Bid Procedures Order.  The Bid Procedures Order also approved NVR as a stalking horse purchaser (the "Stalking Horse Purchaser") pursuant to a Real Estate Sales Contract dated June 1, 2022 (the "Stalking Horse Contract").  The Stalking Horse Purchaser, however, did not exit tests and studies under the Stalking Horse Contract and was terminated.

G.     Auction and Sale of the Property.  The Property has been marketed amply by the Debtor and its approved broker, Fraser Forbes Real Estate Services, LLC (the "Broker").  In accordance with the approved Bid Procedures, an Auction for the sale of the Property was noticed and scheduled for October 7, 2022 at 10:00 a.m. (the "Auction").  In advance of the Auction and accordance with the approved Bid Procedures, the Debtor solicited bids for the sale of the Property.  The Debtor received two Qualified Bids.  NVR submitted a Qualified Bid to the Debtor and a contract (the "NVR Contract") that provided for the sale of the Property to NVR, or its assignee (the "NVR Purchaser") in exchange for a $7.5 million, all-cash, purchase price, provided the Debtor meets closing conditions which include the closure of the airport that presently operates on the Property.  The NVR Contract is attached hereto and incorporated herein as **Exhibit B.**  The second bidder ("Bidder B") submitted a Qualified Bid was for $6.5 million, with $5.5 million cash paid at closing and a $1 million promissory note with payment

due in several years.  Bidder B elected not to increase its bid or to participate in the Auction. As such, the Court finds that the NVR Purchaser is the Prevailing Bidder under the Bid Procedures Order.

H.    <u>Sale Notice</u>.  The Sale Notice [clerk's docket no. 377] was served on all parties required to receive such notice under the Bid Procedures Order and was sufficient and proper notice to any other interest parties, and provided notice to all interested parties with timely and proper notice of the Sale, including, without limitation: (a) the date, time, and place of the Auction (if one is held); (b) the Bid Procedures; (c) reasonably specific identification of the Property to be sold; and (d) a description of the Sale as being free and clear of liens, claims, encumbrances, and other interests.  The foregoing notice is good, sufficient, and appropriate under the circumstances, and no other or further notice of the Bidding Procedures, the Sale (and all transactions contemplated in connection therewith), the Sale Hearing, and all other deadlines related thereto are or shall be required.

I.    <u>Best Interests of the Estate</u>.    Approval of the NVR Contract and the consummation of the Sale under the NVR Contract is in the best interest of the Debtor, its creditors, its estate, and all other parties in interest.  Based upon the evidence submitted to the Court at the Hearing, the Sale of the Property to the NVR Purchaser under the NVR Contract would provide sufficient proceeds to the Debtor's estate to pay the Debtor's secured creditors, administrative expense claims, and priority claims in-full, with the potential for a distribution to general unsecured creditors, thereby supporting a finding that there is both (i) good, sufficient, and sound business purposes and justifications and (ii) compelling circumstances for this Court to approve the NVR Contract and consummation of the Sale.

J.    <u>Good Faith Purchaser</u>.   Based on the evidence submitted to the Court at the Hearing, the Court makes the following final findings as follows: The NVR Purchaser is an arm's length, third-party purchaser and is unrelated to the Debtor.  Neither the NVR Purchaser, nor any of its affiliates, subsidiaries, officers, directors, members, partners, principals, or any of their respective representatives, successors, or assigns is an "insider" of the Debtor, as that term is defined in section 101(31) of the Bankruptcy Code. The NVR Contract was proposed, by the NVR Purchaser without collusion or fraud, in good faith, and on an arm's-length basis.  Neither the Debtor, nor the NVR Purchaser, nor any affiliate of the NVR Purchaser has engaged in any conduct, action or inaction that would cause or permit the Contract to be avoided under section 363(n) of the Bankruptcy Code.  The NVR Purchaser is purchasing the Property in good faith and is a good-faith buyer within the meaning of section 363(m) of the Bankruptcy Code.  Subject to the satisfaction of conditions to closing set forth in the NVR Contract, the NVR Purchaser is, therefore, entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code. The consideration provided by the NVR Purchaser pursuant to the NVR Contract is (a) reasonably equivalent value under the Bankruptcy Code and any Uniform Fraudulent Transfer Act, (b) fair consideration under any Uniform Fraudulent Conveyance Act, and (c) reasonably equivalent value, fair consideration, fair salable value, and fair value under any such laws as applicable or any other applicable laws of the United States, any state, territory, or possession thereof, or the District of Columbia.  Neither the Debtor nor the NVR Purchaser has entered into the NVR Contract or is consummating the Sale with any fraudulent or otherwise improper purpose, including, but not limited to, the purpose of hindering, delaying, or defrauding present or future creditors of the Debtor or its estate.  The terms of the NVR Contract and the transactions

contemplated in connection therewith are fair and reasonable in light of the circumstances of the Debtor's business and the Chapter 11 Case.

      K.    <u>Free and Clear</u>.  Effective as of the Closing, pursuant and subject to the terms and conditions set forth in the NVR Contract, the transfer of the Property and the Sale, if and when approved,  will effect a legal, valid, enforceable, and effective transfer of the Property and will vest the NVR Purchaser with all of the legal, equitable and beneficial right, title, and interest of the Debtor in the Property, free and clear of (i) all claims, liens, and encumbrances (including any liens as that term is defined in section 101(37) of the Bankruptcy Code and as the term "Liens" is defined in the Contract) relating to, accruing, or arising at any time prior to the Closing Date, including but not limited to the Lien securing the claims of Sandy Spring and real estate taxes and (ii) except as otherwise provided in this Order or the NVR Contract, all debts arising from, relating to, or in any way connected with the Debtor or the Property including any claims (as that term is defined in section 101(5) of the Bankruptcy Code), liabilities, obligations, demands, guaranties, options in favor of third parties, rights, contractual commitments, restrictions, interests of any kind or nature, mortgages, hypothecations, charges, indentures, loan agreements, instruments, collective bargaining agreements, leases, licenses, deeds of trust, security interests, conditional sale or other title retention agreements, pledges, judgments, claims for reimbursement, contribution, indemnity, exoneration, infringement, products liability, covenant or other restrictions of any kind, restrictions, defects of title, attachments, rights of first refusal, charges of interests of any kind or nature, if any, including, without limitation, any restriction of use or transfer, voting, transfer, receipt of income or other exercise of any attributes of ownership, alter-ego, and matters of any kind and nature, whether arising prior to or subsequent to the commencement of this Chapter 11 case, and whether imposed by agreement,

understanding, law, equity, or otherwise, known or unknown, contingent or matured, liquidated or unliquidated, including, without limitation, all rights and remedies with respect to the Liens in this clause (i) that purport to give to any party a right of setoff or recoupment against, or a right or option to effect any forfeiture, modification, profit sharing interest, right of first refusal, purchase or repurchase right or option, or termination of, any of the Debtor's or the NVR Purchaser's interests in the Property, or any similar rights (collectively, as defined in this clause (ii), "Claims"), relating to, accruing or arising at any time prior to the Closing Date.  The NVR Purchaser would not have entered into the NVR Contract and will not consummate the Sale, thus adversely affecting the Debtor, its estate, and its creditors, unless the Sale is free and clear of all Liens, Claims, encumbrances, and other interests of any kind or nature whatsoever.

L.      Section 363(f) is Satisfied.  The Debtor may sell the Property free and clear of all Liens, Claims, encumbrances, and other interests of any kind or nature whatsoever, because, in each case, one or more of the standards set forth in section 363(f)(l)-(5) of the Bankruptcy Code has been satisfied.  Specifically, the Court finds that the standards set forth in sections 363(f)(3) and (5) of the Bankruptcy Code have been satisfied.  Without limiting the generality of the foregoing, the Court finds that (1) the affected interests are Liens, and that the price at which the Property is to be sold is greater than the aggregate value of all Liens on the Property; and (2) the holders of Liens and alleged interests in the Property could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such Liens or interests.

M.      Transaction Not a Sub Rosa Plan.  The Closing of the Sale of the Property to the NVR Purchaser is conditioned upon the entry of the Confirmation Order that affords the Debtor and the NVR Purchaser any and all protections under section 1146 of the Bankruptcy Code.  The NVR Contract, in itself, does not restructure the rights of the Debtor's creditors or impermissibly

dictate the terms of a plan of reorganization. The Sale does not constitute a sub rosa chapter 11 plan.

O.    <u>Consumer Privacy Ombudsman</u>. The Sale does not include the transfer of any personally identifiable information. Thus, the appointment of a consumer privacy ombudsman is not required.

P.    <u>Immediate Effect of Order / Waiver of Stay</u>. Time is of the essence in consummating the Sale. The Court expressly finds that there is no just reason for delay in the implementation of this Order, waives any stay including as contemplated by Bankruptcy Rule 6004(h) directs that this Order be effective immediately upon its entry, and expressly directs entry of this Order as set forth herein.

**IT IS HEREBY ORDERED THAT:**

1.    The Motion is **GRANTED** as provided herein.

2.    All objections to the relief requested in the Motion are **OVERRULED**.

3.    NVR's Contract is **APPROVED** and for all purposes this Sale Order shall be considered a final order. The Sale may be closed pursuant to a Plan and Confirmation Order or, in the event that a Plan that provides for the sale on the terms set forth herein is not confirmed in time to permit closing on or before December 14, 2022, the Sale may be closed pursuant to this Order.

4.    The Debtor is authorized and directed to execute and deliver, perform under, consummate, implement, comply with and close fully the NVR Contract, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the NVR Contract and the Sale, consummate the Sale subject and pursuant to, and in accordance with, the terms and conditions of the NVR Contract, and to take all further actions as may be

necessary or appropriate for the purpose of assigning, transferring, granting, conveying and conferring to the NVR Purchaser all of the Debtor's right, title and interest to the Property, free and clear of all Liens and Claims, or as may be reasonably necessary or appropriate to the performance of the obligations as contemplated by the NVR Contract. Effective as of Closing (as such term is defined in the Contract), the Sale of the Property shall be free and clear of all Liens and Claims of all persons and entities, including without limitation the Claims and Interests of Sandy Spring. Pending Closing, the Liens and Claims of all creditors shall remain in place, subject to all claims, counterclaims, causes of action, rights and defenses of the Debtor.

5.      Unless modified in the Plan or Confirmation Order, or otherwise ordered by the Court or agreed to by the Debtor and the affected creditor, the secured claims of Sandy Spring and any real estate tax claims then due and owing, shall be paid and discharged in full in cash at Closing. For purposes of clarity, the Sale may be conducted and implemented through the Debtor's Plan and Confirmation Order such that the transaction shall be done subject to the protections set forth in section 1146 of the Bankruptcy Code.

6.      The Debtor and the NVR Purchaser are hereby authorized to take any and all actions as may be necessary or desirable to implement the Sale, and any actions taken by the Debtor and the NVR Purchaser necessary or desirable to implement the Sale prior to the date of this Order (including without limitation the execution of the NVR Contract), are hereby approved and ratified. The Debtor shall make its best efforts to satisfy all conditions precedent set forth in the NVR Contract, as modified herein or any subsequent amendment to the NVR Contract, on or before **December 14, 2022** to facilitate a closing on the NVR Contract on or before December 14, 2022. If, however, such closing conditions are not met in time to allow for a closing to occur on or before December 14, 2022, Article 6(a) of the NVR Contract is amended and the Closing Date,

as defined herein and in the NVR Contract, as amended by this Order, shall mean one hundred twenty days (120) days after entry of this Order, unless extended at NVR's sole option upon NVR's written notice of same. The Bidder Deposit shall be held in the non-interest bearing IOLTA trust account of Debtor's counsel, Whiteford Taylor & Preston LLP ("WTP"), WTP's service as escrow agent shall not disqualify it from continuing its representation of the Debtor, and WTP shall not be liable to any party in connection with the Bidder Deposit absent its willful misconduct or gross negligence.

7.      The Debtor is hereby authorized and directed to take any and all steps necessary for the Debtor to meet its obligations to close under the NVR Contract, unless waived in writing by the NVR Purchaser, including but not limited to ceasing all airport operations prior to closing on the Sale. The Debtor is further hereby authorized and directed to take all such necessary steps pursuant to sections 108 and 365 of the Bankruptcy Code to move to reject and terminate any and all executory contracts, service contracts, and leases related to the Property (the "Executory Contracts"); to remove, and, if necessary, dispose of any property of the Debtor, including any and all fuel, oil, or other regulated chemicals stored at the Property (the "Debtor Personal Property"). Unless effectuated by a Plan that is confirmed at the hearing scheduled for November 2, 2022, no later than **November 7, 2022**, the Debtor shall file with the Court and/or serve upon any contract counterparties: (a) any necessary motions or notices to reject and terminate the Executory Contracts such that the Executory Contracts are rejected and terminated prior to the Closing Date; and (b) any necessary motions or notices to the third parties that any Third-Party Property not removed prior to the Closing Date shall be deemed abandoned by the third parties and subject to disposal by the Debtor and/or the NVR Purchaser. Upon the effective date of the rejection or termination of Executory Contracts, the Debtor, any successor or assign

of the Debtor, any trustee, restructuring officer, plan administrator or similar officer, the NVR Purchaser and any of their respective employees or agents, are all hereby authorized to remove from the Property and dispose of all aircraft and third-party property (the "Third-Party Property") that has not been timely removed from the Property by the owner of such Third-Party Property. Any Debtor Personal Property or Third-Party Property not timely removed or disposed of from the Property shall be deemed abandoned and the Debtor or NVR Purchaser, in either of their sole discretion, shall be authorized, but not obligated, to take any and all action it deems appropriate to dispose of, store, or otherwise remove the Debtor Personal Property and the Third-Party Personal Property from the Property. Neither the NVR Purchaser, the Debtor, any successor or assign of the Debtor, any trustee, restructuring officer, plan administrator or similar officer, nor or any of their employees or agents shall be liable to any person for disposal, removal or storage of Debtor Personal Property or Third-Party Personal Property pursuant to this Order. For the avoidance of doubt, unless waived in writing by NVR Purchaser, the Debtor must remove all of Debtor Personal Property (including the above-ground storage tanks) and Third-Party Personal Property in order to satisfy its condition to closing, under the NVR Contract.

8.    Section 9(f)(iii) of the NVR Contract titled "Covenants of Seller" requires the Debtor to properly remove all fuel, oil, and other regulated chemicals stored at the Property. In order to satisfy this condition precedent of the Debtor to close under the NVR Contract, the NVR Purchaser waives the requirement and condition that underground storage tanks be removed. Further, upon the NVR Purchaser's satisfaction that above-ground storage tanks have been properly removed in accordance with all Federal, state, and local laws, regulations, and ordinances, then the Debtor may submit its invoices for such removal costs and for the costs of removal, disposal or storage of Third-Party Personal Property (the "Removal Costs") to the NVR

Purchaser no later than thirty (30) days after Closing on the NVR Contract, and the NVR Purchaser agrees to pay up to $100,000 of the Removal Costs directly to the parties that performed the removal work and issued the invoices, provided that NVR Purchaser has had the opportunity to inspect the work for which an invoice is submitted for payment and NVR Purchaser is satisfied that such work was performed in a good, customary and reasonable manner, in accordance with all prevailing laws, regulations and procedures.

