### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF MARYLAND
### (Greenbelt Division)

| | | |
|---|---|---|
| *In re:* | ) | |
| | ) | Case No. 20-10691-TJC |
| ZACHAIR, LTD., | ) | |
| | ) | Chapter 11 |
| Reorganized Debtor. | ) | |
| | ) | |
| LAWRENCE A. KATZ, Plan Administrator | ) | |
| for the Bankruptcy Estate of Zachair, Ltd., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DR. NABIL J. ASTERBADI | ) | Adv. Proc. No. 23-_____ |
| 2726 Chain Bridge Road, N.W. | ) | |
| Washington, D.C. 20016-3404 | ) | |
| | ) | |
| And | ) | |
| | ) | |
| MAUREEN ASTERBADI | ) | |
| 2726 Chain Bridge Road, N.W. | ) | |
| Washington, D.C. 20016-3404 | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT (I) TO RECOVER SHAREHOLDER LOANS, (II) FOR BREACH OF FIDUCIARY DUTY, AND (III) FOR UNJUST ENRICHMENT

Plaintiff Lawrence A. Katz ("**Plaintiff**" or "**Plan Administrator**"), formerly the Chapter 11 Trustee and now the plan administrator under the confirmed chapter 11 plan of Zachair, Ltd. (the "**Debtor**"), files this Complaint against Dr. Nabil J. Asterbadi ("**Dr. Asterbadi**") and Maureen Asterbadi ("**Mrs. Asterbadi**" and together with Dr. Asterbadi, the "**Defendants**") and in support hereof states as follows:

**Parties**

1.      Plaintiff is the Plan Administrator appointed by the United States Bankruptcy Court for the District of Maryland (the "Bankruptcy Court") pursuant to its *Order Confirming Debtor's Second Amended Plan of Reorganization and Finally Approving Sale of Property Free and Clear of Liens, Claims, Encumbrances and Other Interests*, entered on November 15, 2022 [Docket No. 422] (the "**Confirmation Order**").

2.      Dr. Nabil Asterbadi is a resident of the District of Columbia.  Dr. Asterbadi is and at all times relevant to this Complaint has been a Director, President, and Secretary of the Debtor.  Dr. Asterbadi is the 100% owner of the Debtor along with his wife, Mrs. Asterbadi, as tenants by the entirety.  Dr. Asterbadi previously worked as an obstetrician/ gynecologist, but is retired from active practice.

3.      Maureen Asterbadi is a resident of the District of Columbia.  Mrs. Asterbadi is and at all times relevant to this Complaint has been a Director and Vice President of the Debtor.  Mrs. Asterbadi is the 100% owner of the Debtor along with her husband, Dr. Asterbadi, as tenants by the entirety.

4.      The Debtor is a sub-chapter S corporation organized and existing under the laws of the State of Maryland.  During all times relevant to this Complaint, the Debtor's principal place of business was located in Prince George's County, Maryland.

**Jurisdiction and Venue**

5.      This Court has jurisdiction pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(c).

6.      Venue is proper under 28 U.S.C. §§ 1408 and 1409.

- 2 -

<u>**Facts**</u>

**A. The Bankruptcy Case**

7.        On January 17, 2020 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code commencing the Debtor's chapter 11 case, captioned *In re Zachair, Ltd.*, Case No. 20-10691 (the "**Bankruptcy Case**").  The Debtor continued in possession of its property and the management of its business as a debtor-in-possession, pursuant to sections 1107 and 1108 of the Bankruptcy Code until the Court appointed a chapter 11 trustee by order entered on November 10, 2022 [Docket No. 420].  At all times prior to the appointment of a chapter 11 trustee, Dr. Asterbadi was designated to perform the duties imposed on the Debtor by the Bankruptcy Code.

**B. The Debtor**

8.        The Debtor was incorporated on January 6, 1994.  The Debtor is owned by the Defendants as tenants by the entirety.  The Debtor's Articles of Incorporation appointed three directors of the Debtor: Dr. Asterbadi, Mrs. Asterbadi, and Kathy Lane.  The Defendants have served as directors of the Debtor at all times since the Debtor's incorporation.  Upon information and belief, Kathy Lane was a former employee of Dr. Asterbadi's medical practice and has not had any involvement with the Debtor for many years.  Her current whereabouts are unknown to the Plan Administrator.

9.        The Defendants executed a *Resolution of the Board of Directors of Zachair, Ltd.* dated January 13, 2020, pursuant to which the Defendants reduced the number of directors of the Debtor from three directors to two, and appointed themselves as the Debtor's sole directors. Since that date, the Debtor has had no officers, directors or management other than the Defendants, and at all times relevant to this Complaint remained under the sole and absolute control of the Defendants.

10.    In addition to the above-referenced resolution, also on January 13, 2020, the Defendants executed a second resolution authorizing the Debtor to file a voluntary chapter 11 petition.  The second resolution authorized Dr. Asterbadi to act as the Debtor's authorized representative in the Bankruptcy Case, and reserved the right of the board of directors to designate additional representatives to take all action that they may deem necessary or proper in connection with the Bankruptcy Case.

11.    In addition to having full and complete authority over the Debtor, both Dr. Asterbadi and Mrs. Asterbadi were kept informed of developments in the case by virtue of receiving service of all material pleadings and notices filed in the case.