9.      The sale of the Property to the NVR Purchaser pursuant to the NVR Contract and the consummation of the transactions contemplated by the NVR Contract do not require any consents other than as specifically provided for in the NVR Contract, this Order or any order confirming a plan.  Each and every federal, state, and local governmental agency or department is hereby authorized to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the NVR Contract.  A certified copy of this Order may be filed with the appropriate clerk or recorded with the recorder of any state, county, or local authority to act to cancel any of the Liens, Claims, and other encumbrances of record.

10.     This Order shall be binding in all respects upon the Debtor and its estate, successors, and assigns, all creditors of and equity holders in the Debtor, all lessees and tenants at the Property, and any and all other parties in interest, including, without limitation, any and all holders of Liens, Claims, encumbrances, and other interests (including holders of any rights or claims based on any putative successor or transferee liability) of any kind or nature whatsoever in the Property and any trustee or successor trustee appointed in this chapter 11 case or upon a conversion to chapter 7 under the Bankruptcy Code and any restructuring officer, plan administrator or similar officer or authorized party.

11.     The Court makes the following final findings: The NVR Purchaser is the Prevailing Bidder on the sale of the Debtor's Property.  The NVR Purchaser is a good faith purchaser of the Property and, conditioned on the satisfaction of conditions set forth in the NVR Contract and this Order, is hereby granted and is entitled to all of the protections provided to a good faith purchaser under section 363(m) of the Bankruptcy Code.  Pursuant to section 363(m) of the Bankruptcy Code, and subject to the satisfaction of the conditions set forth in the Contract and this Order, if any or all of the provisions of this Order are hereafter reversed, modified or vacated on appeal, such reversal, modification or vacatur shall not affect the validity and enforceability of any sale, transfer or assignment under the NVR Contract or obligation or right granted pursuant to the terms of this Order (unless stayed pending appeal prior to the Closing Date) and, notwithstanding any reversal, modification or vacatur, any sale, transfer or assignment, shall be governed in all respects by the original provisions of this Order or the Contract, as the case may be.

12.     The Sale to the NVR Purchaser finally approved by this Order is not subject to avoidance or any recovery of damages pursuant to section 363(n) of the Bankruptcy Code.

13.     Except as expressly permitted or otherwise specifically provided by the NVR Contract or this Order, upon the Closing on the Sale of the Property to the NVR Purchaser, all entities and persons (as defined in sections 101(15) and (41) of the Bankruptcy Code), including, but not limited to, all lenders, debt security holders, creditors, vendors, suppliers, equity security holders, governmental, tax, regulatory authorities, lenders, trade creditors, contract counterparties, customers, landlords, licensors, employees, litigation claimants and other persons and parties to executory contracts and unexpired leases holding Liens or Claims, encumbrances or interests of any kind or nature whatsoever in or against the Debtor or any of

the Property (whether known or unknown, legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, liquidated or unliquidated, senior or subordinated, asserted or unasserted, whether arising prior to or subsequent to the commencement of these chapter 11 cases, whether imposed by agreement, understanding, law, equity or otherwise, arising under or out of, in connection with, or in any way relating to, the Debtor, the Property, the operation of the Debtor's business before the Closing or the transfer of the Debtor's interests in the Property to the Purchaser) are and shall be forever barred, estopped, and permanently enjoined from asserting any such Liens, Claims, encumbrances or interests against the Purchaser, its successors, designees, assigns, or against the Property.

14.    Neither the NVR Purchaser, nor any of its assignees, affiliates, agents, officers or employees (together, "Related Parties") are or shall be deemed, as a result of the consummation of the Sale contemplated herein, to: (a) be legal successors to the Debtor or its estate by reason of any theory of law or equity, (b) be an affiliate of the Debtor, (c) have, *de facto* or otherwise, merged with or into the Debtor or its estate, (d) be an alter ego or a mere continuation or substantial continuation or successor of the Debtor in any respect. Except as expressly permitted or otherwise specifically provided for in the Contract or this Order, neither the Purchaser nor any of its Related Parties shall (i) assume or in any way be responsible for any liability or obligation of the Debtor and/or its estate or (ii) have any liability or responsibility for any liability or other obligation or any acts or omissions of the Debtor in the conduct of business, arising under or related to the Property or otherwise, other than as set forth in the Contract. Without limiting the generality of the foregoing, and except as otherwise specifically provided herein and in the NVR Contract, the NVR Purchaser and its Related Parties shall not be liable for any Liens, Claims, encumbrances or interests against the Debtor or the Property. The NVR

Purchaser and its Related Parties shall have no successor or vicarious liabilities of any kind or character including but not limited to any theory of warranty, product liability, environmental, successor or transferee liability, labor law, merger or *de facto* merger, or substantial continuity, for Claims known or unknown, and whether asserted or unasserted at the time of the Closing Date including, but not limited to, liabilities on account of any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the operation of the Debtor's business prior to the Closing.

15.    All persons and entities, including but not limited to Dr. Nabil Asterbadi, are hereby forever prohibited and enjoined from taking any action that would adversely affect or interfere with the ability of the Debtor to sell and transfer the Property to the NVR Purchaser in accordance with the terms of the NVR Contract and this Order.  Nothing in this section shall be construed to prevent any person from filing or pursuing confirmation of a plan in this case, and/or contesting or objecting to the confirmation of such a plan.

16.    The terms of this Sale Order shall be deemed to be incorporated into the Debtor's Plan and the Confirmation Order such that the Sale of the Property to the NVR Purchaser may occur through and implemented through the Debtor's Plan and subject to the protections of section 1146 of the Bankruptcy Code.  The Debtor, or any subsequently appointed a chapter 11 trustee or a restructuring officer or other designated party shall not modify the Debtor's Plan or seek to confirm any plan that is inconsistent with the terms of this Order or the NVR Contract, as may be amended.

17.    This Court retains exclusive jurisdiction to, among other things, interpret, enforce and implement the terms and provisions of the NVR Contract, all amendments thereto, any

waivers and consents thereunder, and each of the agreements executed in connection therewith in all respects.

18.    The failure to include or reference a particular provision of the NVR Contract or other related documents in this Order shall not diminish or impair the effectiveness or enforceability of such provisions, it being the intent of the Court that the NVR Contract and other related documents be authorized and approved in their entirety.

19.    In the event of any inconsistencies between this Order and the Motion, this Order shall govern.

20.    Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

21.    The headings in this Order are for convenience of reference only and shall not be deemed to modify or limit the provisions of this Order or the NVR Contract.

22.    The Debtor is authorized to take all actions necessary to effectuate the relief granted in this Order.

23.    Except as otherwise indicated herein, findings and conclusions made herein are final in nature.

**End of Order**

Dated: October 27, 2022

WATT, TIEDER, HOFFAR & FITZGERALD, L.L.P.

*/s/ Jennifer L. Kneeland*
Jennifer L. Kneeland, Esq., Bar No. 14916
Marguerite L. DeVoll, Esq., Bar No. 13899
1765 Greensboro Station Place, Ste. 1000
McLean, Virginia 22102
Telephone: (703) 749-1026
Facsimile: (703) 893-8029

WHITEFORD TAYLOR & PRESTON, LLP

*/s/    Bradford F. Englander*
Bradford F. Englander, Esq., Bar No. 11951
3190 Fairview Park Drive, Suite 800
Falls Church, Virginia 22042
Telephone: (703) 280-9081
Facsimile: (703) 280-3370
Email: benglander@wtplaw.com

Email: jkneeland@watttieder.com
        mdevoll@watttieder.com                    *Counsel for Zachair, Ltd.*
*Counsel for NVR, Inc.*

HENRY & O'DONNELL, P.C.


*/s/ Kevin M. O'Donnell*
Kevin M. O'Donnell, Esq. Bar No. 08703
300 N. Washington Street, Suite 204
Alexandria, Virginia 22314
Alexandria, Virginia 22314
(703) 548-2100
(703) 548-2105 (fax)
bwh@henrylaw.com

## CERTIFICATE OF CONSENT TO ORDER

I HEREBY CERTIFY that the terms of the copy of the Order submitted to the Court are identical to the original Order; and the signatures represented by the /s/ on this copy reference the signatures of the consenting parties on the original Order.


*/s/ Jennifer L. Kneeland*
Jennifer L. Kneeland

cc:

Nabil J. Asterbadi
2726 Chain Bridge Road, NW
Washington, DC 20016-3404

Bradford F. Englander, Esq.
Whiteford, Taylor & Preston, LLP
3190 Fairview Park Drive, Suite 800
Falls Church, Virginia 22042

U.S. Trustee - Greenbelt
L. Jeanette Rice, Esq.
6305 Ivy Lane, Suite 600
Greenbelt, MD 20770-6305

Sandy Spring Bank
Attn: Bruce Henry, Esq.
Kevin O'Donnell, Esq.
300 N Washington Street, Suite 204
Alexandria, VA 22314-2530

Jennifer L. Kneeland, Esq.
Counsel for NVR, Inc.
1765 Greensboro Station Place, Suite 1000
McLean, Virginia 22102

## Exhibit A

PROPERTY DESCRIPTION

Parcel I - containing 285.101 acres of land, more or less. Saving and excepting property conveyed by Deed recorded in Liber 3562, Folio 941. Tax Account No. 05-0328708 - 4401 Steed Road.

Parcel II - containing 16.180 acres of land, more or less. Tax Account No. 05-0327833 - Piscataway Road

Parcel B - containing 64.153 acres of land, more or less. Saving and excepting therefrom all that portion of the within property that lies in the land now known as Piscataway Road.  Tax Account No. 05-0360651 - 10651 Piscataway Road

Parcel C - containing 58.0204 acres of land, more or less.  Tax Account No. 09-0865121 - Piscataway Road

All Four (4) Parcels lying and being in the Piscataway District of Prince George's County, Maryland.   Said Four (4) Parcels being described in the Deed recorded in Liber 10110, folio 106 as follows:

Parcel I

Being part of the land conveyed by Arthur C. Hyde, unmarried to Hyde Field, Incorporated by deed dated September 4, 1941 and recorded in Liber 620 at folio 276 among the Land Records of Prince George's County, Maryland and being more particularly described as follows:

BEGINNING for the same at an iron pipe set at a point where the Northwesterly right of way line of 40 foot wide Piscataway Road (Maryland State Route No. 223) intersects the 2nd or North 58°37' West 219-1/5 perch line of the 145 3/4 acre tract described as Tract 2 in Liber 620 at folio 276, thence leaving Piscataway Road and running with part of said 2nd line.

1. North 61°42'20" West 3575.76 feet to a corner fence post found at the end thereof, said corner fence post also being the end of the 2nd line of the 82 1/4 acre tract described in a Deed from Gussie B. Sansbury, Widow to Hency C. Padgett et ux. dated July 14, 1939 and recorded in Liber 532 at folio 275, thence running with the 3rd line of Tract 2 as described in Liber 620 at folio 276, as now surveyed,

2. North 45°40'00" East 1143.18 feet to an iron pipe set at the end thereof, thence running with the 4th line of Tract 2 as described in Liber 620 at folio 276 and also running with part of the 5th line of Tract 1 as described therein

3. North 47°40'00" East 2359.87 feet to an iron pipe set at a point where said 5th line is intersected by the Southwesterly right of way line of 50 foot wide Steed Road as shown on

Prince George's County R/W Plat No. 398, passing through the centerline of a 18 inch diameter cedar tree found at 2345.17 feet on line, said pipe set being opposite Centerline Station 32+26:95 and distant South 29°18'37" West 25.00 feet measured radially therefrom, thence running with the Southwesterly right of way line of 50 foot wide Steed Road per R/W Plat Nos. 398 and 397 by a curve to the left whose radius and central angle are 1457.40 feet and 08°38'24" respectively, whose long chord is

4. South 65°00'35" East 219.56 feet for an arc distance of 219.77 feet to a concrete monument found at a point of tangency opposite Centerline State 30+10.95. thence running with the Southwesterly right of way line of 50 foot wide Steed Road as per R/W Plat Nos. 397 and 396, the following four courses and distances:

5. South 69°19'47" East 624.07 feet to a point of curve, thence running by a curve to the right whose radius and central angle are 1407.40 feet and 10°36'50" respectively, whose long chord is

6. South 64°01'22" East 260.34 feet for an arc distance of 260.71 feet to a point of tangency, thence running

7. South 58°57' East 1849.03 feet to an iron pipe set at a point of curve opposite Centerline Station 2+73.29, thence running by a curve to the right whose radius and central angle are 1248.24 feet and 09°11'40" respectively, whose long chord is

8. South 54°07'07" East 200.09 feet for an arc distance of 200.31 feet to a point in the Northwesterly right of way line of Piscataway Road, as said Road was widened by virtue of Maryland State Roads Commission R/W Plat No. 33848, thence running with the said side of Piscataway Road, as widened by R/W Plat 33848, the following four courses and distances:

9. South 40°45'10" West 5.62 feet to an iron pipe set, thence running

10. South 04°17'51" East 40.31 feet to an iron pipe set, thence running

11. South 41°42'27" West 114.00 feet to an iron pipe set, thence running

12. South 20°54'03" West 53.49 feet to an iron pipe set in the Northwesterly right of way line of 40 foot wide Piscataway Road, as said Road is now being used, thence running with the Northwesterly right of way line of Piscataway Road (40 feet wide) as now being used, the following eight courses and distances:

13. South 41°32'53" West 769.87 feet to a point, thence running

14. South 40°55'14" West 455.15 feet to a point, thence running

15. South 41°23'14" West 321.88 feet to a point, thence running

16. South 41°38'13" West 136.33 feet to a point, thence running

17. South 41°18'21" West 408.52 feet to a point, thence running

18. South 40°52'31" West 309.66 feet to a point, thence running

19. South 41°15'00" West 433.06 feet to a point, thence running

20. South 41°24'18" West 838.32 feet to the beginning, containing 285.101 acres, more or less.

(Tax Account No. 05-0328708 - 4401 Steed Road)

## PARCEL II

Being part of the land conveyed as Parcel No. 2 in a Deed from Helen R. Houser, et al, to Nora C. Thorne dated February 25, 1948 and recorded in Liber 1016 at folio 413 among the Land Records of Prince George's County, Maryland and being more particularly described as follows:

BEGINNING for the same at an iron pipe set at a point where the Northwesterly side of 40 foot wide Piscataway Road (Maryland State Route No. 223) intersects the 6th or South 55°15' East 1581 foot line of the 16.52 acre tract conveyed as Parcel No. 2 in Liber 1016 at folio 413, thence running with the Northwesterly side of 40 foot wide Piscataway Road, parallel to and 20 feet from the existing centerline thereof