### C. The Property

12.    The Debtor was the owner of approximately 423 acres of land located in Prince George's County, Maryland (the "**Property**") further described as follows:

"Parcel 90": consisting of approximately 58.02 acres, Tax Map 0115, Grid 00D4, Parcel 0090, Subdivision 0000, Tax ID Number: 09-0865121;

"Parcel 21": consisting of approximately 16.18 acres, Tax Map 0124, Grid 00C3, Parcel 0021, Subdivision 0000, Tax ID Number: 05-0327833;

"Parcel 20": consisting of approximately 64.15 acres, Tax Map 0124, Grid 00C3, Parcel 0020, Subdivision 0000, Tax ID Number: 05-0360651; and

"Parcel 45": consisting of approximately 285.10 acres, Tax Map 0124, Grid 00C2, Parcel 0045, Subdivision 0000, Tax ID Number: 05-0328708.

13.    The Debtor operated a portion of the Property as an airfield known as Hyde Field (the "**Airfield**").  The Airfield generated revenue for the Debtor through the rental of aircraft hangar and parking spaces.  Operation of the Airfield also entitled the Debtor to reduced real estate taxes.

14.    In addition to the Airfield, portions of the Property previously were mined for sand and gravel pursuant to a mining permit issued by the Maryland Department of the

Environment ("**MDE**").  Upon the cessation of mining activities, the Debtor earned revenue through contracts with various companies that allowed such companies to bring ostensibly clean fill dirt on to the Property (the "**Surcharge Fill Operation**").  Initially, the Surcharge Fill Operation served the purpose of reclamation of the sand and gravel mines.  However, the Debtor, under the control of the Defendants, continued the Surcharge Fill Operation far beyond the reclamation needs.  The Surcharge Fill Operation was a source of substantial revenue.  The Surcharge Fill Operation continued until March 2020, at which time the Debtor was instructed to cease such operations by MDE.  The Debtor's most recent contract, which was with Metro Earthworks (a division of Shirley Contracting Co.) provided for monthly payments to the Debtor in the amount of $62,000.

**D.  The Defendants' Devaluation of the Property Through the Surcharge Fill Operation.**

15.     At the commencement of the Surcharge Fill Operation, the Debtor's acceptance of fill dirt from third parties provided the Debtor with both additional revenue and a means of filling the cavities created by the prior mining operation in order to reclaim and restore the Property as required by MDE.  The Surcharge Fill Operation was required to be conducted in compliance with a surcharge plan approved by MDE to ensure that the quantity and quality of the fill dirt remained within acceptable limits.  However, through mismanagement and sheer greed, the Defendants ignored the surcharge plan and other MDE requirements and caused the Surcharge Fill Operation to diminish the value of the Property.

16.     First, the Defendants' actions with respect to the Surcharge Fill Operation diminished the value of the Property because  the Defendants permitted fill dirt to be placed on the Property that lacked the quality to support future residential development.  The fill dirt placed on the Property was to be free from organic compounds, construction debris, and other

contaminants.  Defendants failed to implement reasonable or sufficient safeguards to ensure that

the dirt brought to the Property met these specifications.  The Debtor employed a "monitor" to

ostensibly inspect incoming fill material.  However, the individual that the Debtor hired had no

prior experience with respect to fill dirt, no training or education with respect to her job, and had

serious medical conditions that impeded her from making a close inspection of incoming fill dirt.

Her only qualifications were that she lived on the Property and was inexpensive to hire.  The

Defendants failed to take reasonable steps to ensure that the fill dirt placed on the Property met

the required quality standards.  Tests conducted in late 2017 by PD Hyde Field, LLC ("**PD

Hyde**"), and subsequent tests conducted by contractors engaged by the Debtor during the

Bankruptcy Case, identified organic compounds, construction debris, and other prohibited

materials in surcharge fill areas that would have been avoided by proper management and

oversight by the Defendants.

17.     Although PD Hyde notified the Debtor and Dr. Asterbadi of its concerns in early

2018 the Defendants permitted the Surcharge Fill Operation to continue without any additional

safeguards for more than two additional years, when the operation was shut down at the direction

of MDE.

18.     Second, the Defendants' actions with respect to the Surcharge Fill Operation

diminished the value of the Property because the dirt deposited on the Property was "loose fill."

The Defendants did not require that the fill be compacted as it was brought on to the Property.

Active compaction (along with strict adherence to the need for clean fill) would have improved

the prospect for construction of residential units on the filled areas of the Property.  Instead of

actively compacting the fill dirt, the Defendants relied on "passive compaction", such that the

weight of the newly-added dirt would compact the dirt below over time as a result of gravity and

other passive physical forces.  Passive compaction is not viewed as creating a reliable foundation for construction, particularly with respect to construction of residential units.  There was a reason for the Defendants' failure to insist on active compaction.  Active compaction is an expensive process   and would have diminished the revenues received by the Defendants.

19.     Third, the Defendants' desire to receive fees for the Surcharge Fill Operation resulted in the Debtor accepting a quantity of fill dirt wildly in excess of the amount permitted by MDE or that was consistent with the development of the Property for residential uses, thereby diminishing the value of the Property.  What should have been flat open property became a mountain of fill dirt.  In some locations on the Property, the depth of the fill exceeded 50 feet.  Estimate show that nearly 4 million cubic yards of excess fill were piled on the Property.  The Surcharge Fill Operations violated MDE's mining permit and, as significantly, impaired the use of the Property for what otherwise would have been its highest and best use: residential development.