1. South 41°23'53" West 483.82 feet to an iron pipe set at a point where said right of way line intersects the 2nd line of said 16.52 acre tract, thence leaving Piscataway Road and running with part of said 2nd line

2. North 54°55'00" West 375.35 feet to an iron pipe set, thence running with the 3rd, 4th and 5th lines of the 16.52 acre tract conveyed as Parcel No. 2 in Liber 1016 at folio 413, the following three courses and distances:

3. South 35°05'00" West 100.00 feet to an iron pipe set, thence running

4. North 55°15'00" West 1120.00 feet to an iron pipe set, thence running

5. North 35°05'00" East 403.05 feet to an iron pipe set in the 2nd or North 58°37' West 219-1/5 perch line of the 145 3/4 acre tract conveyed as Tract 2 in a Deed to Arthur C. Hyde dated December 19, 1940 and recorded in Liber 609 at folio 42, thence running reversely with part of said 2nd line

6. South 61°42'20" East 1559.48 feet to the beginning, containing 16.180 acres of land more or less.

(Tax Account No. 05-0327833 - Piscataway Road)

### Parcel B

BEING all of the land conveyed by Henry C. Padgett et ux. to Henry Cecil Padgett, Jr. et ux. by Deed dated November 14, 1955 and recorded in Liber 1929 at folio 146 and intended to be all of the land conveyed by Henry C. Padgett, Jr. personal representative of the estate of Henry C. Padgett To Henry C. Padgett, Jr. and Robert H. Padgett by Deed dated September 5, 1985 and recorded in Liber 6189 at folio 286 among the Land Records of Prince George's County, Maryland; both tracts being more particularly described as one tract as follows:

BEGINNING for the same at an iron pipe set in the North Westerly right of way line of 40 foot wide Piscataway Road at the end of the 1st line of a 16.18 acre tract conveyed by Arthur C. Hyde to W. A. Albright Investments, Inc. by Deed dated November 13, 1985 and recorded in Liber 6215 at folio 538, thence running with Piscataway Road (1) South 41°19'43" West 619.11' to a pipe set at the beginning point of the 82.25 acre tract described in Liber 6189 at folio 286, thence leaving Piscataway Road and running reversely with the 6th, 5th, 4th and 3rd lines of said 82.25 acre tract, the following four courses and distances: (2) North 50°59'08" West 682.45' to a pipe set, thence running (3) North 63°38'20' West 2335.56' to a fence post at an angle point in an existing fence, thence running (4) North 27°42'10" West 653.40' to a flint stone found, then running (5) North 46°42'27" East 696.48' to an iron pipe found at the end of the 1st line of the 285.101 acre tract conveyed as Parcel 1 in Liber 6215 at folio 538, thence running reversely with part of said 1st line (6) South 61°42'20" East 2016.38' to a pipe found at the end of the 5th line of the 16.180 acre tract conveyed as Parcel 2 in Liber 6215 at folio 538, thence running reversely with the 5th, 4th, 3rd and 2nd lines of said 16.180' acre tract, the following four courses and distances: (7) South 35°03'00" West 403.05' to a pipe found, thence running (8) South 55°15'00" East 1120.00" to a pipe found, thence running (9) North 35°05'00' East 100.00' to an iron pipe found, thence running (10) South 54°55'00" East 375.35' to the beginning.

Contaning 64.153 acres of land more or less. Saving and excepting therefrom however, all that portion of the within property that lies in the land now known as Piscataway Road.

(Tax Account No. 05-0360651 - 10651 Piscataway Road)

Parcel C

Being part of the 59.673 acre tract described as Parcel No. 2 in a Deed dated January 25, 1965 from Griffith S. Oursler et ux. to Clinton Manor, Inc. and duly recorded in Liber 3093 at folio 94 among the Land Records of Prince George's County, Maryland; and being more particularly described as follows:

Beginning for the same at an iron pipe set on the Northerly side of Piscataway Road (MD Route 223) at a point where the Northerly right of way line of Piscataway Road (80 feet wide) intersects the 9th line of Parcel No. 2, Liber 3098 at folio 94, thence running with Piscataway Road per right of way Plat No. 33848, the following two courses and distances: (1) South 55°33'25" west 519.37' to a pipe set at an angle point opposite base line station No. 141+10.602 and distant 40' therefrom, thence running (2) South 55°14'09" West 105.51' to a pipe set at a flare connection leading to Steed. Road (50' wide), thence running with said flare connection (3) North 80°40'25" West 44.55' to a pipe set in the Westerly right of way line of 50 foot wide Steed Road, thence running with said side of Steed Road, the following three courses and distances: (4) South 53°19'34" West 4.41' to a pipe set, thence running by a curve to the left whose radius and central angle are 1298.24' and 09°09'46" respectively, whose long chord is (5) North 40°36'17" West 207.39' for an arc distance of 207.61' to a pipe set at a point of tangency, thence running (6) North 45°11'15" West 1715.96' to a pipe set opposite centerline station No. 19+89.25 as per Prince George's County R/W Plat #397, thence leaving Steed Road and running with the 6th line of Parcel No. 2 as per Liber 3098 at Plat 94 (7) North 42'06'20" East 551.58' to a pipe set at the end thereof, thence running with the 7th line of said Parcel No. 2 (8) North 12'23'40" West 900.30' to a "PK" nail set in a fence post at the end of said 7th line, thence running with part of the 8th line of Parcel No. 2 as per Liber 3098 at folio 94 (9) North 80°22'20" East 381.10' to a pipe set at the end of the 5th or North 64°19'28" West 278.52 foot line of the 1,298 acre tract conveyed to Potomac Electric Power Company by Deed dated March 25, 1965 and recorded in Liber 3122 at folio 122, the following two courses and distances: (10) South 50°46'51" East 278.54' to a pipe set and (11) South 61°17'31" East 242.47' to a pipe set in the 9th line of Parcel No. 2 as per Liber 3098 at plat 94, distant 372.11' from the beginning of said 9th line, thence running with part of the 9th line of Parcel No. 2 of Liber 3098 at folio 94, (12) South 24°12'40" East 2277.55' to the beginning of the land now conveyed. Containing 58.0204 acres of land, more or less.

Subject to the Right of Way Agreement between Barry B. Early, et ux. and Potomac Electric Power Company in Liber 1293 at folio 2550

And subject to the "Limit of Denial of Vehicular Access" as shown on state roads commission R/W Plat No. 33848.

(Tax Account No. 09-0865121 - Piscataway Road)

## REAL ESTATE SALES CONTRACT

## HYDE FIELD PROPERTY

THIS REAL ESTATE SALES CONTRACT ("**Contract**") is made this ___ day of October, 2022, by and between ZACHAIR, LTD., a Maryland corporation ("**Seller**") and NVR, Inc., a Virginia corporation, or an assignee, upon assignment pursuant to Section 18, below ("**Purchaser**"). Seller and Purchaser are sometimes jointly referred to herein as the "Parties" and individually as a "Party."

## RECITALS:

**Whereas,** Seller is the owner in fee simple of: (i) four (4) parcels of land, zoned R-S and LAC and located adjacent to Steed Road and Piscataway Road in Prince George's County, Maryland (the "**County**"), containing a total of approximately 423 acres, more or less, as more particularly described in the legal description attached hereto and incorporated herein as Exhibit "A" (the "**Land**"); (ii) all buildings and any other improvements situated on such land and all fixtures, machinery and systems necessary to operate such buildings (the "**Improvements**"); and (iii) all licenses, approvals and permits issued with respect to any of the foregoing property attached hereto as Exhibit "B" (the "**Permits**"). The foregoing Land, Improvements, and Permits are sometimes referred to collectively herein as the "**Property**".

**Whereas**, the Property is currently operated as an air field, and a portion of the remaining land stockpiled with fill dirt. Pursuant to a Comprehensive Design Plan dated July 24, 2018, prepared by Dewberry Engineers, Inc., and other information considered by Purchaser, it is anticipated that the Land will yield a minimum of 500 residential units (collectively, the "**Lots**").

**Whereas,** on January 17, 2020, Seller commenced a case, no. 20-10691-TJC (the "**Bankruptcy Case**") under the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.,* as amended (the "**Bankruptcy Code**") by filing a voluntary petition in the United States Bankruptcy Court for the District of Maryland (the "**Bankruptcy Court**").

**Whereas**, on or about June 1, 2021, the Seller entered in to a real estate sales contract (as amended, the "**JP Holdings Contract**") with JP Land Holdings LLC ("**JP Land Holdings**") for the sale of the Property to JP Land Holdings LLC.

**Whereas**, on June 28, 2021, Seller filed a plan [DE 224] (the "**Bankruptcy Plan**") and disclosure statement [DE 223] (the "**First Disclosure Statement**") under Chapter 11 of the Bankruptcy Code.

**Whereas**, on September 7, 2021, Seller filed an amended plan [DE 245] (the "**Amended Bankruptcy Plan**") and an amended disclosure statement [DE 246] (the "**Amended Disclosure Statement**").

**Whereas**, on October 15, 2021, the Bankruptcy Court entered an Order [DE 263] (the "**Disclosure Statement Order"**) approving the Amended Disclosure Statement and setting deadlines for confirmation of the Amended Bankruptcy Plan.

**Whereas**, after the Bankruptcy Court's entry of the Disclosure Statement Order the JP Holdings Contract terminated on account of JP Land Holding's failure to submit a notice of intent to proceed, and the Seller renewed its efforts to secure an alternative purchaser.

**Whereas**, on June 5, 2022, the Seller filed its Second Motion for an Order (A) Approving the Sale of the Debtor's Property Free and Clear of Liens, Claims, Interests and Encumbrances, (B) Approving the Sales Contract, (C) Approving Bid Procedures, (D) Scheduling Bid Deadline, Auction and Sale Hearing, (E) Approving Form and Manner of Notice Thereof, and (F) Granting Certain Related Relief [DE 321] (the "**Bid Procedures Motion**").

**Whereas**, on July 1, 2022, the Bankruptcy Court entered its Order (A) Conditionally Approving the Sale of Debtor's Property Free and Clear of Liens, Claims, Interests and Encumbrances, (B) Conditionally Approving the Contract, (C) Approving the Bid Procedures, (D) Scheduling Bid Deadline, Auction and Sale Hearing, (E) Approving Form and Manner of Notice Thereof, and (F) Granting Certain Related Relief [DE 343] (the "**Bid Procedures Order**").

**Whereas**, pursuant to the bid procedures (the "**Bid Procedures**") approved by the Bid Procedures Order, a hearing on approval of the sale of the Property (the "**Sale Hearing**") will be held at the Confirmation Hearing (defined below).

**Whereas**, this Contract is submitted contemporaneously with Purchaser's bid (the "**Bid**") made pursuant to the Bid Procedures.

**Whereas**, on June 22, 2022, Seller filed an amended plan [DE 332] (the "**First Amended Bankruptcy Plan**") and a second amended disclosure statement [DE 233] (the "**First Amended Disclosure Statement**") under Chapter 11 of the Bankruptcy Code.

**Whereas**, on August 31, 2022, Seller filed an amended plan [DE 365] (the "**Second Amended Bankruptcy Plan**") and an amended disclosure statement [DE 366] (the "**Second Amended Disclosure Statement**").

**Whereas**, on September 9, 2022, the Bankruptcy Court entered its Order (I) Approving the Disclosure Statement and (II) Approving the form of Ballot and Setting Hearing on Confirmation [DE 375] (the "**Disclosure Statement Order**").

**Whereas**, pursuant to the Disclosure Statement Order, a confirmation hearing on the Second Amended Plan is scheduled for October 19, 2022 at 10:30 a.m. (the "**Confirmation Hearing**").

NOW, THEREFORE, in consideration of the mutual covenants of Seller and Purchaser and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Purchaser agree as follows:

1.    **AGREEMENT OF SALE AND PURCHASE.**  Seller hereby agrees to sell and convey to Purchaser and Purchaser hereby agrees to purchase from Seller the Property, in fee simple absolute, for the consideration and pursuant and subject to the terms and conditions set forth in this Contract.  Purchaser hereby agrees and acknowledges that, except as otherwise expressly set forth in this Contract, neither Seller nor any principal (direct or indirect), affiliate, agent, attorney, employee or representative of Seller has made any representation or warranty whatsoever regarding the subject matter of this Contract, or any part hereof, including (without limiting the generality of the foregoing) representations as to the physical nature or physical condition of the Property or the capabilities thereof, and that Purchaser, in executing, delivering and/or performing this Contract, does not rely upon any statement and/or information to whomever made or given, directly or indirectly, orally or in writing, by any individual, firm or entity.  Accordingly, Purchaser agrees that the Property shall be deemed acceptable to Purchaser and the acquisition of the Property shall be on an "as is, where is" basis, with all faults, subject to the provisions of this Contract.  Purchaser further acknowledges that Seller would not agree to sell the Property to Purchaser for the Purchase Price stated herein (as hereinafter defined) without the disclaimers, agreements and other statements set forth in this Section.    EXCEPT AS EXPRESSLY PROVIDED HEREIN, SELLER MAKES NO REPRESENTATIONS OR WARRANTIES AS TO THE PHYSICAL CONDITION OF THE PROPERTY OR THE SUITABILITY THEREOF FOR ANY PURPOSE.  SELLER HEREBY EXPRESSLY DISCLAIMS ANY WARRANTIES OF MERCHANTABILITY AND/OR FITNESS FOR A PARTICULAR PURPOSE AND ANY OTHER WARRANTIES OR REPRESENTATIONS AS TO THE PHYSICAL CONDITION OF THE PROPERTY.  Purchaser will conduct such investigations of the Property, including but not limited to, the physical and environmental conditions thereof, as Purchaser deems necessary or desirable to satisfy itself as to the condition of the Property and the existence or nonexistence or curative action to be taken with respect to any hazardous materials including lead paint on or discharged from the Property, and Purchaser will rely solely upon same and not upon any information provided by or on behalf of Seller or its agents or employees with respect thereto.

2.    **PURCHASE PRICE and PAYMENT OF PURCHASE PRICE.**  The total Purchase Price for the Property shall be seven million five hundred thousand ($7,500,000.00) (the "**Purchase Price**").  The Purchase Price shall be paid as follows:

a.    Payment.    Seven million five hundred thousand ($7,500,000.00) of the Purchase Price (the "**Payment**"), of which the Deposit (as hereinafter defined) and accrued interest thereon shall be a part, shall be payable by Purchaser in immediately available funds on the Closing Date (as hereinafter defined in Section 6(a)).

b. – g.  Intentionally deleted.