20.     The Defendants knowingly permitted this massive accumulation of excess and substandard fill material to enable the Debtor to continue receiving payments from the Surcharge Fill Operation.  When the Surcharge Fill Operation finally ended, the Debtor was receiving fees totaling almost $750,000 per year.  This revenue represented the Defendants' primary source of funding for their personal expenses, including payment of their personal credit card bills, mortgage payments on their personal residence and their New Jersey beach house, taxes, luxury cars, debts to family members, liabilities to their personal creditors, insurance, personal loans, and even their housekeeper.  Many such payments, as well as cash distributions to the Defendants and their family members, were recorded as "loans to shareholder" on the Debtor's books.  The pretense that the Defendants would eventually repay the "loans" permitted them to

- 7 -

avoid paying income tax on such distributions.  *See* Amended Statement of Financial Affairs, Attachment to SOFA Question 13 at Docket No. 29.  The continuation of the Surcharge Fill Operation was necessary to support the Defendants' lavish lifestyle.  The Defendants thus ignored all warnings and instructions to cease accepting additional fill material.

21.     The Defendants' acceptance of millions of cubic yards of excess and unsuitable fill material devastated the value of the Property.  As discussed *infra*, the Prince George's County Department of Permitting, Inspections and Enforcement has declared that the areas of the Property containing the excess fill are now unsuitable for residential development and can only be used for less profitable commercial use.  This restriction has reduced the number of possible residential lots on the Property by approximately 2/3 and thus drastically lowered the value of the Property.  At the commencement of the Bankruptcy Case, the Property was valued at $19-22.3 million.  The Debtor received offers for the Property in amounts exceeding $16-17 million. Largely as a result of the excessive and unsuitable fill dirt placed on the Property at the direction of the Defendants, the Property was sold for $7.5 million.

**E.  The PD Hyde Lawsuit**

22.     On March 22, 2013, the Debtor entered into a contract to sell the Property to WV/B Palisades Development LLC ("**Palisades Development**") with the intent that the Property be developed into residential units as well as retail and commercial space.  Palisades Development subsequently assigned its rights and obligations under the contract to an affiliate, PD Hyde Field LLC ("**PD Hyde**").

23.     On November 15, 2018, PD Hyde filed a complaint (the "**PD Hyde Complaint**") against the Debtor and Dr. Asterbadi in the Circuit Court for Prince George's County, Maryland (the "**Circuit Court**") alleging breaches of the purchase contract arising from the condition of the Property.  Specifically, PD Hyde alleged that the Debtor allowed the Surcharge Fill

Operation to continue to be conducted on the Property in violation of the contract, and that the operations were also conducted in violation of MDE permits and approved surcharge plans, resulting in substantial excess and unsuitable fill being on the Property.  PD Hyde asserted that these breaches prevented it from closing on the Property by the outside closing date under the contract.  In September 2018, when PD Hyde failed to close as required, the Debtor notified PD Hyde that it was in default.  The PD Hyde Complaint followed on November 15, 2018.  As amended, the PD Hyde Complaint asserted nine counts against the Debtor and Dr. Asterbadi, including claims for declaratory judgment, injunctive relief, specific performance, breaches of contract, fraud in the inducement, and for establishment and enforcement of a vendee's lien.

24.     On March 14, 2019, PD Hyde recorded a Memorandum of Lis Pendens (the "**Lis Pendens**") in the land records of Prince George's County, Maryland.  As a result of the Lis Pendens, the Debtor was unable to sell or refinance the Property outside of bankruptcy.  Further, because the Defendants had expended the vast proceeds of the Surcharge Fill Operation on their personal expenses, the Debtor lacked sufficient resources to fund the Circuit Court litigation with PD Hyde.  The combination of the lack of resources to contest PD Hyde's claims and the inability to sell or refinance the Property caused the Debtor to file the Bankruptcy Case in order to stay the PD Hyde litigation and to facilitate a sale of the Property.

25.     On September 8, 2021, PD Hyde, its affiliate Watt Companies, Inc., the Debtor, and Dr. Asterbadi entered into a settlement agreement whereby, among other terms, PD Hyde has an allowed $3.2 million unsecured claim in the Bankruptcy Case and PD Hyde released its claims against Dr. Asterbadi.

F.  **Sale of the Property During the Bankruptcy Case and Dr. Asterbadi's Obstruction of the Debtor's Sale Efforts**

26.     The primary purpose of the Bankruptcy Case was the sale of the Debtor's most significant asset, the Property.  With the assistance of its professionals and advisors, including real estate broker Fraser Forbes Company LLC ("**Fraser Forbes**"), the Debtor actively marketed the Property.  Following an extensive marketing process, on June 11, 2021, the Debtor entered into a sale contract for the Property (the "**JP Contract**") with JP Land Holdings LLC ("**JP Land Holdings**"), subject to potential overbid and satisfactory completion of a tests and studies period, during which JP Land Holdings could perform further diligence regarding the Property.  The sale price under the JP Contract was $16 million, subject to certain specified adjustments, which amount would have been sufficient to pay all of the Debtor's creditors in full.  The JP Contract was premised upon JP Land Holdings' assumption that it could develop between 1,278 to 1,550 residential units on the Property.  *See* Docket No. 215.

27.     The Debtor and JP Land Holdings entered into three successive amendments to the JP Contract extending JP Land Holdings' due diligence/study period through January 14, 2022.  At the conclusion of the due diligence/study period, after further assessment of the Property and its development potential, JP Land Holdings ultimately decided to not proceed with the purchase of the Property.  The JP Contract was terminated on January 14, 2022.

28.     A major factor precipitating the termination of the JP Contract was a November 10, 2021, meeting between JP Land Holdings and representatives of Prince George's County Maryland, including the Department of Permitting, Inspections and Enforcement ("**DPIE**").  The DPIE representatives informed JP Land Holdings that DPIE would not grant permits for the construction of residential units on portions of the Property where the Surcharge Fill Operation had occurred, unless the excess fill dirt was removed.  Removal of the millions of cubic yards of

excess fill dirt was not financially feasible.  DPIE's position therefore meant that JP Land Holdings could not achieve its expected unit density.  JP Land Holdings estimated that the inability to construct residential units on surcharge fill areas would result in a 2/3 reduction in its planned unit density on the Property.  JP Land Holdings' $16 million proposed purchase price in the JP Contract was no longer economically viable.