3.    **DEPOSIT**.

a.    Simultaneously with the submission of Purchaser's Bid to Seller in accordance with the Bid Procedures, the Purchaser paid into escrow with Seller's escrow agent, Whiteford, Taylor & Preston, LLP (the "**Escrow Agent**") the sum of Five Hundred Thousand Dollars ($500,000.00) in immediately available funds, as a good faith deposit (the "**Deposit**").

b.      Unless this Contract is terminated pursuant to Section 4 below or the Purchaser is not approved as the Purchaser of the Property at the Sale Hearing (defined above), the Deposit shall be non-refundable except where expressly set forth, in this Agreement, including an event of Seller default as set forth in Section 14, and as set forth in Section 11(b), and Section 12(b), below.

c.      Intentionally deleted.

d.      Escrow Agent shall hold the Deposit in escrow in accordance with the terms set forth below:

i.      Upon receipt of the Deposit or any portion thereof (the Deposit or any portion thereof are collectively referenced herein as the "**Escrowed Funds**"), Escrow Agent shall place the Escrowed Funds in an interest-bearing account at a federally insured financial institution (the "**Escrow Account**"). All interest earned on the Escrowed Funds shall be deemed to be a part of the Escrowed Funds and the Party entitled to the Escrowed Funds shall also have the benefit of the interest earned thereon.

ii.      In the event of any disagreement between the Parties regarding the application, distribution or other disposition of the Escrowed Funds, or should Escrow Agent receive conflicting claims, demands, or instructions regarding the Escrowed Funds, Escrow Agent shall continue to hold the Escrowed Funds in escrow until instructed otherwise by joint instructions from the Parties or as directed by a court of competent jurisdiction.

iii.      In the event this Contract is terminated by either Party as expressly permitted in this Contract, or the Purchaser is not approved as the Purchaser of the Property at the Sale Hearing, Escrow Agent is authorized and directed by the Parties to deliver the Escrowed Funds to the Party entitled thereto pursuant to the terms of this Contract not less than five (5) business days nor more than ten (10) business days after receipt by Escrow Agent (with a copy to non-terminating Party) of written notice of termination, unless, within five (5) Business days after the non-terminating Party's receipt of such termination notice, the non-terminating Party provides written notice to Escrow Agent and the other Party that it disputes the right of the terminating Party to receive the Escrowed Funds. Escrow Agent shall not be required to inquire as to the merits of any claimed dispute but may accept a notice of its existence as grounds to act in accordance with this Section 3(c)(iii). In such event, Escrow Agent shall continue to hold the Escrowed Funds or pay the Escrowed Funds into a court of competent jurisdiction in an action of interpleader until such dispute is resolved. All attorneys' fees and costs of Escrow Agent (acting in such capacity, and not as counsel for a Party) incurred in connection with any such dispute or interpleader shall be assessed against the Party that is not awarded the Escrowed Funds, or if the Escrowed Funds are distributed in part to both Parties then in the inverse proportion of such distribution.

iv.      The Parties hereby jointly and severally agree that, except as provided otherwise herein, Escrow Agent shall incur no liability whatsoever in connection with its performance pursuant to this Contract. Each Party hereby severally indemnifies and holds Escrow Agent harmless from any loss, damage, injury, or claims, including reasonable attorneys' fees and expenses caused by the actions of such Party and arising from Escrow Agent's due performance of its obligations under this Contract. Purchaser and Seller hereby jointly and severally release and waive any claims they may or either of them may have against Escrow Agent that may result from its due performance of its functions under this Contract. Escrow Agent shall be liable only for loss or damage directly resulting from its, or any of its officers' or employees' acts of gross negligence, defalcation, willful misconduct, or breach of the express terms of this Contract, while performing as Escrow Agent.

v.      The Parties shall execute such additional escrow instructions as Escrow Agent may reasonably require regarding the Escrow Account. Any such instructions shall not in any way modify the terms of this Contract or impose any fee, cost, expense or liability on Seller or Purchaser that is not provided for in this Contract.

The Escrow Agent is joining in the execution of this Contract solely to evidence its consent to and acceptance of this escrow, subject to the foregoing terms.

4.      **PROPERTY DOCUMENTS; ENTRY ONTO PROPERTY; STUDY PERIOD**.

a.      Seller has delivered to Purchaser, without any representation or warranty from Seller, copies of all title reports, title insurance policies, environmental, soil and other tests and studies, and copies of all surveys, engineering and other plans and plats relating to the Property to the extent within Seller's possession or control (collectively, the "**Property Documents**"). Seller has made the Property Documents available to Purchaser in an online data room maintained by Fraser

Forbes, and that all Property Documents that are in the data room, or are added to the data room, shall be deemed delivered to Purchaser.

b.    Commencing on the Effective Date and continuing for the entire term of this Contract, Purchaser, at Purchaser's sole cost and expense, shall have complete access to the Property for the purpose of conducting such soil borings, soil analyses, engineering tests and studies, environmental tests and studies, economic and/or topographic tests, studies, and/or investigations, including, but not limited to, a Phase I Environmental Report and a Phase II Environmental Report if expressly recommended by the Phase I Environmental Report (collectively, the "**Studies**"), with respect to the Property as Purchaser may deem necessary. Purchaser shall keep all information obtained through its Studies confidential except that Purchaser may disclose such information as necessary, customary, required by law or expedient for the development of the Property as contemplated by this Contract. Purchaser shall, without representation or warranty and at no cost or expense to Purchaser, provide Seller with copies of all final reports, studies, easements, licenses and permits, contracts, agreements or memoranda of understanding that Purchaser obtains or enters into regarding the Property (collectively, "**Study Documents**") from the Effective Date through Closing ("**Access Period**"), within three (3) business days of receipt, and at Seller's sole cost and expense promptly license their use and dissemination by Seller to the extent such use and dissemination is permitted by the preparer of such reports and studies. Except, however, Purchaser shall not be required to provide to Seller any of its conceptual, engineering and design reports and studies, nor shall Purchaser be required to provide any of its internal analysis regarding the Property. Effective upon termination of this Contract for any reason, Purchaser hereby assigns, without representation or warranty, all right, title and interest to all Study Documents (and Purchaser's rights against third parties under such Study Documents) to Seller, absolutely and exclusively without further compensation to Purchaser.

c.    Intentionally deleted.

d.    Purchaser's right to conduct Studies on, at or otherwise with respect to the Property during the Access Period shall be subject to Purchaser's continuing compliance with each and all of the following conditions: (i) Seller shall permit Purchaser, and its agents, representatives and contractors, to have reasonable access to the Property during normal business hours with not less than 24 hours prior notice by e-mail, subject to the rights of tenants and occupants of the Property; (ii) all such due diligence shall be conducted so as not to cause any unreasonable or material disruption to tenants or other occupants of the Property; (iii) Purchaser shall at all times comply with all laws, ordinances, rules and regulations applicable to the Property; (iv) promptly after entry onto the Property, Purchaser shall restore or repair (to substantially the same condition that existed prior to the entry) any damage thereto caused by or otherwise arising from any act or omission by Purchaser, its agents, representatives or contractors; and (v) Purchaser's certificate of liability insurance attached as Exhibit D is satisfactory evidence that Purchaser or its agents and contractors have procured comprehensive liability insurance from an insurer authorized to do business in the State of Maryland which is reasonably acceptable to Seller. Purchaser shall indemnify, defend, reimburse, and hold and save Seller harmless from and against liquidated, actual damage to personal property or bodily injury, loss, cost, damage, injury or other expense arising solely out of or in any way related to the activities, acts or omissions of Purchaser, its agents, employees and contractors on or about the Property. Purchaser's obligations under this Subsection 4(d), including without limitation the indemnification provisions, shall survive termination of this Contract and Closing.

**5.    Intentionally deleted.**

**6.    CLOSING; CLOSING DATE; ADJUSTMENTS AT CLOSING; CLOSING COSTS.**

a.    In the event that all of the conditions precedent to Purchaser's obligations hereunder have been satisfied or waived by written notice of same pursuant to this Contract, and this Contract has not been sooner terminated, settlement under the terms of this Contract ("**Closing**") shall be held at the offices of NVR Settlement Services, 3701 Pender Drive, Suite 210, Fairfax, VA 22030 ATTN: Dy Welch, or other closing attorney or settlement agent selected by Purchaser, within 60 days after the later of Bankruptcy Court's entry of an order (the "**Sale Approval Order**") approving of the Seller's sale of the Property to the Purchaser and the Confirmation Order (defined below) (the "**Closing Date**").

b.    Notwithstanding the foregoing, the Closing Date shall be extended, at Purchaser's option, until either all of the Seller's Conditions Precedent set forth in Sections 11 and 12(a)(ii-iv) are satisfied or are waived in writing by Purchaser

c.    Seller agrees to execute the usual special warranty deed, with covenant of further assurance and right to convey, containing the usual covenants of title, in proper form for recording in the County.

d.      At Closing, Seller shall deliver to Purchaser a "Certification of Non-Foreign Status" which meets the requirements of Section 1445 of the Internal Revenue Code and Internal Revenue Regulations for the purpose of informing the transferee that withholding of Federal taxes is not required.

e.      Possession of the Property shall be given to Purchaser or its agents and assigns at the time of settlement, free from any parties in possession.  Prior to Closing, Seller shall terminate air field operations and shall terminate all leases with respect thereto.  Prior to Closing, operation of the airport located on the Property shall have ceased with all leases terminated; all aircraft and third-party property removed; and all fuel, oil and other regulated chemicals stored at the Property shall be properly removed from the site.

f.      Real estate taxes, general and special, and usual water and sewer charges are to be adjusted to the date of settlement and thereafter assumed and paid for by Purchaser.  Seller shall pay, when and if due, any agricultural recapture tax or any similar tax imposed on the Property, whether imposed prior to or within one year subsequent to the last to occur of Closing.  Further, pursuant to section 1146(a) of the Bankruptcy Code, the purchase contemplated by this Contract shall be exempt from all documentary stamps, recordation and transfer taxes.

g.      Examination of title, owner's and mortgagee's title insurance, Survey (as hereinafter defined) (if Purchaser elects to have a Survey prepared), tax certificates, and recording charges are to be at the cost of Purchaser.  Seller shall pay the cost of preparation of the deed, and obtaining releases of all monetary liens encumbering the Property.  Each party shall pay for the cost of their respective legal counsel.  In the unlikely event that any documentary stamps, recordation or transfer taxes are charged, notwithstanding the fact that the purchase contemplated by this Contract shall be facilitated through section 1146(a) of the Bankruptcy Code, such charges shall be split equally and paid by Seller and Purchaser.

h.      No later than 30 days before Closing, unless such other time is agreed to in writing by Seller and Purchaser, Purchaser shall prepare and submit to the Maryland Department of Environment ("**MDE**") an "Application for Transfer for a Surface Mine Permit" to cause the transfer to Purchaser of Seller's mining permit issued by **MDE** with respect to the Property (the "**Mining Permit**") and a transfer of the haul road permit issued to Seller by the County (the "**Haul Road Permit**"), which transfers shall release Seller from responsibility under the Mining Permit and Haul Road Permit.  Seller, at its own expense, shall review such application, shall provide any customary consent effective as of the Closing, and shall cooperate with Purchaser in connection with the transfer of the permits.  Notwithstanding the foregoing, Seller shall not be required to undertake any action required to satisfy any conditions to transfer as MDE may impose.  Purchaser shall assume all post-closing obligations under the Mining Permit and Haul Road Permit.  Purchaser acknowledges the authorized activities and terms and conditions of the Mining Permit and Haul Road Permit and Seller shall not be responsible or liable for any changes, modifications, expansions, or revisions to the Mining Permit or Haul Permit, including, but not limited to, the authorized activities or terms and conditions of the Mining Permit or Haul Road Permit. Notwithstanding anything in this Contract to the contrary, Purchaser shall, at Purchaser's sole cost and expense, undertake any actions necessary on its part to accept the transfer of the Mining Permit and Haul Road Permit, including, but not limited to, obtaining an MDE Mining License.  At Closing, Purchaser, at its expense, shall obtain replacement surety bonds in its name securing obligations under the Mining Permit and the Haul Road Permit, sufficient in terms and amounts to permit the release of Seller's existing bonds that secure the foregoing permits.

7.      **TITLE**

a.      At Closing, Seller will convey to Purchaser good and marketable and insurable fee simple title to the Property.  For the purposes of this Contract, "good and marketable and insurable fee simple title" shall mean fee simple ownership, free of all monetary liens (*e.g.*, bank loans and deeds of trust, tax liens), liens, encumbrances, judgments, covenants, restrictions, easements and rights of way, recorded or unrecorded; subject, however, to those matters (if any) affecting title to the Property which are set forth in the Title Commitment referred to below and accepted or deemed accepted by Purchaser in accordance with Subsection 7(b) (the "**Permitted Exceptions**").  Such title shall also be insurable by a recognized and reputable title insurance company selected by Purchaser which is licensed to do business in the State of Maryland, at then-current standard rates under the standard form of ALTA owner's policy of title insurance in effect on the Closing Date, with the standard printed exceptions deleted and without exception other than for the Permitted Exceptions.

b.      Purchaser has obtained a report of title for owner's title insurance for the Property (the "**Title Commitment**"), which is attached hereto as Exhibit E.  Purchaser objects to all monetary liens (*e.g.*, bank loans and deeds of trust, tax liens, etc.) identified in the Title Commitment, or else wise, and such liens must be released before or at Closing.  Except as to the monetary liens,

Purchaser has no objections to the Title Commitment. Title to the Property must be delivered to Purchaser at Closing without any changes to the title as set forth in the Title Commitment. Any changes to title prior to Closing shall constitute a default by Seller under this Agreement, and Seller shall promptly commence and diligently pursue good faith and reasonable efforts to cure the changes in title to comply with the title set forth in the Title Commitment prior to the Closing Date. If necessary and at Purchaser's sole option, the Closing Date shall be extended for the period of time required to allow Seller to cure the changes in the title such that the title conforms with the Title Commitment.

c. Purchaser shall, at its sole option, have until the Closing Date to procure a Survey (as defined below).

d. Intentionally deleted.

e. Upon request by Purchaser, Seller shall, at no cost to Seller, execute such affidavits, certifications, and other instruments as are reasonably required by Purchaser's title insurance company for the elimination of any standard or printed exceptions in Purchaser's final policy of title insurance or to comply with tax reporting or disclosure requirements. The term "**Survey**" shall mean an ALTA/NSPS Land Title Survey of the Property prepared, at Purchaser's expense, by a registered Maryland land surveyor designated by Purchaser.