29.    Following the termination of the JP Contract, the Debtor's real estate broker, Fraser Forbes, continued to market the Property to other potential buyers.  Following the Debtor's receipt of indications of interest and letters of intent from several potential buyers, the Debtor determined, in consultation with its advisors, that the best and highest offer was from NVR, Inc. ("**NVR**").  The Debtor and NVR thereafter executed a sales contract with NVR (the "**NVR Contract**") on June 1, 2022.  Like the JP Contract, the NVR Contract was subject to overbid and NVR's satisfactory completion of a tests and studies period before it became binding on NVR.  The purchase price under the NVR Contract consisted of an initial payment of $10 million, plus additional payments for each unit developed in excess of 500 units and a portion of profits from any non-residential units developed on the Property, subject to a minimum total purchase price of $12 million and a maximum total purchase price of $17 million.

30.    In conjunction with the marketing of the Property as well as JP Land Holdings' efforts during the tests and studies period under JP Contract, the Debtor procured various reports and analyses, including geotechnical reports, engineering analyses, environmental studies, and preliminary design work.  The Debtor also engaged land use counsel and a consultant to assist discussions with representatives of Prince George's County.  Following the termination of the JP Contract, the Debtor and its advisers met with county and state representatives to gain a better understanding of the likelihood of obtaining development approvals with respect to the Property.

The Debtor shared all such information with NVR in an effort to facilitate NVR's satisfactory exit from the tests and studies period.

31.    On October 5, 2022, NVR informed the Debtor that it would not exit the tests and studies period and that the NVR Contract therefore would terminate by its terms.  Instead, NVR submitted an alternative $7.5 million, all-cash bid with closing to occur before December 31, 2022, provided the Debtor met certain closing conditions which included the closure of the Airfield.  The proposed $7.5 million purchase price was not sufficient to pay all creditors in full, and therefore would not result in any funds being available for the Defendants as the 100% equity owners of the Debtor.

32.    Pursuant to the order of the Bankruptcy Court authorizing the Debtor to enter into the NVR Contract [Docket No. 343], the Debtor was to hold an auction of the Property if it received more than one qualified offer in addition to the NVR Contract.  The Debtor scheduled such auction to be held on October 7, 2022.  In addition to NVR's $7.5 million all-cash offer, the Debtor received a $6.5 million bid from another potential buyer.  The Debtor accordingly scheduled an auction to be held on October 7, 2022.  Prior to the start of the auction, the competing buyer informed the Debtor that it did not intend to increase its bid.  Nevertheless, the Debtor opened the auction in case the competing buyer reconsidered its position or another potential bidder appeared.  Before the Debtor could seek additional offers, Dr. Asterbadi, against the advice of Debtor's counsel, abruptly and unilaterally announced "that the debtor is canceling the auction."  When asked the basis for cancelling the auction, Dr. Asterbadi refused to respond. *See* Transcript of October 7, 2022 Proceeding at 11:14-12:5, attached as Exhibit B to Docket No. 383.

33.     Following Dr. Asterbadi's purported cancellation of the auction, on October 14, 2022, NVR filed an Emergency Motion seeking to have NVR declared the Prevailing Bidder at the auction of the Property.  *See* Docket No. 383.  On October 19, 2022, the Bankruptcy Court held a hearing on NVR's emergency motion.  During the hearing, the Court considered a proposed stipulation between the Debtor and Dr. Asterbadi proposing a new sale process whereby the sale of the Property would be delayed to permit the further marketing of the Property in the hopes of achieving a higher sale price.  The stipulation also proposed that Dr. Asterbadi, in his capacity as owner of the Debtor, would retain two valuable luxury automobiles, and that the Defendants would receive any future distributions paid to the Debtor by purchasers of the Property pursuant to promissory notes or profit sharing arrangements and would receive a release of all claims and causes of action of the bankruptcy estate against them, even if creditors were not paid in full.  The Bankruptcy Court concluded that Dr. Asterbadi offered no credible reason for not accepting the NVR bid other than to improve the Defendants' personal financial condition.  At the conclusion of the hearing, the Bankruptcy Court granted NVR's emergency motion and named NVR as the prevailing bidder of the auction.  *See* Transcript of Ruling at October 19, 2022 Hearing at 3:12-13 [Docket No. 407].

34.     At the October 19, 2022 hearing, Dr. Asterbadi also testified that in the event that the Bankruptcy Court approved the sale to NVR, he would only participate in such sale if his request for more time to market the Property was approved.  This statement essentially was a threat that, as the responsible person acting for the Debtor, Dr. Asterbadi would neither sign the necessary documents, nor take any other actions required to consummate the sale of the Property to NVR.  Following the presentation of evidence, the Bankruptcy Court invited parties in interest to file motions in response to Dr. Asterbadi's threat.  On October 27, 2022, the Office of the

United States Trustee filed a motion seeking the appointment of a chapter 11 trustee (the "**Trustee Motion**") on the grounds that Dr. Asterbadi, among other things, mismanaged the Debtor, acted for his own benefit to the detriment of other parties in interest, and likely would refuse to consummate the sale to NVR.  *See* Docket No. 394.