**8.** **REPRESENTATIONS AND WARRANTIES OF SELLER.** Except as set forth in the Disclosure Schedule (Exhibit C to the Contract), and in the Property Documents, Seller represents and warrants to Purchaser as follows:

a. Seller is a corporation, duly organized and validly existing, licensed under the laws of the State of Maryland, and qualified to do business in the State of Maryland, in good standing.

b. Subject to the approval of the Bankruptcy Court, Seller has the full right, power and authority to enter into and carry out and perform this Contract, without obtaining any further approvals or consents. Seller is the owner of the Property in fee simple absolute, and has all right, power and authority to enter into this Contract. Subject to the approval of the Bankruptcy Court, the entering into this Contract and consummation of this transaction by Seller will not violate any law or governmental regulation, order or decree to which Seller is subject or any agreement or other instrument to which Seller is a party or by which it is bound.

c. Seller has not made any binding commitments or representations to the applicable governmental authorities, any adjoining or surrounding property owners, any civic association, any utility, or any other person or entity which would in any manner be binding upon Purchaser, except as provided for in this Contract and as set forth on Exhibit "C" and except as provided in the Property Documents, Title Commitment and Survey.

d. There are no leases, tenancies, licenses, or other rights of occupancy or use for any portion of the Property except for airport tenant leases, which will be terminated prior to Closing.

e. To the Seller's actual knowledge without any duty or obligation to investigate, there is no threatened in writing or pending annexation, condemnation or other judicial or administrative proceedings against or affecting any part of the Property.

f. To Seller's actual knowledge without any duty or obligation to investigate (i) there are no "Hazardous Materials" (defined below) located on or within the Property except as routinely used in the ordinary course of business of a commercial airport including aviation gas and jet fuel, (ii) no portion of the Property has been used for the storage, use, generation, treatment or disposal of Hazardous Materials Property except as routinely used in the ordinary course of business of a commercial airport including aviation gas and jet fuel; and (iii) there are no underground fuel tanks located upon the Property, except as provided for in this Contract and as set forth in that Phase I Environmental Site Assessment Report, Hyde Field, prepared by ECS Mid-Atlantic, LLC, dated April 26, 2021, and except as provided in the Property Documents. The term "**Hazardous Materials**" means any substance, material or waste that is defined or regulated as hazardous or toxic, or is a pollutant or contaminant, by or that gives rise to liability under, any Law, regulation, permit or judicial, administrative or governmental order, including without limitation (A) oil petroleum products and their byproducts, (B) polychlorinated biphenyls ("**PCBs**"), and (C) urea formaldehyde, but expressly excludes asbestos. Seller makes no representation or warranty with respect to the presence of asbestos.

g. The Memorandum of Lis Pendens recorded in the Land Records of Prince George's County, Maryland by PD Hyde Field, LLC on March 19, 2019 in Liber 41885, folio 52 has been released.

h.    All of Seller's representations and warranties shall be repeated and true at and as of the Closing Date.  Except as set forth in Section 14 of this Contract, Seller's representations and warranties shall terminate at Closing.  When referring to the "actual knowledge" of Seller, such phrase shall mean the actual knowledge of Nabil Asterbadi, who is the President of Seller, provided, however that this provision shall not cause Nabil Asterbadi, to be individually liable under this Contract if a breach of a Seller representation and warranty occurs.

9.    **COVENANTS OF SELLER.**  Seller covenants with Purchaser that from the Effective Date through the Closing Date:

a.    Seller shall not bring or allow to be brought onto the Property any Hazardous Materials, except as routinely used in the ordinary course of business of a commercial airport including aviation gas and jet fuel.  Seller shall not install or permit the installation of any underground fuel tanks on the Property.

b.    Seller shall promptly advise Purchaser in writing of any matters coming to Seller's attention indicating the material inaccuracy of any of Seller's representations or warranties set forth in this Contract and give to Purchaser copies of any written notices which Seller receives from governmental authorities relating to the Property.

c.    Intentionally deleted.

d.    After the Effective Date, Seller shall not voluntarily alter title to the Property or voluntarily seek any zoning changes or other governmental approvals with respect to the Property, except for the zoning changes and government approvals provided for in this Contract, without Purchaser's prior written approval, which approval shall not be unreasonably withheld, conditioned, or delayed.

e.    The Property is currently encumbered by a Deed of Trust and Security Agreement securing that loan from Sandy Spring Bank in the maximum aggregate principal amount of $2,660,000, recorded in Liber 37703, folio 452 among the Land Records for the County, as modified by that certain First Modification to Deed of Trust and Security Agreement dated as of March 1, 2021 (recordation pending) (the "**Existing Debt**").  The Existing Debt will be paid in full at or prior to Closing and any related liens released.

f.    Prior to the Closing Date, Seller shall: (i) wind down the air field operations on the Property and terminate all leases and service contracts related to the Property; (ii) remove all aircraft and third-party property from the Property; and (iii) properly remove all fuel, oil, and other regulated chemicals stored at the Property.

g.    Seller shall file a motion with the Bankruptcy Court seeking approval of the sale to Purchaser pursuant to the Bid Procedures Order.

h.    From and after Effective Date, no additional fill shall be deposited on the Property by Seller or by Seller's agent, employees, contractors or subcontractors, or with Seller's consent.

i.    From and after the Effective Date, Seller shall use commercially reasonable efforts to satisfy the Conditions Precedent to Seller's Obligation to Close in Section 12 of this Contract.

10.    **COVENANTS OF PURCHASER.**  Purchaser covenants with Seller that from and after the Bankruptcy Court's approval of the Second Amended Plan and the sale of the Property to Purchaser, Purchaser shall use commercially reasonable efforts to satisfy all conditions precedent to Purchaser's obligation to Close that are within Purchaser's control.

11.    **CONDITIONS PRECEDENT TO PURCHASER'S OBLIGATION TO CLOSE:**

a.    The obligation of the Purchaser to purchase the Property and to perform under this Contract shall be subject to satisfaction of the following conditions:

i.    Title to the Property shall be in the condition required pursuant to Section 7 above including but not limited to, payment and/or release of all monetary liens (*e.g.*, bank loans and deeds of trust, tax liens) at or before Closing.

ii.    The representations and warranties made by Seller in this Contract shall be true in all respects as of the Effective Date and as of the Closing Date, and (subject to notice

and cure rights) Seller shall have performed all covenants and obligations and complied with all conditions required of Seller under this Contract, including those covenants set forth in Section 9 above.

        iii.    The Bankruptcy Court shall have entered the Sale Approval Order and the Confirmation Order (defined below) (or such other order, or orders) authorizing the sale of the Property to Purchaser in accordance with the terms of this Contract, and no stay of such orders shall be in effect.

        b.    In the event any of the conditions set forth in Subsection 11(a) are not satisfied as of the Closing Date, Purchaser shall have the right, in its sole discretion, (i) to terminate this Contract by giving written notice to Seller, (ii) to waive them and proceed to Closing; or (iii) to extend the Closing Date until such conditions have been satisfied or failed.  In the event Purchaser elects to terminate this Contract due to the Seller's default or pursuant to Subsection 11(a), Purchaser shall have the remedies set forth in Section 14 of this Contract.

        **12.**    **CONDITIONS PRECEDENT TO SELLER'S OBLIGATION TO CLOSE:**

        a.    The obligation of the Seller to sell the Property and to perform under this Contract shall be subject to satisfaction of the following conditions:

        i.    The Bankruptcy Court shall have entered the Sale Approval Order , in form and substance reasonably acceptable to Seller.

        ii.    Unless waived in writing by Seller, the Bankruptcy Court shall have entered an order approving the Seller's Second Amended Bankruptcy Plan, in form and substance reasonably acceptable to Seller (the "**Confirmation Order**").

        iii.    Unless waived in writing by Seller, the effective date of the Seller's Second Amended Bankruptcy Plan shall have occurred, or shall occur concurrently with the Closing.

        iv.    Unless waived in writing by Seller, the Sale Approval Order and the Confirmation Order shall have become final orders, without reversal or modification, and all rights of appeal of the Sale Approval Order and the Confirmation Order shall have lapsed.

        v.    The representations and warranties made by Purchaser in this Contract shall be true in all respects as of the Effective Date and as of the Closing Date, and (subject to notice and cure rights) Purchaser shall have performed all covenants and obligations and complied with all conditions required of Purchaser under this Contract.

        b.    In the event any of the conditions set forth in Subsection 12(a)(i-iv) have failed (e.g., one or more of the required orders have been denied, or been reversed or materially modified), Seller shall have the right, in its sole discretion, either to waive such conditions and proceed to Closing or to terminate this Contract by giving written notice to Purchaser, whereupon, the Escrowed Funds shall be promptly returned to Purchaser and thereupon the Parties shall have no further rights or obligations hereunder, except for such rights and obligations that expressly survive termination of this Contract.

    In the event that any of the conditions set forth in Subsection 12(a)(i-iv) have not been satisfied prior to the Closing Date, but remain susceptible to satisfaction (e.g., an appeal was filed and remains pending), Seller shall have the right, in its sole discretion, either to waive such conditions and proceed to Closing, or to extend the Closing Date; provided, however, that if the conditions set forth in Section 12(a)(i-iv) remain susceptible to satisfaction, Seller shall not be entitled to terminate the Contract based merely on the continued pendency of such conditions.  In the event Seller elects to terminate this Contract due to the conditions in Subsection 12(a)(v) not being met, the Escrowed Funds shall be released to Seller and thereupon the Parties shall have no further rights or obligations hereunder, except for such rights and obligations that expressly survive termination of this Contract.

        **13.**    **PURCHASER'S DEFAULT.**  If Purchaser fails to tender Closing on the Property on the Closing Date and Seller is ready, willing and able to perform, or if Purchaser shall otherwise breach or default under any of the provisions of this Contract, then, provided Purchaser has received written notice from Seller specifying the nature of the breach or default and Purchaser fails to cure the specified breach or default within ten (10) business days after receipt of the notice, or five (5) days written notice for failure to close by the Closing Date, Seller may declare a default. Seller's sole remedy for Purchaser's failure to close shall be to receive the Deposit from Escrow Agent, as complete and liquidated damages, not as a penalty.  In the event of Purchaser's default that is not timely cured, Seller, at its election, may terminate this Contract by giving written notice to Purchaser, and Seller shall be relieved of further liability hereunder, at law or equity (except for obligations that

expressly survive termination of this Contract). Seller expressly waives all rights of action against Purchaser for specific performance and any other equitable remedies or damages for any matter arising out of or relating to Purchaser's failure to close under this Contract. Any attendance at Closing by either Party shall not nullify this provision for payment of liquidated damages as Seller's sole remedy.

14. **SELLER'S DEFAULT.** In the event Seller shall fail to tender and complete Closing, breaches its representations and warranties, or otherwise fails to perform any of its obligations hereunder, then, provided Seller has received written notice from Purchaser specifying the nature of the breach or default and Seller fails to cure the specified breach or default within ten (10) business days after receipt of the notice, Purchaser shall (i) have the right to seek specific performance of this Contract if the failure is not due to actions required by the Bankruptcy Court or (ii) may, in the alternative, elect to terminate this Contract, whereupon the Escrow Agent shall deliver to Purchaser a complete refund of the Deposit, and thereupon the parties shall have no further rights or obligations hereunder, except as stated in this Section 14 or expressly set forth elsewhere in this Contract. In the event that: (a) Seller's representations and warranties prove to be materially false; (b) Closing has occurred; and (c) Purchaser did not know and, with the exercise of reasonable diligence could not have known, of the falsity of such representations and warranties prior to Closing, then Purchaser shall have the right to deduct actual damages (but not consequential damages, lost profits or punitive damages) from payments as may be due in excess of the Payment. If the failure of the parties to complete Closing is due to a Seller default that occurs after the Closing Date, and is not cured, and the default thereby causes a material condition not to be satisfied, or Seller refuses to tender and complete Closing after all conditions thereto have been satisfied or waived, then the Seller shall also deliver a complete refund of the Deposit pursuant to subsection (i). In order to exercise the remedy of specific performance, Purchaser shall file suit within one hundred eighty (180) days after Purchaser's notice of default. Subject to the timely satisfaction of all of the conditions to the Seller's obligations to close as set forth in Section 12(a), above, if specific performance is not available due to Seller intentionally (e.g., not by foreclosure or other similar remedy with respect to exit financing, obligations under the Plan or other financing arrangements) selling or transferring the Property to a party other than Purchaser or Purchaser's designee, Purchaser shall have all rights and remedies against the Seller available to Purchaser at law or in equity. Other than as expressly stated in this Section 14, Purchaser shall have no other right or remedy, including without limitation claims for actual damages, consequential damages, lost profits or punitive damages. Nothing in this Contract shall provide any basis for a claim by Purchaser against any owner, insider, agent, employee, officer or director of Seller.

15. **RISK OF LOSS.** Until execution and delivery of the deed at Closing, the risk of loss or damage by fire or other casualty is assumed by Seller.

16. **CONDEMNATION.** If, at or prior to the time of Closing, any portion of the Property shall be condemned or taken pursuant to any governmental or other power of eminent domain, any written notice of taking or condemnation is issued, or any proceedings are instituted by any governmental authority having the power of eminent domain, and any such condemnation or taking has an adverse effect upon Purchaser's intended development of the Property, as reasonably determined by Purchaser in Purchaser's sole and absolute discretion, the Purchaser shall have the right to terminate this Contract by delivering written notice to Seller to that effect within fifteen (15) days after receiving written notice from Seller advising of the condemnation or taking. In that event, the Deposit shall be promptly returned to Purchaser and thereafter the Parties shall be relieved of further liability under this Contract, at law or in equity. In the event of condemnation, if Purchaser is entitled to terminate this Contract but elects not to do so or if Purchaser is not entitled to terminate this Contract, Purchaser shall proceed to settlement with an equitable reduction in the Purchase Price equal to the condemnation award paid to Seller. If Purchaser shall proceed to Closing and the portion of the Property to be condemned has not yet been taken and paid for by the condemning authority by the time of Closing then there shall be no abatement in the Purchase Price and Seller shall assign to Purchaser at the time of settlement of all Seller's right to any unpaid condemnation awards, and Seller shall convey the entire Property to Purchaser. Purchaser shall be entitled to participate jointly with Seller in all negotiations with the concerning authority and any settlement of any pending or threatened condemnation proceedings shall be subject to Purchaser's approval, such approval not to be unreasonably withheld, conditioned, or delayed. If Seller has knowledge of any pending or threatened condemnation proceedings or actions, Seller will promptly advise Purchaser in writing.

17. **BROKERAGE.** Seller warrants that it has not dealt with any real estate broker, agent or finder in connection with this transaction other than Fraser Forbes Real Estate Services who will be compensated by Seller pursuant to a separate agreement and that no other right to or claim for commission or other compensation has been created by their actions with respect to this Contract. Purchaser warrants that it is not represented by a broker in this transaction. The Parties agree to indemnify and hold each other harmless from any and all liability, loss or damage, including reasonable attorneys' fees and related costs arising out of, or resulting from, any and all brokerage claims arising from breaches of the representations and warranties set forth in this section.

18.     **ASSIGNMENT.**

(A) Purchaser shall have the right, following conclusion of the Confirmation Hearing, and without Seller's consent, to assign its rights and obligations under this Contract to a single entity, or to designate a single alternative grantee to take title to the Property from Seller prior at Closing, (an "**Assignee**"), provided that such Assignee demonstrates that it: (a) has the financial wherewithal to perform all obligation of Purchaser under this Contract; (b) has experience, or contracts with an organization with experience, in developing land and obtaining entitlements in Prince George's County, Maryland; and (c) that it has a reputation in the community for consummating the development of residential land development.