35.    Despite the Bankruptcy Court's ruling at the October 19, 2022 hearing, Dr. Asterbadi continued to attempt to interfere with the Debtor's sale of the Property to NVR in order to further the Defendants' own personal interests.  On October 28, 2022, Dewberry Consultants, LLC, an engineering firm retained by the Debtor in connection with the Property, filed a response to the Trustee Motion stating that on October 27, 2022, Dr. Asterbadi contacted two Dewberry employees and urged Dewberry to object to the sale of the Property to NVR. Among other things, Dr. Asterbadi alleged to the Dewberry employees that (i) an auction for the property had occurred (which it had not because Dr. Asterbadi purported to cancel the auction), (ii) Dewberry's unsecured claim would be wiped out if Dewberry did not object to the sale before November 1, 2022 (which it would not), (iii) Dr. Asterbadi had just placed a bid for the Property (which he had not), and (iv) Dr. Asterbadi's plan paid all unsecured creditors while the other plan wiped them out (which was wildly speculative with respect to Dr. Asterbadi's proposal and incorrect with respect to the treatment of creditors under the Debtor's filed Chapter 11 Plan).  *See* Docket No. 396.  Rather than winning Dewberry's support, Dr. Asterbadi's actions caused Dewberry to respond in favor of the Trustee Motion and  Dr. Asterbadi's removal as the designated representative of the Debtor.

36.    On November 2, 2022, the Bankruptcy Court held a hearing to consider the Trustee Motion as well as the confirmation of the Debtor's second amended chapter 11 plan [Docket No. 365] (the "**Chapter 11 Plan**").  The United States Trustee, the Debtor, and several

other parties in interest informed the Court that Dr. Asterbadi had withdrawn his opposition to the sale to NVR and that the parties had agreed to the appointment of a chapter 11 trustee to take control of the Debtor.  The parties also agreed to amend the proposed Confirmation Order to provide that, among other terms, the chapter 11 trustee would become the plan administrator charged with implementing the Chapter 11 Plan, including consummation of the sale to NVR, upon the occurrence of the Plan's effective date.  The Bankruptcy Court accordingly granted the Trustee Motion and confirmed the Chapter 11 Plan on a consensual basis.

37.      On November 3, 2022, the Bankruptcy Court entered an order granting the Trustee Motion.  *See* Docket No. 412.  On November 10, 2022, the Bankruptcy Court entered an order appointing the Plaintiff as the chapter 11 trustee.  *See* Docket No. 420.  On November 15, 2022, the Bankruptcy Court entered the Confirmation Order.  *See* Docket No. 422.  Upon the occurrence of the Effective Date of the Chapter 11 Plan on December 14, 2022, the Plaintiff became the Plan Administrator under the terms of the Chapter 11 Plan.

### Count I
### (Loans to Shareholders)

38.      The allegations of Paragraph 1 through 37 are incorporated in this Count as if fully set forth herein.

39.      The Debtor, under the control of the Defendants, historically paid personal expenses of the Defendants and distributed cash to the Defendants in transfers characterized as "owner draws."  Among other personal payments, the Debtor has paid personal credit card bills, life insurance premiums, loan payments on loans to the Defendants from third-parties, mortgage payments, payments to the Defendants' housekeeper, car payments, legal fees, taxes, and cash payments to the Defendants and their family members (together, the "**Shareholder Loans**").

- 15 -

The Defendants continued to cause the Debtor to pay amounts constituting such Shareholder Loans as late as January 14, 2020, just three days prior to the Petition Date.

40.      Examples of the personal payments comprising the Shareholder Loans along with payment descriptions and corresponding general ledger draw account designations can be found in the Debtor's Attachment to SOFA Question 13 in its Amended Statement of Financial Affairs [Docket No. 29] (the "**Amended SOFA**").  Dr. Asterbadi signed the Amended Statement of Financial Affairs under penalty of perjury and certified that the information contained therein was true and correct.

41.      The Debtor recorded such payments and distributions in individual and joint owner draw accounts on the Debtor's general ledger, and booked such amounts as "loans to shareholder" on the Debtor's tax returns.  The Debtor's most recent federal tax return filed for the year 2021 reflects that the aggregate Shareholder Loans at the end of 2021 totaled $831,809.

42.      In addition to enjoying the benefit of the funds comprising the Shareholder Loans, the Defendants benefitted from the characterization of the transactions as loans, which allowed the Defendants to avoid the payment of income tax.

43.      The Defendants failed to make any provision for the repayment of the Shareholder Loans.  By failing to repay the Shareholder Loans, the Defendants breached their fiduciary duties of care and loyalty to the Debtor.  The Defendants' misconduct harmed creditors by misdirecting corporate resources to or for the benefit of the Defendants and their family members.

44.      The Defendants are indebted to the Debtor for the Shareholder Loans.

45.    The Shareholder Loans remain outstanding in an amount not less than $831,809 and are due and payable to the Debtor.  The Defendants have failed to repay the Shareholder Loans.

**46.**    The Debtor requests entry of judgment against the Defendants in an amount not less than $831,809, plus reasonable attorneys' fees, the costs of this action, post-judgment interest at the legal rate, and for such other and further relief as the Court deems necessary and appropriate.

**Count II**
**Breach of Fiduciary Duty For Failure to Preserve Assets of the Estate**
**(Avoidance Actions)**

47.    The allegations of Paragraphs 1 through 46 are incorporated in this Count as if fully set forth herein.

48.    Among the assets of the Debtor's estate were numerous claims and causes of action for the avoidance and recovery of transfers of property of the estate occurring prior to the Petition Date ("**Avoidance Actions**").