Assignee must assume all liabilities and obligations of Purchaser under this Contract.  At least ten (10) days prior to the proposed assignment, Purchaser, and upon request by Seller for further information, Purchaser and the proposed Assignee shall provide to Seller information and documentation regarding: the proposed Assignee's financial condition, operating history, development experience, and reputation in the community; the proposed Assignee's relationship to Purchaser; the terms of the proposed transaction as between the Purchaser and the proposed Assignee; and other matters relevant to the proposed assignment.

(B)  Seller shall have the right (a) to assign its rights, but not its obligations, under this Contract, for collateral purposes to secure an obligation of Seller; or (b) to assign its rights and obligations to a successor, plan administrator, trustee, or similar party pursuant to Seller's Second Amended Plan.

19.     **DEFERRED WATER AND SEWER CHARGES.**

a.     Purchaser shall be responsible, at its sole expense, for constructing the water systems for the residential portion of the Property including all water pipes required by the County in the streets and the physical connection from the water pipes in the streets to each individual lot line and all other facilities related to public water service required by the Washington Suburban Sanitary Commission ("**WSSC**")  (all such pipes, appurtenances, connections, facilities and associated components being herein collectively referred to as "**Water Systems**").  Purchaser shall be responsible, at its sole expense, for constructing all sanitary sewer mains and appurtenances and sewer pipes required by WSSC in the streets, the physical sewer connection from the sewer pipes in the streets to each individual lot line and all other facilities relating to public sanitary sewer services required by WSSC (all of such pipes, appurtenances, connections and associated components being herein referred to collectively as the "**Sewer Systems**").

b.     Purchaser shall retain all rights to charge a fee or assessment against the Lots that purports to reimburse all or part of the cost of installing all or part of the Water Systems installed in and for the Lots and the Sewer Systems installed in and for the Lots, i.e., "front foot" water and sewer charges on the Property (collectively, hereinafter the "**Water and Sewer Charges**"), including all rights to impose a private utility declaration on the Lots pursuant to a Deferred Water and Sewer Charges Declaration (the "**Declaration**") which will impose Deferred Water and Sewer Charges ("**DWSC**") on each Lot, which DWSC shall be a lien on the Lots and commercially reasonable in all events.

20.     **Intentionally deleted.**

21.     **MISCELLANEOUS.**

a.     Purchaser reserves the right to waive any of the terms and conditions of this Contract for its benefit, including, without limitation, conditions precedent to Closing, title, and warranty provisions, and to purchase the Property in accordance with the terms and conditions of this Contract which have not been so waived.  Any and all such waiver(s) must be in writing signed by Purchaser.

b.     All notices and other communications hereunder shall be in writing, and be deemed to have been received (i) immediately upon personal delivery or confirmed fax receipt, (ii) one (1) business day after being sent by confirmed overnight mail, or (iii) three (3) days after mailing, if mailed by certified mail, return receipt requested, postage prepaid:

|  |  |
|---|---|
| to Seller: | Zachair Ltd. |
|  | Attn: Dr. Nabil J. Asterbadi |
|  | 2726 Chain Bridge Road, NW |
|  | Washington, DC  20016 |
|  | Email:  nasterbadi@aol.com |

|                      |                                                    |
|----------------------|----------------------------------------------------|
| with a copy to:      | Whiteford, Taylor & Preston, LLP                   |
|                      | Attn: Bradford F. Englander, Esq.                  |
|                      | 3190 Fairview Park Drive, Suite 800                |
|                      | Falls Church, VA 22042                             |
|                      | Email: benglander@wtplaw.com                       |
|                      |                                                    |
| to Purchaser:        | NVR, Inc.                                          |
|                      | Attn: Patrick Donahue                              |
|                      | Vice President, Regional Land Operations           |
|                      | 656 Quince Orchard Road, Suite 500                 |
|                      | Gaithersburg, Maryland 20878                       |
|                      | E-mail: pdonahue@nvrinc.com                        |
|                      | E-mail: jmcmahon@nvrinc.com                        |
|                      | E-Mail: rborleis@nvrinc.com                        |
|                      |                                                    |
| with a copy to:      | Watt, Tieder, Hoffar & Fitzgerald, LLP             |
|                      | Attn: Jennifer L. Kneeland, Esq.                   |
|                      | 1765 Greensboro Station Place, Suite 1000          |
|                      | McLean, Virginia 22102                             |
|                      | E-mail: jkneeland@watttieder.com                   |

The parties shall be responsible for notifying each other of any change of address or facsimile number.

c.     This Contract contains the entire agreement between the parties regarding the subject matter of this Contract.  There are no promises, agreements, conditions, undertakings, warranties or representations, oral or written, express or implied, between them, relating to this subject matter, other than by an agreement in writing signed by all the parties or their respective successors in interest.  This Contract may be executed in several counterparts, each of which shall be an original, but all of which shall constitute one and the same instrument.  The Recitals set forth on pages 1-2 are incorporated in and made a part of this Contract.  The terms of this Contract are mutually agreed to be clear and unambiguous, shall be considered the workmanship of all the parties and shall not be construed against the drafting party.  Other than the sections of this Contract referenced in the following sentence, the terms and provisions of this Contract shall not survive Closing and otherwise shall be merged with the deed executed and delivered at Closing.  Surviving sections are: Section 2; Section 5; Section 10; Section 18; Section 19; and Section 21.

d.     If any terms, covenants or condition of this Contract or its application to any person or circumstances shall be invalid or unenforceable, the remainder of this Contract, or the application of such term or provision to persons or circumstances other than those to which it is held invalid or unenforceable, shall not be affected, unless the result would frustrate the purpose of this Contract.

e.     All questions with respect to the construction of this Contract, shall be determined in accordance with the laws of the jurisdiction in which the Property is located, without regard to conflict of law rules.  Time is hereby declared to be of the essence in the performance of each of party's obligations hereunder.

f.     If any date upon which action is required under this Contract shall be a Saturday, Sunday or legal holiday, the date for such action shall be extended to the first regular business day after such date which is not a Saturday, Sunday or legal holiday.

g.     In the event of any dispute or controversy arising out of or relating to this Contract or the parties' compliance therewith, it is agreed that the exclusive forum for determination of any and all such disputes or controversies shall be the Bankruptcy Court.  The Parties hereby consent to the Bankruptcy Court hearing and determining all factual and legal disputes arising under or in connection with this Contract, without requiring the Bankruptcy Court to prepare or submit proposed findings or conclusions to the United States District Court.  In the event that the Bankruptcy Court lacks subject matter jurisdiction to hear or determine any dispute, the exclusive forum for determination of any and all such disputes or controversies shall be the appropriate state or federal trial court for the jurisdiction in which the Property is located.  Moreover, in addition to any other relief to which it may be entitled, the prevailing party shall be entitled to recover its attorneys' fees and costs incurred in regard to such dispute or controversy.  **THE PARTIES WAIVE THEIR RESPECTIVE RIGHTS OF TRIAL BY JURY**.

h.     All of the covenants, conditions and obligations contained in this Contract shall be binding upon and inure to the benefit of the respective heirs, legal representatives, successors and assigns of Seller and Purchaser.  Subject to the provisions of Section 18 of this Contract, upon

any assignment of this Contract by Purchaser, and that assignee's express assumption of Purchaser's obligations under this Contract the term "Purchaser" shall mean and refer to the assignee only and, except as expressly provided in this Contract, the assignor Purchaser shall be released from any further obligation under this Contract, unless and until (i) Purchaser resumes its status as contract purchaser under the terms of such assignment, or (ii) the assignment otherwise becomes null and void pursuant to its terms; in either such event Purchaser shall resume its status as the sole Purchaser, assignment notwithstanding.

22.    **RULE AGAINST PERPETUITIES.**    Solely for purposes of avoiding the rule against perpetuities, and not to modify any provision of this Contract, Closing shall take place no later than twenty one (21) years from the Contract Effective Date.

23.    **FORCE MAJEURE.**    If either party hereto shall be delayed, hindered, adversely affected or prevented from the performance of any act required hereunder, by reason of labor disputes of any kind, inability to procure materials or unusual delay in deliveries, delays or actions caused by government authority, government refusal to issue any necessary permits, delays caused by utility service providers, war, acts of terrorism, civil commotion or other casualty, damage caused by fire, earthquake, flood, hurricane or severe weather, disruptions resulting from a health crisis, such as an epidemic or pandemic, any form of act of God, or any other events of a similar nature not the fault of the party delayed in performing work or doing acts required under the terms of this Contract, whether or not the underlying event is foreseeable at the time of execution of this Contract, then performance of such act shall be excused for the period of the delay, and thereafter the period for the performance of any such act shall be extended for the lesser of (i) a period equivalent to the period of such delay, or (ii) twenty-four (24) months.

Beginning with the expiration of the extension period set forth above, if the required performance remains unperformed or assignment remains unavailable, either party may either waive the foregoing in writing, or either party may at its option either continue to wait for the performance or declare this Contract null and void and in such event the Deposit shall be returned to Purchaser within ten (10) days and there shall be no further liability on the part of either party to the other.

24.    **EFFECTIVE DATE.**    This Contract shall become effective on the date last signed by Seller and Purchaser; provided that Purchaser's signature is only valid upon execution of the Contract by a Senior Vice President and two other officers of the Purchaser ("**Effective Date**").

The parties have signed, sealed and delivered this Contract as of the dates written below each signature.

**[SIGNATURES BEGIN ON FOLLOWING PAGE]**

**SELLER:**

ZACHAIR LTD., a Maryland corporation

By: _____
Name: Dr. Nabil J. Asterbadi
Title: President
Date: _____

**PURCHASER:**

NVR, INC., a Virginia corporation

By: _____
Name: Brett Hetrick
Title: Senior Vice President, Operations
Date: _____10/3/2022_____

By: _____
Name: Ryan Borleis
Title: Vice President/Regional Manager
Date: _____10/3/2022_____

By: _____
Name: Patrick Donahue
Title: Vice President, Regional Land Operations
Date: _____10/3/2022_____

By: _____
Name: Matthew McHale
Title: Vice President/Division Manager
Date: _____10/3/2022_____

**ESCROW AGENT:**

WHITEFORD, TAYLOR & PRESTON, LLP

By: _____
Name: _____
Title: _____
Date: _____

## PROPERTY DESCRIPTION

Parcel I - containing 285.101 acres of land, more or less. Saving and excepting property conveyed by Deed recorded in Liber 3562, Folio 941. Tax Account No. 05-0328708 - 4401 Steed Road.

Parcel II - containing 16.180 acres of land, more or less. Tax Account No. 05-0327833 - Piscataway Road

Parcel B - containing 64.153 acres of land, more or less. Saving and excepting therefrom all that portion of the within property that lies in the land now known as Piscataway Road. Tax Account No. 05-0360651 - 10651 Piscataway Road

Parcel C - containing 58.0204 acres of land, more or less. Tax Account No. 09-0865121 - Piscataway Road

All Four (4) Parcels lying and being in the Piscataway District of Prince George's County, Maryland. Said Four (4) Parcels being described in the Deed recorded in Liber 10110, folio 106 as follows:

### Parcel I

Being part of the land conveyed by Arthur C. Hyde, unmarried to Hyde Field, Incorporated by deed dated September 4, 1941 and recorded in Liber 620 at folio 276 among the Land Records of Prince George's County, Maryland and being more particularly described as follows:

BEGINNING for the same at an iron pipe set at a point where the Northwesterly right of way line of 40 foot wide Piscataway Road (Maryland State Route No. 223) intersects the 2nd or North 58°37' West 219-1/5 perch line of the 145 3/4 acre tract described as Tract 2 in Liber 620 at folio 276, thence leaving Piscataway Road and running with part of said 2nd line.

1. North 61°42'20" West 3575.76 feet to a corner fence post found at the end thereof, said corner fence post also being the end of the 2nd line of the 82 1/4 acre tract described in a Deed from Gussie B. Sansbury, Widow to Hency C. Padgett et ux. dated July 14, 1939 and recorded in Liber 532 at folio 275, thence running with the 3rd line of Tract 2 as described in Liber 620 at folio 276, as now surveyed,

2. North 45°40'00" East 1143.18 feet to an iron pipe set at the end thereof, thence running with the 4th line of Tract 2 as described in Liber 620 at folio 276 and also running with part of the 5th line of Tract 1 as described therein

3. North 47°40'00" East 2359.87 feet to an iron pipe set at a point where said 5th line is intersected by the Southwesterly right of way line of 50 foot wide Steed Road as shown on

Prince George's County R/W Plat No. 398, passing through the centerline of a 18 inch diameter cedar tree found at 2345.17 feet on line, said pipe set being opposite Centerline Station 32+26:95 and distant South 29°18'37" West 25.00 feet measured radially therefrom, thence running with the Southwesterly right of way line of 50 foot wide Steed Road per R/W Plat Nos. 398 and 397 by a curve to the left whose radius and central angle are 1457.40 feet and 08°38'24" respectively, whose long chord is

4. South 65°00'35" East 219.56 feet for an arc distance of 219.77 feet to a concrete monument found at a point of tangency opposite Centerline State 30+10.95. thence running with the Southwesterly right of way line of 50 foot wide Steed Road as per R/W Plat Nos. 397 and 396, the following four courses and distances:

5. South 69°19'47" East 624.07 feet to a point of curve, thence running by a curve to the right whose radius and central angle are 1407.40 feet and 10°36'50" respectively, whose long chord is

6. South 64°01'22" East 260.34 feet for an arc distance of 260.71 feet to a point of tangency, thence running

7. South 58°57' East 1849.03 feet to an iron pipe set at a point of curve opposite Centerline Station 2+73.29, thence running by a curve to the right whose radius and central angle are 1248.24 feet and 09°11'40" respectively, whose long chord is

8. South 54°07'07" East 200.09 feet for an arc distance of 200.31 feet to a point in the Northwesterly right of way line of Piscataway Road, as said Road was widened by virtue of Maryland State Roads Commission R/W Plat No. 33848, thence running with the said side of Piscataway Road, as widened by R/W Plat 33848, the following four courses and distances:

9. South 40°45'10" West 5.62 feet to an iron pipe set, thence running

10. South 04°17'51" East 40.31 feet to an iron pipe set, thence running

11. South 41°42'27" West 114.00 feet to an iron pipe set, thence running

12. South 20°54'03" West 53.49 feet to an iron pipe set in the Northwesterly right of way line of 40 foot wide Piscataway Road, as said Road is now being used, thence running with the Northwesterly right of way line of Piscataway Road (40 feet wide) as now being used, the following eight courses and distances:

13. South 41°32'53" West 769.87 feet to a point, thence running

14. South 40°55'14" West 455.15 feet to a point, thence running

15. South 41°23'14" West 321.88 feet to a point, thence running

16. South 41°38'13" West 136.33 feet to a point, thence running

17. South 41°18'21" West 408.52 feet to a point, thence running

18. South 40°52'31" West 309.66 feet to a point, thence running

19. South 41°15'00" West 433.06 feet to a point, thence running

20. South 41°24'18" West 838.32 feet to the beginning, containing 285.101 acres, more or less.

(Tax Account No. 05-0328708 - 4401 Steed Road)

## PARCEL II

Being part of the land conveyed as Parcel No. 2 in a Deed from Helen R. Houser, et al, to Nora C. Thorne dated February 25, 1948 and recorded in Liber 1016 at folio 413 among the Land Records of Prince George's County, Maryland and being more particularly described as follows:

BEGINNING for the same at an iron pipe set at a point where the Northwesterly side of 40 foot wide Piscataway Road (Maryland State Route No. 223) intersects the 6th or South 55°15' East 1581 foot line of the 16.52 acre tract conveyed as Parcel No. 2 in Liber 1016 at folio 413, thence running with the Northwesterly side of 40 foot wide Piscataway Road, parallel to and 20 feet from the existing centerline thereof

1. South 41°23'53" West 483.82 feet to an iron pipe set at a point where said right of way line intersects the 2nd line of said 16.52 acre tract, thence leaving Piscataway Road and running with part of said 2nd line

2. North 54°55'00" West 375.35 feet to an iron pipe set, thence running with the 3rd, 4th and 5th lines of the 16.52 acre tract conveyed as Parcel No. 2 in Liber 1016 at folio 413, the following three courses and distances:

3. South 35°05'00" West 100.00 feet to an iron pipe set, thence running

4. North 55°15'00" West 1120.00 feet to an iron pipe set, thence running

5. North 35°05'00" East 403.05 feet to an iron pipe set in the 2nd or North 58°37' West 219-1/5 perch line of the 145 3/4 acre tract conveyed as Tract 2 in a Deed to Arthur C. Hyde dated December 19, 1940 and recorded in Liber 609 at folio 42, thence running reversely with part of said 2nd line

6. South 61°42'20" East 1559.48 feet to the beginning, containing 16.180 acres of land more or less.

(Tax Account No. 05-0327833 - Piscataway Road)

Parcel B

BEING all of the land conveyed by Henry C. Padgett et ux. to Henry Cecil Padgett, Jr. et ux. by Deed dated November 14, 1955 and recorded in Liber 1929 at folio 146 and intended to be all of the land conveyed by Henry C. Padgett, Jr. personal representative of the estate of Henry C. Padgett To Henry C. Padgett, Jr. and Robert H. Padgett by Deed dated September 5, 1985 and recorded in Liber 6189 at folio 286 among the Land Records of Prince George's County, Maryland; both tracts being more particularly described as one tract as follows:

BEGINNING for the same at an iron pipe set in the North Westerly right of way line of 40 foot wide Piscataway Road at the end of the 1st line of a 16.18 acre tract conveyed by Arthur C. Hyde to W. A. Albright Investments, Inc. by Deed dated November 13, 1985 and recorded in Liber 6215 at folio 538, thence running with Piscataway Road (1) South 41°19'43" West 619.11' to a pipe set at the beginning point of the 82.25 acre tract described in Liber 6189 at folio 286, thence leaving Piscataway Road and running reversely with the 6th, 5th, 4th and 3rd lines of said 82.25 acre tract, the following four courses and distances: (2) North 50°59'08" West 682.45' to a pipe set, thence running (3) North 63°38'20' West 2335.56' to a fence post at an angle point in an existing fence, thence running (4) North 27°42'10" West 653.40' to a flint stone found, then running (5) North 46°42'27" East 696.48' to an iron pipe found at the end of the 1st line of the 285.101 acre tract conveyed as Parcel 1 in Liber 6215 at folio 538, thence running reversely with part of said 1st line (6) South 61°42'20" East 2016.38' to a pipe found at the end of the 5th line of the 16.180 acre tract conveyed as Parcel 2 in Liber 6215 at folio 538, thence running reversely with the 5th, 4th, 3rd and 2nd lines of said 16.180' acre tract, the following four courses and distances: (7) South 35°03'00" West 403.05' to a pipe found, thence running (8) South 55°15'00" East 1120.00" to a pipe found, thence running (9) North 35°05'00' East 100.00' to an iron pipe found, thence running (10) South 54°55'00" East 375.35' to the beginning.

Contaning 64.153 acres of land more or less. Saving and excepting therefrom however, all that portion of the within property that lies in the land now known as Piscataway Road.

(Tax Account No. 05-0360651 - 10651 Piscataway Road)

DocuSign Envelope ID: BFC624C4-57F4-42D9-A96C-3C82E2AEE27A

Parcel C

Being part of the 59.673 acre tract described as Parcel No. 2 in a Deed dated January 25, 1965 from Griffith S. Oursler et ux. to Clinton Manor, Inc. and duly recorded in Liber 3093 at folio 94 among the Land Records of Prince George's County, Maryland; and being more particularly described as follows:

Beginning for the same at an iron pipe set on the Northerly side of Piscataway Road (MD Route 223) at a point where the Northerly right of way line of Piscataway Road (80 feet wide) intersects the 9th line of Parcel No. 2, Liber 3098 at folio 94, thence running with Piscataway Road per right of way Plat No. 33848, the following two courses and distances: (1) South 55°33'25" west 519.37' to a pipe set at an angle point opposite base line station No. 141+10.602 and distant 40' therefrom, thence running (2) South 55°14'09" West 105.51' to a pipe set at a flare connection leading to Steed. Road (50' wide), thence running with said flare connection (3) North 80°40'25" West 44.55' to a pipe set in the Westerly right of way line of 50 foot wide Steed Road, thence running with said side of Steed Road, the following three courses and distances: (4) South 53°19'34" West 4.41' to a pipe set, thence running by a curve to the left whose radius and central angle are 1298.24' and 09°09'46" respectively, whose long chord is (5) North 40°36'17" West 207.39' for an arc distance of 207.61' to a pipe set at a point of tangency, thence running (6) North 45°11'15" West 1715.96' to a pipe set opposite centerline station No. 19+89.25 as per Prince George's County R/W Plat #397, thence leaving Steed Road and running with the 6th line of Parcel No. 2 as per Liber 3098 at Plat 94 (7) North 42'06'20" East 551.58' to a pipe set at the end thereof, thence running with the 7th line of said Parcel No. 2 (8) North 12'23'40" West 900.30' to a "PK" nail set in a fence post at the end of said 7th line, thence running with part of the 8th line of Parcel No. 2 as per Liber 3098 at folio 94 (9) North 80°22'20" East 381.10' to a pipe set at the end of the 5th or North 64°19'28" West 278.52 foot line of the 1,298 acre tract conveyed to Potomac Electric Power Company by Deed dated March 25, 1965 and recorded in Liber 3122 at folio 122, the following two courses and distances: (10) South 50°46'51" East 278.54' to a pipe set and (11) South 61°17'31" East 242.47' to a pipe set in the 9th line of Parcel No. 2 as per Liber 3098 at plat 94, distant 372.11' from the beginning of said 9th line, thence running with part of the 9th line of Parcel No. 2 of Liber 3098 at folio 94, (12) South 24°12'40" East 2277.55' to the beginning of the land now conveyed. Containing 58.0204 acres of land, more or less.

Subject to the Right of Way Agreement between Barry B. Early, et ux. and Potomac Electric Power Company in Liber 1293 at folio 2550

And subject to the "Limit of Denial of Vehicular Access" as shown on state roads commission R/W Plat No. 33848.

(Tax Account No. 09-0865121 - Piscataway Road)

Exhibit B
Permits

| Permit | Identification Number | Expiration |
|---|---|---|
| PG County Haul Road Permit | 12963-2009-00 | 9/24/2022 |
| FCC Radio Station License | WRMI580 | 4/14/2031 |
| MDE License to Surface Mine | 21-SL-0725 | 12/31/2022 |
| MDE Surface Mine Permit | 91-SP-0385 | 3/31/2026 |
| MAA Airport Operating License | #135 | 9/30/2022 |
| MDE Stormwater Pollution Prevention Plan, General Discharge Permit 12SW | 12SR3455 | |
| MDE General Discharge Permit for Stormwater Associated with Industrial Activity | 12SR3455 | |

Exhibit C
Disclosure Schedule

All matters appearing of record in any of the following cases filed in the Prince George's County Circuit Court:

CAL97-20084

CAL04-16402

CAL09-29788

CAL09-31386

CAL09-32017

CAL13-02398

CAL13-09817

CAL13-23483

CAL13-23484

CAL13-24972

CAL14-07971

CAL18-42893

Exhibit D
Purchaser's Certificate of Insurance

**ACORD** | **CERTIFICATE OF LIABILITY INSURANCE** | DATE (MM/DD/YYYY): 12/23/2021

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must have ADDITIONAL INSURED provisions or be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | | | CONTACT NAME: | | |
|---|---|---|---|---|---|
| Marsh USA Inc. 1717 Arch Street Philadelphia, PA 19103-2797 | | | PHONE (A/C, No, Ext): | | FAX (A/C, No): |
| | | | E-MAIL ADDRESS: | | |
| | | | **INSURER(S) AFFORDING COVERAGE** | | NAIC # |
| CN101288850-NVR-GAWUX-22-23 | | | INSURER A : Liberty Mutual Fire Insurance Company | | 23035 |
| INSURED | | | INSURER B : Liberty Insurance Corporation | | 42404 |
| NVR, Inc. 11700 Plaza America Drive, Suite 500 Reston, VA 20190-4792 | | | INSURER C : Allied World Assurance Company (U.S.) Inc. | | 19489 |
| | | | INSURER D : | | |
| | | | INSURER E : | | |
| | | | INSURER F : | | |

**COVERAGES** | **CERTIFICATE NUMBER:** CLE-006229948-10 | **REVISION NUMBER:** 4

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | X COMMERCIAL GENERAL LIABILITY | | | EB2-631-510577-012 "GL - PREMISES" | 01/01/2022 | 01/01/2023 | EACH OCCURRENCE | $ 1,000,000 |
| | CLAIMS-MADE X OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 100,000 |
| | X $500,000 SIR | | | | | | MED EXP (Any one person) | $ 5,000 |
| | X $1,000,000 SIR NY ONLY | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | POLICY X PRO-JECT LOC | | | | | | PRODUCTS - COMP/OP AGG | $ |
| | OTHER: | | | | | | | $ |
| A | AUTOMOBILE LIABILITY | | | AS2-631-510577-042 | 01/01/2022 | 01/01/2023 | COMBINED SINGLE LIMIT (Ea accident) | $ 2,000,000 |
| | X ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | OWNED AUTOS ONLY SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | HIRED AUTOS ONLY NON-OWNED AUTOS ONLY | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| C | X UMBRELLA LIAB X OCCUR | | | 03062342 | 01/01/2022 | 01/01/2023 | EACH OCCURRENCE | $ 10,000,000 |
| | EXCESS LIAB CLAIMS-MADE | | | | | | AGGREGATE | $ 10,000,000 |
| | DED RETENTION $ | | | | | | | $ |
| B | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY Y/N ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? N (Mandatory in NH) If yes, describe under DESCRIPTION OF OPERATIONS below | | N/A | WA7-63D-510577-032 | 01/01/2022 | 01/01/2023 | X PER STATUTE OTH-ER | |
| | | | | | | | E.L. EACH ACCIDENT | $ 1,000,000 |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 1,000,000 |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ 1,000,000 |
| A | Products Liability Retention $1,000,000 | | | EB2-631-510577-022 Products/Comp Ops | 01/01/2022 | 01/01/2023 | Occurrence | $ 1,000,000 |
| | | | | | | | Aggregate | $ 2,000,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
Evidence of coverage.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| NVR, Inc. 11700 Plaza America Drive, Ste 500 Reston, VA 20190 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. |
| | AUTHORIZED REPRESENTATIVE *Marsh USA Inc.* |

© 1988-2016 ACORD CORPORATION. All rights reserved.

ACORD 25 (2016/03) | The ACORD name and logo are registered marks of ACORD

36

DocuSign Envelope ID: BFC624C4-57F4-42D9-A96C-3C82E2AEE27A

**NVR SETTLEMENT SERVICES, INC.**
3701 Pender Drive
Fairfax, VA 22030

**REPORT OF TITLE**

**ISSUED TO:** NVR Land Department (WMS)
*22000360041/Hyde Field*

**TITLE VESTED IN: Zachair, Ltd., a Maryland corporation**

Being part of the same property as conveyed by Nelson Deckelbaum and Lawrence H. Fischer, as Substituted Trustees, to Zachair, Ltd., by virtue of a Trustees' Deed dated March 10, 1995, and recorded April 28, 1995 among the Land Records of Prince George's County, Maryland in Liber 10119, Folio 106.

**LEGAL DESCRIPTION**:

**Tax ID # 05-0328708**
ALL those pieces or parcels of land situate, lying and being in the Piscataway District of Prince George's County, Maryland described in two (2) parcels as follows:

BEING  PART OF THE LAND CONVEYED BY Arthur C. Hyde, unmarried to Hyde Field, Incorporated by deed dated September 4, 1941, and recorded in Liber 620 at folio 276 among the Land records of Prince George's County, Maryland and being more particularly described as follows:

BEGINNING for the same at an iron pipe set at a point where the Northwesterly right of way line of 40 foot wide Piscataway Road (Maryland State Route No. 223) intersects the 2nd or North 58° 37'West 219-1/5 perch line of the 145 ¾ acre Tract described as Tract 2 in Liber 620 at folio 276, thence leaving Piscataway Road and running with part of said 2nd line.

North 61°42'20"West 3575.76 feet to a corner fence post found at the end thereof, said corner fence post also being the end of the 2nd line of the 82 ¼ acre Tract described in a Deed from Gussie B. Sansbury, Widow to Henry C. Padgett et ux dated July 14, 1939 and recorded in Liber 532 at folio 275, thence running with the 3rd line of Tract 2 as described in Liber 620 at folio 276, as now surveyed.

North 45°40'00" East 1143.18 feet to an iron pipe set at the end thereof, thence running with the 4th line of Tract 2 as described in Liber 620 at folio 276 and also running with part of the 5th line of Tract 1 as described therein.

North 47°40'00" East 2359.67 feet to an iron pipe set at a point where said 5th line is intersected by the Southwesterly right of way line of 50 foot wide Steed Road as shown on Prince George's County R/W Plat No. 398, passing through the centerline of a 18 inch diameter cedar tree found at 2345.17 feet on line, said pipe set being opposite Centerline Station 32+26:95 and distant South 29°18'37" West 25.00 feet measured radially therefrom.