49.    The scope of potential Avoidance Actions was identified in part in the  Amended SOFA.

50.    The Avoidance Actions include payment of owner draws; the Defendants' personal credit card bills; mortgages on the Defendants' personal residence; mortgages on the multi-million dollar New Jersey beach house titled in the name of Mrs. Asterbadi; legal fees owed personally by Dr. Asterbadi; salary of the Defendants' housekeeper; the Defendants' personal tax obligations; premiums on life insurance policies owned by the Defendants; automobile finance charges on cars owned by the Defendants and their family members;

repayment of personal loans owed to relatives; and other personal expenses of the Defendants and their family members (collectively, the "**Insider Transfers**").

51. The Debtor was not indebted to the payees or beneficiaries of the Insider Transfers and received no benefit on account of such payments.

52. The amount of the Insider Transfers made during the two years prior to the Petition Date exceed $1.4 million. In addition to the two-year payments, Insider Transfers were made during the third year prior to the Petition Date. Since the applicable Bankruptcy Rules do not require disclosure of transfers made more than two years prior to the Petition Date, the three-year transfers have not been computed. However, the three-year Insider Transfers may be avoidable under section 544 of the Bankruptcy Code. The amount of the three-year Insider Transfers remains to be determined.

53. The Insider Transfers made to and for the benefit of the Defendants and their family members prevented the Debtor from paying its indebtedness as such became due in the usual course of business. For example, the Debtor was indebted to Sandy Spring Bank in the principal amount of $2.3 million pursuant to Deed of Trust Note dated December 11, 2015 (the "**SSB Note**"). *See* Proof of Claim No. 21. The maturity date (the "**Maturity Date**") under the SSB Note was 36 months following the date of the SSB Note (*i.e.*, December 11, 2018). On the Maturity Date, after giving effect to the Insider Transfers, the Debtor was unable to timely repay the SSB Note. As an accommodation to the Debtor, Sandy Spring Bank agreed to extend the Maturity Date to June 19, 2019 (the "**Extended Maturity Date**"). *See* Modification and Extension Agreement dated April 3, 2019, Proof of Claim No. 21 at page 17. At the direction of the Defendants, the Debtor continued to make Insider Transfers to and for the benefit of the Defendants and their family members even after Sandy Spring Bank agreed to the Extended

Maturity Date.  The Insider Transfers prevented the Debtor from repaying the SSB Note on the

Extended Maturity Date.  Indeed, it was not until the Property was sold in December 2022 that

any portion of the principal owed to Sandy Spring Bank under the SSB Note was repaid.

54.    Under section 546 of the Bankruptcy Code, the Avoidance Actions had to be filed

within two years following the Petition Date (*i.e.*, on or before January 16, 2022).

55.    During the course of the Bankruptcy Case, the Debtor hoped to sell its Property

for a sufficient sum to pay all creditors in full with interest.  Had a sale that provided for payment

of creditors in full been consummated, and had the creditors been paid in full, prosecution of the

Avoidance Actions would have been unnecessary.

56.    The JP Contract provided for the possible sale of the Debtor's real property for

$16 million (subject to possible adjustments).  *See* Docket No. 215.  Had closing occurred under

the JP Contract, the Debtor's projections showed that creditors would have been paid in full.

57.    The JP Contract was subject to various contingencies, including a contingency for

a due diligence/study period.  Initially, the due diligence/study period was scheduled to expire on

the 75th day following the execution of the JP Contract (*i.e.*, August 16, 2021).

58.    When JP Land Holdings became aware that it could not complete its due

diligence by the scheduled end of the due diligence/study period, it requested, and the Debtor

agreed to, a series of extensions.

59.    Pursuant to the First Amendment to Real Estate Sales Contract, the Debtor agreed

to extend the due diligence/study period through November 15, 2021.  *See* Docket Nos. 242 and

252.

60.    On November 10, 2021, as part of its ongoing due diligence effort, the JP Land

Holdings met with representatives of Prince George's County Maryland, including DPIE.  The

DPIE representatives informed JP Land Holdings that DPIE would not grant permits for construction of residential units on portions of the Debtor's property that had excess fill dirt, unless the fill dirt were removed.  DPIE's position meant that JP Land Holdings could not achieve the density that was necessary to make the JP contract economically viable.  JP Land Holdings estimated that DPIE's position would result in a 2/3 reduction in density.  DPIE's position created significant doubts about JP Land Holding's willingness and ability to proceed under the JP Contract.

61.    On November 11, 2021, counsel for the Debtor, Dr. Asterbadi, and the Defendants' personal counsel met via Microsoft Teams to discuss the situation resulting from DPIE's position.  During such meeting, it was made clear to Dr. Asterbadi and the Defendants' attorney that DPIE's position raised significant concerns regarding the viability of the JP Contract.

62.    The questionable viability of the JP Contract in turn  raised serious concerns that the JP Contract would be terminated and that creditors would not be paid in full.

63.    In an effort to salvage the JP Contract, the Debtor entered into a Second Amendment to Real Estate Sales Contract dated November 14, 2021 [Docket No 276],which extended the Study Period to December 15, 2021.

64.    JP Land Holdings was unable to overcome its concerns that it would not be able to obtain the requisite density necessary to make  the JP Contract economically viable.

65.    Nevertheless, JP Land Holdings was willing to discuss a modified agreement under which it might acquire the Property.  To facilitate discussions regarding a possible revised contract, the Debtor and JP Land Holdings entered into the Third Amendment to Real Estate

Sales Contract dated December 14, 2021 [Docket No. 299], which  extended the Study Period to January 14, 2022.