Thence Running with the Southwesterly right of way line of 50 foot wide Steed road per R/W Plat Nos. 398 and 397 by a curve to the left whose radius and central angle are 1457.40 feet and 08°38'24" respectively, whose long chord is South 65°00'35" East 219.56 feet for an arc distance of 219.77 feet to a concrete monument found at a point of tangency opposite Centerline State 30+10.95, thence running with the Southwesterly right of way line of 50 foot wide Steed Road as per R/W Plat Nos. 397 and 396, the following four courses and distances:

South 69°19'47" East 624.07 feet to a point of curve, thence Running by a curve to the right whose radius and central angle are 1407.40 feet and 10°36'50" respectively, whose long chord is South 64°01'22" East 260.34 feet for an arc distance of 260.71 feet to a point of tangency, thence running South 58°57" East 1849.03 feet to an iron pipe set at a point of curve opposite Centerline Station 2+73.29, thence

Running by a curve to the right whose radius and central angle are 1248.24 feet and 09°11'40" respectively, whose long chord is South 54°07'07" East 200.09 feet for an arc distance of 200.31 feet to a point in the Northwesterly right of way line of Piscataway Road, as said Road was widened by virtue of Maryland State Roads Commission R/W Plat No. 33848, thence running with the said side of Piscataway Road, as widened by R/W Plat 33848, the following four courses and distances:
South 40°45'10" West 5.62 feet to an iron pipe set, thence running
South 04°17'51" East 40.31 feet to an iron pipe set, thence running
South 41°42'27" West 114.00 feet to an iron pipe set, thence running
South 20°54'03" West 53.49 feet to an iron pipe set in the Northwesterly right of way line of 40 feet wide Piscataway Road, as said Road is now being used, thence running with the Northwesterly right of way line of Piscataway Road (40 feet wide) as now being used, the following eight courses and distances:

South 41°32'53" West 769.87 feet to a point, thence running
South 40°55'14" West 455.15 feet to a point, thence running
South 41°23'14" West 321.88 feet to a point, thence running
South 41°38'13" West 136.33 feet to a point, thence running
South 41°18'21" West 408.52 feet to a point, thence running
South 40°52'31" West 309.66 feet to a point, thence running
South 41°15'00" West 433.06 feet to a point, thence running
South 41°24'18" West 838.03 feet to the beginning.
Recited as containing 285.101 acres, more or less.

**Tax ID # 05-0327833**
Being part of the land conveyed as Parcel No. 2 in a Deed from Helen R. Houser, et al, to Nora C. Thorne dated February 25, 1948, and recorded in Liber 1016 at folio 413 among the Land Records of Prince George's County, Maryland and being more particularly described as follows:

BEGINNING for the same at an iron pipe set at a point where the Northwesterly side of 40 foot wide Piscataway Road (Maryland Route No. 223) intersects the 6th or South 55°15' East 1581 foot line of the 16.52 acre tract conveyed as Parcel No. 2 in Liber 1016 at folio 413, thence running with the Northwesterly side of 40 foot wide Piscataway Road, parallel to and 20 feet from the existing centerline thereof South 41°23'53" West 483.82 feet to an iron pipe set at a point where said right of way line intersects the 2nd line of said 16.52 acre tract, thence leaving Piscataway Road and running with part of said 2nd line North 54°55'00" West 375.35 feet to an iron pipe set, thence running with the 3rd, 4th and 5th lines of the 16.52 acre tract conveyed as Parcel No. 2 in Liber 1016 at folio 413, the following three courses and distances:

South 35°05'00" West 100.00 feet to an iron pipe set, thence running
North 55°15'00" West 1120.00 feet to an iron pipe set, thence running
North 35°05'00" East 403.05 feet to an iron pipe set in the 2nd or North 58° 37' West 219-1/5 perch line of the 145 ¾ acre tract conveyed as Tract 2 in a Deed to Arthur C. Hyde dated December 19, 1940, and recorded in Liber 609 at folio 42, thence running reversely with part of said 2nd line
South 61°42'20" East 1559.48 feet to the beginning
Recited as containing 16.180 acres of land more or less.

**Tax ID # 05-0360651**
BEING all of the land conveyed by Henry C. Padgett et ux to Henry Cecil Padgett, Jr. et ux by Deed dated November 14, 1955 and recorded in Liber 1929 at folio 146 and intended to be all of the land conveyed by Henry C. Padgett, Jr. Personal Representative of the Estate of Henry C. Padgett to Henry C. Padgett, Jr. and Robert H. Padgett by Deed dated September 5, 1985 and recorded in Liber 6189 at folio 286 among the Land records of Prince George's County, Maryland; both Tracts being more particularly described as one Tract as follows:
BEGINNING for the same at an iron pipe set in the Northwesterly right of way line of 40 foot wide Piscataway Road at the end of the 1st line of a 6.18 acre tract conveyed by Arthur C. Hyde to W.A. Albright Investments, Inc., by Deed dated November 13, 1985 and recorded in Liber 6215 at folio 538, thence running with Piscataway Road South 41°19'43" West 619.11' to a pipe set at the beginning point of the 82.25 acre Tract described in Liber 6189 at folio 286, thence leaving Piscataway Road and running reversely with the 6th, 5th, 4th and 3rd lines of said 82.25 acre Tract, the following four courses and distances:
North 50°59'08" West 682.45' to a pipe set, thence running
North 63°38'20" West 2335.56' to a fence post at an angle point in an existing fence, thence running
North 27°42'10" West 653.40' to a flint stone found, then running
North 46°42'27" East 696.48' to an iron pipe found at the end of the 1st line of the 285.101 acre Tract conveyed as Parcel 1 in Liber 6215 at folio 538, thence running reversely with part of said 1st line
South 61°42' 20" East 2016.38' to a pipe found at the end of the 5th line of the 16.180 acre Tract conveyed as Parcel 2 in Liber 6215 at folio 538, thence running reversely with the 5th, 4th, 3rd and 2nd lines of said 16.180 acre tract, the following four courses and distances:
South 35°03'00" West 403.05' to a pipe found, thence running
South 55°15'00" East 1120.00' to a pipe found, thence running
North 35°05'00" East 100.00' to an iron pipe found, thence running
South 54°55'00" East 375.35' to the beginning.
Recited as containing 64.153 acres of land more or less.

Saving and Excepting therefrom however, all that portion of the within property that lies in the land now known as Piscataway Road.

**Tax ID # 09-0865121**
BEING part of the 59.673 acre Tract described as Parcel No. 2 in a Deed dated January 25, 1965 from Griffith S. Oursler et ux to Clinton Manor, Inc., and duly recorded in Liber 3093 at folio 94 among the Land Records of Prince George's County, Maryland; and being more particularly described as follows:

BEGINNING for the same at an iron pipe set on the Northerly side of Piscataway Road (MD Route 223) at a point where the Northerly right of way line of Piscataway Road (80 feet wide) intersects the 9th line of parcel No. 2, Liber 3098 at folio 94, thence running with Piscataway Road per right of way Plat No. 33848, the following two courses and distances:

South 55º33'25" West 519.37' to a pipe set at an angle point opposite base line Station No. 141+10.602 and distant 40' therefrom, thence running

South 55º14'09" West 105.51' to a pipe set at a flare connection leading to Steed Road (50' wide), thence running with said flare connection

North 80º40'25" West 44.55' to a pipe set in the Westerly right of way line of 50 foot wide Steed Road, thence running with said side of Steed Road, the following three courses and distances:

South 53º19'34" West 4.41' to a pipe set, thence running by a curve to the left whose radius and central angle are 1298.24' and 09º09'46" respectively, whose long chord is

North 40º36'17" West 207.39' for an arc distance of 207.61' to a pipe set at a point of tangency, thence running

North 45º11'15" West 1715.96' to a pipe set opposite centerline Station No. 19+89.25 as per Prince George's County R/W Plat #397, thence leaving Steed Road and running with the 6th line of Parcel No. 2 as per Liber 3098 at Plat 94

North 42º06'20" East 551.58' to a pipe set at the end thereof, thence running with the 7th line of said Parcel No. 2

North 12º23'40" West 900.30' to a "PK" nail set in a fence post at the end of said 7th line, thence running with part of the 8th line of Parcel No. 2 as per Liber 3098 at folio 94

North 80º22'20" East 381.10' to a pipe set at the end of the 5th or North 64º19'28" West 278.52 foot line of the 1.298 acre tract conveyed to Potomac Electric Power Company by Deed dated March 25, 1965 and recorded in Liber 3122 at folio 122, the following two courses and distances:

South 50º46'51" East 278.54' to a pipe set and

South 61º17'31" East 242.47' to a pipe set in the 9th line of Parcel No. 2 as per Liber 3098 at plat 94, distant 372.11' from the beginning of said 9th line, thence running with part of the 9th line of Parcel No. 2 of Liber 3098 at folio 94,

South 24º12'40" East 2277.55' to the beginning of the land now conveyed.

Recited as containing 58.0204 acres of land more or less.

Subject to the Right of Way Agreement between Harry B. Early et ux and Potomac Electric Power Company in Liber 1293 at folio 255.

And Subject to the "Limit of Denial of Vehicular Access" as shown on State Roads Commission R/W Plat No. 33848.

**TAX INFORMATION:**

County and Township Taxes are based on a calendar year 1/1 to 12/31. School Taxes are based on a fiscal year 7/1 – 6/30. All taxes are delinquent if not paid by 12/31 of the year the bill is issued.

The status of taxes is unknown, please contact the seller for copies of paid receipts for the last 3 years or order tax certs to confirm taxes.

| Parent Parcel ID | Acreage/Property |
|---|---|
| 05-0328708 | 4401 Steed Road - 285.100 acres |
| 05-0327833 | 10625 Piscataway Road - 16.180 acres |
| 05-0360651 | 10651 Piscataway Rd. - 64.150 acres |
| 09-0865121 | 10051 Piscataway Road - 58.020 acres |

**MORTGAGE(S):**

UCC Financing Statement by and between Zachair, Ltd. (Debtor) and Watt IP LLC (Secured Party) and recorded May 1, 2013 among the Land Records of Prince George's County, Maryland in **Liber 34668, Folio 419**.

Deed of Trust and Security Agreement dated December 11, 2015, by and between Zachair, Ltd. and Steven E. Anderson and Terry Rawlings, Trustees, for the benefit of Sandy Spring Bank in the maximum aggregate principal amount of $2,300,000.00 and recorded December 21, 2015 among the Land Records of Prince George's County, Maryland in **Liber 37703, Folio 452.**

First Modification to Deed of Trust and Security Agreement dated March 1, 2021, by and between Zachair, Ltd. and Steven E. Anderson and Terry Rawlings, Trustees, for the benefit of Sandy Spring Bank, increasing the maximum aggregate principal amount to $2,600,000.00 and recorded October 22, 2021 among the Land Records of Prince George's County, Maryland in Book 46399, Page 551.

Deed of Appointment of Substitute Trustees dated March 11, 2021, appointing Michael D. Acton and Benjamin H. Colvard, IV, Substitute Trustees, and recorded October 22, 2021 among the Land Records of Prince George's County, Maryland in Book 46399, Page 561.

**JUDGMENTS:**
Maryland Bankruptcy Court Case # 2020bk10691 – Voluntary Chapter 11 filed January 17, 2020 – Zachair, Ltd.

**TITLE MATTERS:**
**DECLARATIONS, COVENANTS AND RESTRICTIONS:** NONE

**EASEMENTS, RIGHTS OF WAYS AND OTHER EXCEPTIONS:**
Right-of-Way Agreement dated October 28, 1950, by and between Harry B. Early and Grace E. Early and Potomac Electric Power Company and recorded among the Land Records of Prince George's County, Maryland in Liber 1293, Folio 255 and the plat attached thereto.

Right of Way/Easement per Deed dated January 5, 1958, by and between Hyde Field, Inc., and the County Commissioners for Prince George's County, Maryland and recorded among the Land Records of Prince George's County, Maryland in Liber 2197, Folio 203 and the plat attached thereto.

Right of Way/Easement per Deed dated January 22, 1958, by and between Harry B. Early and the County Commissioners for Prince George's County, Maryland and recorded among the Land Records of Prince George's County, Maryland in Liber 2197, Folio 209 and the plat attached thereto.

Right of Way/Easement Agreement per Deed dated March 25, 1965, by and between Clinton Manor, Inc., and Potomac Electric Power Company and recorded among the Land Records of Prince George's County, Maryland in Liber 3122, Folio 122 and the plat attached thereto.

Right of Way dated August 26, 1966, by and between Clinton Manor, Inc., and the Washington Suburban Sanitary Commission and recorded among the Land Records of Prince George's County, Maryland in Liber 3378, Folio 466.

Right of Way/Easement as stated in Deed dated November 3, 1967, by and between Clinton Manor, Inc., and The State Roads Commission of Maryland for a fee simple strip of land (.302) conveyed to State of Maryland Roads Commission and recorded among the Land Records of Prince George's County, Maryland in Liber 3550, Folio 114.

Right of Way/Easement as stated in Deed dated September 25, 1967, by and between Hyde Field, Inc., and The State Roads Commission of Maryland for a fee simple strip of land (3,584 sq. ft.) conveyed to State of Maryland Roads Commission and recorded among the Land Records of Prince George's County, Maryland in Liber 3562, Folio 941.

Right of Entry Agreement dated February 17, 1989, by and between Washington Executive Airport Assoc. Ltd. Partnership and the State of Maryland Department of Natural Resources Water Resources Administration Annapolis Maryland and recorded among the Land Records of Prince George's County, Maryland in Liber 7590, Folio 48.

Right of Entry Agreement dated July 19, 1995, by and between Zachair, Ltd. and the Department of the Environment and recorded among the Land Records of Prince George's County, Maryland in Liber 10795, Folio 331.

Right of Way dated September 29, 2005, by and between Zachair, Ltd., and the Washington Suburban Sanitary Commission and recorded among the Land Records of Prince George's County, Maryland in Liber 23163, Folio 563.

Right of Entry Agreement dated August 1, 2008, by and between Zachair, Ltd. and the Maryland Department of the Environment and recorded among the Land Records of Prince George's County, Maryland in Liber 34009, Folio 376.

Rights of upper and lower riparian owners in and to the free and unobstructed flow of water extending through the land without diminution, and riparian or water rights, claims, or title to water whether or not shown by the public records.

Property is subject to the right of the public to use of so much of the property that lies within the beds of Piscataway Road (Maryland Route No. 233) and Steed Road.

**PLATS:** NONE

DocuSign Envelope ID: BFC624C4-57F4-42D9-A96C-3C82E2AEE27A

NVR - Business Use Only

**EFFECTIVE DATE**: 06/26/2022

This report is being issued for the sole benefit of the party indicated above for informational purposes only and is not intended to be a commitment to insure nor is it intended to be a policy of title insurance, nor is it to be relied upon by any other party. This report is not transferable or assignable without the express written permission of NVR SETTLEMENT SERVICES, INC. The total amount of liability assumed hereunder is not to exceed the total amount of $100.00. Matters affecting the above real estate, which do not appear among the land records, are not covered by this report.