66.     During the week of December 13, 2021, counsel for the Debtor initiated several discussions with Dr. Asterbadi regarding the impending two-year statute of limitations with respect to the Avoidance Actions under section 546.  Counsel urged Dr. Asterbadi to obtain tolling agreements from the potential Avoidance Action defendants.  Counsel explained to Dr. Asterbadi that such tolling agreements would protect the Avoidance Actions and permit the Debtor (and Defendants) from incurring the cost of litigation while the sale process was ongoing.  Such conversations included a lengthy in person meeting with Dr. Asterbadi on December 16, 2021.  During such meeting, Dr. Asterbadi vehemently rejected the advice of Debtor's counsel and refused even to ask his family members to sign tolling agreements.  He also declined to authorize counsel to prepare, much less file, complaints before the statute of limitations ran.

67.     Given Dr. Asterbadi's unequivocal rejection of the advice provided by the Debtor's counsel, Debtor's counsel determined that preparation of a fallback position was necessary and recommended to Dr. Asterbadi that counsel be authorized to file a notice of abandonment of the Avoidance Actions so that the Court, creditors and parties in interest would have notice of the Debtor's intention not to prosecute the Avoidance Actions.  Counsel for the Debtor held a lengthy meeting with Dr. Asterbadi and the Defendants' counsel on December 20, 2021 by video conference to discuss the situation.  During such meeting, Dr. Asterbadi was advised of the fiduciary duties of the Debtor's officers and directors and of the legal and factual grounds supporting the Avoidance Actions.  The meeting was followed by several phone calls during the next two days among Debtor's counsel, Dr. Asterbadi, and the Defendants' counsel.  On December 22, 2021, Dr. Asterbadi authorized the filing of the Notice of Abandonment of

Avoidance Actions, and such notice was filed that day [Docket No. 301] (the "**Notice of Abandonment**").

68.     Objections to the Notice of Abandonment were due within 14 days after the date of the notice, *i.e.*, January 5, 2022.  No objections were received.

69.     On January 10, 2022, JP Land Holdings submitted a term sheet outlining the terms on which it would be willing to proceed with the purchase of the Property.  Among other changes, the January 10 term sheet provided for a revised base purchase price in the amount of $9.5 million.  Such a purchase price would not have resulted in full payment of creditor claims, or any distribution to the Defendants as the equity owners of the Debtor.  JP Land Holdings also proposed, in addition to the base purchase price, additional incremental payments contingent on future regulatory approvals and development opportunities.  On January 14, 2022, JP Land Holdings formally terminated the JP Contract.

70.     The Defendants, as officers and directors of the Debtor, owed fiduciary duties to the bankruptcy estate.  Their duties include duties of care and loyalty with respect to the preservation of assets of the estate.  Until at least the effective date of the Notice of Abandonment, the Avoidance Actions were assets of the estate.

71.     Prior to the abandonment of the Avoidance Actions, the Defendants knew or should have known that there was a reasonable likelihood that the Property would not be sold for an amount sufficient to pay creditors in full and, as a consequence, preservation of the Avoidance Actions would be necessary to fulfill the Debtor's obligations to its creditors.

72.     By failing to seek tolling agreements, and by refusing to authorize Debtor's counsel to prepare or file complaints to recover transfers that were Avoidance Actions, the

Defendants breached their fiduciary duties of care and loyalty owed to the Debtor and its bankruptcy estate.

73.     The Defendants' misconduct harmed creditors by depriving the Debtor and its bankruptcy estate of resources for the payment of creditor claims.

74.     The Defendants and their family members were direct recipients of certain transfers, and beneficiaries with respect to other transfers.  As recipients and beneficiaries of the transfers, the Defendants had a stark conflict of interest.  By failing to protect and preserve claims and causes of action against themselves and their family members, the Defendants breached their fiduciary duty of loyalty to the Debtor and its bankruptcy estate.

75.     As a result of their above-referenced breaches of fiduciary duties, the Debtor is entitled to judgment against the Defendants, jointly and severally, in an amount not less than $1.4 million.

### Count III
### Breach of Fiduciary Duty For Failure to Preserve Assets of the Estate
### (Property)

76.     The allegations of Paragraphs 1 through 75 are incorporated in this Count as if fully set forth herein.

77.     The Defendants, as officers and directors of the Debtor, owed fiduciary duties to the estate.  Their duties included preservation of assets of the estate, including the Property, and duties of loyalty and care owed to the Debtor.

78.     Notwithstanding the Defendants' duties to the Debtor, the Defendants caused millions of cubic yards of excess and unsuitable fill dirt to be placed on the Property.  The Defendants knew or should have known that the quality and quantity of the fill dirt impeded the development of the Property for residential construction and significantly diminished its value.

79.     The Defendants failed to take commercially reasonable action to ensure that the fill dirt did not contain organic compounds, construction debris, and other contaminants.

80.     The Surcharge Fill Operation was not for the Debtor's benefit.  To the contrary, it was conducted solely for the benefit of the Defendants.  The proceeds of the Surcharge Fill Operation were used to pay the personal expenses of the Defendants and their family members and were the primary source of funding for the Defendants' draws and their lavish lifestyle.

81.     The Defendants ignored all warnings and instructions to cease accepting additional fill material, notwithstanding the impact of such additional fill material on the development and value of the Property.

82.     By knowingly permitting millions of cubic yards of excess and generally unsuitable fill material to be placed on the Property for their own personal benefit, Defendants breached their fiduciary duties of care and loyalty and failed to preserve and protect the assets of the Debtor.

83.     The Defendants' breach of their fiduciary duties to the Debtor greatly diminished the value of the Property, which was the Debtor's primary asset.  DPIE declared that the areas of the Property containing the excess fill are unsuitable for residential development and can only be used for less profitable commercial use.  An estimated 2/3 of the possible residential lots originally contemplated on the Property can no longer be developed, thus drastically lowering the value of the Property.  Purchase offers for the Property dropped from approximately $16-17 million to $7.5 million in large part due to the impact of the excess and substandard-quality dirt placed on the Property at the direction of the Defendants.

84.     As a result of the Defendants' unwillingness to cease the Surcharge Fill Operation at the appropriate time and their use of the monthly Surcharge Fill Operation payments received

by the Debtor for the payment of personal expenses, the Debtor ultimately was required to file its bankruptcy petition.  The cost of the Bankruptcy Case, including professional fees and loan interest, exceeded $4 million.  But for the Defendants' breaches of fiduciary duty, these costs would not have been incurred.

85.    The Defendants are liable to the Debtor for the cost of the Bankruptcy Case and diminution of the value of the Property resulting from the Surcharge Fill Operation.

86.    As a result of their above-referenced breaches of fiduciary duties, the Debtor is entitled to judgment against the Defendants, jointly and severally, in an amount not less than $4 million.

**Count IV**
**Breach of Fiduciary Duty; Unjust Enrichment**
**(Tax Payments)**

87.    The allegations set forth in paragraphs 1 through 86 above, are incorporated herein by reference.

88.    Under Maryland law, a pass-through entity that is formed, incorporated or doing business in Maryland is required to file Pass-Through Entity Income Tax Returns reporting the entity's items of income, adjustments, gains, losses and other required information.  These items are passed through the entity to be taxed to the partners, shareholders, members or beneficiaries (collectively referred to as "**Members**").  Each Member is then required to file the applicable Maryland income tax return and pay any tax due on the Member's distributable or pro-rata share of the pass-through entity's items for the tax year.

89.    If a pass-through entity has a nonresident Member and any nonresident taxable income, the pass-through entity is subject to the Maryland income tax.  The pass-through entity

is taxed on the nonresident taxable income, which is the sum of the nonresident Member's distributive or pro-rata shares of the pass-through entity's income allocable to Maryland.

90.    The nonresident income tax incurred and paid to Maryland by the pass-through entity is reflected on the K-1 issued to each of the nonresident Members.  The nonresident Members are required to file nonresident tax returns in Maryland and are given a credit against their income tax obligations for amounts paid by the pass-through entity (similar to wage earners who have withholdings taken out of their paychecks).

91.    The Debtor is a Maryland corporation and did business in Maryland.  As a Subchapter S corporation, the Debtor is a pass-through entity.

92.    The Defendants are the sole shareholders of the Debtor.  They are residents of the District of Columbia, and thus are nonresidents of Maryland for purposes of income tax requirements.

93.    The Debtor in the ordinary course of its business incurred and reported nonresident income taxes on behalf of the Defendants.  During certain years, the Debtor paid the required nonresident income taxes.  During other years, the Debtor defaulted in its payment obligations.  The Comptroller of the State of Maryland is scheduled as a creditor on account of unpaid nonresident income taxes in the amount of $74,818.32.

94.    The Defendants routinely filed Maryland nonresident income tax returns asserting credits for their taxes paid by the Debtor.  The Defendants sought and obtained such credits irrespective of whether the Debtor actually paid the Maryland nonresident income tax.

95.    Although the Defendants sought and obtained tax credits from Maryland, the Defendants did not reimburse the Debtor for their nonresident taxes that the Debtor paid and/or incurred.

96.     By failing to reimburse the Debtor for the tax liabilities that it paid or incurred, the Defendants shifted their tax obligations to the Debtor and enjoyed the benefit of credits that they did not earn.

97.     The actions and omissions of the Defendants were a breach of their fiduciary duty of loyalty to the Debtor.

98.     The actions and omissions of the Defendants in obtaining tax credits generated by the Debtor's payment of their income tax liabilities conferred unjust benefits on the Defendants. The Defendants knew about and appreciated the benefits that they received.  It would be inequitable to allow the Defendants to retain the benefits.

99.     The Defendants' failure to reimburse the Debtor for personal income taxes that the Debtor paid on behalf of the Defendants harmed the Debtor's creditors by impeding the Debtor's ability to pay legitimate creditor claims.

100.     The Debtor is entitled to judgment in an amount to be determined based on the unreimbursed tax credits.

**WHEREFORE**, the Plaintiff respectfully requests that the Court enter judgment in his favor and against the Defendants as follows:

i.     On Count One, in an amount not less than $831,809 for the unpaid Shareholder loans;

ii.     On Count Two, in an amount not less than $1.4 million for breach of fiduciary duty and failure to preserve property of the bankruptcy estate with respect to the Avoidance Actions ;

iii.     On Count Three, in an amount not less than $4 million for breach of fiduciary duty and failure to preserve property of the bankruptcy estate with respect to the Property;

iv.      On Count Four, in an amount to be determined at trial based on the unreimbursed

tax credits for breach of fiduciary duty and unjust enrichment; and

v.      Granting the Plaintiff such other and further relief as the Court deems just and

proper.

Dated: January 16, 2023                    Respectfully submitted,

                                           HIRSCHLER FLEISCHER,
                                           A PROFESSIONAL CORPORATION

                                           */s/ Lawrence A. Katz*
                                           Lawrence A. Katz (Md. Fed. Bar No. 02526)

                                           */s/ Kristen E. Burgers*
                                           Kristen E. Burgers (Application for Admission *Pro
                                           Hac Vice* Pending)
                                           1676 International Drive, Suite 1350
                                           Tysons, Virginia 22102
                                           Telephone:      (703) 584-8900
                                           Facsimile:      (703) 584-8901
                                           Email: lkatz@hirschlerlaw.com
                                                       kburgers@hirschlerlaw.com

                                           *Counsel for Lawrence A. Katz, Plan Administrator